```
 1

 2     UNITED STATES BANKRUPTCY COURT

 3     SOUTHERN DISTRICT OF NEW YORK

 4     - - - - - - - - - - - - - - - - - -x

 5     In the Matter of:

 6

 7     EXCEL MARITIME CARRIERS LTD., ET AL.,   Case No. 13-23060-rdd

 8

 9

10                 Debtors.

11

12     - - - - - - - - - - - - - - - - - -x

13

14

15     B E F O R E :

16     HON. ROBERT DRAIN

17     U.S. BANKRUPTCY JUDGE

18

19     A P P E A R A N C E S :

20     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21          Attorneys for the Debtors

22          Four Times Square

23          New York, NY 10036

24     BY:   JAY M. GOFFMAN, ESQ.

25          MARK A. MCDERMOTT, ESQ.
```

```
 1          JONATHAN FRANK, ESQ.

 2          SHANA A. ELBERG, ESQ. (TELEPHONICALLY)

 3

 4    AKIN GUMP STRAUSS HAUER & FELD LLP

 5          Attorneys for the Official Creditors' Committee

 6          One Bryant Park

 7          New York, NY 10036

 8    BY:   MICHAEL S. STAMER, ESQ.

 9          SEAN E. O'DONNELL, ESQ.

10

11    AKIN GUMP STRAUSS HAUER & FELD LLP

12          Attorneys for the Official Creditors' Committee

13          1700 Pacific Avenue

14          Suite 4100

15          Dallas, TX 75201

16    BY:   SARAH LINK SCHULTZ, ESQ.

17

18    BRACEWELL & GIULIANI

19          Attorneys for Ivory Shipping

20          225 Asylum Street

21          Suite 2600

22          Hartford, CT 06103

23    BY:   GREGORY W. NYE, ESQ.

24

25    HOLLAND & KNIGHT LLP
```

```
 1          Attorneys for Secured Lenders, Administrative

 2          Agent & Steering Committee

 3          10 St. James Avenue

 4          11th Floor

 5          Boston, MA 02116

 6     BY:   JOHN J. MONAGHAN, ESQ.

 7

 8     HOLLAND & KNIGHT, LLP

 9          Attorneys for Secured Lenders, Administrative

10          Agent & Steering Committee

11          31 West 52nd Street

12          New York, NY 10019

13     BY:   BARBRA R. PARLIN, ESQ.

14          JOVI TENEV, ESQ.

15

16     MOSES & SINGER, LLP

17          Attorneys for Christiana Trust

18          405 Lexington Avenue

19          New York, NY 10174

20     BY:   ALAN GAMZA, ESQ.

21

22     WEIL, GOTSHAL & MANGES LLP

23          Attorneys for DVB Group Merchant Bank

24          767 Fifth Avenue

25          New York, NY 10153
```

1   BY:   GABRIEL A. MORGAN, ESQ. (TELEPHONICALLY)

2

3   UNITED STATES DEPARTMENT OF JUSTICE

4        Office of the United States Trustee

5        201 Varick Street

6        Suite 1006

7        New York, NY 10014

8   BY:   RICHARD C. MORRISSEY, ESQ. (TELEPHONICALLY)

9

10   MCKOOL SMITH

11        Attorneys for Robertson Maritime Investors

12        600 Travis Street, Suite 7000

13        Houston, TX 77002

14   BY:   HUGH M. RAY, III, ESQ. (TELEPHONICALLY)

15

16   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

17        Attorneys for Oaktree Capital Management

18        1285 Avenue of the Americas

19        New York, NY 10019

20   BY:   PHILIP A. WEINTRAUB, ESQ. (TELEPHONICALLY)

21        MARGARET A. PHILLIPS, ESQ. (TELEPHONICALLY)

22

23   SEWARD & KISSEL, LLP

24        Attorneys for Seward & Kissel, LLP

25        One Battery Park Plaza

1       New York, NY 10004

2   BY:    RONALD L. COHEN, ESQ. (TELEPHONICALLY)

3          WILLIAM MUNNO, ESQ. (TELEPHONICALLY)

4

5                      **MODIFIED BENCH RULING**

6

7           I have before me a motion by the official unsecured

8   creditors' committee, which is supported by the trustee for the

9   unsecured debt, for an order terminating the debtors' exclusive

10  periods under Section 1121 of the Bankruptcy Code to file and

11  obtain confirmation of a Chapter 11 plan.

12          We are well within the debtors' initial exclusive

13  periods under the Bankruptcy Code to file and solicit vote on a

14  plan, and the debtors have filed a Chapter 11 plan and

15  disclosure statement and have a hearing on the adequacy of the

16  disclosure statement scheduled at the end of September.

