UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
EXCEL MARITIME CARRIERS LTD., <u>et</u>                     :    Case No. 13-23060 (RDD)
<u>al.</u>,                                                  :
                                                            :
            Debtors.                                        :    (Jointly Administered)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# DISCLOSURE STATEMENT WITH RESPECT TO THE DEBTORS' <br> AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION


Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett

Counsel for Debtors and Debtors in Possession


Dated:  November 26, 2013
          New York, NY

---

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125(a).  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS OF THE PLAN WILL NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS PROPOSED DISCLOSURE STATEMENT.  THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS PROPOSED DISCLOSURE STATEMENT.**

# INTRODUCTION AND DISCLAIMER

### A.    Overview of Excel's Chapter 11 Filing and Plan Solicitation

On July 1, 2013, Excel Maritime Carriers Ltd. ("Excel"), a company incorporated under the laws of Liberia, and certain of its direct and indirect subsidiaries (collectively with Excel, the "Debtors") commenced cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Debtors submit this Disclosure Statement to certain holders of claims against the Debtors in connection with the solicitation of acceptances of the Amended Joint Chapter 11 Plan of Reorganization of Excel Maritime Carriers Ltd. and Certain of its Affiliates, dated as of November 26, 2013, a copy of which is annexed hereto as Appendix A (the "Plan").  The Plan memorializes the terms of a consensual restructuring of the Debtors as agreed among the Debtors, their secured lenders holding more than 80% of such lenders' claims, the Official Committee of Unsecured Creditors, Ivory Shipping Inc. and other key constituents.

The Debtors are soliciting acceptances from holders of two classes of claims:  (1) holders of secured obligations under Excel's senior secured syndicate credit facility dated April 14, 2008 (as amended, modified and supplemented) (the "Syndicate Credit Facility"), and (2) holders of impaired general unsecured claims against Excel, including but not limited to holders of unsecured convertible notes, swap claims, claims arising under a settlement with certain bareboat charter parties and holders of unsecured deficiency claims arising under the Syndicate Credit Facility.

### B.    Treatment Of Syndicate Credit Facility Lenders' Secured Claims

As described further below, the Debtors own and operate a fleet of "dry bulk" cargo vessels.  The dry bulk shipping industry is cyclical, with attendant volatility in charter hire rates and profitability.  Charter rates for dry bulk vessels have been in a significant down cycle since 2008, with current dry bulk freight rates as measured by the Baltic Dry Index -- a composite of time charter rates for moving dry bulk cargo along 23 shipping routes -- 56% below the long-term average over the past ten years and 87% below the highest rates achieved in May 2008.  Accordingly, the Debtors' revenues, profitability and value have been very negatively affected.  The Debtors' value is significantly below the face amount of their debt, and they are no longer able to sustain their debt service obligations.

The Debtors, with the assistance of their investment banker, estimate their total enterprise value to be between $605 million and $655 million, with a mid-point of $630 million.  However, approximately $765 million is outstanding under the Debtors' Syndicate Credit Facility, after recognition of the adequate protection payment of $6.2 million made on October 1, 2013.  Each of the Debtors is obligated on this Facility, and the Facility is secured by liens on substantially all the Debtors' assets.  Because the value of the collateral securing the Facility is less than the amount outstanding under the Facility, under the Bankruptcy Code, the claims arising under the Facility are bifurcated into (i) a secured claim equal to the Debtors' enterprise value, prior to the new money investment described below (the "Syndicate Credit Facility Secured Claim") and (ii) an unsecured deficiency claim equal to the balance of the claims under the Facility (the "Syndicate Credit Facility Deficiency Claim").  Assuming that an adequate protection payment is made on or before January 2, 2014 in accordance with the Final Cash Collateral Order and the Stipulated Cash Collateral Order (each as defined below), at the mid-point of the valuation, these two claims are equal to approximately $579 million and $180 million, respectively.

The Syndicate Credit Facility lenders' claims are secured by a lien on substantially all of the Debtors' assets, and their claims are significantly underwater.  The Syndicate Credit Facility lenders are legally entitled to recover the value of their collateral.  The Plan contemplates a restructuring of the Debtors that reduces the secured debt to a serviceable and market-based level.  Holders of approximately 82.9% of the Syndicate Credit Facility Claims have signed on to a plan term sheet, attached to the Plan as Exhibit C (the "Plan Term Sheet"), pursuant to which they agreed to support the Plan to the extent it is consistent in all material respects with the treatment of the Syndicate Credit Facility lenders' claims as described below, including by voting to accept the Plan.  Under the Plan, the Syndicate Credit Facility lenders will receive, on account of their Syndicate Credit Facility Secured Claim, a restructured debt obligation in the amount of $300 million and 83.3% of the equity in reorganized Excel, prior to the co-investment rights described below, based on the mid-point of the valuation range.  As set forth in Exhibit A to the

i

Plan, the restructured secured facility will be in the amount of $300 million, and will be repaid over a five-year period, amortized quarterly starting in year 2015 with the amount increasing each year and with the unpaid amount due at maturity and at an interest rate per annum equal to LIBOR plus 4.50% subject to such modifications and/or amendments as are satisfactory to the Debtors and each of the Consenting Parties.  The loan obligation will be secured by a first priority lien on substantially all of the assets, including vessels, of reorganized Excel and each of the reorganized Debtors who were guarantors under the pre-petition Syndicate Credit Facility.  Reorganized Excel, as borrower, will be subject to affirmative, negative and financial covenants and events of default to be determined.  The equity in Reorganized Excel distributed to the Syndicate Credit Facility lenders will be subject to dilution on account of the co-investment rights offered to holders of impaired Excel general unsecured claims, described immediately below.

**C.**        **Treatment of Impaired Excel General Unsecured Claims**

The Debtors, the Syndicate Credit Facility lenders and the Creditors' Committee extensively negotiated and ultimately agreed on the treatment of all claims against Excel.  The Creditors' Committee and certain noteholders, in their capacity as holders of impaired Excel general unsecured claims (the "Consenting Noteholders") have signed on to a term sheet agreeing to support the Plan that is consistent in all material respects with the treatment of their claims as described below and otherwise acceptable to the Creditors' Committee and the Consenting Noteholders.  By signing the Plan Term Sheet, the Consenting Noteholders have agreed to support the Plan, including by voting to accept the Plan.  Under the Plan, holders of impaired general unsecured claims against Excel will receive the following distribution on account of their claims: (i) 8.0% of the stock in reorganized Excel, subject to dilution on account of the co-investment rights offered to such holders (or 7.9% of the fully diluted stock in reorganized Excel representing 1,600,000 shares of stock in reorganized Excel), (ii) the right to purchase up to an additional 1.5% of the total outstanding equity in reorganized Excel, at an offering price equal to $16.25 per share or a total purchase price of $5 million, and (iii) the right to purchase up to an additional 1.4% of the total outstanding equity, at an offering price equal to $17.25 per share or a total purchase price of $5 million.  The price of each tranche of rights offered is based on a total post new money equity value of reorganized Excel of $330 million (with reorganized Excel having $300 million of funded indebtedness on the Effective Date).  Additionally, to the extent the first tranche of rights offered is not fully subscribed, holders of impaired Excel general unsecured claims who are Accredited Investors will be entitled to participate in a separate rights offering for an aggregate number of shares equal to the number of shares not subscribed for as part of the first tranche.

The funds from the offering, coupled with the Ivory investment described below, will be used by Excel for general working capital of the reorganized Company.  To the extent the class of impaired general unsecured claims against Excel votes in favor of the Plan, on the Effective Date of the Plan and without any further actions, the holders of the Syndicate Credit Facility Deficiency Claims shall be deemed to waive their entitlement to any distribution on account of such deficiency claims, and the other holders of impaired Excel general unsecured claims' pro rata participation in the co-investment rights shall be increased accordingly.  The Creditors' Committee recommends that general unsecured creditors vote in favor of the Plan.

**D.**        **Ivory Investment; Go-Forward Management**

Excel's management team is highly regarded in the industry, and is led by Mr. Gabriel Panayotides, who has been involved in the shipping industry since 1978.  Mr. Panayotides and entities associated with him hold stock representing approximately 47% of the voting power of the capital stock in Excel.  Ms. Ismini Panayotides, the Secretary of Excel's Board of Directors and the daughter of Mr. Panayotides, and entities associated with her, hold stock representing approximately 9% of the voting power of the capital stock in Excel.  One of the entities associated with the Panayotides family is Ivory.  Mr. Panayotides has no ownership interest in Ivory, which is owned by certain of his family members.

The Debtors' businesses will continue to be managed, as of the Effective Date, by existing management.  Mr. Gabriel Panayotides shall serve as Chief Executive Officer of Reorganized Excel.  In light of Mr. Panayotides' expertise and that of Excel's existing senior management, the Syndicate Credit Facility lenders have agreed to afford them incentives through a combination of a Management Incentive Plan (with terms acceptable to each of the Consenting Parties) and the offer to Ivory to purchase between 7.1% and up to approximately 10.1% of the stock in reorganized Excel for $25 million and up to $35 million, respectively based on the exercise of the co-investment

rights offered to holders of Excel impaired general unsecured claims.  The Ivory investment consists of a new cash investment of at least $5 million and up to $15 million (subject to the exercise of the co-investment rights offered to holders of Excel impaired general unsecured claims) and Ivory's agreement to consent to, and waive any rights in connection with, the release to reorganized Excel of $20 million in cash currently held in escrow which Ivory previously deposited to backstop an equity offering of Excel.  The Management Incentive Plan may dilute the equity to be distributed to the Syndicate Credit Facility lenders, holders of impaired Excel general unsecured claims and Ivory.  The terms of the Management Incentive Plan will be summarized in the Plan Supplement.

### E.        Pro Forma Capitalization of Reorganized Excel

The pro forma capitalization of reorganized Excel, assuming the rights offering is fully subscribed and the Class of Excel impaired general unsecured claims votes in favor of the Plan, is set forth in the chart below.

| Pro Forma Equity Ownership | | |
|---|---|---|
| | Percentage Ownership | Equity Value (in millions) |
| Syndicate Credit Facility Lenders | 82.0% | $270.7 |
| Impaired Excel General Unsecured Claims | 7.9% | $26.0 |
| Ivory | 7.1% | $23.6 |
| Co-Investment | 2.9% | $9.7 |
| Total | 100% | $330.0 |

### F.        Summary of Treatment of All Stakeholders

The chart below summarizes in greater detail the treatment of all classes of claims and interests under the Plan.

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| **Unclassified Claims** | |
| Administrative Claims (Unimpaired) | An Administrative Claim is a claim for costs and expenses of administration of the chapter 11 cases.  All Allowed Administrative Claims will be paid in full in cash on the Effective Date of the Plan, or as soon thereafter as such claim is allowed, unless the holder and the Debtors agree to different treatment.  The estimated amount below only includes restructuring expenses that the Debtors estimate will remain unpaid upon conclusion of the Debtors' chapter 11 cases, and does not include Trade Claims or any diminution claim of the Debtors' secured lenders.<br><br>**Estimated Amount:    $22.1 million**<br>**Estimated Recovery:   100%** |
| Priority Tax Claims (Unimpaired) | A Priority Tax Claim is any claim owed by the Debtors to governmental units for taxes that are entitled to priority under the Bankruptcy Code.  On the Petition Date, the Debtors obtained Bankruptcy Court authority to pay all such claims in the ordinary course.  To the extent any such claim is not so paid, then on the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Priority Tax Claim shall have its claim reinstated, which means that such holder's legal, equitable and |

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| | contractual rights with respect to its Priority Tax Claim will be left unaltered and paid in the ordinary course, unless such holder and the Debtors agree to different treatment.<br><br>**Estimated Amount:   $0.00**<br>**Estimated Recovery:  100%** |
| Intercompany Claims (Unimpaired or Impaired at the election of the Debtors) | An Intercompany Claim is a claim of a Debtor against another Debtor.  On or prior to the Effective Date, all Intercompany Claims shall either be reinstated, in full or in part, or cancelled and discharged, in full or in part.<br><br>**Estimated Recovery:  100%** |
| **Classified Claims** | |
| Class 1 – Non-Tax Priority Claims (Unimpaired) | A Non-Tax Priority Claim is a pre-petition claim entitled to priority under the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim. Such claims include claims by employees for unpaid wages, salaries or commissions earned within 180 days before the Petition Date. The Debtors do not believe they have any Non-Tax Priority Claims.  To the extent any such claim has not been paid, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Class 1 – Non-Tax Priority Claim will have such claim reinstated and paid in full.<br><br>**Estimated Amount:   $0.00**<br>**Estimated Recovery:  100%** |
| Class 2 – Syndicate Credit Facility Secured Claims (Impaired) | A Syndicate Credit Facility Secured Claim is a claim outstanding under Excel's Syndicate Credit Facility in an amount equal to the mid-point of the estimated enterprise value of reorganized Excel, prior to the new investments by Ivory and unsecured creditors and excluding the value of Excel's equity interest in *M/V Christine*:  $579 million.<br><br>Upon the Effective Date, the Syndicate Credit Facility Secured Claim will be Allowed by the Plan for all purposes in the aggregate amount of $579 million.<br><br>On the Effective Date, each holder of an Allowed Syndicate Credit Facility Secured Claim shall receive, in full and final satisfaction, release, discharge of, and in exchange for, such Syndicate Credit Facility Secured Claim, its *pro rata* share of (i) a restructured loan with a face amount of $300 million, and (ii) 16.7 million shares of common stock of reorganized Excel, representing 83.3% of all such stock to be issued under the Plan, prior to dilution on account of the rights offering to holders of Class 8 Impaired Excel General Unsecured Claims described below.[1]  Additional terms of the restructured loan are contained in Exhibit A to the Plan. Additionally, the Debtors will pay the reasonable fees and documented expenses of (i) Oaktree in its capacity as a secured lender, including the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, its counsel, incurred prior to and subsequent to the commencement of the Chapter 11 Cases in connection with the restructuring of the Debtors, (ii) Angelo Gordon in its capacity as a secured lender and primarily related to the negotiation and documentation of corporate governance related to |

---

[1]   If fully diluted, such New Common Stock shall represent 82% of all New Common Stock issued under the Plan as set forth in the Plan Term Sheet.

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| | Holdco, up to $400,000, including those of Wachtell, Lipton, Rosen & Katz, its counsel, and (iii) the Agent for the Syndicate Credit Facility, including those of Blackstone Group International Partners LLP, Freshfields Bruckhaus Deringer US LLP, and Holland & Knight LLP as advisors to the Agent and the Secured Lenders, incurred in connection with the restructuring of the Debtors, to the extent not previously paid in connection with the final order authorizing the Debtors to use cash collateral and granting adequate protection entered by the Bankruptcy Court on August 6, 2013 (the "Final Cash Collateral Order") [Docket No. 133] and the Stipulation and Consent Order (I) Authorizing the Debtors to Continue to Use Cash Collateral and (II) Granting Adequate Protection entered on November 25, 2013 (the "Stipulated Cash Collateral Order") [Docket No. 442].<br><br>**Estimated Amount:   $579 million**<br>**Estimated Recovery:   98.6%** |
| Class 3 – Christine Shipco Facility Secured Guaranty Claim (Unimpaired) | A Christine Shipco Facility Secured Guaranty Claim is a claim arising under Excel's guaranty of a secured loan agreement, dated as of April 26, 2010 (as amended), between Excel's partially-owned, non-Debtor indirect subsidiary, Christine Shipco LLC, as borrower, and DVB Bank SE, as lender.  Christine Shipco LLC owns the *M/V Christine*.  On the Effective Date, each Allowed Class 3 – Christine Shipco Guaranty Claim shall be reinstated, which means that such holder's legal, equitable and contractual rights with respect to its Christine Shipco Guaranty Claim will be left unaltered and paid in the ordinary course.<br><br>**Estimated Amount:      $27.9 million**<br>**Estimated Recovery:   100%** |
| Class 4 – Other Secured Claims (Unimpaired) | An Other Secured Claim is any claim that is secured by a lien on collateral, or subject to setoff, other than a Syndicate Credit Facility Secured Claim or Christine Shipco Guaranty Claim.  The Debtors do not believe there are any such claims.  On the Effective Date, each Allowed Class 4 – Other Secured Claim shall be reinstated, which means that such holder's legal, equitable and contractual rights with respect to its Other Secured Claim will be left unaltered.<br><br>**Estimated Amount:      $0.00**<br>**Estimated Recovery:   100%** |
| Class 5 – There is no Class 5. | [Reserved] |
| Class 6 – Impaired Subsidiary Debtor General Unsecured Claims (Impaired) | An Impaired Subsidiary Debtor General Unsecured Claim means an unsecured claim or cause of action against a subsidiary Debtor that is (i) held by an insider or affiliate of one or more subsidiary Debtors, or (ii) held by a person over whom a United States court could exercise personal jurisdiction.  This class does not include (a) Syndicate Credit Facility Secured Claims, (b) Unimpaired Subsidiary Debtor General Unsecured Claims, (c) claims held by any insider or affiliate of one or more of the subsidiary Debtors that relates to the subsidiary Debtors' pre-existing and ordinary course management, employee compensation, consulting or brokerage contracts, (d) causes of action (x) covered under any of the Debtors' insurance policies or (y) held by any person over whom a United States court could not otherwise exercise personal jurisdiction, provided that such person properly filed a proof of claim prior to the bar date if required pursuant to the Bar Date Order, (e) claims that arise from the provision of goods, materials or services by trade vendors and service |

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| | providers, including commissions related thereto, incurred by one or more of the subsidiary Debtors in the ordinary course of the subsidiary Debtors' business, most of which have already been authorized to be paid by the Bankruptcy Court in the ordinary course of business, or (f) claims that are secured.  Holders of Class 6 – Impaired Subsidiary Debtor General Unsecured Claims will receive no recovery under the Plan.<br><br>**Estimated Amount:   N/A**<br>**Estimated Recovery:  0%** |
| Class 7 – Unimpaired Subsidiary Debtor General Unsecured Claims (Unimpaired) | An Unimpaired Subsidiary Debtor General Unsecured Claim means an unsecured claim or cause of action against a subsidiary Debtor, other than an Impaired Subsidiary General Unsecured Claim, and includes, among other claims, (i) a claim arising from the provision of goods, materials or services by trade vendors and service providers, including commissions related thereto, incurred by the subsidiary Debtors in the ordinary course of the subsidiary Debtors' business, most of which have already been authorized to be paid by the Bankruptcy Court in the ordinary course of business, (ii) a cause of action to the extent such cause of action (x) is covered under any of the Debtors' insurance policies or (y) is held by a person over whom a United States court could not otherwise exercise personal jurisdiction, provided that the holder of any such cause of action properly filed a proof of claim prior to the bar date if required pursuant to the Bar Date Order, and (iii) a claim, including an insider or affiliate claim, relating to the subsidiary Debtors' pre-existing and ordinary course management, employee compensation, consulting or brokerage contracts. On the Effective Date, any unpaid Class 7 – Unimpaired Subsidiary Debtor General Unsecured Claim shall be reinstated, which means that such holder's legal, equitable and contractual rights with respect to its Unimpaired Subsidiary Debtor General Unsecured Claim will be left unaltered and paid in the ordinary course, subject to any defenses or offsets that the subsidiary Debtors may have to such claims.<br><br>**Estimated Amount:  N/A**<br>**Estimated Recovery:  100%** |
| Class 8 – Impaired Excel General Unsecured Claims (Impaired) | An Impaired Excel General Unsecured Claim means an unsecured claim or cause of action against Excel.  This Class includes, but is not limited to, (i) claims arising under the 1.875% unsecured convertible senior notes issued by Excel pursuant to an indenture dated October 10, 2007 and due October 15, 2027 in the unpaid principal amount of $150 million; (ii) Syndicate Credit Facility Deficiency Claims; (iii) claims arising under certain swap agreements, described below; (iv) claims for damages alleged by Robertson Maritime Investors, LLC; and (v) claims arising under a settlement with certain bareboat charter parties, described below.  This Class does not include (a) Section 510(b) Claims, (b) any claim or cause of action held by an insider or affiliate of Excel, (c) causes of action (x) covered under any of the Debtors' insurance policies or (y) held by any person over whom a United States court could not otherwise exercise personal jurisdiction, provided that the holder of any such cause of action properly filed a proof of claim prior to the bar date if required pursuant to the Bar Date Order, (d) claims arising from the provision of goods, materials or services by trade vendors and service providers, including commissions related thereto, incurred by Excel in the ordinary course of Excel's business, most of which have already been authorized to be paid by the Bankruptcy Court in the ordinary course of business, or (e) claims |

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| | that are otherwise secured.<br><br>The aggregate amount of the Syndicate Credit Facility Deficiency Claims shall be either $179.8 million, if the Adequate Protection Payment is made on or before January 2, 2014, or $185,930,760.71, if the Adequate Protection Payment is not made by Excel on or before January 2, 2014, and shall be Allowed solely for voting purposes in such applicable amount in connection with the Plan and such claims shall be, subject to the next sentence, included within the class of Impaired Excel General Unsecured Claims (for the avoidance of doubt, subject to the next sentence, the Holders of Syndicate Credit Facility Claims, on account of and to the extent of the Syndicate Credit Facility Deficiency Claims, shall have all of the rights belonging to the Holders of Class 8 Claims including, without limitation, all rights to distributions and the Co-Investment Rights).  The Consenting Parties reserve all rights with respect to the amount, if any, and treatment of a Syndicate Credit Facility Deficiency Claim, if any, held by the Secured Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.<br><br>On the Effective Date, and immediately prior to the transfer of the New Common Stock to Holdco and the issuance of the Holdco Units in accordance with Section 5.7 of the Plan, each Holder of an Allowed Impaired Excel General Unsecured Claim will receive, in full and final satisfaction, release, discharge of, and in exchange for, such Allowed Impaired Excel General Unsecured Claim, (a) its Pro Rata share of 1.6 million shares of New Common Stock, representing 8.0% of the New Common Stock to be issued under the Plan, subject to dilution on account of the Co-Investment Rights and (b) its Pro Rata share of the Tranche A Offered Shares and Tranche B Offered Shares subscribed for pursuant to such Holders' Co-Investment Rights.<br><br>For purposes of the Plan, the claims held by holders of Excel's 1.875% unsecured convertible senior notes will be allowed on the Effective Date in the amount of $152,005,566.41 on account of unpaid principal and interest due and owing as of the Petition Date (but, for the avoidance of doubt, excluding the Administrative Claims of Christiana Trust as indenture trustee, including with respect to the fees and expenses of Moses & Singer, of up to $450,000).  The Consenting Parties reserve all rights with respect to the amount of claims held by holders of Excel's 1.875% unsecured convertible senior notes for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.<br><br>Holders of Allowed Class 8 Claims may exercise their Co-Investment Rights pursuant to two separate rights offerings:  the 1145 Rights Offering and 4(a)(2) Rights Offering.  The Co-Investment Rights pursuant to the 1145 Rights Offering shall be split into two $5.0 million tranches.  The Tranche A Subscription Rights shall dilute pro rata the Primary Equity. Each Holder of an Allowed Impaired Excel General Unsecured Claim shall have the right to subscribe for any unsubscribed portion of the Tranche A Offered Shares up to the full amount of the Tranche A |

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| | Subscription Rights subject to Pro Rata reduction to the extent the Tranche A Subscription Rights are oversubscribed and the individual limits on oversubscription described below, if applicable. |
| | The Tranche B Subscription Rights shall reduce the Ivory Investment on a dollar-for-dollar basis.  Ivory shall have the exclusive right to purchase shares equal to the number of unsubscribed Tranche B Offered Shares with respect to the full amount of the Tranche B Subscription Rights. |
| | Each Holder's aggregate Tranche A Subscription Rights (including oversubscription rights related thereto), when taken together with such Holder's Tranche B Subscription Rights, shall be limited to 75% of such Holder's Pro Rata portion of the Section 1145 Stipulated Value.  This limit does not apply to the 4(a)(2) Rights Offering. |
| | Additionally, Holders of Allowed Class 8 Claims who are Accredited Investors, and who timely return an Accredited Investor Questionnaire to the Subscription Agent pursuant to the Rights Offering Procedures, will have the opportunity to participate in the 4(a)(2) Rights Offering.  Notwithstanding anything to the contrary in the Plan, (i) upon the completion of the 1145 Rights Offering and 4(a)(2) Rights Offering, Ivory shall have the exclusive right to purchase shares equal to the number of 1145 Offered Shares and 4(a)(2) Offered Shares remaining unsubscribed pursuant to section 4(a)(2) of the Securities Act and (ii) in no event shall the fact that the Co-Investment Rights are being offered pursuant to two rights offerings diminish Ivory's right to purchase up to 10.1% of the New Common Stock, subject to the rights of Holders of Impaired Excel General Unsecured Claims to exercise their Co-Investment Rights. |
| | Holders of Syndicate Credit Facility Deficiency Claims shall have all of the rights belonging to the holders of Allowed Impaired Excel General Unsecured Claims including, without limitation, all rights to distributions and the co-investment rights.  If the class of Impaired Excel General Unsecured Claims votes to accept the Plan, then on the Effective Date, the holders of Syndicate Credit Facility Deficiency Claims shall be deemed automatically and without the need for any action to have waived their entitlement to any distributions and the co-investment rights on account of such deficiency claims, and the other holders of Allowed Impaired Excel General Unsecured Claims *pro rata* participation in the co-investment rights and distributions of primary equity shall be increased accordingly. |
| | The Estimated Recoveries set forth below do not include any estimated value on account of the rights offering. |
| | **Estimated Amount of all Allowed Class 8 Claims:  $343.1 million** <br> **Estimated Recovery of all Allowed Class 8 Claims:  7.6%[2]** |
| | **Estimated Amount of all Allowed Class 8 Claims, excluding the Syndicate Credit Facility Deficiency Claim:  $163.4 million** |

---

[2]  This calculation assumes that the Adequate Protection Payment is made by Excel on or before January 2, 2014.

| Description and Amount of Claims and Interests | Summary of Treatment |
|---|---|
| | **Estimated Recovery of all Allowed Class 8 Claims, excluding the Syndicate Credit Facility Deficiency Claim: 15.9%** |
| Class 9 – Unimpaired Excel General Unsecured Claims (Unimpaired) | An Unimpaired Excel General Unsecured Claim means an unsecured claim or cause of action against Excel, other than an Impaired Excel General Unsecured Claim and includes, among other claims, (i) a claim arising from the provision of goods, materials or services by trade vendors and service providers, including commissions related thereto, incurred by Excel in the ordinary course of Excel's business, most of which have already been authorized to be paid by the Bankruptcy Court in the ordinary course of business, (ii) any cause of action to the extent such cause of action (x) is covered under any of Excel's insurance policies or (y) is held by a person over whom a United States court could not otherwise exercise personal jurisdiction, provided that the holder of any such cause of action properly filed a proof of claim prior to the bar date if required pursuant to the Bar Date Order and (iii) a claim, including an insider or affiliate claim, relating to Excel's pre-existing and ordinary course management, employee compensation, consulting or brokerage contracts.  On the Effective Date, any unpaid Class 9 – Unimpaired Excel General Unsecured Claims shall be reinstated, which means that such holder's legal, equitable and contractual rights with respect to its Unimpaired Excel General Unsecured Claim will be left unaltered and paid in the ordinary course, subject to any defenses or offsets that Excel may have to such claims.  **Estimated Amount: N/A** **Estimated Recovery: 100%** |
| Class 10 – Section 510(b) Claims (Impaired) | A Section 510(b) Claim is a claim arising from the purchase or sale, or the rescission of the purchase or sale, of equity securities or debt securities of Excel.  Holders of Class 10 – Section 510(b) Claims will receive no recovery under the Plan.  **Estimated Amount: $0.00** **Estimated Recovery: 0%** |
| Class 11 – Interests  in Excel (Impaired) | An Interest in Excel is any equity security in Excel, including but not limited to stock, warrants and options.  On the Effective Date, all Interests in Excel will be cancelled without further action by the Debtors or reorganized Debtors.  Holders of Class 11 – Interests in Excel will not retain any property or receive any recovery under the Plan.  **Estimated Amount: N/A** **Estimated Recovery: 0%** |
| Class 12 – Interests in Debtors Other than Excel (Unimpaired) | This class is comprised of Excel's interests in its subsidiaries.  On the Effective Date, these interests will be reinstated.  **Estimated Amount: N/A** **Estimated Recovery: 100%** |

## G.    Disclaimer

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, the Debtors' indebtedness, the restructuring of the Debtors' financial affairs, the Debtors' post-restructuring management and other related matters.  THE DEBTORS HAVE PREPARED THIS PROPOSED DISCLOSURE STATEMENT

PURSUANT TO BANKRUPTCY CODE SECTION 1125 FOR USE IN THE SOLICITATION OF VOTES ON THE PLAN.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, INCLUDING **SECTION V "RISK FACTORS TO BE CONSIDERED,"** THE PLAN, AND THE APPENDICES AND EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  A SECONDARY PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE HOLDERS OF IMPAIRED EXCEL GENERAL UNSECURED CLAIMS WITH CERTAIN INFORMATION THAT WILL HELP THEM TO DECIDE WHETHER TO EXERCISE THE APPLICABLE CO-INVESTMENT RIGHTS.

IMPORTANT FEDERAL, STATE AND LOCAL LAWS FOR THE PROTECTION OF INVESTORS DO NOT APPLY TO THIS DISCLOSURE STATEMENT.  THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE UPON (A) THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND (B) TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER.

CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO THE SATISFACTION OR WAIVER OF CONDITIONS PRECEDENT, AND THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS PRECEDENT WILL BE SATISFIED.  THE DEBTORS CURRENTLY INTEND TO SEEK TO EFFECTUATE THE PLAN PROMPTLY AFTER CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT (A) THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES AND (B) THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS ARE DESCRIBED IN **SECTION IV — "SUMMARY OF THE PLAN OF REORGANIZATION."**  IF THE PLAN IS NOT CONFIRMED AND/OR EFFECTUATED, THEN THE DEBTORS WILL HAVE TO CONSIDER ALL OF THEIR OPTIONS AS DEBTORS IN BANKRUPTCY.  *SEE* **SECTION X — "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."**

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE APPENDICES ATTACHED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN.  IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.   THE DEBTORS MAKE NO RECOMMENDATION AS TO WHETHER OR NOT HOLDERS OF IMPAIRED EXCEL GENERAL UNSECURED CLAIMS WHO ARE ACCREDITED INVESTORS SHOULD PARTICIPATE IN THE RIGHTS OFFERING.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE DEBTORS' HISTORY, BUSINESS, AND OPERATIONS, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS THAT MAY BE PENDING AS OF THE FILING OF THE DEBTORS' CHAPTER 11 CASES OR COMMENCED AFTER THE FILING OF THE DEBTORS' CHAPTER 11 CASES, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED

HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR MAY BE DEEMED ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  ALL HOLDERS OF IMPAIRED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING **SECTION V — "RISK FACTORS TO BE CONSIDERED,"** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

THE DEBTORS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS AND EQUITY INTEREST HOLDERS.  ACCORDINGLY, THE DEBTORS URGE HOLDERS OF CLAIMS TO VOTE TO ACCEPT THE PLAN.  FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION I OF THIS DISCLOSURE STATEMENT, ENTITLED "PLAN VOTING INSTRUCTIONS AND PROCEDURES."

Except with respect to the "Financial Projections" attached hereto as <u>Appendix E</u> and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Accordingly, the delivery of this Disclosure Statement will not, under any circumstance, imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS:**  This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein.  *See* **Section V — "Risk Factors To Be Considered."**  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or persons acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

# TABLE OF CONTENTS

INTRODUCTION AND DISCLAIMER ................................................................................i

    A.    Overview of Excel's Chapter 11 Filing and Plan Solicitation ...........................i

    H.    Disclaimer ...............................................................................................ix

I.    PLAN VOTING AND RIGHTS OFFERING INSTRUCTIONS AND PROCEDURES ............................1

    A.    Notice To Holders Of Claims ...................................................................1

    B.    Solicitation Procedures and Solicitation Packages ........................................2

    C.    Voting Procedures and Ballots ..................................................................2

        1.    Voting procedures for holders of Syndicate Credit Facility Secured Claims and Impaired Excel General Unsecured Claims other than Noteholder Claims ......................2

        2.    Voting Procedures for Beneficial Holders of Noteholder Claims in Class 8 .....................3

    D.    Confirmation; Acknowledgements ..............................................................4

    E.    Procedures for Holders of Contingent, Disputed or Unliquidated Claims ........................4

    F.    Revocation; Waivers of Defects; Irregularities ..............................................4

    G.    Further Information; Additional Copies .......................................................5

    H.    Co-Investment Rights .............................................................................5

    I.    Confirmation Hearing And Deadline For Objections To Confirmation..............................7

II.    OVERVIEW OF THE COMPANY .....................................................................7

    A.    Corporate Structure of the Company ...........................................................7

    B.    Overview Of Business ............................................................................7

    C.    Capital Structure ...................................................................................8

        1.    Common Stock ...............................................................................8

        2.    Secured Debt..................................................................................8

        3.    Convertible Notes ...........................................................................9

        4.    Interest Rate Swaps..........................................................................9

    D.    Pending Litigation as of the Petition Date .....................................................10

    E.    Events Leading to the Chapter 11 Cases.......................................................10

|  |  | 1. | The International Dry Bulk Shipping Market | 10 |
|  |  | 2. | Evaluation of Restructuring Alternatives | 11 |
| III. | THE CHAPTER 11 CASES | | | 14 |
|  | A. | Motions Filed on the Petition Date | | 14 |
|  | B. | Formation of the Creditors Committee | | 14 |
|  | C. | Plan Mediation Leading to the Plan | | 14 |
|  | D. | Litigation During the Chapter 11 Cases | | 15 |
|  |  | 1. | Motion to Terminate Exclusivity | 15 |
|  |  | 2. | Dispute Over the $20 Million Escrow Funds | 15 |
|  |  | 3. | Dispute with Robertson Maritime Investors | 15 |
|  | E. | Other Events in the Chapter 11 Case | | 16 |
|  |  | 1. | Odell/Minta Sale | 16 |
|  |  | 2. | Setting of Bar Date | 16 |
|  |  | 3. | Recognition of the Automatic Stay in South Africa | 16 |
| IV. | SUMMARY OF THE PLAN OF REORGANIZATION | | | 17 |
|  | A. | Overview Of Chapter 11 | | 17 |
|  | B. | Classification And Treatment Of Claims And Interests | | 17 |
|  |  | 1. | Treatment Of Unclassified Claims | 17 |
|  |  | 2. | Treatment of Classes | 18 |
|  |  | 3. | Intercompany Claims | 23 |
|  |  | 4. | Special Provision Regarding Unimpaired Classes of Claims | 23 |
|  | C. | Acceptance Of The Plan | | 23 |
|  |  | 1. | Classes Entitled to Vote | 23 |
|  |  | 2. | Elimination of Classes | 23 |
|  |  | 3. | Cramdown | 24 |
|  | D. | Means For Implementation Of The Plan | | 24 |
|  |  | 1. | Continued Legal Existence | 24 |
|  |  | 2. | Officers and Directors of Holdco and Reorganized Excel. | 24 |

3.    Officers of Reorganized Debtors ...................................................................24

4.    Ivory Investment. ...........................................................................................24

5.    Compromise and Settlement of Adversary Case No. 13-08338. ....................24

6.    Co-Investment Rights ....................................................................................25

7.    Transfer of New Common Stock to Holdco and Issuance of Holdco Units. ...25

8.    Section 1145 Exemption ................................................................................25

9.    Available Information. ....................................................................................25

10.   Contractual Transferability & Registration Rights. ........................................25

11.   Minority Protections. .....................................................................................26

12.   Management Incentive Plan............................................................................26

13.   Corporate Action ...........................................................................................26

14.   Effectuating Documents; Further Transactions ..............................................27

15.   Check the Box Election. .................................................................................27

16.   Preservation of Causes of Action ..................................................................27

17.   Exemption From Certain Transfer Taxes and Recording Fees ........................27

18.   Dissolution of Creditors' Committee ..............................................................27

19.   Cancellation of Existing Securities and Agreements .......................................27

E.    Provisions Governing Distributions .........................................................................28

1.    Allowed Claims and Interests ........................................................................28

2.    Fractional Shares ...........................................................................................28

3.    Withholding and Reporting Requirements .....................................................28

4.    Setoffs ...........................................................................................................28

5.    Allocation Between Principal and Accrued Interest. .......................................28

F.    Treatment Of Executory Contracts And Unexpired Leases ......................................28

1.    Assumption of Executory Contracts and Unexpired Leases............................28

2.    D&O Liability Insurance Policies and Indemnification Provisions ..................29

3.    Cure of Defaults and Adequate Assurance. ....................................................29

4.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ......29

G.    Confirmation And Consummation Of The Plan.................................................................30

    1.    Condition To Entry of the Confirmation Order ...............................................30

    2.    Conditions To Effective Date ..........................................................................30

    3.    Waiver Of Conditions ......................................................................................31

H.    Effect Of Plan Confirmation .......................................................................................31

    1.    Binding Effect...................................................................................................31

    2.    Revesting of Assets...........................................................................................31

    3.    Compromise and Settlement of Claims and Interests ......................................31

    4.    Discharge of the Debtors ..................................................................................31

    5.    **Releases and Related Matters** .......................................................................32

    6.    **Exculpation and Limitation of Liability** .....................................................33

    7.    **Injunction** ......................................................................................................33

    8.    Term of Bankruptcy Injunction or Stays.........................................................34

I.    Procedures For Resolving and Treating Disputed Claims .........................................34

    1.    Disputed Claims...............................................................................................34

    2.    Objection Deadline ...........................................................................................34

    3.    Prosecution of Objections ................................................................................34

    4.    No Distributions Pending Allowance ...............................................................34

J.    Retention Of Jurisdiction ............................................................................................34

    1.    Retention of Jurisdiction..................................................................................34

    2.    Failure of Bankruptcy Court to Exercise Jurisdiction.....................................35

K.    Miscellaneous Provisions............................................................................................36

    1.    Payment Of Statutory Fees ..............................................................................36

    2.    Amendment Or Modification Of The Plan ......................................................36

    3.    Revocation, Withdrawal, or Non-Consummation............................................36

    4.    Governing Law .................................................................................................36

V.    RISK FACTORS TO BE CONSIDERED .........................................................................36

A.    Risks Related to Failure to Consummate the Plan of Reorganization.........................37

B.      Risks Related to Confirmation ................................................................. 38

C.      Potential Adverse Effects of Chapter 11 ................................................. 38

D.      Risks Relating to the 4(a)(2) Rights Offering ......................................... 38

E.      Risks Related to Becoming a Holder of Reorganized Excel's New Common
        Stock/Holdco's Holdco Units ................................................................. 39

F.      Risks Related to Exercise of the Co-Investment Rights .......................... 40

G.      Dependence on Key Management Personnel and Other Employees ......... 41

H.      No Assurance of Ultimate Recoveries; Uncertainty of Financial Projections ............ 41

I.      Other Risks Relating to the Debtors' Business and the Debtors' Ability to Satisfy their
        Debt Obligations after the Effective Date ............................................... 42

J.      Operational Risks .................................................................................. 52

K.      Financial and Taxation Risks ................................................................. 56

L.      Legal and Regulatory Risks ................................................................... 58

VI.     APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS ...................... 60

A.      Issuance and Resale of Plan Securities Under the Plan Pursuant to Section 1145 ......... 60

        1.      Exemption from Registration ....................................................... 60

        2.      Resales of Plan Securities; Definition of Underwriter .................. 61

        1.      Exemption from Registration ....................................................... 62

        2.      Resales of 4(a)(2) Plan Securities .............................................. 62

VII.    CERTAIN TAX CONSEQUENCES OF THE PLAN ............................................ 63

A.      Certain U.S. Federal Income Tax Consequences to U.S. Holders ........... 64

        1.      U.S. Holders of Syndicate Credit Facility Claims ........................ 64

        2.      U.S. Holders of Convertible Notes ............................................. 67

        3.      Passive Foreign Investment Company Status and Significant Tax Consequences .......... 68

B.      Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders ........................ 70

C.      Other Tax Issues ................................................................................... 70

        1.      Certain Liberian Tax Consequences ........................................... 70

        2.      Certain Marshall Islands Tax Consequences ............................... 71

D.      Importance of Obtaining Professional Tax Assistance ............................ 71

xvi

VIII.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ............................................ 71

    A.    Feasibility of the Plan ................................................................................................. 71

    B.    Valuation Analysis ...................................................................................................... 72

        1.    Introduction ................................................................................................ 72

        2.    Valuation ..................................................................................................... 72

    C.    Best Interests Test ....................................................................................................... 74

IX.    Confirmation Without Acceptance Of All Impaired Classes: The 'Cramdown' Alternative ........................ 74

X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................. 75

XI.    CONCLUSION AND RECOMMENDATION ............................................................................. 76

**APPENDICES**

APPENDIX A          Amended Joint Chapter 11 Plan of Reorganization of Excel Maritime Carriers
                    Ltd. and Certain of its Affiliates

APPENDIX B          List of Debtors

APPENDIX C          Corporate Organization Chart

APPENDIX D          Liquidation Analysis

APPENDIX E          Financial Projections

APPENDIX F          Audited Financial Statements for Fiscal Year 2011

APPENDIX G          Unaudited Financial Statements for Fiscal Year 2012

APPENDIX H          Pending Litigation as of November 18, 2013

## I.     PLAN VOTING AND RIGHTS OFFERING INSTRUCTIONS AND PROCEDURES

### A.     Notice To Holders Of Claims

On [●], 2013, the Bankruptcy Court entered an order (the "Disclosure Statement Approval Order") approving, among other things, this Disclosure Statement as containing "adequate information" within the meaning of Bankruptcy Code section 1125(a) [Docket No. [●]]. Significant dates and deadlines relating to voting and confirmation of the Plan as set forth in the Disclosure Statement Approval Order are:

| Event | Date |
| --- | --- |
| Deadline for Objections to Disclosure Statement | December 2, 2013 at 4:00 p.m. |
| Deadline for Replies to Objections to Disclosure Statement | December 5, 2013 at 12:00 p.m. |
| Disclosure Statement Hearing Date | December 6, 2013 at 2:00 p.m. |
| Voting Record Date and Rights Offering Record Date | December 9, 2013 |
| Solicitation Commencement | December 12, 2013, 2013 at 11:59 p.m. |
| Mailing of 1145 Subscription Agreements | December 12, 2013 at 11:59 p.m. |
| Confirmation Hearing Notice Publication Date | December 12, 2013 |
| Deadline to Return Accredited Investor Forms with Respect to the 4(a)(2) Rights Offering | December 27, 2013 at 5:00 p.m. |
| Deadline to File Plan Supplement | January 10, 2014 |
| Voting Deadline | January 16, 2014 at 4:00 p.m. |
| Deadline to Return Shareholder Release Form | January 16, 2014 at 4:00 p.m. |
| Deadline for Objections to Confirmation | January 16, 2014 at 5:00 p.m. |
| Deadline to File 3018(a) Motion | January 16, 2014 at 5:00 p.m. |
| Deadline for Submission of 1145 Subscription Agreements, 4(a)(2) Subscription Agreements and Wire Transfers | January 17, 2014 at 5:00 p.m. |
| Voting Certification Deadline | January 17, 2014 at 11:59 p.m. |
| Deadline for Replies to Objections to Confirmation | January 23, 2014 at 5:00 p.m. |
| Rule 3018 Hearing Deadline | January 27, 2014 at 10:00 a.m. |
| Confirmation Hearing | January 27, 2014 at 10:00 a.m. |

This Disclosure Statement is being transmitted to holders of claims that are entitled under the Bankruptcy Code to vote on the Plan. Only two classes are entitled to vote on the Plan: (1) holders of secured obligations under the Syndicate Credit Facility; and (2) holders of Impaired Excel General Unsecured Claims, including "Noteholder Claims" with respect to the 1.875% unsecured convertible senior notes issued by Excel pursuant to an indenture dated October 10, 2007 and due October 15, 2027 (the "Convertible Notes"), swap claims, claims arising under a settlement with certain bareboat charter parties and Syndicate Credit Facility Deficiency Claims.

The purpose of this Disclosure Statement is to provide adequate information to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the

Plan. All other classes are either unimpaired under the Plan, in which case the holders of claims in such classes are deemed to have accepted the Plan, or are receiving no distribution under the Plan, in which case the holders of claims in such classes are deemed to have rejected the Plan. Another purpose of this Disclosure Statement is to provide holders of Impaired Excel General Unsecured Claims with certain information that will help them decide whether to purchase shares of common stock in Reorganized Excel pursuant to the co-investment rights.

ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION ABOUT THE PLAN AND IMPORTANT CONSIDERATIONS PERTINENT TO ACCEPTANCE OR REJECTION OF THE PLAN. THIS DISCLOSURE STATEMENT, THE PLAN, AND BALLOTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTORS RELATING TO THE SOLICITATION OTHER THAN THE INFORMATION CONTAINED HEREIN.

### B.    Solicitation Procedures and Solicitation Packages

The Debtors are causing "Solicitation Packages" to be distributed to holders of claims and interests. With respect to holders of claims entitled to vote on the Plan, each Solicitation Package shall include: (1) a copy of the Disclosure Statement Approval Order, (2) a notice of the hearing to consider confirmation of the Plan (the "Confirmation Hearing Notice"), (3) this Disclosure Statement with the Plan annexed thereto,[3] (4) an appropriate form of ballot(s) and appropriate return envelope with postage pre-paid, and (5) a notice of disputed claim status (the "Notice of Disputed Claim Status") as applicable. With respect to holders of claims and interests not entitled to vote on the Plan, each Solicitation Package shall include (1) the Confirmation Hearing Notice, (2) either a notice of such holder's non-voting status – unimpaired classes or a notice of such holder's non-voting status – impaired classes, and (3) such other materials as may be ordered or permitted by the Bankruptcy Court. Holders of Class 11 Interests in Excel, who are not entitled to vote on the Plan, will also receive a notice of the releases set forth in the Plan. Such holders of Class 11 Interests will have the opportunity to opt out of the Plan releases by completing and returning a form to Donlin, Recano & Company, Inc. (the "Voting Agent") by the Voting Deadline.

The Disclosure Statement Approval Order sets forth, among other things, (1) solicitation procedures with respect to holders of claims in voting classes, (2) the deadline for submitting ballots to accept or reject the Plan, (3) the date, time and place of the hearing to consider confirmation of the Plan and the time for filing objections to the Plan, (4) the voting record date, and (5) procedures for tabulation of the ballots cast on the Plan, including assumptions and procedures for tabulating ballots that are not completed fully or correctly. You should read the Disclosure Statement Approval Order and the instructions attached to the ballot you received in this package in connection with this section of the Disclosure Statement.

### C.    Voting Procedures and Ballots

1.    Voting procedures for holders of Syndicate Credit Facility Secured Claims and Impaired Excel General Unsecured Claims other than Noteholder Claims

Holders of Syndicate Credit Facility Secured Claims in Class 2 and Impaired Excel General Unsecured Claims in Class 8, including Syndicate Credit Facility Deficiency Claims will receive a ballot (or beneficial ballot, as explained below) to be used in voting on the Plan. After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot. Complete and sign your ballot and return your ballot to the

---

[3]    Copies of the Disclosure Statement and Plan included in the Solicitation Package will be provided in PDF format on an optical disc, such as a CD-ROM. Hard copies may be obtained by contacting the Voting Agent at (212) 771-1128.

Voting Agent either by first class mail, or by hand delivery, or overnight courier to the address set forth below, so that it is received by the Voting Deadline.

THE VOTING DEADLINE IS JANUARY 16, 2014 AT 4:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS WITH THE CONSENT OF EACH OF THE CONSENTING PARTIES (AS DEFINED IN THE PLAN).  THE VOTING RECORD DATE FOR DETERMINING WHETHER A HOLDER OF AN IMPAIRED CLAIM IS ENTITLED TO VOTE ON THE PLAN IS DECEMBER 9, 2013 PREVAILING EASTERN TIME.  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE VOTING AGENT BY FIRST CLASS MAIL, HAND DELIVERY, OR OVERNIGHT COURIER.  PARTIES RETURNING A BALLOT (AS OPPOSED TO A BENEFICIAL BALLOT) SHOULD DELIVER BALLOTS TO THE ADDRESS SET FORTH BELOW.[4]

### Regular Mail

**Donlin, Recano & Company, Inc.**
**Ballot Processing Center**
**P.O. Box 2034 Murray Hill Station**
**New York, NY 10156-0701**

### If by hand delivery or overnight courier

**Donlin, Recano & Company, Inc.**
**Ballot Processing Center**
**419 Park Avenue South, Suite 1206**
**New York, NY 10016**

Except as provided below, unless the ballot is actually received by the Voting Agent before the Voting Deadline or the Bankruptcy Court orders otherwise, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.  In the event of a dispute with respect to any claim, any vote to accept or reject the Plan cast with respect to such claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

2.    Voting Procedures for Beneficial Holders of Noteholder Claims in Class 8

Each beneficial holder of Convertible Notes as of the Record Date will receive a beneficial ballot.  Beneficial holders of Convertible Notes who wish to vote to accept or reject the Plan must complete the beneficial ballot in accordance with the instructions contained therein and return it to their respective bank, broker, dealer, trust company or other agent or nominee (each, a "Nominee").  Upon receipt of such beneficial ballot, Nominees will execute a master ballot to reflect the votes of their beneficial holders.  Nominees must tender master ballots to the Voting Agent at the address listed above by the Voting Deadline.  In order to ensure that their vote is counted, beneficial holders must provide their beneficial ballot to their respective Nominees in time to allow such Nominees to execute and deliver master ballots to the Voting Agent by the Voting Deadline, which is 4:00 p.m. prevailing eastern time on January 16, 2014.

**By properly completing and executing beneficial ballots and returning them to their Nominees, beneficial holders of Noteholder Claims are directing their respective Nominees to execute a master ballot on the beneficial holders' behalf that reflects their vote with respect to the Plan.**

---

[4]    Holders of Noteholder Claims who will be returning beneficial ballots should review the instructions set forth in Section 2 below.

D.        **Confirmation; Acknowledgements**

By submitting a ballot to the Voting Agent or submitting a beneficial ballot to a Nominee, as applicable, each holder of an impaired claim entitled to vote will be confirming that (i) such holder or legal and financial advisors acting on its behalf has had the opportunity to ask questions of, and receive answers from, Excel concerning the terms of the Plan, the business of Excel and other related matters, (ii) Excel has made available to such holder or its agents all documents and information relating to the Plan and related matters reasonably requested by or on behalf of such holder, and (iii) except for information provided by Excel in writing, and by its own agents, such holder has not relied on any statements made or other information received from any person with respect to the Plan.

By submitting a ballot to the Voting Agent or submitting a beneficial ballot to a Nominee, as applicable, each holder of an impaired claim entitled to vote also acknowledges that the interests in Reorganized Excel and Holdco being offered pursuant to the Plan, including pursuant to the co-investment rights, are not being offered pursuant to a registration statement filed with the SEC and represents that any such security will be acquired for its own account and not with a view to any distribution of such in violation of the Securities Act.  It is expected that if issued pursuant to the Plan the interests in Reorganized Excel and Holdco will be exempt from the registration requirements of the Securities Act by virtue of section 1145 of the Bankruptcy Code and may be resold by the holders thereof subject to the provisions of section 1145.

E.        **Procedures for Holders of Contingent, Disputed or Unliquidated Claims**

If you receive a Notice of Disputed Claim Status, it is because the Debtors scheduled your claim as disputed, contingent or unliquidated, or listed your claim as $0.00 or in an unknown amount.  If you wish to dispute this classification, you may file a motion (the "3018 Motion") seeking to have your claim temporarily allowed for voting purposes in the manner set forth on the Notice of Disputed Claim Status.  Under the terms of the Disclosure Statement Approval Order, any such motions must be filed by the Voting Deadline.  If you timely file such a motion, you will be provided a ballot and permitted to cast a provisional vote to accept or reject the Plan.

F.        **Revocation; Waivers of Defects; Irregularities**

You may modify your vote on the Plan by submitting a superseding ballot at any time prior to the Voting Deadline.  Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding.  The Debtors with the consent of each of the Consenting Parties also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel with the consent of each of the Consenting Parties, not be in accordance with the Disclosure Statement Approval Order or the Bankruptcy Code.

The Debtors further reserve the right, with the consent of each of the Consenting Parties, subject to any contrary order of the Bankruptcy Court, to waive any defects or irregularities or conditions of delivery as to any particular ballot, whether before or after the Voting Deadline and without notice.  The interpretation (including the ballot and the respective instructions therein) by the Debtors in accordance with the terms of the Plan, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with delivery of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Except as may be provided by Rule 3018-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") with respect to a ballot received before the Voting Deadline, neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to delivery of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### G.    Further Information; Additional Copies

If you have any questions about the procedure for voting your claim, the packet of materials that you have received or the amount of your claim; or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact the Voting Agent at:

<div align="center">

**Donlin, Recano & Company, Inc.**
**Ballot Processing Center**
**P.O. Box 2034 Murray Hill Station**
**New York, NY 10156**
**Telephone: (212) 771-1128**

</div>

### H.    Co-Investment Rights

The Debtors are offering holders of Allowed Impaired Excel General Unsecured Claims, including for the avoidance of doubt Holders of the Syndicate Credit Facility Deficiency Claims ("Eligible Holders"), the opportunity to subscribe for and purchase up to an aggregate of 2.9% of the equity in Reorganized Excel in two separate rights offerings, the 1145 Rights Offering and the 4(a)(2) Rights Offering. The "1145 Rights Offering" will consist of two tranches (the "Tranche A Offered Shares" and the "Tranche B Offered Shares") for an aggregate purchase price of up to $10.0 million (the "Tranche A Subscription Rights" and "Tranche B Subscription Rights"). In the event that the Tranche A Offered Shares are not fully subscribed, including the Excess Shares (as defined below), there will be a separate rights offering (the "4(a)(2) Rights Offering") to Eligible Holders who are accredited investors and who timely fill out and return to the Subscription Agent (defined below) an accredited investor questionnaire. Such offering will be for an aggregate number of shares equal to the number of Tranche A Offered Shares, including Excess Shares, not subscribed for pursuant to the 1145 Rights Offering (the "4(a)(2) Offered Shares").

**Eligible Holders, as applicable, will receive separate materials regarding the 1145 Rights Offering and 4(a)(2) Rights Offering, including a copy of the Rights Offering Procedures, subscription form and other documents relating to such offerings. A holder of an Allowed Impaired Excel General Unsecured Claim that does not duly complete, execute and timely deliver an Accredited Investor questionnaire to the Subscription Agent on or before December 27, 2013 at 5:00 p.m. (Prevailing Eastern Time) cannot participate in the 4(a)(2) Rights Offering. To participate in either the 1145 Rights Offering or 4(a)(2) Rights Offering, an Eligible Holder must submit a duly completed 1145 and/or 4(a)(2) Subscription Agreement and the appropriate payment or on before January 17, 2014 at 5:00 p.m. (Prevailing Eastern Time), or, as applicable, to its nominee with sufficient time for the nominee to return a master subscription form by no later than January 17 at 5:00 p.m. (Prevailing Eastern Time).**

The Plan and Confirmation Order will provide (i) that the equity issued pursuant to the 1145 Rights Offering will be exempt from the registration requirements under the Securities Act of 1933 (the "Securities Act") pursuant to section 1145 of the Bankruptcy Code, and (ii) that the equity issued pursuant to the 4(a)(2) Rights Offering will be exempt from the registration requirements under the Securities Act under section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Donlin, Recano & Company, Inc. in its capacity as the subscription agent (the "Subscription Agent") will send agreements to participate in the 1145 Rights Offering ("1145 Subscription Agreements") to the Eligible Holders by no later than December 12, 2013. The 1145 Subscription Agreements are the contracts by which such Eligible Holders will agree to subscribe for and purchase the Tranche A Offered Shares and Tranche B Offered Shares from Reorganized Excel. Each Eligible Holder who wishes to subscribe for the Tranche A Offered Shares and Tranche B Offered Shares pursuant to the 1145 Rights Offering must sign a 1145 Subscription Agreement indicating the number of Tranche A Offered Shares and Tranche B Offered Shares it wishes to purchase and return it to the Subscription Agent by no later than January 17, 2014 at 5:00 p.m.

Eligible Holders may subscribe for up to a maximum of their *pro rata* share of the Tranche A Offered Shares and Tranche B Offered Shares. If Class 8 – Impaired Excel General Unsecured Claims votes to accept the Plan, the *pro rata* share of the Tranche A Offered Shares and Tranche B Offered Shares for each Eligible Holder will be determined by multiplying (a) the total number of Tranche A Offered Shares or Tranche B Offered Shares by

(b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims, other than Syndicate Credit Facility Deficiency Claims, rounded down to the nearest whole share. If Class 8 – Impaired Excel General Unsecured Claims votes to reject the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of either Tranche A Offered Shares or Tranche B Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims rounded to the nearest whole share.

Eligible Holders interested in subscribing for additional shares of the Tranche A Offered Shares (the "Excess Shares") may also indicate on their 1145 Subscription Agreement that they wish to subscribe for Excess Shares. The number of Excess Shares will be 307,692 minus the number of Tranche A Offered Shares subscribed for by all Eligible Holders. Each Eligible Holder may receive up to its *pro rata* portion of these Excess Shares. The *pro rata* portion of the Excess Shares that electing Eligible Holders may subscribe for will be determined by multiplying (a) the total number of unsubscribed shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims held by Eligible Holders who elect to subscribe for unsubscribed shares, rounded to the nearest whole share. Each Eligible Holder's aggregate co-investment rights and any stock acquired pursuant to any oversubscription right shall also be limited to 75% of such Holder's Pro Rata portion of the Section 1145 Stipulated Value (as that term is defined in the Plan).

To the extent that the Tranche A Offered Shares, including the Excess Shares, are not fully subscribed, Eligible Holders who are accredited investors and who timely return the accredited investor form will have the opportunity to participate in the 4(a)(2) Rights Offering. By no later than December 12, 2013, the Subscription Agent will mail out accredited investor questionnaires to all Eligible Holders. In order to participate in the 4(2) Rights Offering, an Eligible Holder must return the accredited investor questionnaire to the Subscription Agent by December 27, 2013. The Subscription Agent will, upon receipt of the accredited investor questionnaire and by no later than December 30, 2013, mail a 4(a)(2) Rights Offering subscription agreement (the "4(2) Subscription Agreement") to such Eligible Holders. The 4(2) Subscription Agreements are the contracts by which such Eligible Holders will agree to subscribe for and purchase the 4(a)(2) Offered Shares from Reorganized Excel. Each Eligible Holder who wishes to subscribe for the 4(a)(2) Offered Shares pursuant to the 4(a)(2) Rights Offering must sign a 4(a)(2) Subscription Agreement indicating the number of 4(a)(2) Offered Shares it wishes to purchase and return it to the Subscription Agent by no later than January 17, 2014 at 5:00 p.m. (Prevailing Eastern Time), or, as applicable, to its nominee with sufficient time for the nominee to return a master subscription form by no later than January 17 at 5:00 p.m. (Prevailing Eastern Time).

The 4(a)(2) Subscription Agreement must be received by the Subscription Agent by January 17 at 5:00 p.m. The 4(a)(2) Rights Offering will be for an aggregate number of shares equal to the number of Class A Offered Shares, including Excess Shares, not subscribed for. These shares are being sold pursuant to an exemption from registration under the Securities Act and will bear the legend set forth in Section IV.B.2. below. To the extent this offering is oversubscribed, subscriptions will be reduced pro rata in accordance with the Eligible Holders' participation levels. To the extent that the Tranche A Offered Shares are fully subscribed, these subscriptions will be null and void.

To the extent the Tranche A Offered Shares are not fully subscribed, following the exercise by Eligible Holders of their respective Tranche A Subscription Rights, including any oversubscription rights, and the Section 4(2) Rights Offering is not fully subscribed, Ivory shall have the exclusive right to purchase shares equal to the number of unsubscribed Tranche A Offered Shares. Further, with respect to the Tranche B Subscription Rights, Eligible Holders shall not have over-subscription rights. Ivory shall have the exclusive right to purchase shares equal to the number of unsubscribed Tranche B Offered Shares.

In order to facilitate participation in the 1145 Rights Offering and the 4(a)(2) Rights Offering, each Impaired Excel General Unsecured Claim will be determined to be Allowed or disallowed by no later than January 16, 2014, for purposes of participating in the 1145 Rights Offering and the 4(a)(2) Rights Offering. In the event that the holder of an Impaired Excel General Unsecured Claim that is disputed wishes to participate in the 1145 Rights Offering and/or the 4(a)(2) Rights Offering, such holder must file a motion pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure seeking allowance of such claim and obtain a ruling on such motion by no later than

6

January 16, 2014. Unless such a motion is timely filed and ruled upon, holders of disputed Impaired Excel General Unsecured Claims will be deemed to be disallowed for purposes of participating in the 1145 Rights Offering and the 4(a)(2) Rights Offering.

Eligible Holders will receive materials regarding the 1145 Rights Offering and the 4(a)(2) Rights Offering based on the current amount of Allowed Impaired Excel General Unsecured Claims. If any disputed Impaired Excel General Unsecured Claims become Allowed by no later than January 16, 2014, the total amount of Allowed Impaired Excel General Unsecured Claims will increase. In that event, the amount of Offered Shares that Eligible Holders will be entitled to purchase pursuant to the 1145 Rights Offering will decrease. To the extent the 1145 Offered Shares corresponding to such additional Allowed Impaired Excel General Unsecured Claims are not subscribed for, the number of 4(a)(2) Offered Shares will include such number of shares. In that case, any Eligible Holder who has fully subscribed for all 4(a)(2) Offered Shares may be allocable to such Eligible Holder in the 4(a)(2) Rights Offering will have the one business day to subscribe for, and pay the applicable Purchase Price with respect to, such additional number of 4(a)(2) Offered Shares as may be available as a result thereof.

### I.        Confirmation Hearing And Deadline For Objections To Confirmation

THE BANKRUPTCY COURT HAS SCHEDULED A HEARING TO CONSIDER CONFIRMATION OF THE PLAN ON JANUARY 27, 2013 AT 10:00 A.M. PURSUANT TO THE NOTICE OF CONFIRMATION HEARING PROVIDED TO HOLDERS OF CLAIMS AND INTERESTS OR THEIR REPRESENTATIVES, OBJECTIONS TO CONFIRMATION MUST BE FILED WITH THE BANKRUPTCY COURT BY JANUARY 16, 2014 AT 5:00 P.M. PREVAILING EASTERN TIME AND ARE GOVERNED BY BANKRUPTCY RULES 3020(B) AND 9014 AND LOCAL RULES OF THE BANKRUPTCY COURT. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, SUCH OBJECTION TO CONFIRMATION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING.

## II.        OVERVIEW OF THE COMPANY

### A.        Corporate Structure of the Company

Excel is a holding company and the ultimate parent of each of the Debtors in these chapter 11 cases, in addition to various non-Debtor entities (the Debtors, collectively with their non-Debtor affiliates, the "Company"). A list of the Debtors is attached as <u>Appendix B</u> hereto. A corporate organization chart is attached as <u>Appendix C</u> hereto. The Company's executive offices are located in Nea Kifisia, Greece, and it maintains registered addresses in Monrovia, Liberia and Hamilton, Bermuda. Excel is the sole member of Excel Maritime LLC, a New York limited liability company with an office in White Plains, New York.

### B.        Overview Of Business

Excel is a shipping company founded in 1988 and incorporated under the laws of the Republic of Liberia. The Company is a provider of worldwide sea borne transportation for "dry bulk" cargo including, among others, iron ore, coal and grain, collectively referred to as "major bulks" and steel products, fertilizers, cement, bauxite, sugar and scrap metal, collectively referred to as "minor bulks." The dry bulk market is the primary provider of global commodities transportation. Approximately one third of all seaborne trade is dry bulk related.

The Company currently owns a fleet of thirty-six vessels. Thirty-five of these vessels are wholly-owned by thirty-five direct subsidiaries of Excel (each subsidiary, a "<u>Vessel Owner</u>"), each of which is a Debtor in these chapter 11 cases. One vessel is owned by non-Debtor Christine Shipco, a joint venture in which Christine Holdings, a direct, non-Debtor subsidiary of Excel, holds a 71.4% interest. The Company's fleet consists of 6 Capesize, 14 Kamsarmax, 14 Panamax and 2 Handymax vessels (together, the "<u>Vessels</u>") with a total carrying capacity of approximately 3.3 million deadweight tons (dwt), making the Company one of the world's largest independent dry bulk operators. The terms "Handymax", "Kamsarmax" et cetera refer to size categories of bulk carriers, some of which reference regional ports. For example, the term "Kamsarmax" refers to the maximum length of a vessel that can load in the port of Kamsar, and the term "Panamax" refers to the vessel size that can fit in the Panama Canal's lock chambers.

Maryville Maritime Inc. ("Maryville"), a wholly-owned non-Debtor subsidiary of Excel, provides in-house technical management for all of the Vessels pursuant to discrete management agreements entered into between each of the Vessel Owners and Maryville. Maryville provides technical supervision such as repairs, maintenance and inspections, safety and quality control, crewing and training, as well as provisioning. Maryville's in-house technical management of the Vessels provides the Company with a competitive advantage in controlling both the cost and quality of its Vessels' operations. Maryville also provides commercial management for negotiating charters, managing relationships, and providing seafaring crew to all the Vessels through a third party manning agent. Maryville is also party to a management agreement with Excel, pursuant to which it provides administrative services to Excel and its direct and indirect, Debtor and non-Debtor subsidiaries. Maryville employs management and administrative employees who oversee and run the Company's operations pursuant to the management agreements.

The Debtors generate revenues by deploying their fleet on a mix of "Period Time Charters" and "Spot Charters." Period Time Charters are charters with a term of at least four months on average. Spot Charters are comprised of both voyage charters (charters for one specific voyage) and short-term charters, which are charters with a term of less than four months on average. The Company deploys its Vessels according to its assessment of market conditions, adjusting the mix of both types of charters to take advantage of the relatively stable cash flow and high utilization rates associated with Period Time Charters and to profit from attractive Spot Charter rates during periods of strong charter market conditions. As of September 30, 2013, 12 of the Vessels in the Company's fleet were employed under Period Time Charters and 24 were operating in the Spot Charter market. In 2010, 2011 and 2012, the Company maintained vessel utilization rates (defined as number of operating days divided by fleet calendar dates) of 96.2%, 98% and 95.6%, respectively. During the first three fiscal quarters of 2013, the Company has achieved a vessel utilization rate of 97.7%, an increase from 95.8% during the same period in 2012 and the Company expects to maintain a similar utilization as it secures additional charters for the remainder of 2013.

**C.      Capital Structure**

1.      Common Stock

Beginning on September 15, 2005, Excel's Class A common stock traded on the NYSE under the symbol "EXM." Prior to that date, Excel's Class A common stock traded on the American Stock Exchange under the same symbol. On June 11, 2013, the NYSE halted trading of Excel's common stock and commenced de-listing procedures. On July 1, 2013, the NYSE notified the SEC of its intention to remove Excel's Class A common stock from listing and registration on the NYSE at the opening of business on July 12, 2013. As of May 15, 2013, 103,153,299 shares of Excel's Class A common stock and 295,746 shares of its Class B common stock were issued and outstanding. Mr. Panayotides and entities associated with him hold 36,625,355 of Excel's Class A common stock and 150,875 of its Class B common stock. These amounts represent approximately 47% of the total voting power of Excel's capital stock. Additionally, Ms. Ismini Panayotides, the Board Secretary and the daughter of Mr. Panayotides, and entities associated with her hold 4,949,837 of Excel's Class A common stock and 30,000 of its Class B common stock, representing approximately 8.8% of the total voting power of Excel's capital stock.

2.      Secured Debt

(a)      Syndicate Credit Facility

Excel is a borrower pursuant to the Syndicate Credit Facility, whereby Wilmington Trust (London) Ltd. is administrative agent, security trustee and mortgagee under certain ship mortgages. Approximately $771 million currently is outstanding under the Syndicate Credit Facility, prior to recognition of adequate protection payments of $6.2 million made by the Debtors on October 1, 2013 and $6.2 million expected to be made on January 2, 2014. The Syndicate Credit Facility is secured by, among other things, guarantees by each Vessel Owner other than non-Debtor Christine Shipco which is party to a separate credit facility, and first priority mortgages and first priority assignments of insurances for each of the Vessels owned by the guarantors ("Collateral Vessels"). The Syndicate Credit Facility is further secured by (i) assignments of earnings, (ii) assignments of charter for the Collateral Vessels in excess of 11 months, (iii) manager's undertakings and an assignment of management agreement for each Collateral Vessel, (iv) account pledge agreements for each Collateral Vessel, and (v) a pledge over, among others, the shares of entities owning the Collateral Vessels.

8

(b)        The Christine Shipco Facility

Christine Holdings, a direct, wholly-owned, non-Debtor subsidiary of Excel, owns a 71.4% interest in non-Debtor Christine Shipco, a joint venture limited liability company.  The owner of the minority interest is Robertson Maritime Investors, LLC ("RMI"), a third party unaffiliated with the Debtors.  On April 30, 2010, Christine Shipco took delivery of the *M/V Christine* from Imabari Shipyard in Japan at a total cost of approximately $72.5 million.  Christine Shipco is a borrower pursuant to that certain secured loan facility agreement for a loan of up to $42.0 million dated April 26, 2010 (as amended, modified and supplemented), pursuant to which DVB Bank SE ("DVB") is the lender (the "Christine Shipco Facility").  The Christine Shipco Facility is governed by English law.  DVB has notified the Debtors that certain events of default have occurred under the Christine Shipco by letters dated March 2013, April 2013 and July 15, 2013 and reserved its rights to exercise its remedies in connection therewith.

The loan amount under the Christine Shipco Facility represented 65% of the vessel's fair market value at the time of the vessel's delivery and was drawn in order to finance the delivery of the *M/V Christine*.  The loan bears interest at LIBOR plus a margin of 3% and is repayable in 26 quarterly installments of $0.8 million through December 2015 and thereafter at $0.6 million through September 2016 with a balloon payment of approximately $20.0 million at October 2016.  Approximately $27.9 million is currently outstanding under the Christine Shipco Facility.  The Christine Shipco Facility is guaranteed by Excel (up to an amount not to exceed $29,988,000 in respect of the principal of the loan or its equivalent under the guaranty and indemnity) and Christine Holdings and secured by, among other things, (i) a first priority pledge of the membership interests in Christine Shipco and Christine Holdings, (ii) a first priority mortgage over, and an assignment of insurance and earnings with respect to, the vessel *M/V Christine*, and (iii) an account pledge agreement.  Further, pursuant to the Final Cash Collateral Order and the Stipulated Cash Collateral Order, the Syndicate Credit Facility lenders acquired a valid, binding, continuing, enforceable, fully-perfected junior lien on Excel's interest in Christine Holdings and a super-priority claim payable from, among other property of the Debtors' estates, lawful cash dividends paid to Excel by Christine Holdings.

Christine Shipco is not a Debtor.  The Christine Shipco Facility is not being restructured and the Christine Shipco Facility is unaffected by these Chapter 11 cases.  As described further below, RMI disputes the validity of Excel's indirect 71.4% interest in Christine Shipco.  The Debtors believe RMI's allegation is baseless and will vigorously contest it.

3.        Convertible Notes

Excel issued $150.0 million principal amount of 1.875% unsecured convertible senior notes due October 15, 2027 pursuant to that certain indenture dated October 10, 2007 (the "Indenture") with Christiana Trust, a division of Wilmington Savings Fund Society FSB, as indenture trustee (the "Indenture Trustee").  Pursuant to the Indenture, the Convertible Notes are convertible into Class A common stock of Excel under certain circumstances.

4.        Interest Rate Swaps

(a)        The Nomura Swap

On September 2, 2010, Excel entered into a partially-secured interest rate swap with Nomura International plc ("Nomura") for a notional amount of $50 million decreasing by $0.8 million quarterly and maturing in September 2015 (the "Nomura Swap").  Excel made quarterly payments to Nomura at a fixed rate of 1.79% and Nomura made quarterly floating rate payments at 3-month LIBOR to Excel based on the same notional amount.  As of May 31, 2013, the estimated mark-to-market liability of Excel in connection with the Nomura Swap was approximately $1.3 million, secured by cash collateral of $1.3 million located in an account held in Nomura's favor.  The Nomura Swap was scheduled to roll over on June 10, 2013, and Excel made a business decision to unwind the swap.  On June 7, 2013, Excel and Nomura agreed to unwind the Nomura Swap, which resulted in a net payment by Nomura to Excel of $30,000.  The cash collateral in the pledged account was used to settle and unwind the swap.  As a result, Nomura has no claims outstanding against Excel arising under the Nomura Swap and Nomura will not receive any distribution under the Plan.

(b)        The Eurobank Swap

9

Excel entered into an unsecured interest rate swap on March 29, 2011 with Eurobank EFG Private Bank Luxembourg S.A. ("Eurobank") for a non-amortizing notional amount of $50 million (the "Eurobank Swap").  The Eurobank Swap is effective from April 1, 2012 to April 1, 2015.  Excel made quarterly payments to Eurobank at a fixed rate of 1.80%, 2.25% and 2.75% for the first, second and third year, respectively, while Eurobank made quarterly floating-rate payments of 3-month LIBOR on the same notional amount.  On July 4, 2013, Eurobank notified Excel that Excel's crystallized liability under the Eurobank Swap is $2,154,000.

(c)    The Marfin Swap

On July 11, 2011 Excel entered into an unsecured interest rate swap with Marfin Popular Bank Public Co. Ltd., Greek Branch ("Marfin") for a non-amortizing notional amount of $50 million (the "Marfin Swap").  The Marfin Swap is effective from January 3, 2013 to January 3, 2017.  Excel makes quarterly payments to Marfin at a fixed rate of 1.5% for the first year, and 2.98% for the remaining years, while Marfin makes quarterly floating-rate payments of 3-month LIBOR to Excel based on the same notional amount.  As of July 1, 2013, the estimated mark-to-market liability of Excel in connection with the Marfin Swap was approximately $4.0 million.

**D.    Pending Litigation as of the Petition Date**

The Debtors are, from time to time, subject to various asserted or unasserted legal proceedings and claims.  As of the date hereof, the Debtors have taken a litigation reserve of approximately $225,000.  The Debtors believe that the majority of claims outside of the litigation reserve would be covered by their insurance policies should any claims proceed to final judgment or be settled by the parties.

Although the Debtors cannot predict what types of claims may be asserted against them in the future, the current claims asserted against the Debtors can be characterized as either breach of contract claims, vessel or port facilities damage claims, claims in respect of cargo, or claims of seafaring employees of Maryville.  The Debtors are currently actively defending approximately six lawsuits in court or arbitration proceedings.  Of the claims asserted, no single claim amount alleged exceeds $500,000.  Set forth on Appendix H hereto is a schedule of the pending claims against the Debtors, identified with reference to the jurisdiction in which such claim is pending, the nature of the pending claim, and the claim amount alleged, if any.  As set forth in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to such claims.

**E.    Events Leading to the Chapter 11 Cases**

1.    The International Dry Bulk Shipping Market

The dry bulk shipping industry is cyclical with attendant volatility in charter hire rates and profitability.  Charter rates for dry bulk vessels have been in a significant down cycle since 2008.  The Baltic Dry Index ("BDI") is an assessment of the price of moving major bulks by vessels.  The BDI measures 23 shipping routes on a timecharter basis, and covers numerous types of vessels, including Handymax, Panamax, and Capesize.  The dry bulk market deteriorated significantly in 2012.  On February 3, 2012, the BDI dropped to a 26-year low of 647, owing to a combination of both weak vessel demand and increases in supply.  The average BDI for 2012 was 920, approximately 41% lower than the average index of 1,549 in 2011.  As of November 25, 2013, the BDI closed at 1,483.  Over the past couple of months, the dry bulk market has displayed a nascent recovery in charter rates, evidenced by the increase in the BDI relative to the 2012 average.  Despite the recent improvement in rates and industry vessel utilization, the Debtors believe that the use of slow-steaming by vessel operators, continued growth in new building vessel orders and expected delivery of dry bulk vessels casts uncertainty as to the sustainability of the recent rate growth and further expansion of future charter rates.

The Debtors' results of operations depend primarily on the charter hire rates that they are able to realize.  Fluctuations in charter rates result from changes in the supply and demand for vessel capacity and changes in the supply and demand for the major commodities carried by sea internationally.  The recent decline and volatility in charter rates is, in significant measure, the result of vessel oversupply, including numerous deliveries of new ships (described in the industry as "newbuilding").  As the global economic downturn continues, lagging demand for dry bulk commodities has been unable to fully absorb the approximately 98.5 and 98.7 million new deadweight tonnage

10

that entered the market in 2011 and 2012, respectively, despite almost record high scrapping levels.  The result is decreased demand and increased supply.

While the Debtors' performance has improved in recent months, the decline and volatility in charter rates during 2012 negatively impacted the Debtors.  The value of their vessels declined due to oversupply, and charter hire rates also dropped.  The Debtors' cash flows and liquidity suffered as a result of these factors, and in consequence the Debtors have not been able to comply with certain covenants in their loan agreements.  Further, as a result of the volatility and rate decline witnessed in the charter markets and continued oversupply of new vessels, vessel values are expected to remain under severe pressure.

2.        Evaluation of Restructuring Alternatives

(a)        Syndicate Credit Facility Amendments and Failed Equity Offering

Since early 2012 the Debtors have worked to address their cash flow issues and debt maturities, including retaining financial advisors and engaging in ongoing negotiations with their lenders under their secured debt facilities.  In particular, in order to address their financial situation, the Debtors entered into a series of amendments to the Syndicate Credit Facility.  Significantly, as of March 30, 2012, the Debtors negotiated a fifth amendment (the "Amendment No. 5") to the Syndicate Credit Facility.  Under Amendment No. 5, the Syndicate Credit Facility's amortization schedule, collateral value clause and certain of its financial covenants were modified in order to permit the Debtors to improve their debt maturity profile and respond to the weak charter conditions and volatility in vessels' market values.  Amendment No. 5 also modified the loan repayment schedule to allow the Debtors, at their option, to defer the repayment of principal amount of up to $100 million, originally scheduled for 2012 and 2013, to the balloon payment due at the end of the Syndicate Credit Facility's term in April 2016.  Following the amendment to the Syndicate Credit Facility, the Debtors reached agreements with each of Credit Suisse and DVB to similarly amend a number of financial covenants under the respective credit facilities with those institutions.

Under Amendment No. 5, Excel was required to raise at least $30 million in equity (the "Additional Equity") by December 31, 2012, through an offer and sale of newly issued capital stock of Excel (the "Offering").  In connection with Amendment No. 5 and the Offering, on March 29, 2012, Excel entered into a backstop agreement with Ivory, pursuant to which Ivory deposited $20 million (the "Escrow Funds") into an escrow account (the "Escrow Account") set up for that purpose and committed to purchase capital stock of Excel up to the total amount deposited in the escrow account, in the event that Excel failed to raise the Additional Equity.

To launch the Offering, on May 7, 2012, Excel entered into separate sales agreements with each of Deutsche Bank Securities Inc. and Knight Capital Americas, L.P., as sales agents, under which it sought to sell an aggregate of up to $35.0 million in gross proceeds of its Class A common stock par value $0.01.  The common stock was to be sold in privately negotiated transactions or transactions deemed to be "at-the-market offerings," including sales made directly on the NYSE, on any other existing trading market for the Class A common stock or to or through a market maker.  Unfortunately, Excel was able to raise only $4.1 million of Additional Equity given the severe continuing decline in the international dry bulk shipping market and the Debtors' over-leveraged capital structure.

(b)        Redelivery of the Bareboat Charters

Bird Acquisition Corp., a non-Debtor indirect subsidiary of Excel ("Bird"), and seven Marshall Islands LLCs wholly owned by Bird (collectively with Bird, the "Bareboat Charterers") previously operated seven vessels under bareboat charters ("Bareboat Charters") entered into in July 2007 with third party vessel owners ("Bareboat Owners").  Due to the dramatic drop in charter rates, after accounting for daily operating costs, in 2012 the Bareboat Charterers were losing approximately $10,000 per day per bareboat chartered vessel.  The Bareboat Charterers took steps to reduce these losses, which led to the redelivery of each of the seven vessels back to their respective owners during the course of the fourth quarter of 2012.  The Bareboat Owners asserted claims against the Bareboat Charterers for payment of alleged outstanding hire and damages arising from the early termination of the Bareboat Charters.  The Bareboat Charterers denied any liability to the owners of the bareboat charter vessels.

11

Three of the Bareboat Charterers (the "Settling Bareboat Charterers"), together with Excel, signed a settlement agreement with the respective owners of three of the Bareboat Charter vessels ("Settling Bareboat Owners"), pursuant to which claims arising out of the redelivery of the chartered vessels were released in exchange for the agreement of Excel, Bird and the Settling Bareboat Charterers to pay $5 million in cash or in stock, in the latter case at the market price on the date of the stock's issuance, by December 2015 (with Excel's option to extend such deadline to December 2017 pursuant to the terms of the settlement agreement, which extension would require interest payments on any remaining balance of 10% per year, payable quarterly).  The Settling Bareboat Charterers are not Debtors in these chapter 11 cases.  However, the Settling Bareboat Owners have claims against Excel arising out of the settlement agreement.  The claims of the Settling Bareboat Owners against Excel arising under the settlement agreement are classed as Impaired Excel General Unsecured Claims under the Plan and will share in the recovery proposed for Class 8 – Impaired Excel General Unsecured Claims.

The remaining four bareboat charter vessels were also redelivered to their respective owners.  Those German owners (and together with any past or potential assignee or designee, including their financing bank, Commerzbank AG, the "German Owners") initiated arbitration proceedings against the respective Bareboat Charterers in connection with their claims under the relevant Bareboat Charters.  The arbitration claims of the German Owners lie directly against Bird and the relevant Bareboat Charterers which are direct subsidiaries of Bird.  As described in **Section V.H. "Other Risks Relating to the Debtors' Business and the Debtors' Ability to Satisfy their Debt Obligations After the Effective Date"** below, the German Owners may attempt to enforce their alleged claims against other vessels owned by the Debtors on the basis that they constitute "associated ships" within the meaning of the South African *Admiralty Jurisdiction Regulation Act 1983*.  The German Owners have been given notice in these Chapter 11 Cases, including notice of the order of the Bankruptcy Court setting a deadline for the filing of claims against the Debtors as described in **Section III.E.2 "Setting of Bar Date"** below.  However the German Owners failed to timely file any proof of claim against any of the Debtors on account of such alleged claims.  As a consequence, any such alleged claims, even if they had existed, are now barred and have been extinguished.

(c)       Divestiture of Hope Shipco

In May 2013, Excel transferred ownership of one of its Vessel-owning subsidiaries, Hope Shipco LLC ("Hope Shipco") (the owner of the Vessel *M/V Mairaki*), to ABN Amro Bank N.V ("ABN Amro") in full and final satisfaction of its and certain of its subsidiaries' obligations under two secured debt instruments.

Hope Shipco was a borrower pursuant to that certain secured loan agreement for a loan of up to $42 million, dated February 11, 2010 (as amended, modified and supplemented), whereby ABN Amro was the lender (the "ABN Facility").  The ABN Facility was guaranteed by Excel and secured by, among other things, (i) a first priority mortgage over, and an assignment of insurances and earnings with respect to, the *M/V Mairaki*, (ii) a manager's undertakings for the *M/V Mairaki*, (iii) an account pledge agreement for the *M/V Mairaki*, and (iv) a pledge over the membership interest in Hope Shipco.  As of April 30, 2013, $35 million was outstanding under the ABN Facility.  Certain subsidiaries of Excel were also counterparties to an interest rate swap (the "ABN Swap") with ABN Amro, which was guaranteed by Excel.  As of April 29, 2013, the ABN Swap represented an estimated mark-to-market liability for Excel of $29 million.  The ABN Swap was secured by the same collateral as the Syndicate Credit Facility on a last-out basis.

Excel entered into negotiations with ABN Amro in March 2013.  Between May 2, 2013 and May 28, 2013, Excel and certain of its subsidiaries, including Hope Shipco, received various reservations of rights and notices of default pursuant to which ABN Amro gave notice of its intent to exercise its rights and remedies as a secured lender. Given that the obligations of Excel and certain of its subsidiaries under the ABN Facility and the ABN Swap significantly exceeded the equity value of the membership interests in Hope Shipco, the parties ultimately entered into a settlement agreement to avoid the unnecessary expenses associated with the exercise of such remedies. As part of that settlement, the parties agreed voluntarily to transfer the ownership of Hope Shipco to ABN Amro's designee in full and final satisfaction of Excel's obligations under both the ABN Facility and ABN Swap.  As part of this consensual settlement, ABN Amro agreed to waive its deficiency claims against Excel with respect to the undersecured portions of the ABN Facility and the ABN Swap.  Hope Shipco's shares were transferred to a subsidiary of ABN Amro on May 31, 2013.  ABN Amro does not have a claim against Excel or any of the Debtors in these chapter 11 cases.

12

(d)    Pre-petition Negotiations with the Steering Committee and Filing of Pre-Negotiated Plan

As of August 2012, Excel had only raised approximately $4.1 million of Additional Equity through the Offering.  By that point, the Debtors had recognized that they would need to pursue a comprehensive restructuring.  To that end, in July and September 2012, the Debtors retained Global Maritime Partners Inc. and Miller Buckfire & Co., LLC ("Miller Buckfire"), respectively, as financial advisors to assist them in evaluating and implementing their restructuring strategies.  Shortly thereafter, a steering committee (the "Steering Committee") of certain Syndicate Credit Facility lenders was formed in connection with a potential restructuring of the Debtors' obligations under the Syndicate Credit Facility.

In connection with negotiations on a potential restructuring with the Steering Committee, the Debtors entered into additional amendments to the Syndicate Credit Facility subsequent to Amendment No. 5 and amended the Escrow Agreement governing the release of the Escrow Funds.  Under a sixth amendment to the Syndicate Credit Facility dated September 30, 2012 ("Amendment No. 6"), the Debtors agreed to repay Syndicate Credit Facility loan principal in the amount of $9.0 million (comprised of $3.0 million per month in October, November and December 2012), in return for agreement by the Syndicate Credit Facility lenders to forbear from exercising their rights in connection with noncompliance of certain loan agreement provisions through December 31, 2012.  In addition to the repayments under Amendment No. 6, in December 2012, Excel sold *M/V Attractive*, a Handymax vessel, for net proceeds of approximately $2.7 million, which were used to repay indebtedness under the Syndicate Credit Facility.

Following the expiration of the forbearance period in Amendment No. 6, the Syndicate Credit Facility lenders agreed to forbear from exercising their rights, through subsequent amendments, in connection with certain overdue principal and interest payments through May 15, 2013.  In particular, the Debtors obtained forbearance from the Syndicate Credit Facility lenders with respect to, among other things, the non-payment of a principal installment of approximately $25 million due January 2, 2013.  Concurrent with its negotiations with the Steering Committee, the Debtors also engaged in similar discussions with their lenders under their other credit facilities.  The Debtors are currently in breach of certain financial covenants relating to outstanding indebtedness for fiscal quarter ended December 31, 2012 and certain other covenants.

After several months of negotiation, in May 2013, the Debtors and the Steering Committee agreed in principle on the terms of a restructuring.  On July 1, 2013, a majority of the Syndicate Credit Facility lenders executed a restructuring support agreement with the Debtors, indicating agreement with the terms set forth on a restructuring term sheet and their agreement to support confirmation of a pre-negotiated plan.  The restructuring support agreement was filed with the Debtors' Notice of Filing of Restructuring Support Agreement, dated July 1, 2013 [Docket No. 18], and a pre-negotiated plan was filed simultaneously [Docket No. 19].  However, this plan did not draw the support of all constituents, and subsequent to the Petition Date all major constituents participated in a plan mediation with Judge Peck which resulted in an agreement on the terms of a restructuring as set forth in the Plan described below.

(e)    Formation of Christine Holdings

As of June 26, 2013, Excel held a direct 71.4% interest in Christine Shipco.  Christine Shipco is a limited liability company formed under Marshall Islands law.  Section 21 of the Marshall Islands Limited Liability Company Act of 1996 (52 MIRC Part IV) provides that a member's membership interests in a limited liability company terminate upon the member's bankruptcy.  The Debtors consider it likely that this provision is an unenforceable *ipso facto* clause.  Nevertheless, to mitigate any risk of Excel's interest in Christine Shipco dissolving upon the Petition Date, in the face of an explicit threat by RMI to cause such dissolution, Excel incorporated Christine Holdings, a new, wholly-owned direct subsidiary, in the Marshall Islands on June 20, 2013, and transferred its 71.4% membership interest in Christine Shipco to Christine Holdings on June 27, 2013.  Excel believes that this transfer is permitted under the limited liability company agreement governing Christine Shipco (the "Christine LLC Agreement").  As discussed herein, RMI disputes that position.

(f)        Negotiations with the Ad Hoc Committee of Noteholders

As the Debtors considered their restructuring alternatives, they recognized that a comprehensive restructuring of their balance sheet would require them to restructure certain unsecured claims against Excel.  In particular, the Debtors recognized that the Convertible Notes, which make up the bulk of such unsecured claims against Excel, exclusive of the unsecured deficiency claims of the Syndicate Credit Facility lenders, and which pursuant to their terms may be redeemed at par on October 15, 2014 at the option of the holders, represented a substantial burden for Excel in view of the uncertain dry bulk market.  As the Debtors formulated the Plan, they concluded that holders of impaired general unsecured claims against Excel, including the holders of Convertible Notes (the "Noteholders"), may be entitled to a minimal recovery on account of, among other things, the Debtors' unencumbered interests in Christine Shipco, and the dispute over the ownership of the Escrow Funds.  In light of this, the Debtors believed that it was appropriate to engage with the Noteholders and seek their support for a plan in exchange for some recovery on their claims.  Therefore, before the Petition Date, the Debtors and their advisors engaged in discussions with an ad hoc committee of Noteholders (the "Ad Hoc Committee of Noteholders") regarding such holders' treatment in the restructuring, including providing certain financial and other information about the Debtors and non-Debtor affiliates, including Christine Shipco.  No agreement was reached at this time.  However, subsequent to the Petition Date, the Debtors and their advisors, along with the Agent for the Syndicate Credit Facility and certain of the Syndicate Credit Facility lenders and their advisors, engaged in mediation with the Creditors' Committee, which is comprised of members of the Ad Hoc Committee of Noteholders, and its advisors and the support of the Creditors' Committee for the Plan was ultimately obtained.

### III.        THE CHAPTER 11 CASES

#### A.        Motions Filed on the Petition Date

To ease their transition into chapter 11 and to expedite their emergence from chapter 11, on the Petition Date, the Debtors filed various "first day" motions requesting permission for administrative relief and to continue operating their business, including motions to use cash collateral, to continue using their existing cash management system and to pay trade vendors, insurance premiums and taxes.  On July 3, 2013, the Bankruptcy Court granted each of these motions on an interim basis.  To date, with the exception of the final order relating to cash management, final orders have been entered with respect to each of the first day motions.

On the Petition Date, the Debtors also sought an order enforcing the automatic stay and declaring invalid *ipso facto* provisions.  The Debtors sought this relief in order to protect their assets on a world-wide basis against parties in foreign jurisdictions and to preserve value for the estates.  The Debtors' motion for an order enforcing and restating the automatic stay and *ipso facto* protections was granted by the Bankruptcy Court on July 3, 2013 [Docket No. 34].

#### B.        Formation of the Creditors Committee

On July 10, 2013, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") to represent the interests of all unsecured creditors in these cases.  The U.S. Trustee subsequently amended such appointments to the Creditors' Committee as of August 10, 2013.  The Creditors' Committee currently consists of the following parties:  Christiana Trust; Kayne Anderson Capital Advisors, L.P.; Silverback Asset Management, LLC; and Zazove Associates, LLC.  The Creditors' Committee has retained the following professionals:  Akin Gump Strauss Hauer & Feld LLP, as counsel, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, as conflicts counsel, and Jefferies LLC, as financial advisor.

#### C.        Plan Mediation Leading to the Plan

On September 11, 2013, at the request of the Debtors and in an effort to resolve continued disputes regarding the terms of the Debtors' restructuring, the Bankruptcy Court ordered that the Debtors, the Creditors' Committee, the Steering Committee, Ivory, RMI, and certain other parties, including Oaktree and certain Syndicate Credit Facility lenders, participate in mediation designed to build consensus among the parties regarding the terms

of a plan of reorganization [Docket No. 322]. Beginning on September 23, 2013 and continuing for several more days throughout September and October 2013, Judge Peck led the mediation at the offices of the Debtors' counsel in New York. The mediation was successful and resulted in an agreement on the terms of the Debtors' restructuring between the Debtors, the Creditor's Committee, Oaktree and certain other Syndicate Credit Facility lenders collectively holding or controlling a controlling percentage of the lenders' claims and Ivory. The terms of that restructuring are described in **Article IV – The Plan of Reorganization** below.

> D.    **Litigation During the Chapter 11 Cases**

> 1.    Motion to Terminate Exclusivity

On August 2, 2013, the Creditors' Committee filed a motion seeking to terminate the Debtors' exclusive plan filing and solicitation periods [Docket No. 118]. A contested hearing on the Creditors' Committee's motion was held on August 29, 2013. By order dated August 30, 2013, the Court denied the Creditors' Committee's motion to terminate exclusivity [Docket No. 288].

> 2.    Dispute Over the $20 Million Escrow Funds

As described above, on March 29, 2012, Excel entered into a backstop agreement with Ivory pursuant to which the Escrow Funds were placed into the Escrow Account to be held pursuant to the terms of an escrow agreement. *See* **Section II.E.2(a) "Syndicate Credit Facility Amendments and Failed Equity Offering"**. On August 2, 2013, the Creditors' Committee filed a complaint against Excel and Ivory seeking a Declaratory Judgment that the Escrow Funds are unencumbered property of the Debtors' estates that should be released to the Debtors' estates [Docket No. 1, Adversary case 13-08338]. On August 30, 2013, the Creditors' Committee filed a motion for summary judgment on their complaint [Docket No. 8; Adversary case 13-08338].

On September 9, 2013, the Debtors filed an answer [Docket No. 12; Adversary case 13-08338] and a cross motion for summary judgment [Docket No. 11; Adversary case 13-08338] on the complaint. On September 9, 2013, Ivory filed an answer to the complaint and cross-motion for summary judgment declaring that it owns the Escrow Funds [Docket No. 13; Adversary case 13-08338]. The Creditors' Committee filed a reply and objection to the Debtors' and Ivory's motions for summary judgment on September 18, 2013 [Docket No. 16; Adversary case 13-08338]. The Debtors and Ivory filed their respective replies on September 25, 2013 [Docket Nos. 19 and 18; Adversary case 13-08338]. The Creditors' Committee has agreed to dismiss this adversary proceeding contemporaneous with the Effective Date in partial consideration for the distribution unsecured creditors will receive under the Plan.

> 3.    Dispute with Robertson Maritime Investors

Shortly before the Petition Date, Excel received a notice from RMI relating to Excel's and RMI's respective equity interests in non-Debtor Christine Shipco. The notice alleged, among other things, that the conveyance by Bird, a subsidiary of Excel, of its 71.4% interest in Christine Shipco to Excel in July 2012 was without RMI's knowledge and violated RMI's right of first offer ("ROFO") under the Christine LLC Agreement. Subsequent to the Petition Date, RMI filed its Omnibus Objection to First Day Pleadings and Debtors' Disclosure Statement [Docket No. 25], and Supplemental Objection to Debtors' Disclosure Statement [Docket No. 328] (together, the "RMI Objection").

The RMI Objection alleges (the "RMI Allegations"), among other complaints, that the breach of the ROFO canceled Excel's indirect interest in Christine Shipco, and that as a result the Debtors hold Christine Shipco in trust for RMI. RMI also alleges that Christine Shipco, Bird and Excel signed a loan modification to the Christine Shipco Facility without RMI's knowledge or consent. The Debtors dispute RMI's position and believe RMI's allegations have no merit. RMI further contends that it has a prepetition claim for damages in the amount of $10-30 million against Excel arising from the alleged breach of the ROFO. The Debtors do not believe there is any basis for this claim or for the claim amount alleged by RMI. Specifically, the Debtors do not believe that the ROFO is triggered by internal corporate reorganizations, especially where, as here, there is no change in the nature of the business enterprise, its ultimate control, or its management. Rather, the Debtors believe that by its terms, the ROFO is only

15

triggered in the event of a proposed transfer to an unaffiliated third party. The Debtors also do not believe that the Plan affects the terms and status of Christine Shipco's operative documents or the members' rights thereunder. The claim asserted by Robertson is a contingent claim for damages and is included in Class 8 – Impaired Excel General Unsecured Claims.

RMI has advised the Debtors that it intends to contest confirmation of the Plan. Specifically, RMI contends that the Plan exceeds the jurisdiction of the Bankruptcy Court by purporting to adjust the rights of non-debtors and third parties. The Debtors disagree with these contentions and will provide a detailed response to these confirmation objections in connection with their brief in support of confirmation of the Plan.

### E.  Other Events in the Chapter 11 Case

#### 1.  Odell/Minta Sale

On the Petition Date, included among the Debtors were two direct subsidiaries of Excel, Odell International Ltd. ("Odell") and Minta Holdings S.A. ("Minta"), which were the owners of the Vessels *M/V Mairouli* and *M/V July M*, respectively. Odell and Minta were borrowers under a secured loan facility with Credit Suisse, as lender, and Excel, as guarantor, dated as of November 27, 2007 (as amended). Before the Petition Date, Excel began negotiating with Credit Suisse, the lender under the Odell/Minta Facility, to restructure and settle the obligations under that facility. Excel and Credit Suisse ultimately reached an agreement whereby Excel would sell the assets of Odell and Minta pursuant to a sale under section 363 of the Bankruptcy Code. Credit Suisse (or its nominee) agreed to credit bid, pursuant to section 363(k) of the Bankruptcy Code, up to the maximum amount of its secured claim against the collateral securing the Odell/Minta Facility as consideration for the purchase of those assets. In order to ensure that Excel received the highest and best price possible in the 363 sale, Excel engaged a third party broker to market the two Vessels owned by Odell and Minta.

On the Petition Date, the Debtors sought authority to establish bid procedures and schedule an auction in connection with the proposed sale of the shares in Odell and Minta to a nominee of Credit Suisse. The Bankruptcy Court entered an order approving the Debtors' proposed bid procedures and scheduling a hearing to consider the sale of the shares in Debtors Odell and Minta for August 5, 2013. The Debtors also sought and received approval to enter into a debtor-in-possession loan, financed by Credit Suisse, for an amount equal to the lesser of (i) $500,000 or (ii) the post-petition operating and restructuring costs of Odell and Minta (including, without limitation, Credit Suisse's restructuring costs). At the sale hearing held on August 5, 2013, the Bankruptcy Court approved the sale to Credit Suisse and ordered that the chapter 11 cases as to debtors Odell and Minta be dismissed upon the closure of the sale [Docket No. 135]. The sale was completed on August 7, 2013 by the transfer of the vessels to a third party entity affiliated with Ms. Ismini Panayotides [Docket No. 150]. Credit Suisse agreed that its guaranty claims against Excel would be discharged in connection with the Odell/Minta sale and that Credit Suisse will receive no further distribution on account of these claims.

#### 2.  Setting of Bar Date

On September 5, 2013 the Bankruptcy Court entered an order establishing a deadline of December 30, 2013 for claims by governmental units, and a deadline of October 18, 2013 for all other claims, and approved the proposed Proof of Claim form and other procedures related thereto [Docket No. 302].

#### 3.  Recognition of the Automatic Stay in South Africa

On September 10, 2013, in response to concerns that creditors may avail themselves of the creditor-friendly maritime law of South Africa and in light of the imminent arrival of the Debtors' vessel *M/V Iron Miner* in the South African port of Saldanha, the Debtors filed an application for recognition and application in South Africa of the Bankruptcy Court's order dated July 3, 2013 enforcing and restating the automatic stay and *ipso facto* protections (*See* **Section III.A "Motions Filed on the Petition Date"**). The High Court of South Africa (Western Cape High Court, Cape Town) granted the Debtor's application on September 12, 2013.

## IV.    SUMMARY OF THE PLAN OF REORGANIZATION

The primary objectives of the Plan are to (i) restructure the Debtors' obligations under the Syndicate Credit Facility and (ii) settle, compromise, or otherwise dispose of certain Claims on terms that the Debtors believe to be fair and reasonable and in the best interests of their respective estates and stakeholders. The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions. Capitalized terms not defined herein have the meaning ascribed to them in the Plan.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and their Estates, the Reorganized Debtors, and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

### A.    Overview Of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and its interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets. The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes that plan binding upon the debtor and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) holds a claim or interest that is impaired under the plan; (ii) has voted to accept or reject the plan; or (iii) receives or retains any property under the plan.

### B.    Classification And Treatment Of Claims And Interests

The Plan, though proposed jointly, constitutes separate plans proposed by each of the Debtors. Therefore, except as expressly in the Plan, the classifications set forth below will be deemed to apply separately with respect to each Plan proposed by the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Claims is set forth in Article II of the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

1.    Treatment Of Unclassified Claims

(a)    Administrative Claims

An Administrative Claim means a claim arising under Bankruptcy Code section 507(a)(2) for costs and expenses of administration of the chapter 11 cases under Bankruptcy Code sections 503(b), 507(b), or 1114(e)(2), including: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and claims of governmental units for taxes (including tax audit claims related to tax years commencing after the Petition Date, but excluding claims relating to tax periods, or portions thereof, ending on or before the Petition Date); and (b) all other claims entitled to administrative claim status pursuant to a final order of the Bankruptcy Court, but excluding Priority Tax Claims, Non-Tax Priority Claims and Professional Fee Claims.

17

On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the chapter 11 cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors in consultation with the other Consenting Parties or the Reorganized Debtors.

(b)    Priority Tax Claims

A Priority Tax Claim means a claim of a governmental unit of the kind specified in Bankruptcy Code sections 502(i) or 507(a)(8).

On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim will be paid in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Debtors in consultation with the other Consenting Parties or the Reorganized Debtors and such Holder will have agreed upon in writing.

(c)    Professional Fee Claims

A Professional Fee Claim means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the chapter 11 cases prior to the Effective Date will file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the chapter 11 cases on or before the 30th day following the Effective Date. Without limiting the foregoing, the Reorganized Debtors may pay the charges incurred by the Reorganized Debtors on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Professional Fees are not classified and are not entitled to vote on the Plan.

2.    Treatment of Classes

(a)    Class 1 - Non-Tax Priority Claims.

(i)    Impairment and Voting. Class 1 Claims in respect of all Debtors are Unimpaired. Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan and will be conclusively deemed to have accepted the Plan.

(ii)    Distribution. Unless the Holder of any such Claim and the Debtors agree to a different treatment, on the Effective Date, each Holder of an Allowed Non-Tax Priority Claim will have its Claim paid in full in cash.

(b)     Class 2 – Syndicate Credit Facility Secured Claims

     (i)     <u>Impairment and Voting</u>.  Class 2 Claims in respect of all Debtors are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 2 Syndicate Credit Facility Secured Claim is entitled to vote to accept or reject the Plan.

     (ii)    <u>Allowance and Distribution</u>.   Upon the Effective Date, the Syndicate Credit Facility Secured Claims shall be Allowed for all purposes in the aggregate amount of $579 million.  On the Effective Date, each Holder of an Allowed Syndicate Credit Facility Secured Claim will receive, in full and final satisfaction, release, discharge of, and in exchange for, such Syndicate Credit Facility Secured Claim, its Pro Rata share of (a) the Amended and Restated Senior Secured Credit Facility; and (b) 16.7 million shares of New Common Stock, representing 83.3% of all New Common Stock to be issued under the Plan, prior to dilution on account of the Co-Investment Rights.[5]  Additionally, on the Effective Date, the Debtors shall pay  the reasonable fees and documented expenses of (i) Oaktree in its capacity as a secured lender, including the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, its counsel, incurred prior to and subsequent to the commencement of the Chapter 11 Cases in connection with the restructuring of the Debtors, (ii) Angelo Gordon in its capacity as a secured lender and primarily related to the negotiation and documentation of corporate governance related to Holdco, up to $400,000, including those of Wachtell, Lipton, Rosen & Katz, its counsel, and (iii) the Agent for the Syndicate Credit Facility, including those of Blackstone Group International Partners LLP, Freshfields Bruckhaus Deringer US LLP, and Holland & Knight LLP as advisors to the Agent and the Secured Lenders, incurred in connection with the restructuring of the Debtors, to the extent not previously paid in connection with the Final Cash Collateral Order and the Stipulated Cash Collateral Order.

         All New Common Stock issued to Holders of Allowed Class 2 Claims pursuant to the Plan shall be deemed to automatically and without the need for any action be contributed to Holdco pursuant to Section 5.7 of the Plan.

(a)     Class 3 – Christine Shipco Facility Secured Guaranty Claim

     (i)     <u>Impairment and Voting</u>. The Class 3 Claim is Unimpaired, and the Holder of the Allowed Class 3 Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holder of the Class 3 Claim is not entitled to vote to accept or reject the Plan.

     (ii)    <u>Distribution</u>. The Holder of the Class 3 Claim will have such Claim Reinstated on the Effective Date.

---

[5]    If fully diluted, such New Common Stock shall represent 82% of all New Common Stock issued under the Plan as set forth in the Plan Term Sheet.

(b)    Class 4 – Other Secured Claims

    (i)    <u>Impairment and Voting</u>. Class 4 Claims in respect of all Debtors are Unimpaired, and the Holders of Allowed Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan.

    (ii)    <u>Distribution</u>. Holders of Class 4 Claims will have such Claims Reinstated on the Effective Date.

(c)    Class 5 – [Reserved]

(d)    Class 6 – Impaired Subsidiary Debtor General Unsecured Claims

    (i)    <u>Impairment and Voting</u>.  Class 6 Claims are Impaired, and the Holders of Allowed Class 6 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

    (ii)    <u>Distribution</u>. Holders of Class 6 Claims will not receive or retain any property under the Plan on account of such Claims and the obligations of the Debtors and Reorganized Debtors on account of such Claims will be discharged.

(e)    Class 7 – Unimpaired Subsidiary Debtor General Unsecured Claims

    (i)    <u>Impairment and Voting</u>.  Class 7 Claims are Unimpaired, and the Holders of Allowed Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

    (ii)    <u>Distribution</u>. Holders of Class 7 Claims will have such Claims Reinstated on the Effective Date.

(f)    Class 8 – Impaired Excel General Unsecured Claims

    (i)    <u>Impairment and Voting</u>.  Class 8 Claims are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 8 Claim is entitled to vote to accept or reject the Plan.

    (ii)    <u>Allowance and Distribution</u>.  The aggregate amount of the Syndicate Credit Facility Deficiency Claims shall be either $179.8 million, if the Adequate Protection Payment is made on or before January 2, 2014, or $185,930,760.71, if the Adequate Protection Payment is not made by Excel on or before January 2, 2014, and shall be Allowed solely for voting purposes in such applicable amount in connection with the Plan and such claims shall be, subject to the next sentence, included within the class of Impaired Excel General Unsecured Claims (for the avoidance of doubt, subject to the next sentence, the Holders of Syndicate Credit Facility Claims, on account of and to the extent of the Syndicate Credit Facility Deficiency Claims, shall have all of the rights belonging to the Holders of Class 8 Claims including, without

20

limitation, all rights to distributions and the Co-Investment Rights). The Consenting Parties reserve all rights with respect to the amount, if any, and treatment of a Syndicate Credit Facility Deficiency Claim, if any, held by the Secured Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet. On the Effective Date, and immediately prior to the transfer of the New Common Stock to Holdco and the issuance of the Holdco Units in accordance with Section 5.7 of the Plan, each Holder of an Allowed Impaired Excel General Unsecured Claim will receive, in full and final satisfaction, release, discharge of, and in exchange for, such Allowed Impaired Excel General Unsecured Claim, (a) its Pro Rata share of 1.6 million shares of New Common Stock, representing 8.0% of the New Common Stock to be issued under the Plan, subject to dilution on account of the Co-Investment Rights and (b) its Pro Rata share of the Tranche A Offered Shares and Tranche B Offered Shares subscribed for pursuant to such Holders' Co-Investment Rights.

For purposes of the Plan, the claims held by holders of Excel's 1.875% unsecured convertible senior notes will be allowed on the Effective Date in the amount of $152,005,566.41 on account of unpaid principal and interest due and owing as of the Petition Date (but, for the avoidance of doubt, excluding the Administrative Claims of Christiana Trust as indenture trustee, including with respect to the fees and expenses of Moses & Singer, of up to $450,000). The Consenting Parties reserve all rights with respect to the amount of claims held by holders of Excel's 1.875% unsecured convertible senior notes for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.

Holders of Allowed Class 8 Claims may exercise their Co-Investment Rights pursuant to two separate rights offerings: the 1145 Rights Offering and 4(a)(2) Rights Offering. The Co-Investment Rights pursuant to the 1145 Rights Offering shall be split into two $5.0 million tranches. The Tranche A Subscription Rights shall dilute pro rata the Primary Equity. Each Holder of an Allowed Impaired Excel General Unsecured Claim shall have the right to subscribe for any unsubscribed portion of the Tranche A Offered Shares up to the full amount of the Tranche A Subscription Rights subject to Pro Rata reduction to the extent the Tranche A Subscription Rights are oversubscribed and the individual limits on oversubscription described below, if applicable.

The Tranche B Subscription Rights shall reduce the Ivory Investment on a dollar-for-dollar basis. Ivory shall have the exclusive right to purchase shares equal to the number of unsubscribed Tranche B Offered Shares with respect to the full amount of the Tranche B Subscription Rights.

Each Holder's aggregate Tranche A Subscription Rights (including oversubscription rights related thereto), when taken together with such Holder's Tranche B Subscription Rights, shall be limited to 75% of such Holder's Pro Rata portion of the Section 1145 Stipulated Value. This limit does not apply to the 4(a)(2) Rights Offering.

21

Additionally, Holders of Allowed Class 8 Claims who are Accredited Investors, and who timely return an Accredited Investor Questionnaire to the Subscription Agent pursuant to the Rights Offering Procedures, will have the opportunity to participate in the 4(a)(2) Rights Offering. Notwithstanding anything to the contrary in the Plan, (i) upon the completion of the 1145 Rights Offering and 4(a)(2) Rights Offering, Ivory shall have the exclusive right to purchase shares equal to the number of 1145 Offered Shares and 4(a)(2) Offered Shares remaining unsubscribed pursuant to section 4(a)(2) of the Securities Act and (ii) in no event shall the fact that the Co-Investment Rights are being offered pursuant to two rights offerings diminish Ivory's right to purchase up to 10.1% of the New Common Stock, subject to the rights of Holders of Impaired Excel General Unsecured Claims to exercise their Co-Investment Rights.

Each Holder's aggregate Co-Investment Rights and any New Common Stock acquired pursuant to the oversubscription right shall be limited to 75% of such Holder's Pro Rata portion of the Section 1145 Stipulated Value.

Holders of Syndicate Credit Facility Deficiency Claims shall have all of the rights belonging to the Holders of Allowed Impaired Excel General Unsecured Claims under the Plan including, without limitation, all rights to distributions and the Co-Investment Rights.  If the class of Impaired Excel General Unsecured Claims votes to accept the Plan, then on the Effective Date, the Holders of Syndicate Credit Facility Deficiency Claims shall be deemed automatically and without the need for any action to have waived their entitlement to any distributions of Primary Equity and the Co-Investment Rights on account of their Syndicate Credit Facility Deficiency Claims, and the other Holders of Allowed Impaired Excel General Unsecured Claims Pro Rata participation in the Co-Investment Rights and distributions of Primary Equity shall be increased accordingly.

All New Common Stock issued to Holders of Allowed Class 8 Claims pursuant to the Plan and the exercise of the Co-Investment Rights shall be deemed automatically and without the need for any action to be contributed to Holdco pursuant to Section 5.7 of the Plan.

(g) Class 9 – Unimpaired Excel General Unsecured Claims

    (i) <u>Impairment and Voting</u>.  Class 9 Claims are Unimpaired, and the Holders of Allowed Class 9 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 9 Claims are not entitled to vote to accept or reject the Plan.

    (ii) <u>Distribution</u>.  Holders of Class 9 Claims will have such Claims Reinstated on the Effective Date.

(h) Class 10 – Section 510(b) Claims

    (i) <u>Impairment and Voting</u>. Class 10 Claims against Excel are Impaired, and the Holders of Allowed Class 10 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy

22

Code.  Therefore, the Holders of Class 10 Claims against Excel are not entitled to vote to accept or reject the Plan.

(ii)    <u>Distribution</u>. The Holders of Section 510(b) Claims will not receive or retain any property under the Plan on account of such Section 510(b) Claims and the obligations of the Debtors and Reorganized Debtors on account of Section 510(b) Claims will be discharged.

(i)    Class 11 – Interests in Excel

(i)    <u>Impairment and Voting</u>. Class 11 Interests in Excel are Impaired, and the Holders of Allowed Class 11 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 11 Interests in Excel are not entitled to vote to accept or reject the Plan.

(ii)    <u>Distribution</u>. On the Effective Date, all Interests in Excel will be deemed to be cancelled automatically without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder will be discharged. Holders of Interests in Excel will not receive or retain any property under the Plan on account of such Interests.

(j)    Class 12 – Interests in Debtors Other than Excel

(iii)    <u>Impairment and Voting</u>. Class 12 Interests in respect of all Debtors other than Excel are Unimpaired, and the Holders of Allowed Class 12 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 12 Interests in Debtors Other than Excel are not entitled to vote to accept or reject the Plan.

(iv)    <u>Distribution</u>. Holders of Class 12 Interests will have such Interests Reinstated on the Effective Date.

3.    Intercompany Claims. On the Effective Date, all Intercompany Claims will, at the election of Excel, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

4.    Special Provision Regarding Unimpaired Classes of Claims. Except as otherwise provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

**C.    Acceptance Of The Plan**

1.    Classes Entitled to Vote.  Classes 2 and 8 are Impaired and entitled to vote to accept or reject the Plan.  Classes 1, 3, 4, 7, 9, and 12 are Unimpaired and, therefore, are not entitled to vote.  Classes 6, 10 and 11 are deemed to have rejected the Plan and are not entitled to vote.

2.    Elimination of Classes.  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, will be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

23

3.      Cramdown.  The Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**D.      Means For Implementation Of The Plan**

1.      Continued Legal Existence.  Except as otherwise provided for in the Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity under applicable law in the jurisdiction in which each applicable Debtor is organized, incorporated or otherwise formed and pursuant to such Debtor's articles of organization or formation, operating agreement and other organizational documents in effect as of the Effective Date (provided that such organizational documents will be amended to prohibit the Reorganized Debtors from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code).

2.      Officers and Directors of Holdco and Reorganized Excel.  On the Effective Date, each of the members of the existing board of directors of Excel shall be deemed to have resigned in such capacity.  The Debtors' businesses will continue to be managed, as of the Effective Date, by existing management.  Mr. Gabriel Panayotides shall serve as Chief Executive Officer of Reorganized Excel.  From the Effective Date until the date that is two years after the Effective Date, the board of directors of Holdco (the "Board") shall consist of seven members, and shall be constituted as follows: (a) Oaktree shall have the right to designate three members of the Board; (b) Angelo Gordon shall have the right to designate two members of the Board, one of which designees shall be subject to the consent of Oaktree (such consent not to be unreasonably withheld); and (c) the current board of directors of the Debtors shall have the right to designate two members of the Board.  At least four business days prior to the Voting Deadline, Excel will file a notice with the Bankruptcy Court designating the members of the boards of directors of Holdco and Reorganized Excel who will be appointed automatically without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors or Holdco.  Such notice shall also include compensation, if any, to be paid to the members of the boards of directors of Holdco and Reorganized Excel to the extent such compensation, if any, has been determined at that time.  Current Excel director Apostolos Kontoyannis shall be paid a performance bonus of $350,000 on the Effective Date.

3.      Officers of Reorganized Debtors.  Subject to Section 5.2 of the Plan, all officers of the Debtors in office as of the Effective Date will continue in office after the Effective Date until and unless removed by the applicable Reorganized Debtors' board of directors to be appointed as soon as practicable after the Effective Date, subject to any restrictions imposed under the Plan or any agreements executed in connection with implementation of the Plan.

4.      Ivory Investment.  On the Effective Date, Ivory will (1)(x) contribute to Excel at least $5 million and up to an additional $10 million in cash, subject to the exercise of the Co-Investment Rights and the Ivory Subscription Rights and (y) release all of its claims to and waive all of its rights in respect of the Escrow Funds; and (2) agree to a settlement (as set forth herein) of Adversary Case No. 13-08338.  In exchange for the foregoing, Ivory shall receive 1,739,231 shares of New Common Stock, representing up to 8.7% of the New Common Stock, subject to dilution and reduction, as applicable, on account of the Co-Investment Rights and without taking into account Ivory's right to purchase shares equal to the number of shares not taken up by holders of Class 8 Claims pursuant to the Co-Investment Rights.  All New Common Stock issued to Ivory, including any New Common Stock issued pursuant to the oversubscription rights described in Section 3.3(g) above, shall be exempt from registration under Section 4(2) of the Securities Act or Regulation D promulgated thereunder.

5.      Compromise and Settlement of Adversary Case No. 13-08338.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for Ivory's (x) settlement and release of all of its claims to and waiver of all of its rights in respect of the Escrow Funds, and (y) contribution to Excel of at least $5 million and up to an additional $10 million in cash (subject to the exercise of the Co-Investment Rights and the Ivory Subscription Rights), the provisions of the Plan, including the Ivory Investment, shall constitute a good faith compromise and settlement of Adversary Case No. 13-08338, including all claims, interests and controversies relating to the Escrow Funds, and any and all claims and Causes of Action related thereto against Ivory, and its affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives.  The entry of the Confirmation Order shall constitute the

24

Bankruptcy Court's approval of the compromise or settlement of Adversary Case No. 13-08338, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.

6.      Co-Investment Rights.  Pursuant to and in accordance with the Rights Offering Procedures and the Subscription Agreements, each Eligible Holder shall receive Subscription Rights to subscribe for (i) the Tranche A Offered Shares at an offering price equal to $16.25 per share, (ii) the Tranche B Offered Shares at an offering price equal to $17.25 per share, and (iii) to the extent applicable, with respect to Eligible Holders who are Accredited Investors, the 4(a)(2) Offered Shares, at an offering price equal to $16.25 per share.  On, or as soon as reasonably practicable after, the Effective Date, the Reorganized Debtors will distribute the applicable Offered Shares purchased by each Eligible Holder that has properly exercised its applicable Subscription Rights in accordance with the delivery instructions set forth in such Eligible Holder's applicable Subscription Agreements.

Secured Lenders, Holders of Allowed Impaired Excel General Unsecured Claims and Ivory shall not be required to execute the Holdco LLC Agreement before receiving their respective distributions of Holdco Units under the Plan; any such Persons who do not execute the Holdco LLC Agreement shall be automatically deemed to have accepted the terms of the Holdco LLC Agreement (in their capacity as members of Holdco) and to be parties thereto without further action.  The Holdco LLC Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Holdco Units shall be bound thereby.

7.      Transfer of New Common Stock to Holdco and Issuance of Holdco Units.  On the Effective Date, and immediately after the issuance of the New Common Stock under the Plan, all holders of New Common Stock shall be deemed to have transferred their shares of New Common Stock to Holdco automatically pursuant to the terms of the Plan and without further action required.  Subject to the terms in the Plan, the Secured Lenders, the Holders of Allowed Impaired Excel General Unsecured Claims and Ivory shall receive Holdco Units in the same percentages as they held New Common Stock in Reorganized Excel on the Effective Date after the exercise of the Co-Investment Rights.

8.      Section 1145 Exemption and Section 4(a)(2) Exemptions.  Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of New Common Stock as Primary Equity to the Secured Lenders and the Holders of Allowed Impaired Excel General Unsecured Claims and any 1145 Offered Shares issued to the Holders of Allowed Impaired Excel General Unsecured Claims pursuant to the 1145 Subscription Rights, and the issuance of Holdco Units pursuant to Section 5.7 of the Plan in exchange for such shares and 1145 Offered Shares, shall be exempt from registration under the Securities Act without further act or action by any Person, and from any state or local law requiring registration for offer or sale of a security.

The Section 1145 exemption will not apply to any securities issued under the 4(a)(2) Rights Offering or to Ivory under the Plan.  Securities issued pursuant to the 4(a)(2) Rights Offering or to Ivory will be issued pursuant to an exemption under section 4(a)(2) of the Securities Act, and may not be transferred or resold absent registration or exemption under the Securities Act or any applicable state securities law.

9.      Available Information.  Reorganized Excel shall make available on its website (including to prospective transferees) (i) unaudited quarterly and audited annual financial statements, on a timely basis, and (ii) to the extent not covered by (i), such information as is provided to the lenders under the Amended and Restated Senior Secured Credit Facility; provided that Reorganized Excel's obligation to provide the information described in (i) above shall commence after the first full quarter following the Effective Date.

10.     Contractual Transferability & Registration Rights.  The Holdco Units to be issued under the Plan pursuant to Section 5.7 thereof (including in the hands of subsequent transferees), shall be freely transferable without being subject to any right of first offer, right of first refusal, board approval or any other restriction, except for restrictions (i) imposed by applicable securities laws and (ii) on transfers that would cause Reorganized Excel or Holdco to become subject to the reporting obligations under the Securities Exchange Act of 1934.  The Holdco LLC Agreement shall provide holders of Holdco Units that are affiliates of Holdco (including, if applicable, Ivory) with customary demand registration rights to sell their Holdco Units, piggy-back registration

rights and marketing cooperation covenants; provided that such demand registration right cannot be exercised until the date that is eighteen (18) months after the Effective Date.

11.     Minority Protections.  The Holdco LLC Agreement shall contain minority protections with respect to pre-emptive rights, restrictions on affiliate transactions that are not on arms' length terms and certain amendments to the provisions of Holdco's governing documents as described below.  The Holdco LLC Agreement shall also provide for the holders of at least 60% of the Holdco Units (the "Majority Interest Holders") to be entitled to drag-along rights in connection with a sale of Holdco to a party unaffiliated with the selling holder(s) (a "Drag-Along Sale"), which drag-along rights shall include, without limitation, an agreement by the holders of Holdco Units to grant a voting proxy to the Majority Interest Holders in connection with such Drag-Along Sale, subject to definitive documentation, including any governance and/or shareholder arrangements among the lenders under the Amended and Restated Senior Secured Credit Facility, which will not have any adverse impact on the minority rights set forth herein.  If (i) such Drag-Along Sale is proposed within the first 12 months after the Effective Date and (ii) more than 50% of the fair market value of the consideration to be received by the holders of Holdco Units in such Drag-Along Sale consists of equity securities that are not publicly traded, then the issuer of such equity securities shall adopt corporate governance provisions substantially similar to those contained in the Plan (including, without limitation, the provisions relating to Contractual Transferability set forth in Section 5.10 of the Plan and Available Information set forth in Section 5.9 of the Plan).  In the event that holders desire to sell at least 50% of the outstanding Holdco Units in one or a series of related transactions, the other holders of Holdco Units shall have tag-along rights in connection with such sale.

The provisions of the Holdco LLC Agreement set forth in the Plan (including, without limitation, the provisions relating to Contractual Transferability set forth in Section 5.10 of the Plan and Available Information set forth in Section 5.9 of the Plan) shall not be modified, amended or waived within the first year following the Effective Date, and thereafter shall not be modified, amended or waived without the prior written consent of both (A) holders of a majority of the equity securities in Holdco, excluding for the purposes of such calculation equity securities held by members who are affiliates of Holdco (which shall, for the avoidance of doubt, include on the Effective Date Oaktree and its affiliates and Ivory and its affiliates); and (B) Ivory, if (i) Ivory or its affiliates still own any equity securities of Holdco and (ii) such modification, amendment or waiver has a disproportionately adverse effect on Ivory or its affiliates as compared with the effect on non-affiliate holders of equity securities in Holdco.

12.     Management Incentive Plan.  On the Effective Date, the Management Incentive Plan shall become effective without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors or Holdco.

13.     Corporate Action.  Each of the matters provided for under the Plan involving the corporate structure of any Debtor, Reorganized Debtor or Holdco or any corporate action to be taken by, or required of, any Debtor, Reorganized Debtor or Holdco shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors or Holdco.

Such actions shall include, but are not limited to the following steps which shall occur in the following order to implement the provisions of the Plan:

(1)     Secured Lenders shall exchange a portion of their Allowed Syndicate Credit Facility Secured Claims for (a) an amount of Amended and Restated Senior Secured Credit Facility, and a portion of their Allowed Syndicate Credit Facility Secured Claims for (b) New Common Stock, all as set forth in Section 3.3(b) of the Plan.

(2)     Holders of Allowed Impaired Excel General Unsecured Claims shall exchange their Allowed Impaired Excel General Unsecured Claims for (a) the remaining New Common Stock (before the cash subscription described in Step 4 below), and (b) the Co-Investment Rights as provided in Section 3.3(g) of the Plan.

(3)      The Class 11 Interests in Excel shall be cancelled for no consideration as provided in Sections 3.3(j) and 5.18 of the Plan.

(4)      Ivory and Holders of Allowed Impaired Excel General Unsecured Claims shall contribute cash to the Company in exchange for New Common Stock pursuant to the Ivory Investment and the Co-Investment Rights as provided in Sections 3.3(g) and 5.4 of the Plan.

(5)      (A) Secured Lenders shall contribute their New Common Stock (received in Step (1)(b)) to Holdco in exchange for Holdco Units and (B) Ivory and the Holders of Allowed Impaired Excel General Unsecured Claims shall contribute their New Common Stock ((received in Steps 2(a) and 4, as applicable) to Holdco in exchange for Holdco Units, as provided in Section 5.7 of the Plan.

14.      Effectuating Documents; Further Transactions.   Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

15.      Check the Box Election. Holdco shall make a check-the-box election on Internal Revenue Service Form 8832 (or successor form) to be treated as a corporation for United States federal income tax purposes, effective on the date of its formation, and in any event, before the Effective Date.

16.      Preservation of Causes of Action.   In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, will have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other Retained Action in the Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of the Plan.

17.      Exemption From Certain Transfer Taxes and Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

18.      Dissolution of Creditors' Committee.  The Creditors' Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee will be dissolved and the Creditors' Committee's members will be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents will terminate, except with respect to (i) all Professional Fee Claims, (ii) any appeals of the Confirmation Order, and (iii) any other matters to which the Creditors' Committee is a party on or before the Effective Date.

19.      Cancellation of Existing Securities and Agreements.  Except as provided in the Plan or in the Confirmation Order, or for the purpose of evidencing a right to distribution hereunder or a contractual right to indemnification or reimbursement of the Administrative Agent, on the Effective Date, (i) all indentures, notes, stock, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements (including

27

registration rights agreements), and other documents evidencing or giving rise to Claims and Interests against and in the Debtors will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture, guarantee or agreement that governs the rights of the Holder of a Claim will continue in effect solely for purposes of (a) allowing Holders of Syndicate Credit Facility Secured Claims and Impaired Excel General Unsecured Claims to receive distributions under the Plan as provided in the Plan; *provided further*, *however*, that the preceding proviso will not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided further*, *however*, that the cancellation of indentures, notes, stock, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements and other documents hereunder will not itself alter the obligations or rights among third parties (apart from the Debtors, the Reorganized Debtors, and the non-Debtor affiliates).

E.    **Provisions Governing Distributions**

1.    Allowed Claims and Interests.  Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors will make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim will receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

2.    Fractional Shares.  No fractional shares of New Common Stock or Holdco Units will be issued or distributed under the Plan.  The actual distribution of shares of New Common Stock or Holdco Units will be rounded to the next higher or lower whole number as follows:  (a) fractions less than one-half (½) will be rounded to the next lower whole number and (b) fractions equal to or greater than one-half (½) will be rounded to the next higher whole number.  No consideration will be provided in lieu of fractional shares that are rounded down.

3.    Withholding and Reporting Requirements.  In connection with the Plan and all distributions hereunder, the Reorganized Debtors will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder will be subject to any such withholding and reporting requirements.  The Reorganized Debtors will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

4.    Setoffs.  The Reorganized Debtors may, pursuant to applicable law, but will not be required to, set off against any Claim the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Reorganized Debtors of any such Claim that the Debtors or the Reorganized Debtors may have against such Holder.

5.    Allocation Between Principal and Accrued Interest.  For tax purposes, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, accrued through the Effective Date.

F.    **Treatment Of Executory Contracts And Unexpired Leases**

1.    Assumption of Executory Contracts and Unexpired Leases.  On the Effective Date, all executory contracts and unexpired leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except (a) those executory contracts or unexpired leases that have previously expired or terminated pursuant to their own terms, (b) subject of a motion to reject filed on or before, and pending on, the Effective Date, or (c) identified on the Rejected Executory Contract and Unexpired Lease List on or prior to the Effective Date.  The Debtors with the consent of the other Consenting Parties, reserve all rights to amend or otherwise supplement the Rejected Executory Contract and Unexpired Lease List through the Effective Date.

28

2.        D&O Liability Insurance Policies and Indemnification Provisions.  Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the D&O Liability Insurance Policies and Indemnification Provisions belonging or owed to directors, officers, and employees of the Debtors (or the Estates) who served or were employed at any time by the Debtors will be deemed to be, and will be treated as though they are, executory contracts and the Debtors will assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies and Indemnification Provisions pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies and Indemnification Provisions. On or before the Effective Date, the Reorganized Debtors will obtain reasonably sufficient tail coverage (i.e., D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for a period of six (6) years after the Effective Date on terms reasonably acceptable to each of the Consenting Parties.

3.        Cure of Defaults and Adequate Assurance.  Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

**The Debtor asserts, and this section of the Plan provides, that no Cure Claim is due to any counterparty to an executory contract or unexpired lease in order to assume any executory contract or unexpired lease under section 365(b)(1)(A) of the Bankruptcy Code.  Any counterparty to an executory contract or unexpired lease that will be assumed under the Plan that asserts a Cure Claim must be paid in order to assume such executory contract or unexpired lease must file an objection asserting the amount of the Cure Claim with the Bankruptcy Court on or before the deadline for objecting to Confirmation of the Plan. Failure to object before the objection deadline to the proposed Cure Claim of $0.00 for an executory contract or unexpired lease shall constitute consent to the assumption of such executory contract or unexpired lease, including the proposed Cure Claim of $0.00, and an acknowledgement that such assumption satisfies all requirements of section 365(b) of the Bankruptcy Code.**  If any such objection to a Cure Claim of $0.00 is filed and is not resolved at or prior to the Confirmation Hearing, such executory contract or expired lease shall not be assumed until the dispute regarding the amount of the Cure Claim is resolved by agreement or order of the Bankruptcy Court; provided, however, the Reorganized Debtors shall be authorized to reject any executory contract or unexpired lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure Claim as determined by the Bankruptcy Court, renders assumption of such executory contract or unexpired lease unfavorable to the Reorganized Debtors.

Except as otherwise provided in the Confirmation Order, the only adequate assurance of future performance shall be the promise of the applicable Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under the Plan.  The Debtors reserve the right, with the consent of the other Consenting Parties, to file a motion on or before the Confirmation Date to assume or reject any executory contract and unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption.  Any proof of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged upon satisfaction of the Cure Claim in accordance with the procedures described above, without further notice to or action, order or approval of the Bankruptcy Court.

4.        **Claims Based on Rejection of Executory Contracts or Unexpired Leases.  All proofs of Claim with respect to Claims arising from the rejection of executory contracts and unexpired leases, if any, must be filed with the Bankruptcy Court on or prior to 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.**  Unless otherwise ordered by the Bankruptcy Court or otherwise provided herein, any Claims arising from the rejection of executory contracts and

29

unexpired leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article X of the Plan. All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as Class 6 Claims or Class 8 Claims, as applicable, against the applicable Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of executory contracts and unexpired leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed, and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

G.    **Confirmation And Consummation Of The Plan**

1.    Condition To Entry of the Confirmation Order. The following are conditions precedent to Confirmation, each of which must be satisfied or waived by each of the Consenting Parties in accordance with the terms hereof:

(a)    The Plan and all schedules, documents, supplements and exhibits relating to the Plan will have been filed in form and substance acceptable to each of the Consenting Parties, unless otherwise provided in the Plan.

(b)    The proposed Confirmation Order will be in form and substance acceptable to each of the Consenting Parties.

2.    Conditions To Effective Date. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by each of the Consenting Parties in accordance with the terms hereof:

(a)    The Confirmation Order shall be in full force and effect and not subject to any stay, and shall provide, among other things, that (i) the New Common Stock and Holdco Units issued under the Plan (other than the New Common Stock and Holdco Units offered pursuant to the 4(a)(2) Rights Offering and to Ivory) shall be exempt from the registration requirements of the Securities Act and similar state statutes pursuant to section 1145 of the Bankruptcy Code and (ii) that the New Common Stock and Holdco Units issued pursuant to the 4(a)(2) Rights Offering and to Ivory shall be exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

(b)    The Amended and Restated Senior Secured Credit Facility will have been executed and delivered, and all conditions precedent to its effectiveness will have been satisfied.

(c)    The Holdco LLC Agreement shall be in full force and effect.

(d)    The Plan and Confirmation Order shall not authorize the Debtors to incur any material debt other than the debt incurred in connection with the Amended and Restated Senior Secured Credit Facility.

(e)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan will have been obtained.

(f)    The Debtors will have received the Ivory Investment and such funds will be available for contribution.

(g)    Ivory and Excel will have delivered instructions to Seward & Kissel to release the Escrow Funds to Excel on the Effective Date, and such funds will be available for release by Seward & Kissel to Excel.

(h)    All other actions, documents, and agreements necessary to implement the Plan will have been effected or executed.

(i)        The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall be in form and substance acceptable to each of the Consenting Parties, unless otherwise specifically provided in the Plan.

(j)        The Plan Supplement documents shall be adopted in the form in which such documents were filed with the Plan Supplement (or with such other modifications as are satisfactory to each of the Consenting Parties).

3.        Waiver Of Conditions.  Each of the Consenting Parties may waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to other parties in interest or the Bankruptcy Court and without a hearing.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## H.        Effect Of Plan Confirmation

1.        Binding Effect.  The Plan will be binding upon and inure to the benefit of the Debtors, their Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

2.        Revesting of Assets.  Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates will revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

3.        Compromise and Settlement of Claims and Interests.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Persons.

4.        Discharge of the Debtors.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan will be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including, without limitation, claims arising under maritime law in any foreign jurisdiction that provides for the seizure or arrest of any vessel of the Debtors under any theory of law or equity (including any claim arising under South African law on the basis that the vessel is an "associated ship" as defined in the South African Admiralty Jurisdiction Regulation Act 1983, and/or of an allegation under the law of any other jurisdiction that any Debtor has or had control of or was associated in any way with any vessel owned and/or operated by a Debtor and/or non-Debtor and of any vessel in respect of which an alleged liability, including a liability of any third party, was incurred), any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in

31

sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed or disallowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the Debtors or their affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases will be deemed cured on the Effective Date. The Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

5.    **Releases and Related Matters**.

(a)    **Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, the Estates and non-Debtor affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or the non-Debtor affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided, however* that nothing in Section 9.5 of the Plan will be construed to release any party or entity from intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order.**

(b)    **Releases by the Holders of Claims and Interests**.

**Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Holder of a Claim or Interest will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Debtors, the Reorganized Debtors, the Estates, non-Debtor affiliates and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence including or pertaining to the Debtors and taking place on or before the Effective Date, *provided, however* that nothing in Section 9.5 of the Plan will be construed to release any party or entity from intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order; *provided further, however* that Section 9.5 of the Plan will not release the Debtors, the Reorganized Debtors, the Estates, non-Debtor affiliates or the**

32

Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act, or other securities laws of the United States or any domestic state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding anything to the contrary in this Section 9.5(b), a Holder of Class 11 Interests in Excel shall only be deemed to provide the releases set forth in this section if such Holder did not affirmatively opt out of the Plan releases by completing and returning a form to Donlin, Recano & Company, Inc. by the Voting Deadline.

      6.     **Exculpation and Limitation of Liability.** Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, and in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors, and the Released Parties have, and upon Confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

      7.     **Injunction**.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED OR EXCULPATED PURSUANT TO THIS ARTICLE IX ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING THAT CONTEMPLATES THE SEIZURE OR ARREST OF ANY PROPERTY OF THE DEBTORS, INCLUDING ANY VESSEL, WHETHER UNDER SOUTH AFRICAN LAW OR THE LAW OF ANY OTHER JURISDICTION, AND WHETHER ON THE BASIS THAT THE VESSEL IS AN "ASSOCIATED SHIP" AS DEFINED IN THE SOUTH AFRICAN ADMIRALTY JURISDICTION REGULATION ACT 1983, AND/OR OF AN ALLEGATION THAT ANY DEBTOR HAS OR HAD CONTROL OF OR WAS ASSOCIATED IN ANY WAY WITH ANY VESSEL OWNED AND/OR OPERATED BY A DEBTOR AND/OR A NON-DEBTOR AND OF ANY VESSEL IN RESPECT OF WHICH AN ALLEGED LIABILITY, INCLUDING A LIABILITY OF ANY THIRD PARTY, WAS INCURRED, OR OTHERWISE.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS IN THE PLAN WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE AGAINST THE DEBTORS OR

**ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS WILL BE CANCELLED.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS WILL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO WILL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE. ALL PERSONS WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

8.      Term of Bankruptcy Injunction or Stays.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), will remain in full force and effect until the Effective Date.

**I.      Procedures For Resolving and Treating Disputed Claims**

1.      Disputed Claims.  All Disputed Claims against the Debtors shall be subject to the provisions of Article X of the Plan.

2.      Objection Deadline.  Unless otherwise ordered by the Bankruptcy Court, objections to Claims will be filed with the Bankruptcy Court and served upon the holders of each such Claim to which objections are made on or before the Claims Objection Bar Date.  If an objection to a Claim is timely filed, a subsequent amendment to the objection will also be deemed timely, even if filed subsequent to the deadline for filing the original Claim objection, and even if the amendment raises facts or legal theories not raised in the original Claim objection.

3.      Prosecution of Objections.  After the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, will have the authority to file, litigate to final judgment, settle, or withdraw objections to Disputed Claims.

4.      No Distributions Pending Allowance.  No payments or distributions will be made with respect to any Claim to the extent it is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim in whole or in part.

**J.      Retention Of Jurisdiction**

1.      Retention of Jurisdiction. Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)      decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtors that may be pending on the Effective Date;

34

(c)       enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(d)       resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from, or obligations incurred in connection with, the Plan or such documents;

(e)       modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(f)       hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

(g)       issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(h)       adjudicate controversies arising out of the administration of the Estates or the implementation of the Plan;

(i)       recover all assets of the Debtors and property of the Estates, wherever located;

(j)       enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(k)       hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l)       determine any other matters that may arise in connection with, or relate to, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, or the Confirmation Order;

(m)       enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases including but not limited to any effort to seize or arrest any vessel of the Debtors in South African waters or elsewhere on account of prepetition claims of the German Owners;

(n)       hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(o)       enter an order closing the Chapter 11 Cases.

2.       Failure of Bankruptcy Court to Exercise Jurisdiction.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section 11.1 of the Plan, the provisions of Article XI of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

### K.    Miscellaneous Provisions

1.    Payment Of Statutory Fees.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on the Effective Date.

2.    Amendment Or Modification Of The Plan.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and subject further to the consent of the Consenting Parties, as provided for in the Plan, the Debtors reserve the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan as to any particular Debtor and seek to confirm and consummate the Plan with respect to the other Debtors.  A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

3.    Revocation, Withdrawal, or Non-Consummation.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan will be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (B) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (C) constitute an admission of any sort by the Debtors or any other Person.

4.    Governing Law.  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York will be governed by the laws of the jurisdiction in which the applicable Debtor or Reorganized Debtor is incorporated.

## V.    RISK FACTORS TO BE CONSIDERED

*The Plan involves a degree of risk and uncertainty.  You should carefully consider the risks and uncertainties described below as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and incorporated by reference) before deciding whether to vote to accept or reject the Plan or to participate in the Rights Offerings.  The Debtors have described the risks and uncertainties that they believe are material, but these risks and uncertainties may not be the only ones faced by the Debtors.  Additional risks and uncertainties that are not currently known to the Debtors, or that the Debtors currently deem immaterial, may also have an adverse effect on the Debtors' business, financial condition, results of operations or future prospects.  If this occurs, the value of Reorganized Excel may decline.*

*The order in which the risks are presented does not necessarily reflect the likelihood of their occurrence or the magnitude of their potential impact on the Debtors' business, financial condition, results of operations, or the value of Reorganized Excel.*

### A.        Risks Related to Failure to Consummate the Plan of Reorganization

***The Debtors believe that restructuring through the Plan is critical to their continuing viability. If the Plan is not confirmed, the Debtors' creditors may seek to exercise certain remedies against them, or the Debtors may need to propose an alternate plan without the support of their secured creditors.***

The Debtors are in default under the Syndicate Credit Facility, and the secured lenders thereunder have the right to enforce share pledges against almost all of the Debtors and thereby take ownership of substantially all of the Debtors' assets. The secured lenders under the Debtors' other secured facilities may also enforce their rights against the collateral securing those facilities, including the Debtors' vessels. Excel has also defaulted under the terms of the Convertible Notes and holders thereof may attempt to pursue Excel for payment. Certain creditors with maritime claims or liens may attempt to enforce such claims by arrest of the Debtors' vessels in various jurisdictions, or may commence foreign insolvency proceedings against the Debtors. In addition, in accordance with the Stipulated Cash Collateral Order, there are certain termination events, including, but not limited to, the obligation to attain one or more milestones within a specified period of time. The occurrence of a Termination Event (as defined in the Stipulated Cash Collateral Order) could result in the lenders terminating the Debtors' consensual access to cash collateral.

The chapter 11 process may be detrimental to the Debtors' business and it may adversely affect the Debtors' relationships with customers, employees, lenders and other stakeholders. For example,

- customers may lose confidence in the Debtors and choose not to do business with the Debtors, leading to a decline in revenues and cash flow;

- suppliers, including in particular bunker suppliers and other maritime service suppliers, may refuse to provide bunkers or services to the Debtors, rendering the Debtors unable to operate their fleet, or may require that bunkers or services be provided on less favorable credit terms, reducing the liquidity available to the Debtors;

- employees of Maryville, who run the day-to-day operations of the Debtors' business, could be distracted from performance of their duties, or more easily attracted to other career opportunities, and it may be more difficult to replace key employees;

- lenders may seek to terminate relationships with the Debtors, require financial assurances or enhanced returns, or refuse to provide credit on the terms contemplated by the Plan; and

- the Debtors could be forced to operate in bankruptcy for an extended period of time while they develop and seek approval for a reorganization plan.

***Failure to Consummate the Plan.***

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Plan is not confirmed and consummated, there can be no assurance that the chapter 11 cases will continue rather than be converted to chapter 7 liquidations. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtors during the chapter 11 cases. Furthermore, although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to such timing or that the Effective Date will occur. The Debtors could experience material adverse changes in their liquidity as a result of any such delay.

### B.        Risks Related to Confirmation

***A Confirmation Order entered by the Bankruptcy Court may not be recognized as effective by a Liberian court.***

Excel is incorporated pursuant to the laws of Liberia.  Although the Debtors will make every effort to ensure that any Confirmation Order entered by the Bankruptcy Court and the steps taken pursuant to the Confirmation Order to implement the restructuring are recognized and are effective as a matter of Liberian law, it is possible that if a creditor or stakeholder were to challenge the restructuring and a Liberian court were required to adjudicate on the effectiveness of the restructuring, a Liberian court may refuse to recognize the effect of the Confirmation Order.

***The cancellation of Interests in Debtor Excel and issuance of new stock pursuant to the Plan may not be recognized as effective by a Liberian court.***

Excel is incorporated pursuant to and the rights attaching to its shares are governed by the laws of Liberia.  While the Debtors consider that the cancellation and issuance of shares in Debtor Excel pursuant to the Confirmation Order will be recognized as effective, it is possible that a Liberian court could refuse to recognize or enforce the rights of the holders of New Common Stock issued pursuant to the Plan.

***Implementation of the Plan May Trigger Event of Default Under the Christine Shipco Facility***

Pursuant to the terms of the Christine Shipco Facility, the cancellation of all securities in Excel and distribution of the New Common Stock of Reorganized Excel to certain impaired creditors would result in a change in the beneficial ownership and control of Excel, Christine Holdings, and Christine Shipco, which, without the consent of DVB, would constitute an event of default under the Christine Shipco Facility.  In the event of a default under the Christine Shipco Facility, DVB, as lender under that facility, may declare the loan, together with accrued interest and all other amounts accrued and outstanding immediately due and payable, and may exercise its right to seize its collateral, which includes a first priority pledge of the membership interests in Christine Shipco and Christine Holdings and a first priority mortgage over, and an assignment of insurance and earnings with respect to, *M/V Christine*.  Additionally, the Christine Shipco Facility contains cross default provisions to which Excel, as guarantor, is party.  If Excel were to default under certain loans, and DVB were not willing to waive the default or if the default went uncured, DVB could exercise its right to seize its collateral.

### C.        Potential Adverse Effects of Chapter 11

Although the Debtors have sought to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the chapter 11 cases could materially adversely affect the relationship among the Debtors and their customers, employees, contractors and vendors.

Moreover, because the Debtors' business operations implicate maritime law, various foreign creditors could assert maritime liens against the Debtors' assets.  The determination of what claim constitutes a maritime lien is determined by local law on a case by case basis.  Thus, various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates and creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code.  In addition, counterparties to leases and executory contracts, including charterparties,  may attempt to terminate those leases or contracts pursuant to *ipso facto* provisions in contravention of section 365 of the Bankruptcy Code.

### D.        Risks Relating to the 4(a)(2) Rights Offering

***The 4(a)(2) Subscription Rights and the 4(a)(2) Offered Shares have not been registered under applicable federal and state securities laws.***

The exemption from registration pursuant to Rule 1145 does not apply to the 4(a)(2) Rights Offering and the 4(a)(2) Subscription Rights and the 4(a)(2) Offered Shares have not been registered under the Securities Act or

any state securities laws. The 4(a)(2) Subscription Rights and the 4(a)(2) Offered Shares are being granted and sold pursuant to an exemption from registration under the applicable securities laws and, therefore, may not be publicly offered, sold or otherwise transferred in any jurisdiction where registration may be required. By subscribing for the 4(2)(2) Offered Shares, Eligible Holders participating in the 4(a)(2) Rights Offering should be aware that they may be required to bear the financial risk of an investment in the 4(a)(2) Offered Shares for an indefinite period of time. *See also* **Article V.F. -- "***You may be restricted from selling the 1145 Offered Shares and Holdco Units you receive upon exercise of your Co-Investment Rights pursuant to the 1145 Rights Offering.***"**

      E.      **Risks Related to Becoming a Holder of Reorganized Excel's New Common Stock/Holdco's Holdco Units**

***Holdco's cash flow will be dependent on the cash flows of Reorganized Excel.***

      Holdco is a holding company with no direct operations. Its sole asset will be the New Common Stock of Reorganized Excel. Accordingly, its cash flow and its ability to make payments on, or repay or refinance, any indebtedness and to fund any planned capital expenditures and other cash needs will be dependent upon the cash flows of Reorganized Excel and any payment of dividends, distributions, loans or other advances to Holdco by Reorganized Excel. Distributions to Holdco from Reorganized Excel will depend on Reorganized Excel's operating results, which are subject to numerous risks, including those described more particularly under "— H. Other Risks Relating to the Debtors' Business and the Debtors' Ability to Satisfy their Debt Obligations After the Effective Date" below. In addition, such distributions may be subject to restrictions under, among other things, the laws of Liberia and other jurisdictions in which Reorganized Excel will operate; agreements Reorganized Excel has entered, and may enter, into, including agreements governing its indebtedness; and applicable regulatory orders. Reorganized Excel has no obligation, contingent or otherwise, to make funds available, whether in the form of loans, dividends or other distributions, to Holdco. Any inability to receive distributions from Reorganized Excel could have a material adverse impact on the business, financial condition, results of operations, and liquidity of Holdco and/or the market price or value of the Holdco Units.

***The market price of Excel's Class A common stock historically has been volatile and the value of Reorganized Excel and Holdco will likely to continue to be volatile.***

      The market price of Excel's Class A common stock fluctuated widely between when it began trading on the NYSE in September 2005 and when the stock was delisted in June 2013. The New Common Stock of Reorganized Excel will not be listed on the NYSE or any other public exchange or market system and will be held through Holdco, a Marshall Islands LLC which will not be listed on the NYSE or any other public exchange or market system. The value of Reorganized Excel is likely to continue to be volatile as a result of many factors, including those discussed in "***Other Risks Relating to the Debtors' Business and the Debtors' Ability to Satisfy their Debt Obligations after the Effective Date***" below, as well as the Debtors' actual results of operations and perceived prospects, the prospects of the Debtors' competition and of the shipping industry in general and in particular the dry bulk sector, differences between the Debtors' actual financial and operating results and those expected by investors and analysts, changes in analysts' recommendations or projections, changes in general valuations for companies in the shipping industry (particularly the dry bulk sector), changes in general economic or market conditions, and broad market fluctuations.

***U.S. securities laws may impose certain restrictions on the resale of New Common Stock or Holdco Units.***

      The New Common Stock and Holdco Units are being distributed in reliance upon an exemption from registration under the Securities Act and applicable state securities laws. Thus, neither the New Common Stock nor the Holdco Units have been registered under the Securities Act or any state securities laws. The Debtors make no representation regarding the right of any holder of New Common Stock or Holdco Units to freely resell the New Common Stock or Holdco Units. *See* **Article VI – "Applicability of Federal and Other Securities Laws."**

***The Debtors do not intend to pay dividends on the New Common Stock or Holdco Units.***

      The Debtors do not intend to pay dividends on the New Common Stock or Holdco Units in the foreseeable future and the Debtors cannot assure holders of New Common Stock or Holdco Units that dividends will ever be

paid on either the New Common Stock or the Holdco Units. This may adversely affect the value of the New Common Stock and Holdco Units.

***Because Holdco is a foreign limited liability company, its members may not have the same rights that shareholders in a U.S. corporation may have.***

Holdco will be a Marshall Islands limited liability company. Holdco's operating agreement and the Marshall Islands Limited Liability Company Act will govern its affairs. While the Marshall Islands Limited Liability Company Act resembles provisions of the limited liability company laws of a number of states in the United States, Marshall Islands law does not as clearly establish members' rights and the fiduciary responsibilities of its directors as do statutes and judicial precedent in some U.S. jurisdictions. However, while the Marshall Islands courts generally follow U.S. court precedent, there have been few judicial cases in the Republic of the Marshall Islands interpreting the Marshall Islands Limited Liability Company Act. Investors may have more difficulty in protecting their interests in the face of actions by the management, directors or controlling members than would members of a limited liability company organized under the laws of a U.S. jurisdiction that has developed a substantial body of case law.

***It may be difficult to serve process on or enforce a U.S. judgment against Reorganized Excel, Holdco or their respective officers and directors.***

Excel is a Liberian corporation and Holdco will be a Marshall Islands limited liability company. Many of their executive officers and directors may be located outside of the United States. In addition, a substantial portion of Excel's and Holdco's assets and the assets of their directors and officers are located outside of the United States. As a result, it may be difficult to serve legal process within the United States upon Reorganized Excel, Holdco or any of these persons. It may also be difficult to enforce, both in and outside the United States, judgments obtained in U.S. courts against Reorganized Excel, Holdco or any of these persons in any action, including actions based upon the civil liability provisions of U.S. federal or state securities laws. Furthermore, there is no guarantee that the courts of the Republic of Liberia, the Republic of the Marshall Islands or of the non-U.S. jurisdictions in which Excel's offices are located would enter judgments in original actions brought in those courts predicated on U.S. federal or state securities laws.

F.     **Risks Related to Exercise of the Co-Investment Rights**

***The subscription prices determined for Tranche A Subscription Rights, Tranche B Subscription Rights and 4(a)(2) Subscription Rights is not an indication of the fair value of the New Common Stock or Holdco Units.***

The subscription prices for the Tranche A Subscription Rights and Tranche B Subscription Rights are not intended to bear any relationship to the book value of Reorganized Excel's assets or its past operations, cash flows, losses, financial condition, net worth, or any other established criteria used to value securities. A holder of an Impaired Excel General Unsecured Claim should not consider the subscription prices to be an indication of the fair value of Reorganized Excel's New Common Stock. Further, upon the Effective Date, all New Common Stock in Reorganized Excel will be exchanged for Holdco Units in Holdco, the new parent of Reorganized Excel. The Company cannot give any assurance that these Holdco Units will be tradeable at or above the subscription prices in any given time period. After the date of this Disclosure Statement, Holdco Units may trade at prices above or below the subscription prices, or may not trade at all.

***If the holder of an Impaired Excel General Unsecured Claim does not act promptly and follow the subscription instructions, its exercise of subscription rights may be rejected.***

Holders of Impaired Excel General Unsecured Claims who desire to purchase shares pursuant to the Co-Investment Rights must act promptly to ensure that all required forms and payments are actually received by the deadlines described in the Rights Offering Procedures. If a claimholder is a beneficial owner of Convertible Notes, it must act promptly to ensure that its broker, bank, or other nominee acts for it and that all required forms and payments are actually received by the Subscription Agent before the deadlines described in the Rights Offering Procedures. The Company will not be responsible if a claimholder's broker, bank, or nominee fails to ensure that all required forms and payments are actually received by the Subscription Agent before the expiration date. If a

claimholder fails to complete and sign the required subscription forms, sends an incorrect payment amount or otherwise fails to follow the subscription procedures that apply to its exercise of the Co-Investment Rights, the Subscription Agent may, depending on the circumstances, reject such claimholder's subscription or accept it only to the extent of the payment received.  Neither the Company nor the Subscription Agent undertakes to contact a claimholder concerning an incomplete or incorrect subscription form or payment, nor is the Company under any obligation to correct such forms or payment.  The Company has the sole discretion to determine whether a subscription exercise properly follows the subscription procedures.  The Company makes no recommendation as to whether any holder of an Impaired Excel General Unsecured Claim should purchase shares in Reorganized Excel.

***The subscription rights are non-transferable and thus there will be no market for them.***

A claimholder may not sell, transfer or assign its subscription rights to anyone else.  The Company does not intend to list the rights on any securities exchange or any other trading market.  Because the subscription rights are non-transferable, there is no market or other means for a claimholder to directly realize any value associated with the subscription rights.

***You may be restricted from selling the 1145 Offered Shares and Holdco Units you receive upon exercise of your Co-Investment Rights pursuant to the 1145 Rights Offering.***

Although it is expected that the 1145 Offered Shares and Holdco Units issuable upon exercise of the Co-Investment Rights will be exempt from the registration requirements of the Securities Act in accordance with Section 1145 of the Bankruptcy Code (and the Confirmation Order will so provide), judicial interpretation of Section 1145 has varied.  In addition, there may be other restrictions on the Offered Shares and Holdco Units as set forth below.  To the extent that persons who receive the 1145 Offered Shares and Holdco Units pursuant to the Co-Investment Rights are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales or transfers of the 1145 Offered Shares and Holdco Units by such persons would not be exempt from registration under the Securities Act or other applicable state securities law by virtue of Section 1145 of the Bankruptcy Code.  Consequently an "underwriter" or "affiliate" would not be able to transfer or resell the 1145 Offered Shares and Holdco Units absent registration under the Securities Act and any applicable state securities laws, or an alternate exemption therefrom, including Rule 144.  Generally, Rule 144 would permit the public sale of the 1145 Offered Shares and Holdco Units received by an "underwriter" or "affiliate" if current information regarding the issuer of such shares is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met.  However, the Debtors do not presently intend to make publicly available the requisite current information regarding the Debtors.  As a result, Rule 144 will not be available for resales or transfers of 1145 Offered Shares and Holdco Units by persons deemed to be "underwriters" or "affiliates."  *See also* **Article V.D. – *"Risks Relating to the 4(a)(2) Rights Offering."***

G.      **Dependence on Key Management Personnel and Other Employees**

The Debtors' success depends to a significant extent upon the abilities and efforts of their management team.  The Debtors' ability to retain key members of their management team and to hire new members as may be necessary will contribute to that success.  The loss of the services of any of these individuals for any significant period of time due to death, disability or termination of employment could adversely affect the Debtors' business prospects and financial condition.  The Debtors are also dependent on qualified personnel in order to execute their day-to-day operations.  The loss of the services of any of these individuals for any significant period of time or the Debtors' inability to attract and retain qualified personnel could have a material adverse effect on their capacity to manage their business.  Difficulty in hiring and retaining replacement personnel could have a similar effect.  The Debtors do not maintain "key man" life insurance on any of their officers.

H.      **No Assurance of Ultimate Recoveries; Uncertainty of Financial Projections**

***No assurance of ultimate recoveries.***

The value of the New Common Stock, and the corresponding Holdco Units, cannot be determined with precision, and there can be no assurances of the actual recoveries to holders of Class 2 or Class 8 Claims.  The

Debtors cannot assure their claimholders that they will be able to resell any consideration received in respect of their claims at current values or at all.

***Inherent uncertainty of Debtors' Financial Projections.***

In connection with this Disclosure Statement and the Confirmation Hearing, the Debtors prepared Financial Projections, attached hereto as <u>Appendix E</u>, to demonstrate to the Bankruptcy Court the feasibility of the Plan and their ability to continue operations upon emergence from the chapter 11 cases.  This information was prepared for the limited purpose of furnishing recipients of this Disclosure Statement with adequate information to make an informed judgment regarding acceptance of the Plan, and was not prepared for the purpose of providing the basis for an investment decision relating to the issuance of the New Common Stock or the Holdco Units.  This information was not audited or reviewed by the Debtors' independent public accountants.  The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

At the time they were prepared, the projections reflected numerous assumptions concerning the Debtors' anticipated future performance and with respect to prevailing and anticipated market and economic conditions that were and remain beyond their control and that may not materialize.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks, and the assumptions underlying the projections and/or valuation estimates may prove to be wrong in material respects.  Actual results may vary significantly from those contemplated by the projections that were prepared in connection with this Disclosure Statement and the Confirmation Hearing.  As a result, such projections are only an estimate and should not be relied upon as necessarily indicative of future, actual recoveries.

The business plan was developed by the Debtors with the help of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions management and Reorganized Excel's Board of Directors make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

***Lack of recent audited financial statements.***

Attached to this Disclosure Statement as <u>Appendix F</u> are the Debtors' audited financial statements for the fiscal year ended December 31, 2011.  This is the last period for which audited financial information is available.  While attached to this Disclosure Statement as <u>Appendix G</u> are the Debtors' unaudited financial statements, as of and for the year ended December 31, 2012 as of the date hereof, the Debtors have not prepared audited financial statements for any fiscal year subsequent to December 31, 2011.  The Debtors believe the unaudited financial statements prepared for fiscal year 2012 are consistent with their audited financials and all adjustments that would be made were such financial statements subjected to an audit in accordance with the standards of the Public Company Accounting Oversight Board.  However, the Debtors cannot assure you that any changes made to the financial statements for fiscal year 2012 pursuant to an audit would not have been material to you in your decision whether to vote to accept or reject the Plan.

I.    **Other Risks Relating to the Debtors' Business and the Debtors' Ability to Satisfy their Debt Obligations after the Effective Date**

***After the Effective Date, the Debtors will require a significant amount of cash to service their indebtedness.  The Debtors' ability to generate cash depends on many factors beyond their control, and the Debtors may default on their obligations to pay any of their indebtedness, violate financial covenants in their loan agreements, and may be subject to restrictions on the payment of their other debt obligations or cause a cross-default or cross-acceleration.***

The Debtors' ability to make scheduled payments on, and to refinance, their indebtedness, will depend on their ability to generate cash from operations in the future.  This, to a certain extent, is subject to general

economic, financial, competitive, legislative, regulatory and other factors that are beyond the Debtors' control. Low dry bulk charter rates and dry bulk vessels have negatively impacted the Debtors' cash flow in the past, and the Debtors cannot provide assurance that their business will generate sufficient cash flow from operations in an amount sufficient to enable the Debtors to pay their indebtedness, fund their other liquidity needs and comply with financial covenant. In the event of such default:

- lenders could require the Debtors to restructure their debt, post additional collateral, enhance their equity and liquidity, increase their interest payments or pay down their indebtedness to a level where the Debtors are in compliance with their loan covenants or sell vessels from their fleet;

- the lenders or holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable and, if not paid on demand, institute foreclosure proceedings against the Debtors' assets securing such indebtedness; and

- even if those lenders or holders do not declare a default, they may be able to cause all of the Debtors' available cash to be used to repay the indebtedness owed to them or restrict the Debtors' access to their cash.

Subject to certain exceptions, the Amended and Restated Senior Secured Credit Agreement will generally restrict the Debtors' ability to incur additional indebtedness or undertake financing activities or other similar actions that would generate cash, absent prior consent from the requisite lenders, and will require that the proceeds thereof be applied to prepay outstanding obligations under the Amended and Restated Senior Secured Credit Agreement. The Debtors' other debt agreements impose similar restrictions. The Debtors cannot offer assurances that requisite consents to undertake such actions could, if necessary, be effected on commercially reasonable terms, or at all. The Debtors' cash flow and capital resources may be insufficient for payment of interest on and principal of their debt in the future, and any such alternative measures may be unsuccessful or may not permit the Debtors to meet scheduled debt service obligations, which could cause the Debtors to default on obligations and could impair their liquidity and ability to continue to operate their business as described herein and in the documents incorporated by reference.

Further, as a result of cross-default provisions contained in the Debtors' loan agreements, any default could lead to additional defaults under the Debtors' other loan agreements and the consequent acceleration of the indebtedness thereunder, the commencement of foreclosure proceedings by other lenders and/or exercise of other remedies by such lenders. This could adversely affect the Debtors' ability to continue their business and force it into bankruptcy or liquidation.

The Debtors may also be required to reclassify all of their indebtedness as current liabilities, which would be significantly in excess of their cash and other current assets, and accordingly would adversely affect the Debtors' ability to continue as a going concern by limiting the Debtors' ability to continue to conduct their operations, finance their future operations, pursue business opportunities, or make payments on their debt obligations.

***The agreements and instruments governing the Debtors' debt contain, and the Amended and Restated Senior Secured Credit Agreement will contain, restrictive covenants which may limit the Debtors' liquidity and corporate activities.***

The Debtors' loan agreements impose, and the Amended and Restated Senior Secured Credit Agreement will impose, significant operating and financial restrictions on them. These restrictions may limit the Debtors' ability to:

- incur additional indebtedness or provide guaranties;

- create liens on their assets;

- sell capital stock of their subsidiaries;

- make investments;

- engage in mergers or acquisitions;

- pay dividends or redeem capital stock;

- make capital expenditures;

- enter into transactions with affiliates;

- change the flag, class or the management of their vessels or terminate or materially amend the management agreement relating to each vessel; and

- sell vessels or other assets.

The Debtors may need to seek permission from their lenders in order to engage in certain corporate actions. The interests of the Debtors' lenders may be different from their own and the Debtors cannot guarantee that they will be able to obtain the permission of the Debtors' lenders when needed. Subject to limited exceptions, the Amended and Restated Senior Secured Credit Agreement restricts the ability of the Debtors and their subsidiaries to raise new funds or financing for future operations or business opportunities without the consent of the requisite lenders. Such restrictions may have an adverse effect on the Debtors' liquidity, operations and financial performance.

***The market fundamentals of the dry bulk market historically have been volatile and have deteriorated significantly since the market high in May 2008, which has adversely affected and may continue to adversely affect the Debtors' results of operations and financial condition.***

The Debtors are an independent shipping company that operates in the dry bulk shipping markets. One of the factors that impacts the Debtors' profitability is the freight rates they are able to charge. The dry bulk shipping industry is cyclical with attendant volatility in charter hire rates and profitability. The degree of charter hire rate volatility among different types of dry bulk vessels has varied widely, and charter hire rates for dry bulk vessels are at near historically low levels. Because the Debtors charter some of their vessels pursuant to voyage charters or short-term time charters, they are exposed to changes in spot market and short-term charter rates for dry bulk carriers and such changes may affect the Debtors' earnings and the value of their dry bulk carriers at any given time.

This volatility is reflected by the movement of the BDI from May 2008 to the present day. The BDI declined from a high of 11,793 in May 2008 to a low of 663 in December 2008, which represents a decline of approximately 94%. Over the comparable period of May through December 2008, the high and low of the Baltic Panamax Index and the Baltic Capesize Index (which measure the price of moving materials by Panamax and Capesize vessels, respectively) represent a decline of approximately 96% and 99%, respectively. During 2009, the BDI increased from a low of 772 in January to a high of 4,661 in November of 2009. In 2010, the BDI increased from a low of 2,848 in January 2010 to a high of 4,209 in May 2010 and subsequently decreased to a low of 1,700 in July 2010. During 2011, the BDI remained volatile, ranging from a low of 1,043 on February 4, 2011 to a high of 2,173 on October 14, 2011. As of December 23, 2011, the BDI was 1,738. On February 3, 2012, the BDI dropped to a 26-year low of 647, owing to a combination of both weak vessel demand and further increases in supply, and the average BDI for 2012 was 920 – 41% lower than the average index of 1,549 in 2011.

The market fundamentals of the dry bulk market deteriorated significantly in 2012, as the average BDI of 920 for the year was about 41% lower than the average index of 1,549 in 2011. On November 20, 2013, the BDI closed at 1,527. Despite a relatively healthy demand growth, primarily due to increased imports in China, the record high deliveries of newly built dry bulk vessels have pushed the charter rates substantially lower. More specifically, the seaborne trade for dry bulk commodities grew by approximately 7% in 2012 and is expected to grow by about 5% in 2013, with a large part of this growth being attributed to iron ore and coal trade which increased by 5% and 12% respectively in 2012 and is anticipated to grow by 7% and 6% respectively in 2013. However, the growth of the dry bulk fleet in 2012 was about 10% or approximately 64 million deadweight tons, as the large number of new deliveries of approximately 99 million deadweight tons was only partly counterbalanced by the demolition of

44

approximately 34 million deadweight tons.  The fleet continued to grow in 2013 and the dry bulk capacity is estimated to increase by about 6% in 2013.  The decline and volatility in charter rates in the dry bulk market and increased supply affected the value of dry bulk vessels and negatively affected the Debtors' cash flows and liquidity. The Debtors can offer no assurance that the dry bulk market will improve, and if the weak dry bulk market persists, it will continue to negatively affect the Debtors' results of operations and financial condition.

***Charter hire rates for dry bulk vessels are volatile and are driven by a number of factors which are outside the control of the Debtors.***

Fluctuations in charter rates result from changes in the supply and demand for vessel capacity and changes in the supply and demand for the major commodities carried by sea internationally.  Because the factors affecting the supply and demand for vessels are outside of the Debtors' control and are unpredictable, the nature, timing, direction and degree of changes in industry conditions are also unpredictable.

Factors that influence demand for vessel capacity include:

- supply and demand for energy resources, commodities, semi-finished and finished consumer and industrial products;

- changes in the exploration or production of energy resources, commodities, semi-finished and finished consumer and industrial products;

- the location of regional and global exploration, production and manufacturing facilities;

- the location of consuming regions for energy resources, commodities, semi-finished and finished consumer and industrial products;

- the globalization of production and manufacturing;

- global and regional economic and political conditions, including armed conflicts and terrorist activities; embargoes and strikes;

- natural disasters and other disruptions in international trade;

- developments in international trade;

- changes in seaborne and other transportation patterns, including the distance cargo is transported by sea;

- environmental and other regulatory developments;

- currency exchange rates; and

- weather.

Factors that influence the supply of vessel capacity include:

- the number of newbuilding deliveries;

- the scrapping rate of older vessels;

- vessel casualties;

- the level of port congestion;

- changes in environmental and other regulations that may limit the useful life of vessels;

45

- the number of vessels that are out of service, namely those that are laid-up, drydocked, awaiting repairs or otherwise not available for hire; and

- changes in global dry bulk commodity production.

Other factors that affect the rate of newbuilding, scrapping and laying-up include newbuilding prices, secondhand vessel values in relation to scrap prices, cost of bunkers and other operating costs, costs associated with classification society surveys, normal maintenance and insurance coverage, the efficiency and age profile of the existing dry bulk fleet in the market, and government and industry regulation of maritime transportation practices, particularly environmental protection laws and regulations.  The Debtors may not be able to correctly assess the nature, timing and degree of changes in industry conditions which may have an adverse effect on their results of operations and financial condition.

***An oversupply of dry bulk carrier capacity may lead to further reductions in charterhire rates and profitability.***

The market supply of dry bulk carriers has been increasing. The number of dry bulk vessels on order as of August 2013 was approximately 17% for Capesize class vessels and 21% for Panamax class vessels of the then-existing global dry bulk fleet in terms of deadweight tons, with the majority of new deliveries expected mainly during 2013 and 2014. In 2012, dry bulk carriers of a cumulative 99 million deadweight tons entered service, representing a year-on-year increase in deadweight of approximately 10%.  Recent estimates indicate that new deliveries in the remaining 2013 will add approximately 6% of additional capacity to the Capesize vessel class and 10% of additional capacity to the Panamax vessel class, excluding the potential effect from slippage or order cancelations.  Fleet growth for the Capesize and Panamax vessel classes in 2014 is anticipated to be 6% and 8%, respectively, which may have a negative impact on the Debtors' business.

An oversupply of dry bulk carrier capacity could negatively impact the recent improvement in dry charter rates and prolong the current period of low charter rates.  A material increase in the net supply of dry bulk vessel capacity without corresponding growth in dry bulk vessel demand could have a material adverse effect on the Debtors' fleet utilization and their charter rates generally, and could materially adversely affect the Debtors' business, financial condition and results of operations.

***When the Debtors' charters end, they may not be able to replace them promptly or with profitable ones and, in addition, any such new charters are potentially subject to further decline in charter rates and other market deterioration, which could adversely affect the Debtors' results of operations.***

When the Debtors' time charters expire, the Debtors will generally attempt to re-charter their vessels at favorable rates with reputable charterers, but there can be no guarantee that they will succeed.  The charterers under these charters have no obligation to renew or extend the charters.  If the Debtors cannot enter into time period charters on acceptable terms, they may have to secure charters in the spot market, where charters rates are more volatile and revenues are, therefore, less predictable.  If the current low charter rate environment persists, or a further reduction occurs, upon the expiration or termination of the Debtors' vessels' current charters, the Debtors may only be able to re-charter their vessels at reduced or unprofitable rates or they may not be able to charter these vessels at all.

Failure to obtain replacement charters will reduce or eliminate the Debtors' revenue and ability to service their debt.  In addition, the Debtors may have to reposition their vessels without cargo or compensation to deliver them to future charterers or to move vessels to areas where they believes that future employment may be more likely or advantageous.  Repositioning the Debtors' vessels would increase their vessel operating costs which could have an adverse effect on the Debtors' results of operations and financial condition.

*A drop in spot charter rates may provide an incentive for some charterers to renegotiate or default on their time charters, which could reduce the Debtors' revenues and have a material adverse effect on their business, financial condition and results of operations.*

When the Debtors enter into a time charter, charter rates under that time charter are fixed for the term of the charter. The ability of each of the Debtors' charterers to perform its obligations under the charter depends on a number of factors that are beyond the Debtors' control and may include, among other things, general economic conditions, the condition of the maritime and offshore industries, the overall financial condition of the charterer, charter rates received for specific types of vessels and various expenses. In addition, if the spot charter rates in the dry bulk shipping industry become significantly lower than the time charter rates that some of the Debtors' charterers are obligated to pay the Debtors under their existing time charters, the charterers may have incentives to default under that time charter or attempt to renegotiate the time charter. If the Debtors' charterers default on their charters, the Debtors will seek the remedies available to them, which may include arbitration or litigation to enforce the contracts, although such efforts may not be successful. If their charterers fail to pay their obligations, the Debtors would have to attempt to re-charter their vessels at lower charter rates, which would affect the Debtors' results of operations.

*The Debtors' operating results are subject to seasonal fluctuations, which could affect their operating results and ability to service their debt.*

The Debtors operate their vessels in markets that have historically exhibited seasonal variations in demand and, as a result, in charterhire rates. To the extent the Debtors operate vessels in the spot market this seasonality may result in quarter-to-quarter volatility in their operating results. The dry bulk sector is typically stronger in the fall and winter months in anticipation of increased consumption of coal and other raw materials in the northern hemisphere. In addition, unpredictable weather patterns in these months tend to disrupt vessel scheduling and supplies of certain commodities. As a result, the Debtors' revenues from their dry bulk carriers may be weaker during the fiscal quarters ending June 30 and September 30, and, conversely, the Debtors' revenues from their dry bulk carriers may be stronger in fiscal quarters ending December 31 and March 31. While this seasonality will not affect the Debtors' operating results as long as their fleet is employed on period time charters, to the extent the Debtors' vessels are employed in the spot market, it could materially affect the Debtors' operating results.

*The market values of the Debtors' vessels have declined and may further decrease. This could lead the Debtors to incur losses when they sell the vessels or they may be required to write down their carrying value, which may adversely affect the Debtors' earnings, or cause them to default under their loan agreements.*

The fair market values of the Debtors' vessels have generally experienced high volatility and although the values of certain of the vessels may have rebounded from their recent historic lows, values remain substantially lower than the amount of the Debtors' debt obligations. The market values of the Debtors' vessels may continue to fluctuate depending on a number of factors, including:

- general economic and market conditions affecting the shipping industry;

- the prevailing rate of charter hire;

- competition from other shipping companies and other modes of transportation;

- the types, sizes and ages of their vessels;

- the supply and demand for vessels;

- applicable governmental regulations;

- technological advances; and

- the cost of newbuildings.

47

The Debtors evaluate the carrying amounts of their vessels to determine if events have occurred that would require an impairment of their carrying amounts. The recoverable amount of vessels is reviewed based on events and changes in circumstances that would indicate that the carrying amount of the assets might not be recovered. The review for potential impairment indicators and projection of future cash flows related to the vessels is complex and requires the Debtors to make various estimates on the basis of various assumptions, including future freight rates and earnings from the vessels which have been historically volatile.

When the Debtors' estimate of undiscounted future cash flows for any vessel is lower than the vessel's carrying value, the carrying value is written down, by recording a charge to operations, to the vessel's fair market value if the fair market value is lower than the vessel's carrying value. The carrying values of the Debtors' vessels may not represent their fair market value in the future because the new market prices of secondhand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. Any impairment charges incurred as a result of declines in charter rates could have a material adverse effect on the Debtors' business, results of operations, cash flows and financial condition. If for any reason the Debtors sell their vessels at a time when prices have fallen, the sale price may be less than the vessels' carrying amount on their financial statements, and the Debtors would incur a loss and a reduction in earnings.

Further, when the market value of a vessel declines, it reduces the Debtors' ability to comply with their outstanding debt or obtain future financing. The Debtors' lending facilities, including the Amended and Restated Senior Secured Credit Agreement, are secured by mortgages on their vessels and require them to comply with minimum security vessel values and satisfy certain financial and other covenants, including those that are affected by the market value of the Debtors' vessels. Further declines in the market and vessel values could cause the Debtors to breach financial covenants relating to the maintenance of minimum security vessel values contained in their lending facilities.

***Continued disruption in world financial markets and the resulting governmental action in Europe, the United States and in other parts of the world could have a material adverse impact on the Debtors' ability to obtain financing, results of operations, financial condition and cash flows and could cause the value of the New Common Stock and Holdco Units to decline.***

In the current global economy, operating businesses have faced and continue to face tightening credit, weakening demand for goods and services, and weak international liquidity conditions. Lower demand for dry bulk cargoes, as well as diminished trade credit available for the delivery of such cargoes, have led to decreased demand for dry bulk carriers, creating downward pressure on charter rates and vessel values. Negative economic conditions have had a number of adverse consequences for dry bulk and other shipping sectors, including, among other things:

- an absence of available financing for vessels;

- a further decrease in the market value of vessels and no active secondhand market for the sale of vessels;

- low charter rates; and

- declaration of bankruptcy by some charterers, operators and ship owners.

The occurrence of one or more of these events could have a material adverse effect on the Debtors' business, results of operations, cash flows and financial condition.

***The Debtors faces liquidity risks which may be exacerbated by changing market conditions.***

The Debtors' activities are subject to liquidity risk, that is, the risk that they will be unable to meet their payment obligations, including loan commitments, when due. In light of this, the availability of the liquidity needed to carry out the various activities in which the Debtors are engaged and the ability to access long-term financing are essential for the Debtors to be able to meet their anticipated and unforeseen cash payment obligations, so as not to impair their day-to-day operations or financial position. Instability in global financial markets, the after-effect in part of the global financial market crisis, may impact liquidity.

A number of financial institutions experienced serious financial difficulties in recent years, and an increasing number of financial institutions will likely continue to experience serious financial difficulties as a result of deterioration in the stability, or perceived stability, of the respective countries in which these institutions are based or operate. This instability is due to the European sovereign debt crisis, which began in May 2010 in the wake of Greece's public finance problems and spread rapidly to the countries of the Euro area exhibiting greatest weakness.

Although the Debtors have no exposure to sovereign debt of governments and other public bodies of countries in or outside the Eurozone, they faces risks attendant to changes in economic environments, changes in interest rates and instability in certain securities markets, among other factors. Major market disruptions and adverse changes in market conditions and the regulatory climate in Europe, the United States and worldwide may adversely affect the Debtors' business or impair their ability to borrow amounts under any future financial arrangements. There is a possibility that the Debtors' ability to access the liquidity they need may be affected by further increases in the cost of borrowing, a reduction in the availability of financing, an increase in the cost of other forms of fundraising and/or an inability to sell their assets or to liquidate their investments, which would, in turn, have an impact on the Debtors' activities, with severe negative effects on their operating results and capital and financial position.

***An economic slowdown in the Asia Pacific region could exacerbate the effect of recent slowdowns in the economies of the United States and Europe and may have a material adverse effect on the Debtors' business, financial condition and results of operations.***

Negative changes in economic conditions in any Asia Pacific country, particularly in China, may exacerbate the effect of the significant recent slowdowns in the economies of the United States and Europe and may have a material adverse effect on the Debtors' business, financial condition and results of operations, as well as future prospects. Before the global economic financial crisis began in 2008, China had one of the world's fastest growing economies in terms of gross domestic product, or GDP, which had a significant impact on shipping demand. In 2012, the growth rate of China's GDP decreased to approximately 7.4%, as compared to approximately 9.2% for the year ended December 31, 2011 and 10.4% for the year ended December 31, 2010. China has recently imposed measures to restrain lending, which may further contribute to a slowdown in its economic growth. It is possible that China and other countries in the Asia Pacific region will continue to experience slowed or even negative economic growth in the near future. Moreover, the limited recovery of the economies of the United States, Europe and other Asian countries may further adversely affect economic growth in China and elsewhere. The Debtors' business, financial condition and results of operations as well as future prospects, will likely be materially and adversely affected by an economic downturn in any of these countries.

***Changes in the economic and political environment in China and policies adopted by the Chinese government to regulate its economy may have a material adverse effect on the Debtors' business, financial condition and results of operations.***

The Chinese economy differs from the economies of most countries belonging to the Organization for Economic Cooperation and Development, in such respects as structure, government involvement, level of development, growth rate, capital reinvestment, allocation of resources, rate of inflation and balance of payments position. Prior to 1978, the Chinese economy was a planned economy. Since 1978, increasing emphasis has been placed on the utilization of market forces in the development of the Chinese economy. Annual and five-year State Plans are adopted by the Chinese government in connection with the development of the economy. Although state-owned enterprises still account for a substantial portion of the Chinese industrial output, in general, the Chinese government is reducing the level of direct control that it exercises over the economy through State Plans and other measures. There is an increasing level of freedom and autonomy in areas such as allocation of resources, production, pricing and management and a gradual shift in emphasis to a "market economy" and enterprise reform. Limited price reforms were undertaken, with the result that prices for certain commodities are principally determined by market forces. Many of the reforms are unprecedented or experimental and may be subject to revision, change or abolition based upon the outcome of such experiments. If the Chinese government does not continue to pursue a policy of economic reform, the level of imports to and exports from China could be adversely affected by the Chinese government's changes to these economic reforms, as well as by changes in political, economic and social conditions or other relevant policies of the Chinese government, such as changes in laws,

49

regulations or export and import restrictions, all of which could adversely affect the Debtors' business, operating results and financial condition.

***The Debtors' vessels may call on ports located in countries that are subject to restrictions imposed by the United States government, which could negatively affect the value of the Reorganized Debtors.***

The Debtors currently employ all of their vessels under time charter contracts with unaffiliated parties. Under the terms of these time charters, and consistent with shipping industry practice, the charterer of each vessel pays the Debtors a daily time charter rate and directs the vessel's route, loading and discharge ports and cargoes carried. While the Debtors do not control the routes or ports of call made by their vessels, all of the time charter contracts under which their vessels operate contain express prohibitions proscribing trades of their vessels in Sudan and Cuba, as well as countries that are prohibited in trading by the United Nations or the United States. In addition, the Debtors have not had, and do not intend to have in the future, directly or indirectly, any agreements, commercial arrangements or other contacts with the governments of, or entities controlled by the governments of Iran, Sudan, Syria or Cuba, and has not provided, and does not intend to provide any goods or services, directly or indirectly, to the governments of, or entities controlled by the governments of, such countries. The value of Reorganized Excel may be adversely affected by the consequences of war, the effects of terrorism, civil unrest and governmental actions in these and surrounding countries.

Occasionally, however, upon charterers' instructions, the Debtors' vessels have called, and may again call, on ports located in countries subject to sanctions and embargoes imposed by the United States government and countries identified by the United States government as state sponsors of terrorism, including Iran, Sudan and Syria. As of the date hereof, the Debtors' vessels made ten calls on Iranian ports (eight calls on the Port of Bandar Imam Khomeini and two calls on the Port of Bandar Abbas) out of a total of 684 calls on worldwide ports. In 2012, the Debtors' vessels made ten calls on Iranian ports (nine calls on the Port of Bandar Imam Khomeini and one call on the Port of Bandar Abbas). In 2011, the Debtors' vessels made seven calls on the Iranian port of Bandar Imam Khomeini and one call on the Syrian port of Tartous. In each of these voyages the cargo consisted solely of agricultural products. Although the Debtors believe that they are in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance, there can be no assurance that the Debtors will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations. Any such violation could result in fines or other penalties. Moreover, the Debtors' charterers may violate applicable sanctions and embargo laws and regulations as a result of actions that do not involve the Debtors or their vessels, and those violations could in turn negatively affect the Debtors' reputation.

***World events outside the Debtors' control may negatively affect the shipping industry, which could adversely affect the Debtors' operations and financial condition.***

Terrorist attacks like those in New York in 2001, London in 2005, Mumbai in 2008 and other countries and the continuing response of the world community to these attacks, as well as the threat of future terrorist attacks around the world, continue to cause uncertainty in the world financial markets and may affect the Debtors' business, results of operations and financial condition. Continuing conflicts in North Africa and the Middle East and the presence of U.S. and other armed forces in various regions around the world may lead to additional acts of terrorism and armed conflict, which may contribute to further economic instability in the global financial markets. In the past, political conflicts resulted in attacks on vessels, mining of waterways and other efforts to disrupt international shipping. For example, in October 2002, the VLCC *Limburg* was attacked by terrorists in Yemen. Acts of terrorism and piracy have also affected vessels trading in regions such as the South China Sea. Such events could also cause partial or complete closure of ports and sea passages such as the Suez and Panama Canals, potentially resulting in higher costs, vessel delays or cancelations on some of the Debtors' lines. Future terrorist attacks could also result in increased volatility of the financial markets in the United States and globally and could result in an economic recession in the United States or the world. Any of these occurrences could have a material adverse impact on the Debtors' operating results, revenue, and costs.

In addition, because the Debtors' operations are primarily conducted outside of the United States, they may be affected by economic, political and governmental conditions in the countries where the Debtors are engaged in business or where their vessels are registered. Future hostilities or political instability in regions where the Debtors operate or may operate could have a material adverse effect on the Debtors' business, results of operations and

ability to service their debt.  In addition, tariffs, trade embargoes and other economic sanctions by the United States or other countries against countries where their vessels trade may limit trading activities with those countries, which could also harm the Debtors' business, financial condition and results of operations.

***The smuggling of drugs, weapons or other contraband onto the Debtors' vessels may lead to governmental claims against the Debtors.***

The Debtors expect that their vessels will call in areas where smugglers attempt to hide drugs, weapons and other contraband on vessels, with or without the knowledge of crew members.  To the extent their vessels are found with contraband, whether with or without the knowledge of any crew member, the Debtors may face governmental or other regulatory claims which could have an adverse effect on the Debtors' business, results of operations, cash flows and financial condition.

***Governments could requisition the Debtors' vessels during a period of war or emergency, resulting in loss of earnings.***

A government could requisition one or more of the Debtors' vessels for title or hire, or seize one or more of their vessels.  Requisition for title occurs when a government takes control of a vessel and becomes her owner.  Requisition for hire occurs when a government takes control of a vessel and effectively becomes her charterer at dictated charter rates.  Generally, requisitions occur during a period of war or emergency, although governments may elect to requisition vessels in other circumstances.  Government requisition of one or more of the Debtors' vessels would negatively impact their revenues.

***Maritime claimants could arrest the Debtors' vessels, which could interrupt their cash flow.***

Crew members, suppliers of goods and services to a vessel, shippers of cargo, vessel financing participants, charterparties, and other parties may be entitled to a maritime lien against a vessel for unsatisfied debts, claims or damages.  In many jurisdictions, a maritime lien holder may enforce its lien by arresting a vessel through foreclosure proceedings.  The arrest or attachment of one or more of the Debtors' vessels could interrupt their cash flow and require them to make significant payments to have the arrest lifted.

In addition, in some jurisdictions, such as South Africa, under the "sister ship" or "associated ship" theory of liability, a claimant may arrest either the vessel which is subject to the claimant's maritime lien or any "associated" vessel, which is any vessel owned or controlled, at the time that the action is commenced, by the same owner or ultimate controller of the vessel concerned when the maritime claim arose.  Claimants could try to assert "sister ship" or "associated ship" liability against one vessel in the Debtors' fleet for claims relating to another of their ships.  In particular, as described in **Section II.E.2(b)  – "Redelivery of the Bareboat Charters"** above, the German Owners have commenced arbitration against certain of Excel's non-Debtor subsidiaries and could attempt to enforce their alleged claims against the assets of Excel pursuant to South Africa's "associated ship" theory of liability, notwithstanding the terms of the Plan which expressly enjoin such acts.

***The Debtors depend upon a few significant customers for a large part of their revenues.  The loss of one or more of these customers could adversely affect the Debtors' financial performance.***

The Debtors have historically derived a significant part of their revenue from a small number of charterers.  In 2012, the Debtors derived approximately 16%, 14% and 10% of their gross revenues from EDF Trading Limited, Global Maritime Investments Ltd., and Glencore Grain B.V., respectively.  In the first nine months of 2013, the Debtors derived 20%, 13% and 8% of their gross revenues from EDF Trading Limited, Glencore Grain B.V. and Global Maritime Investments Ltd., respectively.

If one or more of the Debtors' customers are unable to perform under one or more charters with it and the Debtors are not able to find a replacement charter, or if a customer exercises certain rights to terminate the charter, the Debtors could suffer a loss of revenues that could materially adversely affect their business, financial condition and results of operations.

The Debtors could lose a customer or the benefits of a time charter if, among other things:

- the customer fails to make charter payments because of its financial inability, disagreements with the Debtors or otherwise;

- the customer terminates the charter because the Debtors fail to deliver the vessel within a fixed period of time, the vessel is lost or damaged beyond repair, there are serious deficiencies in the vessel or prolonged periods of off-hire, or there are other defaults by the Debtors under the charter;

- the customer terminates the charter because the vessel has been subject to seizure for more than a specified number of days; or

- there is a prolonged *force majeure* event affecting the customer, including damage to, or destruction of relevant production facilities, war or political unrest, which prevents the Debtors from performing services for that customer.

If the Debtors lose a key customer, they may be unable to obtain period time charters on comparable terms with charterers of comparable standing or may have increased exposure to the volatile spot market.

***The Debtors faces strong competition.***

The Debtors obtain charters for their vessels in a highly competitive market that is capital intensive and highly fragmented.  The Debtors' market share is insufficient to enforce any degree of pricing discipline. Competition for the transportation of dry bulk cargo by sea is intense and depends on price, location, size, age, condition and the acceptability of the vessel and its operators to the charterers.  Although the Debtors believe that no single competitor has a dominant position in the markets in which they compete, the Debtors are aware that certain competitors may be able to devote greater financial and other resources to their activities than they can, resulting in a significant competitive threat to the Debtors.  In addition, due in part to the highly fragmented market, competitors with greater resources than the Debtors could enter the dry bulk shipping industry and operate larger fleets through consolidations or acquisitions and may be able to offer lower charter rates and higher quality vessels than the Debtors are able to offer.  The Debtors cannot give assurances that they will continue to compete successfully with their competitors or that these factors will not erode their competitive position in the future.

### J.    Operational Risks

***The operation of the Debtors' ocean-going vessels entails the possibility of marine disasters including damage or destruction of the vessel due to accident, the loss of a vessel due to piracy or terrorism, loss of life, damage or destruction of cargo and similar events that may cause a loss of revenue from affected vessels and could damage the Debtors' business reputation, which may in turn lead to loss of business.***

The operation of the Debtors' ocean-going vessels entails certain inherent risks that may adversely affect their business and reputation, and which may substantially increase the Debtors' costs, including:

- damage or destruction of a vessel due to marine disaster such as a collision;

- the loss of a vessel due to piracy and terrorism;

- cargo and property losses or damage as a result of the foregoing or less drastic causes such as human error, mechanical failure and bad weather;

- environmental accidents as a result of the foregoing; and

- business interruptions and delivery delays caused by mechanical failure, human error, war, terrorism, political action in various countries, labor strikes or adverse weather conditions.

If the Debtors' vessels suffer damage, they may need to be repaired at a drydocking facility. The costs of drydock repairs are unpredictable and can be substantial. In addition, space at drydocking facilities is sometimes limited and not all drydocking facilities are conveniently located. The Debtors may be unable to find space at a suitable drydocking facility or the vessel in issue may be forced to travel to a drydocking facility that is distant from its current position. The loss of earnings while their vessels are being repaired and repositioned, as well as the actual cost of these repairs, would decrease the Debtors' earnings. The Debtors may not have insurance that is sufficient to cover all or any of these costs or losses and may have to pay drydocking costs not covered by their insurance. Further, the involvement of the Debtors' vessels in a disaster or delays in delivery or loss of cargo may harm their reputation as a safe and reliable vessel operator and could cause them to lose business.

***The operation of dry bulk vessels has certain unique operational risks; failure to adequately maintain the Debtors' vessels could have a material adverse effect on the Debtors' business, financial condition and results of operations.***

With a dry bulk vessel, the cargo itself and its interaction with the vessel may create operational risks. By their nature, dry bulk cargoes are often heavy, dense and easily shifted, and they may react badly to water exposure. In addition, dry bulk vessels are often subjected to battering treatment during unloading operations with grabs, jackhammers (to pry encrusted cargoes out of the hold) and small bulldozers. This treatment may cause damage to the vessel. Vessels damaged due to treatment during unloading procedures may be more susceptible to breach while at sea. Breaches of a dry bulk vessel's hull may lead to the flooding of the vessel's holds. If a dry bulk vessel suffers flooding in its forward holds, the bulk cargo may become so dense and waterlogged that its pressure may buckle the vessel's bulkheads, leading to the loss of a vessel. If the Debtors do not adequately maintain their vessels, they may be unable to prevent these events. The occurrence of any of these events could have a material adverse effect on the Debtors' business, financial condition and results of operations.

***Risk of loss and lack of adequate insurance may affect the Debtors' results.***

In addition to risks relating to the operation of ocean-going vessels, described above, the Debtors' business may be affected by political circumstances in foreign countries, hostilities, labor strikes, and boycotts. Any such event may result in loss of revenues or increased costs. The United States Oil Pollution Act of 1990 ("OPA"), by imposing potentially unlimited liability upon owners, operators and bareboat charterers for certain oil pollution accidents in the U.S., has made liability insurance more expensive for shipowners and operators and has also caused insurers to consider reducing available liability coverage.

The Debtors carry insurance to protect against most of the accident-related risks involved in the conduct of their business and maintain environmental damage and pollution insurance coverage. The Debtors do not carry insurance covering the loss of revenue resulting from vessel off-hire time. The Debtors believe that their insurance coverage is adequate to protect them against most accident-related risks involved in the conduct of their business and that it maintains appropriate levels of environmental damage and pollution insurance coverage. Currently, the available amount of coverage for pollution is $1.0 billion for dry bulk carriers per vessel per incident. However, there can be no assurance that all risks are adequately insured against, that any particular claim will be paid or that the Debtors will be able to procure adequate insurance coverage at commercially reasonable rates in the future. More stringent environmental regulations in the past have resulted in increased costs for insurance against the risk of environmental damage or pollution. In the future, the Debtors may be unable to procure adequate insurance coverage to protect them against environmental damage or pollution.

Outside of the United States, other national laws generally provide for the owner to bear strict liability for pollution, subject to a right to limit liability under applicable national or international regimes for limitation of liability. The most widely applicable international regime limiting maritime pollution liability is the Convention on Limitation of Liability for Maritime Claims (London 1976), or 1976 Convention. Rights to limit liability under the 1976 Convention are forfeited where a spill is caused by a shipowner's intentional or reckless conduct. Certain states have ratified the IMO's 1996 Protocol to the 1976 Convention. The Protocol provides for substantially higher liability limits to apply in those jurisdictions than the limits set forth in the 1976 Convention. Finally, some jurisdictions are not a party to either the 1976 Convention or the Protocol of 1996, and, therefore, a shipowner's rights to limit liability for maritime pollution in such jurisdictions may be uncertain.

In some areas of regulation, the European Union has introduced new laws without attempting to procure a corresponding amendment of international law. In October 2009, the European Union amended a directive to impose criminal sanctions for illicit ship-source discharges of polluting substances, including minor discharges, if committed with intent, recklessly or with serious negligence and the discharges individually or in the aggregate result in deterioration of the quality of water. Criminal liability for pollution may result in substantial penalties or fines and increased civil liability claims. The directive could therefore result in criminal liability being incurred in circumstances where it would not be otherwise incurred under international law. Experience has shown that in the emotive atmosphere often associated with pollution incidents, the negligence alleged by prosecutors has often been found by courts on grounds which the international maritime community has found hard to understand. Moreover, there is skepticism in the international maritime community that "serious negligence" will prove to be any narrower in practice than ordinary negligence. Criminal liability for a pollution incident could not only result in the Debtors incurring substantial penalties or fines, but may also, in some jurisdictions, facilitate civil liability claims for greater compensation than would otherwise have been payable.

***The Debtors are subject to funding calls by their protection and indemnity associations, and their associations may not have enough resources to cover claims made against them.***

The Debtors are indemnified for legal liabilities incurred while operating their vessels through membership in P&I associations. P&I associations are mutual insurance associations whose members must contribute to cover losses sustained by other association members. The objective of a P&I association is to provide mutual insurance based on the aggregate tonnage of a member's vessels entered into the association. Claims are paid through the aggregate premia of all members of the association, although members remain subject to calls for additional funds if the aggregate premia are insufficient to cover claims submitted to the association. Claims submitted to the association may include those incurred by members of the association, as well as claims submitted to the association from other P&I associations with which the Debtors' P&I association has entered into inter-association agreements. The Debtors cannot guarantee that the P&I associations to which they belong will remain viable or that they will not become subject to additional funding calls which could adversely affect the Debtors.

***Acts of piracy on ocean-going vessels could adversely affect the Debtors' business.***

Acts of piracy have historically affected ocean-going vessels, including the Debtors' own, trading in regions of the world such as the South China Sea, the Indian Ocean, and the Arabian Sea, and in the Gulf of Aden off the coast of Somalia. On December 11, 2010, the Debtors' vessel *Renuar* was hijacked in waters east of Somalia and was released on April 23, 2011. Although the frequency of sea piracy worldwide decreased during 2012 to its lowest level since 2009, sea piracy incidents continue to occur, particularly in the Gulf of Aden off the coast of Somalia and increasingly in the Gulf of Guinea, with dry bulk vessels and tankers particularly vulnerable to such attacks.

If piracy attacks result in regions in which the Debtors' vessels are deployed being characterized as "war risk" zones by insurers, as the Gulf of Aden temporarily was in May 2008, or as "war and strikes" listed areas by the Joint War Committee, premia payable for such coverage could increase significantly and such insurance coverage may be more difficult to obtain. Accordingly, the Debtors may not be adequately insured to cover losses from these incidents, which could have a material adverse effect on them. Although the Debtors usually obtain war risk insurance for certain of their vessels making port calls in designated war zone areas, they cannot provide assurance that such insurance will be obtained prior to one of the Debtors' vessels entering into an actual war zone, which could result in that vessel not being insured. Even if their insurance coverage is adequate to cover their losses, the Debtors may not be able to timely obtain a replacement vessel in the event of a loss. In addition, detention of any of the Debtors' vessels, hijacking as a result of an act of piracy against their vessels, or an increase in cost, or unavailability, or insufficiency of insurance for their vessels, could have a material adverse impact on the Debtors' business, financial condition, results of operations and ability to service their debt.

***Rising fuel prices may affect the Debtors' profitability.***

The price of bunker fuel is correlated with crude oil prices, which in turn have historically exhibited significant volatility in short periods of time and have recently been at, or close to, historic highs. Furthermore, crude oil prices are influenced by a host of economic and geopolitical factors, such as global terrorism, political

54

instability, tensions in the Middle East, insurrections in the Niger Delta, a long-term increase in global demand for oil and the economic development of emerging markets, China and India in particular.

While the Debtors generally will not bear the cost of fuel, or bunkers for vessels operating on time charters, fuel is a significant factor in negotiating charter rates.  As a result, an increase in the price of fuel beyond the Debtors' expectations may adversely affect their profitability at the time of charter negotiation.  In addition, upon redelivery of vessels at the end of a period time or trip time charter, the Debtors may be obligated to repurchase bunkers on board at prevailing market prices, which could be materially higher than fuel prices at the inception of the charter period.  Fuel is also a significant, if not the largest, expense in the Debtors' shipping operations when vessels are not under period charters.  Changes in the price of fuel may adversely affect the Debtors' profitability.  The price and supply of fuel is unpredictable and fluctuates based on events outside the Debtors' control, including geopolitical developments, supply and demand for oil and gas, actions by the Organization of Petroleum Exporting Countries, and other oil and gas producers, war and unrest in oil producing countries and regions, regional production patterns and environmental concerns.  Further, fuel may become much more expensive in the future, which may reduce the profitability and competitiveness of the Debtors' business versus other forms of transportation.

***Rising crew costs may adversely affect the Debtors' profits.***

Crew costs are a significant expense for the Debtors under their charters.  Recently, the limited supply of, and increased demand for, well-qualified crew, due to the increase in the size of the global shipping fleet, has created upward pressure on crewing costs, which the Debtors bear under their Period Time Charters and Spot Charters.  Increases in crew costs may adversely affect the Debtors' profitability.

***Because many of Maryville's employees are covered by industry-wide collective bargaining agreements, failure of industry groups to renew those agreements may disrupt the Debtors' operations and adversely affect their earnings.***

Maryville, the technical manager for the Debtors, currently employs approximately 849 seafarers on-board the Debtors' vessels and 119 land-based employees in its Athens office.  The 119 employees in Greece are covered by industry-wide collective bargaining agreements that set basic standards.  The Debtors cannot guarantee that these agreements will prevent labor interruptions.  If not resolved in a timely and cost-effective manner, industrial action or other labor unrest could prevent or hinder the Debtors' operations from being carried out normally and could have a material adverse effect on the Debtors' business, results of operations, cash flows, and financial condition.

***The aging of the Debtors' fleet may result in increased operating costs in the future, which could adversely affect the Debtors' earnings.***

The majority of the Debtors' vessels were acquired secondhand, and the Debtors estimate their useful lives to be 28 years from their date of delivery from the yard, depending on various market factors and management's ability to comply with government and industry regulatory requirements.  The Debtors' current operating fleet has an average age of approximately 11.9 years (11.2 years on a deadweight weighted average basis).

In general, expenditures necessary for maintaining a vessel in good operating condition increase as a vessel ages.  Older vessels are typically less fuel efficient and more costly to maintain than more recently constructed vessels due to improvements in engine technology.  Cargo insurance rates also increase with the age of a vessel, making older vessels less desirable to charterers.  Older vessels also tend to be less fuel-efficient than newer vessels.  While the difference in fuel consumption is factored into the freight rates that the Debtors' older vessels earn, if the cost of bunker fuels were to increase significantly, it could disproportionately affect the Debtors' vessels and significantly lower their profits.  Further, secondhand vessels may also develop unexpected mechanical and operational problems despite adherence to regular survey schedules and proper maintenance.

In addition, governmental regulations, including environmental regulations, safety or other equipment standards related to the age of vessels may require expenditures for alterations to existing equipment or the addition of new equipment to the Debtors' vessels and may restrict the type of activities in which their vessels may engage.

55

The Debtors cannot give assurances that, as their vessels age, market conditions will justify those expenditures or enable the Debtors to operate their vessels profitably during the remainder of their useful lives.

***The Debtors do not expect to set aside reserves for vessel replacement, and at the end of a vessel's useful life its revenue will decline if the Debtors are also unable to borrow funds for vessel replacement.***

The Debtors' current operating fleet has an average age of approximately 11.9 years (11.2 years on a deadweight weighted average basis). The Debtors do not expect to set aside any reserves for vessel replacement. Therefore, the Debtors may be unable to replace the vessels in their fleet upon the expiration of their useful lives in the event the Debtors have insufficient credit at the time of such expiration to borrow funds for vessel replacement. The Debtors estimate the useful life of their vessels to be 28 years from the date of initial delivery from the shipyard. If the Debtors are unable to replace the vessels in its fleet upon the expiration of their useful lives, their business, results of operations, financial condition and ability to service their debt will be adversely affected.

***Technological innovation could reduce the Debtors' charterhire income and the value of their vessels.***

The charterhire rates and the value and operational life of a vessel are determined by a number of factors including the vessel's efficiency, operational flexibility and physical life. Efficiency includes speed, fuel economy and the ability to load and discharge cargo quickly. Flexibility includes the ability to enter harbors, utilize related docking facilities and pass through canals and straits. The length of a vessel's physical life is related to its original design and construction, its maintenance and the impact of the stress of operations. If new dry bulk carriers are built that are more efficient or more flexible or have longer physical lives than the Debtors' vessels, competition from these more technologically advanced vessels could adversely affect the amount of charterhire payments the Debtors receive for its vessels once their initial charters expire, and the resale value of their vessels could significantly decrease. As a result, the Debtors' business, results of operations, cash flows and financial condition could be adversely affected.

***Certain of the Debtors' directors, officers, and principal stockholders are affiliated with entities engaged in business activities similar to those conducted by the Debtors which may compete directly with it, causing such persons or entities with which they are affiliated to have conflicts of interest.***

Some of the Debtors' directors, officers and principal stockholders have affiliations with entities that have similar business activities to those conducted by the Debtors or that are parties to agreements with it. Certain of the Debtors' directors are also directors of other shipping companies and they may enter similar businesses in the future. These other affiliations and business activities may give rise to certain conflicts of interest in the course of such individuals' affiliation with the Debtors.

## K.    Financial and Taxation Risks

***The Debtors currently maintain all of their cash and cash equivalents with a limited number of financial institutions which subject them to credit risk.***

The Debtors currently maintain almost all of their cash and cash equivalents with a limited number of financial institutions located in the United Kingdom, Switzerland, Greece, The Netherlands, Luxembourg and Germany. The Debtors do not expect any of their balances to be covered by insurance in the event of default by any of these financial institutions. The occurrence of such a default could therefore have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows, and they may lose part or all of their cash that they have deposited with such financial institutions.

***Because the Debtors generate all of their revenues in U.S. dollars but incur approximately one-fifth of their expenses in other currencies, exchange rate fluctuations could hurt their results of operations.***

The Debtors generate all of their revenues in U.S. dollars but historically have incurred approximately 20% to 25% of their vessel operating expenses in currencies other than U.S. dollars. This variation in operating revenues and expenses could lead to fluctuations in net income due to changes in the value of the U.S. dollar relative to the

other currencies, in particular the Japanese yen, the Euro, the Singapore dollar and the British pound sterling. Expenses incurred in foreign currencies against which the U.S. dollar falls in value may increase as a result of these fluctuations, therefore decreasing the Debtors' net income. The Debtors currently do not hedge their currency exposure and, as a result, their results of operations and financial condition could suffer as a result of these fluctuations.

***The Debtors are subject to the U.S. Federal Income Tax on U.S. source income, which could reduce their earnings.***

Under the Internal Revenue Code, 50% of the gross shipping income of a vessel owning or chartering corporation, such as the Debtors, that is attributable to transportation that begins or ends, but that does not both begin and end, in the U.S. may be subject to a 4% U.S. federal income tax without allowance for deduction, unless that corporation qualifies for exemption from tax under Section 883 of the Internal Revenue Code and the applicable Treasury Regulations promulgated thereunder.

The Debtors do not believe that they are currently entitled to exemption under Section 883 of the Internal Revenue Code for any taxable year. Therefore, the Debtors are subject to an effective 2% U.S. federal income tax on the gross shipping income that they derive during the year that is attributable to the transport or cargoes to or from the U.S.

***U.S. tax authorities could treat us as a "passive foreign investment company" which could have adverse U.S. federal income tax consequences to U.S. holders.***

A foreign corporation will be treated as a "passive foreign investment company" or PFIC, for U.S. federal income tax purposes if either (i) at least 75% of its gross income for any taxable year consists of certain types of "passive income" or (ii) at least 50% of the average value of the corporation's assets produce or are held for the production of those types of "passive income." For purposes of these tests, "passive income" includes dividends, interest, and gains from the sale or exchange of investment property and rents and royalties other than rents and royalties which are received from unrelated parties in connection with the active conduct of a trade or business. For purposes of these tests, income derived from the performance of services does not constitute "passive income." U.S. shareholders of a PFIC are subject to a disadvantageous U.S. federal income tax regime with respect to the income derived by the PFIC, the distributions they receive from the PFIC and the gain, if any, they derive from the sale or other disposition of their shares in the PFIC.

Based on its projected operations and assets, Holdco does not expect to be or to become a PFIC with respect to any taxable year. In this regard, Holdco intends to treat the gross income it derives or is deemed to derive from its time chartering activities as services income, rather than rental income. Accordingly, Holdco believes that its income from its time chartering activities does not constitute "passive income," and the assets that it will own and operate in connection with the production of that income will not constitute passive assets.

There is substantial legal authority supporting this position consisting of case law and other authorities concerning the characterization of income derived from time charters and voyage charters as services income for other tax purposes. However, it should be noted that there is also authority which characterizes time charter income as rental income rather than services income for other tax purposes. Accordingly, no assurance can be given that the IRS or a court of law will accept this position, and there is a risk that the IRS or a court of law could determine that Holdco is a PFIC. Moreover, no assurance can be given that Holdco would not constitute a PFIC for any future taxable year if the nature and extent of its operations changed.

If Holdco were to be treated as a PFIC for any taxable year, U.S. holders of Holdco Units may face adverse U.S. tax consequences. Under the PFIC rules, unless those unitholders make an election available under the Tax Code (which election could itself have adverse consequences for such unitholders, as discussed below under "**Certain Tax Consequences of the Plan–Certain U.S. Federal Income Tax Consequences to U.S. Holders– Passive Foreign Investment Company Status and Significant Tax Consequences**"), such unitholders would be liable to pay U.S. federal income tax at the then prevailing income tax rates on ordinary income plus interest upon "excess distributions" and upon any gain from the disposition of Holdco Units, as if the excess distribution or gain had been recognized ratably over the unitholders' holding period of such Holdco Units. See "**Certain Tax**

57

**Consequences of the Plan–Certain U.S. Federal Income Tax Consequences to U.S. Holders–Passive Foreign Investment Company Status and Significant Tax Consequences**" for a more comprehensive discussion of the U.S. federal income tax consequences to U.S. holders of Holdco Units if Holdco were treated as a PFIC.

### L.    Legal and Regulatory Risks

*The Debtors' operations are subject to the risks of litigation.*

The Debtors are involved on an ongoing basis in litigation arising in the ordinary course of business or otherwise. Litigation may include claims related to commercial, labor, employment, antitrust, securities, tax or environmental matters. Moreover, the process of litigating cases, even if the Debtors are successful, may be costly, and may approximate the cost of damages sought. These actions could also expose the Debtors to adverse publicity, which might adversely affect the Debtors' brand and reputation. Litigation trends and expenses and the outcome of litigation cannot be predicted with certainty, and adverse litigation trends, expenses and outcomes could adversely affect the Debtors' financial results, to the extent not adequately covered by insurance.

As described in more detail in **Section II.E.2(b) – "Redelivery of the Bareboat Charters,"** certain of Excel's non-Debtor subsidiaries, including Bird, are currently engaged in arbitration with respect to the return of certain bareboat charter vessels to their owners. The German Owners could assert a theory under which they would contend that Excel is obligated under any judgment against Bird or its other subsidiaries. However, as described in more detail in Section II.E.(2)(b), any such claims would have arisen prepetition and therefore would be barred and discharged due to the German Owners' failure to timely file a proof of claim.

Further, RMI has indicated that it may pursue its alleged claims described in **Section III.D.3 – "Dispute with Robertson Maritime Investors"** above in other foreign jurisdictions.

*The Debtors' business may be adversely affected by protectionist policies and regulatory regimes adopted by countries globally.*

There is a risk that countries could, in the wake of the global financial and economic crisis or in response to real or perceived currency manipulations or trade imbalances, resort to protectionist measures or make changes to the regulatory regimes in which the Debtors operate in order to protect and preserve domestic industries. Such measures could include raising import tariffs, providing subsidies to domestic industries, restrictions on currency repatriation and the creation of other trade barriers. A global trend towards protectionism would be harmful to the global economy in general, as protectionist measures could cause world trade to shrink and counter-measures taken by protectionist policies' target countries would increase the chance for all-out trade wars. As the Debtors' business success hinges, among other things, on global trade volumes, the stated protectionist policies and regulatory regimes would have a material adverse effect on the Debtors' business, financial condition and results of operations.

*The Debtors are subject to complex laws and regulations, including environmental, safety and security regulations that could adversely affect the cost, manner or feasibility of doing business.*

The Debtors' operations are subject to numerous laws and regulations in the form of international conventions and treaties, national, state and local laws and national and international regulations in force in the jurisdictions in which the Debtors' vessels will operate or will be registered, which could significantly affect the ownership and operation of the vessels. These requirements include, but are not limited to, conventions of the International Maritime Organization, or IMO, such as the International Convention for the Prevention of Marine Pollution from Ships, 1973, as modified by the Protocols of 1978, the International Convention for the Safety of Life at Sea of 1974, the International Convention on Load Lines of 1966, the Convention on Limitation of Liability for Maritime Claims (as amended), or 1976 Convention, the International Convention on Civil Liability for Oil Pollution Damage of 1969, as amended by different Protocol in 1976, 1984, and 1992, and amended in 2000, the OPA, the U.S. Comprehensive Environmental Response, Compensation and Liability Act of 1980, the U.S. Clean Air Act, U.S. Clean Water Act and the U.S. Marine Transportation Security Act of 2002.

Compliance with such laws, regulations and standards, where applicable, may require installation of costly equipment or operational changes and may affect the resale value or useful lives of the Debtors' vessels. The Debtors may also incur additional costs in order to comply with other existing and future regulatory obligations, including, but not limited to, costs relating to air emissions, including greenhouse gases, the management of ballast waters, maintenance and inspection, development and implementation of emergency procedures and insurance coverage or other financial assurance of their ability to address pollution incidents. These costs could have a material adverse effect on the Debtors' business, results of operations, cash flows and financial condition. Failure to comply with applicable laws and regulations may result in administrative and civil penalties, criminal sanctions or the suspension or termination of the Debtors' operations.

Environmental laws often impose strict liability for remediation of spills and releases of oil and hazardous substances, which could subject the Debtors to liability without regard to whether it was negligent or at fault. Under OPA, for example, owners, operators and bareboat charterers are jointly and severally strictly liable for the discharge of oil within the 200-mile exclusive economic zone around the United States. An oil spill could result in significant liability, including fines, penalties and criminal liability and remediation costs for natural resources damages under other federal, state and local laws, as well as third-party damages. Under OPA, the Debtors will be required to satisfy insurance and financial responsibility requirements for potential marine fuel spills and other pollution incidents. Furthermore, the 2010 explosion of the *Deepwater Horizon* and the subsequent release of oil into the Gulf of Mexico, or other events, may result in further regulation of the shipping industry, and modifications to statutory liability schemes, which could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows. Although the Debtors arrange for insurance to cover certain environmental risks, there can be no assurance that such insurance will be sufficient to cover all such risks or that any claims will not have a material adverse effect on the Debtors' business, results of operations, cash flows and financial condition.

Further legislation, or amendments to existing legislation, applicable to international and national maritime trade are expected over the coming years in areas such as ship recycling, sewage systems, emission control (including emissions of greenhouse gases), ballast treatment and handling. The United States has recently enacted legislation and regulations that require more stringent controls of air and water emissions from ocean-going vessels. Such legislation or regulations may require additional capital expenditures or operating expenses (such as increased costs for low-sulfur fuel) in order for the Debtors to maintain their vessels in compliance with international and/or national regulations.

The operation of the Debtors' vessels is affected by the requirements set forth in the United Nations' International Maritime Organization's International Management Code for the Safe Operation of Ships and Pollution Prevention ("ISM Code"). The ISM Code requires ship owners, ship managers and bareboat charterers to develop and maintain an extensive "Safety Management System" that includes the adoption of a safety and environmental protection policy setting forth instructions and procedures for safe operation and describing procedures for dealing with emergencies. If the Debtors fail to comply with the ISM Code, they may be subject to increased liability, their insurance coverage may be invalidated or decreased, or their vessels may be detained in, or denied access to, certain ports. Currently, each of the Debtors' vessels is ISM Code-certified by Bureau Veritas or American Bureau of Shipping and the Debtors expect that any vessel that they agree to purchase will be ISM Code-certified upon delivery to them. Bureau Veritas and American Bureau of Shipping have awarded ISM certification to Maryville, the Debtors' vessel management company and a wholly-owned subsidiary of Excel. However, there can be no assurance that such certification will be maintained indefinitely.

***The Debtors could be adversely affected by violations of the U.S. Foreign Corrupt Practices Act, UK Bribery Act, and other applicable worldwide anticorruption laws.***

The U.S. Foreign Corrupt Practices Act ("FCPA") and other applicable worldwide anti-corruption laws generally prohibit companies and their intermediaries from making improper payments to government officials for the purpose of obtaining or retaining business. These laws include the recently enacted U.K. Bribery Act, which became effective on July 1, 2011 and which is broader in scope than the FCPA, as it contains no facilitating payments exception. The Debtors charter their vessels into some jurisdictions that international corruption monitoring groups have identified as having high levels of corruption. The Debtors' activities create the risk of unauthorized payments or offers of payments by one of their employees or agents that could be in violation of the

FCPA or other applicable anti-corruption laws. The Debtors maintain policies that prohibit bribery including restrictions on giving or receiving items or services of value to influence business decisions. Although the Debtors have these policies in place, there can be no assurance that these policies will protect the Debtors from governmental investigations or inquiries surrounding actions of their employees or agents. If the Debtors are found to be liable for violations of the FCPA or other applicable anti-corruption laws (either due to their own acts or inadvertence, or due to the acts or inadvertence of others), the Debtors could suffer from civil and criminal penalties or other sanctions.

***Increased inspection procedures and tighter import and export controls could increase costs and disrupt the Debtors' business.***

International shipping is subject to various security and customs inspection and related procedures in countries of origin and destination and transshipment points. Inspection procedures may result in the seizure of contents of the Debtors' vessels, delays in the loading, offloading or delivery and the levying of customs duties, fines or other penalties against the Debtors.

It is possible that changes to inspection procedures could impose additional financial and legal obligations on the Debtors or require significant capital expenditures. Changes to inspection procedures could also impose additional costs and obligations on the Debtors' customers and may, in certain cases, render the shipment of certain types of cargo uneconomical or impractical. Any such changes or developments may have a material adverse effect on the Debtors' business, financial condition and results of operations.

***The Debtors' commercial vessels are subject to inspection by a classification society.***

The hull and machinery of every commercial vessel must be classed by a classification society authorized by its country of registry. Classification societies are non-governmental, self-regulating organizations and certify that a vessel is safe and seaworthy in accordance with the applicable rules and regulations of the country of registry of the vessel and the Safety of Life at Sea Convention. The Debtors' vessels are currently enrolled with Bureau Veritas, American Bureau of Shipping, Nippon Kaiji Kyokai, Det Norske Veritas and Lloyd's Register of Shipping.

A vessel must undergo Annual Surveys, Intermediate Surveys and Special Surveys. In lieu of a Special Survey, a vessel's machinery may be on a continuous survey cycle, under which the machinery would be surveyed periodically over a five-year period. The Debtors' vessels are on Special Survey cycles for hull inspection and continuous survey cycles for machinery inspection. Every vessel is also required to be drydocked every two to three years for inspection of the underwater parts of such vessel. Generally, the Debtors will make a decision to scrap a vessel or reassess its useful life at the time of a vessel's fifth Special Survey.

If any vessel fails any Annual Survey, Intermediate Survey, or Special Survey, the vessel may be unable to trade between ports and, therefore, would be unemployable, potentially causing a negative impact on the Debtors' revenues due to the loss of revenues from such vessel until it is able to trade again.

## VI.     APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

### A.     Issuance and Resale of Plan Securities Under the Plan Pursuant to Section 1145

#### 1.     Exemption from Registration

The Plan provides for Reorganized Excel to issue New Common Stock to holders of Syndicate Credit Facility Secured Claims and Allowed Impaired Excel General Unsecured Claims (including Syndicate Credit Facility Deficiency Claims) on account of their claims, which in turn will be exchanged for Holdco Units. Ivory will receive New Common Stock in Reorganized Excel, which will also be exchanged for Holdco Units, on account of its investment in Reorganized Excel. All such Holdco Units issued in exchange for New Common Stock to holders of Syndicate Credit Facility Secured Claims and Allowed Impaired Excel General Unsecured Claims (including pursuant to the Section 1145 Rights Offering but excluding New Common Stock issued pursuant to the 4(a)(2) Rights Offering and the Holdco Units issued in exchange), the "1145 Plan Securities" and together with the New Common Stock issued pursuant to the 4(a)(2) Rights Offering and to Ivory and the Holdco Units issued in

exchange, the "Plan Securities").  The Debtors believe that the Plan Securities constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  It is expected that the Plan Securities issued to holders of claims will meet these requirements.

With the respect to the 1145 Plan Securities issued to holders of claims (including pursuant to the 1145 Rights Offering), section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  Section 1145 does not cover Plan Securities issued to Ivory or pursuant to the 4(a)(2) Rights Offering (collectively, the "4(a)(2) Plan Securities") and such 4(a)(2) Plan Securities may not be transferred or resold absent registration or an exemption.  With respect to the Plan Securities issued to Ivory, section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. By virtue of section 18 of the Securities Act, section 4(a)(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.  See **"Section VI.B - Issuance and Resale of Plan Securities Under the Plan Pursuant to Section 4(a)(2)."**

In reliance upon these exemptions, the offer and sale of the 1145 Plan Securities (including pursuant to the Co-Investment Rights) will not be registered under the Securities Act or any state Blue Sky Law. Accordingly, it is expected that the 1145 Plan Securities issued to holders of claims may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the 1145 Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the 1145 Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

2.        Resales of Plan Securities; Definition of Underwriter

If the holder of the 1145 Plan Securities is an underwriter, the 1145 Plan Securities will be "restricted securities" and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of

61

voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the 1145 Plan Securities by persons deemed to be "underwriters" (which definition includes "controlling persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of 1145 Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Debtors do not presently intend to make publicly available the requisite current information regarding the Debtors, and as a result, Rule 144 will not be available for resales of 1145 Plan Securities by persons deemed to be underwriters.

Whether any particular person would be deemed to be an "underwriter" (including whether such person is a "controlling person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view whether any person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular person may be an "underwriter," the Debtors make no representations concerning the right of any person to freely resell Plan Securities. Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## B.    Issuance and Resale of Plan Securities under the Plan Pursuant to Section 4(a)(2)

### 1.    Exemption from Registration

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The Debtors believe that the 4(a)(2) Plan Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. These shares will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

### 2.    Resales of 4(a)(2) Plan Securities

Because the 4(a)(2) Plan Securities will not be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, they will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Debtors do not plan to register Holdco Units issued in respect of 4(a)(2) Plan Securities held by persons other than affiliates of the Company. Thus, persons who receive 4(a)(2) Plan Securities will not be permitted to offer, sell or otherwise transfer their 4(a)(2) Plan Securities except pursuant to registration or an available exemption from registration.

All 4(a)(2) Plan Securities will be issued in certificated form and will bear a restrictive legend. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Plan Security shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND SUCH THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR AN EXEMPTION THEREUNDER."**

Reorganized Excel will reserve the right to require certification or other evidence of compliance with the Securities Act and the applicable state securities laws as a condition to the removal of such legend or to any resale of the 4(a)(2) Plan Securities. Reorganized Excel will also reserve the right to stop the transfer of any 4(a)(2) Plan Securities if such transfer is not in compliance with the Securities Act and the applicable state securities laws. Any person who purchases 4(a)(2) Plan Securities pursuant to the 4(a)(2) Rights Offering will be deemed to acknowledge and agree not to resell such securities except in accordance with registration or an exemption of registration, and that the securities will be subject to the other restrictions described above.

Any persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.  *See also* **Article V.D.** *"Risks Relating to the 4(a)(2) Rights Offering"* **and Article V.F. -- "You may be restricted from selling the 1145 Offered Shares and Holdco Units you receive upon exercise of your Co-Investment Rights pursuant to the 1145 Rights Offering."**

# VII.    CERTAIN TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to U.S. Holders and Non-U.S. Holders (as defined below) of allowed Syndicate Credit Facility Claims and of Convertible Notes that are entitled to vote to accept or reject the Plan.  This summary is for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described herein.  No opinion of counsel has been obtained as to any of the tax consequences of the Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect to any statement or conclusion in this summary.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any creditor or equity interest-holder and there can be no assurance that the IRS would not assert, or that a court would not sustain, positions different from those discussed herein.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation applicable to special classes of taxpayers (including, without limitation, banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, partnerships or other pass-through entities, real estate investment trusts (REITs), regulated investment companies (RICs), controlled foreign corporations (CFCs), passive foreign investment companies (PFICs), persons whose functional currency is not the U.S. dollar, dealers subject to the mark-to-market rules of Section 475 of the Tax Code, employees of the Debtors, and persons who received their Syndicate Credit Facility Claims or Convertible Notes, as the case may be, pursuant to the exercise of an employee stock option or otherwise as compensation).  This summary assumes that the Syndicate Credit Facility Claims and Convertible Notes are held as capital assets for U.S. federal income tax purposes and that the Holdco Units, the interests in the Amended and Restated Senior Secured Credit Facility, and New Common Stock will each be held as a capital asset for U.S. federal income tax purposes.  Furthermore, the following discussion does not address U.S. federal taxes other than income taxes (including, without limitation, estate and gift taxes).  U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including U.S. federal, state, local and foreign tax consequences.

For purposes of this discussion, a "U.S. Holder" is a beneficial holder of allowed Syndicate Credit Facility Claims or Convertible Notes that is, for U.S. federal income tax purposes (1) an individual that is a citizen or

resident of the United States, (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (ii) such trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.  A "Non-U.S. Holder" is a beneficial holder (other than any entity treated as a partnership for U.S. federal income tax purposes) of allowed Syndicate Credit Facility Claims or Convertible Notes that is not a U.S. Holder.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds allowed Syndicate Credit Facility Claims or Convertible Notes, as the case may be, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners.  A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **Certain U.S. Federal Income Tax Consequences to U.S. Holders**

The discussion below describes certain U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders; however, no assurance can be given as to the treatment of such transactions by the IRS or as to whether such treatment will be sustained by a court.  Each U.S. Holder should consult its tax advisor regarding the tax consequences to it of the transactions contemplated by the Plan and information that may be relevant to its particular situation and circumstances.

1.      U.S. Holders of Syndicate Credit Facility Claims

(a)      General

Pursuant to the Plan, in full satisfaction and discharge of its Claim, each U.S. Holder of an allowed Syndicate Credit Facility Claim will receive its *pro rata* share of (i) 16.7 million shares of New Common Stock, (ii) all of the interests in the Amended and Restated Senior Secured Credit Facility having a principal amount of $300 million and (iii) if, and only if, Class 8 does not vote to accept the Plan, on account of an allowed Syndicate Credit Facility Deficiency Claim, (a) 1.6 million shares of New Common Stock and (b) the Co-Investment Rights (collectively, the "Excel Exchange").  In addition, on the Effective Date and concurrently with the receipt of the New Common Stock and the exercise, if at all, of the Co-Investment Rights (if issued as described above), each holder of New Common Stock shall automatically (and shall automatically be deemed to) contribute such New Common Stock to Holdco in exchange for the same percentage of Holdco Units as the holder had in the New Common Stock immediately prior to such contribution (the "Holdco Contribution").  Reorganized Excel intends to follow, for U.S. federal income tax purposes, the treatment of the Excel Exchange and the Holdco Contribution as described in the Plan.  The IRS could take the position, however, that the Excel Exchange, the U.S. Holders, Excel, and/or the Holdco Contribution should be treated for U.S. federal income tax purposes in some manner other than that set forth in the Plan.

(b)      The Excel Exchange

The U.S. federal income tax consequences of the Excel Exchange will depend, in part, on whether the U.S. Holders' allowed Syndicate Credit Facility Claims and, if applicable, the Co-Investment Rights constitute

"securities" and rights to acquire New Common Stock for U.S. federal income tax purposes. Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The allowed Syndicate Credit Facility Claims have a term of more than five years but less than ten years. The Co-Investment Rights are a right to acquire New Common Stock. It is unclear whether U.S. Holders' allowed Syndicate Credit Facility Claims constitute, and no assurance can be made that the Co-Investment Rights constitute, "securities" for U.S. federal income tax purposes and each U.S. Holder should consult its tax advisor regarding the treatment of such obligations as "securities."

The Debtors intend to take the position that each of the allowed Syndicate Credit Facility Claims, the Amended and Restated Senior Secured Credit Facility and, if applicable, the Co-Investment Rights should constitute "securities" for U.S. federal income tax purposes.

(i)    Treatment as a Recapitalization

Subject to the discussion below regarding accrued interest, to the extent that a U.S. Holder's allowed Syndicate Credit Facility Claim is characterized as a "security" for U.S. federal income tax purposes, the Excel Exchange should be treated as a "recapitalization" for U.S. federal income tax purposes and the Amended and Restated Senior Secured Credit Facility should also be characterized as a "security" for U.S. federal income tax purposes. If the Excel Exchange is treated as a recapitalization, and assuming that, if applicable, the Co-Investment Rights are properly characterized as a right to acquire New Common Stock, a U.S. Holder of an allowed Syndicate Credit Facility Claim generally should not recognize capital gain or loss pursuant to the Excel Exchange. A U.S. Holder's aggregate tax basis in the New Common Stock, its interest in the Amended and Restated Senior Secured Credit Facility and, if applicable, the Co-Investment Rights it receives in the Excel Exchange should be equal to the tax basis of such U.S. Holder's allowed Syndicate Credit Facility Claim surrendered in exchange therefor. This aggregate tax basis should be allocated among such New Common Stock, Amended and Restated Senior Secured Credit Facility and, if applicable, Co-Investment Rights in proportion to their respective fair market values as of the Effective Date. Such U.S. Holder's holding period for such New Common Stock, Amended and Restated Senior Secured Credit Facility and, if applicable, Co-Investment Rights generally should include its holding period for the allowed Syndicate Credit Facility Claim surrendered in exchange therefor.

(ii)    Treatment as a Taxable Exchange

*Generally.* Subject to the discussion below regarding accrued interest, if the allowed Syndicate Credit Facility Claims are not characterized as "securities," and as a result the Excel Exchange is not treated as a "recapitalization," and the transactions contemplated by the Plan are otherwise taxable to a U.S. Holder, such U.S. Holder should recognize gain or loss equal to the difference between (a) the sum of (i) the fair market value as of the Effective Date of such U.S. Holder's shares of New Common Stock received pursuant to the Plan, (ii) the issue price of such U.S. Holder's *pro rata* share of the Amended and Restated Senior Secured Credit Facility received pursuant to the Plan (which generally should be deemed to equal the stated principal amount if neither the Amended and Restated Senior Secured Credit Facility nor the allowed Syndicate Credit Facility Claim surrendered in exchange therefor is considered "publicly traded" under applicable Treasury regulations) and (iii) the fair market value as of the Effective Date of the Co-Investment Rights the U.S. Holder received pursuant to the Plan, if at all, over (b) such U.S. Holder's tax basis in its allowed Syndicate Credit Facility Claim surrendered pursuant to the Plan. Such gain or loss should be capital gain or loss (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the U.S. Holder's holding period for its surrendered allowed Syndicate Credit Facility Claim exceeded one year. A U.S. Holder's tax basis in each of its shares of New Common Stock, its *pro rata* share of the Amended and Restated Senior Secured Credit Facility and, if applicable, its Co-Investment Right, received pursuant to the Plan, should equal the fair market value of such interests on the Effective Date. A U.S. Holder's holding period for each of its shares of New Common Stock, its *pro rata* share of the Amended and Restated Senior Secured

65

Credit Facility and, if applicable, its Co-Investment Right, received pursuant to the Plan should begin on the day following the Effective Date.

        (c)      The Co-Investment Rights

      If U.S. Holders of allowed Syndicate Credit Facility Claims receive the Co-Investment Rights pursuant to the Plan as a result of Class 8 failing to vote to accept the Plan, such U.S. Holder should not recognize any gain or loss upon the exercise of the Co-Investment Rights received pursuant to the Plan. The tax basis of the shares of New Common Stock acquired through exercise of a Co-Investment Right should equal the sum of the offering price for such shares and the U.S. Holder's tax basis in such Co-Investment Right as described above. The holding period for the shares of New Common Stock acquired through exercise of the Co-Investment Rights should begin on the day following the Effective Date.

      If U.S. Holders of allowed Syndicate Credit Facility Claims receive the Co-Investment Rights pursuant to the Plan as a result of Class 8 failing to vote to accept the Plan, the tax consequences to such U.S. Holder of allowing a Co-Investment Right it received pursuant to the Plan to expire unexercised are unclear. Such a holder generally should realize a capital loss equal to the tax basis in such expired Co-Investment Right, which should be long-term capital loss if the U.S. Holder's holding period for such Co-Investment Right exceeded one year. There can be no assurance, however, that the IRS would not assert that instead of recognizing such loss, the holder should add the tax basis in its expired Co-Investment Right to the tax basis it has in the shares of New Common Stock it received pursuant to the Plan. Each U.S. Holder should consult its tax advisor as to the tax consequences of allowing the Co-Investment Rights it received pursuant to the Plan to expire unexercised.

        (d)      The Holdco Contribution

      Subject to the market discount rules described below, the Holdco Contribution generally should be treated as a tax-free transaction in which no gain or loss is recognized for U.S. federal income tax purposes. A U.S. Holder's basis in its Holdco Units generally should be equal to the tax basis of such U.S. Holder's New Common Stock exchanged therefor. A U.S. Holder's holding period in its Holdco Units generally should include its holding period for such New Common Stock.

        (e)      Accrued Interest

      To the extent that any consideration is allocated to accrued but unpaid interest, a U.S. Holder of allowed Syndicate Credit Facility Claims that has not previously included such accrued interest in taxable income for U.S. federal income tax purposes should recognize ordinary income equal to the fair market value of any property received (including the U.S. Holder's *pro rata* share of the New Common Stock, the Amended and Restated Senior Secured Credit Facility and, if applicable, the Co-Investment Rights) with respect to such Claims for accrued interest. Pursuant to the Plan, Reorganized Excel will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest. No assurance can be given that the IRS will not challenge such allocation. If a distribution with respect to a Claim is entirely allocated to the principal amount of such Claim, a holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the holder's gross income. U.S. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan in respect of allowed Syndicate Credit Facility Claims for accrued interest, including the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

        (f)      Market Discount

      A U.S. Holder that purchased its allowed Syndicate Credit Facility Claim from a prior holder at a discount to the then-adjusted issue price of such allowed Syndicate Credit Facility Claim may be subject to the market discount rules of the Tax Code. Under those rules, assuming such U.S. Holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such allowed Syndicate Credit Facility Claim (subject to a de minimis rule and exceptions for certain nonrecognition transactions) generally would be characterized as ordinary income to the extent of the accrued market discount on such allowed Syndicate

Credit Facility Claim as of the Effective Date.  U.S. Holders of allowed Syndicate Credit Facility Claims should consult their tax advisors as to the tax consequences of the market discount rules, including, without limitation, the possible application of such rules on the Excel Exchange and Holdco Contribution.

2.      U.S. Holders of Convertible Notes

    (a)     General

        Pursuant to the Plan, in full satisfaction and discharge of each Convertible Note, each U.S. Holder of a Convertible Note will receive its *pro rata* share of (i) 1.6 million shares of New Common Stock and (ii) the Co-Investment Rights (collectively, the "Convertible Notes Exchange").  In addition, on the Effective Date and concurrently with the receipt of the New Common Stock and the exercise, if at all, of the Co-Investment Rights, each holder of New Common Stock shall automatically (and shall automatically be deemed to) contribute such New Common Stock to Holdco in exchange for the same percentage of the Holdco Units as the holder had in the New Common Stock immediately prior to such contribution (the Holdco Contribution).  The Debtors intend to follow, for U.S. federal income tax purposes, the treatment of the Convertible Notes Exchange and the Holdco Contribution as described in the Plan.  The IRS could take the position, however, that the U.S. Holders or Excel should be treated for U.S. federal income tax purposes in some manner other than that set forth in the Plan.

    (b)     The Convertible Notes Exchange

        The U.S. federal income tax consequences of the Convertible Notes Exchange will depend, in part, on whether the Convertible Notes constitute "securities" for U.S. federal income tax purposes and whether the Co-Investment Rights constitute "securities" and rights to acquire New Common Stock for U.S. federal income tax purposes.  Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances.  Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued.  The Convertible Notes have a term of more than ten years.  The Co-Investment Rights are a right to acquire New Common Stock.  No assurance can be made that the Convertible Notes and the Co-Investment Rights constitute "securities" for U.S. federal income tax purposes and each U.S. Holder should consult its tax advisor regarding the treatment of such obligations as "securities."

        The Debtors intend to take the position that the Convertible Notes and the Co-Investment Rights should constitute "securities" for U.S. federal income tax purposes and that the Convertible Notes Exchange should be treated as a "recapitalization" for U.S. federal income tax purposes.

        Subject to the discussion below regarding accrued interest, and assuming that the Co-Investment Rights are properly characterized as a right to acquire New Common Stock, a U.S. Holder of Convertible Notes generally should not recognize capital gain or loss pursuant to the Convertible Notes Exchange.  A U.S. Holder's aggregate tax basis in the New Common Stock and the Co-Investment Rights it receives in the Convertible Notes Exchange should be equal to the tax basis of such U.S. Holder's Convertible Notes surrendered in exchange therefor.  This aggregate tax basis should be allocated among such New Common Stock and Co-Investment Rights in proportion to their respective fair market values as of the Effective Date. Such U.S. Holder's holding period for such New Common Stock and Co-Investment Rights generally should include its holding period for the Convertible Notes surrendered in exchange therefor.

    (c)     The Co-Investment Rights

        A U.S. Holder should not recognize any gain or loss upon the exercise of the Co-Investment Rights received pursuant to the Plan.  The tax basis of the shares of New Common Stock acquired through exercise of a Co-

67

Investment Right should equal the sum of the offering price for such shares and the U.S. Holder's tax basis in such Co-Investment Right as described above.  The holding period for the shares of New Common Stock acquired through exercise of the Co-Investment Rights should begin on the day following the Effective Date.

The tax consequences to a U.S. Holder of allowing a Co-Investment Right it received pursuant to the Plan to expire unexercised are unclear.  Such a holder generally should realize a capital loss equal to the tax basis in such expired Co-Investment Right, which should be long-term capital loss if the U.S. Holder's holding period for such Co-Investment Right exceeded one year.  There can be no assurance, however, that the IRS would not assert that instead of recognizing such loss, the holder should add the tax basis in its expired Co-Investment Right to the tax basis it has in the shares of New Common Stock it received pursuant to the Plan.  Each U.S. Holder should consult its tax advisor as to the tax consequences of allowing the Co-Investment Rights it received pursuant to the Plan to expire unexercised.

(d)    The Holdco Contribution

Subject to the market discount rules described below, the Holdco Contribution generally should be treated as a tax-free transaction in which no gain or loss is recognized for U.S. federal income tax purposes.  A U.S. Holder's basis in its Holdco Units generally should be equal to the tax basis of such U.S. Holder's New Common Stock exchanged therefor.  A U.S. Holder's holding period in its Holdco Units generally should include its holding period for such New Common Stock.

(e)    Accrued Interest

To the extent that any consideration is allocated to accrued but unpaid interest, a U.S. Holder of Convertible Notes on which there is accrued interest that such U.S. Holder previously has not included in taxable income for U.S. federal income tax purposes should recognize ordinary income equal to the fair market value of any property received (including the U.S. Holder's pro rata share of the New Common Stock and the Co-Investment Rights) with respect to such Claims for accrued interest.  Pursuant to the Plan, Reorganized Excel will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest.  No assurance can be given that the IRS will not challenge such allocation.  If a distribution with respect to a Claim is entirely allocated to the principal amount of such Claim, a holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the holder's gross income.  U.S. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan in respect of Convertible Notes for accrued interest, including the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

(f)    Market Discount

A U.S. Holder that purchased its Convertible Notes from a prior holder at a discount to the then-adjusted issue price of such Convertible Notes may be subject to the market discount rules of the Tax Code. Under those rules, assuming such U.S. Holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such Convertible Notes (subject to a de minimis rule and exceptions for certain nonrecognition transactions) generally would be characterized as ordinary income to the extent of the accrued market discount on such Convertible Notes as of the Effective Date.  U.S. Holders of Convertible Notes should consult their tax advisors as to the tax consequences of the market discount rules, including, without limitation, the possible application of such rules on the Convertible Notes Exchange.

3.    Passive Foreign Investment Company Status and Significant Tax Consequences

Special U.S. federal income tax rules apply to a U.S. Holder that holds stock in a foreign corporation (such as Holdco) classified as a passive foreign investment company ("PFIC"), for U.S.federal income tax purposes.  In general, Holdco will be treated as a PFIC with respect to a U.S. Holder if, for any taxable year in which such holder held Holdco Units, either:

- at least 75% of Holdco's gross income for such taxable year consists of passive income (e.g., dividends, interest, capital gains and rents derived other than in the active conduct of a rental business); or

- at least 50% of the average value of the assets held by Holdco during such taxable year produce, or are held for the production of, passive income.

For purposes of determining whether Holdco is a PFIC, it will be treated as earning and owning its proportionate share of the income and assets, respectively, of any of its subsidiary corporations in which it owns at least 25% of the value of the subsidiary's stock. Income earned, or deemed earned, by Holdco in connection with the performance of services would not constitute passive income. By contrast, rental income would generally constitute "passive income" unless Holdco were treated under specific rules as deriving its rental income in the active conduct of a trade or business.

Based on its projected operations and assets, Holdco does not expect to be or to become a PFIC with respect to any taxable year. Although there is no legal authority directly on point, and Holdco is not relying upon an opinion of counsel on this issue, this belief is based principally on the position that, for purposes of determining whether Holdco is a PFIC, the gross income Holdco derives or is deemed to derive from the time chartering and voyage chartering activities of its wholly-owned subsidiaries should constitute services income, rather than rental income. Correspondingly, such income should not constitute passive income, and the assets that Holdco or its wholly-owned subsidiaries own and operate in connection with the production of such income, in particular, the drybulk carriers, should not constitute passive assets for purposes of determining whether Holdco is a PFIC. There is substantial legal authority supporting this position consisting of case law and other authorities concerning the characterization of income derived from time charters and voyage charters as services income for other tax purposes. However, there is also authority which characterizes time charter income as rental income rather than services income for other tax purposes. In the absence of any legal authority specifically relating to the statutory provisions governing PFICs, the IRS or a court could disagree with this position. In addition, although Holdco intends to conduct its affairs in a manner intended to avoid being classified as a PFIC with respect to any taxable year, the nature of its operations may change in the future.

As discussed more fully below, if Holdco were to be treated as a PFIC for any taxable year, a U.S. Holder of Holdco Units would be subject to special taxation rules depending on whether the U.S. Holder makes an election to treat Holdco as a "Qualified Electing Fund" (a "QEF"). A U.S. shareholder of a PFIC is required to file an annual information return containing information regarding the PFIC as required by applicable Treasury regulations.

(a)    Taxation of U.S. Holders Making a Timely QEF Election

If a U.S. Holder makes a timely QEF election (an "Electing Holder"), such Electing Holder must report each year for U.S. federal income tax purposes his pro rata share of Holdco's ordinary earnings and net capital gain, if any, for Holdco's taxable year that ends with or within the taxable year of the Electing Holder, regardless of whether or not distributions were received from Holdco by the Electing Holder. The Electing Holder's adjusted tax basis in the Holdco Units will be increased to reflect taxed but undistributed earnings and profits. Distributions of earnings and profits that had been previously taxed will result in a corresponding reduction in the adjusted tax basis in the Holdco Units and will not be taxed again once distributed. An Electing Holder would generally recognize capital gain or loss on the sale, exchange or other disposition of Holdco Units. A U.S. Holder would make a QEF election with respect to any year that Holdco is a PFIC by filing IRS Form 8621 with his U.S. federal income tax return. If Holdco becomes aware that it is to be treated as a PFIC for any taxable year, Holdco will provide each U.S. Holder with all necessary information in order to make the QEF election described above.

(b)    Taxation of U.S. Holders Not Making a Timely QEF Election

If Holdco were to be treated as a PFIC for any taxable year, a U.S. Holder who does not make a QEF election for that year (a "Non-Electing Holder") would be subject to special rules with respect to (1) any excess distribution (i.e., the portion of any distributions received by the Non-Electing Holder on the Holdco Units in a taxable year in excess of 125% of the average annual distributions received by the Non-Electing Holder in the three

preceding taxable years, or, if shorter, the Non-Electing Holder's holding period for the Holdco Units), and (2) any gain realized on the sale, exchange or other disposition of the Holdco Units. Under these special rules:

- the excess distribution or gain would be allocated ratably over the Non-Electing Holder's aggregate holding period for the Holdco Units;

- the amount allocated to the current taxable year and any taxable year before Holdco became a PFIC would be taxed as ordinary income; and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for that year, and an interest charge for the deemed tax deferral benefit would be imposed with respect to the resulting tax attributable to each such other taxable year.

These penalties would not apply to a pension or profit sharing trust or other tax-exempt organization that did not borrow funds or otherwise utilize leverage in connection with its acquisition of the Holdco Units. If a Non-Electing Holder who is an individual dies while owning the Holdco Units, such holder's successor generally would not receive a step-up in tax basis with respect to such stock.

Each U.S. Holder should consult its tax advisor as to the tax consequences to it if Holdco were, or were to become, a PFIC, including the availability of the QEF election and the consequences of making, or failing to make, this election.

### B.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders

A Non-U.S. Holder generally should not be subject to U.S. federal income tax on any gain, accrued interest or accrued market discount recognized in the Excel Exchange, the Convertible Notes Exchange and/or the Holdco Contribution, as applicable, unless the gain, accrued interest or accrued market discount, as the case may be, is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if a tax treaty applies, the Non-U.S. Holder maintains a U.S. permanent establishment to which the gain is attributable).

To the extent that such gain, accrued interest or accrued market discount, as the case may be, is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business (and, if a tax treaty applies, the Non-U.S. Holder maintains a U.S. permanent establishment to which the gain is attributable), the Non-U.S. Holder generally will be subject to U.S. federal income tax on a net basis in the same manner as if the Non-U.S. Holder were a U.S. Holder. Such gain, accrued interest or accrued market discount, as the case may be, by a corporate Non-U.S. Holder may also be subject to an additional U.S. federal branch profits tax at a 30% rate (or, if applicable, a lower treaty rate).

Non-U.S. Holders should consult their tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan and information that may be relevant to their particular situation and circumstances.

### C.    Other Tax Issues

1.    Certain Liberian Tax Consequences

Excel and certain of its subsidiaries are incorporated in the Republic of Liberia. Under the Consolidated Tax Amendments Act of 2010, Reorganized Excel and its Liberian subsidiaries will be deemed non-resident Liberian corporations wholly exempted from Liberian taxation, effective as of 1977, and distributions to its shareholders (if any) will be made free of any Liberian withholding tax.

All vessels owned by Excel through its respective Debtor vessel-owning subsidiaries, as previously stated, are managed by Maryville which is a Liberian corporation, having established a branch office in Greece, pursuant to the provisions of art. 25 of law 27/1975 (often referred to as a "Law 89 Company"). In January 2013, law

4110/2013 amended the long-standing provisions of art. 26 of law 27/1975 by imposing a fixed annual tonnage tax on vessels flying a foreign (i.e. non-Greek) flag which are managed by a Law 89 Company, establishing an identical tonnage tax regime as the one already in force for vessels flying the Greek flag.  This tax varies depending on the size of the vessel, calculated in gross registered tonnage ("GRT"), as well as on the age of each vessel. As explicitly stated in the new law, payment of this tonnage tax completely satisfies ("exhausts") all income tax obligations of both the shipowning company and of all its shareholders up to the ultimate beneficial owners (no matter how many holding companies are in-between the shipowning company and the ultimate beneficial owners).  Any tax payable to the state of the flag of each vessel as a result of its registration with a foreign flag registry (e.g. Liberia or the Marshall Islands) is subtracted from the amount of tonnage tax due to the Greek tax authorities.  In the case of Excel, each vessel-owning Debtor and Maryville are jointly and severally liable vis-à-vis the Greek state for payment of this tax with respect to each vessel. This means that all the Debtor vessel-owning companies (wholly owned by Excel) as of 2013 have this added tax obligation. In addition, under the same law (4110/2013) any transfer (for whatever reason, including as a result of inheritance) of shares in a shipowning company that pays the aforementioned tonnage tax (or of a company holding shares in such shipowning company) is exempt from any tax.

2.    Certain Marshall Islands Tax Consequences

Holdco will be incorporated under the laws of the Marshall Islands.  Under current Marshall Islands law and based on its contemplated activities, Holdco will not be subject to Marshall Islands tax on its income or capital gains.  In addition, under current Marshall Islands law and based on its contemplated activities, Marshall Islands withholding tax *will not* be imposed upon payments of dividends by Holdco to its stockholders or upon payments of interest by Holdco.

**D.    Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR U.S. HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, U.S. HOLDERS OF CLAIMS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**VIII.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**

**A.    Feasibility of the Plan**

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  For purposes of showing that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. To support their belief in the feasibility of the Plan, the Debtors have relied upon the Financial Projections set forth as Appendix E of this Disclosure Statement.  The Financial Projections show that the Reorganized Debtors should have sufficient cash to make payments required under the Plan.  Accordingly, the Debtors believe the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN.  Readers of this Disclosure Statement are cautioned not to place undue reliance on the Financial Projections, and should carefully review **Section V - "Risk Factors To Be Considered**" herein.  The Financial Projections should not be relied upon as necessarily indicative of future, actual recoveries.

Holders of Claims against the Debtors are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or

any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtors' independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

In addition to the assumptions footnoted in the Financial Projections themselves, the Financial Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. Although considered reasonable by the Debtors as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

### B.    Valuation Analysis

#### 1.    Introduction

In conjunction with formulating the Plan, the Debtors have determined that it is appropriate to estimate the post-confirmation enterprise value. Accordingly, the Debtors, have directed Miller Buckfire to prepare such a valuation. In preparing the estimated total enterprise value range, Miller Buckfire has, among other things: (i) conducted meetings and discussions with members of the Debtors' management team; (ii) reviewed the Debtors' business plan, including the underlying assumptions upon which it was based; (iii) considered certain economic and industry information relevant to the Debtors' operating businesses; (iv) reviewed certain analyses prepared by other firms retained by the Debtors; and (v) reviewed relevant publicly available information concerning the Debtors, the dry bulk shipping industry in which the Debtors operate, their markets and competitors.

#### 2.    Valuation

In formulating the Plan, four commonly accepted valuation methodologies were utilized to evaluate the post-confirmation total enterprise value of the Debtors: (i) the fleet valuation methodology, (ii) the comparable public companies trading multiples methodology, (iii) the comparable acquisition multiples methodology and (iv) the discounted cash flow methodology.

The fleet valuation methodology derives an estimated enterprise value of the Debtors based upon third-party fleet valuations. It is a common practice in the shipping industry to obtain third-party fleet valuations and appraisals, which are provided by shipbroking and shipping advisory firms with extensive experience in understanding the global ship purchase and sale markets. These firms review and evaluate a substantial portion of these transactions on an ongoing basis, in addition to formulating informed views on underlying shipping markets and their influence on these transactions, giving them a current view of the market value of vessels based on a going-concern non-distressed asset sale transaction between a willing buyer and seller. These market values are based upon various factors including vessel type, vessel age, market charter rates and the market's view of the vessel's ability to generate a certain stream of future earnings. In performing its analysis, Miller Buckfire reviewed appraisals of the Debtors' fleet from two independent shipping advisory firms, who conducted asset-level valuations of the Debtors' fleet. In addition to these two independent appraisals, Miller Buckfire also evaluated current data from VesselsValue, an internationally recognized provider of vessel sale and valuation information. The average of these indications of value was used to determine an aggregate market value of the 35 vessels owned and operated by the Debtors upon emergence. The market value of the vessels was then adjusted to include the value of any above or below market charter agreements.

72

The comparable public companies trading multiples methodology involved identifying a reference group of publicly-traded marine transportation companies which were selected based on fleet profile, cargo and exposure to the dry bulk shipping market. Miller Buckfire subsequently evaluated each company's enterprise value as a multiple of historical and projected EBITDA and gross asset value. Miller Buckfire used these reference group benchmarks to develop multiple ranges for the Debtors which account for differences in i) profitability profiles and ii) fleet characteristics between the reference group and the Debtors' business.

The comparable acquisition multiples methodology involved reviewing previously announced and completed acquisitions of dry bulk vessels or fleet of vessels that are most comparable to Debtors' fleet of dry bulk vessels. The transactions reviewed cover approximately 6 years from July 2007 to present and range in value from $100 million to $2 billion. Miller Buckfire relied on information available in public documents, company press releases and publicly-available third-party research to calculate the enterprise value multiple to gross asset value implied by the purchase price and transaction value, and applied these multiples to the gross asset value of the 35 vessels owned and operated by the Debtors upon emergence.

The discounted cash flow methodology involved deriving the unlevered free cash flows that the Debtors would generate assuming the Financial Projections (as defined herein) were realized following emergence from Chapter 11. To determine the Debtors' enterprise value range, these cash flows and an estimated enterprise value at the end of the projection period were discounted to an assumed date of emergence from Chapter 11 of December 31, 2013, using the Debtors' estimated weighted average cost of capital.

The total enterprise value incorporates the value attributable to Excel's ownership in non-Debtor subsidiaries. In specific, the equity value of Excel's 71.4% joint venture stake in Christine Shipco was estimated separately based on estimating the enterprise value of Christine Shipco LLC, utilizing the fleet valuation and discounted cash flow methodologies, and adjusting the resultant value of the equity stake for certain items related to corporate governance and ability to monetize the investment at fair value, including existing dividend distribution rights and restrictions on transferability of interest.

Utilizing the aforementioned valuation methodologies and including the value of Excel's non-Debtor subsidiaries, Miller Buckfire estimates the total enterprise value of the Debtors to be between approximately $605 million and $655 million with a mid-point of approximately $630 million.

This valuation is based upon information available to, and analyses undertaken by, Miller Buckfire and assumes a Plan effective date of December 31, 2013.  The valuation analysis reflects other factors and assumptions including a successful reorganization of the Debtors' business and finances in a timely manner, achieving forecasts reflected in the financial projections, the amount of cash available to the Debtor upon emergence and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

Additionally, an estimate of total enterprise value is not entirely mathematical but rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes affecting the financial conditions and prospects of such a business.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in industry conditions. Additionally, these estimates of value represent hypothetical values of the Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Because valuation estimates are inherently subject to uncertainties, neither the Debtors, Miller Buckfire, nor any other person assumes responsibility for their accuracy, but the Debtors believe the estimates have been prepared in good faith based on reasonable assumptions.

### C.    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find that each entity who rejects (or is deemed to reject) the Plan will receive property with a value, as of the Effective Date, that is not less than the amount that it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on that date.  This requirement is known as the "best interests of creditors" test.

In a chapter 7 case, one or more bankruptcy trustees would sell the Debtors' assets to generate cash.  In general, the net proceeds of assets encumbered by valid and perfected security interests would be paid to the creditors holding those security interests.  The remaining proceeds would be applied to the administrative expenses of the liquidation, including the trustees' fees, the fees of their professionals, and wind-down expenses.  If funds were remaining, priority claims, including certain employee and tax claims, would be paid prior to any distributions to non-priority unsecured creditors.  A chapter 7 liquidation analysis of the Debtors' assets is attached hereto as Appendix D (the "Liquidation Analysis").

The Debtors believe that the Plan meets the best interests test.  After analyzing the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution, the Debtors, in consultation with their advisors, believe that the distributions under the Plan will be at least as much as under a chapter 7 liquidation.  The Debtors believe that any liquidation analysis in these cases is highly speculative given the nature of the Debtors' assets. However, based on the Liquidation Analysis, the Debtors believe that in a chapter 7 liquidation the net proceeds of any sale would be far less than the value provided under the Plan.

The fact that the going concern value would be higher than a liquidation value can be attributed to the following:  (i) the increased costs and expenses of liquidation under chapter 7, including the fees payable to the chapter 7 trustee and the attorneys and advisors to such liquidation, (ii) additional expenses and claims, some of which would have to be paid in order to liquidate the Debtors' assets, which would be generated during the liquidation, (iii) the erosion of the value of the Debtors' assets during the liquidation process, (iv) the likelihood that vessel sale prices achieved in the "forced sale" atmosphere of a chapter 7 liquidation, particularly given current market constraints, would be significantly lower than the value which may be realized through the operation or sale of the vessels as going concerns, (v) the potential loss of any "fleet" or "pool" value, being the value derived from coordinated operation of a fleet of vessels so as to minimize ballast voyages, through the separate sale of individual vessels,  and (vi)  the likelihood of increased opportunistic litigation and claims by counterparties to the Debtors' various agreements.

### IX.    CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES: THE 'CRAMDOWN' ALTERNATIVE

Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan over the objection of an impaired rejecting class, if, among other things, at least one impaired class of claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and if the plan "does not discriminate unfairly" against and is "fair and equitable" to each impaired, rejecting class.

Class 2 – Syndicate Credit Facility Secured Claims is impaired and entitled to vote on the Plan.  Holders of over one-half in number and two-thirds in amount of the Class 2 claims have committed to vote in favor of the Plan. Class 8 – Impaired Excel General Unsecured Claims is impaired and entitled to vote on the Plan.  Holders of $67,110,000 in amount of the Class 8 claims have committed to vote in favor of the Plan.  Class 10 – Section 510(b) Claims and Class 11 – Interests in Excel will receive no recovery under the Plan and are deemed to reject it.  In view of the deemed rejection of the Plan by Classes 10 and 11, and, if applicable, the rejection of the Plan by Class 8, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated substantially equivalent with respect to other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class that alleges discrimination. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

Holders of Class 2 – Syndicate Credit Facility Secured Claims will receive a 98.6% recovery under the Plan. Holders of Class 8 – Impaired Excel General Unsecured Claims will receive a 15.9% recovery under the Plan, excluding Syndicate Credit Facility Deficiency Claims. Class 10 – Section 510(b) Claims, and Class 11 – Interests in Excel will both receive zero recovery under the Plan. The Claims and Interests in these Classes are likewise properly subordinated to all other Claims of any nature, and/or are legally distinct. Accordingly, the Plan does not discriminate unfairly against holders of Claims and Interests in Classes 2, 8, 10 and 11.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all. A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.

The Plan is fair and equitable with respect to Classes 8, 10 and 11. First, there are no holders of any Claims against or Interests in the Debtors junior to the Claims and Interests in Classes 8, 10 and 11, respectively, who will receive or retain any property under the Plan on account of such junior claim or interest. Second, pursuant to the Plan, no holders of Claims against or Interests in the Debtors senior to Classes 8, 10 and 11 are receiving more than full payment on account of such Claims against or Interests in the Debtors. Thus, the Debtors submit that the Plan is structured such that it does not "discriminate unfairly" and is "fair and equitable" to each impaired rejecting class.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

## XI.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any other alternative under the circumstances.  Other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and/or a lower recovery to the holders of impaired claims.

Consequently, the Debtors urge all holders of impaired claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before 4:00 p.m., prevailing eastern time, on January 16, 2014 by the Voting Agent.

Dated:    November 26, 2013

<div style="margin-left:50%">

EXCEL MARITIME CARRIERS LTD.
   (for itself and on behalf of the other Debtors)


By:    */s/  Pavlos Kanellopoulos*
    Name:    Pavlos Kanellopoulos
    Title:  Chief Financial Officer


Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000
Email: Jay.Goffman@skadden.com
Email: Mark.McDermott@skadden.com
Email: Shana.Elberg@skadden.com
Email: Suzanne.Lovett@skadden.com

</div>

APPENDIX A

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
Four Times Square
New York, New York 10036
(212) 735-3000


Counsel for Debtors and
  Debtors in Possession


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
In re:                                            :  Chapter 11
                                                  :
EXCEL MARITIME CARRIERS LTD., <u>et al.</u>,     :  Case No. 13-23060 (RDD)
                                                  :   (Jointly Administered)
                     Debtors.                     :
                                                  :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF EXCEL
MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES**

Dated: November 26, 2013

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINED TERMS AND RULES OF INTERPRETATION

1.1      1145 Offered Shares ...................................................................................1
1.2      1145 Rights Offering .................................................................................1
1.3      1145 Subscription Agreement....................................................................1
1.4      4(a)(2) Offered Shares ..............................................................................1
1.5      4(a)(2) Rights Offering .............................................................................1
1.6      4(a)(2) Subscription Agreement ...............................................................1
1.7      4(a)(2) Subscription Rights.......................................................................2
1.8      Accredited Investor ..................................................................................2
1.9      Adequate Protection Payment ..................................................................2
1.10     Administrative Agent ...............................................................................2
1.11     Administrative Claim ...............................................................................2
1.12     Allowed.....................................................................................................2
1.13     Amended and Restated Senior Secured Credit Facility...........................3
1.14     Angelo Gordon..........................................................................................3
1.15     Avoidance Action .....................................................................................3
1.16     Bankruptcy Code ......................................................................................3
1.17     Bankruptcy Court......................................................................................3
1.18     Bankruptcy Rules......................................................................................3
1.19     Bar Date ....................................................................................................3
1.20     Bar Date Order..........................................................................................3
1.21     Bareboat Charter Settlement Claims........................................................3
1.22     Business Day..............................................................................................3
1.23     Cash...........................................................................................................4
1.24     Causes of Action ......................................................................................4
1.25     Chapter 11 Case(s)....................................................................................4
1.26     Christine Shipco Facility..........................................................................4
1.27     Christine Shipco Facility Guaranty..........................................................4
1.28     Christine Shipco Facility Secured Guaranty Claim .................................4
1.29     Christine Shipco Guaranty Security..........................................................4
1.30     Claim.........................................................................................................4
1.31     Claims Objection Bar Date .......................................................................4
1.32     Class..........................................................................................................5
1.33     Co-Investment Rights ...............................................................................5
1.34     Confirmation .............................................................................................5
1.35     Confirmation Date .....................................................................................5
1.36     Confirmation Hearing ...............................................................................5
1.37     Confirmation Order....................................................................................5
1.38     Consenting Parties ....................................................................................5

i

| 1.39 | Creditors' Committee | 5 |
|------|----------------------|---|
| 1.40 | Cure Claim | 5 |
| 1.41 | D&O Liability Insurance Policies | 5 |
| 1.42 | Debtors | 5 |
| 1.43 | Disclosure Statement | 6 |
| 1.44 | Disclosure Statement Approval Order | 6 |
| 1.45 | Disputed Claim | 6 |
| 1.46 | Drag-Along Sale | 6 |
| 1.47 | Effective Date | 6 |
| 1.48 | Eligible Holder | 6 |
| 1.49 | Escrow Agreement | 6 |
| 1.50 | Escrow Funds | 6 |
| 1.51 | Estate(s) | 6 |
| 1.52 | Excel | 6 |
| 1.53 | Exculpated Claim | 6 |
| 1.54 | Exculpated Parties | 7 |
| 1.55 | Exhibit | 7 |
| 1.56 | Final Cash Collateral Order | 7 |
| 1.57 | Final Order | 7 |
| 1.58 | German Bareboat Charters | 7 |
| 1.59 | German Owners | 7 |
| 1.60 | Holdco | 8 |
| 1.61 | Holdco LLC Agreement | 8 |
| 1.62 | Holdco Unit | 8 |
| 1.63 | Holder | 8 |
| 1.64 | Impaired | 8 |
| 1.65 | Impaired Excel General Unsecured Claim | 8 |
| 1.66 | Impaired Subsidiary Debtor General Unsecured Claim | 8 |
| 1.67 | Indemnification Provisions | 9 |
| 1.68 | Intercompany Claim | 9 |
| 1.69 | Interest | 9 |
| 1.70 | Ivory | 9 |
| 1.71 | Ivory Investment | 9 |
| 1.72 | Ivory Subscription Rights | 9 |
| 1.73 | Lien | 9 |
| 1.74 | Loan Documents | 9 |
| 1.75 | Majority Interest Holders | 9 |
| 1.76 | Management Incentive Plan | 9 |
| 1.77 | New Common Stock | 9 |
| 1.78 | Non-Tax Priority Claim | 9 |
| 1.79 | Noteholder Claims | 10 |
| 1.80 | Oaktree | 10 |
| 1.81 | Offered Shares | 10 |
| 1.82 | Other Secured Claims | 10 |
| 1.83 | Person | 10 |
| 1.84 | Petition Date | 10 |

| | | |
|---|---|---|
| 1.85 | Plan | 10 |
| 1.86 | Plan Supplement | 10 |
| 1.87 | Plan Term Sheet | 10 |
| 1.88 | Primary Equity | 11 |
| 1.89 | Priority Tax Claim | 11 |
| 1.90 | Pro Rata | 11 |
| 1.91 | Professional | 11 |
| 1.92 | Professional Fee Claim | 11 |
| 1.93 | Reinstated | 11 |
| 1.94 | Rejected Executory Contract and Unexpired Lease List | 11 |
| 1.95 | Released Parties | 11 |
| 1.96 | Reorganized | 12 |
| 1.97 | Reorganized Excel | 12 |
| 1.98 | Requisite Consenting Lenders | 12 |
| 1.99 | Retained Actions | 12 |
| 1.100 | Rights Offering Procedures | 12 |
| 1.101 | Robertson Damages Claim | 12 |
| 1.102 | Section 510(b) Claim | 12 |
| 1.103 | Section 1145 Stipulated Value | 12 |
| 1.104 | Secured | 12 |
| 1.105 | Secured Lenders | 13 |
| 1.106 | Securities Act | 13 |
| 1.107 | Steering Committee | 13 |
| 1.108 | Stipulated Cash Collateral Order | 13 |
| 1.109 | Subscription Agent | 13 |
| 1.110 | Subscription Agreements | 13 |
| 1.111 | Subscription Rights | 13 |
| 1.112 | Subsidiary Debtors | 13 |
| 1.113 | Swap Claims | 13 |
| 1.114 | Syndicate Credit Facility | 13 |
| 1.115 | Syndicate Credit Facility Claims | 14 |
| 1.116 | Syndicate Credit Facility Deficiency Claim | 14 |
| 1.117 | Syndicate Credit Facility Secured Claims | 14 |
| 1.118 | Trade Claims | 14 |
| 1.119 | Tranche A Offered Shares | 14 |
| 1.120 | Tranche A Subscription Rights | 14 |
| 1.121 | Tranche B Offered Shares | 14 |
| 1.122 | Tranche B Subscription Rights | 14 |
| 1.123 | Unimpaired | 14 |
| 1.124 | Unimpaired Excel General Unsecured Claim | 14 |
| 1.125 | Unimpaired Subsidiary Debtor General Unsecured Claim | 15 |
| 1.126 | Unsecured Swaps | 15 |
| 1.127 | Voting Deadline | 15 |

## ARTICLE II

### TREATMENT OF UNCLASSIFIED CLAIMS

2.1        Administrative Claims ........................................................................16
2.2        Priority Tax Claim ............................................................................16
2.3        Professional Fees ..............................................................................16

## ARTICLE III

### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1        Introduction......................................................................................17
3.2        Summary of Classes..........................................................................17
3.3        Treatment of Classes.........................................................................18
3.4        Intercompany Claims ........................................................................22
3.5        Special Provision Regarding Unimpaired Classes of Claims...............22

## ARTICLE IV

### ACCEPTANCE OF THIS PLAN

4.1        Classes Entitled to Vote ....................................................................22
4.2        Elimination of Classes ......................................................................23
4.3        Cramdown.........................................................................................23

## ARTICLE V

### MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1        Continued Legal Existence ................................................................23
5.2        Officers and Directors of Holdco and Reorganized Excel...................23
5.3        Officers of Reorganized Debtors. .......................................................24
5.4        Ivory Investment. ..............................................................................24
5.5        Compromise and Settlement of Adversary Case No. 13-08338............24
5.6        Co-Investment Rights ........................................................................24
5.7        Transfer of New Common Stock to Holdco and Issuance of Holdco....25
5.8        Section 1145 Exemption and Section 4(a)(2) Exemptions. .................25
5.9        Available Information ........................................................................25
5.10       Contractual Transferability & Registration Rights .............................25
5.11       Minority Protections .........................................................................26
5.12       Management Incentive Plan................................................................26
5.13       Corporate Action...............................................................................26
5.14       Effectuating Documents; Further Transactions ..................................27
5.15       Check the Box Election. .....................................................................27
5.16       Preservation of Causes of Action.......................................................27
5.17       Exemption From Certain Transfer Taxes and Recording Fees.............28

5.18     Dissolution of Creditors' Committee .................................................................28
5.19     Cancellation of Existing Securities and Agreements ...........................................28

## ARTICLE VI

### PROVISIONS GOVERNING DISTRIBUTIONS

6.1      Allowed Claims and Interests ..........................................................................29
6.2      Fractional Shares.............................................................................................29
6.3      Withholding and Reporting Requirements .........................................................29
6.4      Setoffs ...........................................................................................................29
6.5      Allocation Between Principal and Accrued Interest. ...........................................29

## ARTICLE VII

### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

7.1      Assumption of Executory Contracts and Unexpired Leases..................................30
7.2      D&O Liability Insurance Policies and Indemnification Provisions ......................30
7.3      Cure of Defaults and Adequate Assurance. .......................................................30
7.4      Claims Based on Rejection of Executory Contracts or Unexpired Leases............31

## ARTICLE VIII

### CONFIRMATION AND CONSUMMATION OF THIS PLAN

8.1      Condition To Entry of the Confirmation Order ...................................................32
8.2      Conditions To Effective Date ...........................................................................32
8.3      Waiver Of Conditions .....................................................................................33

## ARTICLE IX

### EFFECT OF PLAN CONFIRMATION

9.1      Binding Effect.................................................................................................33
9.2      Revesting of Assets..........................................................................................33
9.3      Compromise and Settlement of Claims and Interests ..........................................33
9.4      Discharge of the Debtors ..................................................................................34
9.5      Releases and Related Matters ...........................................................................34
9.6      Exculpation and Limitation of Liability .............................................................36
9.7      Injunction .......................................................................................................36
9.8      Term of Bankruptcy Injunction or Stays ...........................................................37

## ARTICLE X

Procedures for resolving and
treating disputed claims

10.1       Disputed Claims ................................................................................37
10.2       Objection Deadline ...........................................................................37
10.3       Prosecution of Objections .................................................................38
10.4       No Distributions Pending Allowance ................................................38

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1       Retention of Jurisdiction ...................................................................38
11.2       Failure of Bankruptcy Court to Exercise Jurisdiction ......................39

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1       Payment Of Statutory Fees ...............................................................40
12.2       Amendment Or Modification Of This Plan .......................................40
12.3       Revocation, Withdrawal, or Non-Consummation ............................40
12.4       Notice ................................................................................................40
12.5       Governing Law ..................................................................................42

**EXHIBITS**

EXHIBIT A  -  Certain Terms of the Amended and Restated Senior Secured Credit Facility

EXHIBIT B  -  Subscription Agreements and Rights Offering Procedures

EXHIBIT C  -  Plan Term Sheet

## INTRODUCTION

Excel Maritime Carriers Ltd. and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") propose the following amended joint chapter 11 plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors.  Reference is made to the Disclosure Statement, filed contemporaneously herewith, for a discussion of (i) certain information relating to the Debtors, (ii) a summary and analysis of this Plan, and (iii) certain matters related to the confirmation and the consummation of this Plan.  Subject to certain restrictions and requirements set forth in section 1127 of title 11 of the United States Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, subject to Section 12.3 herein, the Debtors reserve the right to alter, amend, or modify this Plan, subject to, the consent of each of the other Consenting Parties, or to revoke or withdraw this Plan.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms*.  As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.1**     ***1145 Offered Shares*** means Tranche A Offered Shares and Tranche B Offered Shares.

**1.2**     ***1145 Rights Offering*** means the rights offering whereby all Eligible Holders will be offered the opportunity to subscribe for up to their Pro Rata share of the 1145 Offered Shares.

**1.3**     ***1145 Subscription Agreements*** means the agreements to be entered into by and between Excel and an Eligible Holder pursuant to which such Eligible Holder exercises its Tranche A Subscription Rights and/or Tranche B Subscription Rights, which shall be in form and substance acceptable to each of the Consenting Parties.

**1.4**     ***4(a)(2) Offered Shares*** means the shares offered pursuant to the 4(a)(2) Subscription Rights at a price of $16.25 per share.

**1.5**     ***4(a)(2) Rights Offering*** means the rights offering whereby all Eligible Holders who are Accredited Investors and who timely return validly completed Accredited Investor questionnaires to the Subscription Agent pursuant to the Rights Offering Procedures, will be offered the opportunity to subscribe for the 4(a)(2) Offered Shares.

**1.6**     ***4(a)(2) Subscription Agreements*** means the agreements to be entered into by and between Excel and Eligible Holders pursuant to which such Eligible Holders who are Accredited Investors, and who timely return validly completed Accredited Investor questionnaires to the Subscription Agent pursuant to the Rights Offering Procedures, exercise

their 4(a)(2) Subscription Rights with respect to the New Common Stock offered pursuant to section 4(a)(2) of the Securities Act, which shall be in form and substance acceptable to each of the Consenting Parties.

1.7    *4(a)(2) Subscription Rights* means the rights of Eligible Holders who are Accredited Investors, and who timely return validly completed Accredited Investor questionnaires to the Subscription Agent, to subscribe for an aggregate number of shares equal to the number of shares not subscribed for pursuant to the Tranche A Subscription Rights (which subscription rights include certain oversubscription rights, as described in Section 3.3(g)(2) below), subject to Pro Rata reduction in accordance with each such Eligible Holder's participation in the 4(a)(2) Rights Offering.

1.8    *Accredited Investor* means an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under Section 4(a)(2) of the Securities Act.

1.9    *Adequate Protection Payment* means the adequate protection payment to be made by Excel on or before January 2, 2014 to the Secured Lenders in the amount of $6,176,868.76 in accordance with the Final Cash Collateral Order and the Stipulated Cash Collateral Order.

1.10    *Administrative Agent* means Wilmington Trust (London) Ltd., in its capacity as administrative agent under the Syndicate Credit Facility, or its successor in such capacity.

1.11    *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b) or 507(b) of the Bankruptcy Code, including, but not limited to:  (a) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under section 1930 of title 28 of the United States Code; (d) claims under section 503(b)(9) of the Bankruptcy Code; and (e) the reasonable and documented outstanding fees and expenses of (i) Christiana Trust as indenture trustee, including those of Moses & Singer LLP, up to $450,000, and (ii) Bracewell & Giuliani LLP, as counsel to Ivory, up to $600,000 less the $250,000 pre-petition retainer previously paid to Bracewell & Giuliani LLP.

1.12    *Allowed* means, with respect to any Claim, such Claim or any portion thereof that has been allowed (a) by a Final Order of the Bankruptcy Court, (b) pursuant to the terms of this Plan, (c) by agreement between the Holder of such Claim and the Debtors or Reorganized Debtors, (d) by an order of a court in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced, or (e) a Disputed Claim, proof of which was filed on or prior to the Bar Date, and (1) as to which no objection was filed by the Claims Objection Bar Date, unless such Claim is to be determined in a forum other than the Bankruptcy Court, in which case such Claim will not become allowed until determined by a Final Order of such other forum and allowed by a Final Order of the Bankruptcy Court, or (2) as to which an objection was filed by the Claims Objection Bar Date, to the extent allowed by a Final Order of the Bankruptcy Court.  Notwithstanding the foregoing, Claims against the Debtors allowed solely for the purpose of voting to accept or reject the Plan pursuant

2

to the Disclosure Statement Approval Order or other order of the Bankruptcy Court shall not be considered Allowed Claims hereunder.

   **1.13** ***Amended and Restated Senior Secured Credit Facility*** means that certain amended and restated financing facility in a principal amount not to exceed $300 million to be entered into between Reorganized Excel and its Subsidiary Reorganized Debtors and the lenders party thereto on the Effective Date which (including the covenants included therein and any documents executed in connection therewith) shall be acceptable to each of the Consenting Parties, a form of which will be filed as part of the Plan Supplement, and certain terms of which are described on Exhibit A hereto.

   **1.14** ***Angelo Gordon*** means Angelo, Gordon & Co. and certain of its affiliates.

   **1.15** ***Avoidance Action*** means any claim or cause of action of an Estate arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

   **1.16** ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Cases.

   **1.17** ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

   **1.18** ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Cases.

   **1.19** ***Bar Date*** means (i) October 18, 2013 at 5:00 p.m. (Eastern Time), the date by which each Holder of a Claim against any of the Debtors other than a governmental unit must have filed a proof of claim against such Debtor(s) or (ii) December 30, 2013 at 5:00 p.m. (Eastern Time), the date by which each governmental unit with a Claim against any of the Debtors must have filed a proof of claim against such Debtor(s), as applicable in each case.

   **1.20** ***Bar Date Order*** means that certain Order Establishing Deadline for Filing Proofs of Claim and Procedures Relating Thereto Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 3003(c)(3) and Approving Form and Manner of Notice Thereof [Docket. No. 302].

   **1.21** ***Bareboat Charter Settlement Claims*** means claims arising against Excel under that certain settlement, dated as of December 5, 2012, among Coal Glory AS, Iron Man AS, Linda Leah AS, Excel and certain of Excel's non-Debtor Subsidiaries.

   **1.22** ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.23** *Cash* means legal tender of the United States of America, and equivalents thereof.

**1.24** *Causes of Action* means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim arising under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

**1.25** *Chapter 11 Case(s)* means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court jointly administered as Case No. 13-23060.

**1.26** *Christine Shipco Facility* means that certain secured loan agreement, dated as of April 26, 2010, as amended and supplemented by a first supplemental agreement dated as of July 27, 2011, and as further amended and supplemented by a second supplemental agreement dated as of March 30, 2012, between non-Debtor Christine Shipco LLC, as borrower, and DVB Bank SE, as lender.

**1.27** *Christine Shipco Facility Guaranty* means that certain guarantee and indemnity dated as of April 26, 2010 made between Excel, as guarantor, and DVB Bank SE.

**1.28** *Christine Shipco Facility Secured Guaranty Claim* means any Claim pursuant to the terms of the Christine Shipco Facility Guaranty equal to the value of the Christine Shipco Guaranty Security.

**1.29** *Christine Shipco Guaranty Security* means the indirect interest in Christine Shipco LLC owned by Excel.

**1.30** *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.31** *Claims Objection Bar Date* means, for each Claim, the latest of (a) the date that is one hundred and eighty (180) days after the Effective Date, (b) as to a particular Claim, one hundred and eighty (180) days after the filing of a Proof of Claim, or request for payment of such Claim, and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

**1.32** *Class* means a category of Claims or Interests, as described in Article III hereof.

**1.33** *Co-Investment Rights* means the 1145 Rights Offering and the 4(a)(2) Rights Offering, which together consist of the Tranche A Subscription Rights, the Tranche B Subscription Rights and the 4(a)(2) Subscription Rights.

**1.34** *Confirmation* means the confirmation of this Plan by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

**1.35** *Confirmation Date* means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

**1.36** *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.37** *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code which order shall be acceptable to each of the Consenting Parties.

**1.38** *Consenting Parties* means each of (i) the Debtors, (ii) the Requisite Consenting Lenders, (iii) the Creditors' Committee and (iv) Ivory.

**1.39** *Creditors' Committee* means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.40** *Cure Claim* means a Claim based upon any and all amounts payable to a counterparty of an executory contract or unexpired lease at the time such contract or lease is assumed by such Debtor pursuant to section 365(b) of the Bankruptcy Code.

**1.41** *D&O Liability Insurance Policies* means all insurance policies of any of the Debtors for directors', managers' and officers' liability.

**1.42** *Debtors* means Excel Maritime Carriers LLC, Excel Maritime Carriers Ltd., Amanda Enterprises Ltd., Barland Holdings Inc., Candy Enterprises Inc., Castalia Services Ltd., Centel Shipping Company Ltd., Coal Gypsy Shipco LLC, Coal Hunter Shipco LLC, Coal Pride Shipco LLC, Fianna Navigation S.A., Fountain Services Ltd., Grain Express Shipco LLC, Grain Harvester Shipco LLC, Harvey Development Corp., Ingram Ltd., Iron Anne Shipco LLC, Iron Beauty Shipco LLC, Iron Bill Shipco LLC, Iron Bradyn Shipco LLC, Iron Brooke Shipco LLC, Iron Fuzeyya Shipco LLC, Iron Kalypso Shipco LLC, Iron Knight Shipco LLC, Iron Lindrew Shipco LLC, Iron Manolis Shipco LLC, Iron Miner Shipco LLC, Iron Vassilis Shipco LLC, Kirmar Shipco LLC, Liegh Jane Navigation S.A., Lowlands Beilun Shipco LLC, Marias Trading Inc., Ore Hansa Shipco LLC, Pascha Shipco LLC, Point Holdings Ltd., Sandra Shipco LLC, Santa Barbara Shipco LLC, Snapper Marine Ltd., Tanaka Services Ltd., Teagan Shipholding S.A., Thurman International Ltd., Whitelaw Enterprises Co., and Yasmine International Inc.

5

**1.43**    ***Disclosure Statement*** means the Disclosure Statement with Respect to this Amended Joint Chapter 11 Plan of Reorganization of Excel Maritime Carriers Ltd. and Certain of its Affiliates which shall be in form and substance acceptable to each of the Consenting Parties.

**1.44**    ***Disclosure Statement Approval Order*** means the order of the Bankruptcy Court in the Chapter 11 Cases approving, among other things, the adequacy of the Disclosure Statement within the meaning of section 1125(a) of the Bankruptcy Code and solicitation procedures related thereto which order shall be in form and substance acceptable to each of the Consenting Parties.

**1.45**    ***Disputed Claim*** means (a) any Claim as to which the Debtors or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any claim otherwise disputed by the Debtors, the Reorganized Debtors, or other party-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) if there are schedules, any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

**1.46**    ***Drag-Along Sale*** has the meaning set forth in Section 5.11 below.

**1.47**    ***Effective Date*** means a Business Day on or after the Confirmation Date specified by the Debtors with the consent of each of the Consenting Parties on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness set forth in Article VIII hereof have been satisfied or waived.

**1.48**    ***Eligible Holder*** means any Holder of a Claim in Class 8 other than a Holder of a Disputed Claim.

**1.49**    ***Escrow Agreement*** means that certain Escrow Agreement dated March 29, 2012, by and between Excel and Seward & Kissel LLP, as escrow agent, as amended from time to time.

**1.50**    ***Escrow Funds*** means the $20 million deposited by Ivory with Seward & Kissell LLP pursuant to the terms of the Escrow Agreement.

**1.51**    ***Estate(s)*** means, individually, the estate of any of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

**1.52**    ***Excel*** means Excel Maritime Carriers Ltd., a company incorporated under the laws of Liberia.

**1.53**    ***Exculpated Claim*** means any Claim related to any act or omission in connection with, relating to or arising out of the Debtors' in or out of court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan, or any contract, instrument, release or other agreement or

6

document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.  For the avoidance of doubt, no Cause of Action, obligation or liability expressly preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

　　　　1.54　　*Exculpated Parties* means the Released Parties.

　　　　1.55　　*Exhibit* means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as amended, modified or supplemented from time to time.

　　　　1.56　　*Final Cash Collateral Order* means that certain Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 363(c), 507 and 552 and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Adequate Protection entered in these Chapter 11 Cases [Docket No. 133].

　　　　1.57　　*Final Order* means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed, has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

　　　　1.58　　*German Bareboat Charters* means the bareboat charter agreements entered into in respect of the vessels MV Barbara, MV Coal Age, MV Fearless I and MV King Coal, by Excel's non-Debtor Subsidiaries Barbara Shipco LLC, Coal Age Shipco LLC, Fearless Shipco LLC and King Coal Shipco LLC respectively, as such charters were amended, restated or varied from time to time.

　　　　1.59　　*German Owners* means (x) the counterparties to the German Bareboat Charters KUNUK Mobiliengesellschaft mbH & Co. KG, JATAGA Mobiliengesellschaft mbH & Co. KG, Sea Class 10 GmbH & Co. KG, Sea Class 9 GmbH & Co. KG, and (y) their successors, controllers or agents, including but not limited to, (i) KUMAL Schifffahrtsbeteiligungen GmbH as successor to JATAGA Mobiliengesellschaft mbH & Co. KG and (ii) Dr. Philip Heinke as liquidator of each of KUNUK Mobiliengesellschaft mbH & Co. KG, KUMAL Schifffahrtsbeteiligungen GmbH, Sea Class 10 GmbH & Co. KG, Sea Class 9 GmbH & Co. KG and each of his successors, and (z) their designees or assignees including but not limited to Commerzbank Aktiengesellschaft.

**1.60**   *Holdco* means a limited liability company to be formed under the laws of the Republic of the Marshall Islands on or before the Effective Date and to which all the New Common Stock shall be transferred on the Effective Date.  Holdco will be an affiliate of the Debtors.  The formation and governance documents for Holdco shall be included in the Plan Supplement and shall be acceptable to each of the Consenting Parties.

**1.61**   *Holdco LLC Agreement* means the limited liability company operating agreement governing the formation and governance of Holdco, in form and substance satisfactory to each of the Consenting Parties (but including the provisions contained in Section 5.11 of the Plan) and consistent in all material respects with the terms of this Plan and in the form included in the Plan Supplement (or with such other modifications as are satisfactory to each of the Consenting Parties in accordance with such parties' rights as set forth in Section 5.11 of this Plan) (but including the provisions contained in Section 5.11 of the Plan).

**1.62**   *Holdco Unit* means the limited liability company equity interests in Holdco.

**1.63**   *Holder* means a holder of a Claim or Interest, as applicable.

**1.64**   *Impaired* means, when used in reference to a Claim, a Claim that is in a class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.65**   *Impaired Excel General Unsecured Claim* means (i) any unsecured Claim or Cause of Action against Excel, other than an Unimpaired Excel General Unsecured Claim or a Claim or Cause of Action that is (a) covered under any of the Debtors' insurance policies, (b) a Trade Claim, (c) held by a Person over whom a United States court could not otherwise exercise personal jurisdiction, provided that the holder of any such Cause of Action properly filed a proof of claim prior to the Bar Date if required pursuant to the Bar Date Order, (d) a Section 510(b) Claim or (e) Secured; and (ii) includes but is not limited to (a) a Bareboat Charter Settlement Claim, (b) a Noteholder Claim, (c) a Syndicate Credit Facility Deficiency Claim, (d) a Swap Claim, and (e) the Robertson Damages Claim.  For the avoidance of doubt, Claims held by any insider or affiliate of one or more of the Debtors shall not be treated as Impaired Excel General Unsecured Claims.

**1.66**   *Impaired Subsidiary Debtor General Unsecured Claim* means any unsecured Claim or Cause of Action against a Subsidiary Debtor, other than an Unimpaired Subsidiary Debtor General Unsecured Claim, that is (i) held by an insider or affiliate of one or more Subsidiary Debtors or (ii) held by a Person over whom a United States court could exercise personal jurisdiction, and (iii) notwithstanding (i) and (ii) herein, excludes any Claim or Cause of Action that is (a) held by an insider or affiliate of a Subsidiary Debtor and relates to a Subsidiary Debtor's pre-existing and ordinary course management, employee compensation, consulting or brokerage contracts, (b) covered under any of the Debtors' insurance policies or is held by a Person over whom a United States court could not otherwise exercise personal jurisdiction, provided that such Person properly filed a proof of claim prior to the Bar Date if required pursuant to the Bar Date Order, (c) a Trade Claim, or (d) Secured.

**1.67**     *Indemnification Provisions* means each of the indemnification provisions, agreements or obligations in place as of the Petition Date, whether in the bylaws, certificate of incorporation or other formation documents, board resolutions or employment contracts, for the Debtors and the current and former directors, officers, members, employees, attorneys, other professionals and agents of the Debtors.

**1.68**     *Intercompany Claim* means any Claim held by a Debtor or Non-Debtor affiliate against a Debtor or Non-Debtor affiliate.

**1.69**     *Interest* means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

**1.70**     *Ivory* means Ivory Shipping Inc.

**1.71**     *Ivory Investment* means Ivory's contribution of no less than $25 million and up to $35 million in cash to Reorganized Excel, subject to reduction on account of the Co-Investment Rights as described in Section 5.4 below.

**1.72**     *Ivory Subscription Rights* means (i) to the extent applicable Eligible Holders do not fully exercise the Tranche A Subscription Rights (including oversubscription rights related thereto) and 4(a)(2) Subscription Rights, Ivory's right to purchase shares equal to the number of unsubscribed 4(a)(2) Offered Shares, and (ii) Ivory's right to purchase shares equal to the number of unsubscribed Tranche B Offered Shares.  Ivory will receive a subscription agreement in relation to the Ivory Subscription Rights, in a form to be agreed by the Consenting Parties that will be no more restrictive or adverse than the 4(a)(2) Subscription Agreements, at a later date.

**1.73**     *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.74**     *Loan Documents* means the "Loan Documents" as defined in the Syndicate Credit Facility.

**1.75**     *Majority Interest Holders* has the meaning set forth in Section 5.11 below.

**1.76**     *Management Incentive Plan* means the management incentive plan to be implemented by Reorganized Excel pursuant to Section 5.12 below with terms acceptable to each of the Consenting Parties and which also shall be included in the Plan Supplement.

**1.77**     *New Common Stock* means the common stock of Reorganized Excel.

**1.78**     *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

**1.79**    ***Noteholder Claims*** means all Claims against Excel of Holders of 1.875% unsecured senior convertible notes issued by Excel pursuant to that certain indenture dated October 10, 2007 with Deutsche Bank Trust Company Americas as indenture trustee.

**1.80**    ***Oaktree*** means certain investment funds and accounts managed by Oaktree Capital Management, L.P. and certain of its affiliates, in their capacity Secured Lenders.

**1.81**    ***Offered Shares*** means the Tranche A Offered Shares and Tranche B Offered Shares, and to the extent applicable, the 4(a)(2) Offered Shares, representing in the aggregate 2.9% of the New Common Stock to be offered for sale at an aggregate purchase price of $10.0 million in cash (based on a total post-money equity value of $330 million) to the applicable Eligible Holders pursuant to the Co-Investment Rights.

**1.82**    ***Other Secured Claims*** means all Secured Claims other than a Syndicate Credit Facility Secured Claim.

**1.83**    ***Person*** means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, joint venture, joint stock company, firm, trust, estate, unincorporated organization, association, government, governmental agency, or other entity, in each case whether acting in an individual, fiduciary or other capacity.

**1.84**    ***Petition Date*** means, with respect to a Debtor, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

**1.85**    ***Plan*** means this chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be amended, modified or supplemented from time to time with the consent of the Consenting Parties.

**1.86**    ***Plan Supplement*** means the compilation of documents, schedules and exhibits to the Plan to be filed by the Debtors, including any exhibits to the Plan to the extent not attached to the Plan, and including the Amended and Restated Senior Secured Credit Facility, Holdco formation and governance documents, the identity of the members of the new board of directors of Reorganized Excel, a summary of the terms of the Management Incentive Plan and the Rejected Executory Contract and Unexpired Lease List, which shall be filed at least four business days prior to the Voting Deadline (except for the Holdco LLC Agreement, which shall be filed by January 7, 2014) and shall, with the exception of the identity of the members of the new board of directors of Reorganized Excel, be in form and substance satisfactory to each of the Consenting Parties (or with such other modifications as are satisfactory to each of the Consenting Parties).

**1.87**    ***Plan Term Sheet*** means that term sheet, attached hereto as <u>Exhibit C</u>, for restructuring of the Debtors executed by each of the Consenting Parties as of November 22, 2013, including certain Secured Lenders and certain Holders of Noteholder Claims that executed such term sheet in their capacity as creditors of Excel.

**1.88**     ***Primary Equity*** means the New Common Stock to be issued to the Secured Lenders, the Holders of Allowed Impaired Excel General Unsecured Claims, and Ivory, prior to dilution on account of the Co-Investment Rights.

**1.89**     ***Priority Tax Claim*** means a Claim of a governmental unit of the kind specified in sections 502(i), 507(a)(8), or 1129(a)(9)(D) of the Bankruptcy Code.

**1.90**     ***Pro Rata*** means a proportional share, so that the ratio of the amount of property distributed on account of an Allowed Claim in a class is the same as the ratio such Claim bears to the total amount of all Claims in such class.

**1.91**     ***Professional*** means (a) any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.92**     ***Professional Fee Claim*** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

**1.93**     ***Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided, however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions, change of control or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured to achieve reinstatement, *provided further* that the Debtors may in consultation with the other Consenting Parties, at their option, satisfy their obligations to the holder of a Secured Claim that has been Reinstated by surrendering the property that is security for such a claim at the time such Reinstated Claim matures or otherwise comes due.

**1.94**     ***Rejected Executory Contract and Unexpired Lease List*** means the list (as may be amended) to be included in the Plan Supplement of executory contracts and unexpired leases that will be rejected pursuant to section 365 of the Bankruptcy Code, which shall be acceptable to the Consenting Parties.

**1.95**     ***Released Parties*** means (a) the Debtors, (b) Argon S.A., Boston Industries S.A., Starling Trading Co, Jake Trading Inc., Tanew Holdings Inc., Lhada Holdings Inc., and Ivory; (c) the Administrative Agent, in its capacity as such, (d) the Steering Committee and its members, in their capacity as such, (e) the Creditors' Committee and its members, in their capacity as such; (f) the Secured Lenders, in their capacity as such, and (g) with respect to each of the foregoing persons in clauses (a) through (f), such Persons' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers,

consultants, attorneys, employees, partners, affiliates and representatives, in each case, only in their capacity as such.

     **1.96**   *Reorganized* means, with respect to a Debtor, the successor to such Debtor on and after the Effective Date.

     **1.97**   *Reorganized Excel* means Excel on and after the Effective Date.

     **1.98**   *Requisite Consenting Lenders* means Secured Lenders holding more than two thirds in amount of the Syndicate Credit Facility Claims.

     **1.99**   *Retained Actions* means all claims, causes of action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor, any Debtor's Estate, or any Reorganized Debtor may hold against any Person, including, without limitation, (a) claims and causes of action brought prior to the Effective Date, (b) claims and causes of action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors or Reorganized Debtors, (c) claims and causes of action relating to strict enforcement of any of the Debtors' or Reorganized Debtors' intellectual property rights, including patents, copyrights and trademarks, (d) claims and causes of action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, and (e) all Avoidance Actions; *provided*, *however*, that Retained Actions shall not include those claims, causes of action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, released under Article IX herein.

     **1.100**   *Rights Offering Procedures* means the procedures for implementing the Co-Investment Rights which procedures shall be acceptable to each of the Consenting Parties and which are attached hereto as <u>Exhibit B</u>.

     **1.101**   *Robertson Damages Claim* means the claim for damages filed by Robertson Maritime Investors, LLC against all Debtors in connection with the transfer of membership interests in Christine Shipco from an affiliate of Excel to Excel and from Excel to an affiliate of Excel.

     **1.102**   *Section 510(b) Claim* means any Claim of the type described in section 510(b) of the Bankruptcy Code.

     **1.103**   *Section 1145 Stipulated Value* means $36 million, which amount is stipulated to among the Consenting Parties solely for purposes of compliance with section 1145 of the Bankruptcy Code by Holders of Class 8 – Impaired Excel General Unsecured Claims other than Holders of Syndicate Credit Deficiency Claims, and solely in connection with the Co-Investment Rights.

     **1.104**   *Secured* means, when referring to a Claim, (a) secured by a Lien on property in which the Estate of a Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest

in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan as a Secured Claim.

1.105    *Secured Lenders* means those lenders party to the Syndicate Credit Facility from time to time and their affiliates holding Syndicate Credit Facility Claims.

1.106    *Securities Act* means the Securities Act of 1933, as amended, and the rules and regulations promulgated pursuant thereto.

1.107    *Steering Committee* means that certain steering committee of Secured Lenders.

1.108    *Stipulated Cash Collateral Order* means that Stipulation and Consent Order (I) Authorizing the Debtors to Continue to Use Cash Collateral and (II) Granting Adequate Protection entered on November 25, 2013 [Docket No. 442].

1.109    *Subscription Agent* means Donlin, Recano & Company, Inc.

1.110    *Subscription Agreements* means one or more agreements to be entered into by and between Excel and an Eligible Holder pursuant to which such Eligible Holder exercises its applicable Subscription Rights, and which include the 1145 Subscription Agreement and 4(a)(2) Subscription Agreement, as applicable, each of which shall be in form and substance acceptable to each of the Consenting Parties.

1.111    *Subscription Rights* means the non-transferable, non-certificated subscription rights to purchase Offered Shares in connection with the Co-Investment Rights on the terms and subject to the conditions set forth in this Plan, the Rights Offering Procedures and the Subscription Agreements.

1.112    *Subsidiary Debtors* means each of the Debtors other than Excel.

1.113    *Swap Claims* means all Claims of counterparties to the Unsecured Swaps.

1.114    *Syndicate Credit Facility* means that certain Senior Secured Credit Facility, dated as of April 14, 2008 as amended by Amendment No. 1 to Senior Secured Credit Facility, dated as of March 31, 2009, as further amended by Amendment No. 2 to Senior Secured Credit Facility, dated as of June 1, 2010, as further amended by Amendment No. 3 to Senior Secured Credit Facility, dated as of December 23, 2010, as further amended by Amendment No. 4 to Senior Secured Credit Facility, dated as of July 22, 2011, as further amended by Amendment No. 5 to Senior Secured Credit Facility, dated as of March 30, 2012, as corrected by Immaterial Error Correction, dated as of August 21, 2012, as further amended by Amendment No. 6 to Senior Secured Credit Facility, dated as of September 30, 2012, as further amended by Amendment No. 7 to the Senior Secured Credit Facility, dated as of December 31, 2012, as further amended by Amendment No. 8 to the Senior Secured Credit Facility, dated as of January 31, 2013, as further amended by Amendment No. 9 to the Senior Secured Credit Facility, dated as of February 28, 2013, as further amended by Amendment No. 10 to the Senior Secured Credit

Facility, dated as of March 31, 2013, as further amended by Amendment 11 to the Senior Secured Credit Facility, dated as of April 30, 2013, and as otherwise amended, modified or supplemented from time to time.

       **1.115** ***Syndicate Credit Facility Claims*** means the Claims held by the Secured Lenders, including any Syndicate Credit Facility Deficiency Claim and Syndicate Credit Facility Secured Claims.

       **1.116** ***Syndicate Credit Facility Deficiency Claim*** means the unsecured Claim arising under the Syndicate Credit Facility or the Loan Documents.  For the avoidance of doubt, the Consenting Parties reserve all rights with respect to the amount, if any, and treatment of a Syndicate Credit Facility Deficiency Claim, if any, held by the Secured Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.

       **1.117** ***Syndicate Credit Facility Secured Claims*** means any Secured Claims arising under the Syndicate Credit Facility or the Loan Documents.

       **1.118** ***Trade Claims*** means all unsecured claims arising from the provision of goods, materials or services by trade vendors and service providers, including commissions related thereto, incurred by the Debtors in the ordinary course of the Debtors' business.

       **1.119** ***Tranche A Offered Shares*** means 307,692 shares of New Common Stock, representing 1.5% of all New Common Stock to be offered to Eligible Holders at an offering price of $16.25 per share or a total purchase price of $5.0 million.

       **1.120** ***Tranche A Subscription Rights*** means the first $5.0 million of the Co-Investment Rights.

       **1.121** ***Tranche B Offered Shares*** means 289,872 shares of New Common Stock, representing 1.4% of all New Common Stock to be offered to Eligible Holders at an offering price of $17.25 per share or a total purchase price of $5.0 million.

       **1.122** ***Tranche B Subscription Rights*** means the second $5.0 million of the Co-Investment Rights.

       **1.123** ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

       **1.124** ***Unimpaired Excel General Unsecured Claim*** means any unsecured Claim or Cause of Action against Excel that is not a Christine Shipco Facility Secured Guaranty Claim, Impaired Excel General Unsecured Claim, Other Secured Claim, Priority Non-Tax Claim, Section 510(b) Claim, or Syndicate Credit Facility Claim and includes, among other things, (i) Trade Claims, (ii) any Cause of Action to the extent such Cause of Action (x) is covered under any of the Debtors' insurance policies or (y) is held by a Person over whom a United States court could not otherwise exercise personal jurisdiction, provided that the holder of any such Cause of Action properly filed a proof of claim prior to the Bar Date if required

pursuant to the Bar Date Order, and (iii) any Claim or Cause of Action held by an insider or affiliate of Excel that relates to Excel's pre-existing and ordinary course management, employee compensation, consulting or brokerage contracts.

**1.125** *Unimpaired Subsidiary Debtor General Unsecured Claim* means any unsecured Claim or Cause of Action against a Subsidiary Debtor that is not an Impaired Subsidiary General Unsecured Claim, Other Secured Claim, Priority Non-Tax Claim or Syndicate Credit Facility Claim and includes, among other Claims, (i) Trade Claims, (ii) any Cause of Action to the extent such Cause of Action (x) is covered under any of the Debtors' insurance policies or (y) is held by a Person over whom a United States court could not otherwise exercise personal jurisdiction, provided that the holder of any such Cause of Action properly filed a proof of claim prior to the Bar Date if required pursuant to the Bar Date Order, and (iii) any Claim or Cause of Action held by an insider or affiliate of a Subsidiary Debtor that relates to a Subsidiary Debtor's pre-existing and ordinary course management, employee compensation, consulting or brokerage contracts.

**1.126** *Unsecured Swaps* means the unsecured interest rate swaps entered into between (a) Excel and Eurobank EFG Private Bank Luxembourg S.A. on March 29, 2011; and (b) Excel and Marfin Popular Bank Public Co. Ltd., Greek Branch on July 11, 2011.

**1.127** *Voting Deadline* means January 16, 2014 at 4:00 p.m. (Prevailing Eastern Time) unless extended by the Debtors with the consent of the Requisite Consenting Lenders and the Creditors' Committee.

***Rules Of Interpretation And Computation Of Time***.  For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions with any modifications subject to the consent of each of the Consenting Parties; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (j) "including" means "including without limitation;" and (k) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

***Exhibits***.  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the

Bankruptcy Court on or after the Petition Date, but in any event, at least four business days prior to the deadline that the Bankruptcy Court sets for parties in interest to file objections to Confirmation, and shall, unless otherwise provided in this Plan, be in form and substance satisfactory to each of the Consenting Parties.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected (i) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (ii) on the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required) or (iii) at the Debtors' noticing agent's website at www.donlinrecano.com/EXM at no charge.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1     ***Administrative Claims***.  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors in consultation with the other Consenting Parties or the Reorganized Debtors.

2.2     ***Priority Tax Claim***.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim shall be paid in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Debtors in consultation with the other Consenting Parties or the Reorganized Debtors and such Holder shall have agreed upon in writing.

2.3     ***Professional Fees***.  Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the 30th day following the Effective Date.  Without limiting the foregoing, the Reorganized Debtors may pay the charges incurred by the Reorganized Debtors

on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1    *Introduction*.

The Plan, though proposed jointly, constitutes separate plans proposed by each of the Debtors.  Therefore, except as expressly specified herein, the classifications set forth below shall be deemed to apply separately with respect to each Plan proposed by the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Claims is set forth in Article II of this Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

### 3.2    *Summary of Classes*.

| Class | Claims and Interests | Treatment – Entitlement to Vote |
|---|---|---|
| 1 | Priority Non-Tax Claims; applicable to all Debtors | Unimpaired – Deemed to have accepted this Plan and not entitled to vote. |
| 2 | Syndicate Credit Facility Secured Claims; applicable to all Debtors | Impaired – Entitled to vote. |
| 3 | Christine Shipco Facility Secured Guaranty Claim; applicable to Excel only | Unimpaired – Deemed to have accepted this Plan and not entitled to vote. |
| 4 | Other Secured Claims; applicable to all Debtors | Unimpaired – Deemed to have accepted this Plan and not entitled to vote. |
| 5 | There is no Class 5 in this Plan | *[reserved]* |
| 6 | Impaired Subsidiary Debtor General Unsecured Claims | Impaired – Deemed to have rejected this Plan and not entitled to vote. |
| 7 | Unimpaired Subsidiary Debtor General Unsecured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote. |
| 8 | Impaired Excel General Unsecured Claims | Impaired – Entitled to vote. |
| 9 | Unimpaired Excel General Unsecured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote. |
| 10 | Section 510(b) Claims; applicable to Excel only | Impaired – Deemed to have rejected this Plan and not entitled to vote. |
| 11 | Interests in Excel; applicable to Excel only | Impaired – Deemed to have rejected this Plan and not entitled to vote. |
| 12 | Interests in Debtors other than Excel | Unimpaired – Deemed to have accepted this Plan and not entitled to vote. |

17

### 3.3    *Treatment of Classes*.

(a)    **Class 1 – Non-Tax Priority Claims.**

1.    <u>Impairment and Voting</u>.  Class 1 Claims in respect of all Debtors are Unimpaired. Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

2.    <u>Distribution</u>.  Unless the Holder of any such Claim and the Debtors agree to a different treatment, on the Effective Date, each Holder of an Allowed Non-Tax Priority Claim shall have its Claim paid in full in cash.

(b)    **Class 2 – Syndicate Credit Facility Secured Claims**

1.    <u>Impairment and Voting</u>.  Class 2 Claims in respect of all Debtors are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 2 Syndicate Credit Facility Secured Claim is entitled to vote to accept or reject this Plan.

2.    <u>Allowance and Distribution</u>.  Upon the Effective Date, the Syndicate Credit Facility Secured Claims shall be Allowed for all purposes in the aggregate amount of $579 million.  On the Effective Date, each Holder of an Allowed Syndicate Credit Facility Secured Claim shall receive, in full and final satisfaction, release, discharge of, and in exchange for, such Syndicate Credit Facility Secured Claim, its Pro Rata share of (a) the Amended and Restated Senior Secured Credit Facility; and (b) 16.7 million shares of New Common Stock, representing 83.3% of all New Common Stock to be issued under this Plan, prior to dilution on account of the Co-Investment Rights.[1]

Additionally, on the Effective Date, the Debtors shall pay the reasonable fees and documented expenses of (i) Oaktree in its capacity as a secured lender, including the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, its counsel, incurred prior to and subsequent to the commencement of the Chapter 11 Cases in connection with the restructuring of the Debtors, (ii) Angelo Gordon in its capacity as a secured lender and primarily related to the negotiation and documentation of corporate governance related to Holdco, up to $400,000, including those of Wachtell, Lipton, Rosen & Katz, its counsel, and (iii) the Agent for the Syndicate Credit Facility, including those of Blackstone Group International Partners LLP, Freshfields Bruckhaus Deringer US LLP, and Holland & Knight LLP as advisors to the Agent and the Secured Lenders, incurred in connection with the restructuring of the Debtors, to the extent not previously paid in connection with the Final Cash Collateral Order and the Stipulated Cash Collateral Order.

All New Common Stock issued to Holders of Allowed Class 2 Claims pursuant to the Plan shall be deemed to automatically and without the need for any action be contributed to Holdco pursuant to Section 5.7 of the Plan.

---

[1]    If fully diluted, such New Common Stock shall represent 82% of all New Common Stock issued under this Plan as set forth in the Plan Term Sheet.

(c)     **Class 3 – Christine Shipco Facility Secured Guaranty Claim**

1.     <u>Impairment and Voting</u>.  The Class 3 Claim is Unimpaired, and the Holder of the Allowed Class 3 Claim is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of the Class 3 Claim is not entitled to vote to accept or reject this Plan.

2.     <u>Distribution</u>.  The Holder of the Class 3 Claim will have such Claim Reinstated on the Effective Date.

(d)     **Class 4 – Other Secured Claims**

1.     <u>Impairment and Voting</u>.  Class 4 Claims in respect of all Debtors are Unimpaired, and the Holders of Allowed Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan.

2.     <u>Distribution</u>.  Holders of Class 4 Claims will have such Claims Reinstated on the Effective Date.

(e)     **Class 6 – Impaired Subsidiary Debtor General Unsecured Claims**

1.     <u>Impairment and Voting</u>.  Class 6 Claims are Impaired, and the Holders of Allowed Class 6 Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan.

2.     <u>Distribution</u>.  Holders of Class 6 Claims shall not receive or retain any property under the Plan on account of such Claims and the obligations of the Debtors and Reorganized Debtors on account of such Claims shall be discharged.

(f)     **Class 7 – Unimpaired Subsidiary Debtor General Unsecured Claims**

1.     <u>Impairment and Voting</u>.  Class 7 Claims are Unimpaired, and the Holders of Allowed Class 7 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 7 Claims are not entitled to vote to accept or reject this Plan.

2.     <u>Distribution</u>.  Holders of Class 7 Claims will have such Claims Reinstated on the Effective Date.

(g)     **Class 8 – Impaired Excel General Unsecured Claims**

1.     <u>Impairment and Voting.</u>  Class 8 Claims are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 8 Claim is entitled to vote to accept or reject the Plan.

2. <u>Allowance and Distribution</u>. The aggregate amount of the Syndicate Credit Facility Deficiency Claims shall be either $179.8 million, if the Adequate Protection Payment is made on or before January 2, 2014, or $185,930,760.71, if the Adequate Protection Payment is not made by Excel on or before January 2, 2014, and shall be Allowed solely for voting purposes in such applicable amount in connection with the Plan and such claims shall be, subject to the next sentence, included within the class of Impaired Excel General Unsecured Claims (for the avoidance of doubt, subject to the next sentence, the Holders of Syndicate Credit Facility Claims, on account of and to the extent of the Syndicate Credit Facility Deficiency Claims, shall have all of the rights belonging to the Holders of Class 8 Claims including, without limitation, all rights to distributions and the Co-Investment Rights). The Consenting Parties reserve all rights with respect to the amount, if any, and treatment of a Syndicate Credit Facility Deficiency Claim, if any, held by the Secured Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet. On the Effective Date, and immediately prior to the transfer of the New Common Stock to Holdco and the issuance of the Holdco Units in accordance with Section 5.7 hereof, each Holder of an Allowed Impaired Excel General Unsecured Claim will receive, in full and final satisfaction, release, discharge of, and in exchange for, such Allowed Impaired Excel General Unsecured Claim, (a) its Pro Rata share of 1.6 million shares of New Common Stock, representing 8.0% of the New Common Stock to be issued under this Plan, subject to dilution on account of the Co-Investment Rights and (b) its Pro Rata share of the Tranche A Offered Shares and Tranche B Offered Shares subscribed for pursuant to such Holders' Co-Investment Rights.

For purposes of this Plan, the claims held by holders of Excel's 1.875% unsecured convertible senior notes will be allowed on the Effective Date in the amount of $152,005,566.41 on account of unpaid principal and interest due and owing as of the Petition Date (but, for the avoidance of doubt, excluding the Administrative Claims of Christiana Trust as indenture trustee, including with respect to the fees and expenses of Moses & Singer, of up to $450,000). The Consenting Parties reserve all rights with respect to the amount of claims held by holders of Excel's 1.875% unsecured convertible senior notes for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.

Holders of Allowed Class 8 Claims may exercise their Co-Investment Rights pursuant to two separate rights offerings: the 1145 Rights Offering and 4(a)(2) Rights Offering. The Co-Investment Rights pursuant to the 1145 Rights Offering shall be split into two $5.0 million tranches. The Tranche A Subscription Rights shall dilute pro rata the Primary Equity. Each Holder of an Allowed Impaired Excel General Unsecured Claim shall have the right to subscribe for any unsubscribed portion of the Tranche A Offered Shares up to the full amount of the Tranche A Subscription Rights subject to Pro Rata reduction to the extent the Tranche A Subscription Rights are oversubscribed and the individual limits on oversubscription described below, if applicable.

The Tranche B Subscription Rights shall reduce the Ivory Investment on a dollar-for-dollar basis. Ivory shall have the exclusive right to purchase shares equal to the number of

unsubscribed Tranche B Offered Shares with respect to the full amount of the Tranche B Subscription Rights.

Each Holder's aggregate Tranche A Subscription Rights (including oversubscription rights related thereto), when taken together with such Holder's Tranche B Subscription Rights, shall be limited to 75% of such Holder's Pro Rata portion of the Section 1145 Stipulated Value. This limit does not apply to the 4(a)(2) Rights Offering.

Additionally, Holders of Allowed Class 8 Claims who are Accredited Investors, and who timely return an Accredited Investor Questionnaire to the Subscription Agent pursuant to the Rights Offering Procedures, will have the opportunity to participate in the 4(a)(2) Rights Offering.  Notwithstanding anything to the contrary in the Plan, (i) upon the completion of the 1145 Rights Offering and 4(a)(2) Rights Offering, Ivory shall have the exclusive right to purchase shares equal to the number of 1145 Offered Shares and 4(a)(2) Offered Shares remaining unsubscribed pursuant to section 4(a)(2) of the Securities Act and (ii) in no event shall the fact that the Co-Investment Rights are being offered pursuant to two rights offerings diminish Ivory's right to purchase up to 10.1% of the New Common Stock, subject to the rights of Holders of Impaired Excel General Unsecured Claims to exercise their Co-Investment Rights.

Holders of Syndicate Credit Facility Deficiency Claims shall have all of the rights belonging to the Holders of Allowed Impaired Excel General Unsecured Claims under this Plan including, without limitation, all rights to distributions and the Co-Investment Rights.  If the class of Impaired Excel General Unsecured Claims votes to accept the Plan, then on the Effective Date, the Holders of Syndicate Credit Facility Deficiency Claims shall be deemed automatically and without the need for any action to have waived their entitlement to any distributions of Primary Equity and the Co-Investment Rights on account of their Syndicate Credit Facility Deficiency Claims, and the other Holders of Allowed Impaired Excel General Unsecured Claims Pro Rata participation in the Co-Investment Rights and distributions of Primary Equity shall be increased accordingly.

All New Common Stock issued to Holders of Allowed Class 8 Claims pursuant to the Plan and the exercise of the Co-Investment Rights shall be deemed automatically and without the need for any action to be contributed to Holdco pursuant to Section 5.7 of the Plan.

(h)    **Class 9 – Unimpaired Excel General Unsecured Claims**

1.    <u>Impairment and Voting</u>.  Class 9 Claims are Unimpaired, and the Holders of Allowed Class 9 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 9 Claims are not entitled to vote to accept or reject this Plan.

2.    <u>Distribution</u>.  Holders of Class 9 Claims will have such Claims Reinstated on the Effective Date.

(i)    **Class 10 – Section 510(b) Claims**

1.    <u>Impairment and Voting</u>.  Class 10 Claims against Excel are Impaired, and the Holders of Allowed Class 10 Claims are conclusively deemed to have rejected this Plan pursuant

to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 10 Claims against Excel are not entitled to vote to accept or reject this Plan.

2.    <u>Distribution</u>.  The Holders of Section 510(b) Claims shall not receive or retain any property under the Plan on account of such Section 510(b) Claims and the obligations of the Debtors and Reorganized Debtors on account of Section 510(b) Claims shall be discharged.

(j)    **Class 11 – Interests in Excel**

1.    <u>Impairment and Voting</u>.  Class 11 Interests in Excel are Impaired, and the Holders of Allowed Class 11 Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 11 Interests in Excel are not entitled to vote to accept or reject this Plan.

2.    <u>Distribution</u>.  On the Effective Date, all Interests in Excel shall be deemed to be cancelled automatically without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder shall be discharged.  Holders of Interests in Excel shall not receive or retain any property under the Plan on account of such Interests.

(k)    **Class 12 – Interests in Debtors Other than Excel**

1.    <u>Impairment and Voting</u>.  Class 12 Interests in respect of all Debtors other than Excel are Unimpaired, and the Holders of Allowed Class 12 Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 12 Interests in Debtors Other than Excel are not entitled to vote to accept or reject this Plan.

2.    <u>Distribution</u>.  Holders of Class 12 Interests will have such Interests Reinstated on the Effective Date.

**3.4**    ***Intercompany Claims***.  On the Effective Date, all Intercompany Claims shall, at the election of Excel, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

**3.5**    ***Special Provision Regarding Unimpaired Classes of Claims***.  Except as otherwise provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

## ARTICLE IV

## <u>ACCEPTANCE OF THIS PLAN</u>

**4.1**    ***Classes Entitled to Vote***.  Classes 2 and 8 are Impaired and entitled to vote to accept or reject this Plan.  Classes 1, 3, 4, 7, 9, and 12 are Unimpaired and, therefore, are

not entitled to vote.  Classes 6, 10 and 11 are deemed to have rejected this Plan and are not entitled to vote.

   **4.2** ***Elimination of Classes***.  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

   **4.3** ***Cramdown***.  The Debtors reserve the right to request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

<div align="center">

**ARTICLE V**

**<u>MEANS FOR IMPLEMENTATION OF THIS PLAN</u>**

</div>

   **5.1** ***Continued Legal Existence***.  Except as otherwise provided for in this Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity under applicable law in the jurisdiction in which each applicable Debtor is organized, incorporated or otherwise formed and pursuant to such Debtor's articles of organization or formation, operating agreement and other organizational documents in effect as of the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtors from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code).

   **5.2** ***Officers and Directors of Holdco and Reorganized Excel.***  On the Effective Date, each of the members of the existing board of directors of Excel shall be deemed to have resigned in such capacity.  The Debtors' businesses will continue to be managed, as of the Effective Date, by existing management.  Mr. Gabriel Panayotides shall serve as Chief Executive Officer of Reorganized Excel.  From the Effective Date until the date that is two years after the Effective Date, the board of directors of Holdco (the "Board") shall consist of seven members, and shall be constituted as follows: (a) Oaktree shall have the right to designate three members of the Board; (b) Angelo Gordon shall have the right to designate two members of the Board, one of which designees shall be subject to the consent of Oaktree (such consent not to be unreasonably withheld); and (c) the current board of directors of the Debtors shall have the right to designate two members of the Board.  At least four business days prior to the Voting Deadline, Excel will file a notice with the Bankruptcy Court designating the members of the boards of directors of Holdco and Reorganized Excel who will be appointed automatically without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors or Holdco.  Such notice shall also include compensation, if any, to be paid to the members of the boards of directors of Holdco and Reorganized Excel to the extent such compensation, if any, has been determined at that time.  Current Excel director Apostolos Kontoyannis shall be paid a performance bonus of $350,000 on the Effective Date.

<div align="center">

23

</div>

**5.3**    ***Officers of Reorganized Debtors***.  Subject to Section 5.2 above, all officers of the Debtors in office as of the Effective Date will continue in office after the Effective Date until and unless removed by the applicable Reorganized Debtors' board of directors to be appointed as soon as practicable after the Effective Date, subject to any restrictions imposed under this Plan or any agreements executed in connection with implementation of this Plan.

**5.4**    ***Ivory Investment***.  On the Effective Date, Ivory will (1)(x) contribute to Excel at least $5 million and up to an additional $10 million in cash, subject to the exercise of the Co-Investment Rights and the Ivory Subscription Rights and (y) release all of its claims to and waive all of its rights in respect of the Escrow Funds; and (2) agree to a settlement (as set forth herein) of Adversary Case No. 13-08338.  In exchange for the foregoing, Ivory shall receive 1,739,231 shares of New Common Stock, representing up to 8.7% of the New Common Stock, subject to dilution and reduction, as applicable, on account of the Co-Investment Rights and without taking into account Ivory's right to purchase shares equal to the number of shares not taken up by holders of Class 8 Claims pursuant to the Co-Investment Rights.  All New Common Stock issued to Ivory, including any New Common Stock issued pursuant to the oversubscription rights described in Section 3.3(g) above, shall be exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

**5.5**    ***Compromise and Settlement of Adversary Case No. 13-08338***.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for Ivory's (x) settlement and release of all of its claims to and waiver of all of its rights in respect of the Escrow Funds, and (y) contribution to Excel of at least $5 million and up to an additional $10 million in cash (subject to the exercise of the Co-Investment Rights and the Ivory Subscription Rights), the provisions of the Plan, including the Ivory Investment, shall constitute a good faith compromise and settlement of Adversary Case No. 13-08338, including all claims, interests and controversies relating to the Escrow Funds, and any and all claims and Causes of Action related thereto against Ivory, and its affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of Adversary Case No. 13-08338, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.

**5.6**    ***Co-Investment Rights***.  Pursuant to and in accordance with the Rights Offering Procedures and the Subscription Agreements, each Eligible Holder shall receive Subscription Rights to subscribe for (i) the Tranche A Offered Shares at an offering price equal to $16.25 per share, (ii) the Tranche B Offered Shares at an offering price equal to $17.25 per share, and (iii) to the extent applicable, with respect to Eligible Holders who are Accredited Investors, the 4(a)(2) Offered Shares, at an offering price equal to $16.25 per share.  On, or as soon as reasonably practicable after, the Effective Date, the Reorganized Debtors will distribute the applicable Offered Shares purchased by each Eligible Holder that has properly exercised its applicable Subscription Rights in accordance with the delivery instructions set forth in such Eligible Holder's applicable Subscription Agreements.

Secured Lenders, Holders of Allowed Impaired Excel General Unsecured Claims and Ivory shall not be required to execute the Holdco LLC Agreement before receiving their

respective distributions of Holdco Units under the Plan; any such Persons who do not execute the Holdco LLC Agreement shall be automatically deemed to have accepted the terms of the Holdco LLC Agreement (in their capacity as members of Holdco) and to be parties thereto without further action.  The Holdco LLC Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Holdco Units shall be bound thereby.

> **5.7**     ***Transfer of New Common Stock to Holdco and Issuance of Holdco Units***.  On the Effective Date, and immediately after the issuance of the New Common Stock under the Plan, all holders of New Common Stock shall be deemed to have transferred their shares of New Common Stock to Holdco automatically pursuant to the terms of this Plan and without further action required.  Subject to the terms herein, the Secured Lenders, the Holders of Allowed Impaired Excel General Unsecured Claims and Ivory shall receive Holdco Units in the same percentages as they held New Common Stock in Reorganized Excel on the Effective Date after the exercise of the Co-Investment Rights.

> **5.8**     ***Section 1145 Exemption and Section 4(a)(2) Exemptions***.  Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of New Common Stock as Primary Equity to the Secured Lenders and the Holders of Allowed Impaired Excel General Unsecured Claims and any 1145 Offered Shares issued to the Holders of Allowed Impaired Excel General Unsecured Claims pursuant to the 1145 Subscription Rights, and the issuance of Holdco Units pursuant to Section 5.7 of the Plan in exchange for such shares and 1145 Offered Shares, shall be exempt from registration under the Securities Act without further act or action by any Person, and from any state or local law requiring registration for offer or sale of a security.

> The Section 1145 exemption will not apply to any securities issued under the 4(a)(2) Rights Offering or to Ivory under the Plan.  Securities issued pursuant to the 4(a)(2) Rights Offering or to Ivory will be issued pursuant to an exemption under section 4(a)(2) of the Securities Act, and may not be transferred or resold absent registration or exemption under the Securities Act or any applicable state securities law.

> **5.9**     ***Available Information***.  Reorganized Excel shall make available on its website (including to prospective transferees) (i) unaudited quarterly and audited annual financial statements, on a timely basis, and (ii) to the extent not covered by (i), such information as is provided to the lenders under the Amended and Restated Senior Secured Credit Facility; provided that Reorganized Excel's obligation to provide the information described in (i) above shall commence after the first full quarter following the Effective Date.

> **5.10**     ***Contractual Transferability & Registration Rights***.  The Holdco Units to be issued under the Plan pursuant to Section 5.7 hereof (including in the hands of subsequent transferees), shall be freely transferable without being subject to any right of first offer, right of first refusal, board approval or any other restriction, except for restrictions (i) imposed by applicable securities laws and (ii) on transfers that would cause Reorganized Excel or Holdco to become subject to the reporting obligations under the Securities Exchange Act of 1934.  The Holdco LLC Agreement shall provide holders of Holdco Units that are affiliates of Holdco (including, if applicable, Ivory) with customary demand registration rights to sell their

Holdco Units, piggy-back registration rights and marketing cooperation covenants; provided that such demand registration right cannot be exercised until the date that is eighteen (18) months after the Effective Date.

**5.11**    *Minority Protections*.  The Holdco LLC Agreement shall contain minority protections with respect to pre-emptive rights, restrictions on affiliate transactions that are not on arms' length terms and certain amendments to the provisions of Holdco's governing documents as described below.  The Holdco LLC Agreement shall also provide for the holders of at least 60% of the Holdco Units (the "Majority Interest Holders") to be entitled to drag-along rights in connection with a sale of Holdco to a party unaffiliated with the selling holder(s) (a "Drag-Along Sale"), which drag-along rights shall include, without limitation, an agreement by the holders of Holdco Units to grant a voting proxy to the Majority Interest Holders in connection with such Drag-Along Sale, subject to definitive documentation, including any governance and/or shareholder arrangements among the lenders under the Amended and Restated Senior Secured Credit Facility, which will not have any adverse impact on the minority rights set forth herein.  If (i) such Drag-Along Sale is proposed within the first 12 months after the Effective Date and (ii) more than 50% of the fair market value of the consideration to be received by the holders of Holdco Units in such Drag-Along Sale consists of equity securities that are not publicly traded, then the issuer of such equity securities shall adopt corporate governance provisions substantially similar to those contained in the Plan (including, without limitation, the provisions relating to Contractual Transferability set forth in Section 5.10 of the Plan and Available Information set forth in Section 5.9 of the Plan).  In the event that holders desire to sell at least 50% of the outstanding Holdco Units in one or a series of related transactions, the other holders of Holdco Units shall have tag-along rights in connection with such sale.

The provisions of the Holdco LLC Agreement set forth herein (including, without limitation, the provisions relating to Contractual Transferability set forth in Section 5.10 and Available Information set forth in Section 5.9) shall not be modified, amended or waived within the first year following the Effective Date, and thereafter shall not be modified, amended or waived without the prior written consent of both (A) holders of a majority of the equity securities in Holdco, excluding for the purposes of such calculation equity securities held by members who are affiliates of Holdco (which shall, for the avoidance of doubt, include on the Effective Date Oaktree and its affiliates and Ivory and its affiliates); and (B) Ivory, if (i) Ivory or its affiliates still own any equity securities of Holdco and (ii) such modification, amendment or waiver has a disproportionately adverse effect on Ivory or its affiliates as compared with the effect on non-affiliate holders of equity securities in Holdco.

**5.12**    *Management Incentive Plan*.  On the Effective Date, the Management Incentive Plan shall become effective without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors or Holdco. The Management Incentive Plan may dilute the Holdco Units to be distributed under this Plan.

**5.13**    *Corporate Action*.  Each of the matters provided for under this Plan involving the corporate structure of any Debtor, Reorganized Debtor or Holdco or any corporate action to be taken by, or required of, any Debtor, Reorganized Debtor or Holdco shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to

26

the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors or Holdco.

Such actions shall include, but are not limited to the following steps which shall occur in the following order to implement the provisions of this Plan:

1.      Secured Lenders shall exchange a portion of their Allowed Syndicate Credit Facility Secured Claims for (a) an amount of Amended and Restated Senior Secured Credit Facility, and a portion of their Allowed Syndicate Credit Facility Secured Claims for (b) New Common Stock, all as set forth in Section 3.3(b).

2.      Holders of Allowed Impaired Excel General Unsecured Claims shall exchange their Allowed Impaired Excel General Unsecured Claims for (a) the remaining New Common Stock (before the cash subscription described in Step 4 below), and (b) the Co-Investment Rights as provided in Section 3.3(g).

3.      The Class 11 Interests in Excel shall be cancelled for no consideration as provided in Sections 3.3(j) and 5.18.

4.      Ivory and Holders of Allowed Impaired Excel General Unsecured Claims shall contribute cash to the Company in exchange for New Common Stock pursuant to the Ivory Investment and the Co-Investment Rights as provided in Sections 3.3(g) and 5.4.

5.      (A) Secured Lenders shall contribute their New Common Stock (received in Step (1)(b)) to Holdco in exchange for Holdco Units and (B) Ivory and the Holders of Allowed Impaired Excel General Unsecured Claims shall contribute their New Common Stock ((received in Steps 2(a) and 4, as applicable) to Holdco in exchange for Holdco Units, as provided in Section 5.7.

**5.14    *Effectuating Documents; Further Transactions*.**   Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

**5.15    *Check the Box Election.*** Holdco shall make a check-the-box election on Internal Revenue Service Form 8832 (or successor form) to be treated as a corporation for United States federal income tax purposes, effective on the date of its formation, and in any event, before the Effective Date.

**5.16    *Preservation of Causes of Action*.**   In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or

enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other Retained Action in this Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of this Plan.

**5.17**    ***Exemption From Certain Transfer Taxes and Recording Fees***.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**5.18**    ***Dissolution of Creditors' Committee***.  The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee shall be dissolved and the Creditors' Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims, (ii) any appeals of the Confirmation Order and (iii) any other matters to which the Creditors' Committee is a party on or before the Effective Date.

**5.19**    ***Cancellation of Existing Securities and Agreements***.  Except as provided in this Plan or in the Confirmation Order, or for the purpose of evidencing a right to distribution hereunder or a contractual right to indemnification or reimbursement of the Administrative Agent, on the Effective Date, (i) all indentures, notes, stock, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements (including registration rights agreements), and other documents evidencing or giving rise to Claims and Interests against and in the Debtors shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture, guarantee, or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (a) allowing Holders of Syndicate Credit Facility Secured Claims and Impaired Excel General Unsecured Claims to receive distributions under the Plan as provided herein; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the

28

Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan; *provided further, however*, that the cancellation of indentures, notes, stock, bonds, purchase rights, instruments, guarantees, certificates, warrants, options, puts, agreements and other documents hereunder shall not itself alter the obligations or rights among third parties (apart from the Debtors, the Reorganized Debtors, and the non-Debtor affiliates).

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1    ***Allowed Claims and Interests***.  Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

6.2    ***Fractional Shares***.  No fractional shares of New Common Stock or Holdco Units shall be issued or distributed under this Plan.  The actual distribution of shares of New Common Stock or Holdco Units shall be rounded to the next higher or lower whole number as follows:  (a) fractions less than one-half (½) shall be rounded to the next lower whole number and (b) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number.  No consideration shall be provided in lieu of fractional shares that are rounded down.

6.3    ***Withholding and Reporting Requirements***.  In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

6.4    ***Setoffs***.  The Reorganized Debtors may, pursuant to applicable law, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such Claim that the Debtors or the Reorganized Debtors may have against such Holder.

6.5    ***Allocation Between Principal and Accrued Interest***.  For tax purposes, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, accrued through the Effective Date.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**7.1** *Assumption of Executory Contracts and Unexpired Leases*.  On the Effective Date, all executory contracts and unexpired leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except (a) those executory contracts or unexpired leases that have previously expired or terminated pursuant to their own terms, (b) subject of a motion to reject filed on or before, and pending on, the Effective Date, or (c) identified on the Rejected Executory Contract and Unexpired Lease List on or prior to the Effective Date.  The Debtors, with the consent of the other Consenting Parties, reserve all rights to amend or otherwise supplement the Rejected Executory Contract and Unexpired Lease List through the Effective Date.

**7.2** *D&O Liability Insurance Policies and Indemnification Provisions*. Notwithstanding anything herein to the contrary, as of the Effective Date, the D&O Liability Insurance Policies and Indemnification Provisions belonging or owed to directors, officers, and employees of the Debtors (or the Estates) who served or were employed at any time by the Debtors shall be deemed to be, and shall be treated as though they are, executory contracts and the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies and Indemnification Provisions pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies and Indemnification Provisions.  On or before the Effective Date, the Reorganized Debtors shall obtain reasonably sufficient tail coverage (i.e., D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for a period of six (6) years after the Effective Date on terms reasonably acceptable to each of the Consenting Parties.

**7.3** *Cure of Defaults and Adequate Assurance*.  Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

**The Debtor asserts, and this section of the Plan provides, that no Cure Claim is due to any counterparty to an executory contract or unexpired lease in order to assume any executory contract or unexpired lease under section 365(b)(1)(A) of the Bankruptcy Code.  Any counterparty to an executory contract or unexpired lease that will be assumed under the Plan that asserts a Cure Claim must be paid in order to assume such executory contract or unexpired lease must file an objection asserting the amount of the Cure Claim with the Bankruptcy Court on or before the deadline for objecting to Confirmation of the Plan. Failure to object before the objection deadline to the proposed Cure Claim of $0.00 for an executory contract or unexpired lease shall constitute consent to the assumption of such executory contract or unexpired lease, including the proposed Cure Claim of $0.00, and an**

**acknowledgement that such assumption satisfies all requirements of section 365(b) of the Bankruptcy Code.** If any such objection to a Cure Claim of $0.00 is filed and is not resolved at or prior to the Confirmation Hearing, such executory contract or expired lease shall not be assumed until the dispute regarding the amount of the Cure Claim is resolved by agreement or order of the Bankruptcy Court; provided, however, the Reorganized Debtors shall be authorized to reject any executory contract or unexpired lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure Claim as determined by the Bankruptcy Court, renders assumption of such executory contract or unexpired lease unfavorable to the Reorganized Debtors.

Except as otherwise provided in the Confirmation Order, the only adequate assurance of future performance shall be the promise of the applicable Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under the Plan. The Debtors reserve the right, with the consent of the other Consenting Parties, to file a motion on or before the Confirmation Date to assume or reject any executory contract and unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption. Any proof of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged upon satisfaction of the Cure Claim in accordance with the procedures described above, without further notice to or action, order or approval of the Bankruptcy Court.

> **7.4        *Claims Based on Rejection of Executory Contracts or Unexpired Leases*.  All proofs of Claim with respect to Claims arising from the rejection of executory contracts and unexpired leases, if any, must be filed with the Bankruptcy Court on or prior to 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.** Unless otherwise ordered by the Bankruptcy Court or otherwise provided herein, any Claims arising from the rejection of executory contracts and unexpired leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article X hereof. All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as Class 6 Claims or Class 8 Claims, as applicable, against the applicable Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of executory contracts and unexpired leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed, and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

## ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THIS PLAN

**8.1**    *Condition To Entry of the Confirmation Order*.  The following are conditions precedent to Confirmation, each of which must be satisfied or waived by each of the Consenting Parties in accordance with the terms hereof:

(a)    The Plan and all schedules, documents, supplements and exhibits relating to the Plan will have been filed in form and substance acceptable to each of the Consenting Parties, unless otherwise provided in this Plan.

(b)    The proposed Confirmation Order will be in form and substance acceptable to each of the Consenting Parties.

**8.2**    *Conditions To Effective Date*.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by each of the Consenting Parties in accordance with the terms hereof:

(a)    The Confirmation Order shall be in full force and effect and not subject to any stay, and shall provide, among other things, that (i) the New Common Stock and Holdco Units issued under the Plan (other than the New Common Stock and Holdco Units offered pursuant to the 4(a)(2) Rights Offering and to Ivory) shall be exempt from the registration requirements of the Securities Act and similar state statutes pursuant to section 1145 of the Bankruptcy Code and (ii) that the New Common Stock and Holdco Units issued  pursuant to the 4(a)(2) Rights Offering and to Ivory shall be exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

(b)    The Amended and Restated Senior Secured Credit Facility shall have been executed and delivered, and all conditions precedent to its effectiveness shall have been satisfied.

(c)    The Holdco LLC Agreement shall be in full force and effect.

(d)    The Plan and Confirmation Order shall not authorize the Debtors to incur any material debt other than the debt incurred in connection with the Amended and Restated Senior Secured Credit Facility.

(e)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

(f)    The Debtors shall have received the Ivory Investment and such funds shall be available for contribution.

(g)    Ivory and Excel shall have delivered instructions to Seward & Kissel to release the Escrow Funds to Excel on the Effective Date, and such funds shall be available for release by Seward & Kissel to Excel.

32

(h)    All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

(i)    The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall be in form and substance acceptable to each of the Consenting Parties, unless otherwise specifically provided in the Plan.

(j)    The Plan Supplement documents shall be adopted in the form in which such documents were filed with the Plan Supplement (or with such other modifications as are satisfactory to each of the Consenting Parties).

**8.3**    ***Waiver Of Conditions***.  Each of the Consenting Parties may waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to other parties in interest or the Bankruptcy Court and without a hearing.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

**9.1**    ***Binding Effect***.  This Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

**9.2**    ***Revesting of Assets***.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**9.3**    ***Compromise and Settlement of Claims and Interests***.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the

Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Persons.

**9.4     *Discharge of the Debtors*.**  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided herein, the distributions, rights and treatment that are provided herein shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including, without limitation, claims arising under maritime law in any foreign jurisdiction that provides for the seizure or arrest of any vessel of the Debtors under any theory of law or equity (including any claim arising under South African law on the basis that the vessel is an "associated ship" as defined in the South African Admiralty Jurisdiction Regulation Act 1983, and/or of an allegation under the law of any other jurisdiction that any Debtor has or had control of or was associated in any way with any vessel owned and/or operated by a Debtor and/or non-Debtor and of any vessel in respect of which an alleged liability, including a liability of any third party, was incurred), any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed or disallowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided herein.

**9.5     *Releases and Related Matters*.**

**(a)     Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, the Estates and non-Debtor affiliates from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or the non-Debtor affiliates would have been legally entitled to assert in their own right**

34

(whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided, however* that nothing in this Section 9.5 shall be construed to release any party or entity from intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order.

(b)    Releases by the Holders of Claims and Interests.

Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Holder of a Claim or Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Debtors, the Reorganized Debtors, the Estates, non-Debtor affiliates and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence including or pertaining to the Debtors and taking place on or before the Effective Date, *provided, however* that nothing in this Section 9.5 shall be construed to release any party or entity from intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order; *provided further, however* that this Section 9.5 shall not release the Debtors, the Reorganized Debtors, the Estates, non-Debtor affiliates or the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act, or other securities laws of the United States or any domestic state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as

35

amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding anything to the contrary in this Section 9.5(b), a Holder of Class 11 Interests in Excel shall only be deemed to provide the releases set forth in this section if such Holder did not affirmatively opt out of the Plan releases by completing and returning a form to Donlin, Recano & Company, Inc. by the Voting Deadline.

9.6     *Exculpation and Limitation of Liability*.  Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, and in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors, the Reorganized Debtors, and the Released Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

9.7     *Injunction*.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED OR EXCULPATED PURSUANT TO THIS ARTICLE IX ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING THAT CONTEMPLATES THE SEIZURE OR ARREST OF ANY PROPERTY OF THE DEBTORS, INCLUDING ANY VESSEL, WHETHER UNDER SOUTH AFRICAN LAW OR THE LAW OF ANY OTHER JURISDICTION, AND WHETHER ON THE BASIS THAT THE VESSEL IS AN "ASSOCIATED SHIP" AS DEFINED IN THE SOUTH AFRICAN ADMIRALTY JURISDICTION REGULATION ACT

1983, AND/OR OF AN ALLEGATION THAT ANY DEBTOR HAS OR HAD CONTROL OF OR WAS ASSOCIATED IN ANY WAY WITH ANY VESSEL OWNED AND/OR OPERATED BY A DEBTOR AND/OR A NON-DEBTOR AND OF ANY VESSEL IN RESPECT OF WHICH AN ALLEGED LIABILITY, INCLUDING A LIABILITY OF ANY THIRD PARTY, WAS INCURRED, OR OTHERWISE.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.  ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**9.8**    *Term of Bankruptcy Injunction or Stays*.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**ARTICLE X**

**PROCEDURES FOR RESOLVING AND
TREATING DISPUTED CLAIMS**

**10.1**    *Disputed Claims*.  All Disputed Claims against the Debtors shall be subject to the provisions of this Article X.

**10.2**    *Objection Deadline*.  Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each such Claim to which objections are made on or before the Claims Objection Bar Date.  If an objection to a Claim is timely filed, a subsequent amendment to the objection shall also be

37

deemed timely, even if filed subsequent to the deadline for filing the original Claim objection, and even if the amendment raises facts or legal theories not raised in the original Claim objection.

**10.3    *Prosecution of Objections*.**  After the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall have the authority to file, litigate to final judgment, settle, or withdraw objections to Disputed Claims.

**10.4    *No Distributions Pending Allowance*.**  No payments or distributions shall be made with respect to any Claim to the extent it is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim in whole or in part.

<div align="center">

**ARTICLE XI**

**RETENTION OF JURISDICTION**

</div>

**11.1    *Retention of Jurisdiction*.**  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)    decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtors that may be pending on the Effective Date;

(c)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(d)    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents;

(e)    modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Confirmation Order, or any contract, instrument, release,

<div align="center">38</div>

or other agreement or document created in connection with this Plan, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(f)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(h)    adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

(i)    recover all assets of the Debtors and property of the Estates, wherever located;

(j)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(k)    hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l)    determine any other matters that may arise in connection with, or relate to, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, or the Confirmation Order;

(m)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases including but not limited to any effort to seize or arrest any vessel of the Debtors in South African waters or elsewhere on account of prepetition claims of the German Owners;

(n)    hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(o)    enter an order closing the Chapter 11 Cases.

**11.2    *Failure of Bankruptcy Court to Exercise Jurisdiction*.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section 11.1 of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1** *Payment Of Statutory Fees*.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**12.2** *Amendment Or Modification Of This Plan*.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and subject further to the consent of the Consenting Parties, as provided for in this Plan, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan as to any particular Debtor and seek to confirm and consummate the Plan with respect to the other Debtors.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**12.3** *Revocation, Withdrawal, or Non-Consummation*.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (B) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (C) constitute an admission of any sort by the Debtors or any other Person.

**12.4** *Notice*.  All notices, requests, and demands relating to this Plan, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

Excel Maritime Carriers Ltd.
17th Km of National Road of Athens-Lamia & Finikos Street
14564 Nea Kifisia, Greece
Attention: Pavlos Kanellopoulos
Fax: +30 210 6209 528
Email: pkan@excelmaritime.com

with a copy to:

40

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Fax: (212) 735-2000
Attention: Jay M. Goffman, Esq.
Attention: Mark A. McDermott, Esq.

If to the Administrative Agent, to:

Wilmington Trust (London) Limited
Third Floor
1 King's Arms Yard
London EC2R 7AF
United Kingdom
Tel: +44 (0) 20 7397 3605
Fax: +44 (0) 20 7397 3601
Attention: Paul Barton

with a copy to,

Counsel to the Agent for the Syndicate Credit Facility:

Holland & Knight
10 St. James Avenue
Boston, MA 02116
Fax: (617) 523-6850
Attention: John J. Monaghan, Esq.

        and

Counsel to Oaktree:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Fax: (212) 757-3990
Attention: Alan W. Kornberg, Esq.
Attention: Elizabeth R. McColm, Esq.

If to the Creditors' Committee, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Fax: (212) 872-1002
Attention: Michael S. Stamer, Esq.

and

1700 Pacific Avenue
Suite 4100
Dallas, TX 75201
Fax: (214) 969-4343
Attention: Sarah Link Schultz, Esq.

**12.5** *Governing Law*. Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction in which the applicable Debtor or Reorganized Debtor is incorporated.

*Remainder of Page Left Intentionally Blank*

Dated:  November 26, 2013

EXCEL MARITIME CARRIERS LTD.
 (for itself and on behalf of the other
Debtors)


By: */s/ Pavlos Kanellopoulos*
     Name:  Pavlos Kanellopoulos
     Title:    Chief Financial Officer

EXHIBIT A

Certain Terms of the Amended and Restated Senior Secured Credit Facility

SUBJECT TO THE JOINT DEFENSE AGREEMENT

**TERM SHEET**

| **I. OVERVIEW** |
| --- |

| | |
| --- | --- |
| **Summary** | This Term Sheet sets forth the principal terms of an amended and restated Syndicate Credit Facility (defined below) between and among the Lenders (defined below), the Borrower (defined below) and the Guarantors (defined below) to be executed and become effective on the Effective Date (defined below) of an amended plan of reorganization (the "Plan") to be filed by the Borrower in the cases under chapter 11 of title 11 of the United States Code commenced on July 1, 2013 (the "Petition Date") pending in the United States Bankruptcy Court for the Southern District of New York and styled *In re Excel Maritime Ltd., et al.*, jointly administered under Case No. 13-23060 (RDD) (the "Chapter 11 Cases"). |
| | This Term Sheet outlines the general terms of the Company's senior secured debt obligations from and after the Effective Date pursuant to an amendment and restatement to its Syndicate Credit Facility. This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the amended and restated Syndicate Credit Facility which shall be finalized hereafter and included in the Amended Credit Agreement to be included as part of a plan supplement to be submitted prior to any hearing regarding the confirmation of the Plan.  Any capitalized terms used herein without definition and defined in the Syndicate Credit Facility will be defined consistent with such definition and otherwise acceptable to the Consenting Parties. |
| | The definitive documents governing the amended and restated Syndicate Credit Facility (including the Amended Credit Agreement) and all terms, conditions and other provisions that are to be contained in such definitive documents shall be acceptable to each of the Consenting Parties (as such term is defined in the Plan). |
| **Obligations to be Restructured by the Amended Syndicate Credit Facility** | Obligations to be restructured will consist of approximately $771,000,000 outstanding aggregate principal amount as of the Petition Date (which amount includes all letters of credit outstanding) (plus accrued but unpaid interest thereon) under (x) that certain Senior Secured Credit Facility, dated as of April 14, 2008 as |

|  | amended by Amendment No. 1 to Senior Secured Credit Facility, dated as of March 31, 2009, as further amended by Amendment No. 2 to Senior Secured Credit Facility, dated as of June 1, 2010, as further amended by Amendment No. 3 to Senior Secured Credit Facility, dated as of December 23, 2010, as further amended by Amendment No. 4 to Senior Secured Credit Facility, dated as of July 22, 2011, as further amended by Amendment No. 5 to Senior Secured Credit Facility, dated as of March 30, 2012, as corrected by Immaterial Error Correction, dated as of August 21, 2012, as further amended by Amendment No. 6 to Senior Secured Credit Facility, dated as of September 30, 2012, as further amended by Amendment No. 7 to the Senior Secured Credit Facility dated as of December 31, 2012, as further amended by Amendment No. 8 to the Senior Secured Credit Facility dated as of January 31, 2013, as further amended by Amendment No. 9 to the Senior Secured Credit Facility dated as of February 28, 2013; as further amended by Amendment No. 10 to the Senior Secured Credit Facility dated as of March 31, 2013; as further amended by Amendment No. 11 to the Senior Secured Credit Facility dated as of April 30, 2013 and as otherwise amended, modified or supplemented from time to time (the "Senior Secured Credit Facility") and (y) the other Loan Documents (but excluding any Swap Agreements) (as such terms are defined in such Senior Secured Credit Facility) (collectively, the "Syndicate Credit Facility"). |
|--|--|

SUBJECT TO THE JOINT DEFENSE AGREEMENT

| II. RESTRUCTURING OF SYNDICATE CREDIT FACILITY – SUMMARY OF TERMS | |
|---|---|
| **Borrower** | Excel Maritime Carriers Ltd. |
| **Guarantors** | (i) Point Holdings Ltd., (ii) Excel Maritime Carriers LLC, (iii) each of the Subsidiaries that holds an ownership interest in one or more vessels that constitute collateral for the Company's obligations under the Syndicate Credit Facility (such vessels, the "Collateral Vessels"), and (iv) each other direct and indirect subsidiary of the Borrower but excluding any Subsidiary that is the owner of any vessel (and no other vessel) that serves as security in respect of any indebtedness pursuant to the DVB Loan (the "Excluded Subsidiaries"). Notwithstanding the foregoing, each Guarantor that is a Debtor subsidiary of the Borrower that is a non-vessel owning entity as of the Effective Date (an "Initial Guarantor") shall be released as a Guarantor upon its ultimate dissolution or liquidation under the laws of its respective jurisdiction without the need for further amendment to the Syndicate Credit Facility [1] |
| **Administrative Agent** | Wilmington Trust (London) Ltd. ("Wilmington"). |
| **Collateral Security for Restructured Obligations** | First priority lien on: (i) substantially all assets of the Borrower; (ii) substantially all assets of each of the Guarantors; (iii) the Collateral Vessels; and (iv) the equity interests of the Borrower in each of the Guarantors. |
| **Collateral Agent / Security Trustee** | Wilmington |
| **Lenders** | Oaktree Opportunities Fund VIIIb (Delaware) L.P., Oaktree Huntington Investments Fund, L.P., Oaktree Opportunities Fund VIII (Parallel 2), L.P., Oaktree Opportunities Fund VIII Delaware, L.P., Oaktree Opps VIIIb (Cayman) 2 CTB Ltd, Oaktree Opps VIII Parallel 2 (Cayman) 2 CTB Ltd., Oaktree Opps VIII (Cayman) 3 CTB Ltd., Oaktree Huntington (Cayman) 2 CTB Ltd.; Silver Oak Capital, L.L.C; Goldman Sachs International Bank; BNP Paribas |

---

[1]   The question of which related entities will be guarantors is still under discussion. The Consenting Parties reserve all rights to finalize, supplement or modify the list of Guarantors in the Plan Supplement, subject to the agreement of all Consenting Parties.

SUBJECT TO THE JOINT DEFENSE AGREEMENT

| | |
|---|---|
| | S.A., DVB Bank SE;  Skandinaviska Enskilda Banken AB (publ), Natixis; and any assignees or successors thereto. |
| **Required Lenders** | Lenders owed or holding greater than 50% of the aggregate principal amount of the Advances and undrawn Commitments outstanding under the Amended Credit Facility. |
| **Restructured Facility** | The Plan will provide that the Lenders' prepetition claims arising under the Syndicate Credit Facility will be in part satisfied with debt under the Amended Credit Agreement and in part converted to equity in the Borrower.  The portion of such claims that will be satisfied with debt will be governed by, and will be subject to  the terms set forth in, an amendment and restatement of the Syndicate Credit Facility (the "Amended Credit Agreement") having terms consistent with this Term Sheet and acceptable to each of the Consenting Parties.  It is expected that the existing Senior Secured Credit Facility and related Loan Documents will be amended and restated and, along with any other definitive loan documentation, will be executed on the date on which the Plan is effective (the "Effective Date").  In lieu of the Amended Credit Agreement, the Borrower may, with the consent of each of the Consenting Parties, obtain financing from other lenders pursuant to a credit agreement (or other definitive documents) reflecting interest rate, maturity, amortization and other terms more favorable to the Borrower than those terms proposed under the Amended Credit Agreement and otherwise reasonably acceptable to the Consenting Parties (the "Exit Credit Agreement").  If the Borrower obtains the Exit Credit Agreement, the Lenders' prepetition claims arising under the Syndicate Credit Facility that would have been satisfied with debt under the Amended Credit Agreement shall instead be paid in cash. |
| **Loan Structure** | TBD |
| **Loan Amount** | $300,000,000 |
| **Final Maturity Date** | The fifth anniversary of the Effective Date. |
| **Scheduled Repayments** | Scheduled repayments of the Restructured Facility shall be in agreed |

SUBJECT TO THE JOINT DEFENSE AGREEMENT

|  | to amounts, but no greater than as follows: |
|---|---|
|  | <table><tr><td>Date</td><td>Payments (in millions)</td></tr><tr><td>2014 – Q1</td><td>-</td></tr><tr><td>2014 – Q2</td><td>-</td></tr><tr><td>2014 – Q3</td><td>-</td></tr><tr><td>2014 – Q4</td><td>-</td></tr><tr><td>2015 – Q1</td><td>$6.25</td></tr><tr><td>2015 – Q2</td><td>$6.25</td></tr><tr><td>2015 – Q3</td><td>$6.25</td></tr><tr><td>2015 – Q4</td><td>$6.25</td></tr><tr><td>2016 – Q1</td><td>$10.00</td></tr><tr><td>2016 – Q2</td><td>$10.00</td></tr><tr><td>2016 – Q3</td><td>$10.00</td></tr><tr><td>2016 – Q4</td><td>$10.00</td></tr><tr><td>2017 – Q1</td><td>$15.00</td></tr><tr><td>2017 – Q2</td><td>$15.00</td></tr><tr><td>2017 – Q3</td><td>$15.00</td></tr><tr><td>2017 – Q4</td><td>$15.00</td></tr><tr><td>2018 – Q1</td><td>$15.00</td></tr><tr><td>2018 – Q2</td><td>$15.00</td></tr><tr><td>2018 – Q3</td><td>$15.00</td></tr><tr><td>2018 – Q4</td><td>$130.00</td></tr></table> |
| **Cash Flow Sweep** | 75% of Excess Free Cash Flow generated (to be measured on every 12 month anniversary of the Issue Date) to be used to pay down the loan unless the cash has been reinvested in the business or specific opportunities have been identified and approved by the board, used to purchase stock of the company or pay dividends. Excess Free Cash Flow to be defined in a manner otherwise acceptable to the Consenting Parties and measured as EBITDA less Dry Dock and Special Survey Costs less Debt Service. |
| **Interest Rate Pricing** | Excel shall pay interest on the unpaid principal amount under the Restructured Facility in cash monthly on or before the fifteenth of the month at a rate per annum equal to LIBOR plus the Applicable Margin of 4.50%. |
| **Other Terms** | Mandatory Prepayments; Representations and Warranties; Conditions Precedent; Affirmative, Negative Covenants; Events of |

5

**SUBJECT TO THE JOINT DEFENSE AGREEMENT**

|  | Default; Assignments by Lenders; Expense Reimbursement; and Indemnification by Borrower TBD and acceptable to the Consenting Parties.<br><br>Financial Covenants: Minimum liquidity and others on commercially reasonable terms, and acceptable to the Consenting Parties. |
| --- | --- |

**THESE ABOVE TERMS ARE TO BE MORE FULLY SET FORTH IN DEFINITIVE AGREEMENTS CONTAINING PROVISIONS CONSISTENT IN ALL RESPECTS WTH THIS TERM SHEET (AND OTHERWISE ACCEPTABLE TO EACH OF THE CONSENTING PARTIES).  THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF THE PLAN.  SUCH A SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF BANKRUPTCY LAWS.**

EXHIBIT B

Subscription Agreements and Rights Offering Procedures

**<u>Rule 1145 Subscription Agreement</u>**

**EXCEL MARITIME CARRIERS LTD.**

_____

**RULE 1145 SUBSCRIPTION AGREEMENT**

_____

**Copy # _____**

NOTICES

THIS RULE 1145 SUBSCRIPTION AGREEMENT HAS BEEN PREPARED ON A
CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF ELIGIBLE HOLDERS IN
CONNECTION WITH THE PRIVATE PLACEMENT OF SECURITIES OF EXCEL
MARITIME CARRIERS LTD. (THE "COMPANY") PURSUANT TO THE AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE COMPANY AND ITS
SUBSIDIARIES THAT COMMENCED JOINTLY ADMINISTERED CASES UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE (AS SUCH TERM IS HEREINAFTER
DEFINED) (THE "PLAN").  ANY REPRODUCTION OR DISTRIBUTION OF THIS RULE
1145 SUBSCRIPTION AGREEMENT, OR RETRANSMITTAL OF ITS CONTENTS, IN
WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY
IS PROHIBITED.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN
EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING
THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN
RECOMMENDED, APPROVED OR DISAPPROVED BY THE SECURITIES AND
EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR
ANY OTHER REGULATORY AUTHORITY.  NONE OF THE FOREGOING AUTHORITIES
HAVE PASSED UPON, OR ENDORSED THE MERITS OF, THIS OFFERING OR THE
ACCURACY OR ADEQUACY OF THE COMPANY'S AMENDED DISCLOSURE
STATEMENT WITH RESPECT TO THE DEBTORS AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION DATED NOVEMBER 26, 2013 (THE "DISCLOSURE
STATEMENT") PREVIOUSLY DISTRIBUTED.  ANY REPRESENTATION TO THE
CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED WITH THE
SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"),
OR UNDER THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES WILL BE
OFFERED AND SOLD PURSUANT TO THE EXEMPTIONS FROM THE REGISTRATION
REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 1145 OF THE
BANKRUPTCY CODE.  THIS RULE 1145 SUBSCRIPTION AGREEMENT IS NOT AN
OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM, NOR WILL
ANY SECURITIES BE OFFERED OR SOLD TO, ANY PERSON IN ANY JURISDICTION
IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE
UNLAWFUL UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

THE COMPANY MAKES NO REPRESENTATION TO ANY OFFEREE OR PURCHASER
OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY
SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR
SIMILAR LAWS.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS
RULE 1145 SUBSCRIPTION AGREEMENT, THE DISCLOSURE STATEMENT OR ANY
PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ANY OF ITS

AGENTS, OFFICERS OR REPRESENTATIVES, AS LEGAL OR TAX ADVICE.  EACH
OFFEREE SHOULD CONSULT HIS OWN ADVISORS AS TO LEGAL, TAX AND
RELATED MATTERS CONCERNING AN INVESTMENT IN THE COMPANY.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.  IT IS SPECULATIVE AND
SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL
RESOURCES AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.
FURTHER, THIS INVESTMENT SHOULD ONLY BE MADE BY THOSE WHO
UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE TAX
CONSEQUENCES OF AND RISK FACTORS ASSOCIATED WITH THE INVESTMENT,
INCLUDING, BUT NOT LIMITED TO, THE RISKS ARISING FROM THE ABSENCE OF
CURRENT OR HISTORICAL FINANCIAL INFORMATION REGARDING THE COMPANY,
AND WHO ARE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISK OF THE
INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## RULE 1145 SUBSCRIPTION AGREEMENT

Rule 1145 Subscription Agreement (this "<u>Agreement</u>"), by and between Excel Maritime Carriers Ltd., a company incorporated under the laws of Liberia (including any successor as contemplated by the Plan (as defined below), the "<u>Company</u>"), and the undersigned (the "<u>Subscriber</u>"), shall be deemed executed as of the date the Company executes a counterpart to this Agreement previously executed by the Subscriber.

WHEREAS, on July 1, 2013, the Company and certain of its affiliates (collectively, the "<u>Debtors</u>") commenced cases  under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, the Debtors submitted an Amended Disclosure Statement with respect to the Debtors' Amended Joint Chapter 11 Plan of Reorganization, dated as of November 26, 2013 (the "<u>Disclosure Statement</u>"), to certain holders of claims against the Debtors in connection with the solicitation of acceptances of the Amended Joint Chapter 11 Plan of Reorganization of Excel Maritime Carriers Ltd. and Certain of its Affiliates, dated as of November 26, 2013 (the "<u>Plan</u>");

WHEREAS, capitalized terms used but not defined in this Agreement have the meaning given to them in the Plan;

WHEREAS, pursuant to the Plan, each Eligible Holder will be granted Tranche A Subscription Rights entitling such Eligible Holder to purchase up to its Pro Rata Tranche A Offered Shares at the Tranche A Purchase Price, as calculated in accordance with Item 2a(ii)(A) of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, and the Rule 1145 Rights Offering Procedures;

WHEREAS, pursuant to the Plan, each Eligible Holder will be granted Tranche B Subscription Rights entitling such Eligible Holder to purchase up to its Pro Rata Tranche B Offered Shares at the Tranche B Purchase Price, as calculated in accordance with Item 2a(ii)(B) of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, and the Rule 1145 Rights Offering Procedures;

WHEREAS, each Eligible Holder who exercises its Tranche A Subscription Rights in whole will be granted Over-Subscription Rights entitling such Eligible Holder to purchase, subject to availability, up to its Pro Rata Excess Shares at the Tranche A Purchase Price, as calculated in accordance with Item 2a(iii) of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, and the Rule 1145 Rights Offering Procedures (such offering of the Tranche A Subscription Rights, the Tranche B Subscription Rights and the Over-Subscription Rights, the "<u>Rule 1145 Rights Offering</u>");

WHEREAS, each Subscriber that holds a Syndicate Credit Deficiency Claim shall be entitled to exercise Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, in the Rule 1145 Rights Offering, provided, however that such Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, shall be deemed forever and irrevocably relinquished and waived on the Effective Date if the class of Impaired Excel General Unsecured Claims votes to accept the Plan.  In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any Rule 1145 Subscription Agreement and any Syndicate Credit Deficiency Claims Subscription Form returned by a holder of a Syndicate Credit Deficiency Claim to the Subscription Agent will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of this Agreement.

WHEREAS, any Subscriber that does not hold a Syndicate Credit Deficiency Claim has certified that it is an Eligible Holder and held on the Record Date (i) the aggregate principal amount of the Company's 1.875% Convertible Senior Notes due 2027 (the "Convertible Notes") set forth in Item 1 of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form and/or (ii) any (A) claim arising under certain swap agreements entered into by the Company and Eurobank EFG Private Bank Luxembourg S.A. and Marfin Popular Bank Public Co. Ltd., Greek Branch, respectively; (B) claim for damages alleged by Robertson Maritime Investors, LLC; and/or (C) claim arising under a settlement with certain bareboat charter parties, dated December 5, 2012 (such claims described in (A) through (C), collectively, the "Other Impaired Excel General Unsecured Claims") which are valued at the aggregate amount set forth on Item 1 of such Eligible Holder's Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form;

WHEREAS, any Subscriber that holds a Syndicate Credit Deficiency Claim has certified that it is an Eligible Holder and held on the Record Date an unsecured claim arising under that certain senior secured credit facility, dated as of April 14, 2008, as amended, modified or supplemented from time to time; and

WHEREAS, the Subscriber wishes to subscribe to purchase Tranche A Offered Shares and Tranche B Offered Shares and, to extent applicable, Excess Shares as set forth herein on the terms and subject to the conditions of the Rule 1145 Rights Offering and in accordance with the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.    SUBSCRIPTION.

(a)    Any Subscriber that does not hold a Syndicate Credit Deficiency Claim hereby agrees to subscribe for that number of Tranche A Offered Shares and Tranche B Offered

Shares and, to the extent applicable, Excess Shares, of Common Stock set forth in Item 2b of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, (collectively, the "Rule 1145 Shares"); provided, however, that the right to purchase Excess Shares shall apply only to the Tranche A Subscription Rights offered, to the extent not purchased by Subscribers who exercise their respective Tranche A Subscription Rights.  Once all subscriptions have been received, any Excess Shares subscribed for shall be, if necessary, subject to reduction on a *pro rata* basis so that no Eligible Holder can subscribe for more than its Pro Rata Excess Shares.  In addition, to the extent that the class of Impaired Excel General Unsecured Claims votes to reject the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of either Tranche A Offered Shares or Tranche B Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims inclusive of the Syndicate Credit Deficiency Claims rounded to the nearest whole share. The Subscriber will pay to the Subscription Agent the applicable Purchase Price for such Rule 1145 Shares set forth in Item 2c of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, at the time it returns this Agreement to the Subscription Agent, but in no event later than the Subscription Expiration Deadline by wire transfer of immediately available funds in accordance with the instructions included on Item 3 of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable.

(b)     Any Subscriber that holds a Syndicate Credit Deficiency Claim hereby agrees to subscribe for that number of Tranche A Offered Shares and Tranche B Offered Shares and, to the extent applicable, Excess Shares, of Common Stock set forth in Item 2b of such holder's Syndicate Credit Deficiency Claim Subscription Form, provided, however, that the right to purchase Excess Shares shall apply only to the Tranche A Subscription Rights offered, to the extent not purchased by Subscribers who exercise their respective Tranche A Subscription Rights. Notwithstanding the foregoing, Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, of any Subscriber that holds a Syndicate Credit Deficiency Claim shall be deemed forever and irrevocably relinquished and waived on the Effective Date if the class of Impaired Excel General Unsecured Claims votes to accept the Plan.  In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any Rule 1145 Subscription Agreement and any Syndicate Credit Deficiency Claims Subscription Form returned by a holder of a Syndicate Credit Deficiency Claim to the Subscription Agent will be deemed null and void and any funds paid by such holder will be returned, without interest, as soon as reasonably practicable, but in any event within six (6) Business Days after acceptance or rejection of the Plan is filed with the Bankruptcy Court.

(c)     In the event that funds received by the Subscription Agent in payment for the Subscriber's Rule 1145 Shares in accordance with the instructions provided with this Agreement are less than the applicable Purchase Price (as set forth in Item 2c of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable), the number of

3

Rule 1145 Shares deemed to be purchased by the Subscriber pursuant to this Agreement will be the lesser of (i) the number of Rule 1145 Shares set forth set forth in Item 2b of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, and (ii) a number determined by dividing the amount of such funds received in accordance with the instructions included with this Agreement by the Tranche A Purchase Price or Tranche B Purchase Price, as applicable.  Funds will first be applied against payment for the Tranche A Offered Shares, including any Excess Shares, with the remaining funds applied to the purchase of the Tranche B Offered Shares. Any Tranche A Offered Shares subscribed for but eliminated from the number of Rule 1145 Shares deemed purchased, pursuant to the previous sentence, shall be deemed part of the Excess Shares.

(d)    In the event that the Subscription Agent receives more funds from the Subscriber than the aggregate Purchase Price for the Subscriber's Rule 1145 Shares, then such funds, to the extent of such overpayment, will be returned, without interest, to the Subscriber as soon as reasonably practicable, but in any event within six (6) Business Days after the Subscription Expiration Deadline.

(e)    In the event that the Subscription Agent receives more funds from the Subscriber than the aggregate Purchase Price for the Subscriber's Rule 1145 Shares as a result of any reduction of the Eligible Holder's subscription for Excess Shares as described in paragraph 1(a), then such funds, to the extent of such overpayment, will be returned, without interest, to the Subscriber as soon as reasonably practicable, but in any event within six (6) Business Days after the Subscription Expiration Deadline.

(f)    Subject to the conditions specified in Section 5, the closing of the issuance of Rule 1145 Shares contemplated by this Agreement (the "Closing") will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP on the Effective Date.  The date on which the Closing occurs is the "Closing Date."

(g)    In the event the Closing does not take place on or before February 14, 2014, a Subscriber may request any funds sent to the Subscription Agent in payment for such Subscriber's Rule 1145 Shares in accordance with the instructions provided with this Agreement be promptly returned to the Subscriber.  Upon receipt of such request, the Subscription Agent shall promptly, but in any event within six (6) Business Days, return such funds to the Subscriber and the applicable Subscriber Rule 1145 Shares shall be designated Excess Shares.

2.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Subscriber as of the date hereof as follows:

(a)    The Company is and, as of the Effective Date, will be, duly organized and validly existing under the laws of Liberia.

(b)    Subject to the entry of the Bankruptcy Court's confirmation order relating to the Plan and occurrence of the Closing, (i) the Company will have the requisite corporate

4

power and authority to execute and deliver this Agreement, (ii) this Agreement and the consummation by the Company of the transactions contemplated hereby will have been duly authorized by all requisite corporate action and (iii) this Agreement will have been duly and validly executed and delivered by the Company and will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(c)    The Rule 1145 Shares, when issued in accordance with the provisions hereof, will be validly issued by the Company, and will represent fully paid and nonassessable shares of the Company.

(d)    Except for the representations and warranties contained in this <u>Section 2</u>, none of the Company and any other Person on behalf of the Company makes any other express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber.  Neither the Company nor any other Person will have or be subject to any liability or indemnification obligation to the Subscriber or any other Person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, including the Disclosure Statement and any other information, documents, projections, forecasts or other material made available to the Subscriber, unless any such information is included in a representation or warranty contained in this <u>Section 2</u>.

3.    <u>REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER</u>.

The Subscriber represents and warrants to the Company as of the date hereof as follows:

(a)    The Subscriber is an Eligible Holder and held on the Record Date (i) the aggregate principal amount of Convertible Notes set forth on Item 1 of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form and/or (ii) Other Impaired Excel General Unsecured Claims which are valued at the aggregate amount set forth on Item 1 of such Eligible Holder's Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, and/or (iii) a Syndicate Credit Deficiency Claim valued at the aggregate amount set forth on Item 1 of such Subscriber's Syndicate Credit Deficiency Claim Subscription Form.

(b)    The Subscriber has the requisite corporate or other applicable power and authority to execute and deliver this Agreement and the Beneficial Holder Convertible Note Subscription Form, Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable, and to perform its obligations hereunder and thereunder.  This Agreement and the consummation by Subscriber of the transactions contemplated hereby have been duly authorized by all requisite action.  This Agreement has been duly and validly executed and delivered by Subscriber and constitutes the valid and binding obligation of Subscriber, enforceable against Subscriber in accordance with its terms.  Except to the extent Subscriber is an individual, Subscriber is a duly organized entity validly existing under the laws of the jurisdiction of its incorporation or formation.

(c)    Except as provided under applicable state securities laws and subject to the conditions contained in Section 6, this subscription is and shall be irrevocable, except that the

5

Subscriber shall have no obligation hereunder if this Agreement is for any reason rejected or this offering is for any reason cancelled.

(d)    The Subscriber understands that the Rule 1145 Shares have not been registered under the Securities Act nor qualified under any state securities laws and that the Rule 1145 Shares are being offered and sold pursuant to an exemption from such registration and qualification requirements based in part upon the Subscriber's representations contained herein.

(e)    The Subscriber has read and understands this Agreement, the Plan, the Disclosure Statement and the Beneficial Holder Convertible Note Subscription Form, Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable, and understands the terms and conditions herein and therein and the risks associated with the Company and its business as described in the Disclosure Statement. The Subscriber has, to the extent deemed necessary by the Subscriber, discussed with legal counsel the representations, warranties and agreements that the Subscriber is making herein.

(f)    No third-party consents or approvals are required to be obtained, made or given in order to permit the Subscriber to execute and deliver this Agreement and to perform its obligations hereunder.

(g)    Neither the execution and delivery of this Agreement by the Subscriber nor the consummation of any of the transactions contemplated hereby will violate or conflict with, or result in a breach of, or constitute a default under (whether upon notice or the passage of time or both) any (i) contract to which the Subscriber is a party or (ii) applicable laws, regulations, orders, judgments and decrees to which the Subscriber is subject.

(h)    Other than as set forth in this Agreement, the Plan, the Disclosure Statement, the Beneficial Holder Convertible Note Subscription Form, Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable, the Subscriber is not relying upon any other information, representation or warranty by the Company. The Subscriber has consulted, to the extent deemed appropriate by the Subscriber, with the Subscriber's own advisors as to the financial, tax, legal and related matters concerning an investment in the Rule 1145 Shares and on that basis believes that an investment in the Rule 1145 Shares is suitable and appropriate for the Subscriber.

(i)    The foregoing representations and warranties will be true on the date hereof and as of the Closing Date and will survive delivery of this Agreement. If any of such representations and warranties is not true prior to acceptance of this Agreement by the Company or prior to the Closing Date, the Subscriber will give written notice of such fact to the Company, specifying which representations and warranties are not true and the reasons therefor.

4.    SUBSCRIBER ACKNOWLEDGMENTS.

The Subscriber further acknowledges the following as of the date hereof and as of the Closing Date:

(a)    The Rule 1145 Shares purchased pursuant hereto will be initially issued in the name of the Subscriber, a controlled Affiliate of the Subscriber or a Related Fund, as indicated on such Subscriber's Beneficial Holder Convertible Note Subscription Form, Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable.

(b)    This Agreement contains its irrevocable firm commitment, subject only to the terms and conditions of this Agreement and the Rule 1145 Rights Offering, to purchase the Rule 1145 Shares, subject to *pro rata* adjustment as provided for in this Agreement and in the Rule 1145 Rights Offering Procedures.

(c)    Except to the extent provided in this Agreement, the Plan or the Disclosure Statement, the Company makes no representation or warranty in connection with the purchase of the Rule 1145 Shares.

(d)    No federal or state agency has made or will make any finding or determination as to the adequacy or accuracy of any information provided to the Subscriber in connection with its consideration of its investment in the Rule 1145 Shares or as to the fairness of this private placement for investment, nor any recommendation or endorsement of the Rule 1145 Shares.

(e)    The Company will be relying on representations, warranties and agreements made by the Subscriber to the Company, and the covenants agreed to by the Subscriber, herein.  The Subscriber agrees to provide, if requested, any additional information that may reasonably be required to determine its eligibility to purchase the Rule 1145 Shares.  If there is any change in any of the information provided by the Subscriber, or if any of the Subscriber's representations and warranties becomes inaccurate in any respect, the Subscriber will furnish such revised or corrected information to the Company as soon as reasonably practicable, but in any event prior to the Expiration Date.

(f)    The Subscriber understands and acknowledges that all calculations, including, to the extent applicable, the calculation of (i) the value of the Subscriber's or any other Eligible Holder's Other Impaired Excel General Unsecured Claims (ii) the value of the Subscriber's Syndicate Credit Deficiency Claim or (iii) the Subscriber's or any other Eligible Holder's Rule 1145 Shares, shall be made in good faith by the Company with the consent of each of the Consenting Parties (as defined in the Plan) and in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

(g)    The Disclosure Statement contains projections.  The projections are subjective in many respects and are based on expectations, estimates, opinions and beliefs of the

7

Company's management with respect to its financial condition, business and industry performance, general economic, market and financial conditions and other matters, all of which are difficult to predict and many of which are beyond the Company's control. Accordingly, there can be no assurance that the estimates and assumptions made in preparing the projections will prove accurate or that the forecasts will be realized. In addition, the projections do not and cannot take into account such factors as general economic conditions, unforeseen changes and developments in available technologies and products, the entry into the Company's market of significant additional competitors, natural disasters, the terms and conditions of future financings of the Company, and other risks inherent to the business of the Company. While management believes that the projections reflect the possible future results of the Company's operations, such results cannot be guaranteed. The Subscriber acknowledges that it is prepared for the substantial economic risks involved in the purchase of the Rule 1145 Shares, including the total loss of its investment. The Company will not be under any duty to update the projections included in the Disclosure Statement prior to or after the Closing Date.

(h)     If the Subscriber is an underwriter, any Rule 1145 Shares it subscribes for will be "restricted securities" and may not be resold under the Securities Act and applicable state Blue Sky Laws absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

## 5.     COVENANT OF THE COMPANY

(a)     Plan Supplement. Except to the extent otherwise agreed by the Consenting Parties, the Company shall file all documents included within the Plan Supplement (as defined in the Plan) with the Bankruptcy Court at least five (5) Business Days prior to the Subscription Expiration Deadline (except for the Holdco LLC Agreement, which shall be filed by January 7, 2014).

## 6.     CONDITIONS TO CLOSING.

(a)     Conditions to Each Party's Obligations. The respective obligations of the Subscriber and the Company to consummate the transactions contemplated by this Agreement are subject to the occurrence of the Effective Date.

8

(b)     Conditions to Obligations of the Company.  The obligations of the Company to consummate the transactions contemplated by this Agreement with the Subscriber are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)     All representations and warranties of the Subscriber in Section 3 of this Agreement must be true, correct and complete in all respects on the Closing Date;

(ii)     All acknowledgments of the Subscriber in Section 4 of this Agreement must be true, correct and complete in all respects on the Closing Date;

(iii)     The Plan shall have been confirmed by the Bankruptcy Court; and

(iv)     Compliance by the Subscriber with the Rule 1145 Rights Offering Procedures governing the Rule 1145 Rights Offering, including payment by the Subscriber of the Purchase Price.

(c)     Conditions to Obligations of the Subscriber.  The obligations of the Subscriber to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)     All representations and warranties of the Company in Section 2 of this Agreement must be true and correct in all material respects on the Closing Date;

(ii)     Compliance by the Company with the Rule 1145 Rights Offering Procedures governing the Rule 1145 Rights Offering;

(iii)     Compliance by the Company with the covenant set forth in Section 5(a) of this Agreement; and

(iv)     The Plan and the Plan Supplement (including all exhibits thereto) shall be effective at Closing with no material changes from the forms on file with the Bankruptcy Court by the deadline set forth in Section 5(a) above.

7.     TERMINATION.

This Agreement will terminate upon the earlier of (i) termination or rejection of the Plan by all classes entitled to vote, (ii) receipt by the Company of written notice of termination from the Subscriber, provided such notice is received by the Subscription Expiration Deadline, and (iii) April 1, 2014.  In the event this Agreement is terminated, any payments received pursuant to Section 1(a) of this Agreement will be returned to the Subscriber as soon as reasonably practicable, but in any event, within six (6) Business Days.

8.     INTERPRETATION OF THIS AGREEMENT.

(a)     Terms Defined.  As used in this Agreement, the following terms have the respective meanings set forth below:

9

"Affiliate":  With respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by agreement, contract, obligation, promise, undertaking or understanding, whether written or oral, or otherwise).

"Beneficial Holder Convertible Note Subscription Form": The subscription form to be completed by beneficial holders of Convertible Notes included as Schedule 1B hereto.

"Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form": The subscription form to be completed by beneficial holders of Other Impaired Excel General Unsecured Claims included as Schedule 1D hereto.

"Business Day": Any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by applicable law to close.

"Debtors": The Company, Excel Maritime Carriers LLC, Amanda Enterprises Ltd., Barland Holdings Inc., Candy Enterprises Inc., Castalia Services Ltd., Centel Shipping Company Ltd., Coal Gypsy Shipco LLC, Coal Hunter Shipco LLC, Coal Pride Shipco LLC, Fianna Navigation S.A., Fountain Services Ltd., Grain Express Shipco LLC, Grain Harvester Shipco LLC, Harvey Development Corp., Ingram Ltd., Iron Anne Shipco LLC, Iron Beauty Shipco LLC, Iron Bill Shipco LLC, Iron Bradyn Shipco LLC, Iron Brooke Shipco LLC, Iron Fuzeyya Shipco LLC, Iron Kalypso Shipco LLC, Iron Knight Shipco LLC, Iron Lindrew Shipco LLC, Iron Manolis Shipco LLC, Iron Miner Shipco LLC, Iron Vassilis Shipco LLC, Kirmar Shipco LLC, Liegh Jane Navigation S.A., Lowlands Beilun Shipco LLC, Marias Trading Inc., Ore Hansa Shipco LLC, Pascha Shipco LLC, Point Holdings Ltd., Sandra Shipco LLC, Santa Barbara Shipco LLC, Snapper Marine Ltd., Tanaka Services Ltd., Teagan Shipholding S.A., Thurman International Ltd., Whitelaw Enterprises Co., and Yasmine International Inc.

"Effective Date": The date the Plan becomes effective.

"Eligible Holder": Any holder of an Impaired Excel General Unsecured Claim as of the Record Date.

"Excess Shares": Certain Tranche A Offered Shares that are not otherwise purchased pursuant to the exercise of Tranche A Subscription Rights that are to be offered to any Eligible Holder who exercises in full its Tranche A Subscription Rights in the Rule 1145 Rights Offering; provided, however, that no Eligible Holder will have the right to purchase any Excess Shares if $5,000,000 of Tranche A Offered Shares are subscribed for pursuant to the exercise by any Eligible Holder of Tranche A Subscription

10

Rights. The right to purchase Excess Shares shall apply only to the Tranche A Subscription Rights offered, to the extent not purchased by Eligible Holders who exercise their respective Tranche A Subscription Rights.

"Impaired Excel General Unsecured Claims": A claim arising by virtue of an Eligible Holder holding Convertible Notes, Other Impaired Excel General Unsecured Claim or Syndicate Credit Deficiency Claim as of the Record Date.

"Master Convertible Note Subscription Form": The subscription form to be completed be completed by the Nominee of any beneficial holders of Convertible Notes included as Schedule 1C hereto.

"New Common Stock": The shares of common stock of the reorganized Company, par value $0.01 per share.

"Nominee": Broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, as applicable.

"Other Impaired Excel General Unsecured Claims": Any (A) unsecured deficiency claim arising under the Company's senior secured syndicate credit facility dated April 14, 2008; (B) claim arising under certain swap agreements entered into by the Company and Eurobank EFG Private Bank Luxembourg S.A. and Marfin Popular Bank Public Co. Ltd., Greek Branch, respectively; (C) claim for damages alleged by Robertson Maritime Investors, LLC; and/or (D) claim arising under a settlement with certain bareboat charter parties, dated December 5, 2012.

"Over-Subscription Rights": The non-Transferable, non-certificated subscription rights to purchase Excess Shares in connection with the Rule 1145 Rights Offering on the terms and subject to the conditions set forth in the Plan, these Rule 1145 Rights Offering Procedures and the Rule 1145 Subscription Agreement. The right to purchase Excess Shares shall apply only to the Tranche A Subscription Rights offered, to the extent not purchased by Eligible Holders who exercise their respective Tranche A Subscription Rights.

"Person":  An individual, partnership, limited liability company, joint-stock company, corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof.

"Pro Rata Excess Shares": The number of Excess Shares that an Eligible Holder can subscribe for in the Rule 1145 Rights Offering, which is equal to (a) the total number of Excess Shares multiplied by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims held by Eligible Holders who elect to subscribe for unsubscribed shares, rounded down to the nearest whole share; provided, however, that (x) if such *pro rata* allocation results in any Eligible Holder being allocated a greater number of Excess Shares than such Eligible Holder subscribed

11

for pursuant to the exercise of such Eligible Holder's Over-Subscription Rights, then such Eligible Holder will be allocated only such number of Excess Shares as such Eligible Holder subscribed for and the remaining Excess Shares will be allocated among all other Eligible Holders exercising Over-Subscription Rights on the same *pro rata* basis outlined above and (y) the total amount of any Eligible Holder's Pro Rata Tranche A Offered Shares, Pro Rata Excess Shares and Pro Rata Tranche B Offered Shares shall in no instance exceed 75% of such Eligible Holder's *pro rata* portion of the Section 1145 Stipulated Value.  Such proration will be repeated until all Excess Shares have been allocated to the full extent of the Over-Subscription Rights; provided, further no Syndicate Credit Deficiency Claims shall be included for purposes of such calculation if such Syndicate Credit Deficiency Claims have been waived pursuant to Section 1(b).

"Pro Rata Tranche A Offered Shares": The number of Tranche A Offered Shares that an Eligible Holder can subscribe for in the Rule 1145 Rights Offering, which is equal to (a) the total number of Tranche A Offered Shares multiplied by (b) the quotient obtained by dividing (i) the aggregate value of all Impaired General Unsecured Claims held by such Eligible Holder as of the Record Date by (ii) the aggregate value of all Impaired General Unsecured Claims held by all Eligible Holders as of the Record Date; provided, however, no Syndicate Credit Deficiency Claims shall be included for purposes of such calculation if such Syndicate Credit Deficiency Claims have been waived pursuant to Section 1(b).

"Pro Rata Tranche B Offered Shares": The number of Tranche B Offered Shares that an Eligible Holder can subscribe for in the Rule 1145 Rights Offering, which is equal to (a) the total number of Tranche B Offered Shares multiplied by (b) the quotient obtained by dividing (i) the aggregate value of all Impaired General Unsecured Claims held by such Eligible Holder as of the Record Date by (ii) the aggregate value of all Impaired General Unsecured Claims held by all Eligible Holders as of the Record Date; provided, however, no Syndicate Credit Deficiency Claims shall be included for purposes of such calculation if such Syndicate Credit Deficiency Claims have been waived pursuant to Section 1(b).

"Purchase Price": The applicable purchase price set forth in Item 2c of an Eligible Holder's Beneficial Holder Convertible Note Subscription Form or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable.

"Record Date": December 9, 2013.

"Related Fund": With respect to the Subscriber, any fund, account or investment vehicle that is controlled or managed by (a) the Subscriber, (b) a controlled Affiliate of the Subscriber or (c) the same investment manager or advisor as the Subscriber or an Affiliate of such investment manager or advisor.

"Rule 1145 Rights Offering Instructions": The instructions included as Schedule 1A hereto.

12

"Rule 1145 Shares": Has the meaning set forth in Section 1 of the Rule 1145 Rights Offering Procedures included as Exhibit A hereto.

"Rule 1145 Subscription Agreement": This agreement.

"Section 1145 Stipulated Value": means $36 million, which amount is stipulated to among the Consenting Parties solely for purposes of compliance with section 1145 of the Bankruptcy Code by Holders of Impaired Excel General Unsecured Claims other than Holders of Syndicate Credit Deficiency Claims, and solely in connection with the Co-Investment Rights.

"Subscription Agent": Donlin Recano & Company, Inc., or any other entity designated as such by the Company, in its capacity as a subscription agent and escrow agent in connection with the Rule 1145 Rights Offering.

"Subscription Commencement Date": The date on which Rule 1145 Subscription Agreements are first sent to Eligible Holders.

"Subscription Expiration Deadline": 5:00 p.m. New York City Time on January 17, 2014, the date by which properly completed Rule 1145 Subscription Agreements and the Purchase Price will be required to be delivered to the Subscription Agent as provided in the Rule 1145 Subscription Agreements.

"Subscription Period": The period beginning on the Subscription Commencement Date and ending on the Subscription Expiration Deadline.

"Syndicate Credit Deficiency Claims": means the unsecured Claim arising under the Syndicate Credit Facility or the Loan Documents.  For the avoidance of doubt, the Consenting Parties reserve all rights with respect to the amount, if any, and treatment of a Syndicate Credit Facility Deficiency Claim, if any, held by the Secured Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.

"Syndicate Credit Deficiency Claims Subscription Form": The subscription form, to be completed by beneficial holders of Syndicate Credit Deficiency Claims, will be filled only if the class of Impaired Excel General Unsecured Claims votes not to accept the Plan, included as Schedule 1E hereto.

"Tranche A Offered Shares": 307,692 shares of New Common Stock to be offered to Eligible Holders in the Rule 1145 Rights Offering at the Tranche A Purchase Price.

"Tranche A Purchase Price" means $16.25 per share.

"Tranche A Subscription Rights": The non-Transferable, non-certificated subscription rights to purchase Tranche A Offered Shares in connection with the Rule

13

1145 Rights Offering on the terms and subject to the conditions set forth in the Plan, these Rule 1145 Rights Offering Procedures and the Rule 1145 Subscription Agreement.

"Tranche B Offered Shares": 289,872 shares of New Common Stock to be offered to Eligible Holders in the Rule 1145 Rights Offering at the Tranche B Purchase Price.

"Tranche B Purchase Price" means $17.25 per share.

"Tranche B Subscription Rights": The non-Transferable, non-certificated subscription rights to purchase Tranche B Offered Shares in connection with the Rule 1145 Rights Offering on the terms and subject to the conditions set forth in the Plan, these Rule 1145 Rights Offering Procedures and the Rule 1145 Subscription Agreement.

"Transfer":  Any resale, sale, assignment, pledge, hypothecation, distribution or other disposition or encumbrance.

(b)    Directly or Indirectly.  Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person.

(c)    Governing Law; Jurisdiction.  THIS AGREEMENT, AND ALL CLAIMS ARISING OUT OF OR RELATING THERETO, WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE SUBSCRIBER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS*.

(d)    Section Headings.  The headings of the sections and subsections of this Agreement are inserted for convenience only and should not be deemed to constitute a part thereof.

(e)    Construction.  This Agreement has been freely and fairly negotiated between the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

9.    MISCELLANEOUS.

(a)    Notices.

14

(i)      The Subscriber acknowledges that a completed and signed copy of this Agreement, the Beneficial Holder Convertible Note Subscription Form or Master Convertible Note Subscription Form, as applicable, and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable, together with payment of the Purchase Price, must be received by the Subscription Agent in accordance with the instructions included herewith prior to the Subscription Expiration Deadline for the subscription contemplated hereby to be valid.

(ii)      Except as otherwise provided in this Agreement, following execution of this Agreement, all demands, notices, requests, consents and other communications under this Agreement must be in writing, sent contemporaneously to all of the notice parties set forth below and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by facsimile, or if no response to the effect that an email cannot be delivered to the sender is received within two (2) hours, if delivered by email, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

(A)      if to the Subscriber, at his or her address or facsimile number shown on the Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, as applicable, or at such other address or facsimile number as the Subscriber may have furnished the Company and the Subscription Agent in writing; and

(B)      if to the Company, at (or at such other address or facsimile number as it may have furnished in writing to the Subscriber):

Excel Maritime Carriers Ltd.
17th Km National Road Athens –
   Lamia & Finikos Street
145 64 Nea Kifisia
Athens, Greece
Attn:  Pavlos Kanellopoulos

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attn: Jay Goffman and Mark McDermott
Facsimile: 212-735-2000
jay.goffman@skadden.com; mark.mcdermott@skadden.com

(b)      Expenses and Taxes.  The Company will pay, and hold the Subscriber harmless from any and all liabilities (including interest and penalties) with respect to, or resulting from any delay or failure in paying, stamp and other taxes (other than income taxes), if any,

which may be payable or determined to be payable on the execution and delivery of this Agreement or acquisition of the securities pursuant to this Agreement.

(c)     Reproduction of Documents.  This Agreement and all documents relating hereto may not be reproduced or distributed by the Subscriber without the prior written consent of the Company.

(d)     Assignment; Successors.  This Agreement is not assignable by the Subscriber without the prior written consent of the Company.  This Agreement and the rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties.

(e)     Entire Agreement; Amendment and Waiver.  This Agreement constitutes the entire understanding of the parties hereto and supersedes all prior understandings among such parties with respect to the matters covered herein.  This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Company and the Subscriber.

(f)     Severability.  If any provision of this Agreement or the application of such provision to any Person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

(g)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

16

Please indicate your acceptance and approval of the foregoing in the space provided below.

EXCEL MARITIME CARRIERS LTD.

_____

Name:
Title:

ACCEPTED AND APPROVED

as of the _____ day of _____, 2013

SUBSCRIBER:    _____

(Please provide full legal name)

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

City: _____ State: _____

Postal Code: _____

Country: _____

Telephone: _____ Facsimile: _____

Email Address: _____

If U.S. person, check here and attach IRS Form W-9: ☐ U.S. person

If Non-U.S. person, check here and attach appropriate IRS Form W-8: ☐ Non-U.S. person

**Exhibit A**

**RULE 1145 RIGHTS OFFERING PROCEDURES**

---

Each Tranche A Offered Share, Tranche B Offered Share and Excess Share is being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon the exemption provided in section 1145 of the Bankruptcy Code.

None of the Tranche A Subscription Rights, Tranche B Subscription Rights or any Over-Subscription Rights distributed in connection with these Rule 1145 Rights Offering Procedures have been or will be registered under the Securities Act, nor any State or local law requiring registration for offer and sale of a security, and no Tranche A Subscription Rights, Tranche B Subscription Rights or Over-Subscription Rights may be sold or independently Transferred.

None of the Tranche A Offered Shares, Tranche B Offered Shares or Excess Shares have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer or sale of a security.

The Rule 1145 Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

---

Terms used and not defined herein or in the Rule 1145 Subscription Agreement shall have the meaning assigned to them in the Plan (as defined below).

To Eligible Holders[1] and Nominees of Eligible Holders:

      On November 26, 2013, the Debtors (as defined below) filed the Amended Joint Chapter 11 Plan of Reorganization of the Debtors with the United States Bankruptcy Court for the Southern District of New York (as such plan of reorganization may be amended or modified from time to time in accordance with its terms, the "Plan"), and the Disclosure Statement with respect to the Plan (as such disclosure statement may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan, each holder of an Impaired Excel General Unsecured Claim as of the Record Date, has the right to participate in the Rule 1145 Rights Offering of the Tranche A Offered Shares, Tranche B Offered Shares and Excess Shares, in accordance with the terms and conditions of the Rule 1145 Subscription Agreement and these Rule 1145 Rights Offering Procedures.

      Pursuant to the Plan, each Eligible Holder will receive Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights to subscribe for its Pro Rata Tranche A Offered Shares and Pro Rata Tranche B Offered Shares and, to the extent applicable, its Pro Rata Excess Shares, provided that it timely and properly executes and delivers its Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and/or Syndicate Credit Deficiency Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), as applicable, to the Subscription Agent or its Nominee, as applicable, in advance of the Subscription Expiration Deadline. Each Nominee will receive a Master Convertible Note Subscription Form which it shall use to summarize the Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, exercised by each Eligible Holder that returns a Beneficial Holder Convertible Note Subscription Form to such Nominee. Please note that all Beneficial Holder Convertible Note Subscription Forms (with accompanying IRS Form W-9 or appropriate W-8, as applicable) must

---

[1]    "Eligible Holder" means any holder of an Impaired Excel General Unsecured Claim as of the Record Date.

be returned to the applicable Nominee early enough to be processed and for such Nominee to prepare and deliver the Master Convertible Note Subscription Form and a copy of all Beneficial Holder Convertible Note Subscription Forms (with accompanying IRS Forms) to the Subscription Agent prior to the Subscription Expiration Deadline.

No Eligible Holder shall be entitled to participate in the Rule 1145 Rights Offering unless the purchase price for the Tranche A Offered Shares and Tranche B Offered Shares and, to the extent applicable, Excess Shares it subscribes for  is received by the Subscription Agent in advance of the Subscription Expiration Deadline. Any Eligible Holder submitting payment via its Nominee must tender such payment to its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent in advance of the Subscription Expiration Deadline.

**Holders of Syndicate Credit Deficiency Claims shall be entitled to participate in the Rule 1145 Rights Offering, provided that if the class of Impaired Excel General Unsecured Claims votes to accept the Plan,  the Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, of any holders of Syndicate Credit Deficiency Claims shall be deemed forever and irrevocably relinquished and waived on the Effective Date.   If the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of either Tranche A Offered Shares or Tranche B Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims (inclusive of Syndicate Credit Deficiency Claims) rounded to the nearest whole share.**

In order to facilitate participation in the Rule 1145 Rights Offering, each Impaired Excel General Unsecured Claim will be determined to be Allowed or disallowed by no later than January 16, 2014, for purposes of participating in the 1145 Rights Offering. In the event that the holder of an Impaired Excel General Unsecured Claim that is disputed wishes to participate in the Rule 1145 Rights Offering, such holder must file a motion pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure seeking allowance of such claim and obtain a ruling on such motion by no later than January 16, 2014.  Unless such a motion is timely filed and ruled upon, holders of disputed Impaired Excel General Unsecured Claims will be deemed to be disallowed for purposes of participating in the Rule 1145 Rights Offering.

Eligible Holders will receive materials regarding the Rule 1145 Rights Offering based on the current amount of Allowed Impaired Excel General Unsecured Claims.  If any disputed Impaired Excel General Unsecured Claims become Allowed by no later than January 16, 2014, the total amount of Allowed Impaired Excel General Unsecured Claims will increase.  In that event, the amount of Offered Shares that Eligible Holders will be entitled to purchase pursuant to the Rule 1145 Rights Offering will decrease.

**In order to participate in the Rule 1145 Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rule 1145 Rights Offering.**

1.       **Rule 1145 Rights Offering**

Eligible Holders have the right, but not the obligation, to participate in the Rule 1145 Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rule 1145 Rights Offering Procedures and the Rule 1145 Subscription Agreements:

Each Eligible Holder is entitled to subscribe for (i) its Pro Rata Tranche A Offered Shares at the Tranche A Purchase Price, (ii) its Pro Rata Tranche B Offered Shares at the Tranche B Purchase Price and (iii) to the extent such Eligible Holder subscribes for the full amount of its Pro Rata Tranche A Offered Shares, its Pro Rata Excess Shares at the Tranche A Purchase Price, subject to the individual limits included in the calculations under Item 2 of such Eligible Holder's Beneficial Holder Convertible Note Subscription Form, Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable. The number of Tranche A Offered Shares, Tranche B Offered Shares and Excess Shares actually subscribed for and purchased by an Eligible Holder shall be referred to as such Eligible Holder's "*Rule 1145 Shares.*"

Notwithstanding the foregoing, holders of Syndicate Credit Deficiency Claims shall be entitled to participate in the Rule 1145 Rights Offering, provided that if the class of Impaired Excel General Unsecured Claims votes to accept the Plan,  the Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, of any holders of Syndicate Credit Deficiency Claims shall be deemed forever and irrevocably relinquished and waived on the Effective Date.  In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any Rule 1145 Subscription Agreement and any Syndicate Credit Deficiency Claims Subscription Form returned by a holder of a Syndicate Credit Deficiency Claim to the Subscription Agent will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of the Rule 1145 Subscription Agreement.  **If the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of either Tranche A Offered Shares or Tranche B Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims (inclusive of Syndicate Credit Deficiency Claims) rounded to the nearest whole share.**

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENTS ARE IRREVOCABLE.**

2.       **Subscription Period**

The Rule 1145 Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Expiration Deadline. Each Eligible Holder intending to purchase Common Stock in the Rule 1145 Rights Offering must affirmatively elect to exercise its Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights in the manner set forth in the Rule 1145 Rights Offering Instructions included with the Rule 1145 Subscription Agreements (consistent herewith, including as described in Section 5 hereof) on or prior to the Subscription Expiration Deadline.

Any exercise of Tranche A Subscription Rights, Tranche B Subscription Rights or Over-Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

**3.      Delivery of Rule 1145 Subscription Agreements**

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Tranche A Subscription Rights or Tranche B Subscription Rights, but subject to the terms and conditions of the Rule 1145 Subscription Agreement, the exercise of any Tranche A Subscription Rights or Tranche B Subscription Rights will be irrevocable. Each Eligible Holder may exercise all or any portion of such Eligible Holder's Over-Subscription Rights only if such Eligible Holder exercises all of such Eligible Holder's Tranche A Subscription Rights, but subject to the terms and conditions of the Rule 1145 Subscription Agreement, the exercise of any Over-Subscription Rights will be irrevocable. In order to facilitate the exercise of the Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Rule 1145 Subscription Agreement to each Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the proper completion, due execution and timely delivery of the Rule 1145 Subscription Agreement and the payment of the applicable Purchase Price for its Rule 1145 Shares.

**4.      Exercise of Subscription Rights**

In order to validly exercise Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights, each Eligible Holder must:

(a)      return a duly executed Rule 1145 Subscription Agreement to the Subscription Agent or its Nominee, as applicable, so that such Rule 1145 Subscription Agreement is actually received by the Subscription Agent on or before the Subscription Expiration Deadline;

(b)      return a duly completed and executed Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) or Syndicate Credit Deficiency Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), as applicable, to the Subscription Agent or its Nominee, as applicable, so that such form and the Master Convertible Note Subscription Form, as applicable,  are actually received by the Subscription Agent on or before the Subscription Expiration Deadline; and

(c)      at the same time it returns its Rule 1145 Subscription Agreement and Beneficial Holder Convertible Note Subscription Form. Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable, to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 3 of the Beneficial Holder Convertible Note Subscription Form, Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form or Syndicate Credit Deficiency Claims Subscription Form, as applicable.

**Holders of  Convertible Notes** – With respect to (a), (b) and (c) above you must duly complete, execute and return your Beneficial Holder Convertible Note Subscription Form in accordance with the instructions herein **directly to your Nominee** in sufficient time to allow your Nominee to process your instructions and deliver to the Subscription Agent your completed Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), Rule 1145 Subscription Agreement and payment on or before the Subscription Expiration Deadline.

In the event that funds received by the Subscription Agent in payment for such Eligible Holder's Rule 1145 Shares are less than the applicable Purchase Price, the number of such Eligible Holder's Rule 1145 Shares deemed to be purchased by the Eligible Holder will be the lesser of (i) the number of such Eligible Holder's Rule 1145 Shares requested by such Eligible Holder and (ii) a number determined by dividing the amount of such funds received by the Tranche A Purchase Price or Tranche B Purchase Price, as applicable. Funds will first be applied against payment for the Tranche A Offered Shares, including any Excess Shares, with the remaining funds applied to the purchase of the Tranche B Offered Shares

The payments of cash made in accordance with the Rule 1145 Rights Offering will be deposited and held by the Subscription Agent in a segregated escrow account until administered in connection with the settlement of the Rule 1145 Rights Offering on the Effective Date. The Subscription Agent may not use such funds for any other purpose prior to such Effective Date and may not encumber or permit such funds to be encumbered with any lien or similar encumbrance. Such funds held by the Subscription Agent shall not be deemed part of the Debtors' bankruptcy estate.

5.      **Transfer Restriction; Revocation**

The Tranche A Subscription Rights, Tranche B Subscription Rights and Over-Subscription Rights are not Transferable. Any Transfer or attempted Transfer of the Tranche A Subscription Rights, Tranche B Subscription Rights or Over-Subscription Rights will be null and void, and no purported transferee will be treated as the holder of any Tranche A Subscription Rights, Tranche B Subscription Rights or Over-Subscription Rights. Once an Eligible Holder has properly exercised its Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights, subject to the terms and conditions of the Rule 1145 Subscription Agreement, such exercise will not be permitted to be revoked.

6.      **Return of Payment**

If the Rule 1145 Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days, after the earlier of (a) the Subscription Expiration Deadline and (b) the date on which the Rule 1145 Rights Offering is terminated.

In the event that the Subscription Agent receives more funds from an Eligible Holder than the aggregate Purchase Price for such Eligible Holder's Rule 1145 Shares, giving effect to any applicable *pro rata* reduction of such Eligible Holder's subscription or over-subscription then such funds, to the extent of such overpayment, will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days after such determination is made.

In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any funds paid by a holder of a Syndicate Credit Deficiency Claim in connection with its exercise of Tranche A Subscription Rights, Tranche B Subscription Rights and, to the extent applicable, Over-Subscription Rights, will be returned, without interest, as soon as reasonably practicable, but in any event within six (6) Business Days after acceptance or rejection of the Plan is filed with the Bankruptcy Court.

7.      **Settlement of the Rule 1145 Rights Offering and Distribution of the Offered Shares**

On the Effective Date, and immediately after the issuance of the Rule 1145 Shares under the Plan, all Eligible Holders shall transfer any Rule 1145 Shares they have subscribed for in the Rule 1145 Rights Offering to Holdco automatically pursuant to the terms of the Plan and without further action required.  Subject to the terms in the Plan, such Eligible Holders shall receive Holdco Units in the same percentages as they held Rule 1145 Shares in Reorganized Excel on the Effective Date after the exercise of their Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights. On the Effective Date (or as soon as reasonably practicable thereafter), the Company's will distribute the physical stock certificates representing the Holdco Units of Eligible Holder that properly exercised its rights in the Rule 1145 Rights Offering in accordance with the delivery instructions set forth in such Eligible Holder's Rule 1145 Subscription Agreement.

8.      **Fractional Rule 1145 Shares**

No fractional shares will be issued in the Rule 1145 Rights Offering. All share allocations (including each Eligible Holder's Rule 1145 Shares) will be calculated to one decimal place and rounded down to the closest whole share.

9.      **Validity of Exercise of Tranche A Subscription Rights, Tranche B Subscription Rights and Over-Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights (including each Eligible Holder's Rule 1145 Shares) will be determined in good faith by the Company, with the consent of each of the Consenting Parties and if necessary, subject to a final and binding determination by the Bankruptcy Court.  The Company may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such time as they may determine in good faith, or reject the purported exercise of any Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights. Rule 1145 Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Company determines in good faith.  In addition, the Company may permit any such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate.

*Before exercising any Tranche A Subscription Rights, Tranche B Subscription Rights  or Over-Subscription Rights, Eligible Holders should read the Disclosure Statement and Plan for information relating to the Debtors and risk factors to be considered.*

10.     **Modification of Procedures**

The Company reserves the right to modify or adopt additional procedures consistent with the provisions of the Rule 1145 Rights Offering Procedures to effectuate the Rule 1145 Rights Offering and to issue the Rule 1145 Shares with the consent of each of the Consenting Parties, provided, however, that the Company shall provide prompt written notice to each Eligible Holder of any material modification to these Rule 1145 Rights Offering Procedures made after the commencement of the Rule 1145 Rights Offering. In so doing, the Company may execute and enter into agreements and take further action that the Company determines in good faith are necessary and appropriate to effect and implement the Rule 1145 Rights Offering and the issuance of the Rule 1145 Shares. Nothing in this paragraph shall be construed so as to permit the Company to modify the terms of this Rule 1145 Subscription Agreement without the consent of the Subscriber.

**11.      Inquiries And Transmittal of Documents; Subscription Agent**

The Rule 1145 Rights Offering Instructions included with the Rule 1145 Subscription Agreement should be carefully read and strictly followed.

Questions relating to the Rule 1145 Rights Offering should be directed to the Subscription Agent at the following phone number:

(212) 771-1128

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Tranche A Subscription Rights, Tranche B Subscription Rights and any Over-Subscription Rights and not the Company or  the Subscription Agent.

<u>Schedule 1A.</u>

**RIGHTS OFFERING INSTRUCTIONS**

**Terms used and not defined herein or in the Rule 1145 Subscription Agreement shall have the meaning assigned to them in the Plan (as defined below).**

**To elect to participate in the Rule 1145 Rights Offering, you must follow the instructions set out below:**

1. **Insert** the amount of your claim or Convertible Note holding, as applicable, that you held as of the Record Date in Item 1 of your Beneficial Holder Convertible Note Subscription Form  (if your Nominee holds your Convertible Notes on your behalf and you do not know the amount, please contact your Nominee immediately) and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable.

2. **Complete** the calculation in Item 2a(i) of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, which calculates your total Maximum Participation Amount (i.e. the maximum amount of Rule 1145 Shares you are entitled to purchase in the Rule 1145 Rights Offering).

3. **Complete** the calculation in Item 2a(ii)(A) of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, which calculates the maximum aggregate purchase price of your Pro Rata Tranche A Offered Shares, each share of which shall be purchased at the Tranche A Purchase Price (Basic Tranche A Co-Investment Right).

4. **Complete** the calculation in Item 2a(ii)(B) of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, which calculates the maximum aggregate purchase price of your Pro Rata Tranche B Offered Shares, each share of which shall be purchased at the Tranche B Purchase Price (Basic Tranche B Co-Investment Right).

5. **Complete** the calculation in Item 2a(iii) of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, which calculates the maximum aggregate purchase price of your Pro Rata Tranche A Excess Shares for which you can subscribe at the Tranche A Purchase Price, to the extent you have subscribed for your entire Pro Rata Tranche A Offered Shares (Over-Subscription Right), subject to pro rata reduction as described in the Rule 1145 Subscription Agreement.

6. **Complete** Item 2b of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, indicating the number of Tranche A Offered Shares, Tranche B Offered Shares and, to the extent applicable, Excess Shares you wish to purchase. Such amount must be in whole shares and the aggregate purchase price therefor cannot exceed your Maximum Participation Amount.

7. **Complete** the calculation in Item 2c of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, which calculates the Purchase Price for the amount of Tranche A Offered Shares, Tranche B Offered Shares and, to the extent applicable, any Excess Shares that you wish to purchase.

8. **Read and complete** the certification in Item 4 of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable.

9. **Read and countersign** the Rule 1145 Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

10. **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

11. **Return** your signed Rule 1145 Subscription Agreement and Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and/or Syndicate Credit Deficiency Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), as applicable, to the Subscription Agent or your Nominee, as applicable, in advance of the Subscription Expiration Deadline. Please note that all Beneficial Holder Convertible Note Subscription Forms must be returned to your Nominee early enough to be processed and for your Nominee to prepare and deliver the Master Convertible Note Subscription Form to the Subscription Agent prior to the Subscription Expiration Deadline.

12. **Arrange for full payment** of the aggregate Purchase Price, calculated in accordance with Item 2c of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form, as applicable, to the Subscription Agent by wire transfer of immediately available funds in accordance with the instructions set forth below. Such payment must be received prior to the Subscription Expiration Deadline.

For Eligible Holders that do not hold Convertible Notes via a Nominee, payment shall be made to:

| Name of Account: | DONLIN RECANO AND CO INC<br>E/F EXCEL MARITIME CARRIERS LTD |
|---|---|
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | *[Name of Nominee/Subscriber]* |

For Eligible Holders that hold Convertible Notes via a Nominee, payment should be made in accordance with the instructions provided by your Nominee. Eligible Holders that hold Convertible Notes via a Nominee, must transmit payment to their Nominee for such Nominee to process such payment and deliver it to the Subscription Agent prior to the Subscription Expiration Deadline.

---

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.**

**Please note that any Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), Rule 1145 Subscription Agreement and payment of the Purchase Price must be received by the broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "Nominee"), in accordance with your Nominee's procedures and instructions, in sufficient time to allow such Nominee to deliver the Master Convertible Note Subscription Form to the Subscription Agent by the Subscription Expiration Date or the subscription represented by your Beneficial Holder Convertible Note Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please note that any Beneficial Holder Other Impaired Excel General Unsecured Claim Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and/or Syndicate Credit Deficiency Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), Rule 1145 Subscription Agreement and payment of the Purchase Price must be received by the Subscription Agent by the Subscription Expiration Date or the subscription represented by your Beneficial Holder Other Impaired Excel General Unsecured Claim Subscription Form and/or Syndicate Credit Deficiency Claims Subscription Form will not be counted and will be deemed forever relinquished and waived.**

<u>Schedule 1B.</u>

**EXCEL MARITIME CARRIERS LTD.**
**BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORM**
**FOR RIGHTS  OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

<div style="border:1px solid black; padding:10px;">

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.**

**Please note that your Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), Rule 1145 Subscription Agreement and payment of the Purchase Price must be received <u>by your Nominee in sufficient time</u> to allow such Nominee to deliver the Master Convertible Note Subscription Form to the Subscription Agent by the Subscription Expiration Date or the subscription represented by your Beneficial Holder Convertible Note Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the Rule 1145 Subscription Agreement and the Rule 1145 Rights Offering Procedures for additional information with respect to this Beneficial Holder Convertible Note Subscription Form.**

</div>

**Item 1.  Amount of Convertible Notes.**

I certify that I am a beneficial holder of Convertible Notes in the following amount as of the Record Date  (insert amount on the line below) or that I am the authorized signatory of that beneficial holder.

[*Insert amount of Convertible Notes, including accrued and unpaid interest through July 1, 2013, held at the Record Date*]

_____

**Item 2.  Rights.**

Each Eligible Holder is entitled to subscribe for (i) its Pro Rata Tranche A Offered Shares, (ii) its Pro Rata Tranche B Offered Shares and (iii) to the extent such Eligible Holder subscribes for its entire Pro Rata Tranche A Offered Shares, its Pro Rata Excess Shares (collectively, the "<u>Maximum Total Participation Amount</u>"), subject to the individual limits included in the calculations under Item 2 below. To subscribe fill out Items 2a, 2b and 2c and 3 below and read and complete Item 4 below.

**2a. Calculation of Maximum Total Participation Amount**.  The maximum amount of Rule 1145 Shares for which the undersigned beneficial holder may subscribe for in the rights offering is calculated as follows:

 **If the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of either Tranche A Offered Shares or Tranche B Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims inclusive of the Syndicate Credit Deficiency Claims rounded to the nearest whole share.**

**(i) Maximum Total Participation Amount:**

$36,000,000.00 x 75% x [Amount of Convertible Notes (including accrued and unpaid interest as of July 1, 2012)/$163,384,158.16[1]]

**(ii)(A) Maximum Pro Rata Tranche A Offered Shares (Basic Tranche A Co-Investment Right Amount):**

Tranche A Offered Shares (307,692) x [Amount of Convertible Notes (including accrued and unpaid interest as of July 1, 2012)/$163,384,158.16[2]]

**(ii)(B) Maximum Pro Rata Tranche B Offered Shares (Basic Tranche B Co-Investment Right Amount):**

Tranche B Offered Shares (289,872) x [Amount of Convertible Notes (including accrued and unpaid interest as of July 1, 2012)/$163,384,158.16[3]]

**(iii) Maximum Pro Rata Excess Shares (Over-Subscription Right Amount):**

Maximum Total Participation Amount − ((Maximum Pro Rata Tranche A Offered Shares x 16.25) + (Tranche B Offered Shares listed in 2b x 17.25))/ 16.25

**2b. Exercise Amount**. By filling in the following blanks, you are indicating that the undersigned Eligible Holder is interested in purchasing the number of Rule 1145 Shares specified below (specify an amount of the Rule 1145 Shares, the aggregate dollar value of which is not greater than the Maximum Participation Amount calculated in Item 2a(i) above), on the terms and subject to the conditions set forth in the Rule 1145 Subscription Agreement and Rule 1145 Rights Offering Procedures.

**Number of Tranche A Offered Shares**

**Number of Tranche B Offered Shares**

**Number of Excess Shares**

**Total:**

(Note: Total must be in whole shares and the aggregate Purchase Price therefor must not exceed the undersigned Eligible Holder's Maximum Participation Amount).

**2c. Calculation of Purchase Price**. The Purchase Price for the amount of the Rule 1145 Shares you are interested in purchasing, as set forth in Item 2b above, is calculated as follows:

---

[1]  $163,384,158.16 assuming no additional Impaired Excel General Unsecured Claims are allowed.  $343,138,050.11 if the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, assuming no additional Impaired Excel General Unsecured Claims are allowed.

[2]  $163,384,158.16 assuming no additional Impaired Excel General Unsecured Claims are allowed.  $343,138,050.11 if the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, assuming no additional Impaired Excel General Unsecured Claims are allowed.

[3]  $163,384,158.16 assuming no additional Impaired Excel General Unsecured Claims are allowed.  $343,138,050.11 if the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, assuming no additional Impaired Excel General Unsecured Claims are allowed.

[*Total Tranche A Offered Shares Amount from Item 2b above*] x [*$16.25*]

+

[*Total Excess Shares Amount from Item 2b above (if applicable)*] x [*$16.25*]

+

[*Total Tranche B Offered Shares Amount from Item 2b above*] x [*$17.25*]

Total =

**Item 3.  Payment and Delivery Instructions**

Payment of the Purchase Price calculated pursuant to Item 2c above shall be made by wire transfer ONLY of immediately available funds in accordance with the procedures of your Nominee.

Please mail or deliver your completed Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and your properly executed Rule 1145 Subscription Agreement and deliver payment of the Purchase Price to your Nominee **in sufficient time** to allow such Nominee to deliver the Master Convertible Note Subscription Form (and associated documentation) and all funds to the Subscription Agent by the Subscription Expiration Date.

Please provide your Nominee with bank account information for the return of any excess funds:

| Name of Account: | [●] |
|---|---|
| Bank Account No.: | [●] |
| Bank Name: | [●] |
| Bank Address: | [●] |
| Routing Number: | [●] |
| Special Instructions: | [●] |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORM AND THE SIGNED SUBSCRIPTION AGREEMENT IS VALIDLY SUBMITTED TO YOUR NOMINEE IN SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO DELIVER THE MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM TO THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF YOUR PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE.**

**Item 4.  Certification.**

I certify that (i) as of the date hereof, the undersigned was the beneficial holder of the Convertible Notes set forth in Item 1 above at the Record Date and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Rule 1145 Subscription Agreement, the Rule 1145 Rights Offering Procedures and the Rule 1145 Rights Offering Instructions and (iii) I understand that the exercise my rights under the Rule 1145 Rights Offering is subject to all the terms and conditions set forth in the Plan, the Rule 1145 Subscription Agreement and Rule 1145 Rights Offering Procedures.

By electing to subscribe for the amount of Rule 1145 Shares designated under Item 2 above, I am hereby instructing my Nominee to arrange for (i) the completion and delivery of its Master Convertible Note Subscription Form to the Subscription Agent and (ii) payment of the Purchase Price on or before the Rule 1145 Subscription Agreement Deadline.

**I acknowledge that, by executing the Rule 1145 Subscription Agreement and this Beneficial Holder Convertible Note Subscription Form, the undersigned Eligible Holder has elected to subscribe for the amount of the Rule 1145 Shares designated under Item 2 above and will be bound to pay for the Rule 1145 Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date:

Name of Beneficial

Eligible Holder:

Name of Nominee:

U.S. Federal Tax
EIN/SSN (optional)

If Non-U.S. person, check    ☐
here and attach
appropriate IRS Form W-
8

If U.S. person, check here    ☐
and attach IRS Form W-9

Signature:

Name of Signatory:

Title:

Address:

Telephone Number:

Fax:

Email:


**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Company's records for the Rule 1145 Shares:**

**Registration Name/
Name of Controlled
Affiliate or Related
Fund in Whose Name
Rule 1145 Shares Should
be Issued:**


**Address:**


**PLEASE RETURN THIS BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE), THE SUBSCRIPTION AGREEMENT AND PAYMENT OF THE PURCHASE PRICE ONLY TO YOUR NOMINEE. <u>DO</u> <u>NOT</u> RETURN THIS FORM DIRECTLY TO THE SUBSCRIPTION AGENT.**

Schedule 1C.

**EXCEL MARITIME CARRIERS LTD.**
**MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM**
**FOR RIGHTS  OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

> **For use by brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees for beneficial holders of Excel Maritime Carriers Ltd.'s 1.875% unsecured senior convertible notes issued pursuant to that certain indenture dated October 10, 2007 [CUSIP No. 300668AA8] (the "Convertible Notes").**

> **YOUR MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM, COPIES OF THE BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS AND PAYMENTS OF THE SUBSCRIPTION PAYMENT AMOUNT MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY 5:00 P.M. (NEW YORK CITY TIME) ON JANUARY 17, 2014, (THE "SUBSCRIPTION EXPIRATION DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.**
>
> **PLEASE LEAVE SUFFICIENT TIME FOR YOUR MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM TO REACH THE SUBSCRIPTION AGENT AND BE PROCESSED.**
>
> **PLEASE CONSULT THE PLAN, THE SUBSCRIPTION AGREEMENT AND THE RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH RESPECT TO THIS MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT AT (212) 771-1128.**

**Item 1.   Certification of Authority to Subscribe.**

The undersigned certifies that it (please check the applicable box):

☐   Is a broker, bank or other nominee for the beneficial holders of the Convertible Notes  listed in Item 2 below, and is the registered holder of such shares, or

☐   Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by the broker, bank, or other nominee that is the registered holder of the Convertible Notes listed in Item 2 below.

**Item 2.   Convertible Note Beneficial Holder Information**.

The undersigned certifies that the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the beneficial holders of the Convertible Notes, as identified by their respective account numbers, that have delivered duly completed Beneficial Holder Convertible Note Subscription Forms to the undersigned, which forms are attached hereto.

**(Please complete the information requested below. Attach additional sheets if necessary)**

| Your Customer Account Number for Each Beneficial Holder | Number of Convertible Notes (Item 1)[1] | Maximum Pro Rata Tranche A Offered Shares (cannot exceed the amount | Maximum Pro Rata Tranche B Offered Shares | Maximum Pro Rata Excess Shares (cannot exceed the Amount | Exercise Amount (Item 2b) | Maximum Total Purchase Price (Item 2a(i)) |
|---|---|---|---|---|---|---|

---

[1] Item numbers reference the applicable section of the Beneficial Holder Convertible Note Subscription Form

| | | calculated in Item 2a(ii)(A)) | (cannot exceed the amount calculated in Item 2a(ii)(B)) | calculated in Item 2a(iii)) | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Item 3.   Payment and Delivery Instructions**

All cash payments with respect to the exercise of Tranche A Subscription Rights, Tranche B Subscription Rights and Over-Subscription Rights that are being transmitted by this Master Convertible Note Subscription Form shall be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| Name of Account: | DONLIN RECANO AND CO INC<br>E/F EXCEL MARITIME CARRIERS LTD |
|---|---|
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | *[Name of Nominee]* |

Please email, mail or deliver your completed subscription form (together with any duly completed and received Beneficial Holder Convertible Note Subscription Forms (with accompanying IRS Forms W-9 or appropriate W-8, as applicable) and Rule 1145 Subscription Agreements) to:

Donlin, Recano & Company, Inc.
Attn: Excel Maritime Carriers LTD Subscription Agent
419 Park Avenue South, Suite 1206
New York, NY 10016
Tel: (212) 771 1128
Email: ExcelRightsOffering@donlinrecano.com

Please provide bank account information for the return of any excess funds:

| Name of Account: | [●] |
|---|---|
| Bank Account No.: | [●] |
| Bank Name: | [●] |
| Bank Location: | [●] |
| Routing Number: | [●] |
| Special Instructions: | |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS MASTER CONVERTIBLE NOTE SUBSCRIPTION FORM, TOGETHER WITH THE APPLICABLE DULY COMPLETED AND EXECUTED BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND EXECUTED SUBSCRIPTION AGREEMENTS, ARE VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF THE AGGREGATE PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE**

**SUBSCRIPTION EXPIRATION DEADLINE, 5:00 P.M. NEW YORK CITY TIME ON JANUARY 17, 2014.**

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

**PROPERLY EXECUTED MASTER CONVERTIBLE NOTE SUBSCRIPTION FORMS ALONG WITH RESPECTIVE BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT ExcelRightsOffering@donlinrecano.com BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT THE ORIGINAL MASTER SUBSCRIPTION FORM(S) WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

**Item 4.  Additional Certification.**

The undersigned certifies that for each beneficial holder whose exercise of rights are being transmitted by this Master Convertible Note Subscription Form (i) it is the authorized signatory of such beneficial holder of the amount of Convertible Notes listed under Item 1. of the Beneficial Holder Convertible Note Subscription Form, (ii) the beneficial holder is entitled to participate in the Rule 1145 Rights Offering, (iii) the beneficial holder has been provided with a copy of the Plan, the Rule 1145 Subscription Agreement, the Rule 1145 Rights Offering Procedures and the Rule 1145 Rights Offering Instructions and other applicable materials and (iv) true and correct copies of the Beneficial Holder Convertible Note Subscription Form have been received from each beneficial holder.

Date:

Name of Nominee:

DTC Participant Number:

U.S. Federal Tax
EIN/SSN (optional)

Signature:

Name:

Title:

Address:

Telephone Number:

Fax:

Email:

<u>Schedule 1D.</u>

**EXCEL MARITIME CARRIERS LTD.**
**BENEFICIAL HOLDER OTHER IMPAIRED EXCEL GENERAL UNSECURED CLAIMS SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.**

**Please leave sufficient time for your Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) to reach the Subscription Agent and be processed.**

**Please consult the Plan, the Rule 1145 Subscription Agreement and the Rule 1145 Rights Offering Procedures for additional information with respect to this Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form.**

---

**Item 1.  Amount of Other Impaired Excel General Unsecured Claim.**

I certify that I am a beneficial holder of [*describe claim*] in the following amount (insert amount on the line below) or that I am the authorized signatory of that beneficial holder:

[*Amount of claim*]

**Item 2.  Rights.**

Each Eligible Holder is entitled to subscribe for (i) its Pro Rata Tranche A Offered Shares, (ii) its Pro Rata Tranche B Offered Shares and (ii) to the extent such Eligible Holder subscribes for its entire Pro Rata Tranche A Offered Shares, its Pro Rata Excess Shares (collectively, the "Maximum Total Participation Amount"), subject to the individual limits included in the calculations under Item 2 below. To subscribe fill out Items 2a, 2b and 2c and 3 below and read and complete Item 4 below.

**2a. Calculation of Maximum Total Participation Amount.** The maximum amount of Rule 1145 Shares for which the undersigned beneficial holder may subscribe for in the rights offering is calculated as follows:

**If the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of either Tranche A Offered Shares or Tranche B Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims inclusive of the Syndicate Credit Deficiency Claims rounded to the nearest whole share.**

**(i) Maximum Total Participation Amount:**

$36,000,000.00 x 75% x [Amount of Claim/$163,384,158.16[1]]

---

[1]    $163,384,158.16 assuming no additional Impaired Excel General Unsecured Claims are allowed.  $343,138,050.11 if the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, assuming no additional Impaired Excel General Unsecured Claims are allowed.

**(ii)(A) Maximum Pro Rata Tranche A Offered Shares (Basic Tranche A Co-Investment Right Amount):**

Tranche A Offered Shares (307,692) x [Amount of Claim/$163,384,158.16[2]]

**(ii)(B) Maximum Pro Rata Tranche B Offered Shares (Basic Tranche B Co-Investment Right Amount):**

Tranche B Offered Shares (289,872) x [Amount of Claim/$163,384,158.16[3]]

**(iii) Maximum Pro Rata Excess Shares (Over-Subscription Right Amount):**

Maximum Total Participation Amount – ((Maximum Pro Rata Tranche A Offered Shares x 16.25) + (Tranche B Offered Shares listed in 2b x 17.25))/ 16.25

        **2b. Exercise Amount**. By filling in the following blanks, you are indicating that the undersigned Eligible Holder is interested in purchasing the number of Rule 1145 Shares specified below (specify an amount of the Rule 1145 Shares, the aggregate dollar value of which is not greater than the Maximum Participation Amount calculated in Item 2a(i) above), on the terms and subject to the conditions set forth in the Rule 1145 Subscription Agreement and Rule 1145 Rights Offering Procedures.

**Number of Tranche A Offered Shares**

**Number of Tranche B Offered Shares**

**Number of Excess Shares**

**Total:**

        (Note: Total must be in whole shares and the aggregate Purchase Price therefor must not exceed the undersigned Eligible Holder's Maximum Participation Amount).

        **2c. Calculation of Purchase Price**. The Purchase Price for the amount of the Rule 1145 Shares you are interested in purchasing, as set forth in Item 2b above, is calculated as follows:

[*Total Tranche A Offered Shares Amount from Item 2b above*] x [*$16.25*]
+
[*Total Excess Shares Amount from Item 2b above (if applicable)*] x [*$16.25*]
+
[*Total Tranche B Offered Shares Amount from Item 2b above*] x [*$17.25*]
Total =

**Item 3. Payment and Delivery Instructions**

---

[2]    $163,384,158.16 assuming no additional Impaired Excel General Unsecured Claims are allowed.  $343,138,050.11 if the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, assuming no additional Impaired Excel General Unsecured Claims are allowed.

[3]    $163,384,158.16 assuming no additional Impaired Excel General Unsecured Claims are allowed.  $343,138,050.11 if the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, assuming no additional Impaired Excel General Unsecured Claims are allowed.

Payment of the Purchase Price calculated pursuant to Item 2c above shall be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| Name of Account: | DONLIN RECANO AND CO INC E/F EXCEL MARITIME CARRIERS LTD |
|---|---|
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | *[Name of Subscriber]* |

Please email, mail or deliver your completed Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Rule 1145 Subscription Agreements to:

Donlin, Recano & Company, Inc.
Attn: Excel Maritime Carriers LTD Subscription Agent
419 Park Avenue South, Suite 1206
New York, NY 10016
Tel: (212) 771 1128
Email: ExcelRightsOffering@donlinrecano.com

Please provide bank account information for the return of any excess funds:

| Name of Account: | [•] |
|---|---|
| Bank Account No.: | [•] |
| Bank Name: | [•] |
| Bank Location: | [•] |
| Routing Number: | [•] |
| Special Instructions: | |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS BENEFICIAL HOLDER OTHER IMPAIRED EXCEL GENERAL UNSECURED CLAIMS SUBSCRIPTION FORM  (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND  THE SIGNED SUBSCRIPTION AGREEMENT IS VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF YOUR PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE.**

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

**YOUR PROPERLY EXECUTED BENEFICIAL HOLDER OTHER IMPAIRED EXCEL GENERAL UNSECURED CLAIMS SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT ExcelRightsOffering@donlinrecano.com BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT YOUR ORIGINAL BENEFICIAL HOLDER OTHER IMPAIRED EXCEL GENERAL UNSECURED CLAIMS SUBSCRIPTION FORM WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

**Item 4.  Certification.**

I certify that (i) as of the date hereof, the undersigned was the beneficial holder of the [*describe claim*] set forth in Item 1 above at the Record Date and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Rule 1145 Subscription Agreement, the Rule 1145 Rights Offering Procedures and the Rule 1145 Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rule 1145 Rights Offering is subject to all the terms and conditions set forth in the Plan, the Rule 1145 Subscription Agreement and Rule 1145 Rights Offering Procedures.

**I acknowledge that, by executing the Rule 1145 Subscription Agreement and this Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, the undersigned Eligible Holder has elected to subscribe for the amount of the Rule 1145 Shares designated under Item 2 above and will be bound to pay for the Rule 1145 Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment. If payment is not received prior to the Subscription Expiration Deadline, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rule 1145 Rights Offering.**

Date:

Name of Beneficial
Eligible Holder:

U.S. Federal Tax
EIN/SSN (optional)

If Non-U.S. person, check    ☐
here and attach
appropriate IRS Form W-
8

If U.S. person, check here    ☐
and attach IRS Form W-9

Signature:

Name of Signatory:

Title:

Address:

Telephone Number:

Fax:

Email:

**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Company's records for the Rule 1145 Shares:**

**Registration Name/
Name of Controlled
Affiliate or Related
Fund in Whose Name
Rule 1145 Shares Should
be Issued:**

*(**Please provide full legal
name**)*

**Address:**

Schedule 1E.

**EXCEL MARITIME CARRIERS LTD.**
**SYNDICATE CREDIT DEFICIENCY CLAIMS SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

---

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.**

**Please leave sufficient time for your Syndicate Credit Deficiency Claims Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to reach the Subscription Agent and be processed.**

**Please consult the Plan, the Rule 1145 Subscription Agreement and the Rule 1145 Rights Offering Procedures for additional information with respect to this Syndicate Credit Deficiency Claims Subscription Form.**

**PLEASE NOTE THAT IF THE CLASS OF IMPAIRED GENERAL UNSECURED CLAIMS VOTES TO ACCEPT THE PLAN, ON THE EFFECTIVE DATE, YOU WILL BE DEEMED TO HAVE FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED YOUR RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING AND THIS SYNDICATE CREDIT DEFICIENCY CLAIMS SUBSCRIPTION FORM SHALL BE CONSIDERED NULL AND VOID.**

---

**Item 1.  Amount of Claim.**

I certify that I am a beneficial holder of Syndicate Credit Deficiency Claim, in the following amount (insert amount on the line below) or that I am the authorized signatory of that beneficial holder:

[*Amount of claim*]

**Item 2.  Rights.**

Provided that the class of Impaired Excel General Unsecured Claims votes to reject the Plan, each holder of a Syndicate Credit Deficiency Claim is entitled to subscribe for (i) its Pro Rata Tranche A Offered Shares, (ii) its Pro Rata Tranche B Offered Shares and (ii) to the extent such Eligible Holder subscribes for its entire Pro Rata Tranche A Offered Shares, its Pro Rata Excess Shares (collectively, the "Maximum Total Participation Amount"), subject to the individual limits included in the calculations under Item 2 below. To subscribe fill out Items 2a, 2b and 2c and 3 below and read and complete Item 4 below.

**2a. Calculation of Maximum Total Participation Amount**.  The maximum amount of Rule 1145 Shares for which the undersigned beneficial holder may subscribe for in the rights offering is calculated as follows:

**(i) Maximum Total Participation Amount:**

$36,000,000.00 x 75% x [Amount of Claim/$343,138,050.11][1]

---

[1] $343,138,050.11 assuming no additional Impaired Excel General Unsecured Claims are allowed.

**(ii)(A) Maximum Pro Rata Tranche A Offered Shares (Basic Tranche A Co-Investment Right Amount):**

Tranche A Offered Shares (307,692) x [Amount of Claim/$343,138,050.11]²

**(ii)(B) Maximum Pro Rata Tranche B Offered Shares (Basic Tranche B Co-Investment Right Amount):**

Tranche B Offered Shares (289,872) x [Amount of Claim/$343,138,050.11]³

**(iii) Maximum Pro Rata Excess Shares (Over-Subscription Right Amount):**

Maximum Total Participation Amount − ((Maximum Pro Rata Tranche A Offered Shares x 16.25) + (Tranche B Offered Shares listed in 2b x 17.25))/ 16.25

**2b. Exercise Amount.** By filling in the following blanks, you are indicating that the undersigned Eligible Holder is interested in purchasing the number of Rule 1145 Shares specified below (specify an amount of the Rule 1145 Shares, the aggregate dollar value of which is not greater than the Maximum Participation Amount calculated in Item 2a(i) above), on the terms and subject to the conditions set forth in the Rule 1145 Subscription Agreement and Rule 1145 Rights Offering Procedures.

**Number of Tranche A Offered Shares**

**Number of Tranche B Offered Shares**

**Number of Excess Shares**

**Total:**

(Note: Total must be in whole shares and the aggregate Purchase Price therefor must not exceed the undersigned Eligible Holder's Maximum Participation Amount).

**2c. Calculation of Purchase Price.** The Purchase Price for the amount of the Rule 1145 Shares you are interested in purchasing, as set forth in Item 2b above, is calculated as follows:

[*Total Tranche A Offered Shares Amount from Item 2b above*] x [*$16.25*]
+
[*Total Excess Shares Amount from Item 2b above (if applicable)*] x [*$16.25*]
+
[*Total Tranche B Offered Shares Amount from Item 2b above*] x [*$17.25*]
Total =

**Item 3.  Payment and Delivery Instructions**

---

² $343,138,050.11 assuming no additional Impaired Excel General Unsecured Claims are allowed.

³ $343,138,050.11 assuming no additional Impaired Excel General Unsecured Claims are allowed.

Payment of the Purchase Price calculated pursuant to Item 2c above shall be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| | |
|---|---|
| Name of Account: | DONLIN RECANO AND CO INC<br>E/F EXCEL MARITIME CARRIERS LTD |
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | *[Name of Subscriber]* |

Please email, mail or deliver your completed Syndicate Credit Deficiency Claim Subscription Form (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) and Rule 1145 Subscription Agreements to:

Donlin, Recano & Company, Inc.
Attn: Excel Maritime Carriers LTD Subscription Agent
419 Park Avenue South, Suite 1206
New York, NY 10016
Tel: (212) 771 1128
Email: ExcelRightsOffering@donlinrecano.com

Please provide bank account information for the return of any excess funds or the full amount of your funds to the extent that the class of Impaired Excel General Unsecured Claims votes to accept the Plan:

| | |
|---|---|
| Name of Account: | [●] |
| Bank Account No.: | [●] |
| Bank Name: | [●] |
| Bank Location: | [●] |
| Routing Number: | [●] |
| Special Instructions: | |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS SYNDICATE CREDIT DEFICIENCY CLAIM SUBSCRIPTION FORM  (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND  THE SIGNED SUBSCRIPTION AGREEMENT IS VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF YOUR PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE.**

**<u>ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL</u>**

**YOUR PROPERLY EXECUTED SYNDICATE CREDIT DEFICIENCY CLAIMS SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT <u>ExcelRightsOffering@donlinrecano.com</u> BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT YOUR ORIGINAL SYNDICATE CREDIT DEFICIENCY CLAIMS SUBSCRIPTION FORM WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

**Item 4.  Certification.**

I certify that (i) as of the date hereof, the undersigned was the beneficial holder of the [*describe claim*] set forth in Item 1 above at the Record Date and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the Rule 1145 Subscription Agreement, the Rule 1145 Rights Offering Procedures and the Rule 1145 Rights Offering Instructions and (iii) I understand that the exercise of my rights under the Rule 1145 Rights Offering is subject to all the terms and conditions set forth in the Plan, the Rule 1145 Subscription Agreement and Rule 1145 Rights Offering Procedures.

**I acknowledge that, by executing the Rule 1145 Subscription Agreement and this Syndicate Credit Deficiency Claims Subscription Form, the undersigned Eligible Holder has elected to subscribe for the amount of the Rule 1145 Shares designated under Item 2 above and will be bound to pay for the Rule 1145 Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment. If payment is not received prior to the Subscription Expiration Deadline, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rule 1145 Rights Offering.**

**I further acknowledge that I am aware that if the class of Impaired Excel General Unsecured Claims votes to accept the Plan, on the Effective Date, I will be deemed to deemed to have forever and irrevocably relinquished and waived my right to participate in the Rule 1145 Rights Offering and this Syndicate Credit Deficiency Claims Subscription Form shall be considered null and void.**

Date:

Name of Beneficial
Eligible Holder:

U.S. Federal Tax
EIN/SSN (optional)

If Non-U.S. person, check          ☐
here and attach
appropriate IRS Form W-
8

If U.S. person, check here          ☐
and attach IRS Form W-9

Signature:

Name of Signatory:

Title:

Address:

Telephone Number:

Fax:

Email:

**Please indicate on the lines provided below the Eligible Holder's name and address as you would like it to be reflected on the Company's records for the Rule 1145 Shares:**

**Registration Name/
Name of Controlled
Affiliate or Related**

**Fund in Whose Name
Rule 1145 Shares Should
be Issued:**
(***Please provide full legal
name***)


**Address:**

**4(a)(2) Subscription Agreement**

**EXCEL MARITIME CARRIERS LTD.**

————————————————————

**4(a)(2) SUBSCRIPTION AGREEMENT**

————————————————————

**Copy # _____**

NOTICES

THIS 4(a)(2) SUBSCRIPTION AGREEMENT HAS BEEN PREPARED ON A CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF SELECTED ELIGIBLE HOLDERS IN CONNECTION WITH THE PRIVATE PLACEMENT OF SECURITIES OF EXCEL MARITIME CARRIERS LTD. (THE "COMPANY") PURSUANT TO THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE COMPANY AND ITS SUBSIDIARIES THAT COMMENCED JOINTLY ADMINISTERED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS SUCH TERM IS HEREINAFTER DEFINED) (THE "PLAN").  ANY REPRODUCTION OR DISTRIBUTION OF THIS 4(a)(2) SUBSCRIPTION AGREEMENT, OR RETRANSMITTAL OF ITS CONTENTS, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED, APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY.  NONE OF THE FOREGOING AUTHORITIES HAVE PASSED UPON, OR ENDORSED THE MERITS OF, THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE COMPANY'S AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE DEBTORS AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED NOVEMBER 26, 2013 (THE "DISCLOSURE STATEMENT") PREVIOUSLY DISTRIBUTED.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE SECURITIES WILL BE OFFERED AND SOLD PURSUANT TO THE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 4(a)(2) OF THE SECURITIES ACT AND/OR REGULATION D PROMULGATED THEREUNDER AND IN COMPLIANCE WITH ANY APPLICABLE STATE OR NON-U.S. SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  THIS 4(a)(2) SUBSCRIPTION AGREEMENT IS NOT AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM, NOR WILL ANY SECURITIES BE OFFERED OR SOLD TO, ANY PERSON IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE UNLAWFUL UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

THE SECURITIES OFFERED HEREBY MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR PLEDGED, IN WHOLE OR IN PART, EXCEPT BOTH (A) AS PERMITTED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE OR OTHER SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THERE IS NO OBLIGATION ON THE PART OF THE COMPANY OR ANY OTHER

PERSON TO REGISTER THE SECURITIES OFFERED HEREBY OTHER THAN IN THE CASE OF CERTAIN AFFILIATES UNDER THE SECURITIES ACT OR ANY OTHER SECURITIES LAWS.

THE COMPANY MAKES NO REPRESENTATION TO ANY OFFEREE OR PURCHASER OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS 4(a)(2) SUBSCRIPTION AGREEMENT, THE DISCLOSURE STATEMENT OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ANY OF ITS AGENTS, OFFICERS OR REPRESENTATIVES, AS LEGAL OR TAX ADVICE.  EACH OFFEREE SHOULD CONSULT HIS OWN ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE COMPANY.

AS A PURCHASER OF THE SECURITIES IN A PRIVATE PLACEMENT NOT REGISTERED UNDER THE SECURITIES ACT, EACH INVESTOR SHOULD PROCEED ON THE ASSUMPTION THAT THE ECONOMIC RISK OF THE INVESTMENT MUST BE BORNE FOR AN INDEFINITE PERIOD, SINCE THE SECURITIES MAY NOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.  IT IS SPECULATIVE AND SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. FURTHER, THIS INVESTMENT SHOULD ONLY BE MADE BY THOSE WHO UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE TAX CONSEQUENCES OF AND RISK FACTORS ASSOCIATED WITH THE INVESTMENT, INCLUDING, BUT NOT LIMITED TO, THE RISKS ARISING FROM THE ABSENCE OF CURRENT OR HISTORICAL FINANCIAL INFORMATION REGARDING THE COMPANY, AND WHO ARE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THEREFORE, INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO RETAIN OWNERSHIP OF THE SECURITIES AND TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

4(a)(2) ELIGIBLE HOLDERS SHALL ONLY BE ENTITLED TO PARTICIPATE IN THE 4(a)(2) RIGHTS OFFERING TO THE EXTENT THAT ANY TRANCHE A OFFERED SHARES HAVE NOT BEEN SUBSCRIBED FOR BY ELIGIBLE HOLDERS IN THE RULE 1145 RIGHTS OFFERING PRIOR TO THE SUBSCRIPTION EXPIRATION DEADLINE.  IN THE EVENT THAT THE TRANCHE A OFFERED SHARES HAVE BEEN FULLY SUBSCRIBED FOR IN THE RULE 1145 RIGHTS OFFERING, ANY 4(a)(2) SUBSCRIPTION AGREEMENT RETURNED BY A 4(a)(2) ELIGIBLE HOLDER WILL BE DEEMED NULL AND VOID AND ANY FUNDS PAID BY SUCH HOLDER WILL BE RETURNED IN ACCORDANCE WITH THE PROVISIONS OF THIS 4(a)(2) SUBSCRIPTION AGREEMENT.

## NOTICE TO FLORIDA INVESTORS

THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061(11) OF THE FLORIDA SECURITIES ACT.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION.  IN ADDITION, THE FLORIDA SECURITIES ACT PROVIDES THAT WHERE SALES ARE MADE TO 5 OR MORE FLORIDA INVESTORS, ALL FLORIDA INVESTORS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE COMPANY, AN AGENT OF THE COMPANY OR AN ESCROW AGENT, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.  TO ACCOMPLISH THIS, IT IS SUFFICIENT FOR A FLORIDA PURCHASER TO SEND A LETTER OR TELEGRAM TO THE ISSUER WITHIN SUCH THREE DAY PERIOD, STATING THAT THE PURCHASER IS VOIDING AND RESCINDING THE PURCHASE. IF A PURCHASER SENDS A LETTER, IT IS PRUDENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT THE LETTER IS RECEIVED AND TO EVIDENCE THE TIME OF MAILING.  HOWEVER, THIS RIGHT IS NOT AVAILABLE TO ANY PURCHASER WHO IS A BANK, TRUST COMPANY, SAVINGS INSTITUTION, INSURANCE COMPANY, SECURITIES DEALER, INVESTMENT COMPANY (AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940 AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER), PENSION OR PROFIT-SHARING TRUST OR QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT).

## NOTICE TO NEW HAMPSHIRE INVESTORS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED ("RSA") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION.  IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

# 4(a)(2) SUBSCRIPTION AGREEMENT

4(a)(2) Subscription Agreement (this "4(a)(2) Subscription Agreement"), by and between Excel Maritime Carriers Ltd., a company incorporated under the laws of Liberia (including any successor as contemplated by the Plan (as defined below), the "Company"), and the undersigned (the "Subscriber"), shall be deemed executed as of the date the Company executes a counterpart to this 4(a)(2) Subscription Agreement previously executed by the Subscriber.

WHEREAS, on July 1, 2013, the Company and certain of its affiliates (collectively, the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Debtors submitted an Amended Disclosure Statement with respect to the Debtors' Amended Joint Chapter 11 Plan of Reorganization, dated as of November 26, 2013 (the "Disclosure Statement"), to certain holders of claims against the Debtors in connection with the solicitation of acceptances of the Amended Joint Chapter 11 Plan of Reorganization of Excel Maritime Carriers Ltd. and Certain of its Affiliates, dated as of November 26, 2013 (the "Plan");

WHEREAS, capitalized terms used but not defined in this 4(a)(2) Subscription Agreement have the meaning given to them in the Plan;

WHEREAS, pursuant to the Plan, each Eligible Holder who validly and timely completes and returns an Accredited Investor Questionnaire to the Subscription Agent (a "4(a)(2) Eligible Holder") will be granted 4(a)(2) Subscription Rights (as defined below) entitling such 4(a)(2) Eligible Holder to purchase shares of New Common Stock in an aggregate amount equal to the number of Tranche A Shares that have not been subscribed for by Eligible Holders prior to the Subscription Expiration Deadline, subject to pro rata reduction as described in the Plan and this 4(a)(2) Subscription Agreement to the extent the aggregate number of shares subscribed for by 4(a)(2) Eligible Holders exceeds the number of shares offered (the "4(a)(2) Offered Shares") (the "4(a)(2) Rights Offering");

WHEREAS, in the event that the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering, any 4(a)(2) Subscription Agreement returned by a 4(a)(2) Eligible Holder will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of this 4(a)(2) Subscription Agreement;

WHEREAS, each Subscriber that holds a Syndicate Credit Deficiency Claim shall be entitled to exercise 4(a)(2) Subscription Rights in the 4(a)(2) Rights Offering, provided, however that such 4(a)(2) Subscription Rights shall be deemed forever and irrevocably relinquished and waived on the Effective Date if the class of Impaired Excel General Unsecured Claims votes to accept the Plan.  In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any 4(a)(2) Subscription Agreement and any 4(a)(2) Other Claim Subscription Form returned by a holder of a Syndicate Credit Deficiency Claim to the Subscription Agent will

be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of this 4(a)(2) Subscription Agreement.

WHEREAS, any Subscriber that does not hold a Syndicate Credit Deficiency Claim has certified that it is a 4(a)(2) Eligible Holder and held on the Record Date (i) the aggregate principal amount of the Company's 1.875% Convertible Senior Notes due 2027 (the "Convertible Notes") set forth in Item 1 of such 4(a)(2) Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form and/or (ii) any (A) claim arising under certain swap agreements entered into by the Company and Eurobank EFG Private Bank Luxembourg S.A. and Marfin Popular Bank Public Co. Ltd., Greek Branch, respectively; (B) claim for damages alleged by Robertson Maritime Investors, LLC; and/or (C) claim arising under a settlement with certain bareboat charter parties, dated December 5, 2012 (such claims described in (A) through (C), collectively, the "Other Impaired Excel General Unsecured Claims") which are valued at the aggregate amount set forth on Item 1 of such 4(a)(2) Eligible Holder's 4(a)(2) Other Claim Subscription Form;

WHEREAS, any Subscriber that holds a Syndicate Credit Deficiency Claim has certified that it is a 4(a)(2) Eligible Holder and held on the Record Date an unsecured claim arising under that certain senior secured credit facility, dated as of April 14, 2008, as amended, modified or supplemented from time to time; and

WHEREAS, the Subscriber wishes to subscribe to purchase 4(a)(2) Offered Shares as set forth herein on the terms and subject to the conditions of the 4(a)(2) Rights Offering and in accordance with the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.      SUBSCRIPTION.

(a)      The Subscriber hereby agrees to subscribe for that number of 4(a)(2) Offered Shares set forth in Item 2b of such 4(a)(2) Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable (the "4(a)(2) Shares"). Once all subscriptions have been received, any 4(a)(2) Shares subscribed for shall be, if necessary, subject to reduction pro rata in proportion to the aggregate subscription by each subscribing 4(a)(2) Eligible Holder in relation to all subscriptions for 4(a)(2) Offered Shares. The Subscriber will pay to the Subscription Agent the Purchase Price for such 4(a)(2) Shares set forth in Item 2c of such 4(a)(2) Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable, at the time it returns this 4(a)(2) Subscription Agreement to the Subscription Agent, but in no event later than the Subscription Expiration Deadline by wire transfer of immediately available funds in accordance with the instructions included on Item 3 of such 4(a)(2) Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable. In the event that the class of Impaired Excel General Unsecured Claims

2

votes to accept the Plan, any 4(a)(2) Subscription Agreement and any 4(a)(2) Other Claim Subscription Form returned by a holder of a Syndicate Credit Deficiency Claim to the Subscription Agent will be deemed null and void and any funds paid by such holder will be returned, without interest, as soon as reasonably practicable, but in any event within six (6) Business Days after acceptance or rejection of the Plan is filed with the Bankruptcy Court.

(b)    In the event that funds received by the Subscription Agent in payment for the Subscriber's 4(a)(2) Shares in accordance with the instructions provided with this 4(a)(2) Subscription Agreement are less than the Purchase Price (as set forth in Item 2c of such 4(a)(2) Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable), the number of 4(a)(2) Shares deemed to be purchased by the Subscriber pursuant to this 4(a)(2) Subscription Agreement will be the lesser of (i) the number of 4(a)(2) Shares set forth set forth in Item 2b of such 4(a)(2) Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable, and (ii) a number determined by dividing the amount of such funds received in accordance with the instructions included with this 4(a)(2) Subscription Agreement by the Purchase Price.

(c)    In the event that the Subscription Agent receives more funds from the Subscriber than the aggregate Purchase Price for the Subscriber's 4(a)(2) Shares, including after giving effect to any pro rata reduction described in Section 1(a) then such funds, to the extent of such overpayment, will be returned, without interest, to the Subscriber as soon as reasonably practicable, but in any event within six (6) Business Days after the Subscription Expiration Deadline.

(d)    Subject to the conditions specified in Section 5, the closing of the issuance of 4(a)(2) Shares contemplated by this 4(a)(2) Subscription Agreement (the "Closing") will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP on the Effective Date.  The date on which the Closing occurs is the "Closing Date."

(e)    In the event the Closing does not take place on or before February 14, 2014, a Subscriber may request any funds sent to the Subscription Agent in payment for such Subscriber's 4(a)(2) Shares in accordance with the instructions provided with this 4(a)(2) Subscription Agreement be promptly returned to the Subscriber.  Upon receipt of such request, the Subscription Agent shall promptly, but in any event within six (6) Business Days, return such funds to the Subscriber.

2.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Subscriber as of the date hereof as follows:

(a)    The Company is and, as of the Effective Date, will be, duly organized and validly existing under the laws of Liberia.

(b)    Subject to the entry of the Bankruptcy Court's confirmation order relating to the Plan and occurrence of the Closing, (i) the Company will have the requisite corporate

3

power and authority to execute and deliver this 4(a)(2) Subscription Agreement, (ii) this 4(a)(2) Subscription Agreement and the consummation by the Company of the transactions contemplated hereby will have been duly authorized by all requisite corporate action and (iii) this 4(a)(2) Subscription Agreement will have been duly and validly executed and delivered by the Company and will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(c)    The 4(a)(2) Shares, when issued in accordance with the provisions hereof, will be validly issued by the Company, and will represent fully paid and nonassessable shares of the Company.

(d)    Except for the representations and warranties contained in this <u>Section 2</u>, none of the Company and any other Person on behalf of the Company makes any other express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber.  Neither the Company nor any other Person will have or be subject to any liability or indemnification obligation to the Subscriber or any other Person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, including the Disclosure Statement and any other information, documents, projections, forecasts or other material made available to the Subscriber, unless any such information is included in a representation or warranty contained in this <u>Section 2</u>.

3.    <u>REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER</u>.

The Subscriber represents and warrants to the Company as of the date hereof as follows:

(a)    The Subscriber is an 4(a)(2) Eligible Holder and held on the Record Date (i) the aggregate principal amount of Convertible Notes set forth on Item 1 of such Eligible Holder's 4(a)(2) Beneficial Holder Convertible Note Subscription Form and/or (ii) Other Impaired Excel General Unsecured Claims which are valued at the aggregate amount set forth on Item 1 of such Eligible Holder's 4(a)(2) Other Claim Subscription Form, and/or (iii) a Syndicate Credit Deficiency Claim valued at the aggregate amount set forth on Item 1 of such Subscriber's 4(a)(2) Other Claim Subscription Form.

(b)    The Subscriber has the requisite corporate or other applicable power and authority to execute and deliver this 4(a)(2) Subscription Agreement and the 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable, and to perform its obligations hereunder and thereunder.  This 4(a)(2) Subscription Agreement and the consummation by Subscriber of the transactions contemplated hereby have been duly authorized by all requisite action.  This 4(a)(2) Subscription Agreement has been duly and validly executed and delivered by Subscriber and constitutes the valid and binding obligation of Subscriber, enforceable against Subscriber in accordance with its terms.  Except to the extent Subscriber is an individual, Subscriber is a duly organized entity validly existing under the laws of the jurisdiction of its incorporation or formation.

(c)    Except as provided under applicable state securities laws and subject to the conditions contained in Section 6, this subscription is and shall be irrevocable, except that the

4

Subscriber shall have no obligation hereunder if this 4(a)(2) Subscription Agreement is for any reason rejected or this offering is for any reason cancelled.

(d)    The Subscriber understands that the 4(a)(2) Shares have not been registered under the Securities Act nor qualified under any state securities laws and that the 4(a)(2) Shares are being offered and sold pursuant to an exemption from such registration and qualification requirements based in part upon the Subscriber's representations contained herein.

(e)    The Subscriber has read and understands this 4(a)(2) Subscription Agreement, the Plan, the Disclosure Statement and the 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable, and understands the terms and conditions herein and therein and the risks associated with the Company and its business as described in the Disclosure Statement.  The Subscriber has, to the extent deemed necessary by the Subscriber, discussed with legal counsel the representations, warranties and agreements that the Subscriber is making herein.

(f)    The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment contemplated by this 4(a)(2) Subscription Agreement, and it is able to bear the economic risk of an investment in the Company.  The Subscriber has sufficient financial resources available to support the loss of all or a portion of its investment in the Company, and has no need for liquidity in its investment in the Company.

(g)    The Subscriber recognizes that except as described in the Plan with respect to affiliates of the Company there is no obligation on the part of the Company or any other Person to register the 4(a)(2) Shares under the Securities Act or any other securities laws. The Subscriber understands that it must bear the economic risk of this investment indefinitely unless its 4(a)(2) Shares are registered pursuant to the Securities Act or an exemption from such registration is available, and unless the disposition of such 4(a)(2) Shares is qualified under applicable state securities laws or an exemption from such qualification is available.  The Subscriber further understands that there is no assurance that any exemption from the Securities Act will be available, or, if available, that such exemption will allow the Subscriber to Transfer all or part of its 4(a)(2) Shares, in the amounts or at the times the Subscriber might propose.

(h)    The Subscriber is acquiring the 4(a)(2) Shares solely for its own account for investment and neither with a view toward, nor any present intention of, Transferring the 4(a)(2) Shares.  No other Person has any right with respect to or interest in the 4(a)(2) Shares to be purchased by the Subscriber, nor has the Subscriber agreed to give any Person any such interest or right in the future.

(i)    No finder's fee or other similar fee is payable to any third party in connection with the Subscriber's investment in the Company.  Should such a fee be payable to any third party, such fee is payable in its entirety by the Subscriber and not by the Company or any of its affiliates.

5

(j)      The Subscriber is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under Section 4(a)(2) of the Securities Act and that the Accredited Investor Questionnaire previously completed by the Subscriber sets forth a true, correct and complete statement of the Subscriber's accredited investor status.

(k)      No third-party consents or approvals are required to be obtained, made or given in order to permit the Subscriber to execute and deliver this 4(a)(2) Subscription Agreement and to perform its obligations hereunder.

(l)      Neither the execution and delivery of this 4(a)(2) Subscription Agreement by the Subscriber nor the consummation of any of the transactions contemplated hereby will violate or conflict with, or result in a breach of, or constitute a default under (whether upon notice or the passage of time or both) any (i) contract to which the Subscriber is a party or (ii) applicable laws, regulations, orders, judgments and decrees to which the Subscriber is subject.

(m)      Other than as set forth in this 4(a)(2) Subscription Agreement, the Plan, the Disclosure Statement, the 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable, the Subscriber is not relying upon any other information, representation or warranty by the Company.  The Subscriber has consulted, to the extent deemed appropriate by the Subscriber, with the Subscriber's own advisors as to the financial, tax, legal and related matters concerning an investment in the 4(a)(2) Shares and on that basis believes that an investment in the 4(a)(2) Shares is suitable and appropriate for the Subscriber.

(n)      The foregoing representations and warranties will be true on the date hereof and as of the Closing Date and will survive delivery of this 4(a)(2) Subscription Agreement.  If any of such representations and warranties is not true prior to acceptance of this 4(a)(2) Subscription Agreement by the Company or prior to the Closing Date, the Subscriber will give written notice of such fact to the Company, specifying which representations and warranties are not true and the reasons therefor.

4.      SUBSCRIBER ACKNOWLEDGMENTS.

The Subscriber further acknowledges the following as of the date hereof and as of the Closing Date:

(a)      The 4(a)(2) Shares purchased pursuant hereto will be initially issued in the name of the Subscriber, a controlled Affiliate of the Subscriber or a Related Fund, as indicated on such Subscriber's 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable.

(b)      This 4(a)(2) Subscription Agreement contains its irrevocable firm commitment, subject only to the terms and conditions of this 4(a)(2) Subscription Agreement and the 4(a)(2) Rights Offering, to purchase the 4(a)(2) Shares, subject to *pro rata* adjustment as provided for in this 4(a)(2) Subscription Agreement and in the 4(a)(2) Rights Offering Procedures.

6

(c)     Except to the extent provided in this 4(a)(2) Subscription Agreement, the Plan or the Disclosure Statement, the Company makes no representation or warranty in connection with the purchase of the 4(a)(2) Shares.

(d)     No federal or state agency has made or will make any finding or determination as to the adequacy or accuracy of any information provided to the Subscriber in connection with its consideration of its investment in the 4(a)(2) Shares or as to the fairness of this private placement for investment, nor any recommendation or endorsement of the 4(a)(2) Shares.

(e)     The Company will be relying on representations, warranties and agreements made by the Subscriber to the Company, and the covenants agreed to by the Subscriber, herein.  The Subscriber agrees to provide, if requested, any additional information that may reasonably be required to determine its eligibility to purchase the 4(a)(2) Shares.  If there is any change in any of the information provided by the Subscriber, or if any of the Subscriber's representations and warranties becomes inaccurate in any respect, the Subscriber will furnish such revised or corrected information to the Company as soon as reasonably practicable, but in any event prior to the Expiration Date.

(f)     The Subscriber understands and acknowledges that all calculations shall be made in good faith by the Company with the consent of each of the Consenting Parties (as defined in the Plan) and in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

(g)     The Disclosure Statement contains projections.  The projections are subjective in many respects and are based on expectations, estimates, opinions and beliefs of the Company's management with respect to its financial condition, business and industry performance, general economic, market and financial conditions and other matters, all of which are difficult to predict and many of which are beyond the Company's control.  Accordingly, there can be no assurance that the estimates and assumptions made in preparing the projections will prove accurate or that the forecasts will be realized.  In addition, the projections do not and cannot take into account such factors as general economic conditions, unforeseen changes and developments in available technologies and products, the entry into the Company's market of significant additional competitors, natural disasters, the terms and conditions of future financings of the Company, and other risks inherent to the business of the Company.  While management believes that the projections reflect the possible future results of the Company's operations, such results cannot be guaranteed.  The Subscriber acknowledges that it is prepared for the substantial economic risks involved in the purchase of the 4(a)(2) Shares, including the total loss of its investment.  The Company will not be under any duty to update the projections included in the Disclosure Statement prior to or after the Closing Date.

(h)     The Subscriber understands that the 4(a)(2) Shares and any certificates therefor will bear a restrictive legend in substantially the following form, in addition to any legend imposed or required by the Company's organizational documents or other applicable securities laws:

7

THE SECURITIES REPRESENTED BY THIS CERTIFICATE
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR
ANY SECURITIES LAWS OF ANY STATE AND MAY NOT
BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED
UNDER THE SECURITIES ACT AND THE APPLICABLE
STATE SECURITIES LAWS, PURSUANT TO REGISTRATION
OR EXEMPTION THEREUNDER.

The Subscriber may present the certificate evidencing the 4(a)(2) Shares bearing such legend to the Company's transfer agent for the 4(a)(2) Shares for exchange for one or more new certificates not bearing such legend or for Transfer to a new holder without such legend at such times as (i) such 4(a)(2) Shares are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder has delivered to the Company an opinion of counsel reasonably satisfactory to the Company to the effect that the 4(a)(2) Shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such 4(a)(2) Shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

## 5.    COVENANT OF THE COMPANY

(a)    Plan Supplement. Except to the extent otherwise agreed by the Consenting Parties, the Company shall file all documents included within the Plan Supplement (as defined in the Plan) with the Bankruptcy Court at least five (5) Business Days prior to the Subscription Expiration Deadline (except for the Holdco LLC Agreement, which shall be filed by January 7, 2014).

## 6.    CONDITIONS TO CLOSING.

(a)    Conditions to Each Party's Obligations.  The respective obligations of the Subscriber and the Company to consummate the transactions contemplated by this 4(a)(2) Subscription Agreement are subject to the occurrence of the Effective Date.

(b)    Conditions to Obligations of the Company.  The obligations of the Company to consummate the transactions contemplated by this 4(a)(2) Subscription Agreement with the Subscriber are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)    All representations and warranties of the Subscriber in Section 3 of this 4(a)(2) Subscription Agreement must be true, correct and complete in all respects on the Closing Date;

(ii)    All acknowledgments of the Subscriber in Section 4 of this 4(a)(2) Subscription Agreement must be true, correct and complete in all respects on the Closing Date;

(iii)    The Plan shall have been confirmed by the Bankruptcy Court; and

8

(iv)    Compliance by the Subscriber with the 4(a)(2) Rights Offering Procedures governing the 4(a)(2) Rights Offering, including payment by the Subscriber of the Purchase Price.

(c)    Conditions to Obligations of the Subscriber.  The obligations of the Subscriber to consummate the transactions contemplated by this 4(a)(2) Subscription Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)    All representations and warranties of the Company in Section 2 of this 4(a)(2) Subscription Agreement must be true and correct in all material respects on the Closing Date;

(ii)    Compliance by the Company with the 4(a)(2) Rights Offering Procedures governing the 4(a)(2) Rights Offering;

(iii)    Compliance by the Company with the covenant set forth in Section 5(a) of this 4(a)(2) Subscription Agreement; and

(iv)    The Plan and the Plan Supplement (including all exhibits thereto) shall be effective at Closing with no material changes from the forms on file with the Bankruptcy Court by the deadline set forth in Section 5(a) above.

7.    TERMINATION.

This 4(a)(2) Subscription Agreement will terminate upon the earlier of (i) termination or rejection of the Plan by all classes entitled to vote, (ii) receipt by the Company of written notice of termination from the Subscriber, provided such notice is received by the Subscription Expiration Deadline, and (iii) April 1, 2014.  In the event this 4(a)(2) Subscription Agreement is terminated, any payments received pursuant to Section 1(a) of this 4(a)(2) Subscription Agreement will be returned to the Subscriber as soon as reasonably practicable, but in any event, within six (6) Business Days.

8.    INTERPRETATION OF THIS AGREEMENT.

(a)    Terms Defined.  As used in this 4(a)(2) Subscription Agreement, the following terms have the respective meanings set forth below:

"Accredited Investor": Shall mean an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under Section 4(a)(2) of the Securities Act.

"Affiliate":  With respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether

9

through ownership of securities or partnership or other ownership interests, by agreement, contract, obligation, promise, undertaking or understanding, whether written or oral, or otherwise).

"4(a)(2) Beneficial Holder Convertible Note Subscription Form": The subscription form to be completed by 4(a)(2) Eligible Holders included as Schedule 1B hereto.

"4(a)(2) Other Claim Subscription Form": The subscription form to be completed by: (i) beneficial holders of Other Impaired Excel General Unsecured Claims, and (ii) beneficial holders of Syndicate Credit Deficiency Claims included as Schedule 1D hereto.

"4(a)(2) Rights Offering Instructions": The instructions included as Schedule 1A hereto.

"4(a)(2) Shares": Has the meaning set forth in Section 1 of the Rights Offering Procedures included as Exhibit A hereto.

"4(a)(2) Subscription Agreement": This agreement.

"4(a)(2) Subscription Rights": The non-Transferable, non-certificated subscription rights to purchase 4(a)(2) Offered Shares in connection with the 4(a)(2) Rights Offering on the terms and subject to the conditions set forth in the Plan, the 4(a)(2) Rights Offering Procedures and this 4(a)(2) Subscription Agreement.

"Business Day": Any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by applicable law to close.

"Debtors": The Company, Excel Maritime Carriers LLC, Amanda Enterprises Ltd., Barland Holdings Inc., Candy Enterprises Inc., Castalia Services Ltd., Centel Shipping Company Ltd., Coal Gypsy Shipco LLC, Coal Hunter Shipco LLC, Coal Pride Shipco LLC, Fianna Navigation S.A., Fountain Services Ltd., Grain Express Shipco LLC, Grain Harvester Shipco LLC, Harvey Development Corp., Ingram Ltd., Iron Anne Shipco LLC, Iron Beauty Shipco LLC, Iron Bill Shipco LLC, Iron Bradyn Shipco LLC, Iron Brooke Shipco LLC, Iron Fuzeyya Shipco LLC, Iron Kalypso Shipco LLC, Iron Knight Shipco LLC, Iron Lindrew Shipco LLC, Iron Manolis Shipco LLC, Iron Miner Shipco LLC, Iron Vassilis Shipco LLC, Kirmar Shipco LLC, Liegh Jane Navigation S.A., Lowlands Beilun Shipco LLC, Marias Trading Inc., Ore Hansa Shipco LLC, Pascha Shipco LLC, Point Holdings Ltd., Sandra Shipco LLC, Santa Barbara Shipco LLC, Snapper Marine Ltd., Tanaka Services Ltd., Teagan Shipholding S.A., Thurman International Ltd., Whitelaw Enterprises Co., and Yasmine International Inc.

"Effective Date": The date the Plan becomes effective.

10

"Eligible Holder": Any holder of an Impaired Excel General Unsecured Claim as of the Record Date.

"Impaired Excel General Unsecured Claims": A claim arising by virtue of an Eligible Holder holding Convertible Notes, Other Impaired Excel General Unsecured Claim or Syndicate Credit Deficiency Claim as of the Record Date.

"Master 4(a)(2) Convertible Note Subscription Form": The subscription form to be completed be completed by the Nominee of any beneficial holders of Convertible Notes included as Schedule 1C hereto.

"New Common Stock": The shares of common stock of the reorganized Company, par value $0.01 per share.

"Nominee": Broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, as applicable.

"Other Impaired Excel General Unsecured Claims": Any (A) unsecured deficiency claim arising under the Company's senior secured syndicate credit facility dated April 14, 2008; (B) claim arising under certain swap agreements entered into by the Company and Eurobank EFG Private Bank Luxembourg S.A. and Marfin Popular Bank Public Co. Ltd., Greek Branch, respectively; (C) claim for damages alleged by Robertson Maritime Investors, LLC; and/or (D) claim arising under a settlement with certain bareboat charter parties, dated December 5, 2012.

"Person": An individual, partnership, limited liability company, joint-stock company, corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof.

"Purchase Price": means $16.25 per share.

"Record Date": December 9, 2013.

"Related Fund": With respect to the Subscriber, any fund, account or investment vehicle that is controlled or managed by (a) the Subscriber, (b) a controlled Affiliate of the Subscriber or (c) the same investment manager or advisor as the Subscriber or an Affiliate of such investment manager or advisor.

"Subscription Agent": Donlin Recano & Company, Inc., or any other entity designated as such by the Company, in its capacity as a subscription agent and escrow agent in connection with the 4(a)(2) Rights Offering.

"Subscription Commencement Date": The date on which 4(a)(2) Subscription Agreements are first sent to 4(a)(2) Eligible Holders.

"Subscription Expiration Deadline": 5:00 p.m. New York City Time on January 17, 2014, the date by which properly completed 4(a)(2) Subscription Agreements

11

and the Purchase Price will be required to be delivered to the Subscription Agent as provided in the 4(a)(2) Subscription Agreements.

"Subscription Period": The period beginning on the Subscription Commencement Date and ending on the Subscription Expiration Deadline.

"Syndicate Credit Deficiency Claims":  means the unsecured Claim arising under the Syndicate Credit Facility or the Loan Documents.  For the avoidance of doubt, the Consenting Parties reserve all rights with respect to the amount, if any, and treatment of a Syndicate Credit Facility Deficiency Claim, if any, held by the Secured Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in the Plan Term Sheet.

"Tranche A Offered Shares": 307,692 shares of New Common Stock to be offered to Eligible Holders in the Rule 1145 Rights Offering at the Purchase Price.

"Tranche A Subscription Rights": Has the meaning set forth in the Plan.

"Transfer":  Any resale, sale, assignment, pledge, hypothecation, distribution or other disposition or encumbrance.

(b)    Directly or Indirectly.  Where any provision in this 4(a)(2) Subscription Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person.

(c)    Governing Law; Jurisdiction.  THIS 4(a)(2) SUBSCRIPTION AGREEMENT, AND ALL CLAIMS ARISING OUT OF OR RELATING THERETO, WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE SUBSCRIBER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS*.

(d)    Section Headings.  The headings of the sections and subsections of this 4(a)(2) Subscription Agreement are inserted for convenience only and should not be deemed to constitute a part thereof.

(e)    Construction.  This 4(a)(2) Subscription Agreement has been freely and fairly negotiated between the parties.  If an ambiguity or question of intent or interpretation arises, this 4(a)(2) Subscription Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this 4(a)(2) Subscription Agreement.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words

12

in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this 4(a)(2) Subscription Agreement", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this 4(a)(2) Subscription Agreement as a whole and not to any particular subdivision unless expressly so limited.

9.    MISCELLANEOUS.

(a)    Notices.

(i)    The Subscriber acknowledges that a completed and signed copy of this 4(a)(2) Subscription Agreement, the 4(a)(2) Beneficial Holder Convertible Note Subscription Form or Master 4(a)(2) Convertible Note Subscription Form, as applicable, and/or 4(a)(2) Other Claim Subscription Form, as applicable, together with payment of the Purchase Price, must be received by the Subscription Agent in accordance with the instructions included herewith prior to the Subscription Expiration Deadline for the subscription contemplated hereby to be valid.

(ii)    Except as otherwise provided in this 4(a)(2) Subscription Agreement, following execution of this 4(a)(2) Subscription Agreement, all demands, notices, requests, consents and other communications under this 4(a)(2) Subscription Agreement must be in writing, sent contemporaneously to all of the notice parties set forth below and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by facsimile, or if no response to the effect that an email cannot be delivered to the sender is received within two (2) hours, if delivered by email, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

(A)    if to the Subscriber, at his or her address or facsimile number shown on the 4(a)(2) Beneficial Holder Convertible Note Subscription Form and/or 4(a)(2) Other Claim Subscription Form, as applicable, or at such other address or facsimile number as the Subscriber may have furnished the Company and the Subscription Agent in writing; and

(B)    if to the Company, at (or at such other address or facsimile number as it may have furnished in writing to the Subscriber):

Excel Maritime Carriers Ltd.
17th Km National Road Athens –
    Lamia & Finikos Street
145 64 Nea Kifisia
Athens, Greece
Attn:  Pavlos Kanellopoulos

with a copy (which shall not constitute notice) to:

13

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Attn: Jay Goffman and Mark McDermott
> Facsimile: 212-735-2000
> jay.goffman@skadden.com; mark.mcdermott@skadden.com

(b)    Expenses and Taxes.  The Company will pay, and hold the Subscriber harmless from any and all liabilities (including interest and penalties) with respect to, or resulting from any delay or failure in paying, stamp and other taxes (other than income taxes), if any, which may be payable or determined to be payable on the execution and delivery of this 4(a)(2) Subscription Agreement or acquisition of the securities pursuant to this 4(a)(2) Subscription Agreement.

(c)    Reproduction of Documents.  This 4(a)(2) Subscription Agreement and all documents relating hereto may not be reproduced or distributed by the Subscriber without the prior written consent of the Company.

(d)    Assignment; Successors.  This 4(a)(2) Subscription Agreement is not assignable by the Subscriber without the prior written consent of the Company.  This 4(a)(2) Subscription Agreement and the rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties.

(e)    Entire Agreement; Amendment and Waiver.  This 4(a)(2) Subscription Agreement constitutes the entire understanding of the parties hereto and supersedes all prior understandings among such parties with respect to the matters covered herein.  This 4(a)(2) Subscription Agreement may be amended, and the observance of any term of this 4(a)(2) Subscription Agreement may be waived, with (and only with) the written consent of the Company and the Subscriber.

(f)    Severability.  If any provision of this 4(a)(2) Subscription Agreement or the application of such provision to any Person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this 4(a)(2) Subscription Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

(g)    Counterparts.  This 4(a)(2) Subscription Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

14

Please indicate your acceptance and approval of the foregoing in the space provided below.

EXCEL MARITIME CARRIERS LTD.

_____
Name:
Title:

ACCEPTED AND APPROVED

as of the _____ day of _____, 2013

SUBSCRIBER:    _____
                              (Please provide full legal name)

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

City: _____ State: _____

Postal Code: _____

Country: _____

Telephone: _____ Facsimile: _____

Email Address: _____

If U.S. person, check here and attach IRS Form W-9: ☐ U.S. person

If Non-U.S. person, check here and attach appropriate IRS Form W-8: ☐ Non-U.S. person

**Exhibit A**

**4(a)(2) RIGHTS OFFERING PROCEDURES**

---

**Each 4(a)(2) Offered Share is being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "Securities Act").**

**None of the 4(a)(2) Subscription Rights distributed in connection with these 4(a)(2) Rights Offering Procedures have been or will be registered under the Securities Act, nor any State or local law requiring registration for offer and sale of a security, and no 4(a)(2) Subscription Rights may be sold or independently Transferred.**

**None of the 4(a)(2) Offered Shares have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer or sale of a security.**

**The 4(a)(2) Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

---

**Terms used and not defined herein or in the 4(a)(2) Subscription Agreement shall have the meaning assigned to them in the Plan (as defined below).**

To 4(a)(2) Eligible Holders[1] and Nominees of 4(a)(2) Eligible Holders:

On November 26, 2013, the Debtors (as defined below) filed the Amended Joint Chapter 11 Plan of Reorganization of the Debtors with the United States Bankruptcy Court for the Southern District of New York (as such plan of reorganization may be amended or modified from time to time in accordance with its terms, the "Plan"), and the Disclosure Statement with respect to the Plan (as such disclosure statement may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan, each holder of an Impaired Excel General Unsecured Claim as of the Record Date that is an Accredited Investor, has the right to participate in the 4(a)(2) Rights Offering of the 4(a)(2) Offered Shares.

Pursuant to the Plan, each Eligible Holder that has timely and validly completed and returned the Accredited Investor Questionnaire will receive 4(a)(2) Subscription Rights to subscribe for the 4(a)(2) Offered Shares, provided that it timely and properly executes and delivers its Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and/or 4(a)(2) Other Claim Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), as applicable, to the Subscription Agent or its Nominee, as applicable, in advance of the Subscription Expiration Deadline. Each Nominee will receive a Master 4(a)(2) Convertible Note Subscription Form which it shall use to summarize the 4(a)(2) Subscription Rights, exercised by each 4(a)(2) Eligible Holder that returns a 4(a)(2) Beneficial Holder Convertible Note Subscription Form to such Nominee. Please note that all 4(a)(2) Beneficial Holder Convertible Note Subscription Forms (with accompanying IRS Form W-9 or appropriate W-8, as applicable) must be returned to the applicable Nominee early enough to be processed and for such Nominee to prepare and deliver the Master 4(a)(2) Convertible Note Subscription Form and a copy of all 4(a)(2) Beneficial Holder Convertible Note Subscription Forms (with accompanying IRS Forms) to the Subscription Agent prior to the Subscription Expiration Deadline.

No 4(a)(2) Eligible Holder shall be entitled to participate in the 4(a)(2) Rights Offering unless the purchase price for the 4(a)(2) Offered Shares it subscribes for is received by the Subscription Agent in advance of the Subscription Expiration Deadline. Any

---

[1]    "Eligible Holder" means any holder of an Impaired Excel General Unsecured Claim as of the Record Date.

4(a)(2) Eligible Holder submitting payment via its Nominee must tender such payment to its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent in advance of the Subscription Expiration Deadline.

**Holders of Syndicate Credit Deficiency Claims shall be entitled to participate in the 4(a)(2) Rights Offering, <u>provided that</u> if the class of Impaired Excel General Unsecured Claims votes to accept the Plan, the 4(a)(2) Subscription Rights of any holders of Syndicate Credit Deficiency Claims shall be deemed forever and irrevocably relinquished and waived on the Effective Date. If the class of Impaired Excel General Unsecured Claims does not vote to accept the Plan, the *pro rata* share for each Eligible Holder will be determined by multiplying (a) the total number of 4(a)(2) Offered Shares by (b) the quotient obtained by dividing (i) the amount of Impaired Excel General Unsecured Claims held by that 4(a)(2) Eligible Holder by (ii) the total amount of Impaired Excel General Unsecured Claims rounded to the nearest whole share.**

In order to facilitate participation in the 4(a)(2) Rights Offering, each Impaired Excel General Unsecured Claim will be determined to be Allowed or disallowed by no later than January 16, 2014, for purposes of participating in the 4(a)(2) Rights Offering. In the event that the holder of an Impaired Excel General Unsecured Claim that is disputed wishes to participate in the 4(a)(2) Rights Offering, such holder must file a motion pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure seeking allowance of such claim and obtain a ruling on such motion by no later than January 16, 2014.  Unless such a motion is timely filed and ruled upon, holders of disputed Impaired Excel General Unsecured Claims will be deemed to be disallowed for purposes of participating in the 4(a)(2) Rights Offering.

Eligible Holders will receive materials regarding the 4(a)(2) Rights Offering based on the current amount of Allowed Impaired Excel General Unsecured Claims.  If any disputed Impaired Excel General Unsecured Claims become Allowed by no later than January 16, 2014, the total amount of Allowed Impaired Excel General Unsecured Claims will increase.  In that event, the amount of Offered Shares that Eligible Holders will be entitled to purchase pursuant to the Rule 1145 Rights Offering will decrease.  To the extent the Rule 1145 Offered Shares corresponding to such additional Allowed Impaired Excel General Unsecured Claims are not subscribed for, the number of 4(a)(2) Offered Shares will include such number of shares.  In that case, any Eligible Holder who has fully subscribed for all 4(a)(2) Offered Shares that may be allocable to such Eligible Holder in the 4(a)(2) Rights Offering will have the one business day to subscribe for, and pay the applicable Purchase Price with respect to, such additional number of 4(a)(2) Offered Shares as may be available as a result thereof.

**In order to participate in the 4(a)(2) Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the 4(a)(2) Rights Offering.**

1.      **Rights Offering**

4(a)(2) Eligible Holders have the right, but not the obligation, to participate in the 4(a)(2) Rights Offering.

Subject to the terms and conditions set forth in the Plan, these 4(a)(2) Rights Offering Procedures and the 4(a)(2) Subscription Agreements:

Each 4(a)(2) Eligible Holder is entitled to subscribe for the 4(a)(2) Offered Shares at the Purchase Price. The number of 4(a)(2) Offered Shares actually subscribed for and purchased by a 4(a)(2) Eligible Holder shall be referred to as such 4(a)(2) Eligible Holder's "*4(a)(2) Shares.*"

Notwithstanding the foregoing, holders of Syndicate Credit Deficiency Claims shall be entitled to participate in the 4(a)(2) Rights Offering, provided that if the class of Impaired Excel General Unsecured Claims votes to accept the Plan the 4(a)(2) Subscription Rights of any holders of Syndicate Credit Deficiency Claims shall be deemed forever and irrevocably relinquished and waived on the Effective Date.  In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any 4(a)(2) Subscription Agreement and any 4(a)(2) Other Claims Subscription Form returned by a holder of a Syndicate Credit Deficiency Claim to the Subscription Agent will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of the 4(a)(2) Subscription Agreement.

Notwithstanding the foregoing, 4(a)(2) Eligible Holders shall only be entitled to participate in the 4(a)(2) Rights Offering to the extent that any Tranche A Offered Shares have not been subscribed for by Eligible Holders in the Rule 1145 Rights Offering prior to the Subscription Expiration Deadline.  In the event that the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering, any 4(a)(2) Subscription Agreement returned by a 4(a)(2) Eligible Holder will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of the 4(a)(2) Subscription Agreement.

**SUBJECT TO THE TERMS AND CONDITIONS OF THE 4(a)(2) SUBSCRIPTION AGREEMENT, ALL SUBSCRIPTIONS SET FORTH IN THE 4(a)(2) SUBSCRIPTION AGREEMENTS ARE IRREVOCABLE.**

2.      **Subscription Period**

The 4(a)(2) Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Expiration Deadline. Each 4(a)(2) Eligible Holder intending to purchase Common Stock in the 4(a)(2) Rights Offering must affirmatively elect to exercise its 4(a)(2) Subscription Rights in the manner set forth in the 4(a)(2) Rights Offering Instructions included with the 4(a)(2) Subscription Agreements (consistent herewith, including as described in Section 5 hereof) on or prior to the Subscription Expiration Deadline.

Any exercise of 4(a)(2) Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

3.      **Delivery of 4(a)(2) Subscription Agreements**

Each 4(a)(2) Eligible Holder may exercise all or any portion of such 4(a)(2) Eligible Holder's Subscription Rights, but subject to the terms and conditions of the 4(a)(2) Subscription Agreement, the exercise of any 4(a)(2) Subscription Rights will be irrevocable. In order to facilitate the exercise of the 4(a)(2) Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a 4(a)(2) Subscription Agreement to each 4(a)(2) Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the proper completion, due execution and timely delivery of the 4(a)(2) Subscription Agreement and the payment of the Purchase Price for its 4(a)(2) Shares.

4.      **Exercise of Subscription Rights**

In order to validly exercise 4(a)(2) Subscription Rights, each 4(a)(2) Eligible Holder must:

(a)     return a duly executed 4(a)(2) Subscription Agreement to the Subscription Agent or its Nominee, as applicable, so that such 4(a)(2) Subscription Agreement is actually received by the Subscription Agent on or before the Subscription Expiration Deadline;

(b)     return a duly completed and executed 4(a)(2) Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) or 4(a)(2) Other Claim Subscription Form (with accompanying IRS

Form W-9 or appropriate W-8, as applicable), as applicable, to the Subscription Agent or its Nominee, as applicable, so that such form and the Master 4(a)(2) Convertible Note Subscription Form, as applicable, are actually received by the Subscription Agent on or before the Subscription Expiration Deadline; and

(c)    at the same time it returns its 4(a)(2) Subscription Agreement and 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable, to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 3 of the 4(a)(2) Beneficial Holder Convertible Note Subscription Form or 4(a)(2) Other Claim Subscription Form, as applicable.

**Holders of  Convertible Notes** – With respect to (a), (b) and (c) above you must duly complete, execute and return your 4(a)(2) Beneficial Holder Convertible Note Subscription Form in accordance with the instructions herein **directly to your Nominee** in sufficient time to allow your Nominee to process your instructions and deliver to the Subscription Agent your completed 4(a)(2) Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), 4(a)(2) Subscription Agreement and payment on or before the Subscription Expiration Deadline.

In the event that funds received by the Subscription Agent in payment for such 4(a)(2) Eligible Holder's 4(a)(2) Shares are less than the Purchase Price, the number of such 4(a)(2) Eligible Holder's 4(a)(2) Shares deemed to be purchased by the 4(a)(2) Eligible Holder will be the lesser of (i) the number of such 4(a)(2) Eligible Holder's 4(a)(2) Shares requested by such 4(a)(2) Eligible Holder and (ii) a number determined by dividing the amount of such funds received by the Purchase Price.

The payments of cash made in accordance with the 4(a)(2) Rights Offering will be deposited and held by the Subscription Agent in a segregated escrow account until administered in connection with the settlement of the 4(a)(2) Rights Offering on the Effective Date. The Subscription Agent may not use such funds for any other purpose prior to such Effective Date and may not encumber or permit such funds to be encumbered with any lien or similar encumbrance. Such funds held by the Subscription Agent shall not be deemed part of the Debtors' bankruptcy estate.

**5.    Transfer Restriction; Revocation**

The 4(a)(2) Subscription Rights are not Transferable. Any Transfer or attempted Transfer of the 4(a)(2) Subscription Rights will be null and void, and no purported transferee will be treated as the holder of any 4(a)(2) Subscription Rights. Once a 4(a)(2) Eligible Holder has properly exercised its 4(a)(2) Subscription Rights, subject to the terms and conditions of the 4(a)(2) Subscription Agreement, such exercise will not be permitted to be revoked.

**6.    Return of Payment**

If the 4(a)(2) Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable 4(a)(2) Eligible Holder as soon as reasonably practicable, but in any event within four (4) Business Days, after the earlier of (a) the Subscription Expiration Deadline and (b) the date on which the 4(a)(2) Rights Offering is terminated.

In the event that the Subscription Agent receives more funds from a 4(a)(2) Eligible Holder than the aggregate Purchase Price for such 4(a)(2) Eligible Holder's 4(a)(2) Shares, giving effect to any applicable *pro rata* reduction of such 4(a)(2) Eligible Holder's subscription or over-subscription then such funds, to the extent of such overpayment, will be returned, without interest, to the applicable 4(a)(2) Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days after such determination is made.

In the event that the class of Impaired Excel General Unsecured Claims votes to accept the Plan, any funds paid by a holder of a Syndicate Credit Deficiency Claim in connection with its exercise of 4(a)(2) Subscription Rights, will be returned, without interest, as soon as reasonably practicable, but in any event within six (6) Business Days after acceptance or rejection of the Plan is filed with the Bankruptcy Court.

In the event that the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering, any funds paid by a holder of a 4(a)(2) Eligible Holder in connection with its exercise of 4(a)(2) Subscription Rights, will be returned, without interest, as soon as reasonably practicable, but in any event within six (6) Business Days after acceptance or rejection of the Plan is filed with the Bankruptcy Court.

**7.  Settlement of the 4(a)(2) Rights Offering and Distribution of the 4(a)(2) Offered Shares**

On the Effective Date, and immediately after the issuance of the 4(a)(2) Shares under the Plan, all 4(a)(2) Eligible Holders shall transfer any 4(a)(2) Shares they have subscribed for in the 4(a)(2) Rights Offering to Holdco automatically pursuant to the terms of the Plan and without further action required.  Subject to the terms in the Plan, such 4(a)(2) Eligible Holders shall receive Holdco Units in the same percentages as they held 4(a)(2) Shares in Reorganized Excel on the Effective Date after the exercise of their 4(a)(2) Subscription Rights. On the Effective Date (or as soon as reasonably practicable thereafter), the Company's will distribute the physical stock certificates representing the Holdco Units of Eligible Holder that properly exercised its rights in the 4(a)(2) Rights Offering in accordance with the delivery instructions set forth in such 4(a)(2) Eligible Holder's 4(a)(2) Subscription Agreement.

**8.      Fractional 4(a)(2) Shares**

No fractional shares will be issued in the 4(a)(2) Rights Offering. All share allocations (including each 4(a)(2) Eligible Holder's 4(a)(2) Shares) will be calculated to one decimal place and rounded down to the closest whole share.

**9.      Validity of Exercise of 4(a)(2) Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of 4(a)(2) Subscription Rights will be determined in good faith by the Company, with the consent of each of the Consenting Parties and if necessary, subject to a final and binding determination by the Bankruptcy Court.  The Company may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such time as they may determine in good faith, or reject the purported exercise of any 4(a)(2) Subscription Rights. 4(a)(2) Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Company determines in good faith.  In addition, the Company may permit any such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate.

*Before exercising any 4(a)(2) Subscription Rights, 4(a)(2) Eligible Holders should read the Disclosure Statement and Plan for information relating to the Debtors and risk factors to be considered.*

**10.     Modification of Procedures**

The Company reserves the right to modify or adopt additional procedures consistent with the provisions of the 4(a)(2) Rights Offering Procedures to effectuate the 4(a)(2) Rights Offering and to issue the 4(a)(2) Shares with the consent of each of the Consenting Parties, provided, however, that the Company shall provide prompt written notice to each 4(a)(2) Eligible Holder of any material modification to these 4(a)(2) Rights Offering Procedures made after the commencement of the 4(a)(2) Rights Offering. In so doing, the Company may execute and enter into agreements and take further action that the Company determines in good faith are necessary and appropriate to effect and implement the 4(a)(2) Rights Offering and the issuance of the 4(a)(2) Shares. Nothing in this paragraph shall be construed so as to permit the Company to modify the terms of the 4(a)(2) Subscription Agreement without the consent of the Subscriber.

**11.     Inquiries And Transmittal of Documents; Subscription Agent**

The 4(a)(2) Rights Offering Instructions included with the 4(a)(2) Subscription Agreement should be carefully read and strictly followed.

Questions relating to the 4(a)(2) Rights Offering should be directed to the Subscription Agent at the following phone number:

(212) 771-1128

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the 4(a)(2) Eligible Holder electing to exercise its 4(a)(2) Subscription Rights and not the Company or the Subscription Agent.

<u>Schedule 1A.</u>

**RIGHTS OFFERING INSTRUCTIONS**

**Terms used and not defined herein or in the 4(a)(2) Subscription Agreement shall have the meaning assigned to them in the Plan (as defined below).**

**To elect to participate in the 4(a)(2) Rights Offering, you must follow the instructions set out below:**

1. **Insert** the amount of your claim or Convertible Note holding, as applicable, that you held as of the Record Date in Item 1 of your 4(a)(2) Beneficial Holder Convertible Note Subscription Form (if your Nominee holds your Convertible Notes on your behalf and you do not know the amount, please contact your Nominee immediately) and/or Beneficial Holder Other Claim Subscription Form, as applicable.

2. **Complete** Item 2b of your 4(a)(2) Beneficial Holder Convertible Note Subscription Form and/or 4(a)(2) Other Claim Subscription Form, as applicable, indicating the number of 4(a)(2) Offered Shares you wish to purchase. Such amount must be in whole shares.

3. **Complete** the calculation in Item 2c of your 4(a)(2) Beneficial Holder Convertible Note Subscription Form and/or 4(a)(2) Other Claim Subscription Form, as applicable, which calculates the Purchase Price for the amount of 4(a)(2) Offered Shares that you wish to purchase.

4. **Read and complete** the certification in Item 4 of your 4(a)(2) Beneficial Holder Convertible Note Subscription Form and/or 4(a)(2) Other Claim Subscription Form, as applicable.

5. **Read and countersign** the 4(a)(2) Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

6. **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

7. **Return** your signed 4(a)(2) Subscription Agreement and 4(a)(2) Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and/ or 4(a)(2) Other Claim Subscription Form, as applicable (with accompanying IRS Form W-9 or appropriate W-8, as applicable), to the Subscription Agent, as applicable, in advance of the Subscription Expiration Deadline. Please note that all 4(a)(2) Beneficial Holder Convertible Note Subscription Forms must be returned to your Nominee early enough to be processed and for your Nominee to prepare and deliver the Master 4(a)(2) Convertible Note Subscription Form to the Subscription Agent prior to the Subscription Expiration Deadline.

8. **Arrange for full payment** of the aggregate Purchase Price, calculated in accordance with Item 2c of your Beneficial Holder Convertible Note Subscription Form and/or Beneficial Holder Other Impaired Excel General Unsecured Claims Subscription Form, to the Subscription Agent by wire transfer of immediately available funds in accordance with the instructions set forth below. Such payment must be received prior to the Subscription Expiration Deadline.

For 4(a)(2) Eligible Holders that do not hold Convertible Notes via a Nominee, payment shall be made to:

| Name of Account: | DONLIN RECANO AND CO INC E/F EXCEL MARITIME CARRIERS LTD |
| --- | --- |
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | *[Name of Nominee/Subscriber]* |

For 4(a)(2) Eligible Holders that hold Convertible Notes via a Nominee, payment should be made in accordance with the instructions provided by your Nominee. 4(a)(2) Eligible Holders that hold Convertible Notes via a Nominee, must transmit payment to their

Nominee for such Nominee to process such payment and deliver it to the 4(a)(2) Subscription Agent prior to the Subscription Expiration Deadline.

---

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.**

**Please note that any 4(a)(2) Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), 4(a)(2) Subscription Agreement and payment of the Purchase Price must be received by the broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "Nominee"), in accordance with your Nominee's procedures and instructions, in sufficient time to allow such Nominee to deliver the Master 4(a)(2) Convertible Note Subscription Form to the Subscription Agent by the Subscription Expiration Date or the subscription represented by your 4(a)(2) Beneficial Holder Convertible Note Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please note that any 4(a)(2) Other Claim Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), 4(a)(2) Subscription Agreement and payment of the Purchase Price must be received by the Subscription Agent by the Subscription Expiration Date or the subscription represented by your 4(a)(2) Other Claim Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**In the event that the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering, any 4(a)(2) Subscription Agreement returned by a 4(a)(2) Eligible Holder will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of the 4(a)(2) Subscription Agreement.**

---

Schedule 1B.

**EXCEL MARITIME CARRIERS LTD.**
**4(a)(2) BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

<div style="border:1px solid black">

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.**

**Please note that your 4(a)(2) Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable), 4(a)(2) Subscription Agreement and payment of the Purchase Price must be received by your Nominee in sufficient time to allow such Nominee to deliver the Master 4(a)(2) Convertible Note Subscription Form to the Subscription Agent by the Subscription Expiration Date or the subscription represented by your 4(a)(2) Beneficial Holder Convertible Note Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Please consult the Plan, the 4(a)(2) Subscription Agreement and the 4(a)(2) Rights Offering Procedures for additional information with respect to this 4(a)(2) Beneficial Holder Convertible Note Subscription Form.**

**PLEASE NOTE THAT IF THE TRANCHE A OFFERED SHARES HAVE BEEN FULLY SUBSCRIBED FOR IN THE RULE 1145 RIGHTS OFFERING, ANY 4(a)(2) SUBSCRIPTION AGREEMENT RETURNED BY A 4(a)(2) ELIGIBLE HOLDER WILL BE DEEMED NULL AND VOID AND ANY FUNDS PAID BY SUCH HOLDER WILL BE RETURNED IN ACCORDANCE WITH THE PROVISIONS OF THE 4(a)(2) SUBSCRIPTION AGREEMENT.**

</div>

**Item 1.  Amount of Convertible Notes.**

I certify that I am a beneficial holder of Convertible Notes in the following amount as of the Record Date (insert amount on the line below) or that I am the authorized signatory of that beneficial holder.

*[Insert amount of Convertible Notes, including accrued and unpaid interest through July 1, 2013, held at the Record Date]*

_____

**Item 2.  Rights.**

**2a. [Intentionally Omitted]**

**2b. Exercise Amount**. By filling in the following blank, you are indicating that the undersigned 4(a)(2) Eligible Holder is interested in purchasing the number of 4(a)(2) Shares specified below, on the terms and subject to the conditions set forth in the 4(a)(2) Subscription Agreement and 4(a)(2) Rights Offering Procedures.

**Number of 4(a)(2) Offered Shares**

(Note: Total must be in whole shares).

**2c. Calculation of Purchase Price**. The Purchase Price for the amount of the 4(a)(2) Shares you are interested in purchasing, as set forth in Item 2b above, equals:

*[Total 4(a)(2) Offered Shares Amount from Item 2b above]* x [*$16.25*

**2d. Accredited Investor Certification**.

The undersigned certifies that:

    ☐    it is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under Section 4(a)(2) of the Securities Act; and

    ☐    the Accredited Investor Questionnaire previously provided to the Subscription Agent by the undersigned remains true and correct in all respects.

**Item 3.  Payment and Delivery Instructions**

Payment of the Purchase Price calculated pursuant to Item 2c above shall be made by wire transfer ONLY of immediately available funds in accordance with the procedures of your Nominee.

Please mail or deliver your completed 4(a)(2) Beneficial Holder Convertible Note Subscription Form (with accompanying IRS Form W-9 or appropriate W-8, as applicable) and your properly executed 4(a)(2) Subscription Agreement and deliver payment of the Purchase Price to your Nominee **in sufficient time** to allow such Nominee to deliver the Master 4(a)(2) Convertible Note Subscription Form (and associated documentation) and all funds to the Subscription Agent by the Subscription Expiration Date.

Please provide your Nominee with bank account information for the return of any excess funds:

| | |
|---|---|
| Name of Account: | [•] |
| Bank Account No.: | [•] |
| Bank Name: | [•] |
| Bank Address: | [•] |
| Routing Number: | [•] |
| Special Instructions: | [•] |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS 4(a)(2) BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORM AND THE SIGNED SUBSCRIPTION AGREEMENT IS VALIDLY SUBMITTED TO YOUR NOMINEE IN SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO DELIVER THE MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM TO THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF YOUR PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE.**

**Item 4.  Certification.**

I certify that (i) as of the date hereof, the undersigned was the beneficial holder of the Convertible Notes set forth in Item 1 above at the Record Date and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the 4(a)(2) Subscription Agreement, the 4(a)(2) Rights Offering Procedures and the 4(a)(2) Rights Offering Instructions and (iii) I understand that the exercise of my rights under the 4(a)(2) Rights Offering is subject to all the terms and conditions set forth in the Plan, the 4(a)(2) Subscription Agreement and 4(a)(2) Rights Offering Procedures.

By electing to subscribe for the amount of 4(a)(2) Shares designated under Item 2 above, I am hereby instructing my Nominee to arrange for (i) the completion and delivery of its Master 4(a)(2) Convertible Note Subscription Form to the Subscription Agent and (ii) payment of the Purchase Price on or before the Subscription Agreement Deadline.

**I acknowledge that, by executing the 4(a)(2) Subscription Agreement and this 4(a)(2) Beneficial Holder Convertible Note Subscription Form, the undersigned 4(a)(2) Eligible Holder has elected to subscribe for the amount of the 4(a)(2) Shares**

designated under Item 2 above and will be bound to pay for the 4(a)(2) Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.

I further acknowledge that in the event that the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering, any 4(a)(2) Subscription Agreement returned by a 4(a)(2) Eligible Holder will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of the 4(a)(2) Subscription Agreement.

Date:

Name of Beneficial
Eligible Holder:

Name of Nominee:

U.S. Federal Tax
EIN/SSN (optional)

If Non-U.S. person, check    ☐
here and attach
appropriate IRS Form W-
8

If U.S. person, check here    ☐
and attach IRS Form W-9

Signature:

Name of Signatory:

Title:

Address:

Telephone Number:

Fax:

Email:

**Please indicate on the lines provided below the 4(a)(2) Eligible Holder's name and address as you would like it to be reflected on the Company's records for the 4(a)(2) Shares:**

**Registration Name/
Name of Controlled
Affiliate or Related
Fund in Whose Name
4(a)(2) Shares Should be
Issued:**

**Address:**

**PLEASE RETURN THIS 4(a)(2) BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE), THE 4(a)(2) SUBSCRIPTION AGREEMENT AND PAYMENT OF THE PURCHASE PRICE ONLY TO YOUR NOMINEE. <u>DO</u> <u>NOT</u> RETURN THIS FORM DIRECTLY TO THE SUBSCRIPTION AGENT.**

Schedule 1C.

**EXCEL MARITIME CARRIERS LTD.**
**MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM**
**FOR RIGHTS  OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

---

**For use by brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees for beneficial holders of Excel Maritime Carriers Ltd.'s 1.875% unsecured senior convertible notes issued pursuant to that certain indenture dated October 10, 2007 [CUSIP No. 300668AA8] (the "Convertible Notes").**

---

**YOUR MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM, COPIES OF THE BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND SUBSCRIPTION AGREEMENTS AND PAYMENTS OF THE SUBSCRIPTION PAYMENT AMOUNT MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY 5:00 P.M. (NEW YORK CITY TIME) ON JANUARY 17, 2014, (THE "SUBSCRIPTION EXPIRATION DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.**

**PLEASE LEAVE SUFFICIENT TIME FOR YOUR MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM TO REACH THE SUBSCRIPTION AGENT AND BE PROCESSED.**

**PLEASE CONSULT THE PLAN, THE 4(a)(2) SUBSCRIPTION AGREEMENT AND THE 4(a)(2) RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH RESPECT TO THIS MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT AT (212) 771-1128.**

---

**Item 1.   Certification of Authority to Subscribe.**

The undersigned certifies that it (please check the applicable box):

☐     Is a broker, bank or other nominee for the beneficial holders of the Convertible Notes listed in Item 2 below, and is the registered holder of such shares, or

☐     Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by the broker, bank, or other nominee that is the registered holder of the Convertible Notes listed in Item 2 below.

**Item 2.   Convertible Note Beneficial Holder Information**.

The undersigned certifies that the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the beneficial holders of the Convertible Notes, as identified by their respective account numbers, that have delivered duly completed 4(a)(2) Beneficial Holder Convertible Note Subscription Forms to the undersigned, which forms are attached hereto.

**(Please complete the information requested below. Attach additional sheets if necessary)**

| Your Customer Account Number for Each Beneficial Holder | Number of Convertible Notes (Item 1)[1] | Exercise Amount (Item 2b) |
|---|---|---|
|  |  |  |
|  |  |  |

---

[1] Item numbers reference the applicable section of the 4(a)(2) Beneficial Holder Convertible Note Subscription Form

|  |  |  |
|---|---|---|

### Item 3.  Payment and Delivery Instructions

All cash payments with respect to the exercise of 4(a)(2) Subscription Rights that are being transmitted by this Master 4(a)(2) Convertible Note Subscription Form shall be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| Name of Account: | DONLIN RECANO AND CO INC<br>E/F EXCEL MARITIME CARRIERS LTD |
|---|---|
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | [*Name of Nominee*] |

Please email, mail or deliver your completed subscription form (together with any duly completed and received 4(a)(2) Beneficial Holder Convertible Note Subscription Forms (with accompanying IRS Forms W-9 or appropriate W-8, as applicable) and 4(a)(2) Subscription Agreements) to:

> Donlin, Recano & Company, Inc.
> Attn: Excel Maritime Carriers LTD Subscription Agent
> 419 Park Avenue South, Suite 1206
> New York, NY 10016
> Tel: (212) 771 1128
> Email: ExcelRightsOffering@donlinrecano.com

Please provide bank account information for the return of any excess funds:

| Name of Account: | [●] |
|---|---|
| Bank Account No.: | [●] |
| Bank Name: | [●] |
| Bank Location: | [●] |
| Routing Number: | [●] |
| Special Instructions: |  |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORM, TOGETHER WITH THE APPLICABLE DULY COMPLETED AND EXECUTED 4(a)(2) BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORMS (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND EXECUTED 4(a)(2) SUBSCRIPTION AGREEMENTS, ARE VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF THE PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE, 5:00 P.M. NEW YORK CITY TIME ON JANUARY 17, 2014.**

---

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

**PROPERLY EXECUTED MASTER 4(a)(2) CONVERTIBLE NOTE SUBSCRIPTION FORMS ALONG WITH RESPECTIVE 4(a)(2) BENEFICIAL HOLDER CONVERTIBLE NOTE SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORMS) AND (4)(a)(2) SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT ExcelRightsOffering@donlinrecano.com BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT THE ORIGINAL MASTER 4(a)(2) SUBSCRIPTION FORM(S) WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

---

**Item 4.  Additional Certification.**

The undersigned certifies that for each beneficial holder whose exercise of rights are being transmitted by this Master 4(a)(2) Convertible Note Subscription Form (i) it is the authorized signatory of such beneficial holder of the amount of Convertible Notes listed under Item 1. of the 4(a)(2) Beneficial Holder Convertible Note Subscription Form, (ii) the beneficial holder is entitled to participate in the 4(a)(2) Rights Offering, (iii) the beneficial holder has been provided with a copy of the Plan, the 4(a)(2) Subscription Agreement, the 4(a)(2) Rights Offering Procedures and the 4(a)(2) Rights Offering Instructions and other applicable materials and (iv) true and correct copies of the 4(a)(2) Beneficial Holder Convertible Note Subscription Form have been received from each beneficial holder.


Date:

Name of Nominee:

DTC Participant Number:

U.S. Federal Tax
EIN/SSN (optional)

Signature:

Name:

Title:

Address:

Telephone Number:

Fax:

Email:

Schedule 1D.

**EXCEL MARITIME CARRIERS LTD.**
**4(a)(2) OTHER CLAIM SUBSCRIPTION FORM**
**FOR RIGHTS OFFERING**
**IN CONNECTION WITH DEBTORS'**
**AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 26, 2013**

---

**SUBSCRIPTION EXPIRATION DEADLINE**

The Subscription Expiration Deadline is 5:00 p.m. New York City Time on January 17, 2014.

Please leave sufficient time for your 4(a)(2) Other Claim Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to reach the Subscription Agent and be processed.

Please consult the Plan, the 4(a)(2) Subscription Agreement and the 4(a)(2) Rights Offering Procedures for additional information with respect to this 4(a)(2) Other Claim Subscription Form.

PLEASE NOTE THAT IF THE CLASS OF IMPAIRED GENERAL UNSECURED CLAIMS VOTES TO ACCEPT THE PLAN, ON THE EFFECTIVE DATE, YOU WILL BE DEEMED TO HAVE FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED YOUR RIGHT TO PARTICIPATE IN THE 4(a)(2) RIGHTS OFFERING AND THIS 4(a)(2) OTHER CLAIM SUBSCRIPTION FORM SHALL BE CONSIDERED NULL AND VOID.

PLEASE NOTE THAT IF THE TRANCHE A OFFERED SHARES HAVE BEEN FULLY SUBSCRIBED FOR IN THE RULE 1145 RIGHTS OFFERING, ANY 4(a)(2) SUBSCRIPTION AGREEMENT RETURNED BY A 4(a)(2) ELIGIBLE HOLDER WILL BE DEEMED NULL AND VOID AND ANY FUNDS PAID BY SUCH HOLDER WILL BE RETURNED IN ACCORDANCE WITH THE PROVISIONS OF THE 4(a)(2) SUBSCRIPTION AGREEMENT.

---

**Item 1.  Amount of Claim.**

I certify that I am a beneficial holder of [*describe claim*] in the following amount (insert amount on the line below) or that I am the authorized signatory of that beneficial holder:

[*Amount of claim*]

**Item 2.  Rights.**

**2a. [Intentionally Omitted]**

**2b. Exercise Amount**. By filling in the following blank, you are indicating that the undersigned 4(a)(2) Eligible Holder is interested in purchasing the number of 4(a)(2) Shares specified below, on the terms and subject to the conditions set forth in the 4(a)(2) Subscription Agreement and 4(a)(2) Rights Offering Procedures.

**Number of 4(a)(2) Offered Shares**

(Note: Total must be in whole shares).

**2c. Calculation of Purchase Price**. The Purchase Price for the amount of the 4(a)(2) Shares you are interested in purchasing, as set forth in Item 2b above, equals:

*[Total 4(a)(2) Offered Shares Amount from Item 2b above]* x [*$16.25*

**2d. Accredited Investor Certification**.

The undersigned certifies that:

☐  it is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under Section 4(a)(2) of the Securities Act; and

☐  the Accredited Investor Questionnaire previously provided to the Subscription Agent by the undersigned remains true and correct in all respects.

**Item 3.  Payment and Delivery Instructions**

Payment of the Purchase Price calculated pursuant to Item 2c above shall be made by wire transfer of immediately available funds in accordance with the instructions set forth below.

| | |
|---|---|
| Name of Account: | DONLIN RECANO AND CO INC<br>E/F EXCEL MARITIME CARRIERS LTD |
| Bank Account No.: | 7763056015 |
| Bank Name: | TD Bank |
| Bank Address: | 317 Madison Avenue, New York, NY 10017 |
| Routing Number: | 026013673 |
| Reference: | *[Name of Subscriber]* |

Please email, mail or deliver your completed 4(a)(2) Other Claim Subscription Form (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) and 4(a)(2) Subscription Agreements to:

Donlin, Recano & Company, Inc.
Attn: Excel Maritime Carriers LTD Subscription Agent
419 Park Avenue South, Suite 1206
New York, NY 10016
Tel: (212) 771 1128
Email: ExcelRightsOffering@donlinrecano.com

Please provide bank account information for the return of any excess funds or the full amount of your funds to the extent that the class of Impaired Excel General Unsecured Claims votes to accept the Plan or the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering:

| | |
|---|---|
| Name of Account: | [•] |
| Bank Account No.: | [•] |
| Bank Name: | [•] |
| Bank Location: | [•] |
| Routing Number: | [•] |
| Special Instructions: | |

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS 4(a)(2) OTHER CLAIM SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND THE SIGNED 4(a)(2) SUBSCRIPTION AGREEMENT IS VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE AND PAYMENT OF YOUR PURCHASE PRICE IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE.**

---

**ADDITIONAL INSTRUCTIONS IF YOU ARE RETURNING FORMS VIA EMAIL**

**YOUR PROPERLY EXECUTED 4(a)(2) OTHER CLAIM SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND 4(a)(2) SUBSCRIPTION AGREEMENTS CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT** ExcelRightsOffering@donlinrecano.com **BY THE SUBSCRIPTION EXPIRATION DEADLINE PROVIDED THAT YOUR ORIGINAL 4(a)(2) OTHER CLAIM SUBSCRIPTION FORM WITH ORIGINAL MEDALLION STAMP AND SIGNATURE IS MAILED OR DELIVERED TO THE SUBSCRIPTION AGENT PROMPTLY THEREAFTER.**

---

**Item 4.  Certification.**

I certify that (i) as of the date hereof, the undersigned was the beneficial holder of the [*describe claim*] set forth in Item 1 above at the Record Date and will continue to be the beneficial owner thereof through the Subscription Expiration Deadline, (ii) I have received a copy of the Plan, the 4(a)(2) Subscription Agreement, the 4(a)(2) Rights Offering Procedures and the 4(a)(2) Rights Offering Instructions and (iii) I understand that the exercise of my rights under the 4(a)(2) Rights Offering is subject to all the terms and conditions set forth in the Plan, the 4(a)(2) Subscription Agreement and 4(a)(2) Rights Offering Procedures.

**I acknowledge that, by executing the 4(a)(2) Subscription Agreement and this 4(a)(2) Other Claim Subscription Form, the undersigned 4(a)(2) Eligible Holder has elected to subscribe for the amount of the 4(a)(2) Shares designated under Item 2 above and will be bound to pay for the 4(a)(2) Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment. If payment is not received prior to the Subscription Expiration Deadline, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the 4(a)(2) Rights Offering.**

☐      **I further acknowledge that I am a holder of Syndicate Credit Deficiency Claims and am aware that if the class of Impaired Excel General Unsecured Claims votes to accept the Plan, on the Effective Date, I will be deemed to deemed to have forever and irrevocably relinquished and waived my right to participate in the 4(a)(2) Rights Offering and this Syndicate Credit Deficiency Claims Subscription Form shall be considered null and void.**

**I further acknowledge that in the event that the Tranche A Offered Shares have been fully subscribed for in the Rule 1145 Rights Offering, any 4(a)(2) Subscription Agreement returned by a 4(a)(2) Eligible Holder will be deemed null and void and any funds paid by such holder will be returned in accordance with the provisions of this 4(a)(2) Subscription Agreement.**

Date:

Name of Beneficial
Eligible Holder:

U.S. Federal Tax
EIN/SSN (optional)

If Non-U.S. person, check      ☐
here and attach
appropriate IRS Form W-
8

If U.S. person, check here      ☐
and attach IRS Form W-9

Signature:

Name of Signatory:

Title:

Address:

Telephone Number:

Fax:

Email:


**Please indicate on the lines provided below the 4(a)(2) Eligible Holder's name and address as you would like it to be reflected on the Company's records for the 4(a)(2) Shares:**

**Registration Name/**
**Name of Controlled**
**Affiliate or Related**
**Fund in Whose Name**
**4(a)(2) Shares Should be**
**Issued:**
**(*Please provide full legal name*)**


**Address:**

## EXHIBIT C

Plan Term Sheet

EXECUTION VERSION

SUBJECT TO FRE 408
FOR SETTLEMENT DISCUSSION PURPOSES ONLY
PRIVILEGED & CONFIDENTIAL

## Excel Maritime Carriers Ltd.

### Term Sheet for Restructuring Settlement Proposal

*This term sheet (the "Term Sheet") summarizes the terms of a proposal for the restructuring of Excel Maritime Carriers Ltd. and certain of its debtor affiliates (collectively, the "Debtors"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Pre-Negotiated Chapter 11 Plan of Reorganization of Excel Maritime Carriers Ltd., et al.*

*The Term Sheet is subject to, among other things, definitive documentation and is for discussion purposes only. The Term Sheet is provided in confidence and may be distributed only with the express written consent of the Debtors. The Term Sheet is provided in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, including United States federal securities laws regarding a person possessing material, non-public information. Nothing in the Term Sheet shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization within the meaning of Bankruptcy Code section 1125. Further, nothing in the Term Sheet shall be an admission of fact or liability or deemed binding on the Debtors and the foregoing remains subject to review and final approval by the Debtors.*

| | |
|---|---|
| **New Common Stock in Reorganized Excel** | 8.0% of the New Common Stock in Reorganized Excel shall be distributed to holders of Allowed Impaired Excel General Unsecured Claims ("Holders"), 83.3% of the New Common Stock to be distributed to the lenders under the Debtors' Syndicate Credit Facility (the "Syndicate Lenders") (not including the distributions such Syndicate Lenders are entitled to as a result of their Deficiency Claims (defined below) which shall constitute Allowed Impaired Excel General Unsecured Claims) and 8.7% of the New Common Stock of Reorganized Excel shall be distributed to Ivory on account of its $30 million investment ("Ivory's Investment Right") (such distributions collectively, the "Primary Equity"). |
| | To the extent described below, the Primary Equity shall be subject to dilution and Ivory's Investment Right shall be subject to reduction on account of the Holders' Co-Investment Right (defined below). |

1

**Holders' Co-Investment Right:**

Holders shall have the right on the Effective Date to purchase up to 2.9% of the New Common Stock of Reorganized Excel, at a purchase price of $10.0 million based on a total post-money equity value of $330 million (with Reorganized Excel having $300 million of funded indebtedness on the Effective Date).

The Holders' co-investment right shall be achieved by the Holders contributing up to $10.0 million in cash ("Holders' Co-Investment Right").

The first $5.0 million of the Holders' Co-Investment Right (the "Initial Co-Investment Right") shall dilute the Primary Equity. The Holders shall have full soak-up/over-subscription rights with respect to any unsubscribed portion of the Initial Co-Investment Right. To the extent the Holders do not fully exercise such over-subscription rights, Ivory shall have the right to subscribe for the unsubscribed portion of the Initial Co-Investment Right.

The second $5.0 million of the Holders' Co-Investment Right (the "Secondary Co-Investment Right") shall reduce Ivory's Investment Right on a dollar-for-dollar basis. Ivory shall have full soak-up/over-subscription rights with respect to any unsubscribed portion of the Secondary Co-Investment Right.

The Holders' Co-Investment Right will be at the same equity value as Ivory's investment. A calculation of the Holders' Co-Investment Right and the resulting equity distributions after the exercise of the entire Holders' Co-Investment Right is set forth on Exhibit A.

Each Holder's maximum aggregate Co-Investment Right, inclusive of any soak-up/over-subscription right, shall be limited to 75% of such Holder's pro rata portion of the Holders' claims against the unsecured assets of Excel Maritime Carriers Ltd.

2

| | |
|---|---|
| **Board of Directors and Chief Executive Officer:** | On the Effective Date, all shares of Reorganized Excel shall be transferred to a newly formed holdco entity that will be a Marshall Islands limited liability company ("Holdco").  The Holders, the Syndicate Lenders and Ivory shall receive interests in Holdco in the same percentages as they hold in Reorganized Excel on the Effective Date after the exercise, if at all, of the Holders' Co-Investment Right. |
| | From the Effective Date until the date that is two years after the Effective Date, the board of directors of Holdco (the "Board") shall consist of seven members, and shall be constituted as follows: (a) Oaktree shall have the right to designate three members of the Board; (b) Angelo Gordon shall have the right to designate two members of the Board, one of which designees shall be subject to the consent of Oaktree (such consent not to be unreasonably withheld); and (c) the current board of directors of the Debtors shall have the right to designate two members of the Board. |
| | Mr. Gabriel Panayotides shall serve as Chief Executive Officer of Reorganized Excel. |
| **Issuance of Equity to Syndicate Lenders and Holders Under Section 1145 of the Bankruptcy Code:** | The parties shall use commercially reasonable efforts to seek Bankruptcy Court approval to have the Primary Equity issued to the Syndicate Lenders and the Holders and the equity issued pursuant to the Holders' Co-Investment Right issued pursuant to Section 1145 of the Bankruptcy Code. |
| **Issuance of Equity to Ivory Under Section 4(2) of the Securities Act:** | The Primary Equity issued to Ivory and the equity, if any, issued to Ivory pursuant to the oversubscription rights described above shall be exempt from registration under the Securities Act of 1933 (as amended) by virtue of Section 4(2) thereof or Regulation D promulgated thereunder. |
| **Contractual Transferability & Registration Rights:** | The New Common Stock to be issued under the amended plan of reorganization and subsequent membership interests issued in Holdco, including pursuant to the Holders' Co-Investment Right (including in the hands of subsequent transferees), shall be freely transferable without being subject to any ROFO, ROFR, board approval or any other restriction, except for restrictions (i) imposed by applicable securities laws and (ii) on transfers that would cause Reorganized Excel or |

3

Holdco to become subject to the reporting obligations under the Securities Exchange Act of 1934. Holdco's governing documents shall provide holders of Holdco membership interests that are affiliates of Holdco with customary demand registration rights to sell their membership interests, piggy-back registration rights and marketing cooperation covenants; *provided* that such demand registration right cannot be exercised until the date that is eighteen (18) months after the Effective Date.

**Available Information:** Reorganized Excel shall make available on its website (including to prospective transferees) (i) unaudited quarterly and audited annual financial statements, on a timely basis, and (ii) to the extent not covered by (i), such information as is provided to the lenders under the Amended and Restated Senior Secured Credit Facility; provided that Reorganized Excel's obligation to provide the information described in (i) above shall commence after the first full quarter after Reorganized Excel emerges from chapter 11.

**Minority Protections:** Holdco's governing documents shall contain minority protections with respect to pre-emptive rights, restrictions on affiliate transactions that are not on arms' length terms and certain amendments to the provisions of Holdco's governing documents as described below.

Holdco's governing documents shall also provide for the holders of at least 60% of the membership interests in Holdco (the "Majority Interest Holders") to be entitled to drag-along rights in connection with a sale of Holdco to a party unaffiliated with the selling holder(s) (a "Drag-Along Sale"), which drag-along rights shall include, without limitation, an agreement by the holders of membership interests in Holdco to grant a voting proxy to the Majority Interest Holders in connection with such Drag-Along Sale, subject to definitive documentation, including any governance and/or shareholder arrangements among the senior lenders, which will not have any adverse impact on the minority rights set forth herein. If (i) such Drag-Along Sale is proposed within the first 12 months after the Effective Date and (ii) more than 50% of the fair market value of the consideration to be received by the holders of membership interests in Holdco in such Drag-Along Sale

4

consists of equity securities that are not publicly traded, then the issuer of such equity securities shall adopt corporate governance provisions substantially similar to those contained in this Term Sheet (including the provisions relating to Contractual Transferability and Available Information). In the event that holders desire to sell at least 50% of the outstanding Holdco membership interests in one or a series of related transactions, the other holders of Holdco membership interests shall have tag-along rights in connection with such sale.

The provisions of Holdco's governing documents set forth above (including, without limitation, the provisions relating to Contractual Transferability and Available Information) shall not be modified, amended or waived within the first year following the Effective Date, and thereafter shall not be modified, amended or waived without the prior written consent of both (A) holders of a majority of the equity securities in Holdco, excluding for the purposes of such calculation equity securities held by members who are affiliates of Holdco (which shall, for the avoidance of doubt, include on the Effective Date Oaktree and its affiliates and Ivory and its affiliates) and (B) Ivory, if (i) Ivory or its affiliates still own any equity securities of Holdco and (ii) such modification, amendment or waiver has a disproportionately adverse effect on Ivory or its affiliates as compared with the effect on non-affiliate holders of equity securities in Holdco.

**Treatment of Deficiency Claims held by Syndicate Lenders:**

The deficiency Claims held by the Syndicate Lenders in the aggregate amount of $179.8 million assuming an adequate protection payment in the amount of $6,176,868.76 is made on or before January 2, 2014, arising under the Debtors' Syndicate Credit Facility (the "Deficiency Claims") shall be allowed solely for voting purposes in such amount in connection with the plan of reorganization described in this Term Sheet and such claims shall be, subject to the next sentence, included within the class of Impaired Excel General Unsecured Claims (for the avoidance of doubt, subject to the next sentence, the Syndicate Lenders and their affiliates, on account of and to the extent of the Deficiency Claims, shall have all of the rights belonging to the Holders including, without limitation, all rights to distributions

5

and the Holders' Co-Investment Right, but excluding, to the extent such rights exist herein, the pre-Effective Date right to consents and approvals over documents or other terms belonging to the 'Holders' set forth herein).  All parties reserve all rights with respect to the amount, if any, and treatment of a deficiency Claims, if any, held by the Syndicate Lenders for all other purposes including, but not limited to, voting on and receiving distributions, in each case with respect to any plan of reorganization that is not consistent with the plan of reorganization described in this Term Sheet.  If the class of Impaired Excel General Unsecured Claims votes to accept the amended plan of reorganization with the terms described in this Term Sheet, then on the Effective Date, the holders of Deficiency Claims shall be deemed automatically and without the need for any action to have waived their entitlement to any distributions (including of Primary Equity) or Holders' Co-Investment Right on account of such Deficiency Claims, and the other Holders' pro rata participation in the Co-Investment Right shall be increased accordingly.  Each Syndicate Lender that is a party hereto will support a disclosure statement and plan of reorganization (including by voting to accept the plan of reorganization) that are consistent in all material respects with this agreed upon Term Sheet.

**Official Committee of Unsecured Creditors:**

The Official Committee of Unsecured Creditors (the "Creditors' Committee") and each of the current members of the Creditors' Committee as of the date of this Term Sheet, and their affiliates, in their capacity as Holders and their assignees (the "Committee Holders"), will support a disclosure statement and plan of reorganization (including by the Committee Holders voting to accept the plan of reorganization) that are consistent in all material respects with this agreed upon Term Sheet, to the extent that such members have discretionary investment authority over relevant accounts (and such members will use commercially reasonable efforts to obtain such support from any accounts over which such members do not have discretionary investment authority).

**Settlement of Adversary Case No. 13-08338:**

In consideration for Ivory's contribution to Reorganized Excel of $30 million in cash subject to dilution on account of the Holders' Secondary Co-Investment Right,

6

the amended plan of reorganization consistent in all material respects with this agreed upon Term Sheet shall constitute a good faith, full and final compromise and settlement of Adversary Case No. 13-08338 and any and all claims against Ivory in connection therewith.

**Release/Waiver/Settlement of any Challenge Right:**

Upon the effective date of a plan of reorganization on terms that are consistent in all material respects with this agreed upon term sheet, any remaining right the Creditors' Committee may have under the *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 507 and 552 and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Adequate Protection* (the "Final Cash Collateral Order") [Docket No. 133] to challenge the extent, perfection or priority of the Syndicate Lenders' claims and liens, as well as any other challenge of the claims or liens of the Syndicate Lenders or any adversary proceeding against or recovery from the Syndicate Lenders, including, but not limited to, any right to challenge the Syndicate Lenders' asserted liens in the Accounts, the Settlement Funds or the Settlement Funds Accounts as those terms are defined in *Stipulation and Agreed Order By and Among the Official Committee of Unsecured Creditors of Excel Maritime Carriers Ltd., et al., the Agent under the Senior Credit Agreement and the Steering Committee of Lenders Under the Senior Credit Agreement to Extend the Deadline for the Official Committee of Unsecured Creditors to Challenge Prepetition Liens Under the Final Cash Collateral Order* [Docket No. 374] shall be released and extinguished. The Creditors' Committee's deadline to initiate any challenge with respect to the Accounts, the Settlement Funds or the Settlement Fund Accounts shall be tolled until the earlier of (a) the effective date of a plan of reorganization on terms that are consistent in all material respects with this agreed upon term sheet and (b) December 31, 2013; provided, however, that such date may be further extended by the written agreement of the Creditors' Committee, Syndicate Lenders and the Agent. Such tolling or extension shall be memorialized in a stipulation to be filed with the Bankruptcy Court not later than November 22, 2013.

**Treatment of Claims of Insiders**

Any Claims asserted by insiders or affiliates of the

| | |
|---|---|
| **and Affiliates:** | Debtors shall not be treated as Impaired Excel General Unsecured Claims.  Holders of any such Claims shall not be permitted to receive any portion of the distribution made to Holders of Allowed Impaired Excel General Unsecured Claims. |
| **Unimpaired Claims:** | Any Claims that are Unimpaired under the Debtors' current plan of reorganization shall remain Unimpaired. |
| **Expenses of Indenture Trustee and Certain Syndicate Lenders:** | No later than the Effective Date, the reasonable and documented outstanding fees and expenses of (i) Christiana Trust as indenture trustee, including those of Moses & Singer LLP as counsel shall be paid in full by the Debtors as an administrative expense claim up to $450,000, (ii) Bracewell & Giuliani LLP as counsel to Ivory shall be paid in full by the Debtors as an administrative expense claim up to $500,000 less the $250,000 pre-petition retainer previously paid to Bracewell & Giuliani LLP, and (iii) (A) Wilmington Trust (London) Ltd. as administrative agent under the Syndicate Credit Facility and Blackstone Group LP, Freshfields Bruckhaus Deringer US LLP, and Holland & Knight LLP as advisors to the Secured Lenders, (B) Oaktree and certain of its affiliates in their capacity as a secured lender, including those of Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel, including those incurred both prior to and subsequent to the commencement of the Debtors' chapter 11 cases, and (C) Angelo Gordon and certain of its affiliates in their capacity as a secured lender primarily related to the negotiation and documentation of corporate governance up to $400,000, including those of Wachtell, Lipton, Rosen & Katz, in each case of this clause (iii), shall be paid in full by the Debtors as part of distributions to the Syndicate Lenders for the secured portion of their claims arising from the Debtors' Syndicate Credit Facility. |
| **Definitive Documents:** | Definitive documents relating to the foregoing, including but not limited to any plan or amended plan of reorganization, any disclosure statement or amended disclosure statement, the order confirming such plan, the order approving such disclosure statement, the plan supplement and any and all attachments thereto, the co-investment documents, the governing documents of Reorganized and Holdco, and the Amended and Restated Senior Secured Credit Facility (including the |

covenants to be included therein), shall each be acceptable to the Debtors, the Syndicate Lenders holding sixty-six and two-thirds in amount of the Claims held by the Syndicate Lenders (the "Requisite Syndicate Lenders"), the Creditors' Committee and Ivory.

**Affirmation of Holdings by Syndicate Lenders**

The undersigned Syndicate Lenders (the "Consenting Syndicate Lenders") hereby affirm that they hold directly or through a participation and have authority to vote 82.9% of the outstanding Claims arising under the Debtors' Syndicate Credit Facility.

**Affirmation of Holdings by Creditors' Committee**

The undersigned Committee Holders (the "Consenting Committee Holders") hereby affirm that as of the date hereof, they hold an aggregate of not less than $67,110,000 of the outstanding Allowed Impaired Excel General Unsecured Claims of which Committee Holders have discretionary investment authority over the relevant accounts ("Discretionary Authority Claims"), and have authority to vote and will vote the Discretionary Authority Claims to accept the plan of reorganization that is consistent in all material respects with this agreed upon Term Sheet.

**Obligations Binding on Transferees:**

The terms and conditions set forth in this Term Sheet shall be binding on any and all transferees and/or successors in interest of any of the Consenting Syndicate Lenders and Consenting Committee Holders including, without limitation, the obligation to support a disclosure statement and plan of reorganization (including by voting to accept the plan of reorganization) that are consistent in all material respects with this agreed upon Term Sheet and, if applicable, to waive Deficiency Claims.

9

**THE FOREGOING IS HEREBY
AGREED TO AND ACCEPTED
AS OF NOVEMBER 22, 2013:**

**EXCEL MARITIME CARRIERS LTD.,
FOR ITSELF AND ON BEHALF OF ITS
AFFILIATED DEBTORS AND
DEBTORS IN POSSESSION**

By: _____

Name: P. Kanellopoulos

Title: CFO

*[Signature Page to Restructuring Term Sheet]*

**IVORY SHIPPING INC.**

By: _____

Name: M. NOMIKOS

Title: DIRECTOR.

*[Signature Page to Restructuring Term Sheet]*

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF EXCEL
MARITIME CARRIERS LTD., ET AL.**

By: _____

Name: Nicholas M. Brown

Title: Committee Chairman

**ZAZOVE ASSOCIATES, LLC,**
**INVESTMENT ADVISOR WITH**
**DISCRETIONARY AUTHORITY**

By: _____

Name:  Steven M. Kleiman

Title:  Chief Operating Officer

**SILVERBACK ARBITRAGE MASTER FUND LTD.**
BY: SILVERBACK ASSET MANAGEMENT, LLC

By:
Name:
Title:

**KAYNE ANDERSON CAPITAL
INCOME PARTNERS (QP), L.P.**

By: _____
Name: mike Schimmel
Title: Portfolio Manager

*[Signature Page to Restructuring Term Sheet]*

**CHRISTIANA TRUST, AS INDENTURE
TRUSTEE**

By: _____
Name: PATRICK J. Healy
Title: Vice President

*[Signature Page to Restructuring Term Sheet]*

**WILMINGTON TRUST (LONDON),
LTD., AS ADMINISTRATIVE AGENT**

By: _____
Name:
Title:      **Paul Barton
            Director**

**OAKTREE CAPITAL MANAGEMENT, L.P., SOLELY IN ITS CAPACITY AS AGENT ON BEHALF OF CERTAIN LENDERS FOR WHICH IT ACTS INDIRECTLY AS DIRECTOR**

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

**OAKTREE FUND GP I, L.P. SOLELY IN ITS CAPACITY AS AGENT ON BEHALF OF CERTAIN LENDERS FOR WHICH IT ACTS INDIRECTLY AS MANAGER**

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

*[Signature Page to Restructuring Term Sheet]*

**SILVER OAK CAPITAL, L.L.C.**

By: _____
Name:
Title:

Michael L. Gordon
Authorized Signatory

*[Signature Page to Restructuring Term Sheet]*

**BANK OF AMERICA, N.A.**

By: _____

Name:  Jonathan M Barnes

Title: Vice President

**<u>Exhibit A</u>**

Exibit A to Term Sheet
($Millions)

| **Description** | | |
|---|---|---|
| Primary Equity | 8.0% | Prior to dilution from co-investment right. |
| Co-Investment Right | $10.0 | ( $5.0 million from Ivory's $30 million investment, reducing Ivory's investment to $25.0 million) |

| **Implied Post Money Equity** | |
|---|---|
| TEV | $595.0 |
| Less: Debt | (300.0) |
| Add: New Money - Ivory | 25.0 |
| Add: New Money - UCC | 10.0 |
| Implied Post-Money Equity | $330.0 |

| **Pro Forma Equity Ownership** | % Ownership | Equity Value ($) |
|---|---|---|
| Syndicate Lenders | 82.0% | $270.7 |
| Holders - Primary | 7.9% | 26.0 |
| Ivory | 7.1% | 23.6 |
| Co-Investment | 2.9% | 9.7 |
| Total | 100.0% | $330.0 |

APPENDIX B

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

LIST OF DEBTORS

**List of Debtors**

1. Excel Maritime Carriers LLC
2. Excel Maritime Carriers Ltd.
3. Amanda Enterprises Ltd.
4. Barland Holdings Inc.
5. Candy Enterprises Inc.
6. Castalia Services Ltd.
7. Centel Shipping Company Ltd.
8. Coal Gypsy Shipco LLC
9. Coal Hunter Shipco LLC
10. Coal Pride Shipco LLC
11. Fianna Navigation S.A.
12. Fountain Services Ltd.
13. Grain Express Shipco LLC
14. Grain Harvester Shipco LLC
15. Harvey Development Corp.
16. Ingram Ltd.
17. Iron Anne Shipco LLC
18. Iron Beauty Shipco LLC
19. Iron Bill Shipco LLC
20. Iron Bradyn Shipco LLC
21. Iron Brooke Shipco LLC
22. Iron Fuzeyya Shipco LLC
23. Iron Kalypso Shipco LLC
24. Iron Knight Shipco LLC
25. Iron Lindrew Shipco LLC
26. Iron Manolis Shipco LLC
27. Iron Miner Shipco LLC
28. Iron Vassilis Shipco LLC
29. Kirmar Shipco LLC
30. Liegh Jane Navigation S.A.
31. Lowlands Beilun Shipco LLC
32. Marias Trading Inc.
33. Ore Hansa Shipco LLC
34. Pascha Shipco LLC
35. Point Holdings Ltd.
36. Sandra Shipco LLC
37. Santa Barbara Shipco LLC
38. Snapper Marine Ltd.
39. Tanaka Services Ltd.
40. Teagan Shipholding S.A.
41. Thurman International Ltd.
42. Whitelaw Enterprises Co.
43. Yasmine International Inc.

APPENDIX C

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

CORPORATE ORGANIZATION CHART

# Excel Group Corporate Organization Chart

Footnotes:
(*) Non-Ship Owning Entity
(1) Management Company
(2) Joint venture 71.4% owned by Excel Maritime Carriers Ltd



APPENDIX D

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

LIQUIDATION ANALYSIS

## Liquidation Analysis

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (often called the "**Best Interests Test**"), holders of Allowed Claims must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code ("**Chapter 7**").

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets under Chapter 7. A hypothetical Chapter 7 liquidation, the Debtors, with assistance of their financial advisor, have prepared this hypothetical Liquidation Analysis (the "**Liquidation Analysis**") in connection with the Disclosure Statement. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, that would be available to the Debtors' creditors if the Debtors were to be liquidated pursuant to a Chapter 7 liquidation as an alternative to continued operation of the Debtors' business under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement. All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Disclosure Statement.

UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.

### GENERAL ASSUMPTIONS

#### *Overview of the Liquidation Process*

In a hypothetical Chapter 7, a trustee (the "***Chapter 7 Trustee***") would be appointed to manage the Debtors' affairs and to conduct a liquidation of the Debtors' assets. The Liquidation Analysis assumes that the Debtors would be forced to cease substantially all operations in an orderly manner and use their cash position to liquidate their assets and pay claims in accordance with the priority scheme set forth in the Bankruptcy Code.

#### *Hypothetical Liquidation Period*

The Debtors assume an expedited, but orderly wind-down of their operations to maximize recovery values. The hypothetical Chapter 7 liquidation is assumed to commence on December 31, 2013 following the conversion to a Chapter 7. While the Debtors assume the majority of the wind-down would be accomplished in approximately 90 days, the liquidation is likely to take up to six months to be completed fully for reasons including the following:

- The Debtors' revenues are primarily derived by employing their vessels on time charters and in the spot market of dry bulk vessels in a highly competitive environment. Commencement of a Chapter 7 liquidation is likely to cause customers to seek other sources of supply, making it highly unlikely that many of the Debtors' customers could be maintained by a Chapter 7 Trustee for any significant period of time following the end of specific voyages.

- A Chapter 7 liquidation would likely cause the Debtors' vendors to be alert to the status of any unpaid claims and would significantly increase the risk of ship arrests in foreign jurisdictions, thereby complicating the process associated with an orderly liquidation of those assets in a reasonable timeframe.

- With the Debtors facing liquidation, employees, including crews on the Debtors' vessels, would likely leave the Debtors to the extent there were employment opportunities elsewhere. In particular, crew members normally have short-term employment contracts and may leave following completion of a certain voyage. The loss of these employees would render the possibility of continuing operations in an effort to complete a sale of the consolidated Debtors unlikely and create difficulty over a long period of time in executing a liquidation through the sale of the Debtors' individual vessels.

*Estimate of Net Proceeds*

The Debtors estimated cash proceeds that could be realized from a liquidation of the Debtors' assets, primarily their fleet of dry bulk vessels, equity interest in Christine Shipco LLC and any additional operating assets such as customer receivables and other current assets. The net proceeds estimated in the Liquidation Analysis are based on unaudited asset and liability account balances for the Debtors as of the latest available date of September 30, 2013.[1]

All of the Debtors' vessels are employed under time charter and short-term voyage contracts with unaffiliated third-parties. To maximize the proceeds under the Liquidation Analysis, the Debtors have assumed that the individual short-term spot market vessel voyages will be completed such that the Debtors will satisfy contractual arrangements and receive payment for cargo shipped. With regard to time charter contracts, the Debtors assume that those contracts will continue to be honored during the liquidation process and the contracts transfer to the purchaser as part of a sale transaction. Therefore the purchase price received by the Debtors for vessels under time charter will include the value of the time charter contract transferred.

The Liquidation Analysis assumes the orderly wind-down of Maryville Maritime as the vessels operated by the subsidiary are sold to third-parties and its associated contracts, as technical and commercial manager, are not renewed. The assets of Maryville Maritime include a minimum amount of cash used to fund ongoing working capital such as vessel operating expenses and furniture and office equipment.

*Estimate of Costs*

The cost of the liquidation would include fees payable to a Chapter 7 trustee, as well as those which might be payable to attorneys and other professionals that such a trustee may engage. Further, priority expenses would include any obligations and unpaid expenses incurred by the Debtors both during the Chapter 11 case and from the start and until the conclusion of the Chapter 7 case. It is possible that in a Chapter 7 case, the wind-down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation. In addition, while the Debtors' assets are located outside of the United States, the Debtors expect the proceeds from the sale of these assets to be consistent across jurisdictions. Further, we assume that the expenses incurred to sell assets located outside of the United States would be comparable to the expenses incurred to sell such assets if they were located in the United States.

*Distribution of Net Proceeds*

The proceeds available represent the sum of the disposition of the Debtors' assets and cash on the balance sheet at the commencement of the hypothetical Chapter 7 liquidation.

Available proceeds from the liquidation of assets and cash would be first applied to the payment of post-petition Administrative Expense claims, including claims arising from the wind-down of the Debtors' business during the Chapter 7 liquidation process and any postpetition expenses associated with the Chapter 11 reorganization process. Following the payment of Administrative Expense claims, net proceeds attributable to the liquidation of the Debtors' vessels would first be applied to the satisfaction of prepetition maritime liens or claims with respect to services rendered on account of the Debtors' vessels, followed by the satisfaction of debt obligations secured by the respective Debtors' vessels. Remaining liquidated proceeds and cash, including assets unencumbered by the Debtors' loan agreements, would be available first for claims for the benefit of the lenders under the Syndicate Credit Facility on account of the diminution in the value of their cash collateral during the pendency of the chapter 7 wind-down. Any remaining liquidated proceeds and cash would be available for the satisfaction of General Unsecured Claims.

The holders of the Debtors' Syndicate Credit Facility have first priority mortgages over and assignments of earnings with respect to 35 of the Debtors' vessels and cash account pledges for each collateral vessel in which the Debtors have approximately $28.8 million in cash that will fund the Chapter 11 and Chapter 7 processes.   Any secured claims that are not satisfied by the liquidation of the underlying collateral securing the claims would represent an unsecured deficiency claim.

---

[1] Cash balance utilized for purposes of liquidation analysis based on latest available date of November 17, 2013 per reporting under the Debtors' cash collateral order.

The table below summarizes the estimated proceeds that would be available for distribution to the Debtors' creditors in a hypothetical liquidation of the Debtors' estates under Chapter 7 of the Bankruptcy Code. The estimated recoveries do not reflect any potential negative impact on the distributable value available to the Debtors' creditors on account of any potential unknown and contingent liabilities, including, but not limited to, environmental obligations and litigation claims, which could be material. Additional assumptions with respect to the Liquidation Analysis are provided below.

| Liquidation Analysis of Excel Maritime Carriers, Ltd. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/13 Amount | % Recovery | | | Liquidation Proceeds | | | See Note |
| | | Low | Mid | High | Low | Mid | High | |
| Cash and Cash Equivalents | $28.8 [1] | 100.0% | 100.0% | 100.0% | $28.8 | $28.8 | $28.8 | 1 |
| Accounts Receivable | 14.1 | 20.0% | 40.0% | 80.0% | 2.8 | 5.6 | 11.2 | 2 |
| Prepaid Expenses and Inventories | 8.9 | 48.9% | 64.0% | 80.0% | 4.4 | 5.7 | 7.1 | 3 |
| Value of Syndicate Facility Vessels | 575.7 | 24.5% | 60.0% | 80.0% | 141.2 | 345.4 | 460.6 | 4 |
| Other Fixed Assets | 0.4 | 10.0% | 20.0% | 30.0% | 0.0 | 0.1 | 0.1 | 5 |
| Excel Christine ShipCo Equity Value | 16.0 | - | 28.2% | 64.2% | - | 4.5 | 10.3 | 6 |
| **Proceeds Available for Post-Petition Administrative Claims** | | | | | **$177.2** | **$390.1** | **$518.1** | |
| Chapter 7 Trustee Fees (3% of Gross Proceeds) | | | | | $5.3 | $11.7 | $15.5 | 7 |
| Corporate Wind-down Costs | | | | | 10.6 | 13.5 | 15.5 | 8 |
| **Estimated Net Proceeds Available for Allocation** | | | | | **$161.2** | **$364.9** | **$487.0** | |
| Estimated Proceeds Available for Distribution to Syndicate Credit Facility Claim [2] | | | | | $161.2 | $360.5 | $477.1 | |
| Estimated Proceeds Available for Distribution to Unsecured Claim [3] | | | | | 0.1 | 4.3 | 9.9 | |
| Estimated Proceeds Available for Distribution to Syndicate Credit Facility Claim | | | | | $161.2 | $360.5 | $477.1 | |
| Less: Accrued Maritime Payables | | | | | (8.2) | (8.2) | (8.2) | 9 |
| **Proceeds Available for Distribution After Maritime Payables** | | | | | **$153.0** | **$352.3** | **$468.9** | |
| Less: Syndicate Credit Facility (Plus Accrued Interest) | | | | | (771.0) | (771.0) | (771.0) | 10 |
| **Estimated Net Proceeds After Distribution to Syndicate Credit Facility Claim** | | | | | **-** | **-** | **-** | |
| **Syndicate Facility Deficiency Claim** | | | | | **$618.1** | **$418.7** | **$302.1** | |
| Estimated Proceeds Available for Distribution to Unsecured Claim [3] | | | | | $0.1 | $4.3 | $9.9 | |
| Less: Syndicate Credit Facility Administrative Claim | | | | | (15.9) | (24.9) | (30.5) | 11 |
| **Estimated Net Proceeds After Distribution to Syndicate Credit Facility Administrative Claim** | | | | | **-** | **-** | **-** | |

| | Estimated Claim | | | % Recovery | | | Aggregate Proceeds | | | See Note |
|---|---|---|---|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High | Low | Mid | High | |
| **Estimated Net Proceeds Available for Unsecured Claims** | | | | | | | **-** | **-** | **-** | 12 |
| Convertible Senior Notes (Plus Accrued Interest) | $152.0 | $152.0 | $152.0 | - | - | - | - | - | - | |
| Syndicate Credit Facility Deficiency Claim | 618.1 | 418.7 | 302.1 | - | - | - | - | - | - | |
| Eurobank Interest Rate Swap | 2.2 | 2.2 | 2.2 | - | - | - | - | - | - | |
| Marfin Interest Rate Swap | 4.0 | 4.0 | 4.0 | - | - | - | - | - | - | |
| Cleaves Marine | 5.0 | 5.0 | 5.0 | - | - | - | - | - | - | |
| Other Pre-Petition Liabilities Subject to Compromise | 0.2 | 0.2 | 0.2 | - | - | - | - | - | - | |
| **Total Unsecured Claims** | **$781.5** | **$582.1** | **$465.5** | **-** | **-** | **-** | **-** | **-** | **-** | |
| **Estimated Net Proceeds Available for Equity** | | | | | | | **-** | **-** | **-** | |

(1) Assumes cash balances as of November 17, 2013.
(2) Represents assets secured under Syndicate Credit Facility agreement less pro-rata share of Administrative Claims.
(3) Represents assets unencumbered by the Debtors' credit facilities less pro-rata share of Administrative Claims.

## SPECIFIC ASSUMPTIONS

### Note 1- Cash and Equivalents
As of November 17, 2013 there is $37.3 million in cash and equivalents at Excel, including cash held by the Debtors and at non-Debtor subsidiaries and as adjusted for accrued and unpaid post-petition professional fees through September 30, 2013. Of the $37.3 million in total cash, $8.5 million is pledged under the Christine Shipco Facility and as such is included in the calculation of equity value for Christine ShipCo LLC.  Of the remaining cash and equivalents, $28.8 million is pledged to the Syndicate Credit Facility and contained in cash accounts with Maryville funded by the Debtors for the payment of operating expenses.

### Note 2 – Accounts Receivable
Estimated proceeds realized from accounts receivable under a liquidation are based on management's estimate of collectability and the assumption that every reasonable effort will be made by the Chapter 7 Trustee to collect

receivables from customers, a number of whom may be in various foreign jurisdictions. The amounts due from charters (accounts receivable) consist of freight receivables and accrued voyage revenue. Freight receivables are receivables for undisputed freight services that the Debtors have already performed. Accrued voyage revenue is freight income that is being earned at the time of the balance sheet of September 30, 2013. This amount would become a freight receivable after the cargo is delivered to the destination port.

### Note 3 – Prepaid Expenses and Inventories

Prepaid expenses and inventories include bunker and lubricants inventory and prepaid insurance. Bunker and lubricants includes inventory for which the Debtors' have purchased fuel and lubes to operate the vessels. This inventory is stored on-board the vessels at the time of purchase. Prepaid insurance includes insurance premiums paid in advance which cover a period of time which has not elapsed.

### Notes 4 – Value of Debtors' Vessels

The Liquidation Analysis assumes that the Debtors' vessels will be sold for scrap value or through the sale of the vessels to other shipping companies and/or financial investors in the secondary market over an accelerated time period. The Debtors have received appraisals from two independent ship brokerage firms, who conducted an asset-level appraisal of the Debtors' fleet and evaluated data as of November 2013 from VesselsValue, an internationally recognized provider of vessel sale and valuation information. These appraisals and indications of value are based on macroeconomic forecasts, industry conditions and recent asset transactions observed in the market and assume vessels to be in sound condition, free of average damage, free of charter commitments, and there being a willing seller and willing buyer. The value of any existing above or below market charter commitments is added to the appraisal value. Compared to a normalized asset sale scenario, the liquidation value of the vessels is estimated to be approximately 20% lower than the average of the two appraisals, including the charter commitment value. In a normalized scenario, with a reasonable amount of time, the Debtors' management believes it could sell any one vessel in a fair, reasonable, and negotiated transaction. Under a liquidation scenario (90 days), asset prices are predicted to be negatively affected as the sale of Debtors' fleet of 35 vessels (excluding M/V Christine) would temporarily overwhelm the vessel supply in the market. Based on the current marketplace for vessel scrapping, it is estimated that the scrap value of the Debtors' vessels would total approximately $141.2 million ($325 per LWT), or approximately 75.5% lower than the average of the three appraisals ($576).

### Note 5 – Other Fixed Assets

Other fixed assets include vessel equipment, furniture & fixtures and computer equipment, software & other. Vessel equipment includes capital goods aboard the vessel. A large portion of these items are significantly depreciated and may not result in significant liquidation value, particularly since the potential universe of buyers for these assets is narrow and is primarily comprised of competing companies.

### Note 6 – Value of Equity Interest in Christine Shipco LLC

The Debtors' are also party to a joint venture agreement under which the Debtors own 71.4% of the vessel-owning subsidiary Christine Shipco LLC. The remaining 28.6% is owned by an unaffiliated third-party to the Debtors. Christine Shipco LLC is owner of the vessel M/V Christine and is borrower under a secured loan agreement dated April 26, 2010, as amended with DVB Bank SE as lender. The loan agreement is secured by a first priority mortgage on the M/V Christine and as of November 17, 2013 has $27.9 million due in remaining loan principal. In conjunction with the amount outstanding, there is $8.5 million of restricted cash pledged under the loan agreement. The Debtors assume as part of the liquidation process that it would either sell its 71.4% equity stake in Christine Shipco LLC to the minority shareholder or a third-party. The value of the Debtors equity interest is based on an appraisal of the M/V Christine, consistent with the form and range of appraisals described for the Debtors' vessels above plus the value of the existing charter commitment and working capital, less net debt and accrued interest outstanding.

### Note 7 – Chapter 7 Trustee Fees

The Debtors estimate fees of $5.3 million to $15.5 million would be incurred for the Chapter 7 liquidation process and comprise Chapter 7 Trustee fees (3.0% of the gross proceeds available for distribution based on the Bankruptcy Code). The amount of Chapter 7 Trustee fees is estimated to be necessary due to the number of the Debtors' vessels and the complexity of the liquidation process.

*Note 8 – Corporate Wind-Down Costs*

Corporate wind-down costs consist of corporate overhead, occupancy costs and professional fees to be incurred during the Chapter 11 reorganization and Chapter 7 liquidation processes. It is assumed that the liquidation would occur over a six-month period beginning December 31, 2013 following the conversion of the Chapter 11 case to a Chapter 7 and that such expenses, costs and overhead would decrease over time. Any positive income from operating businesses during this time is assumed to offset corporate wind-down costs.

*Note 9 – Maritime Liens*

Maritime liens are generated from claims related to providing "necessaries" associated with vessel operations and include crew wages, vessel repairs and voyage supplies such as bunkers. The Liquidation Analysis assumes that maritime liens, in the form of trade accounts payable at the individual vessel-owning subsidiaries, are senior to the secured loan claims at the Debtors' vessel-owning subsidiaries and therefore are satisfied first through net proceeds available to the Debtors after the payment of Administrative Claims.

*Note 10 – Prepetition Secured Debt Obligations*

As of September 30, 2013, the substantial majority of the Debtors' secured liabilities consisted of funded debt comprised of first priority mortgage debt with principal consisting of approximately $771 million and adjusted for the adequate protection payment of $6.2 million in October 2013. Prior to the commencement of the Chapter 7 liquidation, it is estimated that accrued interest expense under the Syndicate Credit Facility will be equal to $6.1 million. The Liquidation Analysis assumes that the secured debt claims are satisfied following the payment of Administrative Claims and any maritime liens generated by the vessels that are collateralized by the secured debt.

*Note 11 – Syndicate Credit Facility Administrative Expense Claim*

The Syndicate Credit Facility lenders are entitled to, among other things, a superpriority administrative expense claim to the extent of the diminution in the value of their collateral during the pendency of the Chapter 11 and Chapter 7 processes. For ease of presentation, the claim amount included herein is limited to the diminution in cash collateral during the pendency of the Chapter 11 and Chapter 7 processes. However, the lenders also would be entitled to a superpriority administrative expense claim to the extent of the diminution in value of their vessel collateral as well.

*Note 12 – Unsecured Claims*

Prepetition non-priority unsecured claims include the 1.875% Convertible Senior Notes, prepetition accrued liabilities, interest rate swap contract rejection damages, prepetition bareboat charter payables, deficiency claims related to the prepetition secured debt obligations and other unsecured liabilities in a Chapter 7 liquidation. The Convertible Senior Notes claim consists of principal amount of $150 million plus accrued prepetition interest expense of $2.0 million. The estimated swap contract damage claims are based on the estimate of the mark-to-market liability of the swap liability as determined by discounting, at the prevailing treasury yield for the time period remaining on the respective swap contract, the net differential of future fixed rate payments made by the Debtors and the floating rate payments, based on forward LIBOR rates, made by the counterparty. The mark-to-market liability of the Marfin Swap has been estimated as of July 1, 2013. The Eurobank Swap was terminated on June 19, 2013 and the mark-to-market liability has been estimated as of that date.

APPENDIX E

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

FINANCIAL PROJECTIONS

**Financial Projections**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor thereto, unless such liquidation or reorganization is contemplated by the Plan. Accordingly, in connection with the planning and development of the Plan, and for the purposes of determining whether the Plan satisfies this "feasibility" standard, the Debtors analyzed their ability, as Reorganized Debtors, to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Specifically the Debtors prepared the following financial projections ("Financial Projections"), which reflect results of operations, cash flows and financial position for the years 2014 through 2018 (the "Projection Period"). These Financial Projections are presented on a consolidated basis for the Debtors and their subsidiaries (the "Company"). These Financial Projections, summarized below, have been adjusted to reflect the terms of the chapter 11 reorganization contemplated in this Disclosure Statement and should be read in conjunction with the "Risk Factors" referenced in this Disclosure Statement and the assumptions, qualifications and notes set forth below.

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES OR DISCLOSE PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT IT WILL, AND DISCLAIMS ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS, STRATEGIES, PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS OR RESULTS OF OPERATIONS TO CREDITORS OR EQUITYHOLDERS PRIOR TO THE EFFECTIVE DATE OF ANY PLAN OF REORGANIZATION OR TO INCLUDE SUCH INFORMATION IN DOCUMENTS REQUIRED TO BE FILED WITH THE SEC OR OTHERWISE MAKE SUCH INFORMATION PUBLICLY AVAILABLE.**

THE FOLLOWING FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED RULES OF THE SEC OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS. THE PROSPECTIVE FINANCIAL INFORMATION INCLUDED IN THIS DOCUMENT HAS BEEN PREPARED BY, AND IS THE RESPONSIBILITY OF, THE DEBTORS. THE DEBTORS BELIEVE THAT THE FOLLOWING PROJECTIONS HAVE BEEN PREPARED ON A REASONABLE BASIS, REFLECTING THE ASSUMPTIONS DESCRIBED BELOW.  THESE FINANCIAL PROJECTIONS CONTAIN FORWARD-LOOKING STATEMENTS (AS DEFINED IN SECTION 27A OF THE U.S. SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE U.S. SECURITIES EXCHANGE ACT OF 1934, AS AMENDED) CONCERNING FUTURE EVENTS. WORDS SUCH AS "WILL," "SHOULD," "EXPECT," "INTEND," "PLAN," "BELIEVE," "ANTICIPATE," "HOPE," "ESTIMATE," AND VARIATIONS OF SUCH WORDS AND SIMILAR EXPRESSIONS, WHICH ARE PREDICTIONS OF, OR INDICATE FUTURE EVENTS AND FUTURE TRENDS, WHICH DO NOT RELATE TO HISTORICAL MATTERS, IDENTIFY FORWARD-LOOKING STATEMENTS.  ALTHOUGH THE DEBTORS BELIEVE THAT THE EXPECTATIONS REFLECTED IN SUCH FORWARD-LOOKING STATEMENTS ARE REASONABLE, NO ASSURANCE CAN BE GIVEN THAT SUCH EXPECTATIONS WILL PROVE TO HAVE BEEN CORRECT HOWEVER, BECAUSE THIS INFORMATION IS HIGHLY SUBJECTIVE, IT SHOULD NOT BE RELIED ON AS INDICATIVE OF FUTURE RESULTS.  ERNST & YOUNG LLP HAS NEITHER EXAMINED, COMPILED NOR PERFORMED ANY PROCEDURES WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION CONTAINED IN THIS APPENDIX AND, ACCORDINGLY, ERNST & YOUNG LLP DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR ITS ACHIEVABILITY. ERNST & YOUNG LLP ASSUMES NO RESPONSIBILITY FOR AND DENIES ANY ASSOCIATION WITH THE PROSPECTIVE FINANCIAL INFORMATION.

GENERAL ASSUMPTIONS

The Financial Projections are based on the assumptions below and include assumptions with respect to the future performance of the Debtors, the performance of the industry, competition in the markets in which the Debtors will operate, general business and economic conditions and other matters, many of which are beyond the control of management.  These assumptions are based upon historical seasonality and industry experience, projected dry bulk supply and demand indicators and the estimated directions of specific commodity consumption markets.  The Debtors have incorporated the impact of the most recent data received from customers and suppliers wherever possible. Therefore, while the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period may vary from the Financial Projections, and could vary substantially. No representation can be or is being made with respect to the ability of the Debtors to achieve the Financial Projections.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions management and Reorganized Excel's Board of Directors make after fully evaluating strategic direction of the Debtors' and their business plan. Any deviations from the Debtors' business plan would necessarily cause a deviation from the Financial Projections, and could result in materially different outcomes from those projected herein. While management believes that the assumptions underlying the Projections are reasonable in light of current circumstances and the information available, holders of claims and interests must make their own determinations as to the reasonableness of the assumptions and the reliability of the Financial Projections in deciding whether to vote to accept the Plan. The Financial Projections assume the Plan will be confirmed, consummated and implemented in accordance with its stated terms.

*Accounting Disclosure*

Although some assumptions have been made, the Financial Projections do not reflect necessary or complete fresh-start reporting adjustments that may be required to be made on the effective date of the Plan. The Debtors will be required to estimate the Debtors' reorganization value, the fair value of their assets and their actual liabilities as of the effective date. Such determinations will be based upon the fair values as of that date, which could be materially greater or less than the value assumed in these projections. Any fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 – Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Debtors' reorganization value to the Debtors' assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141 – Business Combinations, will be made when the Debtors exit chapter 11.

*Overview of the Debtors*

The Debtors are a leading provider of worldwide seaborne transportation services for dry bulk cargo including, among others, iron ore, coal and grain, collectively referred to as "major bulks," and steel products, fertilizers, cement, bauxite, sugar and scrap metal, collectively referred to as "minor bulks". The Debtors, representing in-part wholly-owned direct subsidiaries of Excel, own a fleet of 35 vessels located throughout the world. In addition, Excel maintains a 71.4% equity interest in a non-Debtor subsidiary, Christine Shipco LLC that owns the vessel M/V Christine. The vessels owned by the Debtors and Christine Shipco LLC are managed by Maryville Maritime Inc., a wholly-owned non-Debtor subsidiary of Excel that provides in-house technical management services. The Debtors' cargo transportation services, as well as those of their competitors, perform a critical role in the trade of commodities necessary for end-markets that drive global economic growth, including industrial production, energy, agriculture and construction.

*Industry Overview*

The dry bulk trade comprises approximately one-third of all seaborne trade. The global dry bulk fleet consists of nearly 9,000 vessels with a combined capacity of 706.3 million deadweight tons. Dry bulk vessels are categorized based on vessel carrying capacity: Handymax (30,000 to 39,999 dwt), Supramax (40,000 to 59,999 dwt), Panamax (60,000 to 79,999 dwt), Kamsarmax (80,000 to 109,999 dwt), Capesize (110,000 to 199,999 dwt) and Very Large Ore Carriers (greater than 200,000 dwt). The dry bulk shipping market is highly fragmented, with over 1,600 independent owners. Primary customers include diversified natural resource companies, electric utilities, agriculture producers and commodities traders and distributors.

The demand for dry bulk transportation services is impacted by the underlying demand for the commodities shipped which is dependent on the growth of the global economy. The pricing of dry bulk transportation services is determined in a highly-competitive dry bulk charter market. Time charter contracts specify a term, with long-term period charters that expire more than four months on average. Voyage charters are charters for one specific voyage.

The Debtors deploy their vessels on a mix of time charters and voyage charters according to an assessment of market conditions, adjusting the mix of these charters to take advantage of the relatively stable cash flow and high utilization rates associated with longer-term time charters or to profit from attractive short-term period or voyage charter rates during periods of strong charter market conditions.

The dry bulk shipping industry is cyclical with attendant volatility in charter hire rates and profitability. Fluctuations in dry bulk charter rates result from changes in the supply and demand for vessel capacity and changes in the supply and demand for the major commodities carried by sea internationally. Dry bulk vessel demand is expressed in "ton-miles" which are measured as the product of (A) the amount of dry bulk cargo transported in vessels, and (B) the distance over which this dry bulk cargo is transported. Factors that influence demand for vessel capacity include: supply and demand for energy resources, commodities, semi-finished and finished consumer and industrial products; changes in the exploration or production of energy resources, commodities, semi-finished and finished consumer and industrial products; the location of regional and global exploration, production and manufacturing facilities; the location of consuming regions for energy resources, commodities, semi- finished and finished consumer and industrial products; the globalization of production and manufacturing; global and regional economic and political conditions, including armed conflicts and terrorist activities; embargoes and strikes; developments in international trade; changes in seaborne and other transportation patterns, including the distance cargo is transported by sea; environmental and other regulatory developments; currency exchange rates; and weather.

Dry bulk supply is largely determined by increases in supply from the investment in and deliveries of newbuilding vessels and decreases in supply due to delayed delivery or slippage of newbuilding vessels and the scrapping of older vessels. The factors that influence the supply of vessels include: the number of newbuilding deliveries; the scrapping rate of older vessels; vessel casualties; the level of port congestion; changes in environmental and other regulations that may limit the useful life of vessels; the number of vessels that are out of service, namely those that are laid-up, drydocked, awaiting repairs or otherwise not available for hire; and changes in global dry bulk commodity production. On average, newbuilding vessels are delivered within 36 months following order.

In recent years, the Debtors' business has operated in a competitive and challenging environment owing to a combination of both weak dry bulk vessel demand and the increase in dry bulk vessel supply. Demand for dry bulk commodities has been unable to fully absorb the new deadweight tonnage that has entered the dry bulk market. In 2012, fleet growth increased 10% based on deliveries of approximately 98.7 million deadweight tons, and is net of record levels of vessel scrapping (34 million deadweight tons). This follows dry bulk industry fleet growth of 15% in 2010 and 2011. In 2012, newbuilding orders, for vessels to be delivered through 2015, had been placed for an aggregate of approximately 25.4 million deadweight tons and are expected to increase to 46.2 million deadweight tons in 2013. The total orderbook of new dry bulk vessels stands at approximately 127 million deadweight tons as of the end of the second quarter of 2013 or 18% of the current industry fleet.

## KEY ASSUMPTIONS TO FINANCIAL PROJECTIONS
### Methodology
The Financial Projections represent selected income statement, balance sheet and cash flows for the fiscal years ending 2014 through 2018. The financial statements included herein reference the projected consolidated performance for the Company and as such include the projections for both the Debtors and their non-Debtor subsidiaries, including Christine Shipco LLC, owner of the M/V Christine, and Maryville Maritime Inc.

The Financial Projections were developed on a vessel-by-vessel, bottom-up basis for the Company and evidence multiple sources of information including general business and economic conditions as well as industry and competitive trends. After completion of the vessel-by-vessel build-up and combined with projected corporate general and administrative expenses, the financials were aggregated to form the consolidated financials for the Company.

*Revenue*

The Financial Projections project Net Voyage Revenue from both Time Charter and Voyage Charter contracts entered into by the Company and represent the income associated with providing dry bulk freight services to the Company's customers. A Time Charter represents a charter under which a customer pays a fixed daily or monthly rate for a fixed period of time for use of the vessel. Subject to any restrictions in the charter, the customer decides the type and quantity of cargo to be carried and the ports of loading and unloading. The customer pays all voyage expenses such as fuel, canal tolls, and port charges. The shipowner pays all vessel expenses, including technical and commercial management expenses. A Voyage Charter represents a charter under which a customer pays a transportation charge for the movement of a specific cargo between two or more specified ports. The shipowner pays all voyage expenses and all vessel expenses.

With respect to the Financial Projections, the term "Net Voyage Revenue" is equal to voyage revenue minus voyage expenses. It is projected using an assumption for Time Charter Equivalent ("TCE") revenues and vessel operating days. TCE revenues serve as an industry standard for measuring and managing fleet revenue and comparing results between geographical regions and among competitors. For a Time Charter contract, TCE is essentially equal to the daily rate a customer pays. For a Voyage Charter contract, TCE is equal to the voyage revenue minus voyage expenses, divided by the corresponding operating days. For the Financial Projections, the Company's TCE projections are based on a combination of industry projections and the Company's knowledge derived from its experience in the industry and ownership and operation of its vessels. The outlook for the demand for dry bulk commodities, and in turn the demand for transportation of those commodities, and the supply of vessels in the market play a role in determining the appropriate TCE projections. Projected TCE revenues reflect management's best estimates based on recent experience and expected trends.

Below is a list of the Company's expected Time Charter profile as of December 31, 2013. It is assumed that its vessels will achieve projected Voyage Charter rates once each vessel's respective Time Charter has expired.

### Time Charter Profile

| Vessel | Vessel Type | Expiration Date | Daily Rate |
|---|---|---|---|
| Christine[1] | Capesize | November 1, 2015 | $25,000 |
| Sandra[1] | Capesize | August 1, 2015 | $26,000 |
| Lowlands Beilun[1] | Capesize | August 14, 2015 | $28,000 |
| Iron Lindrew | Kamsarmax | February 3, 2014 | $11,968 |
| Elinakos | Panamax | January 11, 2014 | $7,525 |

(1) Charter includes a 50% profit-sharing arrangement over the indicated base daily time charter rate based on the monthly AV4 BCI Time Charter Rate, which is the Baltic Capesize Index Average for four specific time charter routes as published daily by the Baltic Exchange in London.

(*) Charter end date refers to the earliest redelivery date as per the respective charter contract.

The Company's management team estimated the future spot rates, as provided in the table below based on recent fixtures for the Company's vessels operating in the spot market, the prevailing market-based forward curve for freight rates earned by vessel-type for a 30 day voyage and expected freight rates as provided by a third-party industry source. The Company's management team based the projected spot rates on the assumption that there will gradually increase during these years based on a recovery in vessel demand and a decline in the supply of new vessels. Specifically, global dry bulk trade is projected to grow 5.2% in ton-mile terms while aggregate dry bulk fleet growth is projected to slow to an annual rate of 4.1% by 2015 as vessel deliveries decline from 98.7 million deadweight tons in 2012 to 74 million deadweight tons in 2013 and 46 million and 40 million deadweight tons in 2014 and 2015, respectively. Following 2015, fleet growth is projected to grow by 3.8% annually based on a projected rise in newbuild orders.

**Average Projected Spot Rates**

|          | Q4 2013  | FY 2014  | FY 2015  | FY 2016  | FY 2017  | FY 2018  |
|----------|----------|----------|----------|----------|----------|----------|
| Capesize | $32,000  | $15,000  | $16,000  | $20,000  | $21,000  | $21,000  |
| Kamsarmax| 16,000   | 12,250   | 16,000   | 19,000   | 19,000   | 19,000   |
| Panamax  | 15,000   | 12,000   | 15,000   | 18,000   | 18,000   | 18,000   |
| Handymax | 11,500   | 10,000   | 12,000   | 14,000   | 15,000   | 15,000   |

To calculate Net Voyage Revenue, a TCE rate is multiplied by vessel operating days over the projection period for each vessel and aggregated. The TCE rate is assumed to be equal to either the (a) rate defined in an active Time Charter contract or (b) projected spot rates defined in the table above. Vessel operating days are equal to the total days a vessel is in possession of the Company for the relevant period net of off-hire days associated with major repairs, drydockings and special surveys. Days associated with drydocking and special surveys, which is an out-of-service period during which planned repairs, maintenance and inspections are carried out, are estimated based on a schedule. According to industry regulations, vessels are placed into drydock approximately every 24-30 months whereas a special survey, which also normally includes the drydock of the vessel takes place every 60 months for major repairs and maintenance. In addition to drydock days, the Company employs a utilization factor to reduce vessel operating days to estimate other days for which a vessel may be off-hire. The utilization factor is the percentage of time that a vessel is available for revenue generating days. This is determined by dividing operating days by the available days (defined as the calendar days for the relevant period minus the projected off-hire days associated with major repairs, drydockings and special surveys). Calendar days are the total days a vessel is in possession of the Company for the relevant period including off-hire days associated with major repairs, drydockings and special surveys. The utilization factor assumed throughout the Projection Period is equal to 97.5%.

### Vessel Operating Expenses
In the Financial Projections, vessel operating expenses are calculated by multiplying the number of calendar days in a relevant period by a daily budget for each vessel. The daily budget is determined on a vessel by vessel basis and is created by management's best judgment. The budget includes an estimate of the operating costs for each vessel which includes crew costs, provisions, deck and engine stores, lubricating oil, insurance and maintenance and repairs. Over the Projection Period, vessel operating expenses are projected to grow annually at 2% from $5,159 per day during 2014 to approximately $5,363 per day during 2018.

### General and Administrative Expenses
General and administrative ("G&A") expenses were budgeted by the management of the Company on a line-by-line basis and include corporate payroll and benefits, office expenses and marketing and promotion costs. Management has projected G&A expense to grow annually at 2% from $24.1 million in 2014 to $26.1 million in 2018.

### Drydocking and Special Survey Costs
Drydock expenses are based on expected maintenance requirements corresponding to the age of the Company's fleet. For accounting purposes, the Company utilizes the direct expense method, under which the drydocking and special survey costs are expensed as they are incurred. Over the Projection Period, annual dry dock expense for the Company is projected to average $15.2 million.

### Charter Hire Amortization
Charter hire amortization represents non-cash amortization related to the aggregate value of assets or liabilities arising from the market value of the time charters assumed when a vessel is acquired in previous periods. Such assets and liabilities are amortized over the remaining term of the related charters as an increase in charter hire expense and revenue, respectively, and are classified as non-current in the Company's consolidated balance sheet.

*Net Working Capital*

As part of the Plan, claims related to trade payables will be honored in the ordinary course of business without interruption. As such, there is expected to be minimal permanent impact to the Company with regard to changes in net working capital. The Financial Projections reflect temporary changes in working capital during the second half of 2013 prior to emergence but the Company is projected to return to normalized trade terms beginning in 2014.

*Capital Expenditures*

The Financial Projections assume that the Company does not purchase additional vessels, new or secondhand, during the Projection Period. Four vessels, M/V Birthday, M/V Renuar, M/V Rodon and M/V Fortezza are assumed to be sold for scrap at $325 per LWT in 2018 based reaching an age of 25 years.

*Christine ShipCo LLC*

The non-Debtor Christine Shipco LLC is a joint venture in which Excel holds a 71.4% interest. The Financial Projections are consolidated to include the projected financial performance of Christine Shipco LLC through its ownership of the M/V Christine. No future dividends are assumed from the joint venture to the Company and the joint venture partner during the Projection Period. The non-controlling interest, representing the portion of equity not attributable, directly or indirectly, to the Company is included separately within the Company's equity account.

*Post-Effective Date Capital Structure and Equity Contribution*

The Plan contemplates a restructured capital structure for the Company consisting of a $300 million term loan governed by terms to be set forth in the amended and restated Syndicate Credit Facility. Under the amended and restated Syndicate Credit Facility, the term loan will bear interest at L+4.50% with no LIBOR floor. The amended and restated Syndicate Credit Facility will come due on December 31, 2018.

In addition, the post-effective date capital structure includes the secured loan agreement between Christine Shipco LLC as borrower and DVB Bank SE as lender. The loan agreement is secured by a first priority mortgage on the M/V Christine and is expected to have $27.9 million due in remaining loan principal upon the effective date. The DVB secured loan bears interest at L+3.00% with no LIBOR floor and will come due October 27, 2016. It is assumed that the loan is refinanced on substantially similar terms when it matures.

As part of the restructuring, $30 million of restricted cash, associated with the Syndicate Credit Facility, will be available to the Company to be used to fund operations and support liquidity. In addition, the Financial Projections include the investment of $35 million into the Company through Ivory Shipping and the co-investment rights offered to certain holders of Allowed Impaired Excel General Unsecured Claims upon the effective date of the Plan.

## FINANCIAL PROJECTIONS

### INCOME STATEMENT

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| | Fiscal Year Ended December 31, | | | | |
| **Net Voyage Revenue** | **$159** | **$186** | **$213** | **$217** | **$213** |
| Vessel operating expense | (68) | (69) | (71) | (72) | (70) |
| General & administrative expenses | (24) | (25) | (25) | (26) | (26) |
| **EBITDA** | **$67** | **$92** | **$117** | **$119** | **$116** |
| Depreciation & amortization | (47) | (47) | (47) | (47) | (47) |
| Drydocking and special survey costs | (16) | (17) | (21) | (16) | (12) |
| Charter hire amortization | 3 | 3 | 1 | - | - |
| **EBIT** | **$8** | **$32** | **$50** | **$57** | **$57** |
| Interest expense, net | (15) | (15) | (14) | (12) | (6) |
| U.S. source income taxes | (1) | (1) | (1) | (1) | (1) |
| **Net Income** | **($8)** | **$16** | **$35** | **$44** | **$50** |

### CASH FLOW STATEMENT

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| | Fiscal Year Ended December 31, | | | | |
| **Operating Activities** | | | | | |
| EBITDA | $67 | $92 | $117 | $119 | $116 |
| Drydocking and special survey costs | (16) | (17) | (21) | (16) | (12) |
| Interest and finance costs (cash), net | (15) | (15) | (14) | (12) | (6) |
| Tax payment | (1) | (1) | (1) | (1) | (1) |
| Change in working capital | 3 | 2 | 2 | 0 | 0 |
| **Cash from Operating Activities** | **$39** | **$61** | **$83** | **$91** | **$97** |
| **Investing Activities** | | | | | |
| Capital expenditures | - | - | - | - | 14 |
| **Cash from Investing Activities** | **-** | **-** | **-** | **-** | **$14** |
| **Financing Activities** | | | | | |
| Repayment of debt[1] | (3) | (28) | (42) | (62) | (47) |
| **Cash from Financing Activities** | **($3)** | **($28)** | **($42)** | **($62)** | **($47)** |
| **Beginning Cash** | $51 | $87 | $120 | $161 | $190 |
| Total cash flow | 36 | 33 | 41 | 29 | 63 |
| **Ending Cash** | **$87** | **$120** | **$161** | **$190** | **$253** |

(1) Net of proceeds from debt issuance or refinancing. DVB secured loan assumed to be refinanced on materially similar terms when it matures in October 2016.

Below is a reconciliation of the pre-emergence consolidated balance sheet as of December 31, 2013 to the post-emergence consolidated balance sheet as of December 31, 2013, as well as projected balance sheet information for fiscal years 2014 to 2018.

### BALANCE SHEET

| ($ in millions) | Projected 12/31/13 | Adjustments | Proforma 12/31/13 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $16 | $35 | $51 | $87 | $120 | $161 | $190 | $253 |
| Accounts receivable | 12 | - | 12 | 12 | 12 | 11 | 11 | 11 |
| Inventories | 9 | - | 9 | 9 | 9 | 9 | 9 | 9 |
| Prepayments and advances | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Assets** | **$37** | **$35** | **$72** | **$108** | **$141** | **$181** | **$210** | **$273** |
| Vessels, net of accum. depreciation | $901 | - | $901 | $854 | $807 | $760 | $713 | $653 |
| Other fixed assets, net of accum. depreciation | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Fixed Assets, net** | **$901** | **-** | **$901** | **$854** | **$807** | **$760** | **$713** | **$653** |
| **TOTAL ASSETS** | **$938** | **$35** | **$973** | **$962** | **$948** | **$942** | **$924** | **$926** |
| Accounts payable and accrued liabilities | $11 | - | $11 | $14 | $16 | $17 | $17 | $17 |
| Due to related parties | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred revenue | 1 | - | 1 | 1 | 1 | 1 | 1 | 1 |
| Time charters acquired, net of accum. depreciation | 8 | - | 8 | 4 | 1 | - | - | - |
| Liabilities subject to compromise[1] | 153 | (153) | - | - | - | - | - | - |
| **Long-Term Debt** | | | | | | | | |
| Pre-petition syndicate credit facility | $771 | ($771) | - | - | - | - | - | - |
| New Syndicate Senior Secured Term Loan | - | 300 | 300 | 300 | 275 | 235 | 175 | 130 |
| DVB secured term loan | 28 | - | 28 | 25 | 22 | 20 | 18 | 15 |
| **Total Debt** | **$799** | **($471)** | **$328** | **$325** | **$297** | **$255** | **$193** | **$145** |
| Equity | (34) | 659 | 625 | 617 | 633 | 668 | 712 | 762 |
| **LIABILITIES & SHAREHOLDERS EQUITY** | **$938** | **$35** | **$973** | **$962** | **$948** | **$942** | **$924** | **$926** |

(Fiscal Year Ended December 31, spans FY 2014 through FY 2018 columns)

---

(1) Includes convertible notes outstanding at book value, net of OID and the mark-to-market liability on the interest rate swap claims.

APPENDIX F

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

AUDITED FINANCIAL STATEMENTS FOR FISCAL YEAR 2011

ERNST & YOUNG( HELLAS)
Certified Auditors - Accountants S.A.
11ᵗʰ Km National Road Athens-Lamia
144 51 Athens, Greece

Tel: +30 210.2886.000
Fax: +30 210.2886.905
www.ey.com/eyse

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders of Excel Maritime Carriers Ltd.

We have audited the accompanying consolidated balance sheets of Excel Maritime Carriers Ltd. as of December 31, 2010 and 2011, and the related consolidated statements of operations, comprehensive income/loss, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Excel Maritime Carriers Ltd. at December 31, 2010 and 2011, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2011, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Excel Maritime Carriers Ltd.'s internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 30, 2012 expressed an unqualified opinion thereon.

*Ernst + Young*

Athens, Greece
March 30, 2012

ERNST & YOUNG (HELLAS)
Certified Auditors - Accountants S.A.
11th Km National Road Athens-Lamia
144 51 Athens, Greece

Tel: +30 210.2886.000
Fax: +30 210.2886.905
www.ey.com/eyse

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The Board of Directors and Stockholders of Excel Maritime Carriers Ltd.

We have audited Excel Maritime Carriers Ltd.'s internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Excel Maritime Carriers Ltd.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Excel Maritime Carriers Ltd. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Excel Maritime Carriers Ltd. as of December 31, 2010 and 2011 and the related consolidated statements of operations, comprehensive income/loss, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2011 of Excel Maritime Carriers Ltd. and our report dated March 30, 2012 expressed an unqualified opinion thereon.

*Ernst + Young*

Athens, Greece
March 30, 2012

**EXCEL MARITIME CARRIERS LTD.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 4 |
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 5 |
| Consolidated Balance Sheets as of December 31, 2010 and 2011 | 6 |
| Consolidated Statements of Operations for the years ended  December 31, 2009, 2010 and 2011 | 8 |
| Consolidated Statements of Comprehensive Income (Loss) for the years ended  December 31, 2009, 2010 and 2011 | 9 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2009, 2010 and 2011 | 10 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2009, 2010 and 2011 | 11 |
| Notes to Consolidated Financial Statements | 13 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Excel Maritime Carriers Ltd.

We have audited the accompanying consolidated balance sheets of Excel Maritime Carriers Ltd. as of December 31, 2010 and 2011, and the related consolidated statements of operations, comprehensive income/loss, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Excel Maritime Carriers Ltd. at December 31, 2010 and 2011, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2011, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Excel Maritime Carriers Ltd.'s internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 30, 2012 expressed an unqualified opinion thereon.

/s/ Ernst & Young (Hellas) Certified Auditors Accountants S.A.
Athens, Greece
March 30, 2012

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL**
**CONTROL OVER FINANCIAL REPORTING**

The Board of Directors and Stockholders of Excel Maritime Carriers Ltd.

We have audited Excel Maritime Carriers Ltd.'s internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Excel Maritime Carriers Ltd.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Excel Maritime Carriers Ltd. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Excel Maritime Carriers Ltd. as of December 31, 2010 and 2011 and the related consolidated statements of operations, comprehensive income/loss, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2011 of Excel Maritime Carriers Ltd. and our report dated March 30, 2012 expressed an unqualified opinion thereon.

/s/ Ernst & Young (Hellas) Certified Auditors Accountants S.A.
Athens, Greece
March 30, 2012

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2010 AND 2011**
(Expressed in thousands of U.S. Dollars – except for share and per share data)

| ASSETS | | 2010 | | 2011 |
|---|---|---|---|---|
| **CURRENT ASSETS:** | | | | |
| Cash and cash equivalents | $ | 65,917 | $ | 53,749 |
| Restricted cash (Notes 8 and 9) | | 6,721 | | 5,700 |
| Accounts receivable trade, net | | 7,961 | | 7,004 |
| Accounts receivable, other | | 4,546 | | 4,297 |
| Inventories (Note 5) | | 8,187 | | 8,851 |
| Prepayments and advances | | 3,753 | | 3,077 |
| Derivative financial instruments (Note 9) | | 116 | | 167 |
| **Total current assets** | | **97,201** | | **82,845** |
| | | | | |
| **FIXED ASSETS:** | | | | |
| Vessels, net of accumulated depreciation of $413,382 and $528,044 (Note 6) | | 2,622,631 | | 2,579,285 |
| Office furniture and equipment, net of accumulated depreciation of $1,718 and $2,241 (Note 6) | | 1,147 | | 941 |
| Advances for vessels under construction (Note 7) | | 76,585 | | - |
| **Total fixed assets, net** | | **2,700,363** | | **2,580,226** |
| | | | | |
| **OTHER NON CURRENT ASSETS:** | | | | |
| Time charters acquired, net of accumulated amortization of $108,344 as at December 31, 2010 (Note 11), and other deferred non- current assets | | 184,366 | | 1,108 |
| Derivative financial instruments (Note 9) | | 923 | | - |
| Restricted cash (Note 8) | | 48,967 | | 57,750 |
| **Total other non current assets** | | **234,256** | | **58,858** |
| | | | | |
| **Total assets** | $ | **3,031,820** | $ | **2,721,929** |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| | | | | |
| **CURRENT LIABILITIES:** | | | | |
| Current portion of long-term debt, net of unamortized deferred financing fees (Note 8) | $ | 107,369 | $ | 104,879 |
| Accounts payable | | 11,101 | | 12,062 |
| Due to related parties  (Note 4) | | 827 | | 486 |
| Deferred revenue | | 17,887 | | 13,924 |
| Accrued liabilities | | 13,608 | | 16,696 |
| Derivative financial instruments (Note 9) | | 21,945 | | 19,453 |
| **Total current liabilities** | | **172,737** | | **167,500** |
| | | | | |
| Long-term debt, net of current portion and net of unamortized deferred financing fees (Note 8) | | 1,046,672 | | 952,716 |
| Time charters acquired, net of accumulated amortization of $860,640 and $864,115 (Note 11) | | 18,108 | | 14,633 |
| Derivative financial instruments (Note 9) | | 30,155 | | 26,516 |
| **Total non current liabilities** | | **1,094,935** | | **993,865** |
| | | | | |
| **Total liabilities** | | **1,267,672** | | **1,161,365** |
| | | | | |
| Commitments and contingencies (Note 15) | | - | | - |
| | | | | |
| **STOCKHOLDERS' EQUITY:** | | | | |

Preferred Stock, $0.01 par value; 5,000,000 shares authorized; none issued — -

Common Stock, $0.01 par value; 994,000,000 Class A shares and 1,000,000 Class B shares authorized; 84,946,779 Class A shares and 180,746 Class B shares, issued and outstanding at December 31, 2010 and 88,909,430 Class A shares and 230,746 Class B shares, issued and outstanding at December 31, 2011 (Note 12)

| | | |
|---|---:|---:|
| Common Stock (see note above) | 851 | 891 |
| Additional paid-in capital (Notes 12 and 13) | 1,061,134 | 1,071,263 |
| Accumulated Other Comprehensive Income (Loss) (Note 9) | 211 | (3,064) |
| Retained Earnings | 691,674 | 480,081 |
| Treasury stock (115,529 Class A shares and 588 Class B shares at December 31, 2010,  78,650 Class A shares and 588 Class B shares at December 31, 2011) | (189) | (189) |
| **Excel Maritime Carriers Ltd. Stockholders' equity** | **1,753,681** | **1,548,982** |
| | | |
| Non-controlling interests (Note 1) | 10,467 | 11,582 |
| | | |
| **Total stockholders' equity** | **1,764,148** | **1,560,564** |
| | | |
| **Total liabilities and stockholders' equity** | $ **3,031,820** | $ **2,721,929** |

The accompanying notes are an integral part of these consolidated financial statements.

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEARS ENDED DECEMBER 31, 2009, 2010 AND 2011**
(Expressed in thousands of U.S. Dollars-except for share and per share data)

| | 2009 | 2010 | 2011 |
|---|---|---|---|
| **REVENUES:** | | | |
| Voyage revenues (Notes 1 and 4) | $ 391,746 | $ 422,966 | $ 353,397 |
| Time charter amortization (Note 11) | 364,368 | 262,305 | 3,475 |
| Revenue from managing related party vessels (Note 4) | 488 | 376 | 17 |
| **Total revenues** | **756,602** | **685,647** | **356,889** |
| | | | |
| **EXPENSES:** | | | |
| Voyage expenses (Note 17) | 19,317 | 27,563 | 42,740 |
| Charter hire expense | 32,832 | 32,831 | 32,832 |
| Charter hire amortization (Note 11) | 39,952 | 39,945 | 36,526 |
| Commissions to related parties (Notes 4 and 17) | 2,260 | 3,188 | 3,892 |
| Vessels operating expenses (Note 17) | 83,197 | 86,700 | 85,074 |
| Depreciation (Note 6) | 123,411 | 125,283 | 128,089 |
| Drydocking and special survey costs | 11,379 | 11,243 | 13,326 |
| General and administrative expenses (Notes 13 and 15) | 42,995 | 35,748 | 35,583 |
| **Total Expenses** | **355,343** | **362,501** | **378,062** |
| | | | |
| **OTHER OPERATING INCOME/(LOSS):** | | | |
| Gain on sale of vessel (Note 6) | 61 | - | 6,432 |
| Impairment loss on intangible asset (Note 11) | - | - | (146,732) |
| Loss on disposal of JV ownership interest | (3,705) | - | - |
| | | | |
| **Operating income (loss)** | **397,615** | **323,146** | **(161,473)** |
| | | | |
| **OTHER INCOME (EXPENSES):** | | | |
| Interest and finance costs (Notes 8 and 18) | (57,096) | (38,122) | (37,133) |
| Interest income | 809 | 1,436 | 1,551 |
| Losses on derivative financial instruments (Note 9) | (1,126) | (27,061) | (13,292) |
| Foreign exchange losses | (322) | (44) | (187) |
| Other, net | 408 | 243 | 839 |
| **Total other income (expenses), net** | **(57,327)** | **(63,548)** | **(48,222)** |
| | | | |
| **Net income (loss) before taxes and loss assumed (income earned) by non-controlling interest** | **340,288** | **259,598** | **(209,695)** |
| US Source Income taxes (Note 16) | (660) | (772) | (700) |
| **Net income (loss) before loss assumed (income earned) by non-controlling interest** | **339,628** | **258,826** | **(210,395)** |
| Loss assumed (income earned) by non-controlling interest | 154 | (997) | (1,198) |
| **Net income (loss) attributed to Excel Maritime Carriers Ltd.** | **$ 339,782** | **$ 257,829** | **$ (211,593)** |
| | | | |
| **Earnings (losses) per common share, basic (Note 14)** | **$ 5.03** | **$ 3.20** | **$ (2.51)** |
| **Weighted average number of shares, basic** | **67,565,178** | **80,629,221** | **84,463,674** |
| **Earnings (losses) per common share, diluted (Note 14)** | **$ 4.85** | **$ 3.10** | **$ (2.51)** |
| **Weighted average number of shares, diluted** | **69,999,760** | **83,102,923** | **84,463,674** |

The accompanying notes are an integral part of these consolidated financial statements.

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**FOR THE YEARS ENDED DECEMBER 31, 2009, 2010 AND 2011**
(Expressed in thousands of U.S. Dollars)

|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| **Net income (loss)** | $ 339,628 | $ 258,826 | $ (210,395) |
| | | | |
| **Other Comprehensive Income (loss):** | | | |
| Unrealized interest rate swap gains (losses) | - | 514 | (4,225) |
| Reclassification adjustments of interest rate swap losses transferred to Consolidated Statement of Operations | - | (229) | 704 |
| Actuarial gains (losses) | (11) | 11 | 246 |
| **Other Comprehensive Income (loss)** | **(11)** | **296** | **(3,275)** |
| | | | |
| **Comprehensive income (loss)** | $ 339,617 | $ 259,122 | $ (213,670) |
| | | | |
| Comprehensive loss (income) attributable to the non-controlling interest | 154 | (997) | (1,198) |
| | | | |
| **Comprehensive income (loss) attributed to Excel Maritime Carriers Ltd.** | $ 339,771 | $ 258,125 | $ (214,868) |

The accompanying notes are an integral part of these consolidated financial statements.

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2009, 2010 AND 2011**
(Expressed in thousands of U.S. Dollars − except for share data)

| | Common Stock | | Additional Paid-in Capital | Accumulated other comprehensive income (loss) | Retained Earnings | Treasury Stock | Excel Maritime Carriers Ltd. Stockholders' Equity | Non-controlling interests | Total Stockholders' equity |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Shares | Par Value | | | | | | | |
| **BALANCE, December 31, 2008** | 46,226,018 | $ 461 | $ 944,207 | $ (74) | $ 94,063 | $ (189) | $ 1,038,468 | $ 14,930 | $ 1,053,398 |
| - Net income | - | - | - | - | 339,782 | - | 339,782 | (154) | 339,628 |
| - Issuance of common stock | 31,714,286 | 318 | 89,812 | - | - | - | 90,130 | - | 90,130 |
| - Issuance of restricted stock and stock-based compensation expense | 1,975,601 | 20 | 19,827 | - | - | - | 19,847 | - | 19,847 |
| -Non controlling interest contributions | - | - | - | - | - | - | - | 3,328 | 3,328 |
| - Transfer/ exchange of ownership interests | - | - | (7,240) | - | - | - | (7,240) | (12,808) | (20,048) |
| - Actuarial losses | - | - | - | (11) | - | - | (11) | - | (11) |
| **BALANCE, December 31, 2009** | **79,915,905** | **$ 799** | **$ 1,046,606** | **$ (85)** | **$ 433,845** | **$ (189)** | **$ 1,480,976** | **$ 5,296** | **$ 1,486,272** |
| - Net income | - | - | - | - | 257,829 | - | 257,829 | 997 | 258,826 |
| - Issuance of common stock | 3,241,680 | 32 | 4,901 | - | - | - | 4,933 | - | 4,933 |
| - Issuance of restricted stock and stock-based compensation expense | 1,969,940 | 20 | 9,627 | - | - | - | 9,647 | - | 9,647 |
| -Non controlling interest contributions | - | - | - | - | - | - | - | 4,174 | 4,174 |
| - Unrealized interest rate swap gains | - | - | - | 285 | - | - | 285 | - | 285 |
| - Actuarial gains | - | - | - | 11 | - | - | 11 | - | 11 |
| **BALANCE, December 31, 2010** | **85,127,525** | **$ 851** | **$ 1,061,134** | **$ 211** | **$ 691,674** | **$ (189)** | **$ 1,753,681** | **$ 10,467** | **$ 1,764,148** |
| - Net loss | - | - | - | - | (211,593) | - | (211,593) | 1,198 | (210,395) |
| - Issuance of restricted stock and stock-based compensation expense | 4,049,611 | 40 | 10,129 | - | - | - | 10,169 | - | 10,169 |
| -Cancellation of shares | (36,960) | - | - | - | - | - | - | - | - |
| - Joint venture de-consolidation | - | - | - | - | - | - | - | (83) | (83) |
| - Unrealized interest rate swap losses | - | - | - | (3,521) | - | - | (3,521) | - | (3,521) |
| - Actuarial gains | - | - | - | 246 | - | - | 246 | - | 246 |
| **BALANCE, December 31, 2011** | **89,140,176** | **$ 891** | **$ 1,071,263** | **$ (3,064)** | **$ 480,081** | **$ (189)** | **$ 1,548,982** | **$ 11,582** | **$ 1,560,564** |

The accompanying notes are an integral part of these consolidated financial statements

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2009, 2010 AND 2011**
(Expressed in thousands of U.S. Dollars)

| | 2009 | 2010 | 2011 |
|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | |
| Net income (loss) | $ 339,628 | $ 258,826 | $ (210,395) |
| **Adjustments to reconcile net income (loss) to net cash** | | | |
| **provided by operating activities:** | | | |
| Depreciation | 123,411 | 125,283 | 128,089 |
| Amortization of convertible notes debt discount | 6,154 | 6,736 | 7,365 |
| Amortization of deferred financing fees | 3,823 | 3,509 | 3,425 |
| Time charter revenue amortization, net of charter hire amortization expense and write-off | (324,416) | (222,360) | 33,051 |
| Impairment loss on intangible asset | - | - | 146,732 |
| Gain on joint venture de-consolidation | - | - | (83) |
| Gain on sale of vessel | (61) | - | (6,432) |
| Loss on disposal of JV ownership interest | 3,705 | - | - |
| Stock-based compensation expense | 19,847 | 9,647 | 10,169 |
| Unrealized gains on derivative financial instruments | (27,238) | (1,943) | (8,780) |
| Unrecognized actuarial (gains) losses | (11) | 11 | 246 |
| **Changes in operating assets and liabilities:** | | | |
| Accounts receivable | 4,231 | (6,491) | 1,206 |
| Financial instruments settled in the period | - | (612) | - |
| Inventories | 235 | (3,708) | (664) |
| Prepayments and advances | (1,058) | (672) | 676 |
| Due from related parties | 221 | - | - |
| Accounts payable | (1,091) | 5,752 | 961 |
| Due to related parties | (388) | 574 | (341) |
| Accrued liabilities | (14,689) | (5,060) | 3,088 |
| Deferred revenue | 14,949 | (10,993) | (3,963) |
| **Net Cash provided by Operating Activities** | $ 147,252 | $ 158,499 | $ 104,350 |
| **Cash Flows used in Investing Activities:** | | | |
| Joint ventures ownership transfer | (1,591) | - | - |
| Advances for vessels under construction | (9,379) | (92,701) | (18,267) |
| Additions to vessel cost | (113) | (13) | (25) |
| Proceeds from sale of vessel | 3,735 | - | 17,089 |
| Proceeds received from Oceanaut liquidation | 5,212 | - | - |
| Office furniture and equipment | (146) | (135) | (317) |
| **Net cash used in Investing Activities** | $ (2,282) | $ (92,849) | $ (1,520) |
| **Cash Flows used in Financing Activities:** | | | |
| (Increase) decrease in restricted cash | (34,400) | 3,712 | (7,762) |
| Proceeds from long-term debt | 5,067 | 72,967 | 27,100 |
| Repayment of long-term debt | (216,851) | (184,815) | (133,448) |
| Contributions from non-controlling interests | 3,328 | 4,174 | - |
| Issuance of common stock / exercise of warrants, net of related issuance costs-related parties | 44,983 | 4,933 | - |
| Issuance of common stock, net of related issuance costs | 45,147 | - | - |
| Payment of financing fees | (1,938) | (802) | (888) |
| **Net cash used in Financing Activities** | $ (154,664) | $ (99,831) | $ (114,998) |
| **Net decrease in cash and cash equivalents** | (9,694) | (34,181) | (12,168) |
| **Cash and cash equivalents at beginning of year** | 109,792 | 100,098 | 65,917 |
| **Cash and cash equivalents at end of the year** | $ 100,098 | $ 65,917 | $ 53,749 |

**SUPPLEMENTAL CASH FLOW INFORMATION:**

-Cash paid during the year for:

| | | | | |
|---|---|---|---|---|
| Interest payments | $ 56,159 | $ 31,950 | $ 22,632 |
| US Source Income taxes | $ 740 | $ 871 | $ 650 |

The accompanying notes are an integral part of these consolidated financial statements.

EXCEL MARITIME CARRIERS LTD.
**Notes to Consolidated Financial Statements**
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

1.  **Basis of Presentation:**

The accompanying consolidated financial statements include the accounts of Excel Maritime Carriers Ltd. and its wholly subsidiaries and majority owned subsidiary (collectively, the "Company" or "Excel") as listed below. Excel was formed in 1988, under the laws of the Republic of Liberia. The Company is engaged in the ocean transportation of dry bulk cargoes worldwide through the ownership and operation of bulk carrier vessels.

|     | Company | Country of Incorporation | Vessel name | Type | Year of Built |
| --- | --- | --- | --- | --- | --- |
|     | **Ship-owning companies with vessels in operation** | | | | |
| 1. | Hope Shipco LLC | Marshall Islands | Mairaki | Capesize | 2011 |
| 2. | Christine Shipco LLC (1) | Marshall Islands | Christine | Capesize | 2010 |
| 3. | Sandra Shipco LLC | Marshall Islands | Sandra | Capesize | 2008 |
| 4. | Iron Miner Shipco LLC | Marshall Islands | Iron Miner | Capesize | 2007 |
| 5. | Iron Beauty Shipco LLC | Marshall Islands | Iron Beauty | Capesize | 2001 |
| 6. | Kirmar Shipco LLC | Marshall Islands | Kirmar | Capesize | 2001 |
| 7. | Lowlands Beilun Shipco LLC | Marshall Islands | Lowlands Beilun | Capesize | 1999 |
| 8. | Iron Brooke Shipco LLC | Marshall Islands | Iron Brooke | Kamsarmax | 2007 |
| 9. | Iron Lindrew Shipco LLC | Marshall Islands | Iron Lindrew | Kamsarmax | 2007 |
| 10. | Iron Manolis Shipco LLC | Marshall Islands | Iron Manolis | Kamsarmax | 2007 |
| 11. | Coal Gypsy Shipco LLC | Marshall Islands | Coal Gypsy | Kamsarmax | 2006 |
| 12. | Coal Hunter Shipco LLC | Marshall Islands | Coal Hunter | Kamsarmax | 2006 |
| 13. | Pascha Shipco LLC | Marshall Islands | Pascha | Kamsarmax | 2006 |
| 14. | Santa Barbara Shipco LLC | Marshall Islands | Santa Barbara | Kamsarmax | 2006 |
| 15. | Iron Fuzeyya Shipco LLC | Marshall Islands | Iron Fuzeyya | Kamsarmax | 2006 |
| 16. | Ore Hansa Shipco LLC | Marshall Islands | Ore Hansa | Kamsarmax | 2006 |
| 17. | Iron Kalypso Shipco LLC | Marshall Islands | Iron Kalypso | Kamsarmax | 2006 |
| 18. | Iron Anne Shipco LLC | Marshall Islands | Iron Anne | Kamsarmax | 2006 |
| 19. | Iron Bill Shipco LLC | Marshall Islands | Iron Bill | Kamsarmax | 2006 |
| 20. | Iron Vassilis Shipco LLC | Marshall Islands | Iron Vassilis | Kamsarmax | 2006 |
| 21. | Iron Bradyn Shipco LLC | Marshall Islands | Iron Bradyn | Kamsarmax | 2005 |
| 22. | Grain Express Shipco LLC | Marshall Islands | Grain Express | Panamax | 2004 |
| 23. | Iron Knight Shipco LLC | Marshall Islands | Iron Knight | Panamax | 2004 |
| 24. | Grain Harvester Shipco LLC | Marshall Islands | Grain Harvester | Panamax | 2004 |
| 25. | Coal Pride Shipco LLC | Marshall Islands | Coal Pride | Panamax | 1999 |
| 26. | Fianna Navigation S.A | Liberia | Isminaki | Panamax | 1998 |
| 27. | Marias Trading Inc. | Liberia | Angela Star | Panamax | 1998 |
| 28. | Yasmine International Inc. | Liberia | Elinakos | Panamax | 1997 |
| 29. | Amanda Enterprises Ltd. | Liberia | Happy Day | Panamax | 1997 |
| 30. | Fountain Services Ltd. | Liberia | Powerful | Panamax | 1994 |
| 31. | Teagan Shipholding S.A. | Liberia | First Endeavour | Panamax | 1994 |
| 32. | Tanaka Services Ltd. | Liberia | Rodon | Panamax | 1993 |
| 33. | Whitelaw Enterprises Co. | Liberia | Birthday | Panamax | 1993 |
| 34. | Candy Enterprises Inc. | Liberia | Renuar | Panamax | 1993 |
| 35. | Harvey Development Corp. | Liberia | Fortezza | Panamax | 1993 |
| 36. | Minta Holdings S.A. | Liberia | July M | Supramax | 2005 |
| 37. | Odell International Ltd. | Liberia | Mairouli | Supramax | 2005 |
| 38. | Ingram Limited | Liberia | Emerald | Handymax | 1998 |
| 39. | Castalia Services Ltd. | Liberia | Princess I | Handymax | 1994 |
| 40. | Barland Holdings Inc. | Liberia | Attractive | Handymax | 1985 |

(1)    Christine Shipco LLC is owned 71.4% by the Company.

EXCEL MARITIME CARRIERS LTD.

**Notes to Consolidated Financial Statements**

**December 31, 2011**

(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

1.   **Basis of Presentation-continued**

| | Company | Country of Incorporation | Vessel name | Type | Year of Built |
|---|---|---|---|---|---|
| | **Non-shipowning companies with vessels in operation** (2) | | | | |
| 41. | Fearless Shipco LLC | Marshall Islands | Fearless I | Panamax | 1997 |
| 42. | Barbara Shipco LLC | Marshall Islands | Barbara | Panamax | 1997 |
| 43. | Linda Leah Shipco LLC | Marshall Islands | Linda Leah | Panamax | 1997 |
| 44. | King Coal Shipco LLC | Marshall Islands | King Coal | Panamax | 1997 |
| 45. | Coal Age Shipco LLC | Marshall Islands | Coal Age | Panamax | 1997 |
| 46. | Iron Man Shipco LLC | Marshall Islands | Iron Man | Panamax | 1997 |
| 47. | Coal Glory Shipco LLC | Marshall Islands | Coal Glory | Panamax | 1995 |

(2)   Indicates a company whose vessel was sold to a third party in July 2007 and subsequently leased back under a bareboat charter expiring in July 2015.

The following wholly-owned subsidiaries have been established to acquire vessels, although vessels have not yet been identified:

| | Company | Country of Incorporation |
|---|---|---|
| 48. | Magalie Investments Corp. | Liberia |
| 49. | Melba Management Ltd. | Liberia |
| 50. | Naia Development Corp. | Liberia |

The Company is also the sole owner of the following non-shipowning subsidiaries:

| | Company | Country of Incorporation |
|---|---|---|
| 51. | Maryville Maritime Inc. (1) | Liberia |
| 52. | Point Holdings Ltd. (2) | Liberia |
| 53. | Thurman International Ltd. (3) | Liberia |
| 54. | Bird Acquisition Corp (4) | Marshall Islands |
| 55. | Liegh Jane Navigation S.A. (5) | Liberia |
| 56. | Snapper Marine Ltd. (6) | Liberia |
| 57. | Centel Shipping Company Limited (7) | Cyprus |

During the year ended December 31, 2011, the following Marshall Islands joint venture companies, which were 50% owned by Bird Acquisition Corp were dissolved:

| | Company | Country of Incorporation |
|---|---|---|
| 58. | Fritz Shipco LLC (8) | Marshall Islands |
| 59. | Benthe Shipco LLC (8) | Marshall Islands |
| 60. | Gayle Frances Shipco LLC (8) | Marshall Islands |
| 61. | Iron Lena Shipco LLC (8) | Marshall Islands |

(1)   Maryville Maritime Inc. ("Maryville") is a management company that provides the technical management of Excel's vessels. As of October 2010 and January 2011, Maryville also provided technical management services to 2 vessels owned by companies affiliated with the Chairman of the Company's Board of Directors. Both of the aforementioned vessels were sold in October 2010 and January 2011 and Maryville ceased to provide technical services to the companies as of the respective dates.

(2)    Point Holdings Ltd is the parent company (direct owner) of fifteen Liberian ship-owning companies, one Liberian holding company and six Liberian non ship-owning companies.

EXCEL MARITIME CARRIERS LTD.
**Notes to Consolidated Financial Statements**
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

1.  **Basis of Presentation-continued**

(3)  Thurman International Ltd. is the parent company (100% owner) of Centel Shipping Company Limited, the owner of M/V Lady.

(4)  Bird is the parent company (100% owner) of 24 Marshall Islands ship-owning companies and 7 Marshall Islands non ship-owning companies. Bird is also a joint-venture partner in one Marshall Island ship-owning company which is 71.4% owned by Bird.

(5)  Previously the owning company of Swift, a vessel sold in March 2009.

(6)  Previously the owning company of Marybelle, a vessel sold in February 2011.

(7)  Previously the owning company of Lady, a vessel sold in August 2011.

(8)  Previously consolidated joint venture owned 50% by the Company. The joint venture had one contract for the construction of a vessel which was cancelled in June 2011 as no refund guarantee was received, the construction of the vessel had not commenced and the vessel was delayed on its contracted delivery. Following the cancellation of the shipbuilding contract, the company was dissolved on July 27, 2011.

*Concentration of credit risk*
During the years ended December 31, 2009, 2010 and 2011 one, one and two charterers, respectively, were individually accounted for more than 10% of the Company's voyage revenues as follows:

| Charterer | 2009 | 2010 | 2011 |
|-----------|------|------|------|
| A | 34% | 30% | - |
| B | - | - | 14% |
| C | - | - | 11% |

The outstanding balance of these charterers as of December 31, 2011 was not material, representing less of 1% of Company's current assets at the balance sheet date.

2.  **Significant Accounting policies:**

a)  **Principles of Consolidation:** The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles and include in each of the three years in the period ended December 31, 2011 the accounts and operating results of the Company and its wholly-owned and majority-owned subsidiaries. All inter-company balances and transactions have been eliminated in consolidation. The Company consolidates all subsidiaries that are more than 50% owned and presents any non-controlling interests, representing the portion of equity in a subsidiary not attributable, directly or indirectly, to the Company, in the consolidated statement of financial position within equity separate from the Company's equity  in accordance with the amendments of ASC 810 , "Consolidation", adopted on January 1, 2009 and the portion of the net income or loss of the subsidiary earned or assumed by the non-controlling interest is presented separately in the consolidated statements of operations as non controlling interests.

In addition, following the provisions of ASC 810, "Consolidation", the Company evaluates any interest held in other entities to determine whether the entity is a Variable Interest Entity ("VIE") and if the Company is the primary beneficiary of the VIE. In this respect, during the years ended December 31, 2009 and 2010, the Company evaluated its interests in the four 50% owned joint ventures discussed in Note 1 above and it has determined that, each joint venture was a variable interest entity according to the provisions of the Variable Interest Entities Subsections of Subtopic 810-10 and that the Company was, in each case, the primary beneficiary. As such, the Company consolidated the joint ventures for the years ended December 31, 2009 and 2010. Following the dissolution of the joint ventures on July 27, 2011 discussed in Note 1 above, the Company de-consolidated the joint ventures as of that date.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
 **December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.  Significant Accounting policies-continued**

The joint ventures had only four contracts for the construction of respective vessels which were cancelled in June 2011 as no refund guarantees were received, the construction of the vessels had not commenced and all vessels were delayed on their contracted deliveries. As such, the de-consolidation of the joint ventures had no significant effect on the Company's consolidated financial statements.

b)  **Use of Estimates:** The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

c)  **Other Comprehensive Income (Loss):** The Company follows the provisions of ASC 220, "Comprehensive Income", which requires separate presentation of certain transactions, which are recorded directly as components of stockholders' equity. The Company's comprehensive income (loss) is comprised of net income less actuarial gains/losses related to the adoption and implementation of ASC 715, "Compensation-Retirement Benefits", as well as the changes in the fair value of the derivatives that qualify for hedge accounting, net of the realized losses of such derivatives which are reclassified to consolidated statement of operations, in accordance with ASC 815 "Derivatives and Hedging".

In June 2011, the FASB issued ASU 2011-05, Comprehensive Income, Presentation of Comprehensive Income (Topic 220), which revises the manner in which entities present comprehensive income in their financial statements. The new guidance removes the presentation options in ASC 220 and requires entities to report components of comprehensive income in either (i) a continuous statement of comprehensive income or (ii) two separate but consecutive statements. Under the two-statement approach, an entity is required to present components of net income and total net income in the statement of net income. The statement of other comprehensive income should immediately follow the statement of net income and include the components of other comprehensive income and a total for other comprehensive income, along with a total for comprehensive income. The amendments in this Update do not change the items that must be reported in other comprehensive income or when an item of other comprehensive income must be reclassified to net income. The amendments in this Update should be applied retrospectively and they are effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. Early adoption is permitted, because compliance with the amendments is already permitted. The amendments do not require any transition disclosures. The amendments in this Update have been adopted by the Company in the accompanying consolidated financial statements with no material effect.

d)  **Concentration of Credit Risk:** Financial instruments, which potentially subject the Company to significant concentrations of credit risk, consist principally of cash and cash equivalents, trade accounts receivable and derivative contracts (mainly interest rate swaps). The Company places its cash and cash equivalents, consisting mostly of deposits, with various financial institutions and performs periodic evaluations of the relative credit standing of those financial institutions. The Company limits its credit risk with accounts receivable by performing ongoing credit evaluations of its customers' financial condition. The Company does not obtain rights to collateral to reduce its credit risk. The Company is exposed to credit risk in the event of non-performance by counter parties to derivative instruments; however, the Company limits its exposure by diversifying among counter parties considering their credit ratings.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)


**2.   Significant Accounting policies-continued**

**e)**   **Foreign Currency Translation:** The functional currency of the Company is the U.S. Dollar because the Company's vessels operate in international shipping markets, and therefore primarily transact business in U.S. Dollars. The Company's accounting records are maintained in U.S. Dollars. Transactions involving other currencies during the year are converted into U.S. Dollars using the exchange rates in effect at the time of the transactions. At the balance sheet date, monetary assets and liabilities, which are denominated in other currencies, are translated into U.S. Dollars at the year-end exchange rates. Resulting gains or losses are separately reflected in the accompanying consolidated statements of operations.


**f)**   **Cash and Cash Equivalents:** The Company considers highly liquid investments such as time deposits and certificates of deposit with an original maturity of three months or less to be cash equivalents.


**g)**   **Restricted Cash:** Restricted cash includes bank deposits that are required under the Company's borrowing arrangements which are used to fund the loan instalments coming due. The funds can only be used for the purposes of loan repayment. In addition, restricted cash also includes minimum cash deposits required to be maintained with certain banks under the Company's borrowing arrangements and derivative financial instruments.


**h)**   **Accounts Receivable Trade, net:** Accounts receivable-trade, net at each balance sheet date, includes receivables from charterers for hire, freight and demurrage billings, net of any provision for doubtful accounts. The Company's revenue is based on contracted charter parties. However, there is always the possibility of dispute over terms and payment of hires and freights, as disagreements may arise in relation to the responsibility of lost time and revenue due to the Company. Accordingly, at each balance sheet date, all potentially uncollectible accounts are assessed individually for purposes of determining the appropriate provision for doubtful accounts primarily based on the aging of such balances and any amounts in disputes. The provision for doubtful accounts at December 31, 2010 and 2011 amounted to $529 and $339, respectively.


**i)**   **Insurance Claims:** The Company records insurance claim recoveries for insured losses incurred on damage to fixed assets and for insured crew medical expenses. Insurance claim recoveries are recorded, net of any deductible amounts, at the time the Company's fixed assets suffer insured damages or when crew medical expenses are incurred, recovery is probable under the related insurance policies and the Company can make an estimate of the amount to be reimbursed following the insurance claim.


**j)**   **Inventories:** Inventories consist of consumable bunkers and lubricants, which are stated at the lower of cost or market value. Cost is determined by the first in, first out method.


**k)**   **Vessels, net:** Vessels are stated at cost, which consists of the contract price and any material expenses incurred upon acquisition (initial repairs, improvements, delivery expenses and other expenditures to prepare the vessel for her initial voyage). Subsequent expenditures for major improvements are also capitalized when they appreciably extend the life, increase the earning capacity or improve the efficiency or safety of the vessels. Otherwise these amounts are charged to expense as incurred. The cost of each of the Company's vessels is depreciated beginning when the vessel is ready for her intended use, on a straight-line basis over the vessel's remaining economic useful life, after considering the estimated residual value (vessel's residual value is equal to the product of its lightweight tonnage and estimated scrap rate). Management estimates the scrap value per light weight ton (LWT) to be $0.2, which is based on the historical average demolition prices prevailing in the market while management estimates the useful life of the Company's vessels to be 28 years from the date of initial delivery from the shipyard. However, when regulations place limitations over the ability of a vessel to trade on a worldwide basis, her remaining useful life is adjusted at the date such regulations become effective.

**l)** **Office Furniture and Equipment, net** – Office furniture and equipment, net are stated at cost less accumulated depreciation. Depreciation is calculated on a straight line basis over the estimated useful life of the specific asset placed in service which range from three to nine years.

EXCEL MARITIME CARRIERS LTD.
 Notes to Consolidated Financial Statements
 December 31, 2011
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

2.  **Significant Accounting policies-continued**

m)  **Impairment of Long-Lived Assets:** The Company follows the guidance under ASC 360, "Property, Plant and Equipment", which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. The standard requires that long-lived assets and certain identifiable intangibles held and used or disposed of by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. When the estimate of undiscounted cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount, the Company should evaluate the asset for an impairment loss.

Measurement of the impairment loss is based on the fair value of the asset which is determined based on management estimates and assumptions and by making use of available market data. The fair values are determined through Level 2 inputs of the fair value hierarchy as defined in ASC 820 "Fair value measurements and disclosures" and are derived principally from or by corroborated or observable market data. Inputs, considered by management in determining the fair value, include independent broker's valuations, FFA indices, average charter hire rates and other market observable data that allow value to be determined.

The Company evaluates the carrying amounts and periods over which long-lived assets are depreciated to determine if events have occurred which would require modification to their carrying values or useful lives. In evaluating useful lives and carrying values of long-lived assets, management reviews certain indicators of potential impairment, such as undiscounted projected operating cash flows, vessel sales and purchases, business plans and overall market conditions.

The current economic and market conditions, including the significant disruptions in the global credit markets, are having broad effects on participants in a wide variety of industries. Since mid-August 2008, the charter rates in the dry bulk charter market have declined significantly, and dry bulk vessel values have also declined both as a result of a slowdown in the availability of global credit and the significant deterioration in charter rates, conditions that the Company considers indicators of impairment.

In developing estimates of future undiscounted cash flows, the Company makes assumptions and estimates about the vessels' future performance, with the significant assumptions being related to charter rates, fleet utilization, vessels' operating expenses, vessels' capital expenditures, vessels' residual value and the estimated remaining useful life of each vessel. The assumptions used to develop estimates of future undiscounted cash flows are based on historical trends as well as future expectations and taking into consideration growth rates for vessel expenses while these assumptions are always subject to changes based on the economic conditions applicable by the time we are performing the tests.

The Company determines undiscounted projected net operating cash flows for each vessel and compares it to the vessel's carrying value. Consistent with prior years and to the extent impairment indicators were present, the projected vessels' net operating cash flows are determined by considering the charter revenues from existing time charters for the fixed fleet days and an estimated daily time charter equivalent for the unfixed days (based on the most recent ten year historical average and utilizing available market data for time charter and spot market rates such as forward freight agreements or FFAs) over the remaining estimated life of the vessel assumed to be 28 years from the delivery of the vessel from the shipyard, net of brokerage commissions, expected outflows for vessels' maintenance and vessel operating expenses (including planned dry-docking and special survey expenditures), assuming an average annual inflation rate in operating expenses  of 3% to 4% and fleet utilization of 95% to 97%. The salvage value used in the impairment test is estimated to be $0.2 per light weight ton (LWT) in accordance with the Company's depreciation policy discussed above. When the Company's estimate of undiscounted future cash flows for any vessel is lower than the vessel's carrying value, the carrying value is written down, by recording a charge to operations, to the vessel's fair market value. In the years ended December 31, 2009, 2010 and 2011, the undiscounted projected net operating cash flows per vessel exceeded the carrying value of each vessel and thus, no impairment loss was recorded in 2009, 2010 and 2011.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 2.  Significant Accounting policies-continued

**n)   Assets Held For Sale:**  In accordance with ASC 360, "Property, Plant, and Equipment", the Company classifies long-lived assets to be sold as held-for-sale in the period in which all of the following criteria are met: management having the appropriate authority commits to a plan to sell the asset; the asset is available for immediate sale in its present condition; an active program to locate a buyer and other actions required to sell the asset have been initiated; sale of the asset is probable and expected to occur within one year; the asset is being actively marketed for sale at a price that is reasonable in relation to its fair value; and actions required to complete the plan indicate that it is unlikely significant changes to the plan will be made or that the plan will be withdrawn. Assets held-for-sale are not depreciated and are measured at the lower of carrying amount or fair value less costs to sell.

**o)   Intangible assets/liabilities related to time charter acquired:** Where the Company identifies any assets or liabilities associated with the acquisition of a vessel, the Company records all such identified assets or liabilities at fair value. Fair value is determined by reference to market data. The Company values any asset or liability arising from the market value of the time charters assumed when a vessel is acquired. The amount to be recorded as an asset or liability at the date of vessel delivery is based on the difference between the current fair value of a charter with similar characteristics as the time charter assumed and the net present value of future contractual cash flows from the time charter contract assumed. When the present value of the time charter assumed is greater than the current fair value of such charter, the difference is recorded as an asset; otherwise, the difference is recorded as liability. Such assets (so long as recoverability tests support their carrying values) and liabilities, respectively, are amortized over the remaining term of the related charters as an increase in charter hire expense and revenue, respectively, and are classified as non-current in the accompanying consolidated balance sheets.

Following the guidance under ASC 360 discussed under (m) above, the Company tests the intangible assets for recoverability whenever events or changes in circumstances indicate that their carrying amount may not be recoverable.  In this respect, during the fourth quarter of 2011 and as a result of a combination of factors, including mainly the sustained decline in charter rates in 2011 and similar expectations for 2012, the current market turmoil and the illiquidity in the overall credit markets, the Company concluded that sufficient indicators existed requiring the performance of an impairment test of the intangible assets. Based on the same set of significant assumptions and estimates used in the Company's vessel impairment test described under (m) above, the estimates of the undiscounted cash flows of the intangible assets (with assumptions consistent also with those of the prior year) did not support the recoverability of the intangible assets' carrying values and accordingly the intangible assets' carrying values were adjusted to their fair values, which were determined to zero, by recognizing an impairment loss of $146.7 million. The fair values were determined through Level 2 inputs of the fair value hierarchy as defined in ASC 820 "Fair value measurements and disclosures" and were derived principally from independent broker's valuations and market observable data that management considered in determining the fair value. No impairment loss was recorded in the years ended December 31, 2009 and 2010 as the undiscounted projected net operating cash flows of the intangible assets exceeded their carrying values as of these dates.

**p)   Accounting for Dry-Docking and Special Survey Costs:** The Company follows the direct expense method under which the dry-docking and special survey costs are expensed as incurred.

**q)   Financing Costs:** Direct and incremental costs related to the issuance of debt such as legal, bankers or underwriters' fees are capitalized and reflected as deferred financing costs. Amounts paid to lenders or required to be paid to third parties on the lender's behalf are classified as a contra to debt. All such financing costs are amortized to interest and finance costs using the effective interest method over the life of the related debt or for debt instruments that are puttable by the holders prior to the debt's stated maturity, over a period no longer than through the first put option date. Unamortized fees relating to loans repaid or refinanced as debt extinguishment are expensed as interest and finance costs in the period the repayment or extinguishment is made.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 2. Significant Accounting policies-continued

**r)** **Convertible Senior Notes:** The Company follows the provisions of ASC Topic 470-20, "Debt with Conversion and Other Options," which requires the issuer of certain convertible debt instruments that may be settled in cash on conversion to separately account for the liability (debt) and equity (conversion option) components of the instrument in a manner that reflects the issuer's non-convertible debt borrowing rate.

**s)** **Financial Instruments:** The principal financial assets of the Company consist of cash and cash equivalents and restricted cash, accounts receivable, trade (net of allowance), and prepayments and advances. The principal financial liabilities of the Company consist of accounts payable, accrued liabilities, deferred revenue, long-term debt, and interest-rate swaps. The carrying amounts reflected in the accompanying consolidated balance sheets of financial assets and liabilities, with the exception of the 1.875% Unsecured Convertible Senior Notes due 2027 (Note 10), approximate their respective fair values.

**t)** **Fair Value Measurements:** The Company follows the provisions of ASC 820, "Fair Value Measurements and Disclosures" which defines, and provides guidance as to the measurement of, fair value. ASC 820 creates a hierarchy of measurement and indicates that, when possible, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. The fair value hierarchy gives the highest priority (Level 1) to quoted prices in active markets and the lowest priority (Level 3) to unobservable data, for example, the reporting entity's own data. Under the standard, fair value measurements are separately disclosed by level within the fair value hierarchy. ASC 820 applies when assets or liabilities in the financial statements are to be measured at fair value, but does not require additional use of fair value beyond the requirements in other accounting principles.

**u)** **Fair value option:** In February, 2007, the FASB issued ASC 825, "Financial Instruments," which permits companies to report certain financial assets and financial liabilities at fair value.  ASC 825 was effective for the Company as of January 1, 2008 at which time the Company could elect to apply the standard prospectively and measure certain financial instruments at fair value. The Company has evaluated the guidance contained in ASC 825, and has elected not to report any existing financial assets or liabilities at fair value that are not already reported, therefore, the adoption of the statement had no impact on its financial position and results of operations.  The Company retains the ability to elect the fair value option for certain future assets and liabilities acquired under this new pronouncement.

**v)** **Derivatives:**  Derivative financial instruments are used to manage risk related to fluctuations of interest rates, hire rates and currency exchange rates. At the inception of a hedge relationship, the Company formally designates and documents the hedge relationship to which the Company wishes to apply hedge accounting and the risk management objective and strategy undertaken for the hedge.

The documentation includes identification of the hedging instrument, hedged item or transaction, the nature of the risk being hedged and how the entity will assess the hedging instrument's effectiveness in offsetting exposure to changes in the hedged item's cash flows attributable to the hedged risk. A cash flow hedge is a hedge of the exposure to variability in cash flows that is attributable to a particular risk associated with a recognized asset or liability, or a highly probable forecasted transaction that could affect profit or loss. Such hedges are expected to be highly effective in achieving offsetting changes in cash flows and are assessed on an ongoing basis to determine whether they actually have been highly effective throughout the financial reporting periods for which they were designated. All derivatives are recorded on the balance sheet as assets or liabilities and measured at fair value. For derivatives designated as cash flow hedges, the effective portion of the changes in fair value of the derivatives are recorded in Accumulated Other Comprehensive Income (Loss) and subsequently recognized in earnings when the hedged items impact earnings.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.  Significant Accounting policies-continued**

The changes in fair value of derivatives not qualifying for hedge accounting are recognized in earnings. The Company discontinues cash flow hedge accounting if the hedging instrument expires and it no longer meets the criteria for hedge accounting or designation is revoked by the Company. At that time, any cumulative gain or loss on the hedging instrument recognized in equity is kept in equity until the forecasted transaction occurs. When the forecasted transaction occurs, any cumulative gain or loss on the hedging instrument is recognized in profit or loss. If a hedged transaction is no longer expected to occur, the net cumulative gain or loss recognized in equity is transferred to net profit or loss for the year as financial income or expense.

The Company follows the accounting pronouncement relating to the expanded disclosure requirements about derivative instruments and hedging activities codified as ASC 815, "Derivatives and Hedging". ASC 815 intents to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows.

ASC 815 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments. ASC 815 relates to disclosures only and its adoption did not have any effect on the financial condition, results of operations or liquidity of the Company.

**w)  Accounting for Revenues and Related Expenses:** The Company generates its revenues from charterers for the charterhire of its vessels. Vessels are chartered using either voyage charters, where a contract is made in the spot market for the use of a vessel for a specific voyage for a specified charter rate, or time charters, where a contract is entered into for the use of a vessel for a specific period of time and a specified daily charterhire rate and any profit share over the daily charterhire rate, where applicable. If a charter agreement exists and collection of the related revenue is reasonably assured, revenue is recognized, as it is earned ratably over the duration of the period of each voyage or time charter. Revenue on any profit share is recognized following the same criteria. Time charter revenues are recorded over the term of the charter as service is provided. Under a voyage charter the revenues are recognized proportionately over the duration of the voyage. A voyage is deemed to commence upon the completion of discharge of the vessel's previous cargo and the vessel's sail to the next fixed loading port and is deemed to end upon the completion of discharge of the current cargo. A voyage charter contract with a charterer consists of sailing to the load port (the positioning leg), loading the cargo, sailing to the discharge port and discharging the cargo. The charter contract therefore requires the relevant vessel to proceed to the port or place as ordered by the charterer and is not cancellable in the positioning leg, provided that the Company fulfils its contractual commitment. Performance under the contract begins upon sailing to the load port (the positioning leg). Non-cancelable voyage contracts are generally arranged prior to the completion of an existing contract. Assuming, therefore, that a non-cancelable voyage charter agreement is in place, voyage revenue recognition, under the discharge-to-discharge method, commences once the discharge of the previous charter's cargo is complete and the vessel sails for loading. The voyage is deemed complete at the point the vessel has left the discharge terminal.

Demurrage income represents payments by the charterer to the vessel owner when loading or discharging time exceeded the stipulated time in the voyage charter and is recognized as it is earned. Deferred revenue includes cash received prior to the balance sheet date and is related to revenue earned after such date. Voyage expenses, primarily consisting of port, canal and bunker expenses that are unique to a particular charter, are paid for by the charterer under the time charter arrangements or by the Company under voyage charter arrangements, except for commissions, which are always paid for by the Company, regardless of charter type.

All voyage and vessel operating expenses are expensed as incurred, except for commissions. Commissions paid to brokers are deferred and amortized over the related voyage charter period to the extent revenue has been deferred since commissions are earned as the Company's revenues are earned.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.  Significant Accounting policies-continued**

x)  **Repairs and Maintenance:** All repair and maintenance expenses including underwater inspection expenses are expensed in the year incurred and are included in Vessel operating expenses in the accompanying consolidated statements of operations.

y)  **Pension and Retirement Benefit Obligations:** Administrative employees are covered by state-sponsored pension funds. Both employees and the Company are required to contribute a portion of the employees' gross salary to the fund. Upon retirement, the state-sponsored pension funds are responsible for paying the employees retirement benefits and accordingly the Company has no such obligation. Employer's contributions for the years ended December 31, 2009, 2010 and 2011 amounted to $2.7 million, $3.0 million and $3.3 million, respectively.

z)  **Staff Leaving Indemnities – Administrative Personnel:** The Company's employees are entitled to termination payments in the event of dismissal or retirement with the amount of payment varying in relation to the employee's compensation, length of service and manner of termination (dismissed or retired). Employees who resign, or are dismissed with cause are not entitled to termination payments. The Company's liability on an actuarially determined basis, at December 31, 2010 and 2011 amounted to $0.9 million and $1.0 million respectively, while the amount recognized in Accumulated Other Comprehensive Income/Loss at December 31, 2009, 2010 and 2011, following the adoption of ASC 715, "Compensation-Retirement Benefits" amounted to a loss of $85 and $74 and a gain of $172, respectively.

aa)  **Stock-Based Compensation:** Following the provisions of ASC 718, "Compensation- Stock Compensation" the Company recognizes all share-based payments to employees, including grants of employee stock options, in the consolidated statements of operations based on their fair values on the grant date. Compensation cost on stock based awards with graded vesting is recognized on an accelerated basis as though each separately vesting portion of the award was, in substance, a separate award.

bb)  **Taxation:** The Company follows the provisions of  ASC 740-10, "Accounting for Uncertainty in Income Taxes" which clarifies the accounting for uncertainty in income taxes by prescribing the minimum recognition threshold a tax position is required to meet before being recognized in the financial statements. ASC 740-10 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

cc)  **Earnings (losses) per Common Share:** Basic earnings (losses) per common share are computed by dividing net income (loss) available to common stockholders by the weighted average number of common shares outstanding during the year. Diluted earnings (losses) per common share, reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised.

dd)  **Segment Reporting:** The Company reports financial information and evaluates its operations by charter revenues and not by the length of ship employment for its customers, i.e. spot or time charters. The Company does not use discrete financial information to evaluate the operating results for each such type of charter. Although revenue can be identified for these types of charters, management cannot and does not identify expenses, profitability or other financial information for these charters. As a result, management, including the chief operating decision maker, reviews operating results solely by revenue per day and operating results of the fleet and thus the Company has determined that it operates under one reportable segment. Furthermore, when the Company charters a vessel to a charterer, the charterer is free to trade the vessel worldwide and, as a result, the disclosure of geographic information is impracticable.

**ee) Reclassification.** Correct classification of Exchange has been performed during year ended December 31, 2011 from the current derivative financial instruments to Interest and Finance cost to conform to the presentation of realized losses of the swaps designated as hedging instruments under Interest and Finance cost in the year ended December 31, 2011.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 2.   Significant Accounting policies-continued

**Recent Accounting Standards Updates:**

**ASU 2011-04:** In May 2011, the FASB issued ASU 2011-04, Fair Value Measurements, Amendments to achieve common fair value measurements and disclosure requirements in U.S. GAAP and IFRS (Topic 820). The ASU is the result of joint efforts by the FASB and IASB to develop a single, converged fair value framework on how to measure fair value and on what disclosures to provide about fair value measurements. While the ASU is largely consistent with existing fair value measurement principles in U.S. GAAP, it expands ASC 820's existing disclosure requirements for fair value measurements and makes other amendments. Many of these amendments are being made to eliminate unnecessary wording differences between U.S. GAAP and IFRSs. However, some could change how the fair value measurement guidance in ASC 820 is applied. The amendments in this update are effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2011. Earlier application is not permitted. The provisions of ASU 2011-04 are not expected to have a material impact on the Company's consolidated financial statements.

**ASU 2011-11:** In December 2011, the FASB issued ASU 2011-11, Balance Sheet (Topic 210): Disclosures about offsetting Assets and Liabilities. The objective of this update is to provide enhanced disclosures that will enable financial statements' users to evaluate the effect or potential effect of netting arrangements on an entity's financial position. This includes the effect or potential effect of rights of setoff associated with an entity's recognized assets and recognized liabilities within the scope of this ASU. The amendments require enhanced disclosures by requiring improved information about financial instruments and derivative instruments that are either (1) offset in accordance with either Section 210-20-45 or Section 815-10-45 or (2) subject to an enforceable master netting arrangement or similar agreement, irrespective of whether they are offset in accordance with either Section 210-20-45 or Section 815-10-45. The amendments in this update are effective for annual reporting periods beginning on or after January 1, 2013, and interim periods within those annual periods. An entity should provide the disclosures required by those amendments retrospectively for all comparative periods presented. The provisions of ASU 2011-11 are not expected to have a material impact on the Company's consolidated financial statements.

**ASU 2011-12:** In December 2011, the FASB issued ASU 2011-12, Comprehensive Income (Topic 220): Deferral of the Effective Date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in Accounting Standard Update No 2011-05. The amendments in this Update supersede certain pending paragraphs in Accounting Standards Update No. 2011-05, Comprehensive Income (Topic 220): Presentation of Comprehensive Income, to effectively defer only those changes in Update 2011-05 that relate to the presentation of reclassification adjustments out of accumulated other comprehensive income. The amendments will be temporary to allow the Board time to redeliberate whether to present on the face of the financial statements the effects of reclassifications out of accumulated other comprehensive income on the components of net income and other comprehensive income for all periods presented. While the Board is considering the operational concerns about the presentation requirements for reclassification adjustments and the needs of financial statement users for additional information about reclassification adjustments, entities should continue to report reclassifications out of accumulated other comprehensive income consistent with the presentation requirements in effect before Update 2011-05. All other requirements in Update 2011-05 are not affected by this Update, including the requirement to report comprehensive income either in a single continuous financial statement or in two separate but consecutive financial statements. Public entities should apply these requirements for fiscal years, and interim periods within those years, beginning after December 15, 2011. The provisions of ASU 2011-12 are not expected to have a material impact on the Company's consolidated financial statements.

## 3.   Liquidity and Capital resources:

The Company's primary liquidity needs are to fund financing expenses, debt repayment, vessel operating expenses and general and administrative expenses. As of December 31, 2011, working capital, which is current assets minus current liabilities, including the current portion of long-term debt, amounted to a deficit of $84.7 million.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

### 3.    Liquidity and Capital resources-continued

Cash expected to be generated from operations assuming that current market charter hire rates will continue in 2012, may not be sufficient to cover the Company's ongoing working capital requirements, or for the Company to be in compliance with certain covenants contained in its loan agreements.

Consequently, the Company, taking all measures to manage its working capital requirements and ensure compliance with loan covenants, reached an agreement (Note 19(b)) with all the lenders under the Nordea credit facility amending, for a period commencing on March 30, 2012 and ending on December 31, 2013, of the amortization schedule, the collateral value clause and certain of the financial covenants of the facility (the effectiveness of which will be as of January 1, 2012) in order to improve its debt maturity profile and respond to the weak charter conditions currently prevailing in the market and the associated volatility in the vessels' market values. The effective date of the amended loan agreement is March 30, 2012.

As a condition to the amendment, and as more fully described in Notes 19(b) and 19(e), the Company undertook to raise at least $30.0 million through an equity offering, of which $20 million shall be raised by September 30, 2012 and the remaining $10 million by December 31, 2012. The loan amendment is conditioned, among other things, upon the Company raising $20.0 million out of the $30.0 million in equity capital, or alternatively securing from external sources the $20.0 million into a special purpose blocked account, on or prior to the effective date of the loan amendment. In order for the Company to meet the above conditions within the timeframe set by its lenders, it has reached an agreement with certain entities affiliated with the family of the Chairman of the Board of Directors for the placement of the amount of $20 million discussed above. The remaining Company's loan facilities with Credit Suisse, DVB and ABN are also agreed to be similarly amended and will require the Company to comply with a number of covenants, including financial covenants related to leverage, consolidated net worth, liquidity and interest coverage, dividends and collateral maintenance requirements, most of which will be in principle and calculation substantially similar to the covenants described under the amended Nordea facility.

Following the loan amendments above, management expects that the Company's primary sources of funds will be the existing cash and cash equivalents, cash from operations, cash resources being conserved by deferring $100.0 million to April 1, 2016 and the proceeds from the equity financing the Company undertook to complete in connection with the Nordea facility amendment. The Company believes that the above plans will be sufficient to cover its working capital needs for a reasonable period of time.

### 4.    Transactions with Related Parties:

*Commercial Services*

The Company has a brokering agreement with an entity affiliated with the Company's Chairman of the Board of Directors according to which the Company is being provided with brokerage services for the employment and chartering of the Company's vessels, for a commission fee equal to 1.25% of the revenue of each contract. Commissions charged under the agreement for the years ended December 31, 2009, 2010 and 2011 amounted to $2,260, $3,026 and $3,498, respectively and are included in Commissions to related parties in the accompanying consolidated statements of operations. Amounts due to such related party as at December 31, 2010 and 2011 were $110 and $365, respectively, and are included in due to related parties in the accompanying consolidated balance sheets.

In addition, the charter parties of the vessels Lowlands Beilun, Sandra, Christine and Mairaki (which expire in the years through February 2016) provide for a commission fee equal to 1% of the revenue earned to be paid in favor of an entity affiliated with one of the Company's directors. Commissions charged under the agreement for the years ended December 31, 2009, 2010 and 2011 amounted to $0, $162 and $394, respectively and are included in Commissions to related parties in the accompanying consolidated statements of operations. Amounts due to such related party as at December 31, 2010 and 2011 were $162 and $121, respectively, and are included in due to related parties in the accompanying consolidated balance sheets.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

4.    **Transactions with Related Parties-continued**

*Time charter agreement*

On June 3, 2011, the vessel Emerald was fixed under a time charter for about 75 days at a daily gross rate of $13.8 with Torm AS. The Company's chairman of the Board of Directors holds a board member position in Torm AS.  The revenue recognized under the charter party amounted to $1.0 million and is included in voyage revenues in the accompanying consolidated statements of operations for the year ended December 31, 2011.

*Vessels under management*

During the years ended December 31, 2009, 2010 and 2011, Maryville (Note 1) provided shipping services to certain related ship-owning companies, which were affiliated with the Chairman of the Company's Board of Directors. The revenues earned for the years ended December 31, 2009, 2010 and 2011 amounted to $488, $376 and $17, respectively and are separately reflected in the accompanying consolidated statements of operations. Amounts due to such related companies as of December 31, 2010 and 2011 were $555 and $0, respectively and are included in due to related parties in the accompanying consolidated balance sheets. In October 2010 and January 2011, the above entities sold their vessels (Note 1) and Maryville ceased to provide technical services to the companies.

*Agreement in relation to the equity raise (Back Stop Agreement)*

In connection with the loan amendment and the equity offering discussed in Notes 3 above, the Company reached an agreement with certain entities affiliated with the family of the Chairman of the Board of Directors as discussed in Note 19(e) below.

5.    **Inventories:**

The amounts shown in the accompanying consolidated balance sheets are analyzed as follows:

|  | 2010 | 2011 |
|---|---|---|
| Bunkers | $    4,236 | $    4,655 |
| Lubricants | 3,951 | 4,196 |
|  | $    8,187 | $    8,851 |

6.    **Vessels and office furniture and equipment, net:**

The amounts shown in the accompanying consolidated balance sheets are analyzed as follows:

|  | 2010 | 2011 |
|---|---|---|
| Vessels cost | $  3,036,013 | $  3,107,329 |
| Accumulated depreciation | (413,382) | (528,044) |
| Vessels, net | $  2,622,631 | $  2,579,285 |
|  |  |  |
| Office furniture and equipment cost | $    2,865 | $    3,182 |
| Accumulated depreciation | (1,718) | (2,241) |
| Office furniture and equipment, net | $    1,147 | $    941 |

All of the Company's vessels have been provided as collateral to secure the bank loans discussed in Note 8 below.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

### 6.    Vessels and office furniture and equipment, net-continued

Management's impairment analysis as of December 31, 2010 and 2011 indicated that the undiscounted projected net operating cash flows per vessel exceeded the carrying value of each vessel and thus no impairment loss was recorded in the years ended December 31, 2010 and 2011.

On December 11, 2010, the vessel *Renuar* was hijacked in waters east of Somalia. On April 23, 2011, the vessel was released. The outcome of this incident did not have a material adverse effect on the financial condition or operating results of the Company.

On January 7, 2011, the Company entered into a Memorandum of Agreement (MOA) to sell the vessel Marybelle for net proceeds of approximately $9.9 million and realized a gain of $1.3 million which is included in gain on sale of vessels in the accompanying consolidated statement of operations for the year ended December 31, 2011. The vessel delivery took place on February 10, 2011. Following the sale, an amount of approximately $7.8 million was repaid under the Company's Nordea credit facility.

On January 10, 2011, the Company took delivery of vessel Mairaki and paid an amount of $17.6 million to the shipyard representing her delivery installment, and other minor delivery costs of $0.2 million. Of this amount, $16.1 million was funded from the drawdown discussed in Note 8 below and the remaining amount was financed from the Company's own funds.

On May 31, 2011, the Company entered into a MOA to sell the vessel Lady for net proceeds of approximately $7.2 million. The resulting gain on the sale of the vessel amounted to approximately $5.1 million and is included in gain on sale of vessels in the accompanying consolidated statement of operations for the year ended December 31, 2011. The vessel delivery took place on August 9, 2011. Following the sale, an amount of approximately $6.0 million was repaid under the Company's Nordea credit facility.

### 7.    Advances for vessels under construction:

As of December 31, 2010  advances for vessels under construction reflect the advances paid to the shipyard for new-building vessels, as well as, the Company's portion of the excess of the fair value of these contracts over their contracted prices and capitalized interest. The amount shown in the accompanying consolidated balance sheets is analyzed as follows:

|  | December 31, 2010 |
|---|---|
| Advances to the shipyard and initial expenses | $          62,480 |
| Company's portion on the excess of the fair value of new building contracts over their contractual prices following the purchase method of accounting | 10,700 |
| Capitalized interest | 2,265 |
| Other | 1,140 |
|  | $          76,585 |

The vessel was delivered on January 10, 2011 as discussed under Note 6 above.

**EXCEL MARITIME CARRIERS LTD.**
 **Notes to Consolidated Financial Statements**
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

8.    **Long-Term Debt:**

The following table summarizes the Company's long-term debt:

| Description | | December 31, 2010 | | December 31, 2011 |
|---|---|---:|---|---:|
| Long-term loans, net of unamortized deferred financing fees of $11.2 million and $9.1 million, respectively | $ | 1,037,716 | $ | 933,472 |
| 1.875% Convertible Senior Notes due 2027, net of unamortized deferred financing fees of $1.9 million and $1.4 million, respectively | | 116,325 | | 124,123 |
| | | 1,154,041 | | 1,057,595 |
| Less: Current portion of long-term debt, net of unamortized deferred financing fees of $2.8 million and $2.7 million, respectively | | (107,369) | | (104,879) |
| **Long-term debt, net of current portion** | $ | 1,046,672 | $ | 952,716 |

**Nordea Credit Facility**

In April 2008 the Company entered into a credit facility of $1.4 billion in order to finance the cash consideration paid to Quintana's shareholders, to repay Quintana's loans and the outstanding balance ($175.9 million) of certain Company's loans and for working capital purposes. The loan consists of a term loan ($1.0 billion) and a revolving credit facility ($400.0 million) and it was drawndown in full on April 15, 2008. The term loan amortizes in quarterly variable installments through April 2016, while the revolving credit facility shall be repaid in one installment on the term loan maturity date.

**Financial covenants**

The loan entered in April 2008 contains certain financial covenants that require the Company to maintain an adjusted market value leverage ratio of not greater than 0.7:1.0, maintain a ratio of EBITDA to gross interest expense of not less than 3.0 to 1.0, maintain a book net worth of greater than $750.0 million, maintain a minimum of cash and cash equivalents of no less than 7.5% of the outstanding total debt and on the third anniversary and thereafter, no less than 10% of the outstanding total debt, and to ensure that the aggregate fair market value of the collateral vessels at all times is not less than 135% of the sum of (i) the then aggregate outstanding principal amount of the credit facility and (ii) the unused commitment under the revolving loan, provided that the Company has 45 days to cure any default under this particular covenant so long as the default was not the result of a voluntary vessel disposition.  In addition, from and after the Company's fiscal quarter falling on or after the third anniversary of the closing date of the credit facility (April 15, 2008), maintain at the end of each fiscal quarter a ratio of total net debt to EBITDA, for the four fiscal quarters ended as of the end of such quarter, of not greater than 6.0:1.0.

**First amendment**

On March 31, 2009, the Company concluded an amended agreement with Nordea and modified certain of the initial agreement terms in order to comply with the financial covenants related to the collateral vessels' market values following the significant decline prevailed in the market and any potential future non-compliance with the minimum liquidity covenant. The amended terms, which were effective from December 4, 2008 until January 1, 2011, contained financial covenants requiring the Company to maintain a leverage ratio based on book values of not greater than 0.7:1.0, maintain a ratio of EBITDA to gross interest expense of not less than 1.75:1.0, maintain a book net worth of greater than $750.0 million, maintain a minimum of cash and cash equivalents of 25.0 million, and to ensure that the aggregate fair market value of the collateral vessels at all times is not less than 65% of the sum of (i) the then aggregate outstanding principal amount of the credit facility and (ii) the unused commitment under the revolving loan.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 8.  Long-Term Debt-continued

In addition, in accordance with the amended terms, the loan margin increased to 2.5% and the loan repayment schedule was modified to defer an amount of $150.5 million in the balloon payment which would be decreased by any excess cash flows and equity injections.

In this respect, two companies owned and controlled by entities affiliated with the family of the Company's Chairman of the Board of Directors injected a total of $50.0 million of new equity in 2009 and 2010 which were used to prepay a portion of the balloon payment of the credit facility.

During the waiver period discussed above,  the Company had the option to declare the deferral of an additional one or more instalments ("Deferred Option Principal") up to an aggregate amount equal to the paid-in equity discussed above, subject to (i) an increase in the margin of  0.05% as long as any deferrals were outstanding, (ii) 100% of new equity and excess cash proceeds, accumulated after the date of declaring the deferral option, being used towards payment of deferral option amounts as long as deferral options were outstanding, and (iii) deferral options were only permitted if all covenants were met. The loan terms also provided that any excess cash flow as defined in the amended agreement, would be firstly applied against any Deferred Option Principal, the 70% of the remaining excess cash flow against the term loan repayments and the remainder 30% to build and maintain in a pledged account a capex reserve of up to $50.0 million, which would be funded also through new equity, to specifically finance the newbuildings discussed under Note 7 above.

Any amounts left in this reserve after dealing with the newbuildings would be applied against the deferred payments, to increase cash and cash equivalents in order to comply with the minimum liquidity requirements set forth in the loan agreement after January 1, 2011 and to reduce the loan repayment amount inverse order of maturity.

A first priority mortgage over the vessel Sandra, as well as a first assignment of vessel insurances and earnings was provided as additional security for the amended facility. In addition, no dividends would be declared and paid until the loan outstanding balance was brought to the same levels as per the original schedule, the Company was in compliance with all covenants of the original loan agreement and no event of default existed or would result upon giving effect to such dividend, while no repurchase of convertible notes would be effected unless through the concept of exchange offerings (i.e. without any cash outflow for the Company) as well as the Company would not, and would not permit any of its subsidiaries to, make any cash share buybacks.

On June 30, 2010, the Company notified its major lenders of its intention to make a payment of $28.0 million, in addition to the regular instalment of $18.0 million due on July 1, 2010. The payment was made in accordance with the excess cash flow provision as defined in the amended agreement and as such, it was applied against the term loan instalment due on April 1, 2016.

On July 1, 2010, following the total payment of $46.0 million, the Company repaid the total principal amount of $455.0 million that the Company would have paid in accordance with the original credit facility dated April 14, 2008 and on the payment date the Company was in compliance with the relevant financial covenants applicable after the end of the waiver period.

As a result, the excess cash flow provision was terminated and the loan applicable margin for the interest period starting July 1st decreased from 2.5% to 1.25% and remained at this level until the expiration of the waiver period, as the Company continued to be in compliance with the relevant financial covenants as applicable after the end of the waiver period.

For the period from the end of the waiver period (January 1, 2011) and throughout the term of the facility, the applicable covenants would be those provided in the original loan agreement, as discussed above, with the exception of the minimum cash and cash equivalents requirement which would be not less than $1,000 per collateral vessel.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 8.   Long-Term Debt-continued

### Second amendment

On June 1, 2010, the Company concluded an amended agreement in relation to the facility and modified certain of its terms relating to long-term fleet employment requirement for the collateral vessels. According to the amended terms, on and after December 31, 2010 and up to December 31, 2013, the Company is required to employ under time charters no fewer than 50% of the collateral vessel's total available calendar days for the period of the next 12 months from each semi-annual measurement date.

### Third amendment

On December 23, 2010, the Company concluded an amended agreement in relation to the facility which provides that the aggregate fair market value of the collateral vessels at all times is not less than 135% of the then aggregate outstanding principal amount of the credit facility provided that the Company has 45 days to cure any default under this particular covenant so long as the default was not the result of a voluntary vessel disposition.

On May 3, 2011, the Company, in anticipation of a probable non compliance with the hull cover ratio clause of the original loan agreement upon expiration of the waiver period (providing for an aggregate fair market value of the borrowers' vessels not less than 135% of the outstanding loan), prepaid $11.0 million.

### Fourth amendment

Further to the above, in July 2011, the Company modified certain financial covenants through December 31, 2012 in order to address the weak charter market conditions and the unusual high volatility in the sales and purchase market, both having a significant impact on the compliance of its financial covenants.

The financial covenants which were amended and are effective from June 30, 2011 to and including December 31, 2012 require the Company to maintain an adjusted market value leverage ratio of not greater than 0.9:1.0, maintain a ratio of EBITDA to gross interest of not less than 3.0:1.0 through and including March 31, 2012 and not less than 1.75:1.0 thereafter through December 31, 2012,  maintain a ratio of total net debt to EBITDA of not greater than 6.0:1.0 through and including March 31, 2012, while the covenant is waived thereafter up to December 31, 2012, maintain minimum liquidity of $1.0 million per collateral vessel plus an additional $10.0 million through and including December 31, 2012 and maintain, during the waiver period from June 30, 2011 to December 31, 2012, an aggregate fair market value of the collateral vessels at all times not less than 105% through and including March 31, 2012 and not less than 115% thereafter to December 31, 2012 of the then aggregate outstanding principal amount of the facility. During the waiver period no dividends may be declared and paid and no investment and vessel acquisition or construction are permitted, unless the Company is in compliance with the original covenants. During the waiver period the loan margin increases to 2.50%, unless the Company is in compliance with the original covenants where the margin reverts back to 1.25%.

Following the fourth amendment discussed above, the amount of $11.0 million was drawndown again on September 29, 2011.

### Credit Suisse Credit Facility

In November 2007, the Company concluded a term loan of $75.6 million in order to partly finance the acquisition cost of the vessels July M and Mairouli. The loan amortizes in quarterly equal installments through December 2022 plus a balloon payment of $12.6 million together with the last installment.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 8.   Long-Term Debt-continued

**Financial covenants**

The loan contains certain financial covenants that require the Company to maintain an adjusted market value leverage ratio of not greater than 0.7:1.0, maintain a ratio of EBITDA to net interest expense greater than 2.0:1.0, maintain a net worth (adjusted by the market value of total assets) of at least $150.0 million, maintain a minimum of cash and marketable securities of an amount not less than $10.0 million; and to ensure that the aggregate of the fair market value of the borrowers' vessels and the value of any additional security at all times is not less than 125% of the outstanding loan.

**First supplemental agreement**

On March 31, 2009, the Company concluded a first supplemental agreement with Credit Suisse and modified certain of the initial agreement terms in order to comply with the financial covenants that related to the vessels' market values following the significant decline in the vessel's fair market values. The amended terms which were effective from December 4, 2008 until January 1, 2011 contained financial covenants requiring the Company to maintain minimum liquidity of $25.0 million, maintain a leverage ratio based on book values of not greater than 0.7:1.0, maintain a book net worth of not less than $750.0 million, maintain a ratio of EBITDA to net interest of not less than 1.75: 1.0 and maintain an aggregate fair market value of the borrowers' vessels at all times not less than 65% of the sum of the loan. The loan margin increased to 2.25%. For the period from the end of the waiver period (January 1, 2011) and up to the maturity of the loan, the applicable covenants will be those provided in the original loan agreement, as discussed above, with the exception of the minimum cash and cash equivalents requirement which shall be not less than $1,000 per fleet vessel.

**Second supplemental agreement**

On February 28, 2011, the Company, in anticipation of a probable non compliance with the hull cover ratio clause of the original loan agreement upon expiration of the waiver period (providing for an aggregate fair market value of the borrowers' vessels not less than 125% of the outstanding loan), following respective arrangements with its lenders, agreed to place an amount of $11.8 million as additional security in accordance with the relative clause of the loan agreement. The amount was reflected in the accompanying 2010 consolidated balance sheet under restricted cash current and restricted cash non-current as a proportion of the current and long-term portion of the related loan that secured.

**Third supplemental agreement**

Further to the above, in July 2011, the Company modified certain financial covenants through December 31, 2012 in order to address the weak charter market conditions and the unusual high volatility in the sales and purchase market, both having a significant impact on the compliance of its financial covenants. The amended financial covenants require the Company to maintain for the period from June 30, 2011 to and including December 31, 2012 a market value adjusted leverage ratio of not greater than 0.9:1.0, maintain a ratio of EBITDA to gross interest of not less than 3.0:1.0 through and including March 31, 2012, not less than 1.75:1.00 as of December 31, 2012 and not less than 3.0:1.0 thereafter, maintain minimum liquidity of $1.0 million per Nordea collateral vessel plus an additional $10.0 million through and including December 31, 2012, and thereafter reverting to $1.0 million per Nordea collateral vessel or $10.0 million in case Nordea facility is fully repaid and maintain an aggregate fair market value of the collateral vessels at all times not less than 105% through and including March 31, 2012, not less than 115% through December 31, 2012 and not less than 125% thereafter, of the then outstanding principal amount of the facility.

In addition, minimum net worth is changed to $750.0 million in terms of book values permanently. The loan margin increased to 2.50% effective from June 30, 2011 through December 31, 2012 or upon compliance with the original financial covenants, when the margin decreases to its original level of 0.675% and the existing collateral deposit of $11.8 million will be pledged to the lender until December 31, 2012.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 8.   Long-Term Debt-continued

After December 31, 2012 it may be released to the Company upon request to the Lender in writing, to the extent that the applicable value to loan ratio is complied with after such release and provided that there is no event of default which is continuing (Note 19(c)). Until December 31, 2012 no dividends may be declared and paid and no investment is permitted unless the Company is in compliance with the original covenants. As of December 31, 2011 and following the above amendment, the amount of $11.8 million was reflected under restricted cash non-current in the accompanying 2011 consolidated balance sheet.

In February 2012, the lender accepted a request made by the Company in relation to the leverage definition of the financial covenants in order to align it with the definition used in the Company's remaining loans. The amendment was effective as of December 31, 2011.

### DVB Credit Facility

On April 26, 2010, Christine Shipco LLC entered into a loan agreement for the post-delivery financing of the Christine in the amount of the lesser of $42.0 million or 65% of the fair value of the Christine upon delivery. The loan was drawn in full on the vessel delivery date (April 30, 2010). The loan bears interest at LIBOR plus a margin of 3% and is repayable in 26 quarterly instalments and a balloon payment of approximately $20.8 million through December 2016. A first priority mortgage over the Christine as well as a first assignment of vessel insurances and earnings have been provided as security. The Company has also guaranteed the performance of Christine Shipco LLC for up to 71.4%, while a letter of undertaking for the remaining 28.6% has been provided by Robertson Maritime Investors LLC.

### Financial covenants

The loan contains certain financial covenants that require the Company to maintain a leverage ratio of not greater than 0.7:1.0 based on book values up to January 1, 2011 and as adjusted based on fleet market value thereafter, maintain a ratio of EBITDA to gross interest expense greater than 1.75:1.0 up to January 1, 2011 and greater than 3.0:1.0 thereafter, maintain a net worth (based on book values) of at least $750.0 million, maintain a minimum liquidity of $25.0 million up to January 1, 2011 and $1.0 million per fleet vessel thereafter, and to ensure that the aggregate of the fair market value of the borrower's vessel and the value of any additional security at all times is not less than 115% for the first three years and 120% thereafter. In addition, Christine Shipco must maintain minimum liquidity with the bank which stands at $0.5 million at all times.

### First supplemental agreement

In July 2011 and in line with the Nordea and Credit Suisse amendments, the Company entered into a supplemental agreement with DVB and amended certain of its financial covenants. The financial covenants which were amended and are effective from June 30, 2011 to and including December 31, 2012 require the Company to maintain a market value adjusted leverage ratio of not greater than 0.9:1.0, maintain a ratio of EBITDA to gross interest of not less than 3.0:1.0 through and including March 31, 2012 and not less than 1.75:1.00 as of December 31, 2012, maintain minimum liquidity of $1.0 million per Nordea collateral vessel plus an additional $10.0 million through and including December 31, 2012. During the waiver period no dividends may be declared and paid and no investment is permitted, unless the Company is in compliance with the original covenants.

### ABN Credit Facility

On February 11, 2010, Hope Shipco LLC entered into a loan agreement for the financing of the vessel Mairaki in the amount of maximum $42.0 million but in any event not more than 75% of the fair value of the vessel upon delivery. The loan which was drawn down in various instalments following the vessel construction progress through January 2011, bears interest at LIBOR plus a margin of 2.75% and is repayable in twenty quarterly instalments and a balloon payment through January 2016.

EXCEL MARITIME CARRIERS LTD.
 Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 8.    Long-Term Debt-continued

The first, second and third drawdown, amounting to $13.9 million, $6.0 million and $6.0 million, respectively, took place on March 9, 2010, August 20, 2010 and October 1, 2010 to partially finance the second, third and fourth payment instalments to the shipyard upon the steel cutting, keel laying and launching, as provided in the relevant shipbuilding contract. On January 6, 2011, $16.1 million were drawndown under the facility to partly finance the delivery payment of vessel Mairaki to the shipyard. The loan amortizes in 20 quarterly equal instalments through January 2016 including a balloon payment of $26.5 million together with the last installment.

A first priority assignment of the refund guarantee and the shipbuilding contract in addition to other customary securities have been provided for the vessel pre-delivery period and a first priority mortgage, as well as a first assignment of vessel insurances and earnings have been provided as security for the vessel post delivery period. A second priority mortgage and a second priority assignment of the vessel insurances and earnings have been provided as security for an existing swap agreement. Additionally no dividends may be paid without the prior written consent of the lender.

**Financial covenants**

The loan contains certain financial covenants that require the Company to maintain a leverage ratio based on book values of not greater than 0.7:1.0, maintain a ratio of EBITDA to net interest expense greater than 1.75:1.0, maintain a net worth (based on book values) of at least $750.0 million, maintain a minimum liquidity of $25.0 million up to January 1, 2011 and $1.0 million per fleet vessel thereafter, and to ensure that the aggregate of the fair market value of the borrower's vessel and the value of any additional security at all times is not less than 115%.

**First supplemental agreement**

In November 2011, the Company entered into a supplemental agreement with ABN in order to align its financial covenants with the Nordea Credit facility. The  financial covenants which were amended and are effective from June 30, 2011 to and including December 31, 2012 require the Company to maintain a market value adjusted leverage ratio of not greater than 0.9:1.0, maintain a ratio of EBITDA to gross interest of not less than 3.0:1.0 through and including March 31, 2012 and not less than 1.75:1.00 thereafter and up to December 31, 2012, maintain a ratio of total net debt to EBITDA of not greater than 6.0:1.0 for the period from June 30, 2011 through March 31, 2012 and from January 1, 2013 and thereafter (with such covenant being waived during the period from April 1, 2012 through December 31, 2012) (Note 19(c)), maintain minimum liquidity of $1.0 million per Nordea collateral vessel plus an additional $10.0 million through and including December 31, 2012. During the waiver period no dividends may be declared and paid and no investment is permitted, unless the Company is in compliance with the original covenants.

In relation to the loan amendments concluded in July 2011, the Company incurred $0.9 million of financing fees which were deferred and amortized over the term of the related loan agreements using the effective interest method.

***1.875% Unsecured Convertible Senior Notes due 2027***

In October 2007, the Company completed its offering of $125,000 aggregate principal amount of Convertible un-secured Senior Notes due 2027 (the "Notes") subsequent to which, the initial purchaser exercised in full its option to acquire an additional $25,000 of the Notes solely to cover over-allotments. The Notes bear interest semi-annually at a rate of 1.875% per annum, and were initially convertible at a base conversion rate of approximately 10.9529 Excel Class A common shares per $1 principal amount of Notes.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

8.    **Long-Term Debt-continued**

This conversion rate has since been adjusted to 11.2702 Excel Class A common shares per $1 principal amount of Notes as a consequence of the payment of dividends by the Company in 2008 at levels exceeding a threshold set forth in the indenture governing the Notes. The initial conversion price was set at $91.30 per share and an incremental share factor of 5.4765 Excel Class A common shares per $1 principal amount of Notes. The conversion price has since been adjusted to $88.73 per share, based on which the maximum amount of shares to be issued upon conversion is 1,690,522 Class A common shares and the incremental share factor has since been adjusted to 5.6351 Excel Class A common shares per $1 principal amount of Notes.

On conversion, any amount due up to the principal portion of the Notes will be paid in cash, with the remainder, if any, settled in shares of Excel Class A common shares. In addition, the Notes holders are only entitled to the conversion premium if the share price exceeds the market price trigger of $88.73 and thus, until the stock price exceeds the conversion price of $88.73, the instrument will not be settled in shares and only the portion in excess of the principal amount will be settled in shares. The Notes are due October 15, 2027.

The Notes also contain an embedded put option that allows the holder to require the Company to purchase the Notes at the option of the holder for the principal amount outstanding plus any accrued and unpaid interest (i.e. no value for any conversion premium, if applicable) on specified dates (i.e. October 15, 2014, October 15, 2017 and October 15, 2022), and a separate call option that allows the Company to redeem the Notes at any time on or after October 22, 2014 for the principal amount outstanding plus any accrued and unpaid interest (i.e. no value for any conversion premium, if applicable). Any repurchase or redemption of the Notes will be for cash.

As discussed in Note 2(r), the Company follows the provisions of ASC Topic 470-20 which requires that the liability and equity components of convertible debt instruments that may be settled in cash upon conversion (including partial cash settlement) be separately accounted for in a manner that reflects an issuer's nonconvertible debt borrowing rate. As a result, the liability component is recorded at a discount reflecting its below market coupon interest rate, and is subsequently accreted to its par value over its expected life, with the rate of interest that reflects the market rate at issuance being reflected in the results of operations.

The Company adopted ASC 470-20 on January 1, 2009 as its convertible senior notes are within the scope of the standard and applied a nonconvertible borrowing rate of 8.64% based on comparable borrowing arrangements of peers, which resulted in the recognition of a discount on the convertible senior notes totaling $51,456, with the offsetting amount recognized as a component of additional paid-in capital. The recognized discount is amortized through October 2014. As of December 31, 2010 and 2011, the liability component of the convertible notes amounted to $118.2 million and $125.6 million, respectively, while the interest expense for each of the years ended December 31, 2009, 2010 and 2011 amounted to $2.8 million.

Following the amendatory agreements described above and in note 19(b), the Company was in compliance with all of the applicable financial covenants at December 31, 2011. The Company, taking all measures to manage its working capital requirement, believes that it will continue to be in compliance with its loan covenants at the next loan covenant measurement dates for a reasonable time and throughout the waiver period.

There can be no assurance however as to whether the vessel values and charter rates will further deteriorate and to what extent, and accordingly if these will be sufficient for the Company to be in compliance with certain of its loan covenants in the future. Management is in continuous contact with the lending banks and believes that the Company will be in a position to cure any unlikely event of non-compliance in a timely manner. In addition, management expects that the lenders would not declare an event of default, therefore not demand immediate repayment of the loans, provided that the Company pays loan principal instalments and accumulated or accrued interest as they fall due under its existing debt agreements.

EXCEL MARITIME CARRIERS LTD.
  Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 8.    Long-Term Debt-continued

Cash being generated from operations is expected to be sufficient for this purpose for a reasonable period of time. Accordingly, in accordance with the provisions of ASC 470-10-45 "Classification of Debt that Includes Covenants" all amounts not due within the next twelve months under the amended loan terms, have been classified as long-term liabilities in the accompanying 2011 consolidated balance sheet.

All of the Company's outstanding loan agreements contain cross default provisions.

As of December 31, 2011 and without taking into consideration the Company's right to defer instalments of up to $100 million, subject to certain preconditions, as discussed in note 19(b) , the following repayments of principal are required over the next five years and through out their term for the Company's debt facilities:

| Period | | Principal Repayment |
|---|---|---|
| January 1, 2012 to December 31, 2012 | $ | 107,622 |
| January 1, 2013 to December 31, 2013 | | 107,622 |
| January 1, 2014 to December 31, 2014 | | 257,622 |
| January 1, 2015 to December 31, 2015 | | 93,061 |
| January 1, 2016 to December 31, 2016 | | 488,825 |
| January 1, 2017 thereafter | | 37,800 |
| | $ | 1,092,552 |
| Less: Unamortized debt discount of the 1.875% Unsecured Convertible Senior Notes | | (24,438) |
| Total | $ | 1,068,114 |

Borrowings under the credit facilities bear interest at LIBOR plus a margin and the average interest rate (including the margin and the interest swap effect) at December 31, 2009, 2010 and 2011 was 4.1%, 4.0% and 2.8%, respectively. Interest expense for the years ended December 31, 2009, 2010 and 2011, net of interest capitalized, amounted to $43.3 million, $26.7 million and $24.9 million, respectively, and is included in interest and finance costs in the accompanying consolidated statements of operations. Interest capitalized for the years ended December 31, 2009, 2010 and 2011 amounted to $1.6 million, $1.6 million and $0.06 million respectively. Capitalized interest is included in Vessels under construction and it is transferred to Vessels, net upon vessel delivery from the shipyard.

## 9.    Derivative Financial Instruments:

**Interest Rate Swaps**

The Company is exposed to interest rate fluctuations associated with its variable rate borrowings and its objective is to manage the impact in the cash flows of its borrowings. In this respect, the Company uses interest rate swaps to manage net exposure to interest rate fluctuations related to its borrowings and to lower its overall borrowing costs.

**Interest Rate Swaps Designated as Hedging Instruments**

*Nomura International plc ("Nomura"):* In August 2010, the Company entered into an interest rate swap agreement maturing in September 2015. Under the terms of the swap, the Company makes quarterly payments to the counterparty at a fixed rate of 1.79% based on a notional amount of $50.0 million decreasing by $0.8 million quarterly. As of December 31, 2011, the notional amount was $45.9 million. The counterparty makes quarterly floating rate payments at LIBOR to the Company based on the same decreasing notional amount. As of December 31, 2011, the swap agreement contained financial covenants that were in line with the financial covenants contained in the fourth amendment of the Nordea credit facility up to and including December 31, 2012 and with the financial covenants contained in the original Nordea credit facility from January 1, 2013 and thereafter. The Company was in compliance with such financial covenants as of December 31, 2011.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**9.    Derivative Financial Instruments-continued**

In addition, in case the mark-to-market exposure is in excess of a threshold of $5.0 million, either party may be required to provide security in the form described in the swap agreement for the excess amount over the $5.0 million. As the swap qualifies for hedge accounting according to ASC 815 "Derivatives and Hedging", the Company has designated it as a cash flow hedge and accordingly, changes in its fair value are reported in Accumulated Other Comprehensive income/loss in the accompanying consolidated balance sheets.

*Eurobank EFG Private Bank Luxembourg S.A. ("Eurobank"):* In March 2011, the Company entered into an interest rate swap transaction with Eurobank for a non-amortizing notional amount of $50.0 million. The interest rate swap transaction is effective from April 1, 2011 until April 1, 2015. Under its terms, the Company will make quarterly payments to Eurobank at a fixed rate of 1.80%, 2.25% and 2.75% for the first, second and third year, respectively, while Eurobank will make quarterly floating-rate payments of 3-month USD LIBOR to the Company based on the same notional amount. As per the respective ISDA agreement entered on March 29, 2011, in case the mark-to-market exposure is in excess of a threshold of $5.0 million, the Company may be required to provide security in the form of cash for the excess amount over the $5.0 million. In addition based on the same ISDA agreement, a termination event will occur if the value of total debt, including current portion, to total assets is equal to or greater than 0.50.  As the swap qualifies for hedge accounting according to ASC 815 "Derivatives and Hedging", the Company has designated it as a cash flow hedge and accordingly, changes in its fair value are reported in Accumulated Other Comprehensive Income (Loss) in the accompanying 2011 consolidated balance sheet.

In relation to the above interest rate swap agreements and in accordance with ASC 815-20-25-16 Timing and Probability of the Hedged Forecasted Transaction, management of the Company considered the creditworthiness of its counterparties using available market data and reports as of December 31, 2011 and determined that no events have occurred that would make the forecasted transaction not probable.

**Interest Rate Swaps Not Designated as Hedging Instruments**

*ABN AMRO ("ABN"):* Effective December 31, 2010, the Company entered into an Interest Rate Swap, following the Swaption exercise by the counterparty of an Extendible Interest Rate Swap entered in May 2006.  The swap matures on June 30, 2014 and under its terms, the Company makes quarterly payments to the counterparty at a fixed rate of 5.0% based on an amortizing notional amount of $444.0 million at December 31, 2011. The counterparty makes quarterly floating rate payments at LIBOR to the Company based on the same notional amount ("Floating Rate Payer"). This swap is not designated as hedge and accordingly changes in its fair value are reported in earnings.  In connection with the Swaption exercise, the Company entered into an amended agreement with ABN on March 31, 2011.

Under the amended agreement, the Company deposited, by way of cash collateral in a retention account ("Cash Deposit Account") with the counterparty, an amount of $5.9 million, which was used by the counterparty towards the payment of the Floating Rate Payer payment due on June 30, 2011. The amount of $5.9 million is included in restricted cash, current in the accompanying 2010 consolidated balance sheet. Based on the amended agreement the Company shall procure the transfer to the Cash Deposit Account prior to the next Floating Rate Payer payment date of an amount equal to such payment. The amount that will be used by the counterparty towards the payment of the forthcoming Floating Rate Payer payment date due on March 31, 2012 is $5.0 million and is included in restricted cash, current in the accompanying 2011 consolidated balance sheet.

The amended agreement provides for automatic semiannual extensions starting from June 30, 2011, until the counterparty decides at its discretion that no further extension will be granted provided that to this effect sixty days prior notice will be given to the Company's subsidiary Hope Shipco LLC, where ABN retains the right to request an amount equal to 75% of any negative mark to market position due from the Company, minus any amount already deposited to the Cash Deposit Account, to be pledged in favor of the counterparty by way of cash collateral and the second mortgage and assignment of insurances and earnings over the vessel Mairaki will be lifted by ABN simultaneously with the deposit of the cash collateral.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 9.    Derivative Financial Instruments-continued

*Marfin Egnatia ("Marfin")*: In July 2011, the Company entered into an interest rate swap transaction with Marfin Egnatia for a non-amortizing notional amount of $50.0 million. The interest rate swap transaction is effective from January 3, 2013 until January 3, 2017. Under its terms, the Company will make quarterly payments to Marfin at a fixed rate of 1.5% for the first year (from and including January 3, 2013 to and excluding January 3, 2014) and 2.98% for the remaining years (from and including January 3, 2014 to and excluding January 3, 2017), while Marfin will make quarterly floating-rate payments of 3-month USD LIBOR to the Company based on the same notional amount. As per the respective ISDA agreement entered on June 29, 2011, in case the mark-to-market exposure is in excess of a threshold of Euro 5.0 million, the Company may be required to provide security in the form of cash or other form agreed by the parties for the excess amount over Euro 5.0 million.  The swap does not qualify for hedge accounting and accordingly changes in its fair value are reported in earnings.

### Freight Option Contracts

The Company is exposed to changes in the spot market rates associated with the deployment of its fleet and its objective is to manage the impact of such changes in its cash flows. In this respect, from time to time, the Company engages in certain forward freight agreements. These agreements are not designated as hedge and accordingly changes in their fair value are reported in earnings.

### Foreign Currency Contract

The Company is exposed to foreign currency fluctuations associated with certain operating expenses and management expenses which are denominated in Euro and its objective is to manage the impact of such fluctuations in its cash flows. In this respect, the Company reduces the exposure to foreign currency fluctuations through the use of foreign currency forward contracts that management considers favourable.

On November 25, 2010, the Company entered into a foreign currency forward transaction for a period of one year which elapsed on December 16, 2011, under which the Company exchanged USD with EUR for a total notional amount of up to €4.8 million separated into monthly tranches of €0.4 million at specific dates of each month, referred to as Reference Dates. During the period of the contract the Company recognized a gain of $0.2 million which is reflected under losses on derivative financial instruments in the accompanying consolidated statements of operations for the year ended December 31, 2011.

The fair values of the Company's derivative financial instruments presented in the accompanying consolidated balance sheets equate to the amount that would be paid or received by the Company if the agreements were cancelled at the reporting date, taking into account current market data per instrument and the Company's or counterparty's creditworthiness, as appropriate.

The following tables summarize information with respect to the fair values of derivatives reflected in the balance sheet and with respect to gains and losses on derivative positions reflected in the statement of operations or in the balance sheets, as a component of accumulated other comprehensive income/loss.

| Fair value of Asset Derivative Financial Instruments | | |
|---|---|---|
| **Not designated as hedging instruments** | **Balance Sheet Location** | **December 31, 2010** | **December 31, 2011** |
| Freight Option Contracts | Derivative financial instruments-Current assets | $          116 | $          167 |
| **Designated as hedging instruments** | | | |
| Nomura Interest Rate Swap | Derivative financial instruments-Other Non Current assets | $          923 | $          - |

**EXCEL MARITIME CARRIERS LTD.**
Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**9.   Derivative Financial Instruments-continued**

| Fair value of Liability Derivative Financial Instruments | | | |
|---|---|---|---|
| Not designated as hedging instruments | Balance Sheet Location | December 31, 2010 | December 31, 2011 |
| ABN Interest Rate Swap | Derivative financial instruments-Current | $            21,300 | $            18,815 |
| Foreign Currency Contracts | Liabilities | $                   7 | $                  - |
| **Designated as hedging instruments** | | | |
| Nomura Interest Rate Swap | Derivative financial instruments-Current iabilities | $                638 | $                357 |
| Eurobank Interest Rate Swap | Liabilities | $                  - | $                281 |
| **Total** | | **$           21,945** | **$           19,453** |
| **Designated as hedging instruments** | | | |
| Eurobank Interest Rate Swap | Derivative financial instruments- Non- | $                  - | $             1,725 |
| Nomura Interest Rate Swap | current liabilities | $                  - | $                872 |
| **Not designated as hedging instruments** | | | |
| ABN Interest Rate Swaps | Derivative financial instruments- Non- | $            30,155 | $            21,432 |
| Marfin Interest Rate Swap | current liabilities | $                  - | $             2,487 |
| **Total** | | **$           30,155** | **$           26,516** |

| Amount of Gain (Loss) Recognized in OCI (Effective Portion) | | | |
|---|---|---|---|
| | | December 31, | |
| Designated as hedging instruments | 2009 | 2010 | 2011 |
| Nomura Interest Rate Swap | $               - | $              514 | $          (2,220) |
| Eurobank EFG Interest Rate Swap | - | - | (2,005) |
| **Total gain (loss) recognized in OCI** | **$              -** | **$             514** | **$          (4,225)** |
| *Reclassifications adjustments to loss included in the Statement of Operations* | | | |
| Nomura Interest Rate Swap | | (229) | 704 |
| **Total** | **$              -** | **$             285** | **$          (3,521)** |

No portion of the cash flow hedge designated for hedge accounting was ineffective during the years ended December 31, 2010 and 2011 whereas an amount of $0.7 million was transferred in the year ended December 31, 2011 from accumulated Other Comprehensive Income into earnings. An amount of approximately $0.9 million is expected to be reclassified into earning during the following 12-month period.

The accumulated derivative gain as of December 31, 2010 amounted to $285, while as of December 31, 2011 amounted to a loss of $3,236.

Gains/Losses on derivative financial instruments included in the accompanying consolidated statements of operations are analyzed as follows:

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**9.   Derivative Financial Instruments-continued**

| Amount of Gain (Loss) Recognized in Statements of Operations | | | | | | |
|---|---|---|---|---|---|---|
| | | | December 31, | | | |
| | | **2009** | | **2010** | | **2011** |
| Interest Rate Swaps | $ | 27,238 | $ | 2,446 | $ | 8,722 |
| Freight Option Contracts | | - | | (496) | | 58 |
| Foreign Currency Contracts | | - | | (7) | | - |
| **Unrealized gain** | $ | **27,238** | $ | **1,943** | $ | **8,780** |
| Interest Rate Swaps | | (28,364) | | (29,214) | | (23,611) |
| Freight Option Contracts | | - | | - | | 594 |
| Foreign Currency Contracts | | - | | - | | 241 |
| Other expenses | | - | | (19) | | - |
| **Realized loss** | $ | **(28,364)** | $ | **(29,233)** | $ | **(22,776)** |
| Realized losses of instruments designated as hedges and reflected under interest and finance costs | $ | - | $ | 229 | $ | 704 |
| **Losses on derivative financial instruments** | $ | **(1,126)** | $ | **(27,061)** | $ | **(13,292)** |

**10.   Fair Value of Financial Instruments:**

The following methods and assumptions were used to estimate the fair value of each class of financial instrument:

- **Cash and cash equivalents, restricted cash, accounts receivable and accounts payable:** The carrying values reported in the consolidated balance sheets for those financial instruments are reasonable estimates of their fair values due to their short-term nature.

- **Long-term debt:** The fair values of long-term bank loans approximate the recorded values due to the variable interest rates payable.

- **Convertible Senior Notes:** Convertible Senior Notes have a fixed rate and their estimated fair value represents the tradable value of the notes, determined through Level 2 inputs of the fair value hierarchy (quoted price in the over-the counter-market). The estimated fair value of the Notes at December 31, 2011 is approximately $75.0 million.

- **Derivative financial instruments:** The fair values of the Company's derivative financial instruments equate to the amount that would be paid or received by the Company if the agreements were cancelled at the reporting date, taking into account current market data per instrument and the Company's or counterparty's creditworthiness, as appropriate.

A fair value hierarchy that prioritizes the inputs used to measure fair value has been established by GAAP. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurement) and the lowest priority to unobservable inputs (Level 3 measurement). This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs.

The three levels of inputs used to measure fair value are as follows:

*Level 1:*  Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities;

**EXCEL MARITIME CARRIERS LTD.**
 **Notes to Consolidated Financial Statements**
**December 31, 2011**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 10.    Fair Value of Financial Instruments-continued

*Level 2:*  Observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; or other inputs that are observable or can be corroborated by observable market data;

*Level 3:*  Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The table below presents disclosures about the fair value of financial assets and financial liabilities recognized in the Company's consolidated balance sheets on a recurring basis:

| | **Fair Value Measurements at Reporting Date Using** | | | |
|---|---|---|---|---|
| Description | December 31, 2011 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| *Derivative financial instruments-Assets* | | | | |
| Freight Option Contracts- current | $      167 | $      167 | - | - |
| *Derivative financial instruments-Liabilities* | | | | |
| ABN Interest Rate Swap-current | $   18,815 | - | $   18,815 | - |
| Nomura Interest Rate Swap-current | 357 | - | 357 | - |
| Eurobank Interest Rate Swap-current | 281 | - | 281 | - |
| Nomura Interest Rate Swap- non current | 872 | - | 872 | - |
| Eurobank Interest Rate Swap- non current | 1,725 | - | 1,725 | - |
| Marfin Interest Rate Swap-non current | 2,487 | - | 2,487 | - |
| ABN Interest Rate Swap-non current | 21,432 | - | 21,432 | - |

Interest rate swaps are valued using a discounted cash flow model that takes into account the present value of future cash flows under the terms of the contracts using current market information as of the reporting date. For a discussion of the factors warranting fair value assessment used in asset impairments and intangible assets, which are measured at fair value on a non-recurring basis, refer to Notes 2(m), 2(o) and 11 below.

## 11.    Time Charters acquired:

Where the Company identifies any assets or liabilities associated with the acquisition of a vessel, the Company records all such identified assets or liabilities at fair value. Fair value is determined by reference to market data. The Company values any asset or liability arising from the market value of the time charters assumed when a vessel is acquired. The amount to be recorded as an asset or liability at the date of vessel delivery is based on the difference between the current fair value of a charter with similar characteristics as the time charter assumed and the net present value of future contractual cash flows from the time charter contract assumed, with such difference capped to the vessel's fair value on a charter free basis.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 11.  Time Charters acquired-continued

When the present value of the time charter assumed is greater than the current fair value of such charter, the difference is recorded as an asset; otherwise, the difference is recorded as liability. Such intangible assets and liabilities are amortized over the remaining term of the related charters as an increase in charter hire expense and revenue, respectively and are classified as non current in the accompanying consolidated balance sheets. Such amortization for the years ended December 31, 2009, 2010 and 2011 amounted to $40.0 million, $39.9 million and $36.5 million for the intangible assets and $364.4 million, $262.3 million and $3.5 million, respectively for the intangible liabilities and is separately reflected as charter hire amortization and time charter amortization, respectively. Included in the time charter amortization for the year ended December 31, 2009 is an amount of $63.1 million related to the accelerated amortization of the deferred liability related to vessels Sandra, Coal Pride and Grain Harvester due to the early termination of their time charters that were assumed by the Company upon acquiring Quintana in 2008.

 On April 9, 2010 and effective April 17, 2010, the Company entered into a novation agreement with the charterer and the then current sub-charterer of the vessel Iron Miner, under which the charterer was released from the obligations under the existing charter which was assigned directly to the sub-charterer reducing the daily hire from $42.1 per day to $41.4 per day over the remaining term of the charter. Following the above agreement and the release of the charterer from being the primary obligor under the liability, the deferred liability of the fair value of the charter, which was assumed upon acquiring Quintana in 2008, amounting to $26.9 million on the effective date, was released in the accompanying 2010 consolidated statement of operations.

The amortization schedule of the intangible liability as of December 31, 2011 and for the years to follow until they expire is as follows:

| Period | |
|---|---:|
| January 1, 2012 to December 31, 2012 | $    3,569 |
| January 1, 2013 to December 31, 2013 | 3,559 |
| January 1, 2014 to December 31, 2014 | 3,559 |
| January 1, 2015 to December 31, 2015 | 3,559 |
| January 1, 2016 and thereafter | 387 |
| **Total** | **$    14,633** |

As already discussed in Note 2(o) above, management's impairment analysis, indicated that the future undiscounted operating cash flows of the Company's intangible assets did not support the recovery of the intangible assets' carrying values and accordingly the intangible assets' carrying values were adjusted to their fair values, which was determined to zero as charter-in rates of the charter parties assumed (and the value differential between these and the rates currently observed in the market for the remaining term of the charter agreements for vessels with similar characteristics), upon acquisition of Quintana (on April 15, 2008) do not currently (and are not expected in the future to) provide any benefit for the Company. In this respect, an impairment loss of $146.7 million as of November 30, 2011 which is separately reflected in the accompanying 2011 consolidated statement of operations.

## 12.        Common Stock and Additional Paid-In Capital:

The Company's authorized capital stock consists of (a) 994,000,000 shares (all in registered form) of common stock, par value $0.01 per share (the "Class A shares"), (b) 1,000,000 shares (all in registered form) of common stock, par value $0.01 per share (the "Class B shares") and (c) 5,000,000 shares (all in registered form) of preferred stock, par value $0.1 per share. The Board of Directors shall have the fullest authority permitted by law to provide by resolution for any voting powers, designations, preferences and relative, participating, optional or other rights of, or any qualifications, limitations or restrictions on, the preferred stock as a class or any series of the preferred stock.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 12.  Common Stock and Additional Paid-In Capital-continued

The holders of the Class A shares and of the Class B shares are entitled to one vote per share and to 1,000 votes per share, respectively, on each matter requiring the approval of the holders of common stock, however each share of common stock shares in the earnings of the Company on an equal basis.

## 13.  Stock Based Compensation:

On April 1, 2011, the Board of Directors approved the grant of 340,279 shares of the Company's Class A common stock in the form of restricted stock to certain of its employees to be vested as follows: 88,823 Class A common shares immediately, 83,823 Class A common shares on April 1, 2012, 83,823 Class A common shares on April 1, 2013 and 83,810 Class A common shares on April 1, 2014. The restricted stock granted is being recognized as expense over the vesting period based on its fair value on the grant date.

On July 15, 2011, the Board of Directors approved a cash bonus of $2.0 million and stock award of an aggregate grant date fair value of $5.8 million (equal to the value of 1,965,000 shares of the Company's Class A common stock at the closing price on July 14, 2011) and 35,000 shares of the Company's Class B common stock, in the form of restricted stock to the Chairman of its Board of Directors. The Class B shares and the 50% of the Class A shares, vested on October 6, 2011, with the remaining 50% of the Class A shares vested on December 30, 2011. The cash bonus is included in General and Administrative expenses in the accompanying 2011 consolidated unaudited statement of operations. In addition, on the same date, the Board of Directors approved a share grant of 15,000 Class B restricted shares to the Business Development Officer which vested on August 31, 2011. The total cost of the stock awards granted was recognized as expense over their vesting periods based on their fair value on the grant date. The fair value of the Class B shares is determined by reference to the Class A shares price.

Restricted stock during the years ended December 31, 2009, 2010 and 2011 is analyzed as follows:

| | Number of Shares | | Weighted Average Grant Date Price |
|---|---|---|---|
| **Outstanding at December 31, 2008** | **852,845** | **$** | **29.97** |
| Granted | 2,285,000 | $ | 5.91 |
| Vested | (1,977,178) | $ | 9.22 |
| Forfeited or expired | (309,399) | $ | 47.76 |
| **Outstanding at December 31, 2009** | **851,268** | **$** | **7.11** |
| Granted | 2,299,164 | $ | 5.05 |
| Vested | (1,451,208) | $ | 5.80 |
| Forfeited or expired | (47,829) | $ | 9.33 |
| **Outstanding at December 31, 2010** | **1,651,395** | **$** | **5.33** |
| Granted | 3,844,668 | $ | 1.92 |
| Vested | (4,337,280) | $ | 2.32 |
| Forfeited or expired | (76,451) | $ | 10.13 |
| **Outstanding at December 31, 2011** | **1,082,332** | **$** | **4.94** |

The total fair value of the shares vested during the years ended December 31, 2009, 2010 and 2011 amounted to $18.2 million, $8.4 million and $10.0 million, respectively. During the years ended December 31, 2009, 2010 and 2011 the compensation expense in connection with all stock-based employee compensation awards amounted to $19,847, $9,647 and $10,169, respectively, and is included in General and Administrative expenses in the accompanying consolidated statements of operations. At December 31, 2011, the total unrecognized cost related to the above awards was $1.7 million which will be recognized through April 1, 2014.

**EXCEL MARITIME CARRIERS LTD.**
 **Notes to Consolidated Financial Statements**
**December 31, 2011**
 (Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**14.  Earnings / (Losses) per share:**

All shares issued (including non-vested shares) have the right to receive dividends with the non-vested shares receiving forfeitable dividend until their vesting. For the purposes of calculating basic earnings per share, non-vested shares are not considered outstanding until the time-based vesting restriction has lapsed.

Basic earnings per common share are computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings per common share reflect the potential dilution that could occur if securities or other contracts to issue common stock were exercised. None of the non-vested awards for the year ended December 31, 2011 discussed under Note 13 above were included in the computation of diluted earnings per share because inclusion of these awards would be anti-dilutive. For the purposes of calculating basic earnings per share, non-vested shares are not considered outstanding until the time-based vesting restriction has lapsed.

Dividends declared during the period for non vested shares are deducted from (added to) the net income (loss) reported for purposes of calculating net income (loss) available to (assumed by) common stockholders for the computation of basic earnings (losses) per share.

During the years ended December 31, 2009 and 2010, the denominator of the diluted earnings per share calculation includes the incremental shares assumed issued under the treasury stock method weighted for the period the shares were outstanding, with respect to the non vested shares outstanding as of each year-end and the warrants outstanding as of December 31, 2009 and the period from January 1, 2010 to November 16, 2010.  The Company calculates the number of shares outstanding for the calculation of basic and diluted earnings per share as follows:

|  | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|
| *Net income (loss) for Basic and Diluted Earnings (losses) per share* | | | | | | |
| Net income (loss) attributable to Excel Maritime Carriers Ltd.  for the period | $ | 339,782 | $ | 257,829 | $ | (211,593) |
| | | | | | | |
| **Weighted  average common shares outstanding, basic** | | 67,565,178 | | 80,629,221 | | 84,463,674 |
| Add: Dilutive effect of non vested shares | | 282,346 | | 875,003 | | - |
| Add: Dilutive effect of warrants | | 2,152,236 | | 1,598,699 | | - |
| **Weighted average common shares, diluted** | | 69,999,760 | | 83,102,923 | | 84,463,674 |
| | | | | | | |
| **Earnings (losses) per share, basic** | $ | 5.03 | $ | 3.20 | $ | (2.51) |
| **Earnings (losses) per share, diluted** | $ | 4.85 | $ | 3.10 | $ | (2.51) |

In relation to the Convertible Senior Notes due in fiscal year 2027, upon conversion, the Company may settle its conversion obligations, at its election, in cash, shares of our Class A common stock or a combination of cash and shares of our Class A common stock.

The Company has elected on conversion, any amount due up to the principal portion of the notes to be paid in cash, with the remainder, if any, settled in shares of Excel Class A common shares (Note 8). Based on this presumption, and in accordance with ASC 260 "Earnings Per Share", any dilutive effect of the Convertible Senior Notes under the if-converted method is not included in the diluted earnings per share presented above. Any shares to be issued upon conversion would have either an anti-dilutive effect (in 2011) or immaterial dilutive effect (in 2009 and 2010) in the reported earnings / losses per share.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 15. Commitments and Contingencies:

a)   Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of the shipping business. In addition, losses may arise from disputes with charterers, agents, insurance and other claims with suppliers relating to the operations of the Company's vessels. Currently, management is not aware of any such claims or contingent liabilities, which should be disclosed, or for which a provision should be established in the accompanying consolidated financial statements.  The Company is a member of a protection and indemnity association, or P&I Club that is a member of the International Group of P&I Clubs, which covers its third party liabilities in connection with its shipping activities. A member of a P&I Club that is a member of the International Group is typically subject to possible supplemental amounts or calls, payable to its P&I Club based on its claim records as well as the claim records of all other members of the individual associations, and members of the International Group. Although there is no cap on its liability exposure under this arrangement, historically supplemental calls have ranged from 0%-40% of the Company's annual insurance premiums, and in no year have exceeded $1.0 million.  Supplementary calls for 2009 and 2010 amounted to $0.6 million and $0.08 million, respectively, and were included in operating expenses in the consolidated financial statements for the twelve-month periods ended December 31, 2009 and 2010, respectively. All such amounts were not material. There were no supplementary calls for 2011. The Company accrues for the cost of environmental liabilities when management becomes aware that a liability is probable and is able to reasonably estimate the probable exposure. Currently, management is not aware of any such claims or contingent liabilities, which should be disclosed, or for which a provision should be established in the accompanying consolidated financial statements. The Company's protection and indemnity (P&I) insurance coverage for pollution is $1 billion per vessel per incident.

b)   The following table sets forth the Company's lease as of December 31, 2011:

|  | 2012 | 2013 | 2014 | 2015 | 2016 & thereafter | Total |
|---|---|---|---|---|---|---|
|  | *(Amounts in million of US Dollars)* | | | | | |
| Operating lease obligations (Bareboat charters) (1) | (32.9) | (32.8) | (31.9) | (17.1) | - | **(114.7)** |
| Future minimum charter receivables (2) | 135.3 | 56.9 | 37.6 | 33.6 | 2.5 | **265.9** |
| Property leases (3) | (0.8) | (0.8) | (0.9) | (0.1) | - | **(2.6)** |

(1) The amount relates to the bareboat hire to be paid for the seven vessels chartered-in under bareboat charter agreements expiring in July 2015 (Note 1).

(2) The amount relates to revenue to be earned under the Company's fixed time charters net of related commissions.

(3) Maryville (Note 1) has a lease agreement for the rental of office premises until February 2015 with an unrelated party. Under the current terms of the lease, the monthly rental fee is approximately $0.06 million. Operating lease payments for 2009, 2010 and 2011 amounted to approximately $0.8 million, $0.7 million and $0.8 million, respectively and are included in General and Administrative expenses in the accompanying consolidated statements of operations. Rent increases annually at a rate of 1.5% above inflation.

EXCEL MARITIME CARRIERS LTD.
 Notes to Consolidated Financial Statements
December 31, 2011
( Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 16.  Income Taxes:

Under the laws of Marshall Islands, Liberia, Panama, Bahamas, Malta and Cyprus, (the countries of the companies' incorporation and vessels' registration), the companies are subject to registration and tonnage taxes (Note 17), which have been included in Vessels' operating expenses in the accompanying consolidated statements of operations.

**Taxation on United States Source Income:** Pursuant to § 883 of the Internal Revenue Code of the United States (the "Code"), U.S. source income from the international operation of ships is generally exempt from U.S. Federal income tax on such income if the company meets the following requirements: (a) the company is organized in a foreign country that grants an equivalent exception to corporations organized in the U. S. and (b) either (i) more than 50 percent of the value of the company's stock is owned, directly or indirectly, by individuals who are "residents" of the company's country of organization or of another foreign country that grants an "equivalent exemption" to corporations organized in the U.S. (the "50% Ownership Test") or (ii) the company's stock is "primarily and regularly traded on an established securities market" in its country of organization, in another country that grants an "equivalent exemption" to U.S. corporations, or in the U.S. (the "Publicly-Traded Test").

Pursuant to Treasury Regulation § 1.883-2, a company's stock will be considered "regularly traded" on an established securities market if (i) one or more classes of its stock representing 50 percent or more of its outstanding shares, by voting power and value, is listed on the market and is traded on the market, other than in minimal quantities, on at least 60 days during the taxable year; and (ii) the aggregate number of shares of stock traded during the taxable year is at least 10 percent of the average number of shares of the stock outstanding during the taxable year.

Treasury regulations interpreting § 883 were promulgated in final form in August 2003 effective for taxable years beginning after September 24, 2004. As a result, such regulations became effective for calendar year taxpayers, like the Company, beginning with the calendar year 2005. Marshall Islands, Liberia and Cyprus, the jurisdictions where the Company and its ship-owning subsidiaries are incorporated, grant an equivalent exemption to United States corporations. Therefore, the Company is exempt from United States federal income taxation with respect to U.S.-source shipping income if either the 50% Ownership Test or the Publicly-Traded Test is met.

For the years ended December 31, 2009, 2010 and 2011, the Company determined that it does not satisfy the Publicly-Traded Test as a result of its shares not meeting the "regularly traded" requirement as set forth under  the regulations. In addition, the Company does not satisfy the 50% Ownership Test as it is unable to substantiate certain requirements regarding the identity of its shareholders. As a result, the Company does not qualify for exemption under § 883 of the Code from the 4 percent U.S. Federal income tax on its U.S. source gross transportation income. U.S. source gross transportation income is defined as 50 percent of shipping income that is attributable to transportation that begins or ends, but does not both begin and end, in the U.S. Gross transportation income from each voyage is equal to the product of (i) the number of days in each voyage and (ii) the daily charter rate paid to the Company by the charterer.

Relevant to calculating taxable shipping income, days spent loading and unloading cargo in port were not included in the number of days of a voyage. As a result, taxes of approximately $0.7 million, $0.8 million and $0.7 million for the years ended December 31, 2009, 2010 and 2011, respectively were recognized in the accompanying consolidated statements of operations.

The Company believes that the position of excluding days spent loading and unloading cargo in port meets the more likely than not criterion to be sustained upon a future tax examination; however, there can be no assurance that the Internal Revenue Service would agree with the Company's position.  Had the Company included the days spent loading and unloading cargo in port, the Company would have a tax liability of approximately $1.3 million and $1.5 million as of December 31, 2010 and 2011 respectively and additional taxes of $0.2 million, $0.3 million and $0.2 million would have been recognized in the accompanying consolidated statements of operations for the years ended December 31, 2009, 2010 and 2011, respectively.

**EXCEL MARITIME CARRIERS LTD.**
Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**17. Voyage and Vessel Operating expenses:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

| | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|
| *Voyage expenses* | | | | | | |
| Port Charges and other | $ | 1,732 | $ | 1,899 | $ | 6,040 |
| Bunkers | | (630) | | 5,393 | | 21,196 |
| Commissions charged by third parties | | 18,215 | | 20,271 | | 15,504 |
| | | 19,317 | | 27,563 | | 42,740 |
| Commissions charged by related parties | | 2,260 | | 3,188 | | 3,892 |
| | $ | 21,577 | $ | 30,751 | $ | 46,632 |

| | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|
| *Vessel Operating expenses* | | | | | | |
| Crew wages and related costs | $ | 39,558 | $ | 42,093 | $ | 43,122 |
| Insurance | | 9,617 | | 9,081 | | 9,043 |
| Repairs, spares and maintenance | | 16,923 | | 18,809 | | 17,037 |
| Consumable stores | | 14,113 | | 13,192 | | 12,892 |
| Tonnage taxes | | 476 | | 483 | | 404 |
| Miscellaneous | | 2,510 | | 3,042 | | 2,576 |
| | $ | 83,197 | $ | 86,700 | $ | 85,074 |

**18. Interest and Finance Costs:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

| | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|
| Interest on long-term debt | $ | 44,905 | $ | 28,219 | $ | 25,006 |
| Realized losses of interest rate swaps designated as hedging instruments | | - | | 229 | | 704 |
| Imputed and capitalized interest | | (1,563) | | (1,562) | | (61) |
| Amortization of financing costs | | 3,823 | | 3,509 | | 3,425 |
| Amortization of convertible notes debt discount | | 6,154 | | 6,736 | | 7,365 |
| Bank charges and finance costs | | 3,777 | | 991 | | 694 |
| | $ | 57,096 | $ | 38,122 | $ | 37,133 |

**19. Subsequent Events:**

**a)   Loan payments:** Subsequent to December 31, 2011, the Company paid regular loan instalments amounting to $26.9 million in total.

**b)   Nordea loan amendment:** In March 2012, the Company reached an agreement with all the lenders under the Nordea credit facility, for the amendment, for a period from the effective date of such amendment (March 30, 2012) through December 31, 2013, of the amortization schedule, the collateral value clause and certain of the financial covenants of the facility (the effectiveness of which will be as of January 1, 2012) in order to improve its debt maturity profile and respond to the weak charter conditions currently prevailing in the market and the associated volatility in the vessels' market values.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
**December 31, 2011**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 19. Subsequent Events-continued

In accordance with such amendment, the loan repayment schedule will be modified to allow for, at Company's option, the deferral of the repayment of principal amount of up to $100.0 million, originally scheduled for 2012 and 2013, to the balloon payment at the end of the facility's term in 2016.

Under the amendment, the Company is required to raise at least $30.0 million in new equity by December 31, 2012. In addition, the loan amendment and the exercise of the deferral option thereunder were conditional, among other things, upon the deposit of $20.0 million out of the $30.0 million that is required to be raised, into an escrow (special purpose blocked) account. In that respect, the Company reached an agreement with certain entities affiliated with the family of the Chairman of its Board of Directors to deposit such amount into the escrow account. Such deposit took place on March 29, 2012. Under the amendment, the Company is required to raise the $30.0 million in new equity as follows: (i) at least $20.0 million will be raised through an equity offering by September 30, 2012, with any shortfall being covered through the use of the funds deposited into the escrow account; and (ii) the remaining $10.0 million will be raised by December 31, 2012, with any shortfall being covered through the use of any funds remaining in the escrow account.

Following the amendment, through December 31, 2013, the facility contains financial covenants requiring the Company to maintain: (i) minimum liquidity of no less than $1.0 million per collateral vessel plus, in the aggregate, $10.0 million; (ii) a leverage ratio (as adjusted to reflect the fair market values of the vessels wholly owned by the Company) of no more than 0.9:1:0; (iii) a net worth, based on book values, of no less than $750.0 million; (iv) a ratio of EBITDA (as defined in the loan agreement) to gross interest expense of no less than 1.75:1.00 in the first half of 2012, and 1.25:1.00 during the eighteen-month period from July 1, 2012 until December 31, 2013; and (v) an aggregate fair market value of vessels serving as collateral for the facility at all times of no less than 80% of the outstanding principal amount of the facility in 2012, 100% of the outstanding principal amount of the facility in the first half of 2013, and 110% of the outstanding principal amount of the facility in the second half of 2013. In addition, under the amended facility, investments, cash dividends and share repurchases are allowed, as long as, among other things, the Company is in compliance with the original loan covenants and there are no deferred instalments outstanding.

Under the amendment, the Company may defer to the balloon payment at the end of the facility's term in 2016 the repayment of one or more principal instalments falling due after the date of execution of the amendment and prior to July 2, 2013 (inclusive), provided that: (i) at least $20.0 million out of the $30.0 million that the Company is required to raise has been raised through an equity offering or has been deposited by entities affiliated with the Company's Chairman of the Board of Directors into the escrow account discussed above and is held in such account until such amount is raised; (ii) after giving effect to the deferral of any principal repayment, each principal instalment falling due after December 31, 2012 is at least $6.0 million; (iii) the aggregate amount of principal so deferred does not exceed $100.0 million; (iv) no event of default shall have occurred and be continuing; (v) the Company is in compliance with the financial covenants, as amended; and (vi) the applicable margin for any such deferred amount shall increase to 4%. Under the terms of the amended facility, the Company will have to apply any consolidated excess cash flow, calculated on a quarterly basis, towards repayment of any outstanding principal amount so deferred. The Nordea credit facility defines excess cash flow as a amount equal to reported EBITDA (as defined in the loan agreement) less dry docking and special survey cost, net interest expenses (including payments due under the Company's current swap agreements) and less payments of loan principals under the Company's current loan agreements.

Following the amendment and until the expiry of the waiver period, the applicable margin will increase to 2.75% and 2.5% thereafter through maturity, while the applicable margin for any deferred principal amount will increase to 4.0% per annum.

The loan amendment came into effect on March 30, 2012.

**EXCEL MARITIME CARRIERS LTD.**
 Notes to Consolidated Financial Statements
December 31, 2011
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**19. Subsequent Events-continued**

c) **Credit Suisse loan amendment:** Following the Nordea facility amendment, the Company reached an agreement with Credit Suisse to similarly amend its credit facility, requiring the Company to comply with a number of covenants, including financial covenants related to leverage, consolidated net worth, liquidity and interest coverage, dividends and collateral maintenance requirements, most of which are in principle and calculation substantially similar to the covenants described under the amended Nordea credit facility.

In particular, the amended facility, through December 31, 2013, contains financial covenants requiring the Company to maintain: (i) minimum liquidity of no less than $1.0 million per collateral vessel plus, in the aggregate, $10.0 million; (ii) a leverage ratio (as adjusted to reflect the fair market values of the vessels wholly owned by the Company) of no more than 100% for the period from December 31, 2011 to December 31, 2012 and 90% thereafter until December 31, 2013; (iii) a net worth, based on book values, of no less than $750.0 million; (iv) a ratio of EBITDA (as defined in the loan agreement) to gross interest expense of no less than 1.75:1.00 in the first half of 2012, and 1.25:1.00 during the eighteen-month period from July 1, 2012 until December 31, 2013; and (v) an aggregate fair market value of vessels serving as collateral for the facility at all times of no less than 80% of the outstanding principal amount of the facility for the period from December 31, 2011 to December 31, 2012, 100% of the outstanding principal amount of the facility in the first half of 2013, and 110% of the outstanding principal amount of the facility in the second half of 2013. In addition, under the amended facility, the period during which cash dividends and share repurchases are suspended will be extended until December 31, 2013 at the latest.

The applicable margin under the facility will increase to 2.65% from April 1, 2012 until the loan maturity and the amount of $11.8 million pledged with Credit Suisse as discussed in Note 8 above, will remain pledged until December 31, 2013 and it may be released thereafter to the extent that the Company complies with the security clause which changes to 135% from January 1, 2014 until the loan maturity.

d) **ABN and DVB loan amendments:** Similarly to the amendments discussed under (b) and (c) above, the Company reached an agreement with each of DVB and ABN to amend their respective bilateral credit facilities.

Further to the covenants amendments in line with Nordea credit facility, the financial covenant under ABN credit facility requiring the Company to maintain a ratio of total net debt to EBITDA (as defined in the loan agreement) of not greater than 6.0:1.0 will be waived until December 31, 2013, while the aggregate fair market value of the vessel shall be at all times no less than 90% of the outstanding principal amount of the facility in 2012, 100% of the outstanding principal amount of the facility in the first half of 2013, and 110% of the outstanding principal amount of the facility in the second half of 2013. During the waiver period the applicable margin will increase to 3.05%.

The DVB credit facility was also amended in line with Nordea credit facility, with the exception of the value security clause which remained as per the initial agreement.

The Company will incur $2.6 million of financing fees in relation to the loan amendments discussed under (b) and (c) above which will be deferred and amortized over the term of the loan using the effective interest of the amended loan.

e) **Back Stop Agreement:** In connection with the amendment of the Nordea facility, the Company is required to raise at least $30.0 million through the issuance of equity by December 31, 2012 as follows: (a) at least $20.0 million must be raised by September 30, 2012; and (ii) a total of $30 million (including any amounts raised by September 30, 2012) must be raised by December 31, 2012.

In addition, the waiver and amendment agreements and the exercise by the Company of its deferral option thereunder are conditional upon the Company raising $20.0 million out of the $30.0 million in equity capital, or alternatively securing from external sources the immediate deposit of $20.0 million into an escrow account.

**EXCEL MARITIME CARRIERS LTD.**
Notes to Consolidated Financial Statements
**December 31, 2011**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

Certain entities affiliated with the family of the Chairman of the Board of Directors have agreed to deposit the required $20.0 million in cash into an escrow account set up for that purpose and have committed to purchase equity of the Company up to the total amount deposited in the escrow account in the event that the Company does not raise the amount required through equity offerings. Under the terms of this agreement, in exchange for depositing the required amount into the escrow account and agreeing to purchase equity of the Company as and if required to meet the Company's equity raising requirement, such entities will receive:

(i)   upon the execution of the agreement and the deposit of the required $20.0 million in cash, 2.7 million warrants, each convertible into one share of Class A common stock, with an exercise price of $0.01 per warrant, subject to a nine-month lock-up period commencing on the date of issuance;

(ii)  if, and only if, the Company has raised the entire amount required under the amendment to the Nordea facility within the allotted time frame, the entities will receive on January 1, 2013 warrants, each convertible into one share of Class A common stock, in an amount equal to 5% of the then outstanding share capital of the Company, with an exercise price of $0.01 per warrant.

In the event that the Company does not raise the amount required under the amendment to the Nordea facility through the issuance of equity, the escrowed funds ($20.0 million) will be used to purchase equity of the Company, which will consist of cumulative non-voting preferred stock of the Company having a liquidation preference of $1,000 per share, bearing a 12% annual dividend rate, payable in additional shares of preferred stock. The preferred stock will be convertible, at the option of its holder, within 12 months from its issuance, into shares of Class A common stock of the Company at a conversion price equal to a 15% discount on the weighted average closing price of the Class A common stock during the immediately preceding trailing 15-day period. Upon the end of such twelve-month period, any such preferred shares not previously converted will be converted automatically into Class A common stock upon the same terms. The preferred shares will have no preemptive or preferential rights to purchase or subscribe to shares, warrants or other securities of any class of the Company other than as described above, and will rank senior to all classes of common stock of the Company with respect to dividend rights and liquidation rights.

The board of directors established a special committee of independent directors to address issues in connection with the negotiation of the agreement with the entities depositing funds into the escrow account and the terms of the agreement.

The special committee determined the fairness of the terms of the agreement by taking into consideration various factors, including, but not limited to: (1) the adverse conditions currently prevailing in the shipping market and the industry outlook; (2) the importance of the deposit, which was a mandatory requirement for the lenders to amend the Nordea facility in order to agree to the relaxation of the facility's financial covenants and to allow for the deferral of principal amount of up to $100.0 million; (3) the purpose of such deposited funds to serve as equity financing of last resort until December 31, 2012 for purposes of being able to comply with the requirements imposed by the lenders to agree to the amendment of the facility; (4) the lenders requirement to secure such deposit in a very short period of time; (5) the relationship between the market value of the Company's assets and the level of its indebtedness; (6) the size of the deposit or such last resort equity financing *versus* the limited market liquidity, as well as the lack of financing alternatives; (7) the opportunity cost of the committed amount or a potential capital contribution compared to other similar investment opportunities; and (8) the nature of the compensation. On that basis, the special committee concluded that the terms of this specific transaction are fair to the Company. In connection with determining the fairness of the terms of the transactions described above, the special committee also retained an independent consulting firm to provide information for the special committee's use. The information provided by the independent firm included examples of similar transactions and an evaluation of the terms of the agreement against such similar transactions.

APPENDIX G

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

UNAUDITED FINANCIAL STATEMENTS FOR FISCAL YEAR 2012

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | **Page** |
|---|---|
| Consolidated Balance Sheets as of December 31, 2011 and 2012 | 2 |
| Consolidated Statements of Operations for the years ended  December 31, 2011 and 2012 | 3 |
| Consolidated Statements of Comprehensive Income (Loss) for the years ended  December 31, 2011 and 2012 | 4 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2011 and 2012 | 5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2011 and 2012 | 6 |
| Notes to Consolidated Financial Statements | 7 |

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2011 AND 2012**
(Expressed in thousands of U.S. Dollars – except for share and per share data)

| | | 2011 | | 2012 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash and cash equivalents | $ | 53,749 | $ | 28,928 |
| Restricted cash (Notes 7 and 8) | | 5,700 | | 48,916 |
| Accounts receivable trade, net | | 7,004 | | 6,348 |
| Accounts receivable, other | | 4,297 | | 2,983 |
| Inventories (Note 5) | | 8,851 | | 6,807 |
| Prepayments and advances | | 3,077 | | 1,189 |
| Derivative financial instruments (Note 8) | | 167 | | - |
| **Total current assets** | | 82,845 | | 95,171 |
| **FIXED ASSETS:** | | | | |
| Vessels, net of accumulated depreciation of $528,044 and $148,445 (Note 6) | | 2,579,285 | | 1,076,994 |
| Office furniture and equipment, net of accumulated depreciation of $2,241 and $2,698 (Note 6) | | 941 | | 539 |
| **Total fixed assets, net** | | 2,580,226 | | 1,077,533 |
| **OTHER NON CURRENT ASSETS:** | | | | |
| Other deferred non-current assets | | 1,108 | | - |
| Restricted cash (Note 7) | | 57,750 | | - |
| **Total other non-current assets** | | 58,858 | | - |
| **Total assets** | $ | 2,721,929 | $ | 1,172,704 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **CURRENT LIABILITIES:** | | | | |
| Current portion of long-term debt, net of unamortized deferred financing fees (Note 7) | $ | 104,879 | $ | 1,019,501 |
| Accounts payable | | 12,062 | | 14,562 |
| Due to related parties (Note 4) | | 486 | | 372 |
| Deferred revenue | | 13,924 | | 4,758 |
| Accrued liabilities | | 16,696 | | 19,136 |
| Derivative financial instruments (Note 8) | | 19,453 | | 31,715 |
| **Total current liabilities** | | 167,500 | | 1,090,044 |
| Long-term debt, net of current portion and net of unamortized deferred financing fees (Note 7) | | 952,716 | | |
| Time charters acquired, net of accumulated amortization of $864,115 and $867,935 (Note 10) | | 14,633 | | 11,413 |
| Derivative financial instruments (Note 8) | | 26,516 | | - |
| Other non-current liabilities | | - | | 5,563 |
| **Total non-current liabilities** | | 993,865 | | 16,976 |
| **Total liabilities** | | 1,161,365 | | 1,107,020 |
| Commitments and contingencies (Note 14) | | - | | - |
| **STOCKHOLDERS' EQUITY:** | | | | |
| Preferred stock, $0.1 par value: 5,000,000 shares authorized, none issued | | - | | - |
| Common Stock, $0.01 par value; 994,000,000 Class A shares and 1,000,000 Class B shares authorized; 88,909,430 Class A shares (including Class A shares held in treasury) and 230,746 Class B shares issued and outstanding at December 31, 2011 and 102,780,322 Class A shares and 295,746 Class B shares (including Class A and Class B shares held in treasury), issued and outstanding at December 31, 2012 (Note 11) | | 891 | | 1,031 |
| Additional paid-in capital (Notes 11 and 12) | | 1,071,263 | | 1,083,563 |
| Accumulated Other Comprehensive Income (Loss) (Note 8) | | (3,064) | | 365 |
| Retained Earnings(Accumulated deficit) | | 480,081 | | (1,032,021) |
| Treasury stock (78,650 and 3,972,400 Class A shares at December 31, 2011 and 2012 and 588 Class B shares at December 31, 2011 and 2012) | | (189) | | (40) |
| **Excel Maritime Carriers Ltd. Stockholders' equity** | | 1,548,982 | | 52,898 |
| Non-controlling interest (Note 1) | | 11,582 | | 12,786 |
| **Total stockholders' equity** | | 1,560,564 | | 65,684 |
| **Total liabilities and stockholders' equity** | $ | 2,721,929 | $ | 1,172,704 |

The accompanying notes are an integral part of these consolidated financial statements.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2012**
(Expressed in thousands of U.S. Dollars-except for share and per share data)

| | 2011 | 2012 |
|---|---|---|
| **REVENUES:** | | |
| Voyage revenues (Note 1) | $ 353,397 | $ 242,256 |
| Time charter amortization (Note 10) | 3,475 | 3,667 |
| Revenue from managing related party vessels (Note 4) | 17 | - |
| **Total revenues** | **356,889** | **245,923** |
| | | |
| **EXPENSES:** | | |
| Voyage expenses (Note 16) | 42,740 | 31,992 |
| Charter hire expense | 32,832 | 29,145 |
| Charter hire amortization (Note 10) | 36,526 | - |
| Commissions to related parties (Notes 4 and 16) | 3,892 | 2,563 |
| Vessels operating expenses (Note 16) | 85,074 | 79,780 |
| Depreciation  (Note 6) | 128,089 | 127,961 |
| Drydocking and special survey costs | 13,326 | 17,065 |
| General and administrative expenses (Notes 12 and 14) | 35,583 | 35,022 |
| **Total Expenses** | **378,062** | **323,528** |
| | | |
| **OTHER OPERATING INCOME/(LOSS):** | | |
| Gain on sale of vessel (Note 6) | 6,432 | 435 |
| Impairment loss on intangible asset (Note 10) | (146,732) | - |
| Vessel impairment loss (Note 6) | - | (1,372,576) |
| **Operating loss** | **(161,473)** | **(1,449,746)** |
| | | |
| **OTHER INCOME (EXPENSES):** | | |
| Interest and finance costs (Notes 7 and 17) | (37,133) | (52,544) |
| Interest income | 1,551 | 285 |
| Losses on derivative financial instruments (Note 8) | (13,292) | (9,046) |
| Foreign exchange gains (losses) | (187) | 142 |
| Other, net | 839 | 372 |
| **Total other expenses, net** | **(48,222)** | **(60,791)** |
| | | |
| **Net loss before taxes and income earned by non-controlling interest** | **(209,695)** | **(1,510,537)** |
| US Source Income taxes (Note 15) | (700) | (361) |
| | | |
| **Net loss before income earned by non-controlling interest** | **(210,395)** | **(1,510,898)** |
| Income earned by non-controlling interest | (1,198) | (1,204) |
| **Net loss attributed to Excel Maritime Carriers Ltd.** | $ **(211,593)** | $ **(1,512,102)** |
| | | |
| **Losses per common share, basic (Note 13)** | $ **(2.51)** | $ **(16.47)** |
| **Weighted average number of shares, basic** | **84,463,674** | **91,787,564** |
| **Losses per common   share, diluted (Note 13)** | $ **(2.51)** | $ **(16.47)** |
| **Weighted average number of shares, diluted** | **84,463,674** | **91,787,564** |

The accompanying notes are an integral part of these consolidated financial statements.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2012**
(Expressed in thousands of U.S. Dollars)

|  | 2011 | 2012 |
|---|---|---|
| **Net loss** | $ (210,395) | $ (1,510,898) |
| **Other Comprehensive Income (loss):** | | |
| Unrealized interest rate swap gains (losses) | (4,225) | (1,237) |
| Reclassification adjustments of interest rate swap losses transferred to Consolidated Statement of Operations | 704 | 4,472 |
| Actuarial gains | 246 | 194 |
| **Other Comprehensive Income (loss)** | (3,275) | 3,429 |
| **Comprehensive loss** | $ (213,670) | $ (1,507,469) |
| Comprehensive income attributable to the non-controlling interest | (1,198) | (1,204) |
| **Comprehensive loss attributed to Excel Maritime Carriers Ltd.** | $ (214,868) | $ (1,508,673) |

The accompanying notes are an integral part of these consolidated financial statements.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2012**
(Expressed in thousands of U.S. Dollars − except for share data)

| | Common Stock | | Additional Paid-in Capital | Accumulated other comprehensive income (loss) | Retained Earnings (Accumulated Deficit) | Treasury Stock | Excel Maritime Carriers Ltd. Stockholders' Equity | Non-controlling interest | Total Stockholders' equity |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Shares | Par Value | | | | | | | |
| **BALANCE, December 31, 2010** | **85,127,525** | **$ 851** | **$ 1,061,134** | **$ 211** | **$ 691,674** | **$ (189)** | **$ 1,753,681** | **$ 10,467** | **$ 1,764,148** |
| - Net (loss)/ income | - | - | - | - | (211,593) | - | (211,593) | 1,198 | (210,395) |
| -Issuance of restricted stock and stock based compensation expense | 4,012,651 | 40 | 10,129 | - | - | - | 10,169 | - | 10,169 |
| -Joint venture de-consolidation | - | - | - | - | - | - | - | (83) | (83) |
| -Unrealized interest rate swap losses | - | - | - | (3,521) | - | - | (3,521) | - | (3,521) |
| -Actuarial gains | - | - | - | 246 | - | - | 246 | - | 246 |
| **BALANCE, December 31, 2011** | **89,140,176** | **$ 891** | **$ 1,071,263** | **$ (3,064)** | **$ 480,081** | **$ (189)** | **$ 1,548,982** | **$ 11,582** | **$ 1,560,564** |
| Net (loss)/ income | - | - | - | - | (1,512,102) | - | (1,512,102) | 1,204 | (1,510,898) |
| -Issuance of common stock | 5,831,139 | 58 | 4,003 | - | - | - | 4,061 | - | 4,061 |
| -Issuance of treasury stock | 3,972,400 | 40 | - | - | - | (40) | - | - | - |
| -Cancellation of treasury stock | (78,650) | - | (189) | - | - | 189 | - | - | - |
| -Back Stop Agreement | - | - | 5,103 | - | - | - | 5,103 | - | 5,103 |
| -Issuance of restricted stock and stock based compensation expense | 4,211,003 | 42 | 3,383 | - | - | - | 3,425 | - | 3,425 |
| - Unrealized interest rate swap losses & reclassification adjustments of interest rate swap losses transferred to Consolidated Statement of Operations | - | - | - | 3,235 | - | - | 3,235 | - | 3,235 |
| -Actuarial gains | - | - | - | 194 | - | - | 194 | - | 194 |
| **BALANCE, December 31, 2012** | **103,076,068** | **$ 1,031** | **$ 1,083,563** | **$ 365** | **$ (1,032,021)** | **$ (40)** | **$ 52,898** | **$ 12,786** | **$ 65,684** |

The accompanying notes are an integral part of these consolidated financial statements.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2012**
(Expressed in thousands of U.S. Dollars)

|  | 2011 | 2012 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (210,395) | $ (1,510,898) |
| **Adjustments to reconcile net loss to net cash provided by operating activities:** | | |
| Depreciation | 128,089 | 127,961 |
| Amortization of convertible notes debt discount | 7,365 | 8,080 |
| Amortization of deferred financing fees | 3,425 | 3,746 |
| Time charter revenue amortization, net of charter hire amortization expense and write-off | 33,051 | (3,471) |
| Vessel impairment loss | - | 1,372,576 |
| Back stop agreement | - | 5,103 |
| Write-off of other deferred non-current asset | - | 1,359 |
| Impairment loss on intangible asset | 146,732 | - |
| Gain on joint venture de-consolidation | (83) | - |
| Gain on sale of vessel | (6,432) | (435) |
| Stock-based compensation expense | 10,169 | 3,425 |
| Unrealized gains on derivative financial instruments | (8,780) | (10,852) |
| Unrecognized actuarial losses | 246 | 194 |
| **Changes in operating assets and liabilities:** | | |
| Accounts receivable | 1,206 | 1,970 |
| Financial instruments settled in the period | - | - |
| Inventories | (664) | 2,044 |
| Prepayments and advances | 676 | 1,888 |
| Accounts payable | 961 | 7,500 |
| Due to related parties | (341) | (114) |
| Accrued liabilities | 3,088 | 3,003 |
| Deferred revenue | (3,963) | (9,166) |
| **Net Cash provided by Operating Activities** | $ 104,350 | $ 3,913 |
| **Cash Flows used in Investing Activities:** | | |
| Advances for vessels under construction | (18,267) | - |
| Additions to vessel cost | (25) | (29) |
| Proceeds from sale of vessel | 17,089 | 2,675 |
| Office furniture and equipment | (317) | (55) |
| **Net cash provided by (used in) Investing Activities** | $ (1,520) | $ 2,591 |
| **Cash Flows used in Financing Activities:** | | |
| (Increase) decrease in restricted cash | (7,762) | 14,534 |
| Proceeds from long-term debt | 27,100 | - |
| Repayment of long-term debt | (133,448) | (47,160) |
| Contributions from non-controlling interests | - | - |
| Issuance of common stock / exercise of warrants, net of related issuance costs-related parties | - | - |
| Issuance of common stock, net of related issuance costs | - | 4,061 |
| Payment of financing fees | (888) | (2,760) |
| **Net cash used in Financing Activities** | $ (114,998) | $ (31,325) |
| **Net decrease in cash and cash equivalents** | (12,168) | (24,821) |
| **Cash and cash equivalents at beginning of year** | 65,917 | 53,749 |
| **Cash and cash equivalents at end of the year** | $ 53,749 | $ 28,928 |
| | | |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | |
| -Cash paid during the year for: | | |
| Interest payments | $ 22,632 | $ 32,235 |
| US Source Income taxes | $ 650 | $ 479 |

The accompanying notes are an integral part of these consolidated financial statements.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**1.    Basis of Presentation:**

The accompanying consolidated financial statements include the accounts of Excel Maritime Carriers Ltd. and its wholly owned subsidiaries and majority owned subsidiary (collectively, the "Company" or "Excel"). Excel was formed in 1988, under the laws of the Republic of Liberia. In July 2012, the Company separated its ship-owning business from its chartering business and in connection with such separation, implemented an internal reorganization that resulted in changes to its corporate structure as presented below. The Company is engaged in the ocean transportation of dry bulk cargoes worldwide through the ownership and operation of bulk carrier vessels.

| | Company | | Country of Incorporation | | Vessel name | | Type | | Year Built | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ship-owning companies with vessels in operation | | | | | | | | | |
| 1. | Hope Shipco LLC | | Marshall Islands | | Mairaki | | Capesize | | 2011 | |
| 2. | Christine Shipco LLC [1] | | Marshall Islands | | Christine | | Capesize | | 2010 | |
| 3. | Sandra Shipco LLC | | Marshall Islands | | Sandra | | Capesize | | 2008 | |
| 4. | Iron Miner Shipco LLC | | Marshall Islands | | Iron Miner | | Capesize | | 2007 | |
| 5. | Iron Beauty Shipco LLC | | Marshall Islands | | Iron Beauty | | Capesize | | 2001 | |
| 6. | Kirmar Shipco LLC | | Marshall Islands | | Kirmar | | Capesize | | 2001 | |
| 7. | Lowlands Beilun Shipco LLC | | Marshall Islands | | Lowlands Beilun | | Capesize | | 1999 | |
| 8. | Iron Brooke Shipco LLC | | Marshall Islands | | Iron Brooke | | Kamsarmax | | 2007 | |
| 9. | Iron Lindrew Shipco LLC | | Marshall Islands | | Iron Lindrew | | Kamsarmax | | 2007 | |
| 10. | Iron Manolis Shipco LLC | | Marshall Islands | | Iron Manolis | | Kamsarmax | | 2007 | |
| 11. | Coal Gypsy Shipco LLC | | Marshall Islands | | Coal Gypsy | | Kamsarmax | | 2006 | |
| 12. | Coal Hunter Shipco LLC | | Marshall Islands | | Coal Hunter | | Kamsarmax | | 2006 | |
| 13. | Pascha Shipco LLC | | Marshall Islands | | Pascha | | Kamsarmax | | 2006 | |
| 14. | Santa Barbara Shipco LLC | | Marshall Islands | | Santa Barbara | | Kamsarmax | | 2006 | |
| 15. | Iron Fuzeyya Shipco LLC | | Marshall Islands | | Iron Fuzeyya | | Kamsarmax | | 2006 | |
| 16. | Ore Hansa Shipco LLC | | Marshall Islands | | Ore Hansa | | Kamsarmax | | 2006 | |
| 17. | Iron Kalypso Shipco LLC | | Marshall Islands | | Iron Kalypso | | Kamsarmax | | 2006 | |
| 18. | Iron Anne Shipco LLC | | Marshall Islands | | Iron Anne | | Kamsarmax | | 2006 | |
| 19. | Iron Bill Shipco LLC | | Marshall Islands | | Iron Bill | | Kamsarmax | | 2006 | |
| 20. | Iron Vassilis Shipco LLC | | Marshall Islands | | Iron Vassilis | | Kamsarmax | | 2006 | |
| 21. | Iron Bradyn Shipco LLC | | Marshall Islands | | Iron Bradyn | | Kamsarmax | | 2005 | |
| 22. | Grain Express Shipco LLC | | Marshall Islands | | Grain Express | | Panamax | | 2004 | |
| 23. | Iron Knight Shipco LLC | | Marshall Islands | | Iron Knight | | Panamax | | 2004 | |
| 24. | Grain Harvester Shipco LLC | | Marshall Islands | | Grain Harvester | | Panamax | | 2004 | |
| 25. | Coal Pride Shipco LLC | | Marshall Islands | | Coal Pride | | Panamax | | 1999 | |
| 26. | Fianna Navigation S.A | | Liberia | | Isminaki | | Panamax | | 1998 | |
| 27. | Marias Trading Inc. | | Liberia | | Angela Star | | Panamax | | 1998 | |
| 28. | Yasmine International Inc. | | Liberia | | Elinakos | | Panamax | | 1997 | |
| 29. | Amanda Enterprises Ltd. | | Liberia | | Happy Day | | Panamax | | 1997 | |
| 30. | Fountain Services Ltd. | | Liberia | | Powerful | | Panamax | | 1994 | |
| 31. | Teagan Shipholding S.A. | | Liberia | | First Endeavour | | Panamax | | 1994 | |
| 32. | Tanaka Services Ltd. | | Liberia | | Rodon | | Panamax | | 1993 | |
| 33. | Whitelaw Enterprises Co. | | Liberia | | Birthday | | Panamax | | 1993 | |
| 34. | Candy Enterprises Inc. | | Liberia | | Renuar | | Panamax | | 1993 | |
| 35. | Harvey Development Corp. | | Liberia | | Fortezza | | Panamax | | 1993 | |
| 36. | Minta Holdings S.A. | | Liberia | | July M | | Supramax | | 2005 | |
| 37. | Odell International Ltd. | | Liberia | | Mairouli | | Supramax | | 2005 | |
| 38. | Ingram Limited | | Liberia | | Emerald | | Handymax | | 1998 | |
| 39. | Castalia Services Ltd. | | Liberia | | Princess I | | Handymax | | 1994 | |

[1]    Christine Shipco LLC is owned 71.4% by the Company.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars − except for share and per share data, unless otherwise stated)

**1.   Basis of Presentation-continued**

| | Company | | Country of Incorporation | Vessel name | | Type | | Year Built | |
|---|---|---|---|---|---|---|---|---|---|
| | **Non-shipowning company with vessel in operation** [2] | | | | | | | | |
| 40. | Coal Glory Shipco LLC | | Marshall Islands | Coal Glory | | Panamax | | 1995 | |

[2]   Indicates a company whose vessel was sold to a third party in July 2007 and subsequently leased back under a bareboat charter. The vessel was redelivered to her owners in January 2013.

The following wholly-owned subsidiaries have been established to acquire vessels, although vessels have not yet been identified:

| | **Company** | **Country of Incorporation** | |
|---|---|---|---|
| 41. | Magalie Investments Corp. | Liberia | |
| 42. | Melba Management Ltd. | Liberia | |

The Company is also the sole owner of the following subsidiaries:

| | **Company** | **Country of Incorporation** | |
|---|---|---|---|
| 43. | Maryville Maritime Inc. [1] | Liberia | |
| 44. | Point Holdings Ltd [2] | Liberia | |
| 45. | Naia Development Corp. [3] | Liberia | |
| 46. | Thurman International Ltd. [4] | Liberia | |
| 47. | Bird Acquisition Corp [5] | Marshall Islands | |
| 48. | Liegh Jane Navigation S.A. [6] | Liberia | |
| 49. | Snapper Marine Ltd. [7] | Liberia | |
| 50. | Centel Shipping Company Limited [8] | Cyprus | |
| 51. | Fearless Shipco LLC [9] | Marshall Islands | |
| 52. | Barbara Shipco LLC [9] | Marshall Islands | |
| 53. | Linda Leah Shipco LLC [9] | Marshall Islands | |
| 54. | King Coal Shipco LLC [9] | Marshall Islands | |
| 55. | Coal Age Shipco LLC [9] | Marshall Islands | |
| 56. | Iron Man Shipco LLC [9] | Marshall Islands | |
| 57. | Barland Holdings Inc. [10] | Liberia | |
| 58. | Excel Maritime Carriers LLC | United States of America | |

[1]   Maryville Maritime Inc. ("Maryville") is a management company that provides the technical management of Excel's vessels.

[2]   Point Holdings Ltd. is the parent company (100% owner) of Naia Development Corp. and three Liberian non ship-owning companies.

[3]   Naia Development Corp. is the parent company (100% owner) of Bird Acquisition Corp.

[4]   Thurman International Ltd. is the parent company (100% owner) of Centel Shipping Company Limited, the owner of M/V Lady, a vessel sold in August 2011.

[5]   Bird is the parent company (100% owner) of 7 Marshall Islands non ship-owning companies.

[6]   Previously the owning company of Swift, a vessel sold in March 2009.

[7]   Previously the owning company of Marybelle, a vessel sold in February 2011.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 1.    Basis of Presentation-continued

[8]    Previously the owning company of Lady, a vessel sold in August 2011.

[9]    Indicates a company whose vessel was sold to a third party in July 2007 and subsequently leased back under a bareboat charter. The vessel was redelivered to her owners in 2012.

[10]    Previously the owning company of Attractive, a vessel sold in December 2012.

*Concentration of credit risk*

During the years ended December 31, 2011 and 2012 two and three charterers, respectively, individually accounted for more than 10% of the Company's voyage revenues as follows:

| Charterer | 2011 | 2012 | |
|-----------|------|------|--|
| A | 14% | 10% | |
| B | 11% | 16% | |
| C | - | 14% | |

The outstanding balance ($1,176) of these charterers as of December 31, 2012 was not material, representing less of 2% of Company's current assets at the balance sheet date.

The consolidated balance sheet, statement of operations and stockholders' equity, cash flow data and other financial information for the year ended December 31, 2011, have been derived from the Company's consolidated financial statements included in its 2011 Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 30, 2012.

## 2.    Significant Accounting policies:

a)    **Principles of Consolidation:** The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles and include in each of the three years in the period ended December 31, 2012 the accounts and operating results of the Company and its wholly-owned and majority-owned subsidiaries. All inter-company balances and transactions have been eliminated in consolidation. The Company consolidates all subsidiaries that are more than 50% owned and presents any non-controlling interests, representing the portion of equity in a subsidiary not attributable, directly or indirectly, to the Company, in the consolidated statement of financial position within equity separate from the Company's equity and the portion of the net income or loss of the subsidiary earned or assumed by the non-controlling interest in the consolidated statements of operations as non controlling interests. In addition, following the provisions of ASC 810, "Consolidation", the Company evaluates any interest held in other entities to determine whether the entity is a Variable Interest Entity ("VIE") and if the Company is the primary beneficiary of the VIE.

b)    **Use of Estimates:** The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.    Significant Accounting policies-continued**

**c)    Other Comprehensive Income (Loss):** The Company follows the provisions of ASC 220, "Comprehensive Income", which requires separate presentation of certain transactions, which are recorded directly as components of stockholders' equity. The Company's comprehensive income (loss) is comprised of net income less actuarial gains/losses related to the implementation of ASC 715, "Compensation-Retirement Benefits", as well as the changes in the fair value of the derivatives that qualify for hedge accounting, net of the realized losses of such derivatives which are reclassified to consolidated statement of operations, in accordance with ASC 815 "Derivatives and Hedging".

In June 2011, the FASB issued ASU 2011-05, Comprehensive Income, Presentation of Comprehensive Income (Topic 220), which revises the manner in which entities present comprehensive income in their financial statements. The new guidance removes the presentation options in ASC 220 and requires entities to report components of comprehensive income in either (i) a continuous statement of comprehensive income or (ii) two separate but consecutive statements. Under the two-statement approach, an entity is required to present components of net income and total net income in the statement of net income. The statement of other comprehensive income should immediately follow the statement of net income and include the components of other comprehensive income and a total for other comprehensive income, along with a total for comprehensive income. The amendments in this Update do not change the items that must be reported in other comprehensive income or when an item of other comprehensive income must be reclassified to net income. The amendments in this Update should be applied retrospectively and they were adopted by the Company in the accompanying consolidated financial statements with no material effect.

**d)    Concentration of Credit Risk:** Financial instruments, which potentially subject the Company to significant concentrations of credit risk, consist principally of cash and cash equivalents, trade accounts receivable and derivative contracts (mainly interest rate swaps). The Company places its cash and cash equivalents, consisting mostly of deposits, with various financial institutions and performs periodic evaluations of the relative credit standing of those financial institutions. The Company limits its credit risk with accounts receivable by performing ongoing credit evaluations of its customers' financial condition. The Company does not obtain rights to collateral to reduce its credit risk. The Company is exposed to credit risk in the event of non-performance by counter parties to derivative instruments; however, the Company limits its exposure by diversifying among counter parties considering their credit ratings.

**e)    Foreign Currency Translation:** The functional currency of the Company is the U.S. Dollar because the Company's vessels operate in international shipping markets, and therefore primarily transact business in U.S. Dollars. The Company's accounting records are maintained in U.S. Dollars. Transactions involving other currencies during the year are converted into U.S. Dollars using the exchange rates in effect at the time of the transactions. At the balance sheet date, monetary assets and liabilities, which are denominated in other currencies, are translated into U.S. Dollars at the year-end exchange rates. Resulting gains or losses are separately reflected in the accompanying consolidated statements of operations.

**f)    Cash and Cash Equivalents:** The Company considers highly liquid investments such as time deposits and certificates of deposit with an original maturity of three months or less to be cash equivalents.

**g)    Restricted Cash:** Restricted cash includes bank deposits that are required under the Company's borrowing arrangements which are used to fund the loan instalments coming due. The funds can only be used for the purposes of loan repayment. In addition, restricted cash also includes minimum cash deposits required to be maintained with certain banks under the Company's borrowing arrangements and derivative financial instruments.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.   Significant Accounting policies-continued**

**h)   Accounts Receivable Trade, net:** Accounts receivable-trade, net at each balance sheet date, includes receivables from charterers for hire, freight and demurrage billings, net of any provision for doubtful accounts. The Company's revenue is based on contracted charter parties. However, there is always the possibility of dispute over terms and payment of hires and freights, as disagreements may arise in relation to the responsibility of lost time and revenue due to the Company. Accordingly, at each balance sheet date, all potentially uncollectible accounts are assessed individually for purposes of determining the appropriate provision for doubtful accounts primarily based on the aging of such balances and any amounts in disputes. The provision for doubtful accounts at December 31, 2011 and 2012 amounted to $339 and $702, respectively.

**i)   Insurance Claims:** The Company records insurance claim recoveries for insured losses incurred on damage to fixed assets and for insured crew medical expenses. Insurance claim recoveries are recorded, net of any deductible amounts, at the time the Company's fixed assets suffer insured damages or when crew medical expenses are incurred, recovery is probable under the related insurance policies and the Company can make an estimate of the amount to be reimbursed following the insurance claim.

**j)   Inventories:** Inventories consist of consumable bunkers and lubricants, which are stated at the lower of cost or market value. Cost is determined by the first in, first out method.

**k)   Vessels, net:** Vessels are stated at cost, which consists of the contract price and any material expenses incurred upon acquisition (initial repairs, improvements, delivery expenses and other expenditures to prepare the vessel for her initial voyage). Subsequent expenditures for major improvements are also capitalized when they appreciably extend the life, increase the earning capacity or improve the efficiency or safety of the vessels. Otherwise these amounts are charged to expense as incurred. The cost of each of the Company's vessels is depreciated beginning when the vessel is ready for her intended use, on a straight-line basis over the vessel's remaining economic useful life, after considering the estimated residual value (vessel's residual value is equal to the product of its lightweight tonnage and estimated scrap rate). Management estimates the scrap value per light weight ton (LWT) to be $0.2 which is based on the historical demolition prices prevailing in the market while management estimates the useful life of the Company's vessels to be 28 years from the date of initial delivery from the shipyard. However, when regulations place limitations over the ability of a vessel to trade on a worldwide basis, her remaining useful life is adjusted at the date such regulations become effective.

**l)   Office furniture and Equipment, net:** Office furniture and equipment, net are stated at cost less accumulated depreciation. Depreciation is calculated on a straight line basis over the estimated useful life of the specific asset placed in service which range from three to nine years.

**m)   Impairment of Long-Lived Assets:** The Company follows the guidance under ASC 360, "Property, Plant and Equipment", which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. The standard requires that long-lived assets and certain identifiable intangibles held and used or disposed of by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. When the estimate of undiscounted cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount, the Company should evaluate the asset for an impairment loss.

Measurement of the impairment loss is based on the fair value of the asset which is determined based on management estimates and assumptions and by making use of available market data. The fair values are determined through Level 2 inputs of the fair value hierarchy as defined in ASC 820 "Fair value measurements and disclosures" and are derived principally from or by corroborated or observable market data. Inputs, considered by management in determining the fair value, include independent broker's valuations, FFA indices, average charter hire rates and other market observable data that allow value to be determined.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.  Significant Accounting policies-continued**

The Company evaluates the carrying amounts and periods over which long-lived assets are depreciated to determine if events have occurred which would require modification to their carrying values or useful lives. In evaluating useful lives and carrying values of long-lived assets, management reviews certain indicators of potential impairment, such as undiscounted projected operating cash flows, vessel sales and purchases, business plans and overall market conditions.

**n)  Assets Held For Sale:**  In accordance with ASC 360, "Property, Plant, and Equipment", the Company classifies long-lived assets to be sold as held-for-sale in the period in which all of the following criteria are met: management having the appropriate authority commits to a plan to sell the asset; the asset is available for immediate sale in its present condition; an active program to locate a buyer and other actions required to sell the asset have been initiated; sale of the asset is probable and expected to occur within one year; the asset is being actively marketed for sale at a price that is reasonable in relation to its fair value; and actions required to complete the plan indicate that it is unlikely significant changes to the plan will be made or that the plan will be withdrawn. Assets held-for-sale are not depreciated and are measured at the lower of carrying amount or fair value less costs to sell.

**o)  Intangible assets/liabilities related to time charter acquired:**  Where the Company identifies any assets or liabilities associated with the acquisition of a vessel, the Company records all such identified assets or liabilities at fair value. Fair value is determined by reference to market data. The Company values any asset or liability arising from the market value of the time charters assumed when a vessel is acquired. The amount to be recorded as an asset or liability at the date of vessel delivery is based on the difference between the current fair value of a charter with similar characteristics as the time charter assumed and the net present value of future contractual cash flows from the time charter contract assumed.

When the present value of the time charter assumed is greater than the current fair value of such charter, the difference is recorded as an asset; otherwise, the difference is recorded as liability. Such assets (so long as recoverability tests support their carrying values) and liabilities, respectively, are amortized over the remaining term of the related charters as an increase in charter hire expense and revenue, respectively, and are classified as non-current in the accompanying consolidated balance sheets.

Following the guidance under ASC 360 discussed under (m) above, the Company tests the intangible assets for recoverability whenever events or changes in circumstances indicate that their carrying amount may not be recoverable.

**p)  Accounting for Dry-Docking and Special Survey Costs:**  The Company follows the direct expense method under which the dry-docking and special survey costs are expensed as incurred.

**q)  Financing Costs:**  Direct and incremental costs related to the issuance of debt such as legal, bankers or underwriters' fees are capitalized and reflected as deferred financing costs. Amounts paid to lenders or required to be paid to third parties on the lender's behalf are classified as a contra to debt. All such financing costs are amortized to interest and finance costs using the effective interest method over the life of the related debt or for debt instruments that are puttable by the holders prior to the debt's stated maturity, over a period no longer than through the first put option date. Unamortized fees relating to loans repaid or refinanced as debt extinguishment are expensed as interest and finance costs in the period the repayment or extinguishment is made.

**r)  Convertible Senior Notes:**  The Company follows the provisions of ASC Topic 470-20, "Debt with Conversion and Other Options," which requires the issuer of certain convertible debt instruments that may be settled in cash on conversion to separately account for the liability (debt) and equity (conversion option) components of the instrument in a manner that reflects the issuer's non-convertible debt borrowing rate.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
Notes to Consolidated Financial Statements
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.   Significant Accounting policies-continued**

s)   **Financial Instruments:** The principal financial assets of the Company consist of cash and cash equivalents and restricted cash, accounts receivable, trade (net of allowance), and prepayments and advances. The principal financial liabilities of the Company consist of accounts payable, accrued liabilities, deferred revenue, long-term debt, and interest-rate swaps. The carrying amounts reflected in the accompanying consolidated balance sheets of financial assets and liabilities, with the exception of the 1.875% Unsecured Convertible Senior Notes due 2027 (Note 9), approximate their respective fair values.

t)   **Fair Value Measurements:** The Company follows the provisions of ASC 820, "Fair Value Measurements and Disclosures" which defines, and provides guidance as to the measurement of, fair value. ASC 820 creates a hierarchy of measurement and indicates that, when possible, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. The fair value hierarchy gives the highest priority (Level 1) to quoted prices in active markets and the lowest priority (Level 3) to unobservable data, for example, the reporting entity's own data. Under the standard, fair value measurements are separately disclosed by level within the fair value hierarchy. ASC 820 applies when assets or liabilities in the financial statements are to be measured at fair value, but does not require additional use of fair value beyond the requirements in other accounting principles.

In May 2011, the FASB issued ASU 2011-04, Fair Value Measurements, Amendments to achieve common fair value measurements and disclosure requirements in U.S. GAAP and IFRS (Topic 820). The ASU is the result of joint efforts by the FASB and IASB to develop a single, converged fair value framework on how to measure fair value and on what disclosures to provide about fair value measurements. While the ASU is largely consistent with existing fair value measurement principles in U.S. GAAP, it expands ASC 820's existing disclosure requirements for fair value measurements and makes other amendments. Many of these amendments are being made to eliminate unnecessary wording differences between U.S. GAAP and IFRSs. However, some could change how the fair value measurement guidance in ASC 820 is applied. The adoption of this amendment in 2012 did not have a material effect on the presentation of the Company's consolidated financial statements.

u)   **Fair value option:**   In February, 2007, the FASB issued ASC 825, "Financial Instruments," which permits companies to report certain financial assets and financial liabilities at fair value.   ASC 825 was effective for the Company as of January 1, 2008 at which time the Company could elect to apply the standard prospectively and measure certain financial instruments at fair value. The Company has evaluated the guidance contained in ASC 825, and has elected not to report any existing financial assets or liabilities at fair value that are not already reported, therefore, the adoption of the statement had no impact on its financial position and results of operations. The Company retains the ability to elect the fair value option for certain future assets and liabilities acquired under this new pronouncement.

v)   **Derivatives:**   Derivative financial instruments are used to manage risk related to fluctuations of interest rates, hire rates and currency exchange rates. At the inception of a hedge relationship, the Company formally designates and documents the hedge relationship to which the Company wishes to apply hedge accounting and the risk management objective and strategy undertaken for the hedge. The documentation includes identification of the hedging instrument, hedged item or transaction, the nature of the risk being hedged and how the entity will assess the hedging instrument's effectiveness in offsetting exposure to changes in the hedged item's cash flows attributable to the hedged risk. A cash flow hedge is a hedge of the exposure to variability in cash flows that is attributable to a particular risk associated with a recognized asset or liability, or a highly probable forecasted transaction that could affect profit or loss. Such hedges are expected to be highly effective in achieving offsetting changes in cash flows and are assessed on an ongoing basis to determine whether they actually have been highly effective throughout the financial reporting periods for which they were designated. All derivatives are recorded on the balance sheet as assets or liabilities and measured at fair value. For derivatives designated as cash flow hedges, the effective portion of the changes in fair value of the derivatives are recorded in Accumulated Other Comprehensive Income (Loss) and subsequently recognized in earnings when the hedged items impact earnings.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.    Significant Accounting policies-continued**

The changes in fair value of derivatives not qualifying for hedge accounting are recognized in earnings. The Company discontinues cash flow hedge accounting if the hedging instrument expires and it no longer meets the criteria for hedge accounting or designation is revoked by the Company. At that time, any cumulative gain or loss on the hedging instrument recognized in equity is kept in equity until the forecasted transaction occurs. When the forecasted transaction occurs, any cumulative gain or loss on the hedging instrument is recognized in profit or loss. If a hedged transaction is no longer expected to occur, the net cumulative gain or loss recognized in equity is transferred to net profit or loss for the year as financial income or expense.

The Company follows the accounting pronouncement relating to the expanded disclosure requirements about derivative instruments and hedging activities codified as ASC 815, "Derivatives and Hedging". ASC 815 intents to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows.

ASC 815 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments. ASC 815 relates to disclosures only and its adoption did not have any effect on the financial condition, results of operations or liquidity of the Company.

**w)    Accounting for Revenues and Related Expenses:** The Company generates its revenues from charterers for the charterhire of its vessels. Vessels are chartered using either voyage charters, where a contract is made in the spot market for the use of a vessel for a specific voyage for a specified charter rate, or time charters, where a contract is entered into for the use of a vessel for a specific period of time and a specified daily charterhire rate and any profit share over the daily charterhire rate, where applicable. If a charter agreement exists and collection of the related revenue is reasonably assured, revenue is recognized, as it is earned ratably over the duration of the period of each voyage or time charter. Revenue on any profit share is recognized following the same criteria. Time charter revenues are recorded over the term of the charter as service is provided. Under a voyage charter the revenues are recognized proportionately over the duration of the voyage. A voyage is deemed to commence upon the completion of discharge of the vessel's previous cargo and the vessel's sail to the next fixed loading port and is deemed to end upon the completion of discharge of the current cargo. A voyage charter contract with a charterer consists of sailing to the load port (the positioning leg), loading the cargo, sailing to the discharge port and discharging the cargo. The charter contract therefore requires the relevant vessel to proceed to the port or place as ordered by the charterer and is not cancellable in the positioning leg, provided that the Company fulfils its contractual commitment. Performance under the contract begins upon sailing to the load port (the positioning leg). Non-cancelable voyage contracts are generally arranged prior to the completion of an existing contract. Assuming, therefore, that a non-cancelable voyage charter agreement is in place, voyage revenue recognition, under the discharge-to-discharge method, commences once the discharge of the previous charter's cargo is complete and the vessel sails for loading. The voyage is deemed complete at the point the vessel has left the discharge terminal.

Demurrage income represents payments by the charterer to the vessel owner when loading or discharging time exceeded the stipulated time in the voyage charter and is recognized as it is earned. Deferred revenue includes cash received prior to the balance sheet date and is related to revenue earned after such date. Voyage expenses, primarily consisting of port, canal and bunker expenses that are unique to a particular charter, are paid for by the charterer under the time charter arrangements or by the Company under voyage charter arrangements, except for commissions, which are always paid for by the Company, regardless of charter type.

All voyage and vessel operating expenses are expensed as incurred, except for commissions. Commissions paid to brokers are deferred and amortized over the related voyage charter period to the extent revenue has been deferred since commissions are earned as the Company's revenues are earned.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**2.    Significant Accounting policies-continued**

x) **Repairs and Maintenance:** All repair and maintenance expenses including underwater inspection expenses are expensed in the year incurred and are included in Vessel operating expenses in the accompanying consolidated statements of operations.

y) **Pension and Retirement Benefit Obligations:** Administrative employees are covered by state-sponsored pension funds. Both employees and the Company are required to contribute a portion of the employees' gross salary to the fund. Upon retirement, the state-sponsored pension funds are responsible for paying the employees retirement benefits and accordingly the Company has no such obligation. Employer's contributions for the years ended December 31, 2011 and 2012 amounted to $3.3 million and $3.0 million, respectively.

z) **Staff Leaving Indemnities – Administrative Personnel:** The Company's employees are entitled to termination payments in the event of dismissal or retirement with the amount of payment varying in relation to the employee's compensation, length of service and manner of termination (dismissed or retired). Employees who resign, or are dismissed with cause are not entitled to termination payments. The Company's liability on an actuarially determined basis, at December 31, 2011 and 2012 amounted to $1.0 million and $0.6. million respectively, while the amount recognized in Accumulated Other Comprehensive Income/Loss at December 31, 2011 and 2012, following the adoption of ASC 715, "Compensation-Retirement Benefits" amounted to a gain of $0.2 million and $0.4 million, respectively.

aa) **Stock-Based Compensation:** Following the provisions of ASC 718, "Compensation- Stock Compensation" the Company recognizes all share-based payments to employees, including grants of employee stock options, in the consolidated statements of operations based on their fair values on the grant date. Compensation cost on stock based awards with graded vesting is recognized on an accelerated basis as though each separately vesting portion of the award was, in substance, a separate award.

bb) **Taxation:** The Company follows the provisions of ASC 740-10, "Accounting for Uncertainty in Income Taxes" which clarifies the accounting for uncertainty in income taxes by prescribing the minimum recognition threshold a tax position is required to meet before being recognized in the financial statements. ASC 740-10 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

cc) **Earnings (losses) per Common Share:** Basic earnings (losses) per common share are computed by dividing net income (loss) available to common stockholders by the weighted average number of common shares outstanding during the year. Diluted earnings (losses) per common share, reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised.

dd) **Segment Reporting:** The Company reports financial information and evaluates its operations by charter revenues and not by the length of ship employment for its customers, i.e. spot or time charters. The Company does not use discrete financial information to evaluate the operating results for each such type of charter. Although revenue can be identified for these types of charters, management cannot and does not identify expenses, profitability or other financial information for these charters. As a result, management, including the chief operating decision maker, reviews operating results solely by revenue per day and operating results of the fleet and thus the Company has determined that it operates under one reportable segment. Furthermore, when the Company charters a vessel to a charterer, the charterer is free to trade the vessel worldwide and, as a result, the disclosure of geographic information is impracticable.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**3.    Going concern:**

Over the past year, the Company has experienced significant losses and reduction in cash and cash equivalents, which has affected, and which the Company expects will continue to affect, its ability to satisfy its obligations. As charter rates for bulkers have experienced a high degree of volatility and the Company had to re-charter its vessels at low prevailing market rates, the Company experienced significant reduction in cash flow, which in turn further impaired the Company's liquidity. At December 31, 2012, the Company reported a working capital deficit of approximately $1.0 billion.

As a result of the conditions set out above, over a period of time, the Company was not in compliance with certain of its covenants under its credit facilities and derivative agreements (Note 7 and 8), while subsequent to December 31, 2012 defaulted also in respect of making certain principal payments (Note 18), both resulting in the acceleration of its debt. As of December 31, 2012, long-term debt of $1.0 billion and derivative financial instruments of $31.7 million have been classified under current liabilities in the consolidated balance sheet as a result of the above violations of the debt terms and covenants and the cross default provisions contained in the above agreements.

The Company is currently in advanced restructuring discussions with its lenders under its syndicated credit facility, dated as of April 14, 2008 (the "Syndicate Lenders"). The aim of the restructuring is to increase liquidity, improve debt maturity profile, obtain releases from certain of its indebtedness and deleverage the Company on a going forward basis. The restructuring plan, a term sheet of which is currently at the execution phase, provides for a reorganization which would utilize also the bankruptcy laws of the United States and will include, among others, amended loan amortization schedules and extension of the syndicated facility's maturity. While such discussions continue, the Syndicate Lenders have agreed to forbear from exercising their rights in connection with the principal installments that have become due through May 31, 2013 (Note 18(a)). The Company's access to the escrowed funds to fund its equity raising commitment, discussed in Note 7, has been similarly extended to May 31, 2013. To date, the Company has not obtained forbearance from its lenders with respect to other, non-payment related, defaults under its syndicated and bilateral credit facilities as well as under its convertible notes.

The Company is in similar discussions with Credit Suisse AG and DVB Bank SE for the restructuring of its bilateral credit facilities. In addition, in May 2013, the Company reached an agreement with ABN Amro Bank N.V. ("ABN") pursuant to which it settled its liability resulting from covenant violations and non-compliance with the cross-default provisions contained in the bilateral credit facility and the derivative agreement, amounting to approximately $35.0 million and $29.2 million, respectively, by transferring its ownership interest in the borrowing entity and the vessel under such entity's direct ownership to ABN (Note 18(d)).

As of December 31, 2012, the Company has incurred expenses of $8.7 million in relation to the restructuring process, which are included in general and administrative expenses in the accompanying 2012 consolidated statements of operations.

While the Company continues to use its best efforts to complete the restructuring, its outcome, as well as, the ultimate accounting impact of such restructuring is still unknown and will not be determined until the final terms of the restructuring are reached with the Company's lenders. An adverse outcome can negatively impact the Company's ability to continue to conduct business, the trading of its common shares and its ability to remain listed on NYSE.

All of the above raise substantial doubt regarding the Company's ability to continue as a going concern.

The consolidated financial statements have been prepared assuming that the Company will continue as a going concern. Accordingly, the consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, the amounts and classification of liabilities, or any other adjustments that might result in the event the Company is unable to continue as a going concern.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**4.    Transactions with Related Parties:**

*Commercial Services*

The Company has a brokering agreement with an entity affiliated with the Company's Chairman of the Board of Directors according to which the Company is being provided with brokerage services for the employment and chartering of the Company's vessels, for a commission fee equal to 1.25% of the revenue of each contract. Commissions charged under the agreement for the years ended December 31, 2011 and 2012 amounted to $3.5 million and $2.3 million respectively and are included in Commissions to related parties in the accompanying consolidated statements of operations. Amounts due to such related party as at December 31, 2011 and 2012 were $0.4 million and are included in due to related parties in the accompanying consolidated balance sheets.

In addition, the charter parties of the vessels Lowlands Beilun, Sandra, Christine and Mairaki (which expire in the years through February 2016) provide for a commission fee equal to 1% of the revenue earned to be paid in favor of an entity affiliated with one of the Company's directors. On August 28, 2012, such director was resigned from the Company's Board of directors. Commissions charged under the agreement for the year ended December 31, 2011 and the period from January 1, 2012 to August 28, 2012 amounted to $0.4 million and $0.3 million, respectively and are included in Commissions to related parties in the accompanying consolidated statements of operations. Amounts due to such related party as at December 31, 2011 were $0.1 million and are included in due to related parties in the accompanying consolidated balance sheets.

*Back Stop Agreement*

In connection with the loan amendment and the equity offering discussed in Note 7 below, on March 29, 2012, the Company entered into an agreement with certain entities affiliated with the family of the Chairman of the Board of Directors, under which such entities deposited $20.0 million, as required under the loan amendment, into an escrow account set up for that purpose and have committed to purchase capital stock of the Company up to the total amount deposited in the escrow account in the event that the Company does not raise the amount required through equity offerings.

The Company has treated the warrants provided under Schedule 2 of the Back Stop Agreement as a facility /commitment fee, which was amortized through December 31, 2012 as a finance cost recognized under interest and finance costs in the accompanying consolidated 2012 statement of operations. The fair value of the Schedule 2 warrants was determined by reference to the quoted market price of the Company's Class A common stock on March 29, 2012. As of the same date, the fair value of the financial instruments (contingently exercisable instruments upon occurrence of a specific event) issuable under Schedules 3 and 4 of the Back Stop Agreement was $5.3 million as determined through level 3 inputs, with reference to the current and expected price of the Company's Class A common stock weighted by an estimate of probabilities for the occurrence of the events triggering their exercisability. The fair value of these instruments was reflected as finance charge as of September 30, 2012 with a corresponding credit to liabilities. Such liability was re-measured at each reporting period with the corresponding gains/losses were reflected within interest and finance cost in the accompanying 2012 consolidated statement of operations. During the fourth quarter of 2012, management re-assessed the probability of Schedules 3 & 4 occurring and concluded that the value of $4.7 million recorded by then should be written-off to the statement of operations in the year ended December 31, 2012, since in the context of the restructuring process, such schedules were not probable of occurring. The principal factors affecting the fair value estimates for these instruments were the number of the Company's Class A shares at the end of the escrow period, the net proceeds resulting from an equity offering and the quoted market price of the Company's Class A common stock.

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**5.    Inventories:**

The amounts shown in the accompanying consolidated balance sheets are analyzed as follows:

|  |  | **2011** |  | **2012** |
|---|---|---|---|---|
| Bunkers | $ | 4,655 | $ | 3,043 |
| Lubricants |  | 4,196 |  | 3,764 |
|  | $ | **8,851** | $ | **6,807** |

**6.    Vessels and office furniture and equipment, net:**

The amounts shown in the accompanying consolidated balance sheets are analyzed as follows:

|  |  | **2011** |  | **2012** |
|---|---|---|---|---|
| Vessels cost | $ | 3,107,329 | $ | 1,225,439 |
| Accumulated depreciation |  | (528,044) |  | (148,445) |
| Vessels, net | $ | **2,579,285** | $ | **1,076,994** |
|  |  |  |  |  |
| Office furniture and equipment cost | $ | 3,182 | $ | 3,237 |
| Accumulated depreciation |  | (2,241) |  | (2,698) |
| Office furniture and equipment, net | $ | **941** | $ | **539** |

All of the Company's vessels have been provided as collateral to secure the bank loans discussed in Note 7 below.

As discussed in Note 2(m) above, long-lived assets and certain identifiable intangibles held and used or disposed of by an entity are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. The current economic and market conditions, including the significant disruptions in the global credit markets, are having broad effects on participants in a wide variety of industries. Since mid-August 2008, the charter rates in the dry bulk charter market have declined significantly, and dry bulk vessel values have also declined both as a result of a slowdown in the availability of global credit and the significant deterioration in charter rates, conditions that the Company considers indicators of impairment.

Company's impairment test was performed as of December 31, 2012. In developing estimates of future undiscounted cash flows, the Company makes assumptions and estimates about the vessels' future performance, with the significant assumptions being related to charter rates, fleet utilization, vessels' operating expenses, vessels' capital expenditures, vessels' residual value and the estimated remaining useful life of each vessel. The assumptions used to develop estimates of future undiscounted cash flows are based on historical trends as well as future expectations and taking into consideration growth rates for vessel expenses while these assumptions are always subject to changes based on the economic conditions applicable by the time the Company performs the tests.

The Company determines undiscounted projected net operating cash flows for each vessel and compares it to the vessel's carrying value. In light of the continued poor performance in the dry bulk market in 2012 and in particular the prolonged weakness noticed until the fourth quarter of 2012, the Company reassessed its methodology, compared with prior years, in projecting vessels' net operating cash flows. These were determined, consistent with prior year, by considering the charter revenues from existing time charters for the fixed fleet days and an estimated daily time charter equivalent for the unfixed days (based on the most recent ten year historical average but eliminating years 2004, 2007 and 2008, as outliers and utilizing available market data for time charter and spot market rates such as forward freight agreements or FFAs). The cash flows were determined for a period over the remaining estimated life of the vessel assumed to be 28 years from the delivery of the vessel from the shipyard and net of brokerage commissions, expected outflows for vessels' maintenance and vessel operating expenses (including planned dry-docking and special survey expenditures), assuming an average annual inflation rate in operating expenses of 3% to 4% and fleet utilization of 95% to 96%.

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

### 6.    Vessels and office furniture and equipment, net-continued

The salvage value used in the impairment test is estimated to be $0.2 per light weight ton (LWT) in accordance with the Company's depreciation policy discussed above. When the Company's estimate of undiscounted future cash flows for any vessel is lower than the vessel's carrying value, the carrying value is written down, by recording a charge to operations, to the vessel's fair market value. In the year ended December 31, 2011, the undiscounted projected net operating cash flows per vessel exceeded the carrying value of each vessel and thus, no impairment loss was recorded in 2011. The Company's analysis for the year ended December 31, 2012 indicated that the carrying values of 29 of its vessels exceeded the undiscounted projected net operating cash flows and thus an impairment loss of $1.4 billion, being the difference between the carrying value of these vessels and their fair value of $521.6 million, was recognized in the year ended December 31, 2012.

On December 14, 2012, the Company entered into a MOA to sell the vessel Attractive for net proceeds of approximately $2.7 million. The resulting gain on the sale of the vessel amounted to approximately $0.4 million and is separately reflected in gain on sale of vessel in the accompanying consolidated statement of operations for the year ended December 31, 2012. The vessel delivery took place on December 28, 2012. Following the sale, an amount of approximately $3.3 million was repaid under the Company's $1.4 billion Syndicated credit.

### 7.    Long-Term Debt:

The following table summarizes the Company's long-term debt:

| Description | | December 31, 2011 | | December 31, 2012 |
|---|---|---|---|---|
| Long-term loans, net of unamortized deferred financing fees of $9.1 million and $8.5 million, respectively | $ | 933,472 | $ | 886,822 |
| 1.875% Convertible Senior Notes due 2027, net of unamortized deferred financing fees of $1.4 million and $1.0 million, respectively | | 124,123 | | 132,679 |
| | | **1,057,595** | | **1,019,501** |
| Less: Current portion of long-term debt, net of unamortized deferred financing fees of $2.7 million and $9.5 million, respectively | | (104,879) | | (1,019,501) |
| **Long-term debt, net of current portion** | $ | **952,716** | $ | **-** |

As of December 31, 2012, the Company had four term loans outstanding maturing through December 2022 and an amount of $150.0 million of 1.875% unsecured Convertible Senior Notes due 2027. During 2012, the Company entered into certain amendments to the above four term loans as discussed below:

**$1.4 billion Syndicated Credit Facility**

A credit facility of an amount of $1.4 billion was provided in 2008 in connection with the acquisition of Quintana Maritime Limited. The loan consists of a term loan ($1.0 billion) and a revolving credit facility ($400.0 million) and it was drawndown in full on April 15, 2008. The term loan amortizes in quarterly variable installments through April 2016, while the revolving credit facility shall be repaid in one installment on the term loan maturity date.

In March 2012, the Company reached an agreement with its lenders under the credit facility, for the amendment, for a period from March 30, 2012 through December 31, 2013, of the amortization schedule, the collateral value clause and certain of the financial covenants of the facility (the effectiveness of which was as of January 1, 2012) in order to improve its debt maturity profile and respond to the weak charter conditions prevailing in the market and the associated volatility in the vessels' market values.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**7.   Long-Term Debt-continued**

In accordance with such amendment, the loan repayment schedule was modified to allow for, at Company's option, the deferral of the repayment of principal amount of up to $100.0 million, originally scheduled for 2012 and 2013, to the balloon payment at the end of the facility's term in 2016.

Under the amendment, the Company was required to raise at least $30.0 million in new equity by December 31, 2012. In addition, the loan amendment and the exercise of the deferral option thereunder were conditional, among other things, upon the deposit from external sources of $20.0 million out of the $30.0 million that was required to be raised, into an escrow (special purpose blocked) account. In that respect, the Company reached an agreement with certain entities affiliated with the family of the Chairman of its Board of Directors to deposit such amount into the escrow account (Note 4). Such deposit took place on March 29, 2012.

Under the amendment, the Company was required to raise the $30.0 million in new equity as follows: (i) at least $20.0 million to be raised through an equity offering by September 30, 2012, with any shortfall being covered through the use of the funds deposited into the escrow account; and (ii) the remaining $10.0 million to be raised by December 31, 2012, with any shortfall being covered through the use of any funds remaining in the escrow account.

Under the amendment, the Company could defer to the balloon payment at the end of the facility's term in 2016 the repayment of one or more principal installments falling due after the date of execution of the amendment and prior to July 2, 2013 (inclusive), provided that: (i) at least $20.0 million out of the $30.0 million that the Company was required to raise had been raised through an equity offering or had been deposited into the escrow account discussed above and was held in such account until such amount was raised; (ii) after giving effect to the deferral of any principal repayment, each principal installment falling due after December 31, 2012 was at least $6.0 million; (iii) the aggregate amount of principal so deferred would not exceed $100.0 million; (iv) no event of default shall have occurred and was continuing; (v) the Company was in compliance with the financial covenants, as amended; and (vi) the applicable margin for any such deferred amount would increase to 4%. Under the terms of the amended facility, the Company would have to apply any consolidated excess cash flow, calculated on a quarterly basis, towards repayment of any outstanding principal amount so deferred. The $1.4 billion Syndicated credit defines excess cash flow as a amount equal to reported EBITDA (as defined in the loan agreement) less dry docking and special survey cost, net interest expenses (including payments due under the Company's current swap agreements) and less payments of loan principals under the Company's current loan agreements.

Under the amended facility, investments, cash dividends up to a certain level (50% of consolidated annual net income) and share repurchases are allowed, as long as, among other things, the Company is in compliance with the original loan covenants and there are no deferred installments outstanding.

In April 2012, July 2012 and October 2012, the Company exercised its option to defer the full loan installment of $24.3 million each, originally due on April 2, 2012, July 2, 2012 and October 1, 2012 to the balloon payment of the facility in April 2016.

In September 2012, the Company reached an agreement with its lenders under its credit facility to effectively extend, subject to certain conditions, its equity raising commitment discussed above through December 31, 2012 and waive certain covenants (leverage of 0.9:1.0, interest coverage of 1.25:1.00 and security value of 80%) up to and including December 31, 2012. As part of the loan amendment, the Company paid $3.0 million on each of October 1, 2012, November 30, 2012 and December 28, 2012 against the existing deferred installments, with a corresponding decrease in restricted cash, while, the Company's deferral option expired.

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

### 7.  Long-Term Debt-continued

In December 2012, the Company reached an amended agreement with its lenders under which the lenders agreed to forbear from exercising their rights in connection with the principal installment due on January 1, 2013 until January 31, 2013 and similarly extend the Company's access to the escrowed funds to fund its equity raising commitment. The forbearance did not constitute a waiver of any default or event of default other than the payment of principal. Based on the same amendment, the minimum liquidity required to be held by the Company at all times was decreased by $7.0 million to $30.0 million.

As of December 31, 2012, the Company was in compliance with the covenant of minimum liquidity of $30 million, however it was not in compliance with the covenant of net worth, based on book values, of no less than $750.0 million. In addition, the following covenants were waived as of December 31, 2012: (i) leverage ratio (as adjusted to reflect the fair market values of the vessels wholly owned by the Company) of no more than 0.9:1:0; (ii) ratio of EBITDA (as defined in the loan agreement) to gross interest expense of no less than 1.25:1.00; and (iii) aggregate fair market value of vessels serving as collateral for the facility at all times of no less than 80% of the outstanding principal amount of the facility. In addition, following ABN's exercise of its option to call as cash collateral 75% of the swap negative mark to market position (Note 8) in December 2012, an event of default occurred under the Syndicated Credit Facility. Also, as of December 31, 2012, the Company was not in compliance with the requirement to have 50% of the Collateral Vessels' total available calendar days for the period of the next twelve months employed under time charters.

As of December 31, 2012, the outstanding balance under the $1.4 billion Syndicated Credit Facility was $762.9 million, net of unamortized deferred finance fees of $8.2 million and the applicable margin was 2.75%, while the applicable margin for any deferred principal amount was 4.0% per annum. See Note 18(a) for recent developments with respect to this loan facility.

**Credit Suisse Credit Facility**

A credit facility of an amount of $75.6 million was provided in 2007 in order to partly finance the acquisition cost of the vessels July M and Mairouli. A first priority mortgage over the vessels July M and Mairouli as well as a first assignment of vessel insurances and earnings have been provided as security. The loan amortizes in quarterly equal installments through December 2022 plus a balloon payment of $12.6 million together with the last installment.
In February 2012, the lender accepted a request made by the Company in relation to the leverage definition of the financial covenants in order to align it with the definition used in the Company's remaining loans. The amendment was effective as of December 31, 2011.

Following the $1.4 billion Syndicated credit facility amendment of March 2012, the Company reached an agreement with Credit Suisse to similarly amend its credit facility, requiring the Company to comply with a number of covenants, including financial covenants related to leverage, consolidated net worth, liquidity and interest coverage, dividends and collateral maintenance requirements, most of which are in principle and calculation substantially similar to the covenants described under the amended $1.4 billion Syndicated credit facility. In addition, under the amended facility, the period during which cash dividends and share repurchases were suspended was extended until December 31, 2013 at the latest or compliance with the original financial covenants was re-gained, if earlier.

As of December 31, 2012, with the exception of the hull cover ratio of no less than 80% and the ratio of EBITDA (as defined in the loan agreement) to gross interest expense of no less than 1.25:1.00, the Company was not in compliance with certain general undertakings and with the following covenants: (i) leverage ratio (as adjusted to reflect the fair market values of the vessels wholly owned by the Company) of no more than 1.0; (ii) net worth, based on book values, of no less than $750.0 million; and (iii) minimum liquidity of $1 million per collateral vessel, as this is defined in the $1.4 billion Syndicated Credit Facility plus $10 million (or $45 million minimum liquidity in the aggregate). Included in the computation of the hull cover ratio is also an amount of $11.8 million pledged with Credit Suisse since February 2011 (Note 18(b)).

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**7.   Long-Term Debt-continued**

As of December 31, 2012, the outstanding debt under the Credit Suisse Credit Facility was $54.6 million and the applicable margin was 2.65%. See Note 18(b) for recent developments with respect to this loan facility.

**DVB Credit Facility**

A credit facility of an amount of $42.0 million was provided in 2010 in order to partly finance the acquisition cost of the vessel Christine. The loan is repayable in 26 quarterly installments and a balloon payment of approximately $20.8 million through December 2016. A first priority mortgage over the Christine as well as a first assignment of vessel insurances and earnings have been provided as security. The Company has also guaranteed the performance of Christine Shipco LLC for up to 71.4%, while a letter of undertaking for the remaining 28.6% has been provided by Robertson Maritime Investors LLC.

Similarly to the financial covenants' amendments performed in the $1.4 billion Syndicated credit facility of March 2012 discussed above, the Company reached an agreement with DVB to amend its credit facility. In addition, Christine Shipco must maintain minimum cash collateral with the bank which stands at $0.5 million at all times.

As of December 31, 2012, with the exception of the minimum cash collateral of $0.5 million and the ratio of EBITDA (as defined in the loan agreement) to gross interest expense of no less than 1.25:1.00, the Company was not in compliance with the following covenants: (i) leverage ratio (as adjusted to reflect the fair market values of the vessels wholly owned by the Company) of no more than 0.9:1:0; (ii) net worth, based on book values, of no less than $750.0 million;, (iii) aggregate fair market value of vessel serving as collateral for the facility at all times of no less than 115% of the outstanding principal amount of the facility and (iv) minimum liquidity of $1 million per collateral vessel, as this is defined in the $1.4 billion Syndicated Credit Facility plus $10 million (or $45 million minimum liquidity in the aggregate).

Dividend distributions are not permitted to Excel Maritime Carriers Ltd without lender's prior consent.

As of December 31, 2012 the outstanding loan balance under the DVB Credit Facility was $32.9 million, net of unamortized finance fees of $0.2 million and the applicable margin was 3.0%. See Note 18(c) for recent developments with respect to this loan facility.

**ABN Credit Facility**

A credit facility of an amount of $42.0 million was provided in various installments to partly finance the vessel Mairaki construction through January 2011. The loan amortizes in 20 quarterly equal installments through January 2016 including a balloon payment of $26.5 million together with the last installment.

A first priority assignment of the refund guarantee and the shipbuilding contract in addition to other customary securities have been provided for the vessel pre-delivery period and a first priority mortgage, as well as a first assignment of vessel insurances and earnings have been provided as security for the vessel post delivery period. A second priority mortgage and a second priority assignment of the vessel insurances and earnings have been provided as security for an existing swap agreement. Additionally no dividends may be paid without the prior written consent of the lender.

Similarly to the financial covenants' amendments performed in the $1.4 billion Syndicated credit facility of March 2012 discussed above, the Company reached an agreement with ABN to amend its credit facility.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

### 7.   Long-Term Debt-continued

As of December 31, 2012, with the exception of the hull cover ratio of no less than 90% and the ratio of EBITDA (as defined in the loan agreement) to interest payable of no less than 1.25:1.00, the Company was not in compliance with certain general undertakings and with the following covenants: (i) leverage ratio (as adjusted to reflect the fair market values of the vessels wholly owned by the Company) of no more than 0.9:1:0; (ii) net worth, based on book values, of no less than $750.0 million; and (iii) minimum liquidity of $1 million per collateral vessel, as this is defined in the $1.4 billion Syndicated Credit Facility plus $10 million (or $45 million minimum liquidity in the aggregate).

On December 24, 2012, ABN notified the Company that events of default had occurred in relation to the loan and the swap agreement discussed in Note 8 below and that they were continuing resulting to the acceleration of the loan which was declared payable on demand. On December 31, 2012, the Company obtained an extension from the bank relating to its obligations which expired on January 15, 2013, and was subsequently extended up to January 31, 2013.

As of December 31, 2012, the outstanding loan balance under the ABN Credit Facility was $36.4 million, net of unamortized finance fees of $0.2 million the applicable margin was 3.05%. See Note 18(d) for recent developments with respect to this loan facility.

Borrowings under the credit facilities bear interest at LIBOR plus a margin and the average interest rate (including the margin and the interest swap effect) at December 31, 2011 and 2012 was 2.8% and 3.9%, respectively.

Loan amendment expenses

In relation to the loan amendments concluded in March 2012, the Company incurred $2.8 million of financing fees. Of this amount, $2.6 million, relating to the $1.4 billion Syndicated credit facility amendment, are deferred and amortized over the term of the loan using the effective interest of the amended loan, while $0.2 million relating to Credit Suisse loan amendment were expensed as incurred in accordance with the loan extinguishment accounting. In particular, the Company considered the guidance under ASC 470-50 "Debt Modifications and Extinguishments" and concluded that the Credit Suisse facility amendment should be accounted for in the same manner as a debt extinguishment on the basis that the initial and amended loans were substantially different. Accordingly, the new loan was recorded at fair value and that amount together with the associated unamortized financing fees of the initial loan was used to determine the debt extinguishment loss. As the Credit Suisse credit facility is a variable interest rate facility, the fair value of the amended loan was determined by reference to the recorded value of the initial loan and the loss realized on the loan extinguishment amounted to $0.2 million, representing the unamortized deferred financing fees of the initial loan on the loan effective date, and is included in interest and finance costs in the accompanying 2012 consolidated statement of operations.

**1.875% Unsecured Convertible Senior Notes due 2027**

In October 2007, the Company completed its offering of $125,000 aggregate principal amount of Convertible unsecured Senior Notes due 2027 (the "Notes") subsequent to which, the initial purchaser exercised in full its option to acquire an additional of $25,000 of the Notes solely to cover over-allotments. The Notes bear interest semi-annually at a rate of 1.875% per annum, and were initially convertible at a base conversion rate of approximately 10.9529 Excel Class A common shares per $1 principal amount of Notes. This conversion rate has since been adjusted to 11.2702 Excel Class A common shares per $1 principal amount of Notes as a consequence of the payment of dividends by the Company in 2008 at levels exceeding a threshold set forth in the indenture governing the Notes. The initial conversion price was set at $91.30 per share and an incremental share factor of 5.4765 Excel Class A common shares per $1 principal amount of Notes.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**7.   Long-Term Debt-continued**

The conversion price has since been adjusted to $88.73 per share, based on which the maximum amount of shares to be issued upon conversion is 1,690,522 Class A common shares and the incremental share factor has since been adjusted to 5.6351 Excel Class A common shares per $1 principal amount of Notes. On conversion, any amount due up to the principal portion of the Notes will be paid in cash, with the remainder, if any, settled in shares of Excel Class A common shares.

In addition, the Notes holders are only entitled to the conversion premium if the share price exceeds the market price trigger of $88.73 and thus, until the stock price exceeds the conversion price of $88.73, the instrument will not be settled in shares and only the portion in excess of the principal amount will be settled in shares. The Notes are due October 15, 2027. The Notes also contain an embedded put option that allows the holder to require the Company to purchase the Notes at the option of the holder for the principal amount outstanding plus any accrued and unpaid interest (i.e. no value for any conversion premium, if applicable) on specified dates (i.e. October 15, 2014, October 15, 2017 and October 15, 2022), and a separate call option that allows for the Company to redeem the Notes at any time on or after October 22, 2014 for the principal amount outstanding plus any accrued and unpaid interest (i.e. no value for any conversion premium, if applicable). Any repurchase or redemption of the Notes will be for cash.

As discussed in Note 2(r), the Company follows the provisions of ASC Topic 470-20 which requires that the liability and equity components of convertible debt instruments that may be settled in cash upon conversion (including partial cash settlement) be separately accounted for in a manner that reflects an issuer's nonconvertible debt borrowing rate. As a result, the liability component is recorded at a discount reflecting its below market coupon interest rate, and is subsequently accreted to its par value over its expected life, with the rate of interest that reflects the market rate at issuance being reflected in the results of operations.

The Company adopted ASC 470-20 on January 1, 2009 as its convertible senior notes are within the scope of the standard and applied a nonconvertible borrowing rate of 8.64% based on comparable borrowing arrangements of peers, which resulted in the recognition of a discount on the convertible senior notes totaling $51,456, with the offsetting amount recognized as a component of additional paid-in capital. The recognized discount is amortized through October 2014. As of December 31, 2011 and 2012, the liability component of the convertible notes amounted to $125.6 million and $133.6 million, respectively, while the interest expense for each of the years ended December 31, 2011 and 2012 amounted to $2.8 million. See also Note 18(e) for subsequent developments with respect to the Convertible Notes, and the respective notice of default received by the trustee.

All of the Company's outstanding loan and convertible notes agreements contain cross default provisions. As discussed in Note 3 above, as of December 31, 2012, all of the Company's loans and convertible notes were classified under current liabilities. As of December 31, 2012, the Company had no additional borrowing capacity under its existing credit facilities.

Interest expense for the years ended December 31, 2011 and 2012, net of interest capitalized, amounted to $24.9 million and $33.1 million, respectively, and is included in interest and finance costs in the accompanying consolidated statements of operations. Interest capitalized for the years ended December 31, 2011 and 2012 amounted to $0.06 million and $0 million respectively. Capitalized interest is included in Vessels under construction and it is transferred to Vessels, net upon vessel delivery from the shipyard.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars − except for share and per share data, unless otherwise stated)

**8.  Derivative Financial Instruments:**

**Interest Rate Swaps**

The Company is exposed to interest rate fluctuations associated with its variable rate borrowings and its objective is to manage the impact in the cash flows of its borrowings. In this respect, the Company uses interest rate swaps to manage net exposure to interest rate fluctuations related to its borrowings and to lower its overall borrowing costs.  As of December 31, 2012, none of the interest rate swaps was designated as hedging instrument.

*Eurobank EFG Private Bank Luxembourg S.A. (''Eurobank''):* In March 2011, the Company entered into an interest rate swap transaction with Eurobank for a non-amortizing notional amount of $50.0 million. The interest rate swap transaction is effective from April 1, 2012 until April 1, 2015. Under its terms, the Company will make quarterly payments to Eurobank at a fixed rate of 1.80%, 2.25% and 2.75% for the first, second and third year, respectively, while Eurobank will make quarterly floating-rate payments of 3-month USD LIBOR to the Company based on the same notional amount. As per the respective ISDA agreement entered on March 29, 2011, in case the mark-to-market exposure is in excess of a threshold of $5.0 million, the Company may be required to provide security in the form of cash for the excess amount over the $5.0 million. In addition based on the same ISDA agreement, a termination event will occur if the value of total debt, including current portion, to total assets is equal to or greater than 0.50. As of December 31, 2012, the Company was not in compliance with such covenant.

Up to September 30, 2012, the swap qualified for hedge accounting according to ASC 815 "Derivatives and Hedging", and as such Company had designated it as a cash flow hedge and accordingly, changes in its fair value were reported in Accumulated Other Comprehensive Income (Loss) in the accompanying consolidated balance sheets. Effective October 1, 2012, Management decided to discontinue the cash flow hedging relationship and subsequent changes in the derivative fair value were charged to period losses. As of the cash flow discontinuance date, Management of the Company evaluated the likelihood of the forecasted transaction occurring within the originally specified time period and concluded that it was not probable that the forecasted transaction would occur in the context of the Company's restructuring discussed in Note 3 above. Therefore, the amount of $2.5 million accumulated in other comprehensive loss was written off and included in Losses on derivative financial instruments in the accompanying 2012 consolidated statement of operations.

*Nomura International plc ("Nomura")-Designated as hedging instrument as of March 31, 2012:* In August 2010, the Company entered into an interest rate swap agreement maturing in September 2015. Under the terms of the swap, the Company makes quarterly payments to the counterparty at a fixed rate of 1.79% based on a notional amount of $50.0 million decreasing by $0.8 million quarterly. As of December 31, 2012, the notional amount was $42.6 million. The counterparty makes quarterly floating rate payments at LIBOR to the Company based on the same decreasing notional amount. As of December 31, 2012, the swap agreement contained financial covenants that were in line with the financial covenants contained in the fourth amendment of the $1.4 billion Syndicated credit up to and including December 31, 2012 and with the financial covenants contained in the original $1.4 billion Syndicated credit from January 1, 2013 and thereafter. Since March 31, 2012, the Company was not in compliance with certain of the above financial covenants. Under the interest rate swap agreement, financial covenants' non-compliance does not constitute an event of default but rather a termination event.

In connection with such event, the Company was required on June 28, 2012 to provide cash collateral which is re-evaluated at each reporting date on the basis of the derivative instrument's fair value, so long such additional termination event is continuing. As of December 31, 2012, such collateral amounted to $1.3 million and it is included in restricted cash, current, in the accompanying 2012 consolidated balance sheet.

In addition and in the context of the termination event continuation, the fair value of the swap agreement amounting to $1.4 million as of December 31, 2012 was reflected under current liabilities and the cash flow hedging relationship was discontinued as at April 1, 2012.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**8. Derivative Financial Instruments-continued**

As such, subsequent changes in the derivative fair value were charged to period losses. As of the cash flow discontinuance date, Management of the Company evaluated the likelihood of the forecasted transaction occurring within the originally specified time period and concluded that it was still probable that the forecasted transaction would occur. Therefore, the amount of $1.3 million accumulated in other comprehensive loss up to the date of discontinuance, April 1, 2012 was deferred in order to affect earnings/(losses), as long as the forecasted transaction occurs and affects earnings/(losses) or it becomes probable of not occurring. As of December 31, 2012, Management of the Company evaluated the likelihood of the forecasted transaction occurring within the originally specified time period and concluded that it was not probable that the forecasted transaction would occur in the context of the Company's restructuring discussed in Note 3 above. Therefore, the amount of $870 accumulated in other comprehensive loss was written off and included in Losses on derivative financial instruments in the accompanying 2012 consolidated statement of operations.

*ABN AMRO ("ABN"):* Effective December 31, 2010, the Company entered into an Interest Rate Swap, following the Swaption exercise by the counterparty of an Extendible Interest Rate Swap entered in May 2006. The swap matures on June 30, 2014 and under its terms, the Company makes quarterly payments to the counterparty at a fixed rate of 5.0% based on an amortizing notional amount of $384.0 million at December 31, 2012. The counterparty makes quarterly floating rate payments at LIBOR to the Company based on the same notional amount ("Floating Rate Payer"). This swap is not designated as hedge and accordingly changes in its fair value are reported in earnings. In connection with the Swaption exercise, the Company entered into an amended agreement with ABN on March 31, 2011. Under the amended agreement, the Company deposited, by way of cash collateral in a retention account ("Cash Deposit Account") with the counterparty, an amount of $5.9 million, which was used by the counterparty towards the payment of the Floating Rate Payer payment due on June 30, 2011. Based on the amended agreement the Company shall procure the transfer to the Cash Deposit Account prior to the next Floating Rate Payer payment date of an amount equal to such payment.

The amended agreement provides for automatic semiannual extensions starting from June 30, 2011, until the counterparty decides at its discretion that no further extension will be granted provided that to this effect sixty days prior notice will be given to the Company's subsidiary Hope Shipco LLC, where ABN retains the right to request an amount equal to 75% of any negative mark to market position due from the Company, minus any amount already deposited to the Cash Deposit Account, to be pledged in favor of the counterparty by way of cash collateral and the second mortgage and assignment of insurances and earnings over the vessel Mairaki will be lifted by ABN simultaneously with the deposit of the cash collateral.

In October 2012, ABN notified the Company that no further extension would be granted and thus, the 75% of the swap negative mark to market position needed to be given as collateral. In December 2012, the Company requested and finally was granted an extension of such obligation and the interest payment due in December 2012 until January 15, 2013, which was subsequently extended up to January 31, 2013. ABN's exercise of the respective option, constituted an event of default under the $1.4 billion Syndicated Credit Facility.

*Marfin Egnatia ("Marfin"):* In July 2011, the Company entered into an interest rate swap transaction with Marfin Egnatia for a non-amortizing notional amount of $50.0 million. The interest rate swap transaction is effective from January 3, 2013 until January 3, 2017. Under its terms, the Company will make quarterly payments to Marfin at a fixed rate of 1.5% for the first year (from and including January 3, 2013 to and excluding January 3, 2014) and 2.98% for the remaining years (from and including January 3, 2014 to and excluding January 3, 2017), while Marfin will make quarterly floating-rate payments of 3-month USD LIBOR to the Company based on the same notional amount.

As per the respective ISDA agreement entered on June 29, 2011, in case the mark-to-market exposure is in excess of a threshold of Euro 5.0 million, the Company may be required to provide security in the form of cash or other form agreed by the parties for the excess amount over Euro 5.0 million. The swap does not qualify for hedge accounting and accordingly changes in its fair value are reported in earnings.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**8.  Derivative Financial Instruments-continued**

The fair values of the Company's derivative financial instruments presented in the accompanying consolidated balance sheets equate to the amount that would be paid or received by the Company if the agreements were cancelled at the reporting date, taking into account current market data per instrument and the Company's or counterparty's creditworthiness, as appropriate. The following tables summarize information with respect to the fair values of derivatives reflected in the balance sheet and with respect to gains and losses on derivative positions reflected in the statement of operations or in the balance sheets, as a component of accumulated other comprehensive income/loss.

As of December 31, 2012 and based on cross default provisions as well as additional termination events triggered by the fact of non compliance with certain swaps, the derivative financial instruments liability was classified under current liabilities.

**Fair value of Asset/Liability Derivative Financial Instruments**

|  | | December 31, 2011 | | December 31, 2012 |
|---|---|---|---|---|
| Freight Option Contracts- not designated as hedging instrument | | 167 | | - |
| **Derivative financial instruments- Current Assets** | $ | 167 | $ | - |
|  | | | | |
| Interest rate swaps-not designated as hedging instrument | | 18,815 | | 31,715 |
| Interest rate swaps- designated as hedging instrument | | 638 | | - |
| **Derivative financial instruments- Current Liabilities** | $ | 19,453 | $ | 31,715 |
|  | | | | |
| Interest rate swaps-not designated as hedging instrument | | 23,919 | | - |
| Interest rate swaps- designated as hedging instrument | | 2,597 | | - |
| **Derivative financial instruments- Non Current Liabilities** | $ | 26,516 | $ | - |

**Loss of Derivatives Recognized in OCI (Effective Portion)**

|  | | December 31, 2011 | | December 31, 2012 |
|---|---|---|---|---|
| **Designated as hedging instruments** | | | | |
| Unrealized interest rate swap gains (losses) | $ | (4,225) | $ | (1,237) |
| Reclassification adjustments to loss included in the Statement of Operations | | 704 | | 4,472 |
| **Other Comprehensive Income (loss)** | $ | (3,521) | $ | 3,235 |

No portion of the cash flow hedge designated for hedge accounting was ineffective during the years ended December 31, 2011 and 2012 whereas an amount of $4.5 million was transferred in the year ended December 31, 2012 from accumulated Other Comprehensive Income into earnings.

The accumulated derivative loss as of December 31, 2011 and 2012 was $3,236 and $0, respectively.

As of December 31, 2012, the aggregate fair value of derivative financial instruments in a liability position containing credit-related provisions was $31.7 million.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**8.  Derivative Financial Instruments-continued**

Losses on derivative financial instruments qualifying as economic hedges (rather than accounting hedges) and included in the accompanying consolidated statements of operations are analyzed as follows:

**Loss of Derivatives Recognized in Statements of Operations**

|  | Year ended December 31, | |
|---|---|---|
|  | **2011** | **2012** |
| Interest Rate Swaps loss | (14,185) | (8,879) |
| Freight Option Contracts gain (loss) | 652 | (167) |
| Foreign Currency Contracts gain | 241 | - |
| **Losses on derivative financial instruments** | **$  (13,292)** | **$  (9,046)** |

**9.   Fair Value of Financial Instruments:**

The following methods and assumptions were used to estimate the fair value of each class of financial instrument:

- **Cash and cash equivalents, restricted cash, accounts receivable and accounts payable:** The carrying values reported in the consolidated balance sheets for those financial instruments are reasonable estimates of their fair values due to their short-term nature.

- **Long-term debt:** The fair values of long-term bank loans approximate the recorded values due to the variable interest rates payable.

- **Convertible Senior Notes: Convertible** Senior Notes have a fixed rate and their estimated fair value represents the tradable value of the notes, determined through Level 2 inputs of the fair value hierarchy (quoted price in the over-the counter-market). The estimated market value of the Notes at December 31, 2012 is approximately $26.3 million.

- **Derivative financial instruments:** The fair values of the Company's derivative financial instruments equate to the amount that would be paid or received by the Company if the agreements were cancelled at the reporting date, taking into account current market data per instrument and the Company's or counterparty's creditworthiness, as appropriate.

A fair value hierarchy that prioritizes the inputs used to measure fair value has been established by GAAP. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurement) and the lowest priority to unobservable inputs (Level 3 measurement). This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair value are as follows:

*Level 1:*  Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities;

*Level 2:*  Observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; or other inputs that are observable or can be corroborated by observable market data;

*Level 3:*  Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

### 9.   Fair Value of Financial Instruments-continued

The below table presents disclosures about the fair value of financial assets and financial liabilities recognized in the Company's consolidated balance sheets on a recurring basis:

| | Fair Value Measurements at December 31, 2012 Using | | |
|---|---|---|---|
| **Description** | **Quoted Prices in Active Markets for Identical Assets (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Significant Unobservable Inputs (Level 3)** |
| **Liabilities** | | | |
| Derivative Financial Instruments (current and non-current liability) (Interest Rate Swap Contracts) | - | $31,715 | - |

Interest rate swaps are valued using a discounted cash flow model that takes into account the present value of future cash flows under the terms of the contracts using current market information as of the reporting date. For a discussion of the factors warranting fair value assessment used in asset impairments and intangible assets, which are measured at fair value on a non-recurring basis, refer to Notes 2(m), 2(o) and 6 above.

### 10.   Time Charters Acquired:

The amortization schedule of the intangible liability as of December 31, 2012 and for the years to follow until they expire is as follows:

| Period | | |
|---|---|---|
| January 1, 2013 to December 31, 2013 | $ | 3,560 |
| January 1, 2014 to December 31, 2014 | | 3,559 |
| January 1, 2015 to December 31, 2015 | | 3,559 |
| January 1, 2016 to December 31, 2016 | | 386 |
| **Total** | $ | **11,064** |

The amortization for the years ended December 31, 2011 and 2012 amounted to $3.5 million and $3.7 million, respectively and is separately reflected as time charter amortization. Following the full write-off of the intangible assets in late 2011 of $146.7 million, there is no charter hire amortization for the year ended December 31, 2012, while it was $36.5 million for the year ended December 31, 2011.

### 11.   Common Stock and Additional Paid-In Capital:

The Company's authorized capital stock consists of (a) 994,000,000 shares (all in registered form) of common stock, par value $0.01 per share (the "Class A shares"), (b) 1,000,000 shares (all in registered form) of common stock, par value $0.01 per share (the "Class B shares") and (c) 5,000,000 shares (all in registered form) of preferred stock, par value $0.1 per share. The Board of Directors shall have the fullest authority permitted by law to provide by resolution for any voting powers, designations, preferences and relative, participating, optional or other rights of, or any qualifications, limitations or restrictions on, the preferred stock as a class or any series of the preferred stock. The holders of the Class A shares and of the Class B shares are entitled to one vote per share and to 1,000 votes per share, respectively, on each matter requiring the approval of the holders of common stock, however each share of common stock shares in the earnings of the Company on an equal basis.

In May 2012, 2,700,000 warrants at an exercise price of $0.01per share, provided under Schedule 2 of the Back Stop Agreement discussed in Note 4 above, were issued. As of December 31, 2012, none of the warrants was exercised.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

## 11.  Common Stock and Additional Paid-In Capital-continued

On May 7, 2012, the Company filed a prospectus and a prospectus supplement pursuant to Rule 424(b) relating to the offer and sale of an aggregate of up to $35.0 million in gross proceeds of its Class A common stock under an at-the-market offering ("ATM Offering"). As of December 31, 2012, an amount of 5,831,139 shares of the Company's Class A common stock with par value $0.01 were issued. The net proceeds, after deducting issuance costs of $0.3 million, including sales agents' commissions of 2.5% and other issuance expenses of $0.2 million, amounted to $4.1 million.

In July 2012, 3,972,400 Class A shares were issued as part of the internal reorganization discussed in Note 1 above and they are held in treasury.

## 12.  Stock Based Compensation:

On June 5, 2012, the Board of Directors approved the grant of a cash bonus of $2.0 million and 4,587,056 shares of the Company's Class A common stock and 65,000 shares of the Company's Class B common stock in the form of restricted stock, to certain of its executive officers and employees. The shares vest as follows: 212,351 Class A common shares and 65,000 Class B common shares on April 1, 2012, 1,316,667 Class A common shares on December 31, 2012, 212,351 Class A common shares on April 1, 2013, 1,316,667 Class A common shares on June 30, 2013, 1,316,666 Class A common shares on December 31, 2013 and 212,354 Class A common shares on April 1, 2014. The total cost of the stock awards granted is recognized as expense over the vesting period based on their fair value on the grant date. The fair value of the Class B common stock is determined by reference to the Class A share price.

Restricted stock during the years ended December 31, 2011 and 2012 is analyzed as follows:

|  | Number of Shares | Weighted Average Grant Date Price |
|---|---|---|
| **Outstanding at December 31, 2010** | **1,651,394** | **$5.33** |
| Granted | 3,844,668 | $1.92 |
| Vested | (4,337,280) | $2.32 |
| Forfeited or expired | (76,451) | $10.13 |
| **Outstanding at December 31, 2011** | **1,082,331** | **$4.94** |
| Granted | 4,652,056 | $0.68 |
| Vested | (2,415,892) | $2.13 |
| Forfeited or expired | (24,799) | $3.93 |
| **Outstanding at December 31, 2012** | **3,293,696** | **$0.99** |

The total fair value of the shares vested during the years ended December 31, 2011 and 2012 amounted to $10.0 million and $5.1 million, respectively. During the years ended December 31, 2011 and 2012 the compensation expense in connection with all stock-based employee compensation awards amounted to $10.2 million and $3.4 million, respectively, and is included in General and Administrative expenses in the accompanying consolidated statements of operations.  At December 31, 2012, the total unrecognized cost related to the above awards was $1.3 million which will be recognized through April 1, 2014.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**13.   Earnings/ (Losses) per share:**

All shares issued (including non-vested shares) have the right to receive dividends with the non-vested shares receiving forfeitable dividend until their vesting. For the purposes of calculating basic earnings/ (losses) per share, non-vested shares are not considered outstanding until the time-based vesting restriction has lapsed.

Basic earnings/(losses) per common share are computed by dividing net income/(loss) available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings/(losses) per common share reflect the potential dilution that could occur if securities or other contracts to issue common stock were exercised. The Company had no dilutive securities during the years ended December 31, 2011 and 2012 as the effect of the unvested shares of restricted stock (1,082,331 and 3,293,696 shares at December 31, 2011 and 2012, respectively, share issuable upon the exercise of the 2,700,000 warrants and any shares issuable under the Norwegians settlement agreement (Note 14) of 11,496,896 (using the closing share price of $0.4349 at December 31, 2012)  would have an anti dilutive effect on the basis of the reported loss for the period. For the purposes of calculating basic earnings/ (losses) per share, non-vested shares are not considered outstanding until the time-based vesting restriction has lapsed. Dividends declared during the period for non vested shares are deducted from (added to) the net income/ (loss) reported for purposes of calculating net income/ (loss) available to/ (assumed by) common stockholders for the computation of basic earnings/ (losses) per share.

The Company calculates the number of shares outstanding for the calculation of basic and diluted earnings per share as follows:

|  | 2011 | 2012 |
|---|---|---|
| ***Net loss for Basic and Diluted Earnings (losses) per share*** | | |
| Net loss attributable to Excel Maritime Carriers Ltd. for the period | $   (211,593) | $   (1,512,102) |
| | | |
| **Weighted   average common shares outstanding, basic** | **84,463,674** | **91,787,564** |
| Add: Dilutive effect of non vested shares | - | - |
| Add: Dilutive effect of warrants | - | - |
| **Weighted average common shares, diluted** | **84,463,674** | **91,787,564** |
| | | |
| **Losses per share, basic** | **$(2.51)** | **$(16.47)** |
| **Losses per share, diluted** | **$(2.51)** | **$(16.47)** |

In relation to the Convertible Senior Notes due in fiscal year 2027, upon conversion, the Company may settle its conversion obligations, at its election, in cash, shares of its Class A common stock or a combination of cash and shares of its Class A common stock. The Company has elected on conversion, any amount due up to the principal portion of the notes to be paid in cash, with the remainder, if any, settled in shares of Excel Class A common shares. Based on this presumption, and in accordance with ASC 260 "Earnings Per Share", any dilutive effect of the Convertible Senior Notes under the if-converted method is not included in the diluted losses per share presented above. Any shares to be issued upon conversion would have either an anti-dilutive effect (in 2011 and 2012) in the reported earnings / losses per share.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**14.  Commitments and Contingencies:**

a)  Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of the shipping business. In addition, losses may arise from disputes with charterers, agents, insurance and other claims with suppliers relating to the operations of the Company's vessels. Currently, management is not aware of any such claims or contingent liabilities, which should be disclosed, or for which a provision should be established in the accompanying consolidated financial statements. The Company is a member of a protection and indemnity association, or P&I Club that is a member of the International Group of P&I Clubs, which covers its third party liabilities in connection with its shipping activities. A member of a P&I Club that is a member of the International Group is typically subject to possible supplemental amounts or calls, payable to its P&I Club based on its claim records as well as the claim records of all other members of the individual associations, and members of the International Group. Although there is no cap on its liability exposure under this arrangement, historically supplemental calls have ranged from 0%-40% of the Company's annual insurance premiums, and in no year have exceeded $1.0 million.  There were no supplementary calls for 2011 and 2012. The Company accrues for the cost of environmental liabilities when management becomes aware that a liability is probable and is able to reasonably estimate the probable exposure. Currently, management is not aware of any such claims or contingent liabilities, which should be disclosed, or for which a provision should be established in the accompanying consolidated financial statements. The Company's protection and indemnity (P&I) insurance coverage for pollution is $1 billion per vessel per incident.

b)  The following table sets forth the Company's lease as of December 31, 2012:

|  | 2013 | 2014 | 2015 | 2016 | 2017 & thereafter | Total |
|---|---|---|---|---|---|---|
|  | *(Amounts in million of US Dollars)* | | | | | |
| Future minimum charter receivables [1] | 89.5 | 39.1 | 33.6 | 2.4 | - | **$164.6** |
| Property leases [2] | (0.8) | (0.8) | (0.1) | - | - | **(1.7)** |

[1] The amount relates to revenue to be earned under the Company's fixed time charters net of related commissions.

[2] Maryville (Note 1) has a lease agreement for the rental of office premises until February 2015 with an unrelated party. Under the current terms of the lease, the monthly rental fee is approximately $0.06 million. Operating lease payments for 2011 and 2012 amounted to approximately $0.8 million and $0.7 million, respectively and are included in General and Administrative expenses in the accompanying consolidated statements of operations. Rent increases annually at a rate of 1.5% above inflation.

c)  Various consultants have been hired by the Company to assist in the restructuring process discussed in Note 3 above. In accordance with the engagement letters, success fees in the range of approximately $10 million will be due to them upon consummation of the restructuring.

d)  The Company reached an agreement with the owners of three of its vessels that were employed on bareboat charter on the early termination of their respective bareboat charters, initially expiring in July 2015, and the vessels' redelivery for a surviving aggregate claim of $5.0 million payable in December 2015 (reflected within other non-current liabilities in the accompanying 2012 balance sheet), with the Company having the option to extend payment until December 2017 at an annual interest rate of 10%, or, at its option, at any time settle such claim in exchange for shares of its common stock at such stock's average market price over the 30-day period prior to the stock's issue date. Following the settlement, the vessels were redelivered to their respective owners (two of the vessels delivered in the fourth quarter of 2012 and one in the first quarter of 2013).

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**14.   Commitments and Contingencies-continued**

The remaining four vessels that were employed on bareboat charter, initially expiring in July 2015  have been redelivered to their respective owners in the fourth quarter of 2012, with the parties' claims, including those of the vessels' owners for unpaid hire and damages for early termination, being the subject of arbitration. The Company has accrued for the amount of unpaid hire of $4.3 million claiming from the vessels' owners up to the charter party termination, while no accrual has been made in the accompanying consolidated financial statements for the early termination damages, as those cannot be reliably estimated. Management of the Company estimates that the potential contingent losses could be up to $50.0 million.

As a result of the charters' termination, $1.4 million of unamortized deferred asset balance was transferred to period losses under Charter hire expense.

**15.   Income Taxes:**

Under the laws of Marshall Islands, Liberia, Panama, Bahamas, Malta and Cyprus, (the countries of the companies' incorporation and vessels' registration), the companies are subject to registration and tonnage taxes (Note 16), which have been included in Vessels' operating expenses in the accompanying consolidated statements of operations.

***Taxation on United States Source Income:*** Pursuant to § 883 of the Internal Revenue Code of the United States (the "Code"), U.S. source income from the international operation of ships is generally exempt from U.S. Federal income tax on such income if the company meets the following requirements: (a) the company is organized in a foreign country that grants an equivalent exception to corporations organized in the U. S. and (b) either (i) more than 50 percent of the value of the company's stock is owned, directly or indirectly, by individuals who are "residents" of the company's country of organization or of another foreign country that grants an "equivalent exemption" to corporations organized in the U.S. (the "50% Ownership Test") or (ii) the company's stock is "primarily and regularly traded on an established securities market" in its country of organization, in another country that grants an "equivalent exemption" to U.S. corporations, or in the U.S. (the "Publicly-Traded Test").

Pursuant to Treasury Regulation § 1.883-2, a company's stock will be considered "regularly traded" on an established securities market if (i) one or more classes of its stock representing 50 percent or more of its outstanding shares, by voting power and value, is listed on the market and is traded on the market, other than in minimal quantities, on at least 60 days during the taxable year; and (ii) the aggregate number of shares of stock traded during the taxable year is at least 10 percent of the average number of shares of the stock outstanding during the taxable year.

Treasury regulations interpreting § 883 were promulgated in final form in August 2003 effective for taxable years beginning after September 24, 2004. As a result, such regulations became effective for calendar year taxpayers, like the Company, beginning with the calendar year 2005. Marshall Islands, Liberia and Cyprus, the jurisdictions where the Company and its ship-owning subsidiaries are incorporated, grant an equivalent exemption to United States corporations. Therefore, the Company is exempt from United States federal income taxation with respect to U.S.-source shipping income if either the 50% Ownership Test or the Publicly-Traded Test is met.

For the years ended December 31, 2011 and 2012, the Company determined that it does not satisfy the Publicly-Traded Test as a result of its shares not meeting the "regularly traded" requirement as set forth under  the regulations. In addition, the Company does not satisfy the 50% Ownership Test as it is unable to substantiate certain requirements regarding the identity of its shareholders. As a result, the Company does not qualify for exemption under § 883 of the Code from the 4 percent U.S. Federal income tax on its U.S. source gross transportation income. U.S. source gross transportation income is defined as 50 percent of shipping income that is attributable to transportation that begins or ends, but does not both begin and end, in the U.S. Gross transportation income from each voyage is equal to the product of (i) the number of days in each voyage and (ii) the daily charter rate paid to the Company by the charterer.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**15.  Income Taxes-continued**

Relevant to calculating taxable shipping income, days spent loading and unloading cargo in port were not included in the number of days of a voyage. As a result, taxes of approximately $0.7 million and $0.4 million for the years ended December 31, 2011 and 2012, respectively were recognized in the accompanying consolidated statements of operations.

The Company believes that the position of excluding days spent loading and unloading cargo in port meets the more likely than not criterion to be sustained upon a future tax examination; however, there can be no assurance that the Internal Revenue Service would agree with the Company's position. Had the Company included the days spent loading and unloading cargo in port, the Company would have a tax liability of approximately $1.5 million and $1.5 million as of December 31, 2011 and 2012 respectively and additional taxes of $0.2 million and $0.1 million would have been recognized in the accompanying consolidated statements of operations for the years ended December 31, 2011 and 2012, respectively.

**16.  Voyage and Vessel Operating expenses:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

|  | | **2011** | | **2012** |
|---|---|---|---|---|
| ***Voyage expenses*** | | | | |
| Port Charges and other | $ | 6,040 | $ | 3,586 |
| Bunkers | | 21,196 | | 18,468 |
| Commissions charged by third parties | | 15,504 | | 9,938 |
| | | 42,740 | | 31,992 |
| Commissions charged by related parties | | 3,892 | | 2,563 |
| | $ | 46,632 | $ | 34,555 |

|  | | **2011** | | **2012** |
|---|---|---|---|---|
| ***Vessel Operating expenses*** | | | | |
| Crew wages and related costs | $ | 43,122 | $ | 42,667 |
| Insurance | | 9,043 | | 8,332 |
| Repairs, spares and maintenance | | 17,037 | | 13,853 |
| Consumable stores | | 12,892 | | 12,506 |
| Tonnage taxes | | 404 | | 422 |
| Miscellaneous | | 2,576 | | 2,000 |
| | $ | 85,074 | $ | 79,780 |

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

**17.   Interest and Finance Costs:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

|  | **2011** | **2012** |
|---|---|---|
| Interest on long-term debt | $ 25,006 | $ 33,128 |
| Realized losses of interest rate swaps designated as hedging instruments | 704 | 667 |
| Imputed and capitalized interest | (61) | - |
| Amortization of financing costs | 3,425 | 3,746 |
| Amortization of convertible notes debt discount | 7,365 | 8,080 |
| Back stop agreement | - | 5,103 |
| Bank charges and finance costs | 694 | 1,820 |
|  | $ 37,133 | $ 52,544 |

**18.   Subsequent Events:**

a)   **$1.4 billion Syndicated Credit Facility:** Subsequent to December 31, 2012, the Company entered into four amendments to its syndicated credit facility under which its Syndicate Lenders agreed to forbear from exercising their rights in connection with the principal installments that have become due in the current fiscal year for consecutive one-month periods, the most recent of which is due to expire on May 31, 2013. The Company's access to the escrowed funds to fund its equity raising commitment was similarly extended to May 31, 2013. As of the date of this report and further to the amount of $63.2 million of deferred installments as per the amended terms of the facility, the unpaid principal amount is $48.1 million.

b)   **Credit Suisse Credit Facility:** On February 19, 2013, Credit Suisse notified the Company that events of default had occurred and were continuing, resulting to the acceleration of the loan. On the same date, the cash collateral of $11.8 million was applied towards partial prepayment of the loan and the remaining outstanding balance of $42.9 million was declared payable on demand. In addition, based on agreement reached with Credit Suisse, the due date of the principal installment originally due on March 11, 2013 and amounting to $1.1 million was extended for consecutive one-month periods, the most recent of which is due to expire on June 28, 2013. As of today, the bank has not exercised its rights under the facility.

c)   **DVB Credit Facility:** Subsequent to December 31, 2012, $1.6 million of principal installments were paid. On March 13, 2013, DVB notified the Company that there was a shortfall in the loan to value clause and thus an additional security or prepayment was required. In this respect, a prepayment of $2.1 million was performed on April 11, 2013. On April 23, 2013, the Company received a notice of default from the bank under which the bank reserved its rights under the loan which was not declared payable on demand though.

d)   **ABN swap and Credit Facility:** As of the date of this report, $1.6 million of principal installments were paid under the loan, while there was accrued and unpaid interest of approximately $9.2 million under the swap agreement. Following the expiration of the extension period discussed in Note 7 above, on May 2, 2013, ABN notified the Company about its failure to make payments due under the swap agreement and on May 10, 2013 it called on the Company's guarantee. On May 24, 2013, ABN notified the Company that the events of default were continuing and that May 24th would be designated as the early termination date in respect of all outstanding transactions. On May 28, 2013, ABN requested immediate payment of $29.2 million in relation to the termination of the transaction. In May 2013, the Company reached an agreement with ABN pursuant to which it settled its liability resulting from covenant violations and non-compliance with the cross-default provisions contained in the bilateral credit facility and the derivative agreement, amounting to approximately $35.0 million and $29.2 million, respectively, by transferring its ownership interest in the borrowing entity and the vessel under such entity's direct ownership to ABN. The Company expects that the ownership transfer will result to a gain in the range of approximately $10 million or $0.1 per share, and will be recognized in the 2013 statement of operations, in accordance with trouble debt restructuring accounting.

UNAUDITED

**EXCEL MARITIME CARRIERS LTD.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
(Expressed in thousands of United States Dollars – except for share and per share data, unless otherwise stated)

18.   **Subsequent Events-continued**

e)   **Convertible Notes:** On April 16, 2013, Deutsche Bank, as trustee, notified the Company of its failure to make the interest payment due April 15, 2013 and that if such failure continued for a period of thirty days past April 15, 2013, an event of default would occur under the Notes indenture. On May 17, 2013, the Company was notified that such event of default was occurred and is continuing. As of the date of this report, the outstanding principal amount of the Convertible notes has not been declared immediately due and payable.

f)   **Marfin Swap:** As of the date of this report, accrued and unpaid interest of $0.1 million is outstanding under the Marfin swap.

APPENDIX H

TO

DISCLOSURE STATEMENT
OF EXCEL MARITIME CARRIERS LTD. AND CERTAIN OF ITS AFFILIATES

PENDING LITIGATION AS OF NOVEMBER 18, 2013

| | Defendant (debtor entity) | Type | Jurisdiction | Date of the occurrence of the event giving rise to the claim | Claimant | Amount claimed in $ (unless otherwise indicated)** |
|---|---|---|---|---|---|---|
| 1. | CASTALIA SERVICES LTD. | Cargo Claim | Peru | 04.04.2008 | San Fernando S.A. | 45,000.00 |
| 2. | EXCEL MARITIME CARRIERS LTD. *et al.* | Employee Claim | Greece | Action served: 05.10.2011 Action reinstated and served: 10.07.2012 | Dimos Iliopoulos | 180,000 EUR 20,000 EUR 56,267.32 |
| 3. | GRAIN EXPRESS SHIPCO LLC | Cargo Claim | UAE | 06.04.2012 | Omar Insurance Co. | $15,309.70 |
| 4. | HARVEY DEVELOPMENT CORP. | Cargo Claim | China | 10.08.2013 | PICC P&C Kaiyuan Branch | RMB 94,239.00 |
| 5. | IRON BRADYN SHIPCO LLC | Cargo Claim | Italy | 15.06.2010 | Luis Dreyfus Commodities Italia S.p.A. | 183,378.00 |
| 6. | IRON KALYPSO SHIPCO LLC | Cargo Claim | Pakistan | 21.12.2012 | EFU General Insurance Ltd | 10,600.00 |
| 7. | MARIAS TRADING INC. | Cargo Claim | England | 09.07.2010 | WK Webster | 40,000.00 |

**The Debtors believe that a number of these claims are covered in whole or in part by the Debtors' existing insurance coverage.