17

18          So the case is clearly moving forward with a plan that

19  is also clearly supported by the debtors' largest creditor body

20  by debt.  In other words, the case is moving forward at a pace

21  that for a case of this size is rapid and, as I said, well

22  within the exclusive periods set forth by Congress in the

23  Bankruptcy Code.

24          So the debtors are not looking to extend their

25  exclusive periods, where they would have the burden to do so

1   for cause under Section 1121(d).  Instead, the committee is

2   looking to terminate the period that the debtors have to obtain

3   acceptances, in order to file its own competing plan and seek

4   to obtain acceptances of that plan.

5
        Under the Code, the committee therefore has the burden
6
    to show cause for termination. 11 U.S.C. § 1121(d)(1).  "Cause"
7
    is not defined in the statute, and most cases with regard to
8
    the exclusive periods discuss cause in a slightly different
9
    context, that is, cause to extend the exclusive periods rather
10
    than to terminate them.
11

12      I agree with the few cases that have dealt with this

13  type of situation and conclude that the burden here is a heavy

14  one, that terminating exclusivity -- particularly during the

15  initial exclusivity period is an extraordinary thing in a

16  bankruptcy case. In re Energy Conversion Devices, Inc., 474

17  B.R. 503, 508 (Bankr. E.D. Mich. 2012); In re Geriatrics

18  Nursing Home, 187 B.R. 128, 132 (D.N.J. 1995); In re Interco,

19  Inc., 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992).

20
        Usually -- and it's hard to say "usually" because
21
    there are not that many published opinions where exclusivity is
22
    terminated during the initial exclusive periods -- the periods
23
    are terminated because of some conduct by the debtor that is
24
    short of conduct that would justify the appointment of a
25
    trustee (where the statute provides that the exclusive period

1   is terminated automatically) but, still, troubling conduct, for

2   example where the debtor appears to be unable to negotiate a

3   plan because of internal conflicts, or is mismanaging the

4   bankruptcy case short of the need to replace management, or is

5   otherwise using exclusivity in a way that Congress didn't

6   contemplate when it gave debtors in possession the exclusive

7   time to propose and obtain confirmation of a plan. In re

8   Texaco, Inc., 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988).  The

9   mere fact that key players want to file a competing plan is not

10  sufficient cause to terminate a debtor's exclusive periods. In

11  re Geriatrics Nursing Home, 187 B.R. 128, 132 (D.N.J. 1995).

12        The ultimate test is left to considerable discretion

13  by the Court, and it is very fact driven. Id.  Both sides have

14  cited Judge Gerber's opinions in the Adelphia case where he

15  detailed several factors that, depending on the particular

16  context, may be relevant -- nine factors -- that is:  the size

17  and complexity to the case; the necessity for sufficient time

18  to permit the debtor to negotiate a plan of reorganization and

19  prepare adequate information; the existence of good faith

20  progress toward reorganization; the fact that the debtor is

21  paying its bills as they become due; whether the debtor has

22  demonstrated reasonable prospects for filing a viable plan;

23  whether the debtor has made progress in negotiations with its

24  creditors; the amount of time which has elapsed in the case;

25  whether the debtor is seeking an extension of exclusivity in

1    order to pressure creditors to submit to the debtor's

2    reorganization demands; and whether an unresolved contingency

3    exists. In re Adelphia Communications Corp., 352 B.R. 578, 587

4    (Bankr. S.D.N.Y. 2006), which quotes an earlier opinion in the

5    same case by Judge Gerber that was subsequently affirmed at 342

6    B.R. 122 (S.D.N.Y. 2006).

7
          Those or similar factors have been cited in other
8
     cases, including relatively recently by Judge Glenn in In re
9
     Border's Group, Inc., 460 B.R. 818 (Bankr. S.D.N.Y. 2011).
10

11        However, Judge Gerber would be the first to note that

12   the context is what is most important, and, as he stated in the

13   Adelphia case, the ultimate consideration for the Court was

14   what will best move the case forward in the best interest of

15   all parties.

16
          And given the unusual facts here that's what I've
17
     ultimately focused on.  As I think would be clear based on my
18
     recitation of where the case stands at this point, most of the
19
     factors that I have listed would argue for not terminating
20
     exclusivity.  The debtors have moved ahead with a plan.  They
21
     have the support of their largest creditor group on that plan.
22
     A disclosure statement will be considered very shortly. And
23
     this is not a case where it appears to me that the debtors'
24
     plan is a plan that's DOA or one that is obviously not in good
25
     faith, which is another way of saying it is not DOA.

1          On the other hand, it is a plan that at least is

2    premised upon a transaction that involves insiders, through the

3    Ivory Shipping transaction, obtaining a significant amount of

4    equity in either the reorganized debtor under the plan or as a

5    consequence of the plan.

6
           That fact is troubling in the context of a debtor's
7
    continuing assertion of exclusivity, first, on the most basic
8
    point, in that it's long been held that exclusivity should not
9
    be used simply to pressure a creditor to accede to the debtor's
10
    point of view on a critical issue.  See for example, In re
11
    McLean Industries, Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y.,
12
    1987),and, second, perhaps more importantly, because the
13
    Supreme Court in Bank of American National Trust and Savings
14
    Association v. 203 North LaSalle Street Partnership, 526 U.S.
15
    434 (1999), has made it pretty clear that if a plan is properly
16
    viewed as a new value plan and, therefore, confirmable only
17
    under the new value exception to the absolute priority rule
18
    (which the 203 North LaSalle court neither endorsed nor
19
    abrogated) the debtor will not be successful in even getting
20
    out of the gate with such a plan if the Court concludes that
21
    the insider "purchaser" in essence had an exclusive option to
22
    obtain the reorganized equity.
23
           It's clear from the discussion in the 203 North
24
    LaSalle case that one way to lift that cloud over such a plan
25

1   is to terminate exclusivity, Id. at 454-56.

2
        I have had a few hearings in this case already, some
3
   of which have been contested.  From the record of those
4
   hearings, it appears to me that the debtors engaged in a
5
   prolonged period of negotiations with their senior lender group
6
   prepetition.  It appears to me that those negotiations were
7
   difficult.  It appears to me that I cannot say today whether
8
   the debtors because of the difficulty of those negotiations and
9
   their own -- the exigencies of their own financial problems --
10
   were effectively precluded from negotiating with the remaining
11
   unsecured creditors during the prepetition period.
12

13        In any event, even if the debtors filed this case with

14   the full support of their senior lender group, it was clearly

15   with a plan that was not at all attractive on an objective

16   basis to the unsecured creditor group, unless the unsecured

17   creditor group accepted the valuation assumptions of the plan

18   as well as the structure of the plan.

19
        Therefore, it appears to me that while this case is on
20
   a fast track and that track is generally something that courts
21
   and Congress approve of, some facts argue for placing a limit
22
   on the exclusive periods.  Thus, there is some danger here that
23
   if I denied the committee's motion, the debtors would simply
24
   continue on their present track -- and this is an important
25
   fact -- get to confirmation sometime in October or early

1  November with a contested confirmation hearing and at least the

2  prospect of the Court not approving confirmation, at which time

3  the debtor would have very little cash on hand, and someone

4  would have to pay the bill thereafter to get to a plan that

5  would be confirmed.

6

7      The testimony at the prior hearing that I mentioned on

    cash collateral is that there would be roughly four or five

8  million dollars of cash left in the debtors at that time.  So

9  the committee has argued and the indenture trustee has argued

10  that really there is a need at this point to open up the

11  playing field because the alternatives are so bleak that either

12  they will lose a significant amount of the value in the debtors

13  by further delay of opening up their ability to file a plan,

14  or, alternatively, they will be coerced into voting for a plan

15  without any meaningful negotiations.  Those factors all argue

16  strongly for terminating exclusivity, notwithstanding the

17  strong arguments that I began with for keeping exclusivity in

18  place.

19

20      A couple of facts have come out and been confirmed on

21  the record that are in addition relevant to the resolution of

22  the problem.  First, it is clear that the restructuring support

23  agreement with the senior lenders that underpins the debtors'

24  plan, as well as the cash collateral order that is in place, do

25  not prohibit the debtors or the senior lender group from

1   negotiating a plan and considering plan proposals, including

2   proposals supported by third-party investment or by the

3   committee.   The debtors have a clear fiduciary "out," which has

4   been reaffirmed by their counsel today, and the lenders

5   recognize that "out" and recognize that there's no limitation

6   on their talking and negotiating with third parties regarding

7   alternative plans to the plan on the table.   If that had not

8   been the case, I believe the balance would have been tipped to

9   terminating exclusivity so those negotiations could take place.

10  But that's not required.

11
         On the other hand, it is clear that if exclusivity is
12
    terminated, that fact in and of itself will not trigger a
13
    default under the cash collateral order or the restructuring
14
    support agreement, either.
15

16       However, it does appear to me to be clear -- and this

17  is based upon my experience reviewing fee applications and both

18  reviewing pre-trial discovery, as well as contested plan

19  confirmation hearings, and, frankly, having done both of those

20  things before I went on the bench, that the cost, the added

21  cost, to the estate of terminating exclusivity and having a

22  prompt filing of an alternative Chapter 11 plan, which I have

23  no doubt would happen (the committee has been very upfront

24  about that) would be large here.   As things stand, there will

25  already be a significant cost to litigating confirmation of the

1  debtors' plan that's on file today. However, I think that cost

2  would increase dramatically if I terminated exclusivity and the

3  parties engaged, as I trust they would, in the pursuit of not

4  one, but two contested Chapter 11 plans.

5

6       I have reviewed the committee's proposed backstop

   agreement and the exhibits to it, including the plan summary,

7  and heard counsel for the senior lenders as well as counsel for

8  the debtors on it, and I have no doubt that there are

9  sufficient difficult issues pertaining to confirmation of a

10  plan that would be premised upon the structure in those

11  documents to warrant a significant confirmation fight on issues

12  that are not limited simply to legal determinations based on

13  agreed facts, but, instead, issues based upon feasibility and

14  projections pertaining to the reorganized debtors that would

15  emerge under the committee's plan, which, at this point, I have

16  no assurance would be the same type of reorganized debtors that

17  would emerge under the debtors' plan.

18

19       No one has given me testimony on what that additional

20  cost would be; however, again based on my own experience,

21  primarily reviewing fee applications, I believe that the

22  debtors would be in danger of having their remaining cash

23  completely eroded by such a fight:  that is, that the

24  additional cost of terminating exclusivity and having a plan

25  confirmation fight on not one but two plans could exceed five

1   million dollars.  That clearly would trigger a default under

2   the cash collateral order, and, more importantly, not be good

3   for the debtors and their business and their creditors.

4

5              Obviously, someone would bear that cost.  I can't
imagine the debtors would go out of business over it; someone,

6   the lenders or, if they were truly serious, the proposed

7   investors in the committee's plan would find some way to pick

8   up that cost, but it would interject a significant layer of

9   uncertainty over the debtors' business and not be good for the

10  business by any means.

11

12             Frankly, I believe that the parties are sufficiently

13  well informed and now have the ability to negotiate that they

14  didn't have prepetition, as a practical matter seeing the

15  obvious alternative end results -- which are either an agreed

16  plan or coming close to running out of cash before then -- and

17  thus they should be able to negotiate a plan that is clearly

18  confirmable or consensual in large measure.  Frankly, I think

19  that the money saved could go to bridge a negotiating gap, but

20  there are many other ways one could imagine negotiating a plan

21  that would have some chance of getting consensual support.

22

23             It seems to me, given the balance that Congress struck
in Section 1121, and particularly where the debtors are

24  proceeding, I believe, as Congress contemplated by promptly

25  moving ahead with their plan, that they should be given the

1   chance to try to negotiate a plan that will have broader

2   support.

3
         I appreciate that one of the objections that would be
4
    raised to the current plan is that it is not being proposed and
5
    sought in good faith under Section 1129(a)(3) of the Bankruptcy
6
    Code.  Clearly if those negotiations don't proceed, clearly if,
7
    instead, the unsecured creditors are left with only a death
8
    trap provision without those negotiations, a court might well
9
    be inclined to say that, one way or another, whether it's under
10
    the LaSalle case or Section 1129(a)(3), something is wrong at
11
    confirmation, given that exclusivity was left in place.  I
12
    think the debtors, the senior lenders, Ivory Shipping, all
13
    should understand that risk as well as other risks that I've
14
    highlighted during the course of this hearing, and they should
15
    be prepared to negotiate in light of that.
16
         At the same time, the unsecured creditors should
17
    certainly be prepared to understand the types of risks and
18
    concerns that have been articulated by the senior lenders, as
19
    well as the debtors, not just on valuation, but also on
20
    feasibility.
21

22
         It seems to me that, and maybe this is just like
23
    saying I like apple pie and milk, the parties' time is better
24
    served without going down the path of two competing plans, but,
25
    instead, in appreciating that there'll be no high fives at the

1   end of this process unless they negotiate and see if they can

2   reach an agreement that gets over the problems in the plan that

3   have been identified by the committee.

4

5           So I will not, at this time, grant the motion to

    terminate.  I have been very clear that at some point there may

6

    be a problem with this plan if, in fact, the debtors aren't

7

    able to show that there's been a fair opportunity to propose an

8

    alternative, under LaSalle.  And whether that's under LaSalle

9

    or Section 1129(a)(3), that's just -- that's going to be an

10

    issue.  So I hope that I won't ever have to ever get to that

11

    point.  So I'll ask debtors' counsel, Mr. McDermott, if you

12

    could submit an order denying the motion for the reasons stated

13

    on the record.

14

15  Dated: White Plains, NY

16  September 13, 2013              /s/Robert D. Drain

17                                 United States Bankruptcy Judge

18

19

20

21

22

23

24

